**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **TERRENCE LONG and** | ) |
| **BARRY BARR,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:07-CV-881-WKW** |
| | ) |
| **ARONOV REALTY MANAGEMENT,** | ) |
| **INC.,  AMY CLARK KNUDSEN, and** | ) |
| **MEIYING FORNEY,** | ) |
| | ) |
| **Defendants.** | ) |

**BRIEF IN SUPPORT OF DEFENDANT MEIYING FORNEY'S**
**MOTION FOR SUMMARY JUDGMENT**

**COMES NOW**, the defendant, Meiying Forney, by and through her undersigned counsel of record, and submits this Brief in support of her Motion for Summary Judgment contemporaneously filed herewith, and states as follows:

**JURISDICTION AND VENUE**

Plaintiffs Terrence Long and Barry Barr (hereinafter "Long" and "Barr") filed this Complaint against Aronov Realty Management, Inc. (hereinafter "Aronov"), Amy Clark Knudsen (hereinafter "Knudsen"), and Meiying Forney (hereinafter "Forney") alleging discrimination on the basis of race pursuant to 42 U.S.C. §1981 and 42 U.S.C. §1982. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (Federal Question), 28 U.S.C. §1343 (Civil Rights), and 28 U.S.C. §2201, 2202 (Injunctive Relief).  Venue is proper in this case pursuant to 28 U.S.C. §1391.  This defendant does not contest personal jurisdiction or venue in this case.

## STATEMENT OF THE CASE

Long and Barr filed this Complaint on or about October 2, 2007, naming as defendants, Aronov, Knudsen, and Forney.  (Doc.1).

On or about October 25, 2007, the defendant Forney filed her Answer to the plaintiff's Complaint making specific and general denials to the allegations therein, as well as setting forth an averment of her affirmative defenses.  (Doc.10).

This Honorable Court entered in this case on or about November 26, 2007 a Uniform Scheduling Order (Doc.16) and a Briefing Order (Doc.17).  The Dispositive motion deadline was extended by this Honorable Court to June 27, 2008 (Doc.30) pursuant to a joint motion filed by the parties (Doc.28).

This Motion for Summary Judgment is being filed in compliance with this Court's Uniform Scheduling Order and Briefing Order as set forth above.

## STATEMENT OF THE FACTS

Plaintiff Long is an African-American male and is a former major league baseball player.  (Par.8, Doc.1).  Plaintiff Barr is a Caucasian male and the former owner of the Celebrations nightclub in Montgomery.  (Par.9, Doc.1).  In April 2007, Long approached Barr concerning his interest in opening a sports bar in Montgomery, Alabama that would cater primarily to the African-American community.  Long asked Barr to be his partner in this venture and to work on finding a location for the business.  (Par.10, Doc.1).  In fact, Long has only met with bar three times concerning any efforts to open up a sports bar or find a location.  (Barr depo. p.66, l.22-23; p.67, l.1-9).

In May 2007, Barr set up a meeting with defendant Knudsen, to view the former Pure Country location at the LeCroy Shopping Village at 3600 Debbie Drive.  The

LeCroy Shopping Village is owned by Meiying Forney. (Par. 12, Doc.1). Knudsen brought up the fact that they had great tenants at LeCroy and had no problems. She also stated they did not want the same type of problems that existed at the Celebrations nightclub. (Par.14, Doc.1). The Pure Country property was not in good shape when Barr viewed it and Knudsen informed him that the owner was unwilling to put any money into the building, so all improvement would have to be made by the tenants. (Par.17, Doc.1). Barr discovered the LeCroy Shopping Village was for sale and approached Knudsen with a $1 million offer to purchase the shopping center. This offer was turned down with no counteroffer. (Par.20, Doc.1).

Mark Cranage, the owner of Woodmere Tavern in Montgomery contacted Knudsen to set up a time to inspect the Pure Country location. (Par.24, Doc.1). Knudsen informed Cranage that she would arrange it through the attorney who was handling the bankruptcy. (Par.25, Doc.1). Upon Knudsen's request, Cranage called the bankruptcy attorney, Don Little, and set up a time to view the Pure Country location. On June 13th, Cranage met with Little and toured the Pure Country location. (Par.26, Doc.1).

**AMY KNUDSEN**

Amy Knudsen is a salesperson for Aronov. She has worked for Aronov Companies since 2003. She became a salesperson for Aronov Realty Brokerage, Inc. in August 2006. (Knudsen depo. p.29, l.1-23; p.30, l.1-5). In approximately March or April of 2007, the Pure Country Saloon space in the LeCroy Shopping Village was part of a bankruptcy proceeding. Knudsen was aware of this bankruptcy proceeding. (Knudsen depo. p.75, l.8-23; p.76, l.1-6). Don Little was a lawyer in Montgomery who represented Forney in collection of delinquent accounts and the bankruptcy proceeding involving the

Pure Country Saloon. (Knudsen depo. p.86, l.4-23; p.87, l.1-19). While the bankruptcy stay was in effect, Little had the key to the property. Knudsen had to call and ask Mr. Little to either open the property or drop her off the key, and she immediately returned it back to him. (Knudsen depo. p.78, l.10-14). At the first meeting with Barr, Knudsen quoted a lease price of $4,500 a month. (Knudsen depo. p.118, l.8-12). That price was what the owner wanted out of the property. (Knudsen depo. p.119, l.6-17). Barr never asked Knudsen to write a lease; never told Knudsen he would take the asking amount of $4,500; and never told Knudsen he would take it sight unseen. (Knudsen depo. p.140, l.21-23; p.141, l.1-7). To Knudsen's knowledge, Don Little had never shown the property other than he might have gone and unlocked the property for Doodle Hopper's because they were performing due diligence and getting estimates. Knudsen asked Little to open the door because he had the key. She did not ask him to tour the property like a leasing agent, but simply to unlock the door. (Knudsen depo. p.149, l.1-21). As far as Knudsen was concerned, Little had no authority to negotiate anything other than what had to do with the collections through the bankruptcy court. (Knudsen depo. p.157, l.14-21).

Amy Knudsen knows Meiying Forney's national origin to be Chinese. (Knudsen depo. p.169, l.19-23; p.170, l.1-2). During the time that Knudsen has worked with Forney on properties, she has never instructed or directed Knudsen to lease or not lease, to sale or not sale any properties based on a person's race, religion, national origin, age, etc. (Knudsen depo. 170, l.3-12). Forney has never made any discriminatory remarks about anyone concerning their race, religion, national origin, etc., as long as Knudsen has known her. (Knudsen depo. p.170, l.13-18). Forney lives in California and only comes

to visit Montgomery once or twice a year.  Knudsen's dealings with Forney are either by phone or email on most occasions.  (Knudsen depo. p.171, l.11-23).  As it related to Knudsen's dealings with Barr or Grant Sullivan, Barr's agent, Long's race or nationality was never mentioned to Knudsen.  (Knudsen depo. p.172, l.2-23; p.173, l.1-13).

Forney owns three different locations in the City of Montgomery.  In all of the locations, there are numbers of tenants who are minorities.  According to Knudsen, Forney has never denied anyone's request to lease any of her properties based upon their race, religion, national origin, etc.  (Knudsen depo. p.173, l.14-23; p.174, l.1-6).

According to Knudsen's testimony, Barry Barr, through his agent, Grant Sullivan, made an offer to purchase the LeCroy Shopping Center for a price of $1 million.  That is the only written offer concerning Forney's property that was ever made by Barr or anyone acting on his behalf.  There was no mention of Terrance Long's name in the offer to purchase.  That offer to purchase was communicated to Forney by Knudsen, and that offer was rejected because it was not close to being what Forney wanted for the property.  No counteroffer was made.  The fact that no counteroffer was made was communicated to Grant Sullivan.  Grant Sullivan, nor Barry Barr, ever made a written or oral counteroffer to purchase Forney's property.  Furthermore, there was never an offer by Barr individually in any conversations Knudsen had with him to again purchase the property for any amount other than the rejected $1 million.  Further, there was never an offer from Terrance Long to either lease or purchase the property.  In fact, Amy Knudsen never spoke with Terrance Long or met him before the lawsuit was filed.  (Knudsen depo. p.174, l.7-23; p.175, l.1-23; p.176, l.1-21).  According to Knudsen, she discussed with Barry Barr what Forney wanted for leasing the property.  That amount was $4,500 a

month derived by a request of $9.00 per square foot. According to Knudsen, who is in this business, what Ms. Forney was asking was a current market rate for that type of business property. (Knudsen depo. p.177, l.1-23; p.178, l.1-7). The discussion with Forney about the appropriate dollar per square foot was prior to ever meeting with the plaintiff Barr. (Knudsen depo. p.178, l.8-12). In Knudsen's business, the asking price is generally negotiable. It is not uncommon to negotiate what someone is asking for property and what someone is willing to offer for property. According to Knudsen, she informed Forney of her discussions with Barry Barr on the first occasion she met with Barr, but did not communicate an offer because no formal offer was made by Barr. (Knudsen depo. p.179, l.7-23; p.180, l.1-23; p.181, l.1-5). There was never a communication to Forney about Barr requesting to lease the property. That was because there was never a request by Barr to lease the property. Neither Barr, nor his agent, ever provided a written offer to lease the property. Neither Barr, nor his agent, ever orally made an offer to lease the property. (Knudsen depo. p.181, l.14-23; p.182, l.1-19; p.183, l.5-12).

**BARRY BARR**

Barr, the former owner of the Celebrations nightclub and plaintiff in this case is a convicted felon for drug possession with intent to distribute. (Barr depo. p.12, l.1-8). Barr's civil rights have never been reinstated. (Barr depo. p.229, l.20-23; p.230, l.1-12).

Barr does not know Meiying Forney and has never met her. He does not know her nationality or race. (Barr depo. p.230, l.12-20). According to Barr, there were never any specific references to a position by Forney that he considered to be discriminatory. (Barr depo. p.231, l.8-11). According to Barr, Don Little has never been represented to

him to act as a real estate agent on behalf of Forney.  The only person who has acted as a real estate agent of any kind has been Knudsen.  (Barr depo. p.233, l.11-18).  Barr never saw a document of any kind indicating that the LeCroy Shopping Center was for sale. (Barr depo. p.235, l.8-10).  Barr never had discussions directly with Knudsen about purchasing the LeCroy Shopping Center for $1 million.  All of the negotiations were handled through his agent, Grant Sullivan.  (Barr depo. p.238, l.16-22).  Neither Barr nor Grant Sullivan ever had any discussions directly with Meiying Forney.  (Barr depo. p.238, l.23; p.239, l.1-4).  There was no official agreement between Barr and Long in leasing or purchasing any property.  There was only verbal discussions between the two. With regard to the Pure Country location, nothing had been put in writing between Barr and Long.  (Barr depo. p.244, l.18-23; p.245, l.1-15; p.246, l.1-7).  Barr testified that it was a fair statement that the mayor of the City of Montgomery was trying to shut down Celebrations and that it was further a fair statement that in his attempt to shut down Celebrations, he was getting a lot of negative media attention.  (Barr depo. p.261, l.21-23; p.262, l.1-12).  Barr further testified that unless a person was closely connected with the situation, the average citizen only knew what was being reported in the news media. (Barr depo. p.262, l.13-20).

Barr never made an offer in writing to lease the premises known as the Pure Country Saloon.  (Barr depo. p.281, l.15-19).  Barr never made a verbal offer at the first meeting to lease the premises known as the Pure Country Saloon, even though Knudsen gave him a quote.  (Barr depo. p.281, l.20-23; p.282, l.1-7).  There was no verbal offer or counteroffer to what Knudsen told him the first day.  (Barr depo. p.284, l.5-11). Admittedly, Barr offered to purchase the property from Forney less than his agent even

said it could be worth.  (Barr depo. p.285, l.15-23; p.286, l.1).  In fact, Barr did not

begrudge Forney if she did not feel like a $1 million was an appropriate offer regardless

of his race.  (Barr depo. p.286, l.2-23).  In actuality, the contract offered by Barr would

have only netted Forney $900,000 because of a 10% commission.  (Barr depo. p.287, l.6-

23; p.288, l.1-13).

### TERRANCE LONG

Prior to this lawsuit, Terrance Long had never met Amy Knudsen and did not

know her.  (Long depo. p.12, l.16-20).  Long did not know Meiying Forney.  (Long depo.

p.15, l.4-5).  Long had never met Don Little or Grant Sullivan and did not know Grant

Sullivan.  (Long depo. p.16, l.11-13, l.18-22).  According to Long, at no time during any

conversations with Barry Barr about his attempt to lease or buy the LeCroy Shopping

Center, was it ever made known that Long was the problem.  This fact was never made

known to him by Barr.  (Long depo. p.80, l.15-23; p.81, l.1-5).  Barr never told Long that

he told Knudsen what Long's race was.  (Long depo. p.86, l.15-17).  Other than Barr,

Long never made it known to anyone else that he wanted to open up a sports bar.  He

did not know that Barr was a convicted felon.  He did not know anything about Barr when he

ran Celebrations.  He did not know that Barr could not a get a liquor license as a

convicted felon.  Barr did not make that known to Long.  (Long depo. p.91, l.8-23; p.92,

l.1-7).

Long's signature is not on any documents to lease or purchase the LeCroy

Shopping Center or the location formerly known as the Pure Country Saloon which is the

subject of this lawsuit.  (See Exhibit 1).

## SUMMARY JUDGMENT STANDARD

Rule 56(c), <u>Federal Rules of Civil Procedure</u>, provides that summary judgment is due to be entered in favor of the moving party if "there is no genuine issue as to any material facts." <u>Fed.R.Civ.P.</u> 56(c). The moving party must first come forward with proof of the absence of genuine issues of material facts. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 321 (1986). The moving party may meet this burden by identifying portions of the pleadings, depositions, answers to interrogatories, admissions or affidavits that demonstrate the absence of the issue of material facts. <u>Id.</u> at 323. On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158 (1970); <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir.1996).

Rule 56(c) of the <u>Federal Rules of Civil Procedure</u> provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law: <u>Fed.R.Civ.P.</u> 56(c). This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the non-movant either by submitting affirmative evidence negating an essential element of the non-movant's claim or by demonstrating that the non-movant's evidence itself is insufficient to establish an essential element of his or her claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The burden then shifts to the non-movant to make a showing sufficient to establish the existence of an essential element to its claims, and on which it bears the burden of proof at trial. To satisfy this burden, the non-movant cannot rest on its

pleadings, but must, by affidavit or by other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). If the nonmoving party does not respond to a motion for summary judgment, the court may grant a motion for summary judgment in favor of the moving party, if defendant's presentation is sufficient to justify the court's conclusion. Id.

The Court's function in deciding a motion for summary judgment is to determine whether there exists genuine, material issues of fact to be tried; and if not, whether the movant is entitled to a judgment as a matter of law. See Dominick v. Dixie Nat'l Life Ins. Co., 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 258 (1986); see also De Long Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499 (11th Cir.1989).

Consideration of a motion for summary judgment does not lessen the burden on the nonmoving party, i.e., the nonmoving party still bears the burden of coming forth with sufficient evidence on each element that must be proved. Earley v. Champion Intern. Corp., 907 F.2d 1077, 1080 (11th Cir. 1990); See Celotex, 477 U.S. at 322-23.

If on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, the court must grant summary judgment for the defendant. Earley, 907 F.2d at 1080 (citations omitted). In Earley, the Court of Appeals further emphasized, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted; accord <u>Hudson v. Southern Ductile Casting Corp.</u>, 849 F.2d 1372, 1376 (11th Cir.1988).  <u>Earley</u>, 907 F.2d at 1080-81.

### ARGUMENT

The plaintiffs in this case allege two causes of action.  Count I, brought under 42 U.S.C. §1981, alleges that "the failure to lease or sale the property as described above was based upon the plaintiff Long's race, the plaintiff Barr's affiliation with Long, and both of the plaintiff's affiliation with African-Americans."  (Par.33, Doc.1).  The plaintiffs allege that the acts of the defendants violated the plaintiffs' rights guaranteed under 42 U.S.C. §1981 to make and enforce contracts without regard to race.  (Par.34, Doc.1).

Count II, brought under U.S.C. §1982, alleges that "the failure to lease or sale the property as described above was based upon the plaintiff Long's race, the plaintiff Barr's affiliation with Long, and both of the plaintiffs' affiliation with African-Americans." (Par.38, Doc.1).  The plaintiffs alleges the defendants violated their rights guaranteed by 42 U.S.C. §1982 to purchase, lease and to hold real and personal property without regard to race.  (Par.39, Doc.1).

§1981 protects an individual's right to be free from racial discrimination in the making, performance, modification, enforcement, and termination of contracts.  <u>Perdue v. Pilgrim Pride</u>, 237 F.App'x 432, 433 (11th Cir.2007).  The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and

equally in the marketplace.  Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 949 (11th Cir.1991).

To succeed on a cause of action under §1981, a plaintiff must establish:  (1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and, (3) that the discrimination concerned one or more of the activities enumerated in the statute.  Jackson v. Bellsouth Telecomms., 372. F.3d 1250, 1270 (11th Cir.2004).  To survive summary judgment, plaintiff must identify a genuine issue of material fact as to each element.  Kinnon v. Arcoub, Gopman & Assocs., Inc., 490 F.3d 886, 891 (11th Cir. 2007).   §1981 requires proof of intentional discrimination.  Brown, supra at 949.  Similarly, for a §1982 claim, plaintiff must demonstrate that he or she was deprived of a property interest because of an intentional act based on racial animous.  Humphrey v. United Parcel Service, 200 F.App'x 950, 952 (11th Cir.2006).

In evaluating motions for summary judgment regarding discrimination claims where a plaintiff has no direct evidence of discrimination, courts generally use the burden-shifting scheme set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973).  Under this analytic scheme, a plaintiff must first establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1817.  Once a plaintiff establishes a prima facie case, which thereby permits an inference of discrimination, the defendant must articulate some legitimate, non-discriminatory reason for the adverse action and must produce some evidence in support of that reason.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  If the defendant is able to meet

this burden of production, the plaintiff, to survive summary judgment, must then present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination.  Burdine, 450 U.S. at 253.  The "ultimate question" is not whether a plaintiff has established a prima facie case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1184 (11th Cir. 1984).  The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination.  Burdine, 450 U.S. at 253.

The analysis for determining whether intentional discrimination in violation of §1981 and §1982 has occurred is the same as that used in Title VII discriminatory treatment causes, the McDonnell Douglas/Burdine framework.  Brown, *supra* at 949.  In that analysis, a three-part test is utilized to determine the motivation of the defendant in taking the challenged action.  The initial burden rest with the plaintiff to demonstrate by a preponderance of the evidence a prima facia case of discrimation.  Brown *supra* at 949. This burden is not honorous and can be met by demonstrating that the plaintiff is a member of a minority group, that he submitted an application or bid which met the requirements for an available contract, that the application or bid was ultimately rejected, that the contract was eventually given to an individual who is not a member of a protected class.  Brown, *supra*.  See also, Bafford v. Township Apartments Assoc., 2007 WL 4247763 (M.D. Fla.).

The defendant must then come forth with evidence demonstrating legitimate, non-discriminatory reasons for its conduct.  This burden on the defendant is one of production, not persuasion.  Finally, once the defendant satisfies this obligation, the

plaintiff must produce evidence suggesting that those proffered reasons are merely a pretext, the real reason for the action having been based on race.  Brown, *supra*.

Here, the plaintiff's evidence against Forney fails and summary judgment must be granted.  Barr is a white male.  His claim must be based upon his association with Long and/or his claim that he was once associated with a club that was predominantly black.  The evidence is uncontradicted that Barr did not know Forney and did not deal directly with Forney.  Barr alone made an offer to purchase the property for an amount that was admittedly less than what his own agent indicated that it was worth.  Furthermore, that offer was rejected by Forney without knowledge of Barr's race or his former alleged association with a nightclub that was predominantly black.  Long was not a party to the contract presented to Forney to purchase the property.  Furthermore, Long's race was never communicated to Forney regardless of the fact that he was not a party to the contract to purchase the LeCroy Shopping Village.

Furthermore, no offer was ever made or communicated to Forney that Barr and/or Long wanted to lease the space formerly known as the Pure Country Saloon.  Without an offer, there can be no discriminatory action on Forney's part in ultimately leasing the property to Doodle Hopper's, which was a tenant located adjacent to the Pure Country Saloon who, as the evidence in this case suggests, was interested in acquiring the Pure Country Saloon space even before Barr initially met with Knudsen.

Simply stated, plaintiff Barr and plaintiff Long have no evidence that Forney knew of either Barr or Long's race or of either of their affiliations with the African-American community.  This lack of evidence relates directly to whether Forney acted with the intent to discriminate on the basis of race, the second factor enumerated in cases

before this Court.  See <u>Jackson v. Bellsouth Telecomms.</u>, *supra* at 1270.  See also, <u>Lubetsky v. Applied Card Systems, Inc.</u>, 296 F.3d 1301, 1306 (11th Cir.2002)(cert denied 537 U.S. 1106, 123 S.Ct. 872, 154 L.Ed. 2d 776 (2003)).  In this case, there is no evidence that Forney actually knew of Barr or Long's race or their affiliation with the African-American community prior to her rejection of the offer to purchase which is the only action by either party concerning one or more of the activities enumerated under §1981.  Furthermore, Amy Knudsen, who communicated the information concerning Barr's proposal and Barr's discussions has affirmatively stated that Forney, who lives in California, and is also Chinese and minority herself, never has based any of her business decisions upon a persons' race or national origin.  In this case, defendant's decision to reject the offer to purchase by Barr was simply a matter of business judgment.  This business judgment constitutes a legitimate, non-discriminatory reason for Forney's decision not to accept Barr's offer to purchase.  That legitimate, non-discriminatory business reason places the burden on the plaintiff produce evidence suggesting that such reason is merely a pretext.  This cannot be done by the plaintiffs in this case and summary judgment is due to be granted.  No reasonable trier of fact can conclude that Forney knew of Barr or Long's race or their affiliation with the African-American community when she turned down the offer to purchase the shopping center for $1 million.  See <u>Cooper v. Southern Co.</u>, 260 F.Supp.2d 1352, 1364 (N.D. Ga.2003).

Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.  <u>Silvera v. Orange Co. School Bd.</u>, 244 F.3d 1253, 1262 (11th Cir.2001).  Even if Knudsen knew of Long's race, or Barr's affiliation with the African-American community or any of the other allegations alleging racial animus,

Knudsen's knowledge cannot be imputed to Forney.  The plaintiffs' failure to present any evidence to this Court that Forney knew of either parties' race or their association with the African-American community is fatal to the plaintiffs' §1981 and §1982 claims.  It is not the Court's responsibility to second-guess Forney's reasons for not accepting Barr's offer.  The only issue is whether the reasons given are merely a pretext for discriminatory intent.  Brown v. American Honda Motor Co., *supra*.  Forney's decision to reject Barr's offer could have been for a good reason, bad reason or no reason at all, so long as it was not for discriminatory reasons.  Id.  In this regard, Forney's proffered reasons for rejecting Barr's offer is unquestionably legitimate and non-discriminatory.  Barr made an offer to purchase the shopping center for an amount less than it was worth.  Forney rejected that offer.  Forney stood to receive only $900,000 under Barr's offer to purchase when her previous asking price was $1.9 million.  Further, there is no evidence that LeCroy had even been placed on the market for sale by Forney.  Barr, nor anyone on his behalf, made a counteroffer.  Further, no offers were made by Barr, Long, or anyone on their behalf to lease any part of the shopping center.

To avoid summary judgment, the plaintiffs must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.  Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir.1993).  A reason is not a pretext for discrimination, however, unless it is shown both that the reason was false, and that discrimination was the real reason.  Brooks v. County Commission of Jefferson Co., Alabama, 446 F.3d 1170, 1173 (11th Cir. 2006).

Here, plaintiffs' evidence against Forney is non-existent.  A rational fact-finder could not conclude that Forney was aware of either Barr or Long's race or their alleged

16

affiliation with the African-American community.  Further, a rational fact-finder could not conclude that Forney's reason for rejecting Barr's offer to purchase the shopping center was a cover for discrimination.  Forney is therefore entitled to a summary judgment on plaintiffs' §1981 and §1982 claims.

## CONCLUSION

WHEREFORE, the defendant Forney moves this Honorable Court to grant to her a summary judgment on all of the plaintiffs' claims.

Respectfully submitted this 27th day of June, 2008.


       /s/    N. Gunter Guy, Jr.
N. Gunter Guy, Jr.
Attorney for Defendant, Meiying Forney


OF COUNSEL:

Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, AL  36102-2148
Telephone:     (334) 387-7680
Facsimile:      (334) 387-3222
gguy@ball-ball.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system and have also served a copy of the following by e-filing or mailing the same by United States mail properly addressed and first class postage prepaid:

C. Michael Quinn
Kevin W. Jent
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL  35203

Charles A. Stewart
Quindal C. Evans
Bradley, Arant, Rose & White
401 Adams Ave., Ste. 780
Montgomery, AL  36104

                                        s/ N. Gunter Guy, Jr.
                                        OF COUNSEL

**FREEDOM COURT REPORTING**



1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3           NORTHERN DIVISION

4

5  TERRENCE LONG & BARRY BARR,

6         Plaintiffs,

7                      CIVIL ACTION NO:

8  v.               2:07-CV-00881-WKW-WC

9

10  ARONOV REALTY MANAGEMENT, INC.,

11  AMY CLARK KNUDSEN, & MEIYING

12  FORNEY,

13         Defendants.)

14      S T I P U L A T I O N S

15

16        IT IS STIPULATED AND AGREED

17  by and between the parties through their

18  respective counsel, that the deposition of

19  *****************************************

20         AMY KNUDSEN

21  *****************************************

22  may be taken before Kim Duckett,

23  Commissioner, at 401 Adams Avenue,

1      Q  Okay.  When you got your real

2  estate license, you went to work for

3  Aronov?

4      A  Yes, sir.

5      Q  Did you work for any other real

6  estate company before you came to work for

7  Aronov?

8      A  No, sir.

9      Q  And have you worked for Aronov --

10  is Aronov the only real estate company

11  that you have worked for?

12      MR. STEWART:  Object to form.

13      A  Yes, sir.

14      Q  And so you have worked for them

15  since 2003?

16      A  Yes, sir.

17      MR. STEWART:  Object to form.

18      Q  And when I say them so that he

19  won't object anymore, I'm talking about

20  any, all of the Aronov companies.  You

21  have worked only for Aronov companies in

22  real estate; is that right?

23      A  I've worked for Aronov Realty

30

1    Management, Inc., and then I work now for

2    Aronov Realty Brokerage, Inc.

3        Q   Got you.  And you went to Aronov

4    Brokerage August of '06?

5        A   That's when my license changed.

6        Q   Did your license change before you

7    went or after you went to the brokerage

8    company, or was it around the same time?

9        A   I would say approximately that

10   time.

11       Q   Okay.  Now, when you were with the

12   management company, who was your immediate

13   boss?

14       A   My broker and immediate supervisor

15   was Scott Harris -- is Scott Harris, was

16   Scott Harris.

17       Q   Was Scott Harris.  Okay.  And tell

18   me what you did for the management group.

19   What were your duties?

20       A   My responsibility was to market and

21   lease office portfolio.

22       Q   Now, did --

23       A   Specifically, Executive Park.

# FREEDOM COURT REPORTING

75

1    conversation, but we talked regularly

2    about all different issues with the

3    tenants.

4        Q  How much time do you think elapsed

5    between the time he told you they were

6    trying to work it out and the space became

7    available to lease?

8        A  Well, the space was not available

9    to lease until there was a lift of stay

10   granted from the bankruptcy court.

11       Q  At what point in time did you learn

12   that that piece of property -- that that

13   particular piece of the shopping center

14   was part of a bankruptcy proceeding?

15       A  I believe it was sometime in --

16   sometime in March or April.

17       Q  Okay.  Because you told me earlier

18   that in April of '07, that was when they

19   severed their ties with Pure Country.

20       A  Well, you would have to check the

21   dates on the bankruptcy proceeding, but I

22   believe that he filed two different types

23   of bankruptcy.  One is a reorganizational

FREEDOM COURT REPORTING

76

1    bankruptcy where he could have reaffirmed

2    the debt or Chapter 7, which means the

3    debt is discharged.

4        Q  Did you ever see any of the

5    paperwork on the bankruptcy?

6        A  Yes.

7        Q  Let me show you what I've got here.

8    Let me show you this document.  Have you

9    seen this document before?

10   (Whereupon, Plaintiff's Exhibit 2 was

11   marked for identification and the same is

12   attached hereto.)

13       A  No.

14       Q  No.  And the reason I'm showing it

15   to you, it appears to be a motion that was

16   filed by Don Little trying to get the

17   property -- the stay lifted from the

18   property so that -- I guess so that it

19   could be leased.  Were you aware at any

20   point in time that Don Little was

21   attempting to get the stay lifted on the

22   property?

23       A  Yes.

## FREEDOM COURT REPORTING

78

Q   And he was still a friend of yours?

A   Yes.

Q   Okay.   Prior to -- well, before we move there, let me see if I've got this all covered.   Was there a point in time -- well, withdraw that and ask this:   While the stay was in effect as part of the bankruptcy, were you still allowed to show the property to prospective tenants?

A   I did not have a key to the property.   I had to call and ask for Mr. Little to either open the property or drop me off the key, and I immediately returned it back to him.

Q   But just because it was part of the bankruptcy, there was a stay on it as part of the property, that didn't mean that you couldn't show the property, correct?

A   Correct.

Q   And was it your understanding that the reason for the stay was because the person who owned the establishment that was paying the rent on the property had

# FREEDOM COURT REPORTING

86

1    anything about him at all?

2        A   No.

3        Q   Do you know how long -- I'm

4    switching gears a little.  Do you know how

5    long Mr. Little had been representing Ms.

6    Forney?

7        A   No.

8        Q   I am assuming -- had you had any

9    other dealings with the lawyer Little,

10   with Don Little and Ms. Forney?  In other

11   words --

12       A   Yes.

13       Q   So he had represented her in some

14   other stuff, too?

15       A   Collections.

16       Q   And that -- okay.  Collections.

17   Okay.  So he represented her, as far as

18   you knew, for collections, and he was

19   representing her in the bankruptcy?

20       A   I have no personal knowledge of his

21   representation arrangements.

22       Q   Okay.

23       A   I don't know that at all.

## FREEDOM COURT REPORTING

87

1    Q  I understand, but let me explore

2  that just a little bit.  You've told me

3  that you knew him personally.

4    A  Yes.

5    Q  And you also knew him

6  professionally.

7    A  Yes.

8    Q  The professionally, was it through

9  your association with Ms. Forney that you

10  knew him professionally?

11    A  Not -- not --

12    Q  Not just that?

13    A  Correct.

14    Q  Okay.  But you did know that he

15  represented Ms. Forney in some capacity?

16    A  I knew that he was working on

17  collections matters for tenants that had

18  not paid their rent pursuant to their

19  lease.

20    Q  And you knew that before you ever

21  knew that he was involved in this

22  particular piece of property, Pure

23  Country?

**FREEDOM COURT REPORTING**

118

1    Can you remember anything else that y'all

2    may have discussed in that first meeting

3    that you haven't told me?

4         A   Security.   That's another -- let's

5    see.   I believe we did discuss the rent.

6    I believe we had a cursory discussion of

7    the rent.

8         Q   Did you quote him a price?

9         A   I believe I did.

10        Q   Do you remember what it was?

11        A   I believe it was forty-five hundred

12   a month.

13        Q   How did that compare to what the

14   other tenant was paying?   If you don't

15   know, I guess we can look.   The landlord

16   creditor motion that I showed you earlier,

17   it shows that the rent was two thousand

18   eight hundred -- it was twenty-eight

19   hundred dollars.   Do you remember that as

20   being how much Tony Fannin and his group

21   were paying for it?

22        A   I did not have any knowledge of

23   what actually Tony Fannin was paying or

# FREEDOM COURT REPORTING

119

1    did pay to that point because there had

2    been some discussions with the landlord

3    and Mr. McGharr and Mr. Fannin when they

4    were trying to work things out.

5        Q   So -- okay.

6        A   But I didn't price it.  Ms. Forney

7    priced what she wanted out of that

8    property.  That was what she wanted me to

9    quote.

10       Q   So the -- what did you say it was?

11   Forty-eight hundred?

12       A   Forty-five hundred.

13       Q   Forty-five hundred?

14       A   I think that's what I quoted.

15       Q   So the forty-five hundred came from

16   Ms. Forney and not from you?

17       A   That's correct.

18       Q   And when did she tell you that

19   that's how much she wanted to quote?

20       A   I think in, you know, one of our

21   initial discussions.

22       Q   Okay.  You knew it was in

23   bankruptcy, right, but you didn't know

140

1    quicker if can you answer yes or no to

2    these questions, okay, as best you can.

3    If it needs an explanation, you can offer

4    it, but we've been here a long time and I

5    know everybody is getting tired and I know

6    I'm getting tired and I know you're

7    getting tired and we can get on through

8    this.  It is not necessary for you to tell

9    me things over and over again.  I get it

10    the first time, okay?

11         Did you ever tell -- in this

12    meeting, did you ever tell Mr. Barr that

13    you could not show him the building

14    because it was tied up in bankruptcy?

15         MR. STEWART:  Which meeting are you

16    talking about?

17         Q   I'm talking about the telephone

18    conversation, either one of them.

19         MR. STEWART:  Object to form.

20         A   I don't remember.

21         Q   Okay.  Did he ever ask you to write

22    a lease?

23         A   No.

## FREEDOM COURT REPORTING

141

1      Q  Did he ever tell you that he would

2  take the asking amount of forty-five

3  hundred dollars?

4      A  No.

5      Q  Did he ever tell you that he would

6  take it site unseen?

7      A  No.

8      Q  Did you ever tell him that there

9  was a lease pending and that you were

10  actually working out the details of that

11  lease with somebody else?

12      A  Yes.

13      Q  And that would have been Doodle

14  Hoppers?

15      A  Yes.

16      Q  Okay.  Are you familiar with the

17  Woodmere Tavern?

18      A  Yes.

19      Q  Have you frequented the Woodmere

20  Tavern?

21      A  I have -- yes, I have frequented it

22  back in '94 and '95.

23      Q  Okay.  Did you know Mike Morin?

## FREEDOM COURT REPORTING

149

1      Q   Had Mr. Little shown the property

2   before this that you know of?

3      A   I do not know other than he might

4   have gone and unlocked the property for

5   Doodle Hoppers because they were getting

6   due diligence and they were getting

7   estimates on the vent hood and the gas

8   lines and there was a lot of pest control,

9   so he might have opened it without me

10  knowing.  They would have contacted him

11  directly.

12     Q   At the time that you asked -- if

13  you asked Mr. Little to show the property,

14  because I think you've indicated --

15     A   I asked him to open the door.  He

16  had the key.  I did not say please tour

17  the property like a leasing agent.  I

18  asked him to open -- unlock the door.

19     Q   Are you now sure that that's what

20  you did?

21     A   For health and safety.

22     Q   Are you now sure that that is what

23  you did rather than telling Mr. Cranage to

**FREEDOM COURT REPORTING**

157

1    any --

2         MR. STEWART:  Wait, wait.  Let him

3    ask a question and then answer that

4    question, please.  You weren't finished,

5    Michael.

6       Q  So this would have been the only

7    time that you would have requested him to

8    go over there and open up the property?

9       A  I think I already answered that.

10   It's possible that he opened the property

11   for Doodle Hoppers.  It's possible.  But

12   he never had the key to any other property

13   that I know of.

14      Q  Okay.  And as far as his

15   possibility to negotiate a lease for any

16   of those properties, you don't know

17   whether he had that authority or not?

18      A  In this situation, he had no

19   authority to negotiate anything other than

20   what had to do with the collections

21   through the bankruptcy court.

22      Q  Okay.  How do you know that?

23      A  How do I know that?  Well, I do not

**FREEDOM COURT REPORTING**

169

1    this deposition?

2        A   I took a tiny bit of Adderall.

3        Q   Are you prescribed Adderall for

4    anything in particular?

5        A   ADD.

6            MR. QUINN:  Aren't we all.  I think

7    that's all, gentleman.

8            MR. GUY:  I have just a few

9    questions.

10           MR. QUINN:  Thank you.

11           THE WITNESS:  You're welcome.

12

13   EXAMINATION BY MR. GUY:

14       Q   Ms. Knudsen, I want to just ask you

15   a few follow-up questions.  I know it has

16   been a long day, so I will try be brief,

17   okay?

18       A   Okay.

19       Q   And I may jump around just a little

20   bit because, obviously, we don't need to

21   go over some things that have already been

22   talked about or discussed.  What

23   nationality is Meiying Forney, for the

**FREEDOM COURT REPORTING**

170

1    record?

2        A   She is Chinese.

3        Q   And during the time that you have

4    worked with her on her properties, has she

5    ever instructed you or directed you to

6    lease or not lease, to sell or not sell

7    any properties based upon a person's race,

8    religion, national origin, age, et cetera,

9    any criteria such as that?

10       A   Never.  And in addition, she never,

11   ever has asked what the race, creed,

12   anything.

13       Q   Have you ever known her during the

14   time that you have worked with her to make

15   any kind of discriminatory remarks about

16   anyone concerning their race, religion,

17   national origin, et cetera?

18       A   No.

19       Q   Have you ever known her to make

20   during the time that you've known her

21   socially and, you know -- well, let me ask

22   you this:  Do you even know her socially

23   other than the times that she's come into

## FREEDOM COURT REPORTING

171

1    town for business?

2       A   It's difficult to be social long

3    distance, but she does share about -- she

4    does share about her daughter, Sophia.

5    She loves her family and her daughter

6    and --

7       Q   In any social setting, have you

8    ever known her to make any discriminatory

9    remarks about anybody?

10      A   Never.

11      Q   Okay.  And again for the record,

12   let me ask you this:  I think Mr. Quinn

13   did ask you, but Ms. Forney lives in

14   California; is that correct?

15      A   That's correct.

16      Q   And how often would you say she

17   probably even comes to Montgomery on an

18   annual basis as an average?

19      A   Maybe once or twice a year.

20      Q   So most of -- other than when she

21   comes to town, most of your dealings with

22   her are either by phone or by E-mail,

23   probably?

**FREEDOM COURT REPORTING**

172

1    A   Yes.

2    Q   In this particular instance, I know

3    that Mr. Quinn asked you a series of

4    questions about those initial

5    conversations that you had with Grant

6    Sullivan as it related to him having a

7    client who was a, I believe -- and I don't

8    want to misquote -- was a baseball player

9    that was interested in opening a sports

10   bar, right?

11   A   Correct.

12   Q   And that line of questioning there,

13   I don't think Mr. Quinn asked you, but if

14   he did, I apologize, was it ever made

15   known to you at any time during those

16   conversations that Mr. Long was black?

17   A   No.

18   Q   When was the first time that you

19   were made known that Terrence Long was

20   black?

21   A   At this table, at the deposition of

22   Barry Barr.

23   Q   Okay.

**FREEDOM COURT REPORTING**

173

1    A   For all I know, Mark Cranage could

2    be black or African-American.

3    Q   But as it related to your dealings

4    with Mr. Barr and as it related to your

5    dealings with Grant Sullivan, all you knew

6    is that there was a person interested in

7    opening a sports bar who was a baseball

8    player?

9    A   Correct.

10   Q   But his race, nationality,

11   religion, none of those things were ever

12   mentioned in those conversations?

13   A   No.

14   Q   And you mentioned in your direct

15   testimony, I believe, that in all of the

16   locations which Ms. Forney owns -- and I

17   believe there were three different

18   locations, properties she owns here in

19   Montgomery, right?

20   A   Yes, sir.

21   Q   In all of those locations, there

22   are tenants who are minorities, correct?

23   A   Absolutely.

**FREEDOM COURT REPORTING**

174

Q   And in any of those locations that she owns here in Montgomery, has she ever denied anybody the request to lease it based upon their race, religion, national origin, or that kind of thing?

A   Never.

Q   Exhibit number 4 that's in front of you, Ms. Knudsen, is the offer, as I understand it, by Barry Barr and witnessed by Grant Sullivan to purchase the property, the property LeCroy shopping center, owned by Ms. Forney for a purchase price of a million dollars; is that right?

A   Yes.

Q   Is that the only written offer -- listen to my question.  Is that the only written offer concerning Ms. Forney's property that was ever made by Mr. Barr or anyone acting on his behalf in this case?

A   Yes.

Q   And is there any mention of Mr. Long's name in this Exhibit 4?

A   No.

**FREEDOM COURT REPORTING**

175

1     Q   And that offer to purchase was

2   communicated to Ms. Forney, correct?

3     A   Yes.

4     Q   And I believe you said earlier that

5   was rejected because it wasn't even close

6   to being what she was wanting for the

7   property, right?

8     A   Correct.

9     Q   And no counteroffer was even made,

10   correct?

11    A   She chose not to make a

12   counteroffer.

13    Q   And I believe you said you

14   communicated that to Grant Sullivan,

15   correct?

16    A   Yes.

17    Q   And in response to that

18   communication to Grant Sullivan, was there

19   ever any counteroffer made by Grant

20   Sullivan or anyone that he was acting for

21   for another price on Ms. Forney's

22   property?

23    A   No, sir.

## FREEDOM COURT REPORTING

176

Q  Okay.  And I should say written or oral, was there ever another counteroffer from Grant Sullivan or anybody he was acting for?

A  No, sir.

Q  Was there ever another offer by Mr. Barr individually in any conversations you had with him to again purchase the property?

A  No, sir.

Q  For a higher amount, I'm saying, than one million dollars?

A  No, sir.

Q  Have you ever had an offer from Terrence Long to either lease or purchase the property that's the subject of this lawsuit either in writing or orally?

A  No.  I've never spoken with Terrence Long other than in this --

Q  Other than here in his deposition?

A  Yes.

Q  Now, earlier, and I hope I get the context right, I believe when you said

**FREEDOM COURT REPORTING**

177

1    that Mr. Barr initially met with you there

2    at the Pure Country Saloon the first time

3    that a discussion was had about what Ms.

4    Forney wanted in the lease, I believe you

5    said forty-five hundred dollars a month,

6    right?

7         A   That's what she was asking.

8         Q   Okay.  And that's what you

9    communicated to him?

10        A   Yes.

11        Q   And then there was a question, I

12   believe, by Mr. Quinn as to -- I shouldn't

13   state it that way.  Let me just say it

14   this way:  That forty-five hundred dollars

15   a month, as I understood your earlier

16   testimony, was derived by a dollar per

17   square foot, right?

18        A   Yes.

19        Q   And that dollar per square foot,

20   that forty-five hundred dollars was just

21   the number of square feet in the Pure

22   Country Saloon times what Ms. Forney

23   wanted dollar per square foot, correct?

**FREEDOM COURT REPORTING**

178

1      A  Yes.

2      Q  And what she wanted dollar per

3  square foot, that had been discussed with

4  you, I guess, and Ms. Forney as to what

5  was a current market rate for that type of

6  business property?

7      A  Yes.

8      Q  Okay.  And was that discussion with

9  Ms. Forney about the appropriate dollar

10  per square foot, was that prior to you

11  ever meeting with Mr. Barr?

12      A  Yes.

13      Q  Okay.  And I don't think that was

14  ever established.  If it was, I apologize.

15  You know, how long before your meeting

16  with Mr. Barr was that dollar per square

17  foot established, if you recall?

18      A  It was established as soon as it

19  became apparent that Mr. Fannin would not

20  be able to continue with his lease and

21  that the property would be coming

22  available immediately.

23      Q  And I don't know the first thing

**FREEDOM COURT REPORTING**

179

1    about leasing, so was that dollar per

2    square foot the same kind of dollar per

3    square foot you would have got for some of

4    the other property in the same shopping

5    center?

6        A   Some.  It varies.  It can vary.

7        Q   And then what I understood you to

8    say is that that was an asking price, it

9    could be negotiable?

10       A   Yes.

11       Q   So, I mean, in your business, an

12   asking price -- I mean, an amount you ask

13   per square foot is negotiable?

14       A   Yes.

15       Q   It's not uncommon to negotiate that

16   is what I'm asking.

17       A   It is not uncommon.

18       Q   Somebody makes an offer, and then

19   if somebody doesn't want that, they can

20   make a counteroffer and it can be

21   negotiated, correct?

22       A   It can.

23       Q   And then you also testified, as I

**FREEDOM COURT REPORTING**

180

1    understood it, and correct me if I'm

2    wrong, and I'm going have to paraphrase,

3    so if I misstate my paraphrase -- that at

4    some point, you informed Ms. Forney about

5    your meeting with Barry Barr on that first

6    occasion and that the discussions -- that

7    there were discussions with her about some

8    of the things that he discussed with you

9    about -- about the Pure Country location,

10   and I'm going to say i.e., I believe there

11   was some mention of three hundred thousand

12   dollars in improvements he was saying he

13   wanted and those types of things.  Do you

14   remember that testimony?

15        A   Yes.

16        Q   Okay.  What I wanted to understand,

17   and I don't know if it was made clear when

18   the questions were asked, was that

19   discussion with Ms. Forney by you in the

20   form of you communicating an offer from

21   Mr. Barr to her, or was it something else?

22        A   No.  It was just a follow-up

23   report.  There was no formal offer made at

**FREEDOM COURT REPORTING**

181

1    all.

2    Q   Okay.  So you --

3    A   To lease the space by Mr. Barr.

4    There was never a formal or informal

5    offer, for that matter.

6    Q   I believe you testified and you

7    told Mr. Quinn that later, but I just

8    wanted to make sure I understood when you

9    stated that you informed Ms. Forney about

10   -- and I think you also said that you told

11   her he was the former owner of

12   Celebrations, as well?

13   A   Yes.

14   Q   So you just had some general

15   discussion with Ms. Forney about a meeting

16   you had with Barry Barr, but there was

17   never a communication to Ms. Forney about

18   him requesting to lease the property.  Is

19   that a fair characterization?

20   A   Correct.

21   Q   Because there never was, as you

22   testified earlier, and you correct me if

23   I'm wrong, there never was a request by

182

1    Mr. Barr to lease the property?

2        A   No, there never was a request.

3        Q   You talked in terms --

4        A   There was an expression of desire.

5        Q   Well, obviously, he came there

6    because he was interested in the property.

7    I'm not trying -- I don't want to mix

8    words here.  But he never gave you a

9    written offer to lease the property?

10       A   No.

11       Q   He or Grant Sullivan?

12       A   No.

13       Q   And then orally, Grant Sullivan, he

14   never said we want to lease this property,

15   here's what we'll -- here's what we'll

16   give you or he never said I'll accept

17   whatever terms you put on the table?  He

18   never said anything like that?

19       A   Correct.

20       Q   He expressed an interest in the

21   property or he wouldn't have been there to

22   look at it, correct?

23       A   Correct.

**FREEDOM COURT REPORTING**

183

1      Q  And, obviously, that was what you

2   were there for is to show him the

3   property, correct?

4      A  Yes, sir.

5      Q  Okay.  But there never was a formal

6   or what you would consider an offer in

7   your business to say I want to lease the

8   property?

9      A  There never was.

10     Q  The only thing you ever got was the

11  request to purchase the property?

12     A  Correct.

13     Q  When Ms. Forney leases property --

14  I don't know if you've ever sold any

15  property for her.  When she leases

16  property, does she have attorneys draft

17  the leases and take care of that for her?

18  Does she have somebody that does that

19  or --

20     A  Most leases --

21     Q  I would say reviewed, maybe, by an

22  attorney?

23     A  -- are very simple, standard leases



Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR

2             THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     TERRENCE LONG & BARRY BARR,

6            Plaintiffs,

7     vs.                      CIVIL ACTION NO.

8                              2:07-CV-00881-WKW-WC

9     ARONOV REALTY MANAGEMENT,

10    INC., AMY CLARK KNUDSEN,

11    & MEIYING FORNEY,

12           Defendants.

13          *      *      *      *      *

14          DEPOSITION OF BARRY BARR,

15    taken pursuant to notice and stipulation

16    on behalf of the Defendants, in the

17    offices of Bradley, Arant, Rose & White,

18    401 Adams Avenue, Suite 780, Montgomery,

19    Alabama, before Nicole Paulk, Certified

20    Court Reporter and Notary Public in and

21    for the State of Alabama at Large, on

22    April 15, 2008, commencing at 9:42 a.m.

23

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 12

1    A.    Federal prison.

2    Q.    What federal prison?

3    A.    In Atlanta.

4    Q.    What were you in prison for?

5    A.    Drug possession with the intent to

6          distribute.

7    Q.    When were you convicted of that crime?

8    A.    '89.

9    Q.    Have you ever been convicted of any other

10         crimes?

11   A.    I've had a DUI.

12   Q.    One?

13   A.    Two, back in the '70s.

14   Q.    Any others?  Those are the only three

15         convictions?

16   A.    Right.

17   Q.    Okay.  And before you were in federal

18         prison in Atlanta, where did you live?

19   A.    I lived in Columbus, Georgia.

20   Q.    What was your address in Columbus?

21   A.    I don't recall.

22   Q.    What road was it on?

23   A.    I don't recall.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 66

1      that I was discriminated against, no.  Did

2      I make statements about -- after going --

3      changing my format to a hip hop format and

4      having the -- you know, being treated

5      different, yes.  I made statements to

6      media that I was definitely -- and I was

7      asked then, was it a race thing, and I

8      said absolutely.  I mean, I've got 14

9      years worth of records and the fire

10     department was in my place more in six

11     months than it had been the previous 13

12     years.

13  Q.   Okay.  Other than with Celebrations, did

14     you ever claim that you were the victim of

15     discrimination?

16  A.   No.

17  Q.   So you're saying the very first time you

18     claimed victim of discrimination is when

19     you went to the hip hop format?

20  A.   Correct.

21  Q.   Tell me what you mean by that.

22  A.   Hip hop?

23  Q.   No, discrimination -- you were the victim

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 67

1           of discrimination.  What do you mean you

2           were the victim of discrimination when you

3           went to the hip hop format?

4     A.    Well, it was very obvious that after being

5           there 14 years and all of a sudden, when

6           we went to a black format -- and just like

7           I said, you know, everything was treated

8           differently.  I mean, I had a city

9           councilman, you know, tell me I needed to

10          change my format to a country western.

11    Q.    Who was that city councilman?

12    A.    Glenn Pruitt.

13    Q.    You said the --

14                    MR. QUINN:  Tell him all of it.

15                    Give him the history.

16    Q.    You said the fire department came in your

17          store more in the two and a half years

18          than in the 13 years combined?

19    A.    In six months -- and if I'm not mistaken,

20          I still have all these files also.  But

21          not one time in 14 years was I ever

22          overcrowded or had a violation.

23    Q.    So the fire department coming in was just

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 229

1              that.  Do you need to take a

2              break before we get started?

3          THE WITNESS:  No.

4                  EXAMINATION

5     BY MR. GUY:

6     Q.   Mr. Barr, my name is Gunter Guy, and I

7          represent Meiying Forney in this lawsuit

8          that you've filed along with Mr. Long.

9          I'll try not to repeat myself, as lawyers

10         who come second often say, but sometimes

11         we do.  And it's not for trying to be

12         repetitive in any means, but just

13         sometimes I don't either hear what you

14         said or I'm writing something down or for

15         whatever reason, so I'll try not to do

16         that, but please excuse me if I do.  And

17         I'm going to try to jump around to issues

18         that I have questions about that haven't

19         already been asked.  But first let me ask

20         you this.  Have your civil rights ever

21         been restored -- reinstated because you're

22         a felon?  Have you ever had that

23         reinstated?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 230

1    A.    We're working on a full pardon right now

2          because I was a Vietnam vet, and after

3          seven years, I can apply to have my -- you

4          have to go through a full pardon.  And

5          actually, Wayne Sable has started the

6          process on that.

7    Q.    I understand.  But my question is, they

8          haven't been yet?

9    A.    No.

10   Q.    And they've never been reinstated since

11         you were convicted?

12   A.    No.

13   Q.    All right.  Now, do you know Meiying

14         Forney?

15   A.    No.

16   Q.    Have you ever met her?

17   A.    No.

18   Q.    Do you even know what nationality or race

19         she is?

20   A.    No.

21   Q.    During any of these conversations that you

22         had with Ms. Knudsen, were there any

23         specific references to Ms. Forney's

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 231

1    position on the leasing or sale of this

2    property, specifically references to her?

3    A.    Said that she was not -- would not put any

4    money into leasehold improvements.

5    Q.    Okay.  Were there any specific references

6    to what you claim to be discriminatory

7    statements?  Let me strike that and be

8    more specific.  Were there any specific

9    references to a position by Ms. Forney

10    that you considered to be discriminatory?

11    A.    No.

12    Q.    With regard to statements by Don Little

13    that were on that tape, are you aware of

14    any specific references directly

15    attributable to Ms. Forney that you

16    believe to be discriminatory?

17    A.    I think that was between him and Amy.  I

18    don't remember her name being mentioned.

19    Q.    Okay.  With regard to Don Little, I do not

20    remember if you acknowledged or said -- he

21    is an attorney, correct?

22    A.    Correct.

23    Q.    Did you know that?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 233

1    Q.    I'm just asking you --

2    A.    I read -- I saw where he was handling the

3          bankruptcy, but I'm assuming that's what

4          attorneys do.

5    Q.    All I'm trying to establish here, you

6          understood him to be the attorney

7          representing the bankruptcy, right?

8    A.    I only knew him as the attorney that

9          represented the shopping center.  That's

10         how it was described to me.

11   Q.    All right.  Very good.  Has Don Little

12         ever been represented to you to act as a

13         real estate agent on behalf of Ms. Forney?

14   A.    No.

15   Q.    Okay.  The only person that has acted as a

16         real estate agent of any kind has been Ms.

17         Knudsen, correct?

18   A.    Correct.

19   Q.    All right.  Do you know of any other

20         alleged acts of discrimination, whether by

21         hearsay or personal knowledge, concerning

22         Meiying Forney in the Montgomery

23         community?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 235

1      don't know how --

2    Q.   Well, let me ask you this:  Is that a true

3         statement, that you discovered it was for

4         sale?

5    A.   Well, somebody told me it was for sale.

6    Q.   You just don't remember who?

7    A.   I don't remember who, no.

8    Q.   Have you ever seen a document of any kind

9         that indicated it was for sale?

10   A.   No.

11   Q.   Okay.  And when I say that, I'm

12        specifically referring to the time upon

13        which you made the offer.  Are you aware

14        that it was actually for sale personally?

15   A.   Well, I was told -- I mean, they gave us

16        the rent rolls so we could set the cap

17        rates and come up with a value of the

18        property, so I'm assuming they were saying

19        it was for sale.

20   Q.   So you're making that assumption based on

21        your discussions with Grant Sullivan?

22   A.   Right.  True.

23   Q.   All right.  Just so I'm clear, the

Page 238

1                          substitute that, then, if

2                          you'll just make me another

3                          copy.  That was my question.

4    Q.    All right.  Your attorney has one that's

5          got a signature on it.  I'm sorry, but I

6          didn't get that.

7    A.    I thought I remembered signing it.

8    Q.    So when it indicates in Paragraph 20 that

9          you approached Knudsen with a one million

10         dollar offer, really, Grant Sullivan did,

11         correct?

12   A.    He had the conversation with her over the

13         phone.  He got the cap rates, told me to

14         come by and look at the cap rates.  He

15         said, this is what you should offer.

16   Q.    Okay.  I'm just trying to establish -- I

17         just want to understand your earlier

18         testimony.  You never had a discussion

19         directly with Ms. Knudsen about purchasing

20         it for one million dollars, did you?

21   A.    I don't think so.  I think it was all with

22         Grant.  He handled the whole thing.

23   Q.    And you never had any discussions, nor did

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 239

1        Grant Sullivan have any discussions

2        directly with Meiying Forney, correct, to

3        your knowledge?

4   A.   Not to my knowledge.

5   Q.   I'm going to -- I'm going to be skipping

6        around a little bit, okay?  Let me go to

7        asking you some questions that you were

8        talking about your income.  And I'm going

9        to refer to -- and I don't know the

10       exhibit number, but to the income

11       information that you provided here today

12       and the -- whatever exhibit number it is.

13       It's the one that's the Texas Steakhouse

14       January to December income statement.

15       Would you just look at that with me,

16       please?  It's probably sitting right there

17       in front of you.  Okay.  Just so I

18       understand, you closed down Texas

19       Steakhouse d/b/a Celebrations voluntarily,

20       correct?

21  A.   Correct.

22  Q.   And you actually closed that down -- and

23       what month was it?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 244

1              question.

2    A.    Write a check for it.

3    Q.    What I'm trying to understand is, had

4          Mr. Long indicated to you what, if any,

5          monies he was putting up?

6    A.    He was going to put 50 percent of the

7          money up for -- we were going to be 50/50

8          partners in the business.  Now, he would

9          put up 50 percent of whatever it took for

10         the leasehold improvements, on the

11         inventory, whatever we needed.  If they

12         had taken the offer on the LeCroy shopping

13         center, I would have then gone to him

14         saying, I'm purchasing this; do you want

15         in on the real estate part of it.  If not,

16         I felt strong enough about it that I

17         wanted the real estate anyway.

18   Q.    Okay.  So as far as Mr. Long is concerned,

19         though, there was no prior commitment on

20         his part to put up any money?

21   A.    On the business?

22   Q.    Yes.

23   A.    What our agreement was, I would find a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 245

1    location.  If it was a lease, then we

2    would split the cost of opening the

3    business, the leasehold improvements,

4    whatever, the licensing, and if I

5    purchased the building, he had an a option

6    to either buy half the building or not.  I

7    told him that I had preferred to buy the

8    real estate.

9    Q.   But all of what you're saying is verbal

10        discussions, nothing in writing, right?

11   A.   Right.

12   Q.   So if he did not like whatever deal you

13        proposed, he certainly could have backed

14        out of it, correct?

15   A.   Yes.

16   Q.   In other words, whatever terms you came up

17        with, none of those had actually been put

18        down in writing or officially negotiated

19        to a conclusion, correct?

20   A.   We both signed the lease on the Copeland's

21        building before we got the rider from

22        Wal-Mart, so that's a --

23   Q.   Hold on.  That's after the fact, though,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 246

1          right?  I'm talking about on this.  When

2          this came up to buy Pure Country, nothing

3          had been put in writing, correct?

4    A.    Right.

5    Q.    Between you and Mr. Terrence Long,

6          correct?

7    A.    Correct.

8    Q.    Now, other than this one offer to purchase

9          this building, okay -- and I heard what

10         you said earlier in response to Mr.

11         Stewart about these other places that you

12         looked at, but other than the proposal to

13         purchase Pure Country, have you made an

14         offer to purchase any other establishment,

15         in writing?

16   A.    Friday's.

17   Q.    Friday's, okay.  And that was after you

18         originally decided not to do it?  You made

19         a purchase -- or was that part of what you

20         talked about earlier?  Okay.  I take it

21         back.  It was part of what you talked

22         about earlier, wasn't it?

23   A.    Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 261

1                              --

2      A.    There are people probably that would have

3            liked to have seen me shut down, but like

4            I told you, the last time they voted 7 to

5            2 to keep me open.

6      Q.    Look, that's on the record.  I'm not going

7            to argue with you that they didn't vote to

8            shut you down.  I understand what you've

9            told me.  I'm just simply asking you, you

10           were in front of the city council for a

11           vote because they were either unhappy with

12           the business out there -- "they" being the

13           city council and the city leaders -- were

14           unhappy with it or they were attempting to

15           shut you down.  Wouldn't that be a fair

16           statement?

17     A.    The mayor?

18                 MR. QUINN:  See, I think that's

19                     what -- I think this was a

20                     mayor thing.

21     Q.    Well, whoever it was.  Okay.  Would it be

22           a fair statement that the mayor was

23           attempting to shut you down?  Would that

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 262

1          be a fair statement?

2     A.   Yes.

3     Q.   Okay.  Would it be a fair statement that

4          in his attempt to shut you down, it was

5          getting a lot of media attention?

6     A.   Yes.

7     Q.   Okay.  And would it be fair that during

8          this attempt for the mayor to shut you

9          down while it was getting media attention,

10         that most of that media attention was

11         negative towards your business?

12    A.   Yes.

13    Q.   And would you agree with me that unless a

14         person was closely connected with the

15         situation, such as yourself or a police

16         officer or somebody that was kind of

17         familiar with what was going on, the

18         average citizen only knew what was being

19         reported in the news media, correct?

20    A.   Correct.

21    Q.   And because of what you testified to

22         earlier, I'm under the impression -- you

23         tell me if I'm wrong -- but you really

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 281

1        THE WITNESS:  I just said I had

2            already seen the building

3            and I would do it without

4            Terrence.  It was one of the

5            conversations we had on the

6            phone.

7    Q.    You're not even answering Mr. Quinn's

8          question.  Let me try to make it easier.

9          I don't want to be confusing to you.  I

10         want to be fair to you, but I want you to

11         be fair to me.  Let's start off this way.

12         It would be fair to say that you never

13         made an offer in writing --

14   A.    Right.

15   Q.    Let me finish.  You never made an offer in

16         writing to lease the premises that we've

17         been discussing, the Pure Country Saloon,

18         correct?

19   A.    Correct.

20   Q.    All right.  So the writing part's out of

21         the way now.  All right.  As far as a

22         verbal offer to lease the premises, is it

23         fair to say that on your first meeting

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 282

1        with Ms. Knudsen out there, you never made

2        a verbal offer to lease the premises?

3    A.    Correct.  She gave me the quote.

4    Q.    She gave you the quote, but you never

5        either counteroffered or said I accept,

6        correct?

7    A.    Correct.

8    Q.    All right.  So when would be -- in your

9        testimony, when would be the first time

10        you made any verbal request to lease the

11        premises that we've been referring to as

12        the Pure Country Saloon?

13    A.    When I asked to put a backup lease.  I

14        asked if she was working on the lease, and

15        she said she was working on the lease.

16        And I said, well, can I put a backup lease

17        on there, and she said that wasn't

18        necessary -- I don't remember what her

19        explanation was.

20    Q.    Are you referring -- go ahead.  Are you

21        finished?  I don't want to interrupt you.

22        Okay.  Are you referring to the

23        conversation that is part of the tape we

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 284

1              confuses things.  He's

2              talking about before that

3              event on the 13th.

4    A.    There had been no written offer.

5    Q.    And no verbal offer?  You never came in

6          and said, I'll lease this space -- I'm

7          making an offer to lease it for 4500,

8          3500, 2500 a month?  You never made an

9          offer to her -- a counteroffer to what she

10         told you that very first day, did you?

11   A.    No.

12   Q.    Okay.  Do you still have the -- and again,

13         I'm not familiar with this term -- the

14         rent rolls on LeCroy shopping center?

15   A.    Those were sent to Grant, and he called me

16         when he went over them.  I went by his

17         office, and if he has them, he would have

18         them on file.

19   Q.    And you never personally had them in your

20         possession?

21   A.    No.

22   Q.    And if I understood what you said earlier

23         -- and I want to be fair, but I think you

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 285

1          said that based on those rent rolls -- is

2          that R-O-L-L-S?

3     A.   Right.

4     Q.   -- that you believed that the net worth on

5          that shopping center -- or maybe not the

6          net worth but an appropriate offer on that

7          at the time was 1.1 or 1.2 million -- I

8          may be mistaken -- and that you offered a

9          million?

10    A.   Right.

11    Q.   So it would be fair to say that you didn't

12         even offer what the rent rolls indicated

13         was an appropriate value, that you offered

14         something less than that?

15    A.   Well, I was looking for a deal, one; two,

16         there's a lot of things to consider on

17         rent rolls, and that's length of the

18         leases, who the tenant is, were they a

19         triple A tenant or what.  There's a lot of

20         variables that go into that that I don't

21         even understand.  And Grant looked at it

22         and said it could be worth a million one,

23         a million two; why don't you offer a

Page 286

1          million?

2     Q.   And I'm not begrudging you for being a

3          good business person.  That's what a good

4          business person does, right?

5     A.   Right.

6     Q.   You were trying to get a good deal, right?

7     A.   Right.

8     Q.   And you wouldn't begrudge Ms. Forney if

9          she didn't feel like that a million

10         dollars was an appropriate offer, would

11         you?

12    A.   No.

13    Q.   Regardless of your race, correct?

14    A.   My race?

15    Q.   Of anyone's race.  I mean, if she didn't

16         feel it was worth -- that it was worth

17         more than a million dollars, that would be

18         good business on her part, to not accept a

19         million, correct?

20    A.   Correct.

21    Q.   Whether you were black, white, Asian,

22         Hispanic, or whatever, correct?

23    A.   Correct.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 287

1    Q.    I mean, you're a good business person, and

2          Ms. Forney, owning a shopping center,

3          certainly has to be a good business person

4          in order to make it profitable, correct?

5    A.    Correct.

6    Q.    Was Grant -- so -- yeah.  He was going to

7          get a commission too on that purchase, of

8          10 percent, on that offer of a million

9          dollars, is my understanding from this.

10   A.    If that's what it says, yes.

11   Q.    Well, that had to be discussed with you,

12         because he was -- 10 percent, I guess,

13         would have been -- had to be paid to him,

14         which would really have even netted less

15         than the million offer, correct?

16   A.    If that's what it states.

17   Q.    Well, I don't want to misstate it.  Just

18         look and see.

19   A.    It's pretty simple.  It tells you the

20         commission rate is on there; it tells you

21         who's going to pay it; and in this case,

22         it's paid by the seller.

23   Q.    I'm just trying to establish -- you've

Page 288

1   sued my client for discrimination.  All

2   I'm trying to figure out from you is, you

3   would agree with me that the real bottom

4   line on this contract, if it had been

5   accepted, would not even have been a

6   million dollars to Ms. Forney; it would

7   have been 900,000 at least, because she

8   would have had to pay 10 percent

9   commission.  And does it say who would pay

10  closing costs?  It says rents and leases

11  shall be prorated at closing.  I don't

12  know what it says about --

13  A.    Well, that 10 percent wouldn't have gone

14        to Grant.

15              MR. QUINN:  Just answer the

16                    question.

17  Q.    Do what, now?

18  A.    It's split with them.

19              MR. QUINN:  This isn't worth

20                    arguing about.  Just answer

21                    the question.

22  Q.    That's not my question.  I don't care who

23        it's split with.  My question is my

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services



1        IN THE UNITED STATES DISTRICT COURT FOR

2            THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5    TERRENCE LONG & BARRY BARR,

6            Plaintiffs,

7    vs.                     CIVIL ACTION NO.

8                            2:07-CV-00881-WKW-WC

9    ARONOV REALTY MANAGEMENT,

10   INC., AMY CLARK KNUDSEN,

11   & MEIYING FORNEY,

12           Defendants.

13           *     *     *     *     *

14        DEPOSITION OF TERRENCE LONG,

15   taken pursuant to notice and stipulation

16   on behalf of the Defendants, in the

17   offices of Bradley, Arant, Rose & White,

18   401 Adams Avenue, Suite 780, Montgomery,

19   Alabama, before Nicole Paulk, Certified

20   Court Reporter and Notary Public in and

21   for the State of Alabama at Large, on May

22   7, 2008, commencing at 10:12 a.m.

23

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 12

1    A.    No.

2    Q.    Number 6 in the requests there before you

3          is -- and you can actually look on either

4          one of those documents I think, 1 or 2,

5          but it talks about basically the identity

6          of any witnesses who may have knowledge of

7          this case; do you see that?

8    A.    Yeah.

9    Q.    And there was an initial disclosure in

10         this case, and I just want to ask you

11         about some names of some people, and I

12         want to know if you know them at all or

13         know anything about what they might say in

14         this case.  All right?

15   A.    All right.

16   Q.    First of all, do you know or have you ever

17         met previously Amy Knudsen, before you saw

18         her in this room, I guess, the day that

19         Mr. Barr's deposition was taken?

20   A.    No.

21   Q.    So you didn't know her before Mr. Barr's

22         deposition was taken?

23   A.    No.

Page 15

1    A.    No.

2    Q.    What about Meiying Forney?

3    A.    No.

4    Q.    Do you even know Meiying Forney?

5    A.    No.

6    Q.    That's okay.  I have to ask these

7          questions.  I know some of them may seem a

8          little, you know, maybe ridiculous to you,

9          but it's important that I know what you

10         might say if you go to trial, okay?

11   A.    Okay.

12   Q.    Do you know Mark Cranage?  Have you ever

13         heard that name before or know who that

14         is?

15   A.    I've heard the name before, but I don't

16         know him personally.

17   Q.    Okay.  I think he has something to do with

18         Woodmere Tavern, possibly, or something

19         like that.  Does that ring a bell?

20   A.    Yeah, I've been to the establishment once

21         or twice.

22   Q.    You have been to Woodmere before?

23   A.    Yeah.

Page 16

1    Q.    Just for social issues, to go have a

2          drink, or anything related to this case?

3    A.    No, just to go.

4    Q.    Okay.  Do you think you may have met him

5          there, or -- I guess what I'm saying -- I

6          want to make sure I'm clear.  I know

7          you're saying you've been to Woodmere

8          Tavern before, but have you ever met

9          Mr. Cranage?

10   A.    No.

11   Q.    What about Don Little?  Have you ever

12         heard that name or do you know who he is?

13   A.    I've heard the name, never met him.

14   Q.    I will tell you he's an attorney in town

15         that may have some information about this

16         case.  Do you know anything about that?

17   A.    No.

18   Q.    Okay.  What about Mr. Grant Sullivan?

19         Have you ever met Grant Sullivan before?

20   A.    No.

21   Q.    Do you know him?

22   A.    No.

23   Q.    I'll let you know that you may remember

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 80

```
 1              discussed any litigation against any of

 2              the named defendants here?

 3       A.     No.

 4       Q.     Outside the presence of any of the

 5              attorneys involved in the case on you or

 6              Mr. Barr's behalf -- outside of their

 7              presence, have you and Mr. Barr ever

 8              discussed this case or anything about this

 9              case?

10       A.     No.

11       Q.     Okay.  Have you ever discussed it with

12              anyone else other than Mr. Barr outside

13              the presence of your attorneys?

14       A.     No.

15       Q.     At any time during any conversations with

16              Mr. Barr about his attempt to lease or buy

17              the Le Croy Shopping Village, was it ever

18              made known to you that you were the

19              problem?  Do you understand what I'm

20              asking you?  Was there ever any mention by

21              Mr. Barr that you were the holdup in

22              getting the shopping center leased or

23              purchased?
```

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

Page 81

1    A.    Me, personally?

2    Q.    Yes, sir.

3    A.    No.

4    Q.    Okay.  That was never made known to you,

5          was it?

6    A.    No.

7    Q.    In the lawsuit that was filed on your

8          behalf -- have you read that recently or

9          have you ever read it?

10   A.    No.

11   Q.    Okay.  Let me read Paragraph 10.  It says

12         (as read:)  "In April 2007, Long

13         approached Barr concerning his interest in

14         opening a sports bar in Montgomery,

15         Alabama that would cater primarily to the

16         African-American community.  Long asked

17         Barr to be his partner in this venture and

18         to work on finding a location for the

19         business."  Was it your intention in

20         opening this to cater primarily to the

21         African-American community, or just to

22         anybody?

23   A.    I would have to say to the

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 86

1       Celebrations and the crowd at

2       Celebrations, what else was mentioned?

3   A.  That was it.

4   Q.  Okay.  Well, you just said -- did he

5       mention anything about the fact that the

6       crowd was predominantly black or that it

7       had to do with your race?

8   A.  Me, personally?

9   Q.  Yes.

10  A.  No.

11  Q.  Okay, sir.  Do you have any evidence that

12      Ms. Knudsen knew who you were or what your

13      race was?

14  A.  No.

15  Q.  Okay.  Did Barry Barr ever tell you that

16      he told her what your race was?

17  A.  No.

18  Q.  Okay.  When you went to Celebrations, was

19      it only black people that went there, only

20      black individuals that were at

21      Celebrations when you were there, or were

22      there also white individuals?

23  A.  Yeah, there were also white individuals.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 91

1    A.    No.

2    Q.    You didn't make it known to Ms. Knudsen or

3          anybody else, did you?

4    A.    No.

5    Q.    Did you make it known to anybody else with

6          Aronov that that's what you wanted to do?

7    A.    No.

8    Q.    Other than Mr. Barr, did you make it known

9          to anybody else about what you were really

10         wanting to do?

11   A.    No.

12   Q.    Okay.  Did you understand or know that

13         Mr. Barr was a convicted felon?  Did you

14         know that before he gave his deposition

15         here the other day?

16   A.    No.

17   Q.    Okay.  Didn't know anything about his

18         background, then, other than, you know,

19         the fact that he ran Celebrations?

20   A.    No.

21   Q.    Did you understand or know when you met

22         with him and talked about this sports bar

23         that he couldn't get a liquor license?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 92

1          Were you aware that he couldn't do that?

2     A.   No.

3     Q.   So he didn't bring that up or make it

4          known to you that the liquor license would

5          have had to have been in somebody else's

6          name?

7     A.   No.

8     Q.   Did you discuss when you met with him --

9          and again, I may have asked this -- about

10         him being a consultant to you after

11         opening up this sports bar or how he would

12         get paid?  Those are really two different

13         questions, but --

14    A.   Well, I had talked to him about helping me

15         with it, so I guess you could say a

16         consultant, but we didn't talk about any

17         payments.

18    Q.   About what you would pay him for that?

19    A.   No.

20    Q.   And when you asked him to find a place for

21         this sports bar, was there any discussion

22         about whether he would buy it or lease it

23         or you would buy it or lease it, or how

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


| | |
|---|---|
| **TERRENCE LONG & BARRY BARR,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **V.** ) | **Civil Action No.:** |
| ) | **2:07-CV-00881-WKW-WC** |
| **ARONOV REALTY MANAGEMENT,** ) | |
| **INC., AMY CLARK KNUDSEN, &** ) | |
| **MEIYING FORNEY,** ) | |
| ) | |
| **Defendants.** ) | |


## DECLARATION OF MEIYING FORNEY


1.      My name is Meiying Forney.  I am over the age of nineteen years and am competent to testify to the matters contained in this affidavit, which are true and correct and based on my personal knowledge.

2.      I own the LeCroy Village Shopping Center ("LeCroy").  I purchased it in 2004.

3.      Doodle Hoppers has been a tenant in LeCroy since I purchased it.

4.      Until April 2007, Pure Country was located in the space next to Doodle Hoppers. Pure Country was already a tenant at LeCroy when I purchased LeCroy, so I did not negotiate the amount of rent that Pure Country was paying.

5.      Before Pure Country closed, beginning sometime in late 2006 or early 2007, Doodle Hoppers wanted to expand its business.

6. LeCroy was not for sale when Pure Country closed. It had been for sale previously, and the asking price was $1.9 million.

7. Ms. Knudsen has never mentioned the race of a tenant, prospective tenant, purchaser, or prospective purchaser. She has never mentioned the race of the clientele of any business to me.

8. Ms. Knudsen never mentioned the race of Barry Barr or Terrence Long to me, and she never mentioned the race of the clientele of any business operated by Barry Barr or Terrance Long.

9. Barry Barr offered to purchase LeCroy for $1 million, minus a 10% sales commission to be paid by me at closing. The property was not for sale at the time. Neither Knudsen or anyone else at Aronov played a role in my decision not to make a counter-offer to Barr. His offer was so much lower than the previous asking price of $1.9 million that I decided not to make a counter-offer to him.

10. Doodle Hoppers wanted to expand into the Pure Country space. Doodle Hoppers was a good tenant, so I decided to rent the space to Doodle Hoppers for this reason.

11. Before this lawsuit was filed, I was not aware of Barry Barr's race, Terrence Long's race, or the race of the clientele of any of their business establishments.

12. Terrence Long has never made an offer to purchase or lease any property from me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 27th day of June, 2008.

_____

MEIYING FORNEY

DEFENDANT'S
EXHIBIT
_____

**SULLIVAN & WILLS
REAL ESTATE, L.L.C.**
6708 Taylor Cr.
Montgomery, AL 36117
Phone: 334-396-3333
Fax: 334-396-9390
email amy@sullivanwills.com

STATE OF ALABAMA
COUNTY OF MONTGOMERY

## PURCHASE AND SALES AGREEMENT

This Purchase and Sale Agreement ("Agreement") is made and entered into by and between MEIYING FORNEY (hereinafter referred to as "Seller"), and BARRY BALL (hereinafter referred to as "Buyer");

**WITNESSETH:**

Lying and being situated in SHOPPING CENTER MONTG. AL MONTG. County, Alabama.

1. **Property.** Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and take from Seller, under and subject to the terms, conditions and provisions hereof, that certain real property located at LECROY MONTG. AL privileges, easements, appurtenances and other rights benefiting or pertaining to the Property and all right, title and interest of the Seller in and to any land lying in the right-of-way in front or adjoining the Property to the centerline thereof. An exact legal description of the Property shall be based on attached hereto and made a part hereof by reference as if set out in full (hereinafter the "Property"), together with all appurtenances, rights of way, the survey to be obtained or furnished pursuant to Paragraph 5 hereof.

2. **Purchase Price.** The purchase price for the property shall be 1,000,000 and 00/100 Dollars ($ ) The purchase price shall be payable as follows: (a) The sum AMOUNT GOOD OR ($ ) as earnest money (the "Earnest Money"), to be deposited with AMOUNT GOOD within Ten (10) days after Buyer's receipt of a fully executed copy of this Agreement, and (b) The balance of the purchase price, after deductions or credits and prorations as herein provided, shall be paid in full at the Closing herein provided by check or cash on the day of Closing. The Earnest Money shall be paid to Seller at Closing and credited against the purchase price.

3. **Earnest Money.** The Seller and Purchaser hereby authorize the listing agent AMOUNT to hold the earnest money in trust pending to fulfillment of this contract with the understanding that (a) it is not a party to this contract and does not assume any liability for performance or non-performance of any parties, (b) it is the right to request from all parties a written release of liability of the listing agency which authorizes the release of the earnest money; (c) if it is not liable for loss or interest or other charges on the funds held, and (d) in the event a dispute arises between the parties to this agreement as to which shall be entitled to said earnest money, the listing agency shall be authorized to interplead the earnest money into the proper court, and in doing so, the listing agency shall be entitled to deduct a reasonable attorney's fee from the sums so interpleaded.

4. **Entry Upon Property.** Upon execution of the Agreement, Buyer, its agents, employees and all other persons authorized by it, or advisable including, but not limited to, soils, hazardous waste, environmental, and geophysical tests and studies.

5. **Survey.** Seller shall at Seller's expense, within _____ days after the Effective Date of the Agreement, furnish to Buyer within _____ a current on-site survey of the Property prepared by _____ an engineer or another surveyor acceptable to Buyer (the "Agreement") and Buyer, the Surveyor, and their respective agents, employees and contractors shall have the right to enter upon the Property for the purposes of surveying and also may perform thereon such topographical and soil studies and related engineering tests as Buyer deems necessary to so evaluate the proposed use of the Property. The Surveyor shall also determine the extent and scope of any easements that now affect or benefit the Property.

6. **Abstract of Title.** Seller agrees at its cost to furnish to Buyer within Thirty (30) days after the Effective Date of the Agreement, an up-to-date abstract of title _____ property extending back at least Sixty (60) years and disclosing good and merchantable fee simple title thereon disclose as present owner of _____ attorney examine the abstract of title provided, however, it is Buyer's requirement that the abstract of title existing merchantable, indefeasible fee simple title in and to the Property without exception ("Permitted Exceptions"), and shall have the right to enter upon the Property for the absolute discretion, (from which the Property shall be released at closing) and such other easements and exceptions as Buyer may, in its sole and discloses easements or other exhibit ("Permitted Exceptions"). If the abstract of title discloses a defect or defects in title or encumbrance to cure such matters at Seller's expense. If Seller is unwilling to waive, then Buyer agrees to notify Seller of such matters and Seller shall proceed exceptions or cancel this Agreement, in which case if the latter event, at its option, at its option, in writing waive such defect or unacceptable easements or other Seller represents that it presently owns fee simple title to the Property, except for any change in the status of the title to the Property until the Agreement has been respect to the Property at the issue of closing, and will not permit any change in the status of the title to the Property until the Agreement has been consummated or otherwise terminated in accordance with the terms hereof. Risk of loss prior to closing shall remain upon Seller.

7. **Closing.** Closing ("Closing") at the satisfaction of all the conditions hereof or the waiver in writing thereof by Buyer, the date of Closing shall be on or before _____ MONTG County, Alabama. OCCUPANCY SHALL BEGIN _____ MONTG The sale shall be closed at the office of Buyer's attorney. At Closing Seller shall deliver to Buyer a Warranty Deed containing the usual and customary full covenants utilized in a _____ County, Alabama, conveying to all good and merchantable, indefeasible fee simple title in and to the Property, subject only to Permitted Exceptions, and Buyer shall be subrogated to all rights and actions of Seller against all former owners and vendors. The description used in the Deed shall be one and the same and shall coincide with the survey. Seller shall pay at Closing, by deduction from the purchase price, any and all expenses herein provided to be paid by Seller and the cost of preparing the Deed. Buyer shall pay to record its deed. All ad valorem taxes and utilities, if any, shall be prorated as of Closing. Any assessments, whether due or not, levied against the Property shall be paid in full by Seller at Closing. At Closing, Buyer shall pay to Seller the balance of the purchase price, subject to adjustments, prorations, credits as herein provided, and the Earnest Money shall be applied and credited to the purchase price. Each party shall bear its own attorney's fees. Seller shall execute and deliver at Closing such affidavits of title, lien and possession as may be required by Buyer, a FIRPTA Affidavit, and appropriate 1099 forms. Except for the right of entry granted herein, possession shall pass to Buyer on the Closing Date, free and clear of all tenancies and parties in possession.

8. **Default; Remedies.** If Seller has complied with all of its obligations herein contained and all of Seller's representations and warranties are true and correct, and all of the conditions herein have been met to Buyer's satisfaction or waived in writing by Buyer, but Buyer fails to proceed with the purchase of said Property, the Seller shall have the right of specific performance or any other right or remedy on account of a default by Buyer and shall retain the Earnest Money forfeited to Seller as liquidated damages. If Seller defaults, violates, or breaches any of its warranties, covenants, obligations and representation and warranties herein provide, then to take any time prior to the line of Agreement cancelled and of no further force and effect and proceed to receive a return of the Earnest Money, or Buyer shall have the right of specific performance or any other right or remedy on account of a default by Seller.

9. **Assignment.** This Agreement may be assigned by Buyer and all powers, rights and privileges herein reserved and given to Buyer or the Seller shall inure to the benefit of any be held by the respective successors and assigns of the parties, and all liabilities or obligations imposed on each shall be binding upon the respective heirs, successors and assigns of the parties.

10. **Condemnation.** Seller covenants and agrees there is no pending or threatened condemnation or similar proceeding affecting the Property or any portion thereof, nor has Seller acknowledged that any such action is presently contemplated. Should this happen, Buyer, at Buyer's sole option, may elect to require Seller or Buyer's obligation to purchase the Property by giving written notice to Seller at any time prior to the line of Closing and receive back all sums paid hereunder, or (f) complete the purchase of the Property.

272:2279 F

1

11. **Notices.** Any notice permitted or required to be given hereunder shall be in writing and sent to receiving party at the address set forth below by Certified, return receipt requested with postage prepaid sufficient to deliver to its addresses destination whether or not the receiving party receives the same. The addresses of the parties are as follows.

Seller:

Buyer: BAILEY BANK 500 BRISTOL CT MTG. AL. 36117

12. **Miscellaneous.** Seller warrants and represents to Buyer as follows, which representations and warranties shall expressly survive the Closing hereunder: (1) The Property is now assessed on a "fair market value" classification rather than a "current use" classification and is not subject to any so-called "rollback taxes". In the event this warranty and representation shall prove to be untrue, Buyer may have recourse against Seller under Section 40-7-25.3, if any additional ad valorem taxes in the nature of rollback or recapture taxes are levied. (2) That Seller owns fee simple title to the Property and has the power and authority to enter into this Agreement and the entering into of this Agreement and the performance of Seller's obligations hereunder shall not violate the terms or conditions of any applicable law, rule or regulation pertaining to the Property. (b) In the event it becomes necessary for either Seller or buyer to employ the services of an attorney to enforce any term, covenant or provision of this Agreement, then each party agrees that the non-prevailing party shall pay the reasonable attorney's fee incurred by the prevailing party in enforcing this Agreement. (c) This agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understanding or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Agreement and no waiver of any of its terms and conditions shall be deemed to exist or be made by the parties hereto. (d) Each party hereto has been represented, or had the opportunity to be represented, by separate counsel in connection with this Agreement and the drafting of this Agreement. Accordingly, no ambiguity herein shall be resolved against either party based upon such party's having drafted such provision, or this Agreement, or any portion thereof. This Agreement shall be construed according to the fair meaning of its language. The rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, including any exhibits and any amendments hereto. (e) All provisions of this Agreement shall be deemed and construed to be conditions as well as covenants as though the words specifically expressing or imparting covenants and conditions were used in each separate provision hereof. (f) If any provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid, void or illegal for any reason whatsoever, the remaining portions of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid, void or illegal for any reason whatsoever, shall not be affected thereby and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. (g) The submission of this Agreement for examination does not constitute an offer to sell, or a reservation of, or option for, the Property and this Agreement becomes effective and binding only upon the execution and delivery thereof by the parties hereto. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular shall include the plural, and vice versa, unless the context otherwise requires. (h) The submission of this Agreement by either party to the other shall not be deemed a continuing offer to enter into this Agreement and the effective only upon the "Effective Date of this Agreement" shall be the last date of execution of this Agreement by the parties comprising Seller and the Buyer. As used herein, the "Effective Date of this Agreement".

13 **Agency Disclosure and Brokers**

The listing company _____ SULLIVAN & WILLS _____ is an agent of (check one): (a) Seller _____ or Purchaser _____
both Parties as a limited consensual dual agent. (c) Neither party is acting as a contract broker _____

The selling company _____ SULLIVAN & WILLS _____ is an agent of (check one): (a) Seller _____ or Purchaser _____
both Parties as a limited consensual dual agent. (c) Neither party is acting as a contract broker _____

Seller(s) initials: _____   Purchaser(s) initials: _____ ANTONIO SULLIVAN & WILLS

In the event this sale is consummated, seller shall pay at closing a commission of 10 % of the purchase price to the brokers, who shall equally divide the same. _____

14. **Feasibility Period.** Within Ten (10) days after the Effective Date of this Agreement, Seller shall furnish to Buyer a copy of all the following pertaining to the Property which are in Seller's possession or which Seller has reasonably available to Seller: survey, soils report, environmental report, title report or policy, drainage and utility studies pertaining to the physical condition of the property and all documents or instruments pertaining to the physical condition of the Property or that might affect Buyer's intended use or development of the Property. Buyer shall have a period of _____ days after the Effective Date (the "Feasibility Period") during which Buyer shall have the right to inspect all matters or conditions pertaining to the Property and the intended use and development of the Property, to satisfy itself in all matters or conditions pertaining to the Property, to conduct land use, engineering and environmental studies and reviews. Buyer shall have the right to inspect the Property and the intend use thereof, to confirm and seek, as necessary, zoning and other approvals, permits and licenses with respect to the Property and the intended use thereof, and to otherwise conduct a feasibility review and analysis with respect to the Property and the intended use and development thereof. Notwithstanding anything contained herein to the contrary, in the event that Buyer determines, in its sole and absolute discretion, that the Property is not satisfactory for any reason, Buyer shall have the sole right to terminate this Agreement at any time prior to the expiration of the Feasibility Period and, in such event, the Earnest Money REFUNDED to BUYER and all rights and obligations hereunder shall cease and terminate.

15. **Governmental Approvals.** Buyer is hereby authorized to seek and obtain any and all permits, licenses, site and development plan approvals, permits and authorizations, zoning approvals, curb-cut approvals, and any and all other approvals or consents as Buyer may deem necessary in connection with its proposed acquisition, development and use of the Property and Seller agrees to cooperate with Buyer in such endeavor. If any such applications, approvals or permits are required to be sought in Seller's name, Seller shall upon Buyer's request seek same without cost to Seller. As part of the consideration for Buyer's payment of the purchase price, Seller shall assign, transfer and convey to Buyer at Closing and hereby authorized to perform any and all studies, tests and inquiries as it may deem appropriate, all of which studies, tests and inquiries approvals, licenses, site and development plans affecting the property which Buyer requests Seller to assign to Buyer and shall deliver such copies to Buyer at closing.

16. **Environmental Concerns.** Not withstanding anything contained in the Agreement to the contrary, in the event that, as a result of Buyer's investigation, "hazardous substances" or "hazardous waste(s)" or "hazardous materials", as defined under applicable federal or state law, are found on the Property, then Buyer shall have, at its option and election at any time, to terminate this Agreement and to receive a return of the Earnest Money, or Buyer's obligation to purchase the Property that the results of Buyer's environmental studies, reveal that the Property is free from any and all "hazardous substances", "hazardous waste(s)" or "hazardous materials", as defined under applicable federal or state law, or be, provided such environmental studies are performed during the Feasibility Period. Buyer, its agents and representatives, are hereby authorized to perform any and all studies, tests and inquiries as it may deem appropriate in furtherance of the foregoing, including upon the Property and performing tests and studies thereon. Seller agrees that Buyer may make inquiry of pertinent governmental and administrative agencies concerning environmental violations or citations regarding the Property.

17. **Additional Provisions.** RENTS & LEASES SHALL BE PRORATED AT CLOSING.

Except as set forth above, each of the parties agree to indemnify and hold the other harmless from and against any and all claims or demands with respect to any brokerage fees or agents' commissions or other compensation asserted by any person, firm or corporation in connection with this Agreement or the transactions contemplated hereby, insofar as any such claim is based upon any conversation, contract or contact with Seller or Buyer, respectively, relating to the proposed purchase of the property by Buyer. Each party acknowledges that it has not dealt with any broker except as set forth above.

IN WITNESS WHEREOF, the parties have hereunto executed this Agreement on this 23 day of MAY, 2007.

WITNESS: _____   SELLER: _____   DATE: _____

WITNESS: _____   SELLER: _____   DATE: _____

WITNESS: GregSullivan   BUYER: Benny Bonn   DATE: 5/23/07

BUYER: _____   DATE: _____

2