**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERRENCE LONG & BARRY BARR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **V.** | ) | **Civil Action No.:** |
| | ) | **2:07-CV-00881-WKW-WC** |
| **ARONOV REALTY MANAGEMENT,** | ) | |
| **INC., AMY CLARK KNUDSEN, &** | ) | |
| **MEIYING FORNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT BY DEFENDANTS ARONOV**
**REALTY MANAGEMENT, INC. AND AMY CLARK KNUDSEN**

Defendants **Aronov Realty Management, Inc.** and **Amy Clark Knudsen** ("these Defendants") state as follows in support of summary judgment.

## INTRODUCTION

Plaintiffs Terrence Long and Barry Barr have sued Aronov Realty Management Inc. ("Aronov Management"), Amy Clark Knudsen ("Knudsen"), and Meiying Forney ("Forney") for racial discrimination under 42 U.S.C. §§ 1981 and 1982. Plaintiffs claim that Knudsen, a real estate broker who works for Aronov Realty Brokerage, Inc. ("Aronov Brokerage"),[1] made a racially discriminatory remark to Barr when showing him property at LeCroy Village Shopping Center ("LeCroy"), which is owned by Forney. Barr is the former owner of Celebrations, a night club in Montgomery that received much adverse publicity for criminal activity when it was open, and he claims that Knudsen said that LeCroy did not want a "black club" like Celebrations. Plaintiffs claim they were denied the opportunity to purchase or lease the property due to race or

---

[1] Aronov Brokerage has not been sued in this lawsuit; however, on June 25, 2008, Plaintiffs filed a motion to amend their Complaint to add Aronov Brokerage as a defendant. Knudsen worked for Aronov Management before she began working for Aronov Brokerage in August 2006. (Knudsen Dep. at 29:23—30:4.) For purposes of this brief, any reference to "Aronov" will include either or both of these Aronov entities.

affiliation with an African-American clientele. However, the undisputed facts show neither Knudsen nor Aronov played a role in the owner's decision not to sell the property and that the Plaintiffs never even offered to lease the property. Therefore, even assuming for purposes of summary judgment that Knudsen made the alleged discriminatory remark, the Plaintiffs cannot establish that these Defendants intentionally discriminated against them under §1981 or §1982.

With respect to Barr's attempt to purchase the property, the undisputed facts show that LeCroy was not for sale when he made an offer, that it had previously been listed for $1.9 million, that Barr offered $1 million minus a 10% sales commission to be paid by the seller, that Knudsen conveyed this offer to Forney, and that Forney rejected the offer, without any input or influence from Knudsen or Aronov, because the price was so low. It is also undisputed that Knudsen never communicated to Forney the race of either Plaintiff or their clientele. Finally, it is undisputed that Long never made an offer to purchase the property and that the purchase was something Barr did completely on his own.

Concerning a lease of the property, it is undisputed that Barr said he would need at least $100,000.00 to $150,000.00 in improvements, that he already knew that an existing LeCroy tenant was interested in expanding into the space, and that he never made a written or verbal offer to lease the property. Barr claims that he eventually asked to be put on a "back-up" lease, but it is undisputed that he did not describe any concrete financial terms (either accepting the quoted rent, making a counter-offer, or changing the amount of needed improvements) and that he made this request for a back-up lease after he had already decided to go with another location for his sports bar. Finally, it is undisputed that the owner chose to lease the vacant space to a good existing tenant so they could expand.

As further set forth below, these Defendants are entitled to summary judgment on all of the Plaintiffs' claims against them.

## MATERIAL UNDISPUTED FACTS

Plaintiff Barr is Caucasian and is the former owner of Celebrations, a nightclub in Montgomery. (Compl. ¶ 9.)  In April 2007, Long, an African-American, approached Barr about opening a sports bar and asked Barr to find a location for the business.  *Id.* at ¶ 10.

The LeCroy Village Shopping Center ("LeCroy") in Montgomery is owned by Meiying Forney, who lives in California. (Compl. ¶ 12; Knudsen Dep. 50:6-13.)  LeCroy's tenants have included a cake shop, engraver, cooking school for children, insurance office, hair salon, dry cleaners, wireless provider, costume jewelry store, refrigeration repair shop, barbershop, and a personnel office. (Knudsen Dep. at 66:20—67:20, 69:14-23.)  It also currently has a sports pub called Doodle Hoppers, which has been a tenant since Forney purchased it. (Forney Decl. ¶ 3; Knudsen Dep. at 67:21—68:16.)

Knudsen is a commercial real estate broker at Aronov Brokerage, which leases and sells commercial and residential real estate. (Knudsen Dep. at 28:17—30:5; Harris Dep. at 13:14-22.)  After Forney purchased LeCroy, she asked Knudsen for help leasing space if Knudsen ever learned of a tenant who might work well there. (Knudsen Dep. at 59:18-21, 61:22—62:8.)  Knudsen had no written agency agreement for leasing the LeCroy property.[2]  When Knudsen was showing the LeCroy property to Barr in May 2007, she was not representing anyone. (Harris Dep. at 16:3-5.)  She was acting as the transaction broker, the type of relationship that a real

---

[2] At some point before the events giving rise to this litigation, Knudsen had a written agreement with Forney to lease spaces in another of Forney's buildings, East Park Plaza on Atlanta Highway, which used to be owned by Aronov Management but was purchased by Forney. (Knudsen Dep. 47:9—50:5.)  That written agreement has expired. *Id.* at 48:13-20.  Knudsen leased space for Forney at the East Park Plaza during the time she worked at Aronov Management and Aronov Brokerage and after the written agreement expired. *Id.* at 51:8-18.  In addition to East Park Plaza, Knudsen has leased space for Forney at Office Park Circle, another building Forney owns located off Vaughn Road. *Id.* at 54:2—55:1.

estate company defaults to when there is no written agreement with one of the parties. *Id.* at 16:4-18. Other people, besides Knudsen, could show the LeCroy property. *Id.* at 25:6-11. Knudsen called the LeCroy property an "open listing" because Forney negotiated and communicated with some potential tenants on her own. (Knudsen Dep. at 59:10-17.) In leasing Forney's properties, Knudsen has leased to several African-American tenants, including a church, a music store, a hair dresser, a teaching/curriculum consulting business, an insurance company, and a mortgage company. *Id.* at 55:5—58:8.

Until April 2007, a bar called Pure Country was located in LeCroy in the space next to Doodle Hoppers. (Forney Decl. ¶ 4; Knudsen Dep. at 65:11-15.) Before Pure Country closed, beginning sometime in late 2006 or early 2007, Doodle Hoppers expressed an interest to Forney in expanding its business. (Forney Decl. ¶ 5.) Knudsen learned that Doodle Hoppers needed expansion in either November or December 2006. (Knudsen Dep. 80:22—81:1.)

In May 2007, Barr learned that the Pure County space at LeCroy was for lease. (Compl. ¶ 11.) Grant Sullivan first contacted Knudsen on behalf of Barr and told her that he had a client who was a retired baseball player[3] and wanted to open a sports bar. *Id.* at 83:16—84:11. Knudsen had never heard of Sullivan's client before and did not know who he was. *Id.* at 84:18—85:3. Sullivan never told Knudsen that Long was African-American. *Id.* at 172:12-17. Knudsen told Sullivan that an existing tenant was considering expanding into the space but that she would accommodate his request to see the property. *Id.* at 97:5-21; Sullivan Dep. at 11:10-16. Knudsen obtained a key to show the property, and Mr. Barr showed up to see it. (Knudsen Dep. at 85:18—86:2, 97:22—98:3.)

At this first meeting, Knudsen said she told Barr that LeCroy was a very nice center, everyone there works well together, and the main concern was to avoid any problems with

---

[3] As set forth above, Plaintiff Terrence Long is the plaintiff who is a retired baseball player.

security similar to those at Celebrations with police involvement over knifings, stabbings, shootings, drug problems, altercations, and bad publicity in the newspapers and radio. *Id.* at 99:1-21. Barr then informed Knudsen that he was the manager at Celebrations. *Id.* at 100:3-6. He also told her that he was working with a baseball player to find a place for a sports bar. *Id.* at 103:6-9. Although Knudsen's recollection is that Barr said he needed improvements in the range of $300,000.00 (Knudsen Dep. at 103:22—104:1), Barr's recalls saying the space would need $100,000.00 to $150,000.00 in improvements (Barr Dep. at 156:16-18). Knudsen quoted him a monthly rental rate of $4,500.00 with no leasehold improvements. (Knudsen Dep. at 118:8-12; Barr Dep. at 154:14-16.) Knudsen did not set the price; Forney set the price before Barr ever asked to see the property, and that was the amount she wanted Knudsen to quote. (Knudsen Dep. at 119:6-17, 178:8-12.) After the meeting, Knudsen gave Forney a follow-up report, advising of Barr's request for improvements, but Knudsen did not communicate an offer to lease the space because Barr never made a formal or informal offer to lease the space. *Id.* at 179:23—181:5, 181:14-183:12.

Barr said that one of the first things Knudsen said to him when showing him the property was "they didn't want a black club there and they didn't want that Celebrations thing." (Barr Dep. at 153:8-12.) [4] Barr said he explained that the problems with Celebrations were "a parking lot issue" that "had nothing to do with the club." *Id.* at 154:1-4. He told her who he was, who Long was, and what Long was looking at doing. *Id.* at 154:6-9. Knudsen told him she had probably formed her opinions through the media and was "very nice about it." *Id.* at 154:8-12. At this meeting, Barr told Knudsen it would probably be better if he "went with the Friday's

---

[4] Knudsen denies making a reference to a "black" club; she said she mentioned the name Celebrations because of the safety concerns and the terrible publicity it had received. (Knudsen Dep. at 111:19—112:7.) According to Knudsen, Barr said the problems at Celebrations were caused by a "roving gang of black troublemakers" and underage people who could not get in. *Id.* at 112:8-22. Knudsen has been to the bar only once, fourteen years ago in 1994. *Id.* at 110:1-21. She had no knowledge of it being a hip-hop bar or an African American bar. *Id.* at 115:15-22.

thing [another location] and tried to work that deal out." *Id.* at 154:19-23. Barr understood, when he first looked at the LeCroy space, that the owner of Doodle Hoppers had already asked about leasing the space. *Id.* at 162:17-20, 163:23—164:6. Barr admits to understanding why an owner would not want his property to get the type of adverse media attention that Celebrations received. (Barr Dep. at 303:5-11.)

After Barr viewed the Pure Country space, Sullivan contacted Knudsen and asked if Forney would sell LeCroy; Knudsen responded that it was not for sale but that he could make an offer. (Knudsen Dep. at 107:11-15; Forney Decl. ¶ 6.) She told Sullivan that the property had been listed for $1.9 million a couple of years earlier. (Knudsen Dep. at 107:15-18; Forney Decl. ¶ 6.) Knudsen furnished him with rent figures so he could determine the income from the shopping center. (Knudsen Dep. at 108:1-5; Barr Dep. at 181:6-15.) Barr then offered $1 million for the property, minus a ten percent sales commission to be paid by the seller. (Forney Decl. ¶ 9.) Long's name was nowhere on the written offer. (Knudsen Dep. at 174:21-23.)

Knudsen emailed Barr's offer to Forney, who told Knudsen that it was so far below what she needed that she was not going to make a counteroffer. (Knudsen Dep. at 122:10-15, 175:4-12; Forney Decl. at ¶ 9.) Knudsen relayed this information to Sullivan. (Knudsen Dep. at 122:16-23, 175:13-16.) Neither Knudsen nor anyone else at Aronov played a role in Forney's decision not to make a counter-offer to Barr. (Forney Decl. ¶ 9.)

This offer to purchase the property was the only written offer ever made by Barr concerning LeCroy. (Knudsen Dep. at 174:15-20.) Barr never told Sullivan that he wanted to make another higher offer for the property. (Sullivan Dep. at 20:22—21:3.) Sullivan agreed that this was the "end of the deal, so to speak." *Id.* at 21:4-6. No further offers, either written or oral, were made by Barr, Long, Sullivan, or anyone that Sullivan was representing for a different price

on the property. *Id.* at 175:17—176:21. Barr never had a conversation directly with Knudsen about purchasing the property; Sullivan handled the whole thing. (Barr Dep. at 238:16-22.) Barr admits that he has no facts or evidence or reason to believe that the decision not to make a counter-offer was racially motivated. *Id.* at 182:14-17. He does not begrudge Forney if she did not feel that his offer of one million dollars was appropriate. *Id.* at 286:8-12.

After meeting with Knudsen, Barr asked Mark Cranage, who worked at Woodmere Tavern at the time, to see if he could get the Pure Country space because he felt like he was being discriminated against. (Cranage Dep. at 22:11-17.) Cranage called Knudsen and said that, during his second conversation with Knudsen, she mentioned that someone with a black club was interested in it. *Id.* at 38:1-11, 45:20-22. Cranage also testified that Knudsen said she "didn't want [Barr] coming into [LeCroy] with a place like Celebrations." *Id.* at 63:13-22. He does not recall that Knudsen used the term "black club." *Id.* at 64:15-21, 87:5-15. Cranage testified, "And I really honestly can't say that she said black club. I knew she mentioned Celebrations." *Id.* at 67:5-7.

Cranage recalls that Knudsen set up an appointment time for him to see the space with Don Little, Forney's attorney; the property was part of Pure Country's bankruptcy and Little had the key. (Cranage Dep. at 47:18-20; Knudsen Dep. at 143:3-12, 144:3-7, 150:2-11.) When Cranage met with Little, he made racially discriminatory remarks about African-Americans; Cranage recorded this meeting on videotape at the request of Barr. (Cranage Dep. at 103:12-15.) Cranage and Little also discussed rent concessions in the range of two months' rent, close to $10,000.00. *Id.* at 58:20—60:12. Cranage was made aware that Doodle Hoppers was looking at the space. *Id.* at 61:19-21. Based on the condition of the building, Cranage believes it would have rented for something between four and five thousand dollars per month. *Id.* at 61:22—63:3.

By the time Cranage viewed the property, Forney had already approved moving forward with allowing Doodle Hoppers to expand into the space.  (Knudsen Dep. at 157:23—158:7.) Doodle Hoppers ultimately negotiated a lease and moved into the Pure Country space. *Id.* at 164:12-16.  Forney did not pay for any improvements to the property for Doodle Hoppers. *Id.* at 166:6-9.  Doodle Hoppers received some beneficial rent payments over time in order to put in a vent hood that was going to cost approximately $10,000.00.  *Id.* at 167:5-11.

Before Barr got Cranage involved, he says he called Knudsen about seeing the property again, that she asked if his client was still Long, and, when he said yes, that she said the property was tied up in bankruptcy.[5] *Id.* at 184:17—185:3.  At some point after Cranage looked at the space, Barr contacted Knudsen about looking at the building again, and Knudsen said that she might be able to get in touch with the attorney who had the key.  (Barr Dep. at 179:15-23.)  By this time, Knudsen had already told Forney about Barr's need for extensive improvements, that he wanted to move another tenant that was already in a space, and that he was the former owner of Celebrations. (Knudsen Dep. at 137:3-11.)   Forney was not interested in making such extensive improvements and could not have afforded these improvements.  *Id.* at 137:19—138:3. Knudsen also spoke to Barr about other properties that he had asked about, specifically the former Copeland's location and the Capitol Plaza.  (Knudsen Dep. at 139:8-21.)   Knudsen followed up on these properties for him, but the owner of Capitol Plaza wanted a retail establishment, not a sports bar or nighttime establishment, and the Copeland's location had ground restrictions that would not allow Barr to stay open during the hours he wanted. *Id.*

Knudsen said Barr never asked her to write a lease or said that he would pay the $4,500.00 asking price. (Knudsen Dep. at 140:21—141:7.)  Barr admits that he never made a

---

[5] Barr never told anyone at Aronov what Knudsen allegedly said to him.  *Id.* at 195:8-10.  His complaint against Aronov is that Knudsen discriminated against him.  *Id.* at 217:23—218:4.

written offer to lease the Pure Country space. (Barr Dep. at 281:15-19.)  He did not make a verbal offer to lease the space at the first meeting with Knudsen.  *Id.* at 282:1-3.  Knudsen gave him a rent quote, but he did not make a counteroffer or accept the quoted rent.  *Id.* at 282:3-7.  Barr claims he asked to be put on a back-up lease, but Knudsen told him they were "working on [another] lease" and "that wouldn't be necessary."  *Id.* at 282:13-19.  Knudsen remembers telling Barr that a lease was pending with Doodle Hoppers and that she was working out the details. (Knudsen Dep. at 141:8-15.)  The only time Barr made a verbal request for a lease was when he asked to be put on a back-up lease; however, this was after he had decided to go with the Friday's space, and he admits that he did not make an offer of any specific financial terms when he asked for the back-up lease. (Barr Dep. at 284:5-11, 304:23—305:7.)

As mentioned above, Doodle Hoppers had been a tenant since Forney purchased LeCroy. (Forney Decl. at ¶ 3.)  They wanted to expand into the Pure Country space.  *Id.* at ¶ 10.  Because they were a good tenant, Forney decided to rent the space to them.  *Id.*  In all of her dealings with Forney, Knudsen has never mentioned the race of a tenant, a prospective tenant, purchaser, or prospective purchaser.  *Id.* at ¶ 7. Knudsen has never mentioned the race of the clientele of any business to Forney.  *Id.*  Specifically, Knudsen never mentioned the race of Barr, Long, or their clientele to Forney.  *Id.* at ¶ 8.  Before this lawsuit was filed, Forney did not know the race of Barr, Long, or their clientele.  *Id.* at ¶ 11.

Long had no involvement in viewing or trying to buy the LeCroy property.  He never paid Barr start-up money or anything related to the venture or project.  (Long. Dep. at 11:16-20.) He never met Knudsen before Barr's deposition in this case.  *Id.* at 12:16-20.  He has never had any communications with her. *Id.* at 13:1-3.  Long does not know Sullivan, Barr's agent who first contacted Knudsen, and has never met him. *Id.* at 16:18-22.  Long did not meet Barr until

2007. *Id.* at 50:1-6. It was at their second meeting that Long said he wanted to open a sports bar and asked Barr if he "had anything he was about to do" and said "[he'd] like to do some business with [Barr]." *Id.* at 52:12—53:4. No partnership documents were signed and no formal partnership agreement was entered into; Long wanted him to find a location for the sports bar. *Id.* at 54:4—55:4. They did not discuss who was going to put up the money, what the partnership agreement would be like, who would manage the bar, or anything like that. *Id.* at 58:9—19. They met once to view the Copeland's space, and this made a total of three meetings. *Id.* at 66:22—69:6. After Barr met with Knudsen at the Pure Country space, he contacted Long about the meeting. *Id.* at 72:19—73:3. Long testified as follows about that conversation:

> Q:    … What is it you recall about the conversation, just Celebrations came up?
> A:    Celebrations came up, and that apparently she didn't know that he was the guy who owned Celebrations until he told her.
> Q:    Okay. Anything else you remember about your conversation with Mr. Barr about Ms. Knudsen?
> A:    No, that was it.
> Q:    What did you get out of that conversation? I mean, what was your impression of what he was telling you?
> A;    Nothing.
> Q:    Okay. That's what I'm saying, did you get anything out of it.
> A:    No, I got nothing out of it.
> Q:    Okay. And I think I know the answer to this, but the location over there, the Le Croy shopping center, did you even known there was anything for lease over there prior to him telling you about it?
> A:    No.
> Q:    Okay. Were you supposed to be at the meeting where he met with Ms. Knudsen the first time.
> A:    No.
> Q:    Okay. Did you ever ask him to set up a time for you to go over to Le Croy and look at this retail – this space for lease?
> A:    No.

Id. at 74:3—75:10.

> Q:    Did you get the impression that there was a problem with Celebrations, that y'all couldn't get that spot or something, or do you remember anything else about the conversation.
> A:    I don't remember anything else about the conversation.

Id. at 76:16-22.

Long later testified to recalling that, after Barr's meeting with Knudsen, "….[T]hat a statement was made about black people. I don't know where it came from or who it came from, but a statement was made about the Celebrations crowd, that they didn't want that Celebrations crowd in that area." *Id.* at 84:4-22. He admits that the Celebrations crowd included black and white people. *Id.* at 86:18-23. He has no evidence that Knudsen knew his race, and Barr never said he told Knudsen that Long was African-American. *Id.* at 86:11-18. Also, Barr never asked Long to sign a lease for LeCroy. *Id.* at 109:16—110:11.

Regarding the purchase offer that was made by Barr, Long testified:

> Q:    Did you have any discussions with Mr. Barr or were you involved in any way with his offer to purchase the Le Croy Shopping Village?
> A:    No.

Id. at 77:6-10.

> Q:    Okay. So that was – as far as you know, that was just something that Mr. Barr did on his own.
> A:    Yes.

Id. at 78:3-6.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); FED. R. EVID. 56. The moving party must initially advance a showing that "there are no genuine issues of material fact that should be decided at trial." *Weston Group Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1361 (11th Cir. 1999). A claim should be dismissed when "it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." *Slagle v. ITT Hartford*, 102 F.3d 494, 497 (11th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The undisputed facts and relevant law in this case show that these Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims. Because they have carried their initial burden with the filing of its motion and brief, Plaintiffs may not rest on the mere allegations or denials in their pleadings. Plaintiffs, by declarations or as otherwise allowed by Rule 56, must establish a genuine issue of material fact, as determined by an examination of the substantive law. *Irby v. Bittick*, 44 F.3d 949, 953 (11ᵗʰ Cir. 1995). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. As established below, Plaintiffs cannot meet their burden with respect to any of their claims.

## ARGUMENT

### I.    Plaintiffs' *Prima Facie* Case

A plaintiff must establish the following elements in a race discrimination claim under §1981 or §1982: "(1) that the plaintiff is a member of a protected class; (2) that the defendant intended to discriminate against the plaintiff on the basis of race; and (3) that the defendant's racially discriminatory conduct abridged a right enumerated in the statute." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007); *see also CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1955-56 (2008) ("[O]ur precedents have long construed §§ 1981 and 1982 similarly.); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 440 ("In light of the historical interrelationship between § 1981 and § 1982, we see no reason to construe these sections differently when applied, on these facts, to the claim of Wheaton-Haven that it is a private club."); *Selden Apartments v. U.S. Dept. of Hous. & Urban Dev.*, 785 F.2d 152, 159 (6th

Cir. 1986) (citing to numerous cases in which sections 1981 and 1982 and the Fair Housing Act use the same tests and have the same elements); *Bafford v. Township Apartments Assocs.*, No. 8:06-CV-657-T-27TGW, 2007 WL 4247763, at *4 (M.D. Fla. Nov. 30, 2007); *Bell v. Mike Ford Realty Co.*, 857 F. Supp. 1550, 1556-57 (S.D. Ala. 1994) (noting that section 1982 uses the *McDonnell-Douglas* framework).

> In a Section 1981 case, the statute requires that all persons have equal rights to
>
> > make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The statute goes on to define "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Section 1982 protects the rights "to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.

The analysis for determining whether a § 1981 or § 1982 plaintiff has established a *prima facie* case or can survive summary judgment parallels the framework used in Title VII cases.  *See Johnson v. Fulton Concrete Co.*, 330 F. Supp. 2d 1130, 1336-37 (N.D. Ga. 2004) (noting that the Eleventh Circuit has stated that Title VII and § 1981 claims use the same analytical framework); *Bell v. Mike Ford Realty Co.*, 857 F. Supp. 1550, 1556-57 (S.D. Ala. 1994) (noting that section 1982 uses the *McDonnell-Douglas* framework).  Both § 1981 and § 1982 cases "require[] proof of intentional discrimination."  *Brown v. Am. Honda Motor Co., Inc*., 939 F.2d 946, 949-50 (11th Cir. 1991) (citations omitted).  In this case, the undisputed facts show that these Defendants did not intend to discriminate against the Plaintiffs and their conduct did not abridge the Plaintiffs' rights to make or enforce contracts or to lease or purchase property.

## II.    Plaintiffs Cannot Establish Intent to Discriminate.

### A.    Plaintiff's Cannot Present Direct Evidence of Discrimination.

The Plaintiffs may prove the second element of their claims through either direct or circumstantial evidence. *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007). Direct evidence of discrimination is evidence that, if believed, would prove the existence of the fact in issue without inference or presumption. *Bass v. Bd. of County Comm'rs.*, 256 F.3d 1095, 1105 (11th Cir. 2001). Only the most blatant remarks, the intent of which could be nothing more other than to discriminate on the basis of race, constitute direct evidence of discrimination. *Id.* at 1105. For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision and related to that particular decision. *Id.* Remarks by non-decision-makers or remarks unrelated to the decision-making process itself are not direct evidence of discrimination. *Id.*; *Standard v. A.B.E.L. Servs., Inc.*, 161 F.2d 1318, 1330 (11th Cir. 1998).[6] Also, if the plaintiff's evidence is subject to more than one interpretation or suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).

It is undisputed in this case that neither Knudsen nor Aronov was a decision-maker on whether to reject or accept Barr's offer to purchase the property. A decision-maker is "a person

---

[6] In *Hodges v. Stone Savannah River Pulp and Paper*, 892 F. Supp. 1571 (S.D. Ga. 1995) (Title VII discrimination case), the court looked at whether a supervisor's statement could be viewed as direct evidence when the supervisor was not the decision-maker. The plaintiff was hired by the defendant into a general position, and within a year of her hire, she sought to be transferred into a more specialized, electrical position. The court looked at whether a remark by the electrical supervisor that "there would be no women working in his department" constituted direct evidence of discrimination. *Id.* at. 1579. The court held that, even if the supervisor had made this remark, "the opinions of employees or rumors about supervisors' attitudes are irrelevant unless clearly connected to the attitudes of supervisors." *Id.* (citing *Stone v. Galaxy Carpet Mills, Inc.*, 841 F. Supp. 1181, 1188 (N.D. Ga. 1993)). The court also held that the plaintiff "failed to establish a causal nexus between the [supervisor's] remarks and the transfer decision." 892 F. Supp. at 1579 (citing *Williams v. Mead Coated Bd., Inc.*, 836 F. Supp. 1552, 1572 (M.D. Ala. 1993). Because the electrical supervisor was not a decision-maker with respect to the transfer decision, his statement was not relevant to whether there was discrimination. *Id.*

involved in the challenged decision." *See Trotter v. Bd. of Trustees,* 91 F.3d 1449, 1453-54 (11th Cir. 1996). In *Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999) (discussing decision-maker within the context of a retaliation claim), the Eleventh Circuit looked to whether a co-employee could be considered a decision-maker. The Eleventh Circuit held that because a co-employee did not have the authority to terminate plaintiff and because there was no evidence that the co-employee recommended termination, the co-employee could not be considered a decision-maker. *Id.* Additionally, the court held that simply supplying the decision-maker "with information (apparently favorable to [plaintiff]) which he may or may not have considered in making his decision to terminate . . . does not show that [the co-employee] made the decision." *Id.* There is no evidence, or even a suggestion, by the Plaintiffs in this case that Knudsen or Aronov played a role in the decision to reject Barr's purchase offer. Also, the undisputed evidence shows that Forney decided to lease the property to an existing tenant because it was a good tenant who wanted to expand. There is no evidence that Knudsen or Aronov had the authority to make a decision as to whom the property would be leased or that they made a decision not to lease to Plaintiffs. Therefore, because Knudsen's statement was not made by a decision-maker, it is not direct evidence of discrimination.

Additionally, Knudsen's statement is subject to more than one interpretation. Taken in context, it is clear that Knudsen, who has a demonstrated history of renting Forney's properties to African-Americans, did not have a discriminatory motive if she made a statement to Barr about a "black club" like Celebrations. The undisputed evidence shows that Knudsen's concern was not one of race; it was merely about the bad publicity Celebrations had received for criminal activity. Plaintiff Barr admitted that he could not begrudge a property owner for not wanting a tenant that would attract the type of publicity that Celebrations had received, and Plaintiff Long

even testified that black *and* white patrons frequented Celebrations.  Additionally, Knudsen did not know that Long was African-American.  With the undisputed facts showing that Celebrations was the subject of adverse publicity, that Celebrations' customers were black and white, and that Knudsen was unaware of Long's race, it is clear that Knudsen's statement is subject to more than one interpretation.  Therefore, Knudsen's statement is not direct evidence of discrimination.

This case presents an interesting analysis of direct evidence applicable to discrimination cases because most cases on this issue address whether a "blatant" statement made by a non-decision-maker is direct evidence of discriminatory intent *of the decision-maker*, not necessarily the discriminatory intent of the person who made the statement.  This is because most cases are employment cases where the individual actors have not been sued, and courts must address the issue of whether the actor who made the statement played a role in the defendant's decision.  This case is different, however, because the individual actor—the one alleged to have made the statement—has been sued with the decision-maker, raising the issue of whether Knudsen's statement can be viewed as direct evidence against her and Aronov, who was also a non-decision-maker but who was Knudsen's employer.  Again, however, because the statement, taken in context of the entire conversation between Barr and Knudsen, is subject to more than one interpretation (*i.e.*, that the LeCroy owner and tenants did not want a tenant who created so much bad publicity), it is not direct evidence of an intent to discrimination by Knudsen or Aronov on the basis of race.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).  Therefore, the Court must look at the Plaintiffs' case under the circumstantial evidence analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), where, assuming a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce a legitimate,

non-discriminatory reason for the challenged action.  *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).

> **B.      Plaintiff's Cannot Meet the Requirements under the Circumstantial Evidence Analysis.**

> **(1)      Plaintiffs cannot establish a *prima facie* case.**

The Eleventh Circuit has applied the standard Title VII *prima facie* elements to Section 1981 claims of discrimination in employment cases, but the Eleventh Circuit has not yet articulated the appropriate *prima facie* elements to apply in cases outside the traditional employment context. *Munnings v. Fedex Ground Package Sys., Inc.*, 2008 WL 1849003, at *17 (M.D. Fla. Apr. 22, 2008) (citing *Kinnon*, 490 F.3d at 889, 891, 893)).  Those courts that have articulated a *prima facie* test have had trouble distinguishing it from the elements of a Section 1981 cause of action.  *Id.* (citing *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1353 (N.D. Ga. 2005)).  However, courts have consistently required Section 1981 plaintiffs to identify similarly situated persons outside of the plaintiffs' protected class who were treated more favorably by the defendants.  *Id.* (citing *Benton v. Cousins Props., Inc.*, 230 F. Supp. 2d 1351, 1370 (N.D. Ga. 2002); *Kinnon*, 490 F.3d at 893; and *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1273 (11th Cir. 2004)).

In this case, the undisputed facts show that the Plaintiff cannot identify a similarly situation person outside of the Plaintiffs' protected class who was treated more favorably.  First of all, regarding purchase of the property, Forney still owns the property.  Therefore, there is no similarly situated person who was allowed to purchase the property at Barr's price or at any other price.  Second, regarding leasing the property, Barr admits that he said the owner would have to make $100,000.00 or $150,000.00 in improvements if he were going to lease the property. Forney ended up leasing the property to an established existing tenant, who had already

expressed an interest before Barr ever viewed the property, so that tenant could expand, and the undisputed evidence shows that the improvements that tenant needed cost only in the range of $10,000.00. Thus, there is no similarly situated non-African-American who was allowed to lease the property with the owner making $100,000.00 to $150,000.00 in improvements. For this reason, the Plaintiffs cannot establish a *prima facie* case of discrimination under §§ 1981 and 1982, and their claims fail.

> **(2)    Defendants have met their burden of articulating a legitimate, non-discriminatory reason, and Plaintiffs cannot establish that the reason is pretext.**

Even if the Plaintiffs could establish a *prima facie* case of discrimination by identifying a similarly situated person outside their protected class who was treated more favorably by the Defendants, Defendants are entitled to summary judgment because they have articulated a legitimate, non-discriminatory reason for the challenged action, and the Plaintiff can present no evidence of pretext. If a legitimate, non-discriminatory reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *Joe's Stone Crab, Inc.*, 220 F.3d at 1286. As has been stated many times by courts in this circuit and others, a defendant's burden with respect to a legitimate, non-discriminatory reason is one of production, not persuasion, and it is "exceedingly light." *Holifield v. Reno*, 115 F.2d 1555, 1564 (11th Cir. 1997).

As mentioned above, the facts of this case are somewhat different from those usually addressed in 1981 and Title VII cases because, here, neither Knudsen nor Aronov actually made a "challenged action." They played no role in Forney's decision not to make a counteroffer to Barr's purchase offer, and neither Plaintiff ever made an offer to lease the property.[7] So, while

---

[7] Although Barr said he asked Knudsen to write a back-up lease written, he admits that his request did not include any financial terms (i.e., he never offered to rent the space for a certain amount of money or with a certain amount of

Barr alleges that Knudsen made a racially discriminatory statement, there is no "challenged action" that can be attributed to Knudsen or Aronov. Even if there were, however, and assuming for purposes of summary judgment that Knudsen made a comment about a "black club," Knudsen has testified that the concern over Barr's lease of the property, as the former owner of Celebrations, was about all of the adverse publicity regarding criminal activity at Celebrations. It goes without saying that an owner of a building who wants to keep the building fully occupied is justified in considering whether a new tenant will invite bad publicity and news reports about criminal activity, and Barr admitted that a concern over bad publicity is reasonable. Thus, these Defendants have met their burden of articulating a legitimate, non-discriminatory reason, and Plaintiffs have no evidence that this reason is pretext for unlawful discrimination. As set forth above, Barr admitted in his deposition that Celebrations was the subject of bad publicity, so there can be no question that Knudsen's concerns were really pretext for unlawful discrimination.

In summary, Plaintiffs cannot establish intentional discrimination by Knudsen or Aronov. They have no direct evidence of discrimination because the statement allegedly made by Knudsen was not made by a decision-maker and, more important, taken in context, is subject to more than one interpretation. Therefore, the Plaintiffs' evidence must be analyzed under the *McDonnell-Douglas* burden shifting framework. Under this framework, the Plaintiffs cannot establish a *prima facie* case of discrimination because they cannot identify a similarly situated person outside their protected class who was allowed to purchase or lease the property. Even if the Plaintiffs could establish a *prima facie* case, the Defendants are still entitled to summary

---

improvements being made). Previous discussions had revealed his need for extensive improvements in the range of at least $100,000.00 to $150,000.00, and he had never come to any terms of agreement about the monthly rent. Thus, his request for a back-up lease did not contain concrete financial terms that could be considered by the owner. Furthermore, Barr admits that he had already decided to move into another space when he requested the "back-up" lease, that Knudsen told him she was already working on "the other lease" for Doodle Hoppers, and that Doodle Hoppers did ultimately lease the property.

judgment because the Plaintiffs cannot present evidence that the Defendants' legitimate, non-discriminatory reason is pretext.

III.    **Plaintiffs Cannot Establish that Their Rights Under § 1981 or § 1982 Were Abridged by Knudsen or Aronov.**

Assuming that the Plaintiffs could somehow establish intentional discrimination by Knudsen or Aronov, they must still show that their rights under § 1981 or § 1982 were abridged by these Defendants' conduct.  *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007).  Plaintiffs cannot meet this burden.

A.    **Long was not involved in the purchase offer, and these Defendants were not involved in the decision to reject Barr's offer to purchase.**

One of the Plaintiffs' claims in this lawsuit is that they were denied the right to purchase LeCroy because of race.  However, the undisputed facts set forth above show that Long never wanted to purchase the property and was in no way involved in the offer to purchase the property.  His name was not on the written purchase offer.  He testified that he never had any discussions with Barr about purchasing the property and that he was not involved in any way with Barr's offer to purchase the property.  He said the purchase offer was something Barr did all on his own.  Under these facts, Plaintiff Long simply cannot claim that these Defendants abridged his rights to make or enforce a purchase contract under § 1981 or to purchase property under § 1982.

Likewise, Barr cannot establish that any of his rights were abridged by these Defendants' conduct with respect to his Barr's offer to purchase LeCroy.  An individual may be liable for federal civil rights violations under Sections 1981 and 1982.  However, for an individual to be personally liable, she must "be personally involved in the discrimination" or must "authorize[], direct[], or participate[] in the alleged discriminatory conduct."  *Al-Khazraji v. Saint Francis*

*College*, 784 F.2d 505, 514 (3d Cir. 1986) (Title VII and section 1981 case).  The Tenth Circuit has succinctly stated that "[a] claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement."  *Allen v. Denver Public School Bd.*, 928 F.2d 978, 983 (10th Cir. 1991) (citation omitted) (determining that defendant had no contact with the decisionmaker in Title VII, 1981, and 1983 case), *overruled on other grounds by Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000) (overruling *Allen* to the extent that a plaintiff need only establish that his position was not eliminated in order to prevail on his discrimination claim); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("We agree with the Tenth Circuit, however, that in order to make out a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.'").

   The undisputed facts in this case show that Knudsen and Aronov played no role in the decision to reject Barr's purchase offer.  The property was not for sale when he tried to buy it.  It had been for sale previously, and the asking price was $1.9 million.  When his agent, Sullivan, asked Knudsen for the property's rent figures in order to make a valuation of the property, Knudsen provided them.  When Barr made an offer of $1 million, Knudsen conveyed the offer to Forney.  Forney then decided, without any input or influence from Knudsen or anyone else at Aronov, to reject Barr's offer.  The offer was so much lower than what she needed to get out of the property that she decided not to make a counter-offer.  The undisputed evidence shows that Barr is Caucasian, Knudsen did not know Long's race, and that she never mentioned the race of Barr, Long, or their clientele to Forney.  Barr has no evidence that Forney's decision not to make a counter-offer was based on discrimination, and he testified that he would not begrudge an owner for rejecting an offer that she thought was too low.  In short, Knudsen did everything Barr

wanted her to do in connection with his purchase offer, and there is simply no evidence that Knudsen or Aronov did anything to abridge Barr's rights under § 1981 to make or enforce a contract or to abridge his rights under § 1982 to purchase property.

### B.    Neither Plaintiff made an offer to lease the LeCroy property in question.

Not only do Plaintiffs fail to establish that their §§ 1981 or 1982 rights were abridged by these Defendants with respect to the purchase offer, they cannot establish that their rights were abridged with respect to any attempt to lease the property.  Barr's own deposition testimony makes it clear that the Plaintiffs never even offered to lease the property.  He admits that he never made a written offer to lease the Pure Country space. At the first meeting with Knudsen, Barr did not make a verbal offer to lease the space.  Knudsen gave him a rent quote, but he did not make a counteroffer or say that he accepted the rent at $4,500.00.  He claims he asked to be put on a back-up lease, but Knudsen told him they were "working on [another] lease" and "that wouldn't be necessary."  This was his first verbal request to enter into any type of lease, and it occurred after he had already decided to go with the Friday's space.  Barr also admits that he never offered to lease the space for any specific amount of money.  Thus, neither Barr nor Long offered to lease the space at LeCroy.  Barr visited the site and expressed his need for the owner to make $100,000.00 to $150,000.00 in improvements.  He was told that the owner would not invest that much in improvements. After being quoted the $4,500.00 per month rental rate, he never said he would take the space at that price, and he never made a counter-offer for another price.  At most, he was investigating the property and trying to determine whether to make an offer to lease it.  Later, after he decided to rent another space, for some reason he asked Knudsen to be put on a back-up lease (again, without offering to pay a certain amount of agreeing to forego the $100,000-$150,000 in improvements he required), but by this time Knudsen was

working on a lease with Doodle Hoppers, who ended up leasing the property. Plaintiffs simply cannot claim that any conduct by the Defendants abridged their rights to lease the LeCroy property. All they did was inquire about the property and indicate to Knudsen that the financial terms (the lease amount and cost of improvements) were unacceptable. Then, they asked to be put on a back-up lease with no definite offer of financial terms, and this occurred *after* they had decided to rent at another location and *after* Knudsen was already working on the lease for Doodle Hoppers. There is no evidence that Knudsen or Aronov did anything to keep the Plaintiffs from leasing the property. Even taking Plaintiff Barr's testimony as true and assuming that Knudsen made a statement about "black clubs," the undisputed evidence shows that she never conveyed any information to Forney about the Plaintiffs' race or the race of their prospective clientele. The undisputed evidence shows that Forney wanted to rent to Doodle Hoppers because they were a good tenant and that she wanted to work with them in expanding their business. There is simply no basis in fact or law for the Plaintiffs' claim that these Defendants abridged their rights under § 1981 to make or enforce a lease contract or their rights under § 1982 to lease the property in question. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims against them.

Respectfully submitted this the 27th day of June, 2008.

                                    s/ Quindal C. Evans
                                    Charles A. Stewart, III (STE067)
                                    Quindal C. Evans (EVA040)
                                    Bradley Arant Rose & White LLP
                                    Alabama Center for Commerce
                                    401 Adams Avenue, Suite 780
                                    Montgomery, AL 36104
                                    Telephone: (334) 956-7700
                                    Facsimile: (334) 956-7701
                                    E-mail:  cstewart@bradleyarant.com
                                    Email: qevans@bradleyarant.com
                                    **Attorneys for Defendants Aronov Realty**
                                    **Management, Inc., and Amy Knudsen**

<u>CERTIFICATE OF SERVICE</u>

I certify that on June 27, 2008, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Kevin W. Jent                          N. Gunter Guy
Counsel for the Plaintiff              Ball, Ball, Matthews & Novak, P.A.
Wiggins, Childs, Quinn & Pantazis, LLC P.O. Box 2148
The Kress Building                     Montgomery, AL 36102-2148
301 19th Street North
Birmingham, AL 35203


and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: Not applicable.

                                    s/ Quindal C. Evans
                                    Quindal C. Evans
                                    Bradley Arant Rose & White LLP
                                    The Alabama Center for Commerce
                                    401 Adams Avenue, Suite 780
                                    Montgomery, AL 36104
                                    Telephone: (334) 956-7700
                                    Facsimile: (334) 956-7701
                                    E-mail: qevans@bradleyarant.com

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2007 OCT -2  A 11: 28

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

TERRENCE LONG and )
BARRY BARR, )
)
    Plaintiffs, )
)
vs. )    CIVIL ACTION NO.:
)    ~~CV-07~~ 2:07CV 881-WKW
ARONOV REALTY MANAGEMENT, )
INC., AMY CLARK )    JURY DEMAND
KNUDSEN, and MEIYING FORNEY, )
)
    Defendants. )

# COMPLAINT

## I. JURISDICTION

1. This is an action for legal and equitable relief to redress discrimination in housing and employment on the basis of race. This action arises under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982; and Alabama state law.

2. The Court has jurisdiction of the subject of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 2201, & 2202. Jurisdiction over plaintiffs' claims based on Alabama law exist under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.


EXHIBIT
A

## II.  PARTIES

3.  Plaintiff, Terrence Long (hereinafter referred to as "Long"), is an African-American citizen of the United States of America and is over the age of nineteen years. Plaintiff resides in Montgomery, Alabama, which is in this judicial district and division.

4.    Plaintiff, Barry Barr (hereinafter referred to as "Barr"), is a Caucasian citizen of the United States of America and is over the age of nineteen years. Barr resides in Montgomery, Alabama, which is in this judicial district and division.

5.    Defendant, Aronov Realty Management, Inc., is a residential and commercial real estate company based in Montgomery, Alabama, and does business in this judicial district and division.

6.  Defendant, Amy Clark Knudsen (hereinafter referred to as "Knudson"), is a residential and commercial real estate agent who is based in Montgomery, Alabama, and who does business in this judicial district and division. Knudsen is employed by defendant Aronov as a Leasing and Sales Specialist in the Commercial Division. At all times relevant to this Complaint, Knudsen was acting in the line and scope of her employment with Aronov and as leasing agent for the property owned by defendant Meiying Forney.

7.  Defendant, Meiying Forney (hereinafter referred to as "Forney"), is an individual who is believed to be a resident of California. Forney is the owner of the

2

property known as the "Lecroy Shopping Village" located at 3600 Debby Drive in Montgomery, Alabama and does business in this judicial district and division.

### III.  FACTUAL ALLEGATIONS

8.  Plaintiff Long, is an African-American male and is a former major league baseball player.

9.  Plaintiff Barr, is a Caucasian male and is the former owner of the Celebrations nightclub in Montgomery.  Celebrations clientele was predominantly African-American.

10. In April 2007, Long approached Barr concerning his interest in opening a sports bar in Montgomery, Alabama, that would cater primarily to the African-American community.  Long asked Barr to be his partner in this venture and to work on finding a location for the business.

11. In May 2007, Barr learned that the Pure Country nightclub had closed business and that its location, in the Lecroy Shopping village, was for lease.

12. In May 2007, Barr set up a meeting with defendant Knudsen, a Leasing and Sales Specialist with Aronov and the leasing agent for Lecroy Shopping Village's Pure Country location.  On or about May 10, 2007, Barr and Knudsen met at the Lecroy Shopping Village at 3600 Debby Drive to view the former Pure Country location. The Lecroy Shopping Village is owned by Meiying Forney.

3

13. During their meeting, Knudsen was very concerned with the type of business that Barr was attempting to place in the shopping center. Barr told Knudsen that Long wanted to put a sports bar in the location and told her that they had looked at other properties in Montgomery.

14. Knudsen brought up the fact that they had great tenants at Lecroy and had no problems. She also stated that they did not want the same type of problems that existed at the Celebrations nightclub.

15. Knudsen repeatedly emphasized the fact that another "Celebrations" type nightclub was not wanted at the Lecroy Shopping Village and stated that they did not want a black club at that location because of problems in the parking lot.

16. Barr then told Knudsen that he was the former owner of Celebrations. Knudsen appeared shocked and uncomfortable upon hearing this information.

17. The Pure Country property was not in good shape when Barr viewed it, and Knudsen informed him that the owner was unwilling to put any money into the building, so all improvements would have to be made by the tenants.

18. At the close of that meeting Barr told Knudsen that they would probably make an offer on the Friday's building.

19. The offer on the Friday's building was turned down. The asking price was $550,000.00.

4

20. Barr discovered that the Lecroy Shopping Village was for sale and approached Knudsen with a one million dollar offer to purchase the shopping center. This offered was turned down with no counteroffer.

21. In the first week of June 2007, Barr called Knudsen and informed her that he and Long were still interested in the Pure Country location and that they wanted to do something immediately. Barr asked Knudsen if Long could look at the inside of the property.

22. Knudsen stated that she could not let them inside the property because it was tied up in a bankruptcy.

23. Barr then asked Knudsen if they would write a lease for the asking amount. Knudsen replied that there was already a lease pending and that they were in the process of working out the details on that lease. Knudsen would not even write a back up lease for the property.

24. The week after Barr's conversation with Knudsen, Mark Cranage (hereinafter referred to as "Cranage"), the owner of the Woodmere Tavern in Montgomery, contacted Knudsen and set up a time to inspect the Pure Country location. Cranage, who had previously owned a country-western bar similar to Pure Country, told Knudsen who he was. Knudsen stated that she had been in Cranage's previous club and the Woodmere Tavern and was familiar with the format used at both

5

clubs.

25. Knudsen told Cranage that she wanted him to see the property as soon as possible and that she would arrange it through the attorney who was handling the bankruptcy. Cranage inquired if there was anyone else looking at the property and Knudsen responded that other people were looking at the property, but they were not the kind of people they wanted in that location. Knudsen told Cranage that he was exactly what they wanted and they needed to move on it as quickly as possible. Knudsen repeatedly told Cranage that she would move him to the front of the list because he was the type they wanted at this location.

26. Upon Knudsen's request, Cranage then called the bankruptcy attorney, Don Little, and set up a time to view the Pure Country location. Little represents the owner of the Lecroy Shopping Village, Meiying Forney. On June 13th, Cranage met with Little and toured the Pure Country location.

27. Several times during this tour, Little made comments about the type of tenant that was wanted in the location. Little also stated that there was another party interested in the property, even after they had inflated the price to discourage interest. Cranage was promised a lease by the next Monday.

28. The day after Cranage toured with Little, Barr contacted Knudsen and once again asked if they could tour the building. She stated that we could not. Barr also

6

asked about a back up lease in case the lease that they had been previously working on fell through and was told that he could not.

29. To date, Barr and Long have not been allowed to lease or purchase any property affiliated with the Lecroy Shopping Village at 3600 Debby Drive in Montgomery.

### IV.  COUNT ONE - 42 U.S.C. § 1981

30. Plaintiffs adopt and re-allege paragraphs 1-29, as if fully set forth herein.

31. At all times referenced above, defendant Knudsen was acting within the line and scope of her duties as an agent of the defendants Aronov Realty and Forney.

32. At all times reference above, Little was acting within the line and scope of his duties as an agent of the defendant Forney.

33. The failure to lease or sale the property as described above was based upon the plaintiff Long's race, the plaintiff Barr's affiliation with Long, and both of the plaintiffs' affiliation with African-Americans.

34. The conduct of the defendants violated the plaintiffs' rights guaranteed by the Civil Rights Act of 1866, 42 U.S.C. § 1981, to make and enforce contracts without regard to race.

### COUNT TWO - SECTION 1982

35. Plaintiffs adopt and re-allege paragraphs 1-29, as if fully set forth herein.

7

36. At all times referenced above, defendant Knudsen was acting within the line and scope of her duties as an agent of the defendants Aronov Realty and Forney.

37. At all times reference above, Little was acting within the line and scope of his duties as an agent of the defendant Forney.

38. The failure to lease or sale the property as described above was based upon the plaintiff Long's race, the plaintiff Barr's affiliation with Long, and both of the plaintiffs' affiliation with African-Americans.

39. The above-described conduct of the defendant violated Plaintiffs' rights guaranteed by the Civil Rights Act of 1866, 42 U.S.C. § 1982, to purchase, lease and to hold real and personal property without regard to race.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court will grant them the following relief:

A.    Issue a declaratory judgment declaring that the wrongs complained of herein violate the rights of Plaintiffs guaranteed by the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982.

B.    Enter a permanent injunction or other injunctive relief enjoining Defendants and their brokers, agents, assistants, estate, successors, employees, assigns, and those acting in concert or cooperation with them from maintaining or continuing any

8

customs, policies, patterns, practices, or actions which operate to discriminate on the basis of race or color.

C.    Enter a permanent injunction or other injunctive relief enjoining the defendants to take such other and affirmative steps to insure that all of the provisions of the applicable anti-discrimination laws are and will be complied with and that the effects of past and unlawful discrimination by defendants are eradicated.

D.    Award Plaintiffs compensatory and punitive damages, including pre-judgment interest.

E.    Retain jurisdiction of this action for a sufficient time to ensure full compliance with the remedial decree requested herein.

F.    Award Plaintiffs their costs incurred in this case, together with reasonable attorneys' fees and pre-judgment interest, pursuant to 42 U.S.C. §1 1988 and 3613(c)(2).

G.    Grant such additional and further relief as the court may deem just and equitable under the circumstances.

### PLAINTIFF DEMANDS A TRIAL BY A STRUCK JURY

9

Respectfully submitted,

C. Michael Quinn
Kevin W. Jent
Attorneys for Plaintiffs


**OF COUNSEL:**

**WIGGINS, CHILDS, QUINN
& PANTAZIS, LLC**
The Kress Building
301 19th Street North
Birmingham, AL 35203
205/314-0500

**Defendants' Addresses:**

Aronov Realty Management, Inc.
3500 Eastern Blvd.
Montgomery, AL 36116-1781

Amy Clark Knudsen
3500 Eastern Blvd.
Montgomery, AL 36116-1781

Meiying Forney
2233 Paragon Drive
San Jose, CA 95131

10

Exhibit B

# FREEDOM COURT REPORTING

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4
5    TERRENCE LONG & BARRY BARR,
6        Plaintiffs,
7            CIVIL ACTION NO:
8    v.    2:07-CV-00881-WKW-WC
9
10    ARONOV REALTY MANAGEMENT, INC.,
11    AMY CLARK KNUDSEN, & MEIYING
12    FORNEY,
13        Defendants.)
14    S T I P U L A T I O N S
15
16        IT IS STIPULATED AND AGREED
17    by and between the parties through their
18    respective counsel, that the deposition of
19    ****************************************
20        AMY KNUDSEN
21    ****************************************
22    may be taken before Kim Duckett,
23    Commissioner, at 401 Adams Avenue,

**2**

1    Montgomery, Alabama, on June 23rd, 2008,
2    beginning at 11:30 A.M.
3        IT IS FURTHER STIPULATED AND
4    AGREED that the signature to and the
5    reading of the deposition by the witness is
6    waived, the deposition to have the same
7    force and effect as if full compliance had
8    been had with all laws and rules relating
9    to the taking of depositions.
10        IT IS FURTHER STIPULATED AND
11    AGREED that it shall not be necessary for
12    any objections to be made by counsel to any
13    questions, except as to the form or leading
14    questions, and that counsel for the parties
15    may make objections and assign grounds at
16    the time of trial, or at the time said
17    deposition is offered in evidence, or prior
18    thereto.
19        IT IS FURTHER STIPULATED AND
20    AGREED that notice of filing of the
21    deposition by the Commissioner is waived.
22
23

**3**

1        I N D E X
2
3    WITNESS:
4    AMY KNUDSEN
5
6    EXAMINATION BY        PAGE
7    Mr. Quinn ..................... 5
8    Mr. Guy........................ 169
9
10        DEFENDANT'S EXHIBITS
11    There were no Defendant's Exhibits marked
12    to this deposition.
13
14        PLAINTIFF'S EXHIBITS
15    NO.                PAGE
16    1............................. 28
17    2............................. 76
18    3............................. 92
19    4............................. 122
20
21
22
23

**4**

1        A P P E A R A N C E S
2    APPEARING ON BEHALF OF THE PLAINTIFF(S):
3
4    WIGGINS, CHILDS, QUINN & PANTAZIS
5    BY: Mike Quinn & Kevin Jent
6        301 19th Street North
7        Birmingham, Alabama 35203
8
9
10    APPEARING ON BEHALF OF THE DEFENDANT(S):
11
12    BRADLEY, ARANT, ROSE & WHITE
13    BY: Charles Stewart, III
14        401 Adams Avenue, Suite 780
15        Montgomery, Alabama 36104
16
17    BALL, BALL, MATTHEWS & NOVAK
18        BY: N. Gunter Guy
19    2000 Interstate Park Drive, Suite 204
20        Montgomery, Alabama 36109
21
22    ALSO PRESENT: BARRY BARR & SCOTT HARRIS
23

1 (Pages 1 to 4)


EXHIBIT
B
ALL-STATE LEGAL®

## FREEDOM COURT REPORTING

25

1  creditors, bankruptcy.
2      Q How long did you do that?
3      A Four years.
4      Q Okay.
5      A Almost five, close.
6      Q And then after that -- did you
7  leave voluntarily?
8      A I did.
9      Q Any particular reason why you left?
10     A John changed jobs and an
11 opportunity came up for me to work with
12 SunCom.
13     Q What is that?
14     A In outside sales.
15     Q What is SunCom?
16     A A wireless company.
17     Q And how long did you do that?
18     A Three and a half years. Three and
19 a half years.
20     Q And then what did you do after
21 that?
22     A Two and a half years. Two and a
23 half years.

26

1      Q Okay. Then what did you do after
2  that?
3      A I went to work for Aronov.
4      Q Did you -- and when you went to
5  work for Aronov, what was the job that you
6  went to work with them? What job was it?
7      A Leasing the Aronov portfolio.
8      Q Did you have to have your real
9  estate license in order to do that?
10     A Yes, sir.
11     Q When did you get your real estate
12 license?
13     A I believe it was September of 2003.
14     Q And I'm not wise to the real estate
15 ways. When you get your license, does it
16 -- do you have to get a separate license
17 for commercial as opposed to residential?
18     A No, sir.
19     Q So you just, you take the classes,
20 you get certified, and you can sell
21 either; is that right?
22     A That's correct. Wait, wait. That
23 is not correct. I don't know that you get

27

1  certified. That's not -- that's your
2  word.
3      Q That's my word. That's my word.
4  But I guess the point -- what I'm trying
5  to determine is when you get your real
6  estate license, is it a specialized
7  license for commercial?
8      A There is no differentiation.
9      Q Okay. And how often do you have to
10 renew that license?
11     A Every two years.
12     Q Have you renewed your license each
13 of those two years?
14     A Yes, sir.
15     Q And are you presently -- do you
16 presently have a license?
17     A Yes, sir.
18     Q And did you renew it in '06,
19 September of '06, and it's good through
20 September of '08?
21     A Yes, sir.
22     Q And the reason I know that is
23 because I'm looking at '06. But this one

28

1  is issued August the 16th of '06 and
2  expires September the 30th of '06. It's
3  not for two years. It's a State of
4  Alabama Real Estate Commission -- can you
5  tell me what this one is that would only
6  be for that limited amount of time? I'll
7  mark it as Plaintiff's 1 and show it to
8  you.
9  (Whereupon, Plaintiff's Exhibit 1 was
10 marked for identification and the same is
11 attached hereto.)
12     Q Do you know what that is? Well, it
13 says it's a Real Estate Commission --
14     A Yes. I believe that's when my
15 license changed from management to
16 brokerage.
17     Q Okay. And it actually says Aronov
18 Realty Brokerage, Inc., on there. So this
19 is your real estate license for you to be
20 a broker for Aronov Realty Brokerage; is
21 that right? Not a broker but a
22 salesperson?
23     A Yes, sir.

7  (Pages 25 to 28)

# FREEDOM COURT REPORTING

29

1  Q Okay. When you got your real
2 estate license, you went to work for
3 Aronov?
4  A Yes, sir.
5  Q Did you work for any other real
6 estate company before you came to work for
7 Aronov?
8  A No, sir.
9  Q And have you worked for Aronov --
10 is Aronov the only real estate company
11 that you have worked for?
12     MR. STEWART: Object to form.
13  A Yes, sir.
14  Q And so you have worked for them
15 since 2003?
16  A Yes, sir.
17     MR. STEWART: Object to form.
18  Q And when I say them so that he
19 won't object anymore, I'm talking about
20 any, all of the Aronov companies. You
21 have worked only for Aronov companies in
22 real estate; is that right?
23  A I've worked for Aronov Realty

30

1 Management, Inc., and then I work now for
2 Aronov Realty Brokerage, Inc.
3  Q Got you. And you went to Aronov
4 Brokerage August of '06?
5  A That's when my license changed.
6  Q Did your license change before you
7 went or after you went to the brokerage
8 company, or was it around the same time?
9  A I would say approximately that
10 time.
11  Q Okay. Now, when you were with the
12 management company, who was your immediate
13 boss?
14  A My broker and immediate supervisor
15 was Scott Harris -- is Scott Harris, was
16 Scott Harris.
17  Q Was Scott Harris. Okay. And tell
18 me what you did for the management group.
19 What were your duties?
20  A My responsibility was to market and
21 lease office portfolio.
22  Q Now, did --
23  A Specifically, Executive Park.

31

1  Q And was that owned by Aronov?
2  A I don't know.
3  Q But you were given a specific
4 portfolio to go out and try to lease? Let
5 me withdraw it, and let's do it this way:
6 I suspect that when you first get into
7 real estate and this was brand-new to you
8 that rather than have you completely on
9 your own out there finding your own stuff
10 to lease that they give you a building or
11 a complex that you were responsible for.
12 Is that what they did here to start you
13 off, they gave you a portfolio of
14 properties that it was your responsibility
15 to try and lease?
16  A It was not my responsibility alone.
17  Q Okay. But it was in a particular
18 area?
19  A They were properties that it was my
20 understanding were managed through the
21 realty management company.
22  Q Okay. Were they all office space?
23  A Yes.

32

1  Q So when you started, you started by
2 leasing office space?
3  A Yes.
4  Q Okay. How long did you exclusively
5 lease office space?
6  A Well, I don't know exactly, but
7 until I leased a space at East Park Plaza
8 very -- within probably a very short
9 period of time that it was sold, Aronov
10 sold -- they owned it and they sold it and
11 I leased a space there.
12  Q And was that -- was that a
13 commercial piece, or was that also office
14 space?
15  A It was -- it had office, and it had
16 -- it also had some retail that -- it had
17 a hair salon, which was really --
18 normally, you don't have hair salons in
19 office.
20  Q So are you telling me that that was
21 your first venture in the commercial?
22  A No.
23  Q No. Okay.

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

---

**49**

1  Q -- with Ms. Forney?
2  A Yes.
3  MR. STEWART: Let me just warn you,
4  let him -- make sure he's finished his
5  question before you answer. A couple of
6  times, y'all have been talking over each
7  other.
8  THE WITNESS: I'm sorry.
9  MR. STEWART: That's okay.
10  Q How did you develop this
11  relationship with Ms. Forney? How did it
12  start?
13  A I was -- that was part of my
14  responsibility because it was owned by
15  Aronov -- let me take that back. It was
16  part of my responsibility to lease it as
17  Aronov Realty Management, Inc., and it was
18  subsequently sold and I received a call
19  about that space and, of course, we didn't
20  -- we weren't managing it any longer, so I
21  called the person who worked with Ms.
22  Forney to -- represented Ms. Forney in the
23  sales transaction, Josh Hall, and said

**50**

1  that there was a prospect for leasing in
2  East Park Plaza. He said I really don't
3  want to handle the leasing. Would you
4  like to handle the leasing, and I'll have
5  Ms. Forney call you.
6  Q Did you develop the relationship
7  with Ms. Forney by telephone?
8  A I believe it was over the
9  telephone, and I also had to -- well, that
10  was it. And E-mail.
11  Q Because she lives in California, as
12  I understand it; is that right?
13  A She does.
14  Q Have you ever met her?
15  A Yes.
16  Q At what point in time did you meet
17  her?
18  A That's a good question. I believe
19  it was sometime in 2006, I think.
20  Q Now, once you started -- once you
21  were asked will you undertake the leasing,
22  I take it that you entered into a written
23  agreement with her for this particular

**51**

1  space or strip? Was it a shopping center?
2  A It's a mixed use strip center of
3  office -- mostly office. At that time, it
4  was mostly office.
5  Q Okay. But you did enter into a
6  written agreement with her?
7  A I believe so.
8  Q And did you actively rent space for
9  her in that place both while you were with
10  management and after you moved over to
11  brokerage?
12  A Yes.
13  Q Okay. And was that ongoing until
14  the written agreement expired?
15  A Yes.
16  Q Did it continue after the written
17  agreement expired?
18  A Yes.
19  Q Approximately how many spaces do
20  you believe that you have rented for her
21  in that place?
22  A I leased -- I worked with a hair
23  salon, I did a renewal, and then two

**52**

1  others, three, four.
2  Q Okay.
3  MR. STEWART: Is that total, or is
4  that in addition to the hair salon
5  renewal?
6  THE WITNESS: Five total, I
7  believe.
8  Q What -- and this may tax your
9  memory a bit, but what spaces did you
10  rent? What kind -- was it mostly still
11  office that you did in that place?
12  A Are you asking me what type of
13  profession the tenants engaged in?
14  Q Yeah. Yeah, I am.
15  MR. GUY: Let's make sure we're
16  clear on the record. Are you still
17  talking about East Park Plaza?
18  MR. QUINN: Right, we're still
19  talking about East Park Plaza, yes.
20  MR. GUY: You keep referring to it
21  as "that place."
22  MR. QUINN: That's because I can't
23  remember the name.

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

57

1    Q  And then the Office Park Circle is
2  the other one?
3    A  Well, there is Vaughn Office Park.
4  There are two separate buildings.
5    Q  Uh-huh.
6    A  In Vaughn Office Park Oliver two
7  were two twin African-American girls,
8  ladies.
9    Q  What was that called?
10    A  Oliver two.
11    Q  Is that a hair dresser?
12    A  No.  They are consulting.  They are
13  teachers, and they are writing curriculum
14  for health and whatever that course is in
15  high school.  Okay.  That one.  She's --
16  they are African-American.  And then
17  Benchmark Insurance is African-American.
18  The mortgage company, they vacated the
19  space, but they are African-American.
20  There is a Korean tenant.  Now, Josh Hall
21  leased to them, but -- and then the other
22  -- what's his name?  It's Sims.  I really
23  don't know his nationality.  He could be

58

1  African-American.  I don't know.
2    Q  All right.
3    A  And then the other two, Tricounty
4  Medical I don't know because they are a
5  corporation, and then HealthSouth or
6  Select Medical, I don't know what their
7  compilation is because they are a
8  corporation.
9    Q  Okay.  Thank you.  Now, let's --
10  and I think we established this before
11  lunch, but the only other affiliation you
12  had was LeCroy Shopping Center; is that
13  right?
14    A  With Ms. Forney?
15    Q  Yeah, with Ms. Forney.
16    A  Yes, sir.
17    Q  All right.  Did you have a written
18  agreement for the Office Park Circle?
19    A  No.
20    Q  How does that work?  I'm just
21  curious.  Well, let me ask it this way:
22  Why isn't there a written agreement?
23    A  Well, initially, I was leasing for

59

1  her at East Park and she was very happy
2  with my performance and she acquired
3  Office Park and asked me to work with
4  them, as well, and Josh Hall was also
5  leasing there, as well.  Josh is an
6  appraiser, and I really couldn't give it
7  the attention, so I was working with her
8  on that.  I would get an occasional call.
9  And then LeCroy.
10    Q  So that's not unusual, then, for
11  there not to be a written agreement
12  between the owner?
13    A  It probably is more unusual, but it
14  is called an open listing or an open --
15  it's open.  She wanted to negotiate some
16  of her own renewals, and she communicated
17  with some of the tenants herself.
18    Q  Okay.  How did you get LeCroy?
19    A  She asked me if I ever learned of
20  anyone that might work well in LeCroy
21  Shopping Village and --
22    Q  And -- I'm sorry.  I interrupted
23  you.  Go ahead.

60

1    A  That's it.
2    Q  At the point in time that she
3  contacted you about LeCroy, were you
4  familiar with LeCroy?
5    A  Yes.
6    Q  And how were you familiar with it?
7  Why were --
8    A  In what way?
9    Q  How did you know about it?  Had you
10  leased any other space in there, had you
11  been involved with any tenant there?  How
12  did you know about LeCroy?  Or did you
13  just know that it existed?
14    A  I knew it existed.  I live in
15  midtown.  I shopped at Montgomery Mall all
16  the time.  And I'm trying to remember if I
17  had ever -- I may have shopped over at
18  LeCroy.
19    Q  How big a space is LeCroy?
20    A  Thirty-eight thousand square feet.
21    Q  How many tenants if it's full?
22    A  Well, some spaces can be expanded
23  or divided.  All the spaces are different

15  (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

61

1  configurations. So I can give you an
2  approximate, if you'll give me a second.
3      Q  Okay.
4      A  And you want to know number, how
5  many?
6      Q  Approximately, yeah.
7      A  Okay. Sixteen or seventeen.
8      Q  To your knowledge, have all of them
9  ever been rented at one time? Has the
10  place been full at any point in time that
11  you know of?
12      A  I don't know. Ms. LeCroy leased --
13  I mean, owned it, so.
14      Q  But I take it that it was
15  purchased? Or did she still own it when
16  you started leasing it?
17      A  No.
18      Q  No. It was purchased, right?
19      A  Ms. Forney purchased it.
20      Q  Right. But kept the same name?
21      A  Yes.
22      Q  Okay. How did you -- did Ms.
23  Forney just call you just like she had

62

1  with the other properties and said would
2  you please help me lease this space?
3      MR. STEWART: Object to the form.
4      Q  Is that how it worked?
5      A  I believe that she said if you
6  learn of anyone that might work well at
7  LeCroy, would you help me lease there,
8  something like that.
9      Q  Was it a particular space in the
10  shopping center that she wanted your help
11  trying to lease?
12      A  Yes. Any of the vacant spaces.
13      Q  How many vacant spaces were there
14  at that time?
15      A  I don't remember.
16      Q  When you say work well, what do you
17  mean by that?
18      MR. STEWART: Object to the form.
19      A  For example, I get numerous calls
20  for hair salons, numerous. Everybody
21  does. You can't fill a whole strip center
22  with hair salons. It would destroy
23  everyone's business.

63

1      Q  Sure.
2      A  So you try to get businesses that
3  synergize. You have cake designs. It has
4  to do with weddings and birthday parties.
5  It's nice if you have something that
6  complements that so that when the invitees
7  come that it can help synergize the whole.
8      Q  I got you. I understand. And one
9  of the spaces that was available there was
10  a space that had been occupied by a lounge
11  called the Pure Country Lounge which was,
12  I believe, a cowboy, country type
13  establishment? Did you know that?
14      A  I knew of Pure Country. I knew of
15  the business Pure Country.
16      Q  Okay. Did you make -- did you
17  determine when she asked you to help her
18  lease that space that that was one of the
19  spaces that she wanted your help in
20  leasing?
21      MR. STEWART: Object to form.
22      A  Not at that time.
23      Q  At the time that this first

64

1  started, that space was not open?
2      A  Correct.
3      Q  Pure Country was still in
4  operation?
5      A  Yes.
6      Q  Okay. When do you believe that you
7  began leasing space there at LeCroy?
8      A  I'm trying to think which my first
9  lease was there. I think my first lease
10  was to a -- they'd said a computer
11  company, but they needed storage and also
12  to run a business and it was an outreach
13  of my office leasing.
14      Q  Okay.
15      A  And the perimeters of what they
16  needed didn't fit your traditional office
17  and I called and said does this type use
18  interest you and she said yes and that, I
19  believe, was my first lease there. It was
20  more of an office lease.
21      Q  And so that probably was while you
22  were still with the management company; is
23  that right?

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

<table>
<tr><td>65</td></tr>
</table>

1    A It probably was. I can't say for
2 sure unless you have something to refresh
3 my mind.
4    Q No, I don't. Okay. So you knew
5 Pure Country was in that shopping center?
6    A Yes, sir.
7    Q How soon after you started helping
8 her lease that property before Pure
9 Country closed down and that space became
10 available?
11    A I believe the last day of operation
12 was somewhere around the end of April
13 2007, but I don't know -- I don't want to
14 speculate and guess an exact date but
15 sometime late April.
16    Q And before attempting to lease that
17 space after it came open, how many other
18 leases do you believe you had done on
19 LeCroy? Just the one you told me about?
20    A Oh, before that one came available?
21    Q Yes. Before Pure Country became
22 available, how many other spaces had you
23 rented in that shopping center? You've

<table>
<tr><td>66</td></tr>
</table>

1 already told me about the one, the office
2 kind of thing.
3    A Uh-huh.
4    Q Did I understand, you did end up
5 leasing that?
6    A Sir?
7    Q You leased that?
8    A Leased what?
9    Q The office.
10    A Yes.
11    Q You completed that lease?
12    A Yes.
13    Q Okay. All right. And now I'm
14 asking you whether there were any others
15 before Pure Country?
16    A Yes.
17    Q Do you remember them?
18    A Yes.
19    Q What were they?
20    A The first space, nine hundred
21 square feet, it was leased for a dry
22 cleaners and a wireless provider, you
23 know, off the wall, you know, wireless

<table>
<tr><td>67</td></tr>
</table>

1 telephones and wireless service. I think
2 -- and they had some gift baskets there,
3 too. I leased a beauty salon and a little
4 jewelry -- a little jewelry place where
5 she sold some costume jewelry. I did a
6 renewal and an expansion for Fine Line
7 Engravers. Let's see. I leased just
8 briefly one of those internet computer
9 where I think they -- they couldn't
10 continue because of legislation. They
11 gambled or something about like some kind
12 of monopoly or, you know, they had little
13 -- like a computer cafe. And then a
14 refrigeration repair shop, a barbershop, a
15 place where they had -- a birthday party,
16 children's birthday parties that they
17 taught cooking to children. I can't think
18 what -- Chef and Me. I'm trying to think
19 time frame as much as I can remember. And
20 a personnel office for day workers.
21    Q Okay. Now, am I right that Pure
22 Country wasn't the only bar and lounge?
23 There was also -- Doodle Hoppers was also

<table>
<tr><td>68</td></tr>
</table>

1 in there; is that right?
2    A One of the tenants that occupied at
3 LeCroy is Doodle Hoppers.
4    Q What kind of an establishment is
5 that?
6    MR. STEWART: Object to form.
7    A When you say what kind --
8    Q I don't know at all. I mean, was
9 it -- did the name signify the kind of
10 drinks that it served or the kind of food
11 that it served? Was it just a bar? What
12 was it?
13    A Primarily, karaoke, and they were a
14 late-night establishment. They served
15 food, hamburgers and basic food late at
16 night.
17    Q And how much space did -- how big a
18 place was it?
19    A Twenty-eight hundred square feet.
20    Q Was it in there when you started
21 your relationship with Ms. Forney?
22    A Yes. It's been there a long time.
23    Q Long time. Okay. Most of the

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

69

1  tenants -- are most of the tenants in
2  there long-term?
3      A  When you say most, there is a core
4  group of tenants that --
5      Q  Core group?  And about how many
6  make up that core group?
7      A  Well, can you give me perimeters,
8  like how long they need to be to be
9  included in a core group?
10     Q  Oh, I don't know.  I was using your
11 term.  Who would you have identified as
12 the, I guess, long-time established
13 tenants in that shopping center?
14     A  There is a printing company, a cake
15 designs, there is a chiropractic company,
16 an insurance company, and I don't know if
17 Fine Line Engravers would be included.  I
18 think they've been there a while.  I don't
19 know exactly -- I can't remember how long
20 they've been there, but -- there was
21 another internet kind of -- a guy that
22 taught internet games, Dungeons and
23 Dragons and -- but he left.

70

1      Q  Okay.  Were there any -- other than
2  Doodle Hoppers and Pure Country, were
3  there any other tenants who operated at
4  night and into the late night?
5      A  At night and into the late night.
6  I didn't lease to these folks, but there
7  was at one point a recording studio.  I
8  don't know what their hours of operations
9  were.  They might have been late-night.
10     Q  Were they there during this period
11 of time when Pure Country came open?
12     A  No.
13     Q  Okay.
14     A  I don't believe they were.
15     Q  Were they before that or after
16 that?
17     A  Before.
18     Q  Okay.  Do you remember whether that
19 space had been rented to somebody else at
20 this point this time?
21     A  Which space, now?
22     Q  The music --
23     A  The recording studio space?

71

1      Q  Yeah, the recording studio.  That's
2  what I'm talking about.
3      A  Subsequently, it was leased, and
4  it's been leased again.
5      Q  And what kind of tenant is in
6  there?
7      A  She calls it a shoe place, but
8  she's never been opened, so.
9      Q  What about the one before that?
10     A  Medical transcribing company.
11     Q  So at the time when you were
12 leasing, as far as you know, Pure Country
13 and Doodle Hoppers were the only ones in
14 that shopping center that remained open
15 late into the evening?
16     A  There was a tenant briefly that she
17 had her own clothing, and I understand
18 that sometimes she was open later at
19 night, but I don't know that from personal
20 experience.
21     Q  Who was that?  What was the name of
22 that place?
23     A  I can't remember.  It was an

72

1  unusual -- I can't remember.
2      Q  And it was there at this same time?
3      A  Yes.
4      Q  Now, when -- and I'm sorry if I'm
5  repeating myself, but when -- Pure Country
6  was open for a period of time after you
7  started leasing that space, leasing the
8  shopping center?
9      A  Yes, it was.
10     Q  Did you know the owner of Pure
11 Country?
12     A  No.
13     Q  How did you learn that that space
14 was going to become available and that Ms.
15 Forney wanted you to help her lease it?
16     A  It was either Sam McGharr, who
17 manages her properties for her, or Ms.
18 Forney herself.
19     Q  How do you spell McGharr?  Do you
20 know?
21     A  M-c-G-h-a-r-r.
22     Q  Now, this Sam McGharr, did he work
23 for her?

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

77

1  Q Okay. Do you know who Don Little
2  is?
3  A Yes.
4  Q Prior to this dealings with the
5  Forney piece of property, had you had any
6  -- did you know Don Little?
7  A Yes.
8  Q How long had you known Don Little?
9  A Many years.
10  Q How did you know him?
11  A I was introduced by a friend.
12  Q And did you know him both on a
13  friendly as well as a professional level?
14  A Yes.
15  Q Did you -- did y'all socialize
16  together?
17  A At one time.
18  Q So you knew him quite well. He was
19  a regular acquaintance of yours?
20  A Regular acquaintance.
21  Q Well, let's just put it he was a
22  friend of yours?
23  A Yes.

78

1  Q And he was still a friend of yours?
2  A Yes.
3  Q Okay. Prior to -- well, before we
4  move there, let me see if I've got this
5  all covered. Was there a point in time --
6  well, withdraw that and ask this: While
7  the stay was in effect as part of the
8  bankruptcy, were you still allowed to show
9  the property to prospective tenants?
10  A I did not have a key to the
11  property. I had to call and ask for Mr.
12  Little to either open the property or drop
13  me off the key, and I immediately returned
14  it back to him.
15  Q But just because it was part of the
16  bankruptcy, there was a stay on it as part
17  of the property, that didn't mean that you
18  couldn't show the property, correct?
19  A Correct.
20  Q And was it your understanding that
21  the reason for the stay was because the
22  person who owned the establishment that
23  was paying the rent on the property had

79

1  gone bankrupt?
2  A That's right.
3  Q Thus, no more payments were being
4  made on the place, and actually finding a
5  tenant would be a good thing for the
6  bankruptcy; i.e., at least you would have
7  somebody renting the space and paying for
8  the monthly payments?
9  MR. GUY: Object to the form.
10  Q Do you understand my question?
11  A Those are your words. My words are
12  that the landlord wants income from any of
13  her property.
14  Q Okay. We're saying the same thing.
15  In other words, just because it was under
16  the stay didn't mean that you didn't need
17  to be looking for a tenant to rent that
18  space?
19  A Well, actually, one of her tenants
20  had already been expressing that they
21  needed to expand.
22  Q I was going to ask you that next.
23  You jumped the gun on me here. Let's

80

1  establish that the stay, number one,
2  didn't keep you from being able to show
3  the property, right? It just became more
4  difficult because you had to get the key?
5  A The stay in and of itself did not
6  preclude me from showing the property.
7  Q And even though the gentleman who
8  owned the establishment was in bankruptcy,
9  Ms. Forney, the owner, still wanted to
10  rent that space and the sooner the better?
11  MR. STEWART: Object to the form.
12  Q Correct?
13  A Ms. Forney, of course, wanted
14  income on any of her property.
15  Q Okay. One of the possibilities was
16  that Doodle Hoppers would expand; is that
17  right?
18  A The number one possibility, the
19  desired possibility was that Doodle
20  Hoppers --
21  Q Okay. And when did you learn that?
22  A I learned that Doodle Hoppers
23  needed expansion either December or

20  (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

81

1   November of 2006.
2   Q  Were you looking for them another
3   place?
4   A  There was the Trainmaster space
5   that was next to them, and discussions had
6   been made about expanding them the other
7   direction rather than the Pure Country
8   direction. And I never saw them, but I
9   was told that they priced out specific
10  ways to do that in order to meet City
11  code.
12  Q  Did you know the owner of Doodle
13  Hoppers?
14  A  I did not know the owner of Doodle
15  Hoppers. I met her once.
16  Q  Who is "her"?
17  A  Her name was Jeanie Hudson.
18  Q  When were you first -- other than
19  Doodle Hoppers, when were you first
20  contacted by anybody else to look at that
21  piece of property where Pure Country was?
22  A  I'm trying to put it in time frame.
23  There was a real estate agent with Junior

82

1   Towns, Wallace Litchfield, called and
2   wanted the key.
3   Q  Do you remember when that was?
4   A  I don't specifically remember when
5   that was. And then Grant Sullivan called
6   me.
7   Q  Okay. Now, before we get to Grant,
8   did this gentleman who called to get the
9   key, do you know whether he actually got
10  the key and whether he showed the
11  property?
12  A  No, never did.
13  Q  Never did?
14  A  No.
15  Q  So it was just a call, can I get
16  the key, and then not following through?
17  A  Well, he was primarily a
18  residential agent, and residential agents
19  handle transactions differently. They
20  have lock boxes, and they are not used to
21  this type of commercial property, and in
22  addition, there was open alcohol and
23  dangerous -- it could have been a

83

1   dangerous environment. There were no
2   lights. You could trip, you could fall.
3   There were -- it was not a safe place for
4   anyone to go unauthorized. When I say
5   unauthorized, unaccompanied or --
6   Q  Who was he -- do you know who he
7   was going to show it to?
8   A  I don't have any idea.
9   Q  But he just kind of just decided
10  not to do it?
11  A  Correct.
12  Q  Okay. And so then the next call,
13  tell me about that.
14  A  I believe the next call was Grant
15  Sullivan.
16  Q  Okay. And Grant Sullivan called,
17  and tell me what he told you. Tell me
18  about that conversation.
19  A  Grant said that he -- that someone,
20  a client, his client learned that Mr.
21  Fannin had closed Pure Country and Mr.
22  Fannin was going around telling people
23  that it was available and he asked if he

84

1   and his client could come and look at it,
2   tour the property.
3   Q  And what did you say?
4   A  I said I would have to get the key,
5   I'll have to be able to open it. I had no
6   way of accessing the space.
7   Q  All right. Was that all that was
8   said at that time?
9   A  He said that it was -- his client
10  was a retired baseball player, and he
11  wanted to open a sports bar.
12  Q  That's what Grant Sullivan said to
13  you?
14  A  I think so. I can't promise, but I
15  believe -- you know, some of it's
16  confusing, but I believe that's what he
17  said at that point.
18  Q  Did he tell you who the pro
19  baseball player was?
20  A  I don't think so. He might have.
21  Q  Did you know who it was? When you
22  heard the name, was it someone you knew?
23  A  I had never heard the name nor was

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1  I familiar with him, and I really like
2  baseball. I'm sorry. But I had never --
3  I never -- I never had heard of him ever.
4      Q  Okay. After the conversation, what
5  happened next? Did you get the key for
6  Grant?
7      A  Grant set a time to tour the space,
8  and I believe -- I can't remember how I
9  got the key.
10     Q  And so did you show the property?
11     A  Yes.
12     Q  And you showed the property to Mr.
13  Barr?
14     A  Yes.
15     Q  Prior to this, had you ever met Mr.
16  Barr before?
17     A  Not in person, that I can remember.
18     Q  Okay. Did you know who Mr. Barr
19  was? And I'm talking about at the time
20  you're getting ready to show him the
21  property --
22     A  No.
23     Q  -- do you know who he is or

86

1  anything about him at all?
2      A  No.
3      Q  Do you know how long -- I'm
4  switching gears a little. Do you know how
5  long Mr. Little had been representing Ms.
6  Forney?
7      A  No.
8      Q  I am assuming -- had you had any
9  other dealings with the lawyer Little,
10  with Don Little and Ms. Forney? In other
11  words --
12     A  Yes.
13     Q  So he had represented her in some
14  other stuff, too?
15     A  Collections.
16     Q  And that -- okay. Collections.
17  Okay. So he represented her, as far as
18  you knew, for collections, and he was
19  representing her in the bankruptcy?
20     A  I have no personal knowledge of his
21  representation arrangements.
22     Q  Okay.
23     A  I don't know that at all.

87

1      Q  I understand, but let me explore
2  that just a little bit. You've told me
3  that you knew him personally.
4      A  Yes.
5      Q  And you also knew him
6  professionally.
7      A  Yes.
8      Q  The professionally, was it through
9  your association with Ms. Forney that you
10  knew him professionally?
11     A  Not -- not --
12     Q  Not just that?
13     A  Correct.
14     Q  Okay. But you did know that he
15  represented Ms. Forney in some capacity?
16     A  I knew that he was working on
17  collections matters for tenants that had
18  not paid their rent pursuant to their
19  lease.
20     Q  And you knew that before you ever
21  knew that he was involved in this
22  particular piece of property, Pure
23  Country?

88

1      A  Yes.
2      Q  Did you have anything to do with
3  him getting Ms. Forney's business? Did
4  you introduce them?
5      A  I did introduce them.
6      Q  How did that come about?
7      A  There was a tenant -- I'm trying to
8  think now. There was a tenant that
9  defaulted and she works with Saxon Main on
10  her closings and Saxon did not want to
11  work on her collections and so she asked
12  if there was anyone that might work on
13  some collections and it was my
14  understanding he had done some collections
15  work.
16     Q  Okay.
17     A  And all I did was say he does some
18  collections work. She was in town, and
19  they -- that's all I did. Was, you know,
20  completely up to her whether or not she
21  wanted --
22     Q  And she being Ms. Forney?
23     A  Correct. Ms. Forney -- they met

22 (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

97

1  former baseball player wanted to tour the
2  space because he was interested in opening
3  a sports bar.
4      Q  Okay.
5      A  And I told Grant that there was
6  already a tenant in the space -- I mean,
7  in the center that needed expansion space
8  and that they had already been approached
9  and were working on actually converting
10  their establishment to the Pure Country
11  space, but I would accommodate Grant.
12  He's someone that -- as a courtesy, and I
13  would meet him and his client to tour the
14  space.
15      Q  Okay.
16      A  You don't know Grant, but Grant is
17  pretty pushy, and says we just want to see
18  the space, we just have -- you know, we
19  just want to see the space and push and
20  push and push and okay, Grant, we can go
21  see the space.
22      Q  All right.  So when Mr. Barr shows
23  up, you're assuming that this is -- does

98

1  Mr. Barr tell you who he is?
2      A  I believe he said his name, and I
3  wondered where Grant was.
4      Q  Well, tell me what you remember
5  about y'all's meeting.  Tell me what was
6  said.  During the time that you were
7  showing him the space, tell me everything
8  that you remember at that point in time
9  that the two of you said to each other.
10      A  He walked up, we shook hands, he
11  introduced himself, and we started
12  chatting about just the weather and
13  typical hi, how are you kind of stuff and
14  he asked me about the Aronov development
15  down at the beach called Aqua and then
16  started talking about that he owned some
17  -- a condominium or had an option on a
18  condominium and how the construction was
19  very poor, how difficult it was to get a
20  good contractor, and he went into detail
21  about the furniture, the cabinets and that
22  he probably was going to have to sue them
23  in order for them to correct the problems

99

1  at this condominium at the beach.  And
2  then we started talking about the parking
3  lot.  We were looking at the parking lot,
4  and I said, you know, this is a very nice
5  center and everyone works well together or
6  did work well together and that if they
7  were -- if he was considering leasing, you
8  know, that I wanted to make sure up front
9  that our main concern was for the health
10  and safety of the invitees to the
11  establishment and that -- and, also, the
12  health and safety of the other tenants in
13  the center, and I said we don't -- for
14  example, we would like to avoid any kind
15  of problems through security measures like
16  there have been over at Celebrations and
17  with police involvement with knifing,
18  stabbings, shootings, drug trans --
19  supposed drug problems, altercations,
20  continual bad publicity in the newspapers,
21  on the radio.
22      Q  Now, you said all this to him?
23      A  I probably said some of it.

100

1      Q  Well, I'm asking you to tell me
2  what you said, not --
3      A  Okay.  Well, I said something to
4  that effect, and he said stop, wait a
5  minute, this -- you know, I was the
6  manager of Celebrations, and he said that
7  all that problem was caused by a roving
8  gang of black troublemakers.  And it
9  struck me right then and there that that's
10  the second time that I've heard him say
11  that.
12      Q  When was the first time you heard
13  him say that?
14      A  Well, when I was involved in
15  leasing a Dave and Busters type
16  establishment at Atlanta Crossing, he
17  called me and wanted me to introduce him
18  to the tenant who was going to lease over
19  there at Atlanta Crossing, Fred Beasley,
20  who is -- was at the time a pro football
21  player, and he said put in a good word for
22  me and I said, you know, who are you and
23  he said Celebrations and I said oh, my

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

101

1  goodness, you've had a lot of problems
2  over there and then that same phrase came,
3  well, that's all -- it's all caused by a
4  roving gang of black troublemakers and
5  underaged people who sit in the parking
6  lot and can't get in. And he went into
7  the same explanation then, and it just, my
8  head clicked at that point who he was.
9  And I said -- so then he said that -- then
10  he went into his explanation about at that
11  time that it was because the police didn't
12  do their job and that -- then he said that
13  the owners of the strip center didn't do
14  their job. They were supposed to have
15  security. And then at that point, he
16  never one -- well --
17  Q He said all of this to you?
18  A Yes, he did.
19  Q I'm asking you to tell me exactly
20  what you remember being said at this
21  meeting with Mr. Barr.
22  A Yeah.
23  Q Okay.

102

1  A Yes, sir, he did.
2  Q Okay. Well, go on.
3  A He did say that.
4  Q Okay.
5  A Because I was hoping -- I was
6  hoping that I could hear something that
7  would say I, too, am very interested in
8  the health and safety of my invitees; I,
9  too, am very interested in the health and
10  safety of any of the people that are going
11  to be my neighbors. I kept hoping and
12  waiting to hear it.
13  Q Well, tell me what you did hear.
14  A I told you.
15  Q Is that all?
16  A It was constantly -- every question
17  I asked or everything I said, it was it
18  wasn't his fault what happened at
19  Celebrations, he had no control at
20  Celebrations. It was just one blame on
21  these roving gang of black troublemakers
22  and that -- and that these underaged
23  people that hung out in the parking lot

103

1  and that the police didn't do their job,
2  that he had gotten bad publicity and,
3  finally, that he told me that he chose to
4  close down Celebrations.
5  Q Okay.
6  A And he said that he was now working
7  with this baseball player to help find a
8  place because he had heard about Fred
9  Beasley's place for a sports bar. I said
10  well, you know, we would love to have a
11  sports bar here.
12  Q Okay.
13  A And so we went in, and we -- he
14  said wasn't this a Brannigans or
15  Bronnigans, and I said I don't know, but I
16  think it used to be. And he said well,
17  all that up there has to come out and he
18  started telling me all the things that
19  would have to change and he said now, that
20  other -- that other tenant right down
21  there, we'd need to move that person out
22  and he said and, of course, the landlord
23  would spend about three hundred thousand

104

1  dollars for us to do our improvements,
2  right? And at that time, I said no. I
3  said the landlord probably will not. I
4  said it's not usually will she invest any
5  kind of money for improvements. It's if
6  you do choose to lease it, it would be
7  as-is. I said occasionally, the landlord
8  may offer some beneficial rent, but it
9  would depend upon the terms of the lease,
10  it would depend upon many, you know,
11  factors, on what your offer would be.
12  And then we walked around, and he
13  -- I believe he took some photographs or
14  -- and then he called, and he -- I said
15  when is your associate or your client
16  coming, and he said well, he was supposed
17  to be here, and he called and he said that
18  Mr. Long had just gotten out of the shower
19  and that -- I said well, I'll wait. I'll
20  wait. Can he come? And so we walked
21  around some more, walked around some more.
22  He called him back. And finally, he said
23  -- I think it was by that time almost

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

105

1  10:30, and our appointment was at 9:00
2  o'clock, and he said I guess he's not
3  going to come.
4      Q  Was that it?
5      A  And we walked out and he said he
6  was going to meet him to eat at Chappies
7  or somewhere and -- I'm trying to think if
8  there was anything else.  He may -- I
9  believe there was some discussion about
10 the improvements, that there was no vent
11 hood, so if they wanted to serve food,
12 there would have to be, you know, that.
13 There was no gas to the building, there
14 were -- you know, different details that
15 you talk about when you are touring a
16 space.
17     Q  Okay.  Have you told me everything
18 you think that you can remember that was
19 said?
20     A  There may have been other things
21 said.  Right this minute, I've told you
22 what I can remember right this minute.
23     Q  Uh-huh.

106

1      A  But there are days when I can't
2  even remember my children's names, so I
3  will try my best.  That's to my best of my
4  recollection how the conversation
5  progressed.
6      Q  Okay.  Is LeCroy in a predominantly
7  white area?
8      A  I don't know the demographics.
9      Q  The bar that had been there, do you
10 know how long this particular country bar
11 had been there?
12     A  I would be guessing.  Somewhere
13 around eight to ten years maybe.  Maybe,
14 maybe not.  I'm guessing.
15     MR. STEWART:  Don't guess.
16     THE WITNESS:  I'm sorry.
17     Q  Do you know that its tenants were
18 predominantly white?
19     MR. STEWART:  Object to form.
20     A  I never have ever met Tony Fannin.
21 I've never -- no.
22     MR. STEWART:  The question was --
23     A  No, I do not know the compilation

107

1  of their invitees.
2      Q  Was this the only meeting that you
3  had with Mr. Barr in person?
4      A  Yes, sir.
5      Q  After that meeting with Mr. Barr,
6  did you have any other conversations with
7  Grant Sullivan about either Mr. Barr or
8  the space?
9      A  Yes.
10     Q  Tell me about those.
11     A  Mr. Sullivan called and wanted to
12 know if Ms. Forney would sell LeCroy
13 Shopping Village, and my response was that
14 it was not listed for sale; however, he
15 was welcome to make an offer.  And I said
16 I think a couple years ago or a year ago,
17 Josh Hall had it listed for one point nine
18 million.  And then we discussed the
19 tenants that were there and the income and
20 he did some calculation.  Okay.  I don't
21 know that he did, but he asked me with the
22 reason for wanting to know about the net
23 operating income.  That's what he told me.

108

1      Q  Did you furnish him with any rent
2  roles or anything like that so that he
3  could determine the income from the
4  shopping center?
5      A  I believe I did.
6      Q  And subsequent to that, you
7  received an offer on the property, didn't
8  you?
9      A  Yes, sir.  May I -- I believe there
10 is something else I remember about that
11 first conversation with Mr. Barr.  I'm
12 having trouble sometimes time-wise when we
13 had it, but I do remember that he did
14 mention some other properties that he had
15 looked at.
16     Q  Okay.
17     A  But -- I think he did, but that
18 might have been in another conversation,
19 but it's possible that he told me that he
20 had looked.  I think --
21     Q  Do you remember the property he
22 said that he might have looked at?
23     A  I believe he had said he was

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

109

1  looking at -- there was a property down
2  the street, a stand-alone building next to
3  the Pizza Hut. It was the former Chili's
4  I think.
5      Q How about Friday's?
6      A Friday's. That was it. Friday's.
7      Q So he did mention the fact that he
8  had looked at the former Friday's
9  building?
10     A I believe he did.
11     Q And --
12     A And the Macaroni Grill I believe he
13 did.
14     Q Now, he also -- you agree that he
15 told you who Terrence Long was, the ex
16 baseball player?
17     A I knew from he and Grant that the
18 -- that it was an ex-baseball player.
19     Q Okay. Now, how familiar were you
20 with the kind of clientele that
21 Celebrations had?
22     MR. STEWART: Object to form.
23     A I was not.

110

1      Q Had you ever been to Celebrations?
2      A Once.
3      Q When you went, did you notice that
4  it was a predominantly black bar?
5      MR. STEWART: Object to form.
6      Q Well, I might need to ask you when
7  you went?
8      A Yes, you do.
9      Q When did you go?
10     A I went the summer -- remember I
11 said I got divorced --
12     Q Yeah.
13     A -- in March of 1994, and I believe
14 that it was that summer because I had
15 never been to a bar or anything before
16 being a minister's wife. I was curious,
17 and I went with one of my little legal
18 assistant friends. She wanted to go. And
19 we ran into Grant. And that was, I
20 believe, in 1994. I believe it was right
21 then.
22     Q And at that point in time, was it a
23 country western?

111

1      A I have no idea. I don't know -- I
2  just, I see a picture of a room and us
3  standing and talking and music and -- but
4  I can't remember if there was a ball, I
5  can't -- but that's -- I really didn't
6  remember the clientele.
7      Q 1994, there probably was a ball,
8  and it was probably going around with
9  lights and all that good stuff. Okay.
10     A Uh-huh.
11     Q But he did talk -- he did tell you
12 at that time that despite the fact that he
13 had owned Celebrations, the problems with
14 Celebrations and he had shut down
15 Celebrations that this was going to be a
16 sports bar? He told you that, didn't he?
17     A I believe he said a sports bar,
18 yes.
19     Q Okay. Did you bring up
20 Celebrations first and then he told you he
21 was the owner?
22     A I probably did, yes.
23     Q And when you brought it up, you

112

1  brought it up to talk about the problems?
2      A Absolutely. Health and safety of
3  their invitees and all the terrible,
4  terrible publicity.
5      Q Did you ever make reference to the
6  fact that it was a black club?
7      A Never.
8      Q Did you ever say that --
9      A He did.
10     Q Okay. You've told me that.
11     A Black troublemakers. That was his
12 words, not mine.
13     Q Who were underage, couldn't get in
14 the bar --
15     A No, no.
16     Q -- and would stay out in the
17 parking lot?
18     A A roving gang of black
19 troublemakers. He did not say the age of
20 the gang, but he said that in addition,
21 there were underaged people who hung out
22 in the parking lot that he could not --
23     Q He had no control over?

28 (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

---

113

1    A    Correct. He could not assure his
2   invitees' safety.
3    Q    Well, now, what gave you the
4   impression that that same group of rove
5   blacks would frequent his place if he
6   rented this space at LeCroy?
7    A    Nothing. Nothing, sir.
8    Q    Nothing. Okay.
9    A    No. My concern was that he would
10  take responsibility for the security of
11  his invitees.
12   Q    But didn't he tell you that the
13  reason for the lack of security was he
14  could get no police help or City help?
15  Didn't he tell you that during that
16  meeting? Didn't you tell me he blamed it
17  on the police not patrolling it?
18   A    He blamed it on everybody except
19  himself.
20   Q    What could he as the tenant of the
21  property do about the parking lot that is,
22  I believe, a public parking lot and the
23  problems that are existing in that parking

---

114

1   lot?
2    A    No, sir.
3        MR. STEWART: Object to form.
4        MR. GUY: Object to the form.
5    A    No, sir. I would say that that is
6   a private parking lot. It is not a public
7   parking lot.
8    Q    But it's not --
9    A    It's on private property.
10   Q    But it's not just his parking lot,
11  is it? He's one of the tenants of that
12  parking lot, is he not, one of many
13  tenants whose clients use that parking
14  lot?
15   A    He would be a tenant whose invitees
16  imbibed in adult beverages. The other
17  invitees other than Doodle Hoppers would
18  not be selling adult beverages.
19   Q    I'm sorry. I didn't understand.
20  What?
21   A    None of the other tenants would
22  have people come in and sell adult
23  beverages to them.

---

115

1    Q    What was Doodle Hoppers selling?
2    A    That's what I mean. Doodle Hoppers
3   and -- and whatever tenant -- you know,
4   historically, the only two would have been
5   Doodle Hoppers who had adult beverages and
6   Pure Country who had adult beverages.
7    Q    Okay. Did you ever -- during any
8   of the conversation, did you ever admit to
9   Mr. Barr that you may have -- you may have
10  gotten your opinions about Celebrations
11  from the press and that maybe --
12   A    In polite conversation, I might
13  have said such a thing, but it wasn't just
14  the press.
15   Q    Okay. You knew that Celebrations
16  was a hip-hop bar, did you not?
17   A    I did not.
18   Q    Did you know that it was frequented
19  by mostly African-Americans?
20   A    I did not.
21   Q    You didn't know that?
22   A    No, sir.
23   Q    How did you know what you knew

---

116

1   about Celebrations that you mentioned to
2   him that day? How did you know about it?
3    A    There were -- it was in the -- on
4   the news.
5    Q    Okay. How many times do you think
6   you saw something about it on the news?
7    A    Many times.
8    Q    A whole bunch of times?
9    A    In the newspaper.
10   Q    Okay. How many times do you think
11  you saw something about it in the
12  newspaper?
13   A    Many times.
14   Q    Any other places? Did you ever
15  talk to any people about it?
16   A    It was discussed at chamber of
17  commerce gatherings. I don't know
18  specifically with who.
19   Q    All right.
20   A    Just in Montgomery, it was
21  constantly, you know, a frightening place,
22  a very frightening -- it would be a
23  frightening place.

---

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

117

1    Q  Okay.  Did Aronov do any leasing in
2  the place where Celebrations was?
3    A  No.
4    Q  And despite having heard all of
5  that and read all of that, seen all of
6  that, you didn't know it was a black bar,
7  a black hip-hop bar?
8      MR. STEWART: Object to form.
9    A  Sir, I'd never been there since
10 1994.
11   Q  I know.  That wasn't my question,
12 though.  Seeing all that you saw on TV and
13 all that you saw in the newspapers and all
14 that you heard at the chamber of commerce
15 meetings and everywhere else, are you
16 telling me that despite hearing all of
17 that, you did not know and it was never
18 mentioned that it was a black hip-hop bar
19 and that the problems were with blacks?
20     MR. STEWART: Object to form.
21   A  No.
22   Q  Okay.  We got off -- I was about to
23 show you this lease when we got into that.

118

1  Can you remember anything else that y'all
2  may have discussed in that first meeting
3  that you haven't told me?
4    A  Security.  That's another -- let's
5  see.  I believe we did discuss the rent.
6  I believe we had a cursory discussion of
7  the rent.
8    Q  Did you quote him a price?
9    A  I believe I did.
10   Q  Do you remember what it was?
11   A  I believe it was forty-five hundred
12 a month.
13   Q  How did that compare to what the
14 other tenant was paying?  If you don't
15 know, I guess we can look.  The landlord
16 creditor motion that I showed you earlier,
17 it shows that the rent was two thousand
18 eight hundred -- it was twenty-eight
19 hundred dollars.  Do you remember that as
20 being how much Tony Fannin and his group
21 were paying for it?
22   A  I did not have any knowledge of
23 what actually Tony Fannin was paying or

119

1  did pay to that point because there had
2  been some discussions with the landlord
3  and Mr. McGharr and Mr. Fannin when they
4  were trying to work things out.
5    Q  So -- okay.
6    A  But I didn't price it.  Ms. Forney
7  priced what she wanted out of that
8  property.  That was what she wanted me to
9  quote.
10   Q  So the -- what did you say it was?
11 Forty-eight hundred?
12   A  Forty-five hundred.
13   Q  Forty-five hundred?
14   A  I think that's what I quoted.
15   Q  So the forty-five hundred came from
16 Ms. Forney and not from you?
17   A  That's correct.
18   Q  And when did she tell you that
19 that's how much she wanted to quote?
20   A  I think in, you know, one of our
21 initial discussions.
22   Q  Okay.  You knew it was in
23 bankruptcy, right, but you didn't know

120

1  what the rent was?
2    A  I didn't -- I had nothing to do
3  with rent collections.
4    Q  Okay.  Well, let me ask you this:
5  Have you rented the space since it was
6  shown to Mr. Barr?
7    A  Yes.
8    Q  And how much did you charge?
9    A  It was an escalating lease.
10   Q  So what did it begin at?
11   A  It began at -- because Doodle
12 Hoppers chose to keep their present
13 location while they were renovating the
14 new location, it was a blended rate
15 between the two, and then they agreed to
16 make all of the additional improvements on
17 the space.
18   Q  Who is "they"?
19   A  Doodle Hoppers, the tenant.  And
20 once they got -- did some estimates, there
21 was a tremendous amount of electrical that
22 needed repair, so Ms. Forney decided on
23 four thousand a month.

30  (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

121

1   Q All right. Let's go back. You did
2   quote them an amount, it was forty-five
3   hundred, that was set by Ms. Forney?
4   A Yes.
5   Q Okay.
6   A But there is always room for
7   negotiation if someone wants to make an
8   offer. I think that's right. I believe
9   that's right, but you know, I would have
10  to -- nine dollars a square foot is what
11  she wanted to charge, which is very much
12  in --
13  Q Okay. Did you get this purchase
14  and sales agreement from Gordon Sullivan
15  after y'all's conversation about the
16  property for sale?
17  MR. GUY: You mean Grant Sullivan.
18  Q Grant Sullivan?
19  A I received it from Grant Sullivan.
20  He faxed it over, I believe.
21  Q And you recognize that as being the
22  offer?
23  MR. GUY: I'm sorry. Did you mark

122

1   that, Mike?
2   MR. QUINN: Yeah. It's number 4.
3   (Whereupon, Plaintiff's Exhibit 4 was
4   marked for identification and the same is
5   attached hereto.)
6   A Yes, I believe this is what I
7   received.
8   Q Did you respond to that or make a
9   counteroffer?
10  A Ms. Forney was E-mailed. I scanned
11  it, and I also faxed it to her, and she
12  said that she was not going to make a
13  counteroffer, that it was so far below
14  what she needed to get out of the center
15  that she chose not to.
16  Q All right. Did you communicate
17  that to anybody?
18  A To Grant?
19  Q To Grant?
20  A I did.
21  Q How did you communicate that to
22  Grant? Did you call him?
23  A I called him.

123

1   Q Okay. So you called him, and you
2   told him that that was so low that she was
3   not going to respond?
4   A No.
5   Q What did you tell him?
6   A I said that she has chosen not to
7   counteroffer.
8   Q Did you tell him anything else?
9   A And that she was not going to
10  accept the offer.
11  Q Did he respond in any way to that?
12  A Yes, he did.
13  Q Tell me what he said.
14  A He started saying that it wasn't
15  worth that, that there was crime in the
16  area, that it was a terrible place, that
17  she would be lucky to get it, that if she
18  -- when she was ready to change her mind
19  to let him know, that -- and I said, well,
20  Grant, you and I have a difference of
21  opinion. I love midtown. I love this
22  part of the town. I don't feel there is
23  -- that I'm in danger and that it's been

124

1   very safe over here at LeCroy. We've
2   never had any problems or very -- I take
3   that back. I said we have very few
4   instances or occurrences and I'm sorry
5   that your client feels that it's such a --
6   that my -- you know, that Ms. Forney
7   should just give it away. I don't --
8   she's made this decision and --
9   Q Were there any other discussions
10  about buying or selling the property after
11  this with anybody?
12  A Mr. Barr.
13  Q Tell me about that.
14  A He called me up.
15  Q When did he call you? After --
16  A After this.
17  Q After you had talked to Grant?
18  A Yes.
19  Q Tell me about that conversation.
20  A Well, he started apologizing for
21  Grant and Grant's comments. I guess Grant
22  had talked to him about what he had said
23  to me and that he had bullied -- tried to

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

125

1   bully me, and he -- Mr. Barr tried to be
2   very charming, and he said that they just
3   want to find a place, and so I said, well,
4   I would be glad to help you find a place
5   somewhere, you know, somewhere else that
6   you could purchase or buy. And by the
7   way, I suggested the Copeland's and then
8   -- and I think there was another building
9   on there. And then he wanted me to -- and
10  I don't know if this was this conversation
11  or a subsequent conversation, but he asked
12  me about a listing that one of our other
13  agents had at Capitol Plaza, and I
14  followed up on that for him.
15      Q Did he ever ask to go back into the
16  property to see it again?
17      A He did. I believe he did.
18      Q When did he do that? Was that the
19  conversation after you'd talked to Grant
20  or the subsequent conversation?
21      A After I had talked to Grant
22  sometime.
23      Q And what did you tell him about

126

1   going to see the property again?
2       A I said -- told him I do not have
3   the key, I did not have the key. He can
4   be very demanding and pushy.
5       Q Who?
6       A Mr. Barr.
7       Q You had only met him once. How do
8   you come to that conclusion?
9       A Well, on the phone, he wanted to
10  see it right then and there. He wanted to
11  go back and see it right then and there,
12  and I can't just drop -- I couldn't just
13  drop everything at that moment because he
14  was pushing to -- you know, I was
15  available, I waited an hour and a half for
16  Mr. Long. I waited and waited and waited
17  and took time away from other things and
18  waited and waited and then he calls me and
19  wants me again to drop everything. I
20  don't know that he was going to show up.
21  He didn't show up this first time.
22      Q Well, did you --
23      A He had already seen it. Mr. Long

127

1   didn't even show up the first time when he
2   made an appointment and didn't show up.
3       Q Okay.
4       A So I really felt like somebody that
5   was truly interested would have shown up.
6   Don't you?
7       Q Did you tell him that you could get
8   the key?
9       A Yes. I said that an attorney had
10  it but that, you know, I -- I couldn't
11  just drop everything and -- and go right
12  now.
13      Q Okay. Did you mention to him
14  anything about the bankruptcy at that
15  point in time?
16      A Of course, I did. I'm sure he knew
17  about the bankruptcy.
18      Q Did you tell him about the
19  bankruptcy? You didn't mention that you
20  mentioned that the first meeting or your
21  personal meeting with him.
22      A You're right. I forgot to tell
23  you.

128

1       Q I gave you every --
2       A I know you did.
3       MR. STEWART: Let him finish the
4   question, please.
5       THE WITNESS: Yes.
6       Q And you did not tell me that that
7   was mentioned in the first meeting with
8   him; and I gave you every opportunity.
9   Are you now saying you now remember that
10  in the first meeting, you told him that it
11  was under a bankruptcy stay or not?
12      A Yes, I did.
13      MR. STEWART: Object to form.
14      A But he already knew. I guess
15  that's why I didn't --
16      Q How do you know that he knew? Did
17  he say --
18      MR. STEWART: Y'all need to quit
19  cutting -- she wasn't even finished with
20  her answer. Y'all are cutting each other
21  off.
22      Q How do you know that he knew? Did
23  he say to you I know that it's in

32 (Pages 125 to 128)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

133

1  if possible, if it worked out.
2      Q If somebody else, though, wanted to
3  lease the property and actually made an
4  offer on it, would you have -- could you
5  still tell that person no, we're not going
6  to accept that offer because we're going
7  to still give Doodle Hoppers an
8  opportunity to do it?
9      MR. STEWART: Object to form.
10     Q Or would you have to take that
11  offer from them?
12     MR. STEWART: Object to form.
13     A Any offer that comes through me,
14  that is given to me, I have an obligation
15  as a licensee to inform my customer that
16  an offer has been made.
17     Q Okay. That answers that. Was
18  Doodle Hoppers also thinking about moving
19  to the Trainmaster space? Didn't you tell
20  me that that was in the works, too?
21     A No. That was initially before the
22  Pure Country space --
23     Q Before it came open?

134

1      A -- became available. You know,
2  that was something that had been discussed
3  because they were having people standing
4  out in the -- on the sidewalk in lines
5  waiting to get in because there was
6  occupancy, you know, a certain occupancy.
7  So they were looking into expansion.
8      Q Okay. Now, in this telephone
9  conversation with Mr. Barr, how did the
10  conversation end?
11     A Which telephone conversation? Do
12  you have anything in writing that -- is
13  that the one that you transcribed, or
14  which conversation are you talking about?
15     Q I don't know what you're talking
16  about. I'm talking about the one between
17  Mr. Barr and yourself that we were just
18  talking about a minute ago when he called
19  after Grant -- after you had talked to
20  Grant and he told you he wanted to see it,
21  you told him you didn't have the key. How
22  did y'all leave it?
23     A That one was about the third

135

1  conversation we had.
2      Q Okay.
3      A The first one was him talking about
4  wanting to see some other locations.
5      Q Okay.
6      A And apologizing and charming.
7      Q I'm sorry. I thought that was the
8  same conversation.
9      A No, sir. To my recollection, he
10  did not ask to go and tour the property
11  again in that conversation.
12     Q Okay. So then there was another
13  conversation in which he wanted to tour
14  the property, and he wanted to tour it
15  with his partner, because that's when you
16  were telling me about why should I wait
17  because an hour and a half and he didn't
18  show and all of that. But did you
19  understand that that was the reason he
20  wanted to see it again was so that Mr.
21  Long could see the property?
22     MR. STEWART: Object to form.
23     A I don't know what you're saying.

136

1      Q In the conversation that I believe
2  you said was the third conversation when
3  you told him you would have to get the key
4  and he was very persistent about seeing
5  it, did you under --
6      A He was persistent about the time
7  frame of seeing it. Drop everything.
8      Q Okay. Did you under --
9      A That's what I meant.
10     Q Did you understand that he wanted
11  to go into it again so that Mr. Long could
12  see it?
13     MR. GUY: Object to the form.
14     A I believe that that could have been
15  part of his reasoning.
16     Q Okay.
17     A At that point --
18     Q You've answered my question.
19     A Okay.
20     Q How did y'all leave it at the end
21  of that conversation? Were you going to
22  get the key and call him back and set up a
23  time? Was he going to go over there and

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**137**

1  meet you? How did y'all leave that
2  conversation?
3       A  Well, at that point, Ms. Forney had
4  been informed that he wanted three hundred
5  thousand dollars in improvements, that he
6  wanted to move the other tenant that was
7  already in the space, and that at that
8  point, it was really -- and then she had
9  been informed that he was the former owner
10  of Celebrations, and with all the
11  problems, that it really wasn't urgent at
12  all in her mind --
13       Q  Okay.
14       A  -- to open it up again to someone
15  that could not -- wasn't interested in the
16  health and safety of the invitees nor the
17  other tenants.
18       Q  Okay.
19       A  And she didn't have three hundred
20  thousand dollars that she told me. You
21  know, that was just -- it was over. When
22  she heard the three hundred thousand
23  dollars, there was no -- she wasn't -- it

**138**

1  just -- you know, his terms -- the terms
2  that he suggested at the first meeting he
3  never said changed. He never said on the
4  telephone the terms have changed, my needs
5  have changed, I would like, you know, to
6  -- there was -- you know, so there would
7  be no reason to tour the property. He had
8  already seen the property. He knew the
9  property.
10       Q  All right.
11       A  And so it wasn't urgent. I would
12  have opened up the property or made
13  arrangements but not on an urgent basis.
14  We -- and she had chosen to move forward
15  with the prior -- with the tenant who she
16  already had in --
17       Q  Doodle Hoppers?
18       A  Correct.
19       Q  Okay. Now --
20       A  It was a business decision.
21       Q  Did you have any other
22  conversations with Mr. Barr after that
23  conversation, that last one that we just

**139**

1  talked about?
2       A  I know that we had a conversation,
3  and which one, whether it was the second
4  or the third, I don't -- I can't tell you
5  for sure, but it was -- he wanted to know
6  about the Capitol Plaza.
7       Q  Okay.
8       A  And I told him that the owners of
9  Capitol Plaza had said that they preferred
10  to have a retail establishment. They
11  weren't ready to have a sports bar or
12  nighttime establishment there at that
13  point in time. I also told him that I had
14  spoken with Robert Long in our office and
15  that there were ground restrictions so
16  that they could not keep the Copeland's
17  open the hours that they wanted to, plus
18  there had to be a certain percentage of
19  the income in food-based sales, and so
20  that turned out -- you know, that would
21  not have worked for him.
22       Q  Okay. I'm going to ask you some
23  questions now, and we can move along a lot

**140**

1  quicker if can you answer yes or no to
2  these questions, okay, as best you can.
3  If it needs an explanation, you can offer
4  it, but we've been here a long time and I
5  know everybody is getting tired and I know
6  I'm getting tired and I know you're
7  getting tired and we can get on through
8  this. It is not necessary for you to tell
9  me things over and over again. I get it
10  the first time, okay?
11       Did you ever tell -- in this
12  meeting, did you ever tell Mr. Barr that
13  you could not show him the building
14  because it was tied up in bankruptcy?
15       MR. STEWART: Which meeting are you
16  talking about?
17       Q  I'm talking about the telephone
18  conversation, either one of them.
19       MR. STEWART: Object to form.
20       A  I don't remember.
21       Q  Okay. Did he ever ask you to write
22  a lease?
23       A  No.

35 (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

141

1     Q  Did he ever tell you that he would
2  take the asking amount of forty-five
3  hundred dollars?
4     A  No.
5     Q  Did he ever tell you that he would
6  take it site unseen?
7     A  No.
8     Q  Did you ever tell him that there
9  was a lease pending and that you were
10  actually working out the details of that
11  lease with somebody else?
12     A  Yes.
13     Q  And that would have been Doodle
14  Hoppers?
15     A  Yes.
16     Q  Okay.  Are you familiar with the
17  Woodmere Tavern?
18     A  Yes.
19     Q  Have you frequented the Woodmere
20  Tavern?
21     A  I have -- yes, I have frequented it
22  back in '94 and '95.
23     Q  Okay.  Did you know Mike Morin?

142

1     A  No.
2     Q  Did you prior to -- at any time,
3  did you know Mark Cranage, C-r-a-n-a-g-e?
4     A  No.
5     Q  Do you remember getting a telephone
6  conversation from Mark Cranage about
7  seeing the property over where Pure
8  Country was?
9     A  Yes.
10     Q  Tell me what you remember about
11  that conversation.
12     A  Can you be more specific?
13     Q  Did he ask to see the property?
14     A  He did.  He asked to see the dance
15  floor.
16     Q  The dance floor?
17     A  Uh-huh.
18     Q  Which would be --
19     A  Had one of the finest dance floors
20  in Montgomery.
21     Q  Okay.  Which would be inside the
22  property?
23     A  Yes.

143

1     Q  Did you tell him you would have to
2  get the key?
3     A  I did.  I said that I did not have
4  the key, that it was involved in
5  bankrupty.  But he knew that, too,
6  because Tony Fannin told everybody.
7     Q  Okay.  Did he tell you he knew
8  that?
9     A  Yes.
10     Q  Did he tell you that he was
11  involved with Woodmere?
12     A  Yes.
13     Q  You knew Woodmere to be a country
14  and western place?
15     A  No.
16     Q  Did you know what it was?  Did he
17  tell you what it was?
18     A  No.
19     Q  That it was a country western?
20     A  No.  It was -- it was a -- just a
21  -- no, it was not -- I did not know it to
22  be a country and western bar.
23     Q  Okay.  Did you tell him that you

144

1  would arrange through the attorney for him
2  to see the property?
3     A  I cannot remember.  My memory was
4  that I gave him the attorney's number
5  because he wanted to see it on a Thursday
6  night and I had another appointment.  I
7  could not be there.  And he said -- I said
8  I can't -- he said I just want to see the
9  floor, I want to see the dance floor.
10     Q  Okay.
11     A  And I said, well, you can look at
12  the dance floor, but I don't have the key.
13     Q  Are you telling -- okay.  Was he
14  calling to look at the dance floor and not
15  calling about leasing the space, or was he
16  calling about leasing the space because of
17  the dance floor?
18     A  He -- okay.  Do you want me to
19  elaborate or say yes or no?
20     Q  Well, you really can't answer yes
21  or no to that question because I was
22  asking you two questions.
23     MR. STEWART:  The ground rules have

36  (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

145

1  changed.
2  A  Okay.  Now you've changed your
3  mind?
4  Q  Yeah, I've changed my mind because
5  this yes or no ain't going to work.
6  A  Okay.
7  Q  Explain to me why he --
8  A  The conversation --
9  Q  Explain to me your understanding of
10 why he wanted to see the property and
11 whether it included possibly leasing it.
12 A  Okay.  He identified himself on the
13 telephone as a manager of Woodmere Tavern.
14 He asked -- told me that Tony Fannin had
15 come there, said that he was in bankruptcy
16 and he was -- that it was available, that
17 he knew that Doodle Hoppers was in the
18 process of their due diligence in deciding
19 whether they wanted to lease the space.
20 He then told me that Phillip Stewart, one
21 of the principals at Doodle Hoppers, was a
22 convicted pedophile, and he then directed
23 me to the website and showed me the

146

1  website where Mr. Stewart came up as
2  having a felony, being incarcerated for a
3  felony.  He then said that he had always
4  wanted to own his own place.  He said that
5  he was either part owner or owner of a
6  country and western bar -- establishment
7  up in Prattville where there was line
8  dancing.  He said that some of the ladies
9  that worked at Woodmere were interested in
10 line dancing, and he said I understand it
11 has one of the best dance floors in
12 Montgomery and he said I would really like
13 to see it.  He said I don't want my boss
14 to know that I'm looking, but I have
15 looked at some other spaces for lease and
16 I'm almost at the point of leasing another
17 space and I would just like to look at
18 this one.  I understand that you're
19 already in due diligence -- well,
20 negotiations with Doodle Hoppers, but I
21 thought you might want to know about the
22 criminal history of who you are working
23 with.  And he said if it's possible, I

147

1  would like to at least see the dance floor
2  before I lease this other space in case
3  this other one falls through and in case
4  you decide not to lease to them since now
5  you know that he is a felon.
6  Q  Okay.
7  A  And I said well, I -- he said I
8  need to see it right away, and here's
9  where I really don't remember.  I thought
10 that I gave him Mr. Little's telephone
11 number and I said here is the person with
12 the key.  If you want to go look at the
13 dance floor, you need to call him.  But
14 maybe I called Mr. Little and said he's
15 going to meet you over there on Thursday
16 night.  I can't be there.  Will you open
17 the door?  He wants to look at the dance
18 floor.
19 Q  Is that it?
20 A  Oh, no, that isn't it.  Then we
21 discussed -- I said to him --
22 Q  Who is "we"?  You're talking to
23 Little or are you talking to --

148

1  A  No, Mr. Cranage or the person on
2  the phone who identified himself as Mark
3  Cranage.  I said to him I don't ever see
4  Woodmere in the newspaper or, you know,
5  that y'all don't have any problems over
6  there.  How do you keep the parking lot
7  safe for your invitees?  He said that's
8  very important to us because if you can't
9  provide security to the ladies, they will
10 not come, and he said if the ladies don't
11 come, the men won't come.  And he said so
12 there are certain things that we don't
13 allow such as wife-beater shirts, certain
14 type dress that we don't encourage and we
15 are also very careful to make sure that
16 any parking areas are thoroughly secured.
17 And I said if the property were available,
18 your type of security and concern about
19 the health and safety of your invitees is
20 the kind that we would want.
21 Q  Okay.  Anything else?
22 A  I can't think of anything else
23 right now.

37  (Pages 145 to 148)

# FREEDOM COURT REPORTING

149

1    Q Had Mr. Little shown the property
2 before this that you know of?
3    A I do not know other than he might
4 have gone and unlocked the property for
5 Doodle Hoppers because they were getting
6 due diligence and they were getting
7 estimates on the vent hood and the gas
8 lines and there was a lot of pest control,
9 so he might have opened it without me
10 knowing. They would have contacted him
11 directly.
12    Q At the time that you asked -- if
13 you asked Mr. Little to show the property,
14 because I think you've indicated --
15    A I asked him to open the door. He
16 had the key. I did not say please tour
17 the property like a leasing agent. I
18 asked him to open -- unlock the door.
19    Q Are you now sure that that's what
20 you did?
21    A For health and safety.
22    Q Are you now sure that that is what
23 you did rather than telling Mr. Cranage to

150

1 call Mr. Little?
2    A I cannot -- honestly, I -- I cannot
3 remember if Mr. Cranage called Mr. Little
4 and made that arrangement or if -- my
5 memory was that Mr. Cranage and Mr. Little
6 found a mutually convenient time to meet,
7 but it could -- it's possible that it
8 would -- that I might have -- he might
9 have said Thursday night at 6:00 or
10 whenever, and I might have called Mr.
11 Little, but I cannot remember.
12    Q But in any event, either through
13 Mr. Cranage contacting him or through you
14 contacting him, he was going to let Mr.
15 Cranage in to look at the property?
16    A At the dance floor.
17    Q Including the dance floor?
18    MR. STEWART: Object to form.
19    Q Was the property still in the same
20 dangerous condition that you had indicated
21 to me some time ago it was in when you --
22 when the homeowner -- or the residential
23 agent wanted to come see the property?

151

1    A I'm not sure. I know some of the
2 health -- like there was trash and garbage
3 and yucky stuff and open liquor and --
4 some of that may have been, by that time,
5 had been -- may have been addressed. I
6 don't know.
7    Q Did you -- had you, prior to
8 telling Little to let him in, had a
9 conversation with Little in which you had
10 told him any of the things that had
11 transpired between you and Mr. Barr?
12    A Would you say that again, sir?
13    Q Now, earlier you said that Ms.
14 Forney knew -- and then you listed a whole
15 lot of things, the three hundred thousand
16 dollars for improvements, the Celebrations
17 and the problems at Celebrations, those
18 things. I am assuming that she knew those
19 things because you told her. Is that
20 right?
21    A Yes. Well, not just me but Mr.
22 McGharr, too, the -- she really --
23 historically, she asks him, too, because

152

1 he lives there. Any -- on any of the
2 properties, there are times, it's my
3 understanding, that she consults him,
4 like, you know, so -- just out of an
5 abundance of caution.
6    Q Had you told Little about any of
7 your conversations or meeting with Barr?
8    A I'm sure that I mentioned that I
9 had met with Mr. Barr at Celebrations.
10 Not Celebrations. Okay. I told him that
11 I had met Mr. Barr at the Pure Country
12 space.
13    Q Did you tell him that Mr. Barr was
14 the former owner of Celebrations?
15    A I'm sure I probably did.
16    Q Did he know what Celebrations was
17 and the problems at Celebrations?
18    A You would have to ask him what he
19 knew.
20    Q Did he mention to you that he knew
21 of the problems at Celebrations?
22    A I don't know if he specifically,
23 but everybody knew. It was public record

38 (Pages 149 to 152)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

157

1  any --
2      MR. STEWART:  Wait, wait.  Let him
3  ask a question and then answer that
4  question, please.  You weren't finished,
5  Michael.
6      Q  So this would have been the only
7  time that you would have requested him to
8  go over there and open up the property?
9      A  I think I already answered that.
10  It's possible that he opened the property
11  for Doodle Hoppers.  It's possible.  But
12  he never had the key to any other property
13  that I know of.
14      Q  Okay.  And as far as his
15  possibility to negotiate a lease for any
16  of those properties, you don't know
17  whether he had that authority or not?
18      A  In this situation, he had no
19  authority to negotiate anything other than
20  what had to do with the collections
21  through the bankruptcy court.
22      Q  Okay.  How do you know that?
23      A  How do I know that?  Well, I do not

158

1  know that, but Ms. Forney would have -- if
2  that had been the case, she knew that I
3  was working -- I mean, she had already
4  approved that -- to move forward with the
5  Doodle Hoppers lease, so -- it would be
6  unusual if she went and told him to
7  negotiate a lease.
8      Q  Okay.
9      A  It would have been out of sinc or
10  character.
11      Q  After you learned -- well, did you
12  talk to Mr. Little after he met Mr.
13  Cranage at the property?
14      A  Yes.
15      Q  And did he tell you what
16  transpired?
17      A  I don't know what specifically what
18  transpired.
19      Q  Just tell me what y'all talked
20  about after he had met Mr. Cranage.  Did
21  he say anything?
22      A  I'm trying to sort out what he said
23  afterwards and what I know now.  I'm

159

1  trying to sort it through.
2      Q  Yeah, because all I want to know is
3  what he told you, if anything, about the
4  meeting after the meeting was over with
5  Mark Cranage.
6      A  I think he said that Mark was going
7  to call me.
8      Q  Okay.  Did he?
9      A  And -- I believe he did.
10      Q  I'm sorry.  I interrupted you.
11  Were you going to add something?  And?
12  Did he say anything else other than that
13  Mark was going to call you?
14      A  I can't remember.
15      Q  Let me see if I can jog your
16  memory.  Did he say -- did he indicate to
17  you that he had had a conversation with
18  Mark and that Mark was very interested in
19  leasing the space, that he was going to
20  try to free up the property by Monday so
21  that if he came -- if he called you with a
22  lease or with an offer that, in fact, the
23  property would be cleared up, did he tell

160

1  you anything to that effect?
2      A  No, nothing.
3      Q  Did he say that Mark was interested
4  in leasing the property period?
5      A  He said that he was -- Mark was
6  going to call me.  That's what I remember,
7  none of that other that you said, nothing
8  of that other.
9      Q  Okay.  Did you -- have you've seen
10  the transcript of the video that was done?
11      A  I did read the transcript.
12      Q  Have you had any conversation with
13  Mr. Little since you saw that transcript?
14      A  Yes.
15      Q  What did y'all talk about?
16      A  I asked him about it.  I said where
17  did this come from?  It was a shock.
18      Q  And what did he say?
19      A  He said I was just puffing, and I
20  said all you were supposed to do was just
21  unlock the door.
22      Q  Puffing for who?
23      A  I don't know.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

161

1    Q  Well, he didn't own the property,
2    did he?
3        MR. STEWART:  Object to form.
4    Q  So he had to be puffing for
5    somebody.
6        MR. STEWART:  Object to the form.
7    A  Well, you'll have to ask him that.
8    Of course, I said did you know that you
9    were being videotaped?  Did the man have a
10   video camera with him?  Mr. Cranage never
11   asked me for permission to bring a video
12   camera.  He never asked me nothing.  I
13   mean, it was a complete shock.
14   Q  Now, let's back up and let's --
15   when did you first learn that Mark Cranage
16   had brought a video camera?
17   A  Scott Harris called me into his
18   office and said that an attorney had
19   called him and another attorney had called
20   him.
21   Q  Okay.  And did he say and they have
22   a video?  What did he say?
23   A  I'm trying to think how he -- he

162

1    said did you know.
2        MR. STEWART:  This sounds like it's
3    revealing what an attorney told Scott
4    Harris.  Is what you're about to testify
5    to something that an attorney told Scott
6    Harris?
7        THE WITNESS:  Yes.
8        MR. STEWART:  And is that attorney
9    Bobby Segall?
10       THE WITNESS:  Yes.
11       MR. STEWART:  I instruct you not to
12   discuss the contents of any conversation
13   that Bobby Segall had with either you or
14   Scott Harris.
15       THE WITNESS:  Okay.
16   Q  Did you ever, after you learned
17   that there was a video, call anybody other
18   than Mr. Little and talk about the video?
19   A  I believe --
20   Q  Other than lawyers?
21   A  I believe that Mr. Cranage called.
22   Q  He called you?
23   A  I believe I called him, and then he

163

1    returned my call.
2    Q  Okay.  And tell me about that
3    conversation.
4    A  I asked him if he had taken a video
5    and he said his father was a stroke victim
6    and that he wanted to take a video to show
7    his father and that he was very angry at
8    me and Mr. Little because he asked for any
9    -- for the viewing of the dance floor to
10   be confidential and that Barry Barr had
11   come to him and had started yelling at him
12   and telling him that he wanted to lease
13   that space and that -- and he said he told
14   Barry you can have it, in fact I've got a
15   video tape and you can look at it to Barry
16   and that Barry had taken it to an
17   attorney.  And I said, well, can I see it?
18   And he said I'm probably going to lose my
19   job and I'm very upset and I wish I had
20   just gotten rid of it.
21   Q  Did you ever ask him to get rid of
22   it?
23   A  No.  I had never seen it.  I didn't

164

1    know what it said.  I didn't know what was
2    on it.
3        MR. STEWART:  Hey.  The question
4    was did you ever ask him to get rid of it.
5        THE WITNESS:  Okay.
6    Q  Did this conversation with Mark
7    take place after you talked to Mr. Harris
8    and learned that there was, in fact, a
9    tape?
10   A  Yes.
11   Q  What eventually -- well, I think
12   I've already asked you that.  Doodle
13   Hoppers eventually got the property; is
14   that right?  They expanded into this
15   property?
16   A  Doodle Hoppers negotiated a lease.
17   Q  When you learned about the criminal
18   record of one of the owners or proprietors
19   or somebody of Doodle Hoppers, did you
20   check to see whether the leases that were
21   involved were, in fact, signed by somebody
22   other than him because he had a felony
23   record?

41  (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

165

1    A  You've got like three or four
2  little parts in there, so --
3    Q  You were told that he had a
4  criminal record --
5    A  Yes.
6    Q  -- and you were even sent to the
7  website and you confirmed that he had a
8  criminal record.
9    A  Yes.
10    Q  That was the truth?
11    A  Yes.
12    Q  Did you know that for a bar that is
13  going to sell alcohol through the ABC
14  board that a convicted felon could not
15  sign a lease for such property?
16    MR. STEWART:  Object to form.
17    A  I can't say that I knew that at
18  that point in time.  I did -- for some
19  reason, I did know or I thought that a
20  felon could not get a liquor license.
21  That was my concern, also, with Mr. Barr.
22    Q  When you renegotiated with Doodle
23  Hoppers and they worked out the

166

1  arrangements, do you know who signed the
2  new lease?
3    A  Yes.
4    Q  Who?
5    A  Jeff Strong.
6    Q  Okay.  And did the owner pay for
7  any improvements to the property for
8  Doodle Hoppers?
9    A  No.
10    Q  Did anyone -- did the owner give
11  him any incentives such as rent reduction,
12  anything like that as -- to help him
13  expand into that location?
14    A  There was some beneficial rent.
15    Q  How much beneficial rent was there?
16    A  Do you have the lease so I can
17  review?
18    Q  No, we do not have the lease.
19    MR. QUINN:  Do we?
20    MR. STEWART:  Not to Doodle
21  Hoppers.
22    Q  We have not been given the Doodle
23  Hoppers lease.

167

1    MR. STEWART:  It's not due yet.
2    Q  It's not due yet.
3    A  Okay.
4    Q  So you don't know the specifics?
5    A  The -- Doodle Hoppers asked for
6  some beneficial rent because they were
7  going to have to put in a vent hood that
8  was going to be in excess of ten thousand
9  dollars, and so they paid partial rent but
10  not the full rent, and it was for a period
11  of time.
12    Q  Okay.  Do you know whether Doodle
13  Hoppers got any assistance, any financial
14  assistance from anyone else in order to
15  work out this deal for the expanded space?
16    A  I don't.
17    Q  How did you know that Mr. Barr was
18  a felon?
19    A  It was just general knowledge.
20    Q  Really?
21    A  Uh-huh.
22    Q  Okay.  When did you first learn
23  that he had a criminal record?

168

1    A  I don't know.  It just -- general
2  knowledge and -- I go to chamber of
3  commerce events.  I mean, it's part of --
4  I don't -- I believe my brother-in-law or
5  my son-in-law had a case where
6  Celebrations was sued.  I don't know if it
7  came up in that conversation.  I don't
8  know.
9    Q  Okay.  How much does -- how much
10  does Little know about the renovations to
11  Doodle Hoppers?  Was he involved in those
12  negotiations?
13    A  I believe that he did have some
14  independent meetings, not in his capacity
15  as an attorney, but he is a home builder
16  and has done some -- built homes and I
17  think that Jeff Strong and Mr. Stewart may
18  have in -- you know, at times when he
19  unlocked the door or whatever, they may
20  have asked him a question or two about --
21  but I don't know specifics, no.
22    Q  Okay.  Have you been on any
23  medications today while we've been taking

42  (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

169

1  this deposition?
2      A  I took a tiny bit of Adderall.
3      Q  Are you prescribed Adderall for
4  anything in particular?
5      A  ADD.
6      MR. QUINN:  Aren't we all.  I think
7  that's all, gentleman.
8      MR. GUY:  I have just a few
9  questions.
10     MR. QUINN:  Thank you.
11     THE WITNESS:  You're welcome.
12
13  EXAMINATION BY MR. GUY:
14     Q  Ms. Knudsen, I want to just ask you
15  a few follow-up questions.  I know it has
16  been a long day, so I will try to be brief,
17  okay?
18     A  Okay.
19     Q  And I may jump around just a little
20  bit because, obviously, we don't need to
21  go over some things that have already been
22  talked about or discussed.  What
23  nationality is Meiying Forney, for the

170

1  record?
2      A  She is Chinese.
3      Q  And during the time that you have
4  worked with her on her properties, has she
5  ever instructed you or directed you to
6  lease or not lease, to sell or not sell
7  any properties based upon a person's race,
8  religion, national origin, age, et cetera,
9  any criteria such as that?
10     A  Never.  And in addition, she never,
11  ever has asked what the race, creed,
12  anything.
13     Q  Have you ever known her during the
14  time that you have worked with her to make
15  any kind of discriminatory remarks about
16  anyone concerning their race, religion,
17  national origin, et cetera?
18     A  No.
19     Q  Have you ever known her to make
20  during the time that you've known her
21  socially and, you know -- well, let me ask
22  you this:  Do you even know her socially
23  other than the times that she's come into

171

1  town for business?
2      A  It's difficult to be social long
3  distance, but she does share about -- she
4  does share about her daughter, Sophia.
5  She loves her family and her daughter
6  and --
7      Q  In any social setting, have you
8  ever known her to make any discriminatory
9  remarks about anybody?
10     A  Never.
11     Q  Okay.  And again for the record,
12  let me ask you this:  I think Mr. Quinn
13  did ask you, but Ms. Forney lives in
14  California; is that correct?
15     A  That's correct.
16     Q  And how often would you say she
17  probably even comes to Montgomery on an
18  annual basis as an average?
19     A  Maybe once or twice a year.
20     Q  So most of -- other than when she
21  comes to town, most of your dealings with
22  her are either by phone or by E-mail,
23  probably?

172

1      A  Yes.
2      Q  In this particular instance, I know
3  that Mr. Quinn asked you a series of
4  questions about those initial
5  conversations that you had with Grant
6  Sullivan as it related to him having a
7  client who was a, I believe -- and I don't
8  want to misquote -- was a baseball player
9  that was interested in opening a sports
10  bar, right?
11     A  Correct.
12     Q  And that line of questioning there,
13  I don't think Mr. Quinn asked you, but if
14  he did, I apologize, was it ever made
15  known to you at any time during those
16  conversations that Mr. Long was black?
17     A  No.
18     Q  When was the first time that you
19  were made known that Terrence Long was
20  black?
21     A  At this table, at the deposition of
22  Barry Barr.
23     Q  Okay.

43  (Pages 169 to 172)

# FREEDOM COURT REPORTING

173

1    A  For all I know, Mark Cranage could
2   be black or African-American.
3    Q  But as it related to your dealings
4   with Mr. Barr and as it related to your
5   dealings with Grant Sullivan, all you knew
6   is that there was a person interested in
7   opening a sports bar who was a baseball
8   player?
9    A  Correct.
10    Q  But his race, nationality,
11   religion, none of those things were ever
12   mentioned in those conversations?
13    A  No.
14    Q  And you mentioned in your direct
15   testimony, I believe, that in all of the
16   locations which Ms. Forney owns -- and I
17   believe there were three different
18   locations, properties she owns here in
19   Montgomery, right?
20    A  Yes, sir.
21    Q  In all of those locations, there
22   are tenants who are minorities, correct?
23    A  Absolutely.

174

1    Q  And in any of those locations that
2   she owns here in Montgomery, has she ever
3   denied anybody the request to lease it
4   based upon their race, religion, national
5   origin, or that kind of thing?
6    A  Never.
7    Q  Exhibit number 4 that's in front of
8   you, Ms. Knudsen, is the offer, as I
9   understand it, by Barry Barr and witnessed
10   by Grant Sullivan to purchase the
11   property, the property LeCroy shopping
12   center, owned by Ms. Forney for a purchase
13   price of a million dollars; is that right?
14    A  Yes.
15    Q  Is that the only written offer --
16   listen to my question.  Is that the only
17   written offer concerning Ms. Forney's
18   property that was ever made by Mr. Barr or
19   anyone acting on his behalf in this case?
20    A  Yes.
21    Q  And is there any mention of Mr.
22   Long's name in this Exhibit 4?
23    A  No.

175

1    Q  And that offer to purchase was
2   communicated to Ms. Forney, correct?
3    A  Yes.
4    Q  And I believe you said earlier that
5   was rejected because it wasn't even close
6   to being what she was wanting for the
7   property, right?
8    A  Correct.
9    Q  And no counteroffer was even made,
10   correct?
11    A  She chose not to make a
12   counteroffer.
13    Q  And I believe you said you
14   communicated that to Grant Sullivan,
15   correct?
16    A  Yes.
17    Q  And in response to that
18   communication to Grant Sullivan, was there
19   ever any counteroffer made by Grant
20   Sullivan or anyone that he was acting for
21   for another price on Ms. Forney's
22   property?
23    A  No, sir.

176

1    Q  Okay.  And I should say written or
2   oral, was there ever another counteroffer
3   from Grant Sullivan or anybody he was
4   acting for?
5    A  No, sir.
6    Q  Was there ever another offer by Mr.
7   Barr individually in any conversations you
8   had with him to again purchase the
9   property?
10    A  No, sir.
11    Q  For a higher amount, I'm saying,
12   than one million dollars?
13    A  No, sir.
14    Q  Have you ever had an offer from
15   Terrence Long to either lease or purchase
16   the property that's the subject of this
17   lawsuit either in writing or orally?
18    A  No.  I've never spoken with
19   Terrence Long other than in this --
20    Q  Other than here in his deposition?
21    A  Yes.
22    Q  Now, earlier, and I hope I get the
23   context right, I believe when you said

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

---

177

1 that Mr. Barr initially met with you there
2 at the Pure Country Saloon the first time
3 that a discussion was had about what Ms.
4 Forney wanted in the lease, I believe you
5 said forty-five hundred dollars a month,
6 right?
7     A That's what she was asking.
8     Q Okay. And that's what you
9 communicated to him?
10    A Yes.
11    Q And then there was a question, I
12 believe, by Mr. Quinn as to -- I shouldn't
13 state it that way. Let me just say it
14 this way: That forty-five hundred dollars
15 a month, as I understood your earlier
16 testimony, was derived by a dollar per
17 square foot, right?
18    A Yes.
19    Q And that dollar per square foot,
20 that forty-five hundred dollars was just
21 the number of square feet in the Pure
22 Country Saloon times what Ms. Forney
23 wanted dollar per square foot, correct?

---

178

1     A Yes.
2     Q And what she wanted dollar per
3 square foot, that had been discussed with
4 you, I guess, and Ms. Forney as to what
5 was a current market rate for that type of
6 business property?
7     A Yes.
8     Q Okay. And was that discussion with
9 Ms. Forney about the appropriate dollar
10 per square foot, was that prior to you
11 ever meeting with Mr. Barr?
12    A Yes.
13    Q Okay. And I don't think that was
14 ever established. If it was, I apologize.
15 You know, how long before your meeting
16 with Mr. Barr was that dollar per square
17 foot established, if you recall?
18    A It was established as soon as it
19 became apparent that Mr. Fannin would not
20 be able to continue with his lease and
21 that the property would be coming
22 available immediately.
23    Q And I don't know the first thing

---

179

1 about leasing, so was that dollar per
2 square foot the same kind of dollar per
3 square foot you would have got for some of
4 the other property in the same shopping
5 center?
6     A Some. It varies. It can vary.
7     Q And then what I understood you to
8 say is that that was an asking price, it
9 could be negotiable?
10    A Yes.
11    Q So, I mean, in your business, an
12 asking price -- I mean, an amount you ask
13 per square foot is negotiable?
14    A Yes.
15    Q It's not uncommon to negotiate that
16 is what I'm asking.
17    A It is not uncommon.
18    Q Somebody makes an offer, and then
19 if somebody doesn't want that, they can
20 make a counteroffer and it can be
21 negotiated, correct?
22    A It can.
23    Q And then you also testified, as I

---

180

1 understood it, and correct me if I'm
2 wrong, and I'm going have to paraphrase,
3 so if I misstate my paraphrase -- that at
4 some point, you informed Ms. Forney about
5 your meeting with Barry Barr on that first
6 occasion and that the discussions -- that
7 there were discussions with her about some
8 of the things that he discussed with you
9 about -- about the Pure Country location,
10 and I'm going to say i.e., I believe there
11 was some mention of three hundred thousand
12 dollars in improvements he was saying he
13 wanted and those types of things. Do you
14 remember that testimony?
15    A Yes.
16    Q Okay. What I wanted to understand,
17 and I don't know if it was made clear when
18 the questions were asked, was that
19 discussion with Ms. Forney by you in the
20 form of you communicating an offer from
21 Mr. Barr to her, or was it something else?
22    A No. It was just a follow-up
23 report. There was no formal offer made at

---

45 (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

181

1  all.
2      Q  Okay.  So you --
3      A  To lease the space by Mr. Barr.
4  There was never a formal or informal
5  offer, for that matter.
6      Q  I believe you testified and you
7  told Mr. Quinn that later, but I just
8  wanted to make sure I understood when you
9  stated that you informed Ms. Forney about
10  -- and I think you also said that you told
11  her he was the former owner of
12  Celebrations, as well?
13      A  Yes.
14      Q  So you just had some general
15  discussion with Ms. Forney about a meeting
16  you had with Barry Barr, but there was
17  never a communication to Ms. Forney about
18  him requesting to lease the property.  Is
19  that a fair characterization?
20      A  Correct.
21      Q  Because there never was, as you
22  testified earlier, and you correct me if
23  I'm wrong, there never was a request by

182

1  Mr. Barr to lease the property?
2      A  No, there never was a request.
3      Q  You talked in terms --
4      A  There was an expression of desire.
5      Q  Well, obviously, he came there
6  because he was interested in the property.
7  I'm not trying -- I don't want to mix
8  words here.  But he never gave you a
9  written offer to lease the property?
10      A  No.
11      Q  He or Grant Sullivan?
12      A  No.
13      Q  And then orally, Grant Sullivan, he
14  never said we want to lease this property,
15  here's what we'll -- here's what we'll
16  give you or he never said I'll accept
17  whatever terms you put on the table?  He
18  never said anything like that?
19      A  Correct.
20      Q  He expressed an interest in the
21  property or he wouldn't have been there to
22  look at it, correct?
23      A  Correct.

183

1      Q  And, obviously, that was what you
2  were there for is to show him the
3  property, correct?
4      A  Yes, sir.
5      Q  Okay.  But there never was a formal
6  or what you would consider an offer in
7  your business to say I want to lease the
8  property?
9      A  There never was.
10      Q  The only thing you ever got was the
11  request to purchase the property?
12      A  Correct.
13      Q  When Ms. Forney leases property --
14  I don't know if you've ever sold any
15  property for her.  When she leases
16  property, does she have attorneys draft
17  the leases and take care of that for her?
18  Does she have somebody that does that
19  or --
20      A  Most leases --
21      Q  I would say reviewed, maybe, by an
22  attorney?
23      A  -- are very simple, standard leases

184

1  for each property; however, in a situation
2  where there is adult beverages and
3  security, health and safety issues, I
4  requested that an attorney review the
5  lease, Mr. Knox Argo.
6      Q  Is that in the Doodle Hoppers case
7  you mean?
8      A  Yes, sir.
9      Q  When they wanted to lease the
10  space?
11      A  Yes, sir.
12      Q  That has to do with just a review
13  of the terms to make sure that she's
14  protected?
15      A  The greatest concern is the health
16  and safety of the parking lot, the
17  invitees, the other tenants, and it's
18  connected with adult beverages.
19      MR. GUY:  I think that's all.  Give
20  me one second to make sure I've covered
21  all my little check marks here.  Thank
22  you, ma'am.
23      MR. STEWART:  I don't have

46  (Pages 181 to 184)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

TERRENCE LONG & BARRY BARR,   )
)
    Plaintiffs,          )
)
V.                         )      Civil Action No.:
)      2:07-CV-00881-WKW-WC
ARONOV REALTY MANAGEMENT,   )
INC., AMY CLARK KNUDSEN, &   )
MEIYING FORNEY,         )
)
    Defendants.         )

## DECLARATION OF MEIYING FORNEY

1.     My name is Meiying Forney.  I am over the age of nineteen years and am competent to testify to the matters contained in this affidavit, which are true and correct and based on my personal knowledge.

2.     I own the LeCroy Village Shopping Center ("LeCroy").  I purchased it in 2004.

3.     Doodle Hoppers has been a tenant in LeCroy since I purchased it.

4.     Until April 2007, Pure Country was located in the space next to Doodle Hoppers. Pure Country was already a tenant at LeCroy when I purchased LeCroy, so I did not negotiate the amount of rent that Pure Country was paying.

5.     Before Pure Country closed, beginning sometime in late 2006 or early 2007, Doodle Hoppers wanted to expand its business.



ALL-STATE LEGAL®

EXHIBIT

C

6.    LeCroy was not for sale when Pure Country closed.  It had been for sale previously, and the asking price was $1.9 million.

7.    Ms. Knudsen has never mentioned the race of a tenant, prospective tenant, purchaser, or prospective purchaser.  She has never mentioned the race of the clientele of any business to me.

8.    Ms. Knudsen never mentioned the race of Barry Barr or Terrence Long to me, and she never mentioned the race of the clientele of any business operated by Barry Barr or Terrance Long.

9.    Barry Barr offered to purchase LeCroy for $1 million, minus a 10% sales commission to be paid by me at closing.  The property was not for sale at the time.  Neither Knudsen or anyone else at Aronov played a role in my decision not to make a counter-offer to Barr.  His offer was so much lower than the previous asking price of $1.9 million that I decided not to make a counter-offer to him.

10.    Doodle Hoppers wanted to expand into the Pure Country space.  Doodle Hoppers was a good tenant, so I decided to rent the space to Doodle Hoppers for this reason.

11.    Before this lawsuit was filed, I was not aware of Barry Barr's race, Terrence Long's race, or the race of the clientele of any of their business establishments.

12.    Terrence Long has never made an offer to purchase or lease any property from me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 27th day of June, 2008.

MEIYING FORNEY

Exhibit D

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

1              IN THE UNITED STATES DISTRICT COURT FOR

2                  THE MIDDLE DISTRICT OF ALABAMA

3                       NORTHERN DIVISION

4

5     TERRENCE LONG & BARRY BARR,

6              Plaintiffs,

7     vs.                          CIVIL ACTION NO.

8                                  2:07-CV-00881-WKW-WC

9     ARONOV REALTY MANAGEMENT,

10    INC., AMY CLARK KNUDSEN,

11    & MEIYING FORNEY,

12             Defendants.

13             *       *       *       *       *

14             DEPOSITION OF TERRENCE LONG,

15    taken pursuant to notice and stipulation

16    on behalf of the Defendants, in the

17    offices of Bradley, Arant, Rose & White,

18    401 Adams Avenue, Suite 780, Montgomery,

19    Alabama, before Nicole Paulk, Certified

20    Court Reporter and Notary Public in and

21    for the State of Alabama at Large, on May

22    7, 2008, commencing at 10:12 a.m.

23

EXHIBIT
D

ALL-STATE LEGAL®

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 11

1    checks or financial records of whatever

2    description that reflect any sums paid to

3    the defendants.  And the response there is

4    see documents produced with the initial

5    disclosures.  Again, aside from what

6    Mr. Barr may have responded -- and that's

7    what I'm trying to separate here today --

8    do you have any checks or financial

9    records that relate to any sums paid to

10    any of the defendants in this case?

11   A.    No.

12   Q.    Okay.  Have you paid any sums to anybody

13        in connection with any of the issues in

14        this case?

15   A.    No.

16   Q.    Did you ever pay Mr. Barry Barr any

17        start-up money or anything related to this

18        venture or project that you wanted to do

19        with him?

20   A.    No.

21   Q.    Did you read over any documents or do

22        anything in preparation for your testimony

23        here today?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 12

1    A.    No.

2    Q.    Number 6 in the requests there before you

3          is -- and you can actually look on either

4          one of those documents I think, 1 or 2,

5          but it talks about basically the identity

6          of any witnesses who may have knowledge of

7          this case; do you see that?

8    A.    Yeah.

9    Q.    And there was an initial disclosure in

10         this case, and I just want to ask you

11         about some names of some people, and I

12         want to know if you know them at all or

13         know anything about what they might say in

14         this case.  All right?

15   A.    All right.

16   Q.    First of all, do you know or have you ever

17         met previously Amy Knudsen, before you saw

18         her in this room, I guess, the day that

19         Mr. Barr's deposition was taken?

20   A.    No.

21   Q.    So you didn't know her before Mr. Barr's

22         deposition was taken?

23   A.    No.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 13

1    Q.    Had you ever communicated with her in any

2          way before this lawsuit for any reason?

3    A.    No.

4    Q.    Okay.  What about Aronov Realty

5          Management, Inc., or any other division of

6          Aronov Realty?  Have you ever had any

7          dealings with any of them, anybody with

8          Aronov before?

9    A.    Yes.

10   Q.    Okay.  Who is that?

11   A.    I bought my first house through Aronov

12         through -- what's her name -- last name is

13         -- Catherine Berman.

14   Q.    Cathy Berman?

15   A.    Yeah.  This was like in, say, 2001.  And

16         then I sold that house and she found me a

17         new house, the house that I'm living in

18         now.  And I rented a place off of Wares

19         Ferry Road through Joey -- Joey Long.

20   Q.    And he's also with Aronov?

21   A.    If I'm not mistaken.

22   Q.    All right.  You think he was?

23   A.    If I'm not mistaken, yeah, I think he was.

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 16

```
 1   Q.   Just for social issues, to go have a

 2        drink, or anything related to this case?

 3   A.   No, just to go.

 4   Q.   Okay.  Do you think you may have met him

 5        there, or -- I guess what I'm saying -- I

 6        want to make sure I'm clear.  I know

 7        you're saying you've been to Woodmere

 8        Tavern before, but have you ever met

 9        Mr. Cranage?

10   A.   No.

11   Q.   What about Don Little?  Have you ever

12        heard that name or do you know who he is?

13   A.   I've heard the name, never met him.

14   Q.   I will tell you he's an attorney in town

15        that may have some information about this

16        case.  Do you know anything about that?

17   A.   No.

18   Q.   Okay.  What about Mr. Grant Sullivan?

19        Have you ever met Grant Sullivan before?

20   A.   No.

21   Q.   Do you know him?

22   A.   No.

23   Q.   I'll let you know that you may remember
```

Page 50

1    Q.    Okay.  When was the first time you met

2          Mr. Barr?

3    A.    I think the first time I met him was maybe

4          last year, was the first time we finally

5          met in person.

6    Q.    So that would actually be 2007?

7    A.    Yes.

8    Q.    Do you remember what month or part of the

9          year that you met?

10   A.    No.

11   Q.    You don't even remember what part of the

12         year it was, whether it was the early part

13         of the year, middle part of the year, last

14         part of the year?

15   A.    I'd say the middle part of the year, I

16         guess.

17   Q.    Well, let me ask it this way.  There's an

18         allegation in the complaint that was filed

19         in this case on your behalf that says, in

20         April 2007, Long approached Barr

21         concerning his interest in opening a

22         sports bar in Montgomery, Alabama.  Do you

23         have a recollection if it was in April of

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 52

1    A.    Yeah.

2    Q.    So you just met him at the club and said,

3          hey, I'm Terrence Long, nice to meet you,

4          that kind of just brief social greeting

5          kind of thing?

6    A.    Yes.

7    Q.    All right.  When was the next time that

8          you met him?  Would it have been this time

9          that you approached him about opening a

10         sports bar, or would you have had any

11         other occasion to meet him?

12   A.    I had no other occasion to meet him after

13         that, so that's the next time I met him.

14   Q.    And I don't know where this April came

15         from; it could have come from Mr. Barr.

16         But you're saying you don't have a

17         recollection but you do recall meeting him

18         to express an interest in opening a sports

19         bar?

20   A.    Yes.

21   Q.    Okay.  Tell me about that meeting, just

22         what you recall.

23   A.    Just -- in the meeting, I told him that I

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 53

1    wanted to open up a sports bar.  And I

2    asked him if he had anything that he was

3    about to do, and I told him I'd like to do

4    some business with him.

5    Q.    All right.  If my notes are correct, I

6          believe Mr. Barr testified that he closed

7          Celebrations on April 1st of 2007.  I

8          don't know if you recall his deposition

9          the other day.  Do you remember that?

10   A.    I don't remember --

11   Q.    Do you remember that he did close

12         Celebrations last year?

13   A.    Yeah.

14   Q.    Okay.  When you met him the first time,

15         based on what you told me earlier, I'm

16         assuming that it must have been before

17         that time, then, when it was still open?

18   A.    Yeah, it was still open.

19   Q.    Okay.  When you met him the second time

20         and you say you talked to him about what

21         he would like to do, had he closed it by

22         that time?  Is that a recollection of

23         yours?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 54

1   A.     I don't know.

2   Q.     You don't remember?

3   A.     I don't know.

4   Q.     Okay.  All right.  Anything else about

5          that conversation?  You just basically

6          wanted to talk to him about opening a

7          sports bar and wanted to know -- I don't

8          want to put words in your mouth -- would

9          he be willing to help you and be a part of

10         it?  Is that a fair statement; you wanted

11         to see if he would be a part of it?

12  A.     Yeah, that's fair.

13  Q.     Well, I don't want to put words in your

14         mouth.  Other than it was just a

15         conversation -- that's all it was, right?

16         No documents were signed or anything like

17         that?

18  A.     No.

19  Q.     You didn't come prepared to enter into an

20         agreement on that day, right?

21  A.     No.

22  Q.     Were you looking for a partner or were you

23         just looking for him to get the thing set

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 55

1          up or did you have anything in mind at

2          that time?

3     A.   Location.  I wanted him to find a

4          location.

5     Q.   All right.  When you went to him and met

6          with him the first time, was it your

7          intent that you would actually open and

8          manage the bar yourself without any

9          involvement on his part, or were you

10         seeking to do that as well?

11    A.   I don't understand the question.

12    Q.   Okay, that's fair.  Here's what I'm trying

13         to find out.  You liked his place,

14         Celebrations, right, and you liked the way

15         he ran it, correct?

16    A.   Yes.

17    Q.   So did you call him up to talk with him

18         about opening a sports bar?  Did you call

19         him up?  How did your meeting get

20         arranged?

21    A.   Through a friend of mine that worked at

22         his bar.

23    Q.   Who is that?

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 58

```
 1              do you want to be a partner with me, so to

 2              speak?

 3     A.       Yes.

 4     Q.       And so you discussed it when you met with

 5              him on this occasion?

 6     A.       Yeah, we discussed it.

 7     Q.       Okay.  Anything else?

 8     A.       No.

 9     Q.       What about -- did you discuss who was

10              going to put up money or that kind of

11              thing?

12     A.       No.

13     Q.       Did you discuss about, you know, what the

14              partnership agreement was going to be or

15              anything like that?

16     A.       No.

17     Q.       Did you discuss who was going to manage

18              the bar or anything like that?

19     A.       No.

20     Q.       Okay.  So would it be fair to say that it

21              was just a kind of general conversation

22              about, hey, this is what I'd like to do;

23              are you interested?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 66

1    A.    It wasn't signed that day.

2    Q.    Okay.  Within a few days thereafter?

3    A.    I don't recall.

4    Q.    You don't remember?  I think -- what date

5          is your signature on that, or when is it

6          dated?

7    A.    11/6/07.

8    Q.    Okay.  Do you think it was sometime either

9          right around the first of November or the

10         end of October that you were there at

11         Copeland's?

12   A.    I don't remember the exact time we was

13         there.

14   Q.    Okay.  Well, and I'm not asking you to

15         remember the exact time.

16   A.    Yeah, I don't remember.  I met him over

17         there one day; I don't remember when.

18   Q.    Well, do you remember signing this

19         proposal to lease sometime after you met

20         with him about Copeland's?

21   A.    Yes.

22   Q.    All right.  So that's three meetings that

23         we've now discussed that you've had with

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 67

1          Mr. Barr -- the initial meeting where you

2          just actually met him; the second meeting

3          where you talked about, you know, actually

4          opening up a sports bar and wanting him to

5          be a partner and talking about, you know,

6          him finding a location; and then the

7          meeting at Copeland's.  Any other times

8          that you've met with Mr. Barr?

9     A.   No.

10    Q.   Outside of this lawsuit, too; let me add

11         that.  Outside of this lawsuit?

12    A.   Outside the lawsuit, yes.

13    Q.   All right.  When else have you met with

14         him?

15    A.   I don't know the exact date, but I just

16         met him at the little bar off Vaughn Road

17         in the -- I don't know the shopping

18         center.  It's where Dominique's used to

19         be, where the little grocery store used to

20         be, right past Vaughn and Pike.

21    Q.   Yeah, I know where you're talking about.

22    A.   I met him there once.

23    Q.   Was that to look at the place?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 68

1    A.    No, it's a bar they have open over there.

2    Q.    Okay.  Crockmier's?  Met him at

3          Crockmier's?

4    A.    Yeah, that's the name of it.

5    Q.    Okay.  That's fine.  And when was that,

6          that you met Mr. Barr at Crockmier's?  Was

7          that recently?

8    A.    No, no.

9    Q.    We're talking about last year again?

10   A.    Yeah, it was last year.  It was last year.

11   Q.    Let me put everything in perspective.

12         This lawsuit was filed in October of 2007

13         -- October 2nd of 2007.  So what was the

14         occasion that you met Mr. Barr for at

15         Crockmier's, if you recall?  Just social?

16   A.    Just social.

17   Q.    Okay.  Nothing to do with finding a

18         location?

19   A.    No.

20   Q.    Nothing to do with this lawsuit?

21   A.    No.

22   Q.    All right.  Any other times you've met

23         with Mr. Barr?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 69

1   A.   No.

2   Q.   So in regards to you wanting to open up a

3        sports bar and getting Mr. Barr to help

4        you, anything related to that, you've only

5        met with him three times?

6   A.   Yes.

7   Q.   Now, you said that -- I believe earlier --

8        that when you had been at Mr. Barr's

9        establishment that was called

10       Celebrations, that you felt safe there,

11       you liked the atmosphere, that kind of

12       thing, right?

13  A.   Yes.

14  Q.   Okay.  And did you ever become aware --

15       and I don't know when you were playing

16       baseball as it relates to these kinds of

17       things, but the discussions we had with

18       Mr. Barr during his deposition about some

19       of the troubles they were having out at

20       Celebrations with -- you know, he said the

21       police were not -- let me just say this.

22       Do you remember those discussions during

23       his deposition?

Page 72

1    A.    Yes.

2    Q.    I'm not trying to pin you down to a

3          particular thing, just did you hear about

4          problems in the parking lot?  Whether

5          Celebrations was responsible for it or

6          not, did you hear about the problems out

7          there?

8    A.    Yes.

9    Q.    Were you ever there when any of that

10         happened?

11   A.    No.

12   Q.    And I don't know that I asked you this,

13         but can you give me just your best

14         estimate about how many times you may have

15         gone to Celebrations?  You know, more than

16         10, more than 20, less than 10?  I don't

17         know.

18   A.    Less than 10.

19   Q.    Okay.  Did Mr. Barr ever discuss with you

20         any conversations he had with Ms. Amy

21         Knudsen?  Or let me say has he ever

22         discussed with you any of those

23         discussions he had with Amy Knudsen?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 73

1    A.    I recall one.

2    Q.    Just one?

3    A.    Yes.

4    Q.    When was it?

5    A.    I guess the first time he went over there.

6    Q.    Okay.  So is it your recollection that

7          sometime after he went over there the

8          first time, he discussed some -- he made

9          some comments about discussions he had

10         with Ms. Knudsen?  That's what you recall?

11   A.    That's what I recall.

12   Q.    Okay.  What was that discussion you had

13         with Mr. Barr about Ms. Knudsen?

14   A.    It was -- like I said, it was really

15         brief.  He was telling me that

16         Celebrations -- however you want to put

17         it, Celebrations came up in the

18         conversation.

19   Q.    Like that was a problem with you getting

20         the place?

21   A.    I can't say that.

22   Q.    Well, I don't want to put words in your

23         mouth.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 74

1    A.    No.

2    Q.    I'm trying to help, and maybe I shouldn't

3          help.  What is it you recall about the

4          conversation, just Celebrations came up?

5    A.    Celebrations came up, and that apparently

6          she didn't know that he was the guy who

7          owned Celebrations until he told her.

8    Q.    Okay.  Anything else you remember about

9          your conversation with Mr. Barr about Ms.

10         Knudsen?

11   A.    No, that it was.

12   Q.    What did you get out of that conversation?

13         I mean, what was your impression of what

14         he was telling you?

15   A.    Nothing.

16   Q.    Okay.  That's what I'm saying, did you get

17         anything out of that?

18   A.    No, I got nothing out of it.

19   Q.    Okay.  And I think I know the answer to

20         this, but the location over there, the Le

21         Croy shopping center, did you even know

22         there was anything for lease over there

23         prior to him telling you about it?

Page 75

1    A.    No.

2    Q.    Okay.  Were you supposed to be at the

3          meeting where he met with Ms. Knudsen the

4          first time?

5    A.    No.

6    Q.    Okay.  Did you ever ask him to set up a

7          time for you to go over to Le Croy and

8          look at this retail -- this space for

9          lease?

10   A.    No.

11   Q.    Okay.  Any other conversations that you

12         can recall where Mr. Barr had a discussion

13         with you about anything that Ms. Knudsen

14         said or did?

15   A.    No.

16   Q.    So that's the only time, just that one

17         time?

18   A.    That's the only time I recall.

19   Q.    Okay.  You don't recall him calling you

20         while he was there with Ms. Knudsen?  Do

21         you remember that, on the phone possibly?

22   A.    I didn't receive a call.

23   Q.    Okay.  I'm just checking.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 76

1    A.    Yes.

2    Q.    You don't have a recollection of that?

3    A.    No.

4    Q.    Very good.  Any other -- and just to make

5          sure, so that's the only time you can

6          recall Mr. Barr and you having any

7          discussion about Ms. Knudsen, is that one

8          time?

9    A.    Yes.

10   Q.    And all you remember about it is something

11         about Celebrations and what else?  What

12         did you tell me?

13   A.    That it was.

14   Q.    That was it?

15   A.    Yeah.

16   Q.    Did you just get the impression that there

17         was a problem with Celebrations, that

18         y'all couldn't get that spot or something,

19         or do you remember anything else about the

20         conversation?

21   A.    I don't remember anything else about the

22         conversation.

23   Q.    Okay.  Did you have anything to do or were

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 77

1     you aware of him sending anybody in to

2     video or attempt to video Ms. Knudsen or

3     anybody else with Aronov relating to the

4     leasing of the Le Croy shopping area?

5   A.   No.

6   Q.   Did you have any discussions with Mr. Barr

7     or were you involved in any way with his

8     offer to purchase the Le Croy Shopping

9     Village?

10  A.   No.

11              MR. GUY:  Let me take a short

12                  break.

13          (Brief recess.)

14  Q.   The document that was previously provided

15     as an exhibit to Mr. Barr's deposition --

16     Defendants' Exhibit 11, I believe -- and

17     it is the offer to purchase the Le Croy

18     shopping center by Mr. Barr, made to

19     Meiying Forney for a million dollars.  And

20     my question to you -- and it's dated May

21     23rd of 2007.  And I just want to ask, did

22     you have anything to do with that, any

23     discussions with him, or were you part of

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 78

| | | |
|---|---|---|
| 1 | | that offer? |
| 2 | A. | No. |
| 3 | Q. | Okay.  So that was -- as far as you know, |
| 4 | | that was just something Mr. Barr did on |
| 5 | | his own? |
| 6 | A. | Yes. |
| 7 | Q. | And I kind of want to understand, again, |
| 8 | | as far as anything formal, if Mr. Barr |
| 9 | | let's say purchased the Le Croy shopping |
| 10 | | center, if he had got that, no details had |
| 11 | | been worked out between you and Mr. Barr |
| 12 | | about the arrangements for him to lease |
| 13 | | the club back to you and what you were |
| 14 | | going to pay or -- none of those kind of |
| 15 | | details had been worked out, right? |
| 16 | A. | No. |
| 17 | Q. | Nothing in writing to commit you to that |
| 18 | | or to say that, you know, those kind of |
| 19 | | things would have worked out? |
| 20 | A. | No. |
| 21 | Q. | Okay.  When Mr. Barr talked to you -- |
| 22 | | strike that.  When did Mr. Barr talk to |
| 23 | | you about suing Ms. Knudsen, Aronov |

Page 80

1       discussed any litigation against any of

2       the named defendants here?

3   A.  No.

4   Q.  Outside the presence of any of the

5       attorneys involved in the case on you or

6       Mr. Barr's behalf -- outside of their

7       presence, have you and Mr. Barr ever

8       discussed this case or anything about this

9       case?

10  A.  No.

11  Q.  Okay.  Have you ever discussed it with

12      anyone else other than Mr. Barr outside

13      the presence of your attorneys?

14  A.  No.

15  Q.  At any time during any conversations with

16      Mr. Barr about his attempt to lease or buy

17      the Le Croy Shopping Village, was it ever

18      made known to you that you were the

19      problem?  Do you understand what I'm

20      asking you?  Was there ever any mention by

21      Mr. Barr that you were the holdup in

22      getting the shopping center leased or

23      purchased?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 81

1    A.    Me, personally?

2    Q.    Yes, sir.

3    A.    No.

4    Q.    Okay.  That was never made known to you,

5          was it?

6    A.    No.

7    Q.    In the lawsuit that was filed on your

8          behalf -- have you read that recently or

9          have you ever read it?

10   A.    No.

11   Q.    Okay.  Let me read Paragraph 10.  It says

12         (as read:)  "In April 2007, Long

13         approached Barr concerning his interest in

14         opening a sports bar in Montgomery,

15         Alabama that would cater primarily to the

16         African-American community.  Long asked

17         Barr to be his partner in this venture and

18         to work on finding a location for the

19         business."  Was it your intention in

20         opening this to cater primarily to the

21         African-American community, or just to

22         anybody?

23   A.    I would have to say to the

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 84

1          your race?  That's never been mentioned,

2          has it, your race, as far as why this

3          property was not leased or sold?

4     A.   Well, no, it was mentioned --

5     Q.   I'm sorry?  I thought I asked you about

6          that and you said --

7     A.   -- by Mr. Barr, that a statement was made

8          about black people.  I don't know where it

9          came from or who it came from, but a

10         statement was made about the Celebrations

11         crowd, that they didn't want that

12         Celebrations crowd in that area.

13    Q.   Okay.  Now, this is what we went over

14         earlier and I was trying to ask.  So you

15         do remember a conversation with Mr. Barr

16         that has to do with the Celebrations

17         crowd?

18    A.   That was mentioned, yes.

19    Q.   Okay.  In which conversation was it

20         mentioned?

21    A.   That was mentioned the time he met with

22         Ms. Knudsen.

23    Q.   Okay.  What else was mentioned at the time

Page 86

1          Celebrations and the crowd at

2          Celebrations, what else was mentioned?

3    A.    That was it.

4    Q.    Okay.  Well, you just said -- did he

5          mention anything about the fact that the

6          crowd was predominantly black or that it

7          had to do with your race?

8    A.    Me, personally?

9    Q.    Yes.

10   A.    No.

11   Q.    Okay, sir.  Do you have any evidence that

12         Ms. Knudsen knew who you were or what your

13         race was?

14   A.    No.

15   Q.    Okay.  Did Barry Barr ever tell you that

16         he told her what your race was?

17   A.    No.

18   Q.    Okay.  When you went to Celebrations, was

19         it only black people that went there, only

20         black individuals that were at

21         Celebrations when you were there, or were

22         there also white individuals?

23   A.    Yeah, there were also white individuals.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 109

1    A.    No.

2    Q.    Okay.  And I think there's a Doodle

3          Hopper's there that may actually be

4          leasing that space now.  Have you ever

5          been in there?

6    A.    No.

7                    MR. GUY:  Off the record just a

8                 second.

9                 (Brief recess.)

10   Q.    I want to go back to Defendants' Exhibit 8

11         to Mr. Barr's deposition.  Do you remember

12         me asking you about this lease that you

13         signed on or about November 6th of '07?

14         Do you remember I showed that to you?

15   A.    Yes.

16   Q.    Why is it that you signed that lease; do

17         you know?  None of the other leases that

18         Mr. Barr signed relating to this, trying

19         to find a place, were signed by you.  Do

20         you know why you were asked to sign this

21         lease, who told you to sign it?

22   A.    Well, Mr. Barr asked me to sign it.

23   Q.    Okay.  But he had never asked you to sign

Page 110

```
 1              any other of the leases that we've looked

 2              at or offers to purchase, right?

 3      A.      No.

 4      Q.      Had anything changed or was anything

 5              different in November of '07 than it was

 6              back in May of '07?

 7      A.      I've just never seen anything else.

 8      Q.      Okay.  But that's the only lease, the one

 9              for the Copeland's, that you were asked to

10              sign, right?

11      A.      Yeah.

12      Q.      Long Money Entertainment, your business?

13      A.      Yes.

14      Q.      I don't know that I asked you

15              specifically.  You may have said, but when

16              did you actually incorporate that

17              business?

18      A.      I incorporated it in '06.

19      Q.      Okay.  And does it file income tax

20              returns?

21      A.      Yes.

22      Q.      And who is your accountant?

23      A.      I was using my baseball one, MIA, from
```

Exhibit E

COPY

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR

2              THE MIDDLE DISTRICT OF ALABAMA

3                     NORTHERN DIVISION

4

5      TERRENCE LONG & BARRY BARR,

6              Plaintiffs,

7      vs.                      CIVIL ACTION NO.

8                               2:07-CV-00881-WKW-WC

9      ARONOV REALTY MANAGEMENT,

10     INC., AMY CLARK KNUDSEN,

11     & MEIYING FORNEY,

12             Defendants.

13           *      *      *      *      *

14          DEPOSITION OF BARRY BARR,

15     taken pursuant to notice and stipulation

16     on behalf of the Defendants, in the

17     offices of Bradley, Arant, Rose & White,

18     401 Adams Avenue, Suite 780, Montgomery,

19     Alabama, before Nicole Paulk, Certified

20     Court Reporter and Notary Public in and

21     for the State of Alabama at Large, on

22     April 15, 2008, commencing at 9:42 a.m.

23

EXHIBIT

E

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 153

1    Q.    Okay.  What did y'all do?

2    A.    She opened up the building and started

3          showing me the building.

4    Q.    What did y'all talk about?

5    A.    I didn't talk about much; she did.

6    Q.    What did she say?

7    A.    Well, at first I thought it was actually

8          Grant playing a trick on me.  You know,

9          almost the first thing out of her mouth

10         when we were talking about the place was

11         they didn't want a black club there and

12         they didn't want that Celebrations thing.

13         And I kept looking at her like -- and I

14         thought Grant put her up to it or

15         something.  So about the third time she

16         mentioned Celebrations and all that crap

17         going on out there and everything, I asked

18         her if she knew who I was, at which point

19         she said, your name sounds familiar.  And

20         I told her who I was, and to say she

21         looked shocked would be -- she looked more

22         than shocked.

23   Q.    What did she say at that point?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 154

1    A.    Well, we actually talked a little bit, and

2          I tried to explain to her, I said, that

3          was a parking lot issue up there and it

4          had nothing to do with the club, and I

5          hope you don't think that has anything to

6          do with this.  And at that point I told

7          her who I was doing this for and told her

8          who Terrence Long was and what he was

9          looking at doing.  And she said that she

10         probably had formed her opinions through

11         the media, and she was, you know, very

12         nice about it.  And I left.

13   Q.    Okay.

14   A.    After -- well, after discussing the rent.

15         She quoted me $4,500 on the rent, no

16         lease, no improvements.

17   Q.    Anything else you discussed that first

18         day?

19   A.    Just told her that I thought that we would

20         -- we'd go ahead and go with the -- that

21         it would probably be better if we went

22         ahead and went with the Friday's thing and

23         tried to work that deal out.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 156

1   Q.   Did you quote her any number at that time

2         on what it would cost to improve the space

3         to your liking?

4   A.   I told her I think it would -- because we

5         needed kitchen equipment and stuff, it

6         would probably span, you know, 100 to 150

7         grand, redoing the building.

8   Q.   Could it have been more like 300 or

9         400,000 that you quoted her?

10   A.   No.

11   Q.   No?

12   A.   Oh, absolutely not.  I mean, how many

13         square feet is the building?

14              MR. QUINN:  Don't ask questions,

15                just answer.

16   Q.   Is it 100 to $150,000 that you would need

17         in improvements?

18   A.   Right.

19   Q.   No more than that?

20   A.   No more than that.

21   Q.   All right.  You said that she said they

22         didn't want a black club there?

23   A.   Correct.

Page 162

1          that.

2    A.    I don't know.  It's easy to find out.

3                    MR. GUY:  I'm sorry, I didn't

4               hear you.

5                    THE WITNESS:  I said it's easy to

6               find out.

7                    MR. GUY:  Who told you?

8                    THE WITNESS:  No, what he paid.

9                    MR. GUY:  I'm sorry.  I didn't

10              understand.  Thank you, sir.

11   Q.    Do you know who's leasing the space

12         currently?

13   A.    Yes.

14   Q.    Who?

15   A.    I believe it's the guy from Doodle

16         Hoppers.

17   Q.    Did you understand that the guy from

18         Doodle Hoppers had already asked about

19         leasing that space?

20   A.    Yes.

21   Q.    Were you told that the guy from Doodle

22         Hoppers had sort of a first right of

23         refusal to that space?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 163

1    A.    No, absolutely not.  Said he didn't have

2          the money to do it with.

3    Q.    No.  Did Amy tell you that he had the

4          first right of refusal to that space?

5    A.    No.

6    Q.    Did Amy tell you they had been negotiating

7          with him about leasing the space?

8    A.    She mentioned that he had looked at it,

9          about expanding it over there, but she

10         never said he had the first right of

11         refusal.

12   Q.    Well, words to that effect, that there was

13         somebody already looking at the space?

14         Did you know that?

15   A.    Well, I knew --

16               MR. QUINN:  And he's asking you

17                    what you learned from her,

18                    not what you may have

19                    learned later.  He'll ask

20                    you that in a minute.

21   A.    -- that somebody else was looking at the

22         building.

23   Q.    You did know that somebody else was

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 164

1          looking at the building on this first

2          occasion?

3     A.    Right.

4     Q.    And did you know who it was?

5     A.    Well, she said it was the guy from Doodle

6          Hoppers.

7     Q.    Did you understand from the first meeting

8          that the guy from Doodle Hoppers would

9          have to turn down the space before it

10         would be available for rent by anybody

11         else?

12    A.    No, I did not.

13    Q.    So did you have the impression that

14         whoever said I want to lease it first got

15         it?

16    A.    Yes, that was the impression I got.

17    Q.    Was it a statement that was actually made

18         to you, though?

19    A.    I'm not sure.  If you can rephrase the

20         question...

21    Q.    Well, she didn't actually tell you that,

22         whoever gets to me first gets it, or words

23         to that effect, did she?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 179

1  A.    Yeah.  I asked if they were working on a

2        lease because they just offered Mark a

3        lease.  And I said, well, can I get a

4        backup lease on it.

5  Q.    And she said you possibly could?

6  A.    She didn't seem real anxious.  I don't

7        remember.

8              THE WITNESS:  Maybe I should have

9                   listened to the tape before

10                  I gave it to them.

11 Q.    Well, I'm just asking you what you recall.

12       Do you recall whether she said one way or

13       the other about the backup lease?

14 A.    No, I don't.

15 Q.    Do you recall that she offered to give you

16       the phone number of the person with the

17       key so that you could call and go look at

18       the property?

19 A.    Well, I told you after I -- you know, that

20       she finally said that the guy, the

21       attorney, whoever it was, that she might

22       be able to get in touch with him and get

23       us in the building.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 181

1   Q.   Okay.  Then let's shift to the

2        conversation with Grant Sullivan.  He got

3        the rent rolls on the LeCroy shopping

4        center?

5   A.   Yes.

6   Q.   Where did he get that from?

7   A.   I guess from Amy.  I don't know.

8   Q.   Okay.  So someone at Aronov, Amy or

9        somebody, had provided Grant Sullivan with

10       the rent rolls on the property?

11  A.   Correct.

12  Q.   And the purpose of looking at the rent

13       rolls was to come up with some sort of

14       value for purchasing the property?

15  A.   Correct.

16  Q.   We've already established that you don't

17       know whether, at the time that y'all were

18       looking at this property, that it was for

19       sale or listed for sale?

20  A.   When I first originally went in to look at

21       it for leasing it, I was not aware that it

22       was for sale.

23  Q.   Okay.  And do you know whether at the time

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 182

```
1         you went in to look at it that it was

2         placed on the market?

3    A.   Do I know when it was placed on the

4         market?

5    Q.   Do you know if it was placed on the

6         market?

7    A.   No, I don't.

8    Q.   Do you know if it had been on the market

9         before you went to look at it?

10   A.   I don't know.

11   Q.   Do you know why there was no counter to

12        the one million one or one million two?

13   A.   No.

14   Q.   Do you have any facts or evidence or

15        reason to believe that it was racially

16        motivated?

17   A.   No.

18             MR. STEWART:  Would now be a good

19                  time to take a break?

20             (Brief recess.)

21   Q.   The meeting at the property with Amy that

22        we discussed before the break, I think you

23        had said it may have lasted 30 or 40
```

Page 184

1    had other conversations with Amy.  The day

2    I told you I went to Woodmere with Mike

3    Morin -- because I had just called Amy to

4    ask her if me and Terrence Long could get

5    in the building and she said, no, it's

6    tied up in bankruptcy.  And that's when I

7    drove to Woodmere and was talking to Mike

8    and Mark.  And we were in there, I don't

9    know, 15, 20 minutes, and Mark said -- I

10   told them what I thought was going on, and

11   Mark said, well, let me call.  So I talked

12   to her that day before Mark called, and

13   then she -- that's -- I just -- you follow

14   that?

15   Q.   No.  No, I didn't.  I got the impression

16        --

17   A.   Before I went to Woodmere, I had been on

18        the phone with Amy and asked her if

19        Terrence and I could get in the building,

20        that, you know -- I don't know if this is

21        the time when the Friday's thing and he

22        wanted to go ahead and do something

23        immediately.  And then she asked me if my

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 185

| | | |
|---|---|---|
| 1 | | client was still Terrence, and I said yes. |
| 2 | | And she said, well, it's tied up in |
| 3 | | bankruptcy; you can't get in.  And that's |
| 4 | | when I told her, well, it was in |
| 5 | | bankruptcy when you let me in before; |
| 6 | | well, we can't do it now.  At that point |
| 7 | | is when I drove up there and talked to |
| 8 | | Mike and Mark and Mark made the phone call |
| 9 | | to her. |
| 10 | Q. | Was this conversation you just told us, |
| 11 | | was it record? |
| 12 | A. | No. |
| 13 | Q. | Is there anything else y'all discussed in |
| 14 | | the phone conversation? |
| 15 | A. | Just trying to get into the building. |
| 16 | Q. | Okay.  And why did you want to get in the |
| 17 | | building? |
| 18 | A. | To let Terrence look at it, because I told |
| 19 | | him it needed some work.  And that's when |
| 20 | | the Friday's thing fell through.  At this |
| 21 | | point he wanted to move ahead and do |
| 22 | | something immediately. |
| 23 | Q. | To lease the property? |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 195

1    Q.    Okay.  Now, as you sit here today, are

2          there any other conversations that you had

3          with Amy?

4    A.    No, not to my knowledge.

5    Q.    Any other that you had with anybody at

6          Aronov?

7    A.    Not to my knowledge.

8    Q.    Did you ever call anybody at Aronov and

9          say, let me tell you what Amy said to me?

10   A.    No.

11   Q.    Did you ever report her conduct to the

12         Alabama department of real estate

13         people --

14   A.    No.

15   Q.    -- whatever that is called?  Alabama Board

16         of Realtors?

17   A.    No.

18   Q.    Have you ever reported it to anybody,

19         other than your lawyer?

20               MR. QUINN:  You can answer that,

21                   but you can't say what was

22                   said.

23   A.    I went to Wayne Sable, who is my attorney

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 217

1          listening, didn't you?

2                MR. STEWART:  You need to decide

3                     which one of you is going to

4                     object, but that's okay.

5                MR. QUINN:  I'm sorry.

6    Q.   As you read the complaint this morning,

7         did you see anything that was left out

8         that you thought was important?

9    A.   No.

10   Q.   Okay.  Are there any other ways that you

11        believe that you've been discriminated

12        against that we have not talked about here

13        thus far?

14   A.   No.

15   Q.   Were there any witnesses, other than who

16        we've already discussed -- we've already

17        talked about Mark Cranage --

18   A.   Mike Morin.

19   Q.   Anybody else that you claim was a witness

20        to the discrimination that you claim in

21        this case?

22   A.   No.

23   Q.   What are your claims against Aronov in

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 218

1          this case?

2                    MR. QUINN:  Object to the form.

3                        You can answer if you know.

4     A.    She represents Aronov.

5                    MR. QUINN:  Yeah.  I think he had

6                        already answered that.  You

7                        asked that earlier.

8     Q.    Are there any other documents, other than

9          what we've talked about in this

10         deposition, that support your claim that

11         we haven't talked about?

12    A.    No.

13    Q.    Have you talked to anyone else who says

14         that they feel like Amy Knudsen

15         discriminated against them?

16    A.    No.

17    Q.    Have you talked to anyone else that said

18         that they felt like Aronov had

19         discriminated against them?

20    A.    No.

21    Q.    May I see Exhibit 4?

22    A.    (Witness complies.)

23    Q.    Thanks.  Exhibit 4 is the Texas Steakhouse

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 238

1                    substitute that, then, if

2                    you'll just make me another

3                    copy.  That was my question.

4    Q.   All right.  Your attorney has one that's

5         got a signature on it.  I'm sorry, but I

6         didn't get that.

7    A.   I thought I remembered signing it.

8    Q.   So when it indicates in Paragraph 20 that

9         you approached Knudsen with a one million

10        dollar offer, really, Grant Sullivan did,

11        correct?

12   A.   He had the conversation with her over the

13        phone.  He got the cap rates, told me to

14        come by and look at the cap rates.  He

15        said, this is what you should offer.

16   Q.   Okay.  I'm just trying to establish -- I

17        just want to understand your earlier

18        testimony.  You never had a discussion

19        directly with Ms. Knudsen about purchasing

20        it for one million dollars, did you?

21   A.   I don't think so.  I think it was all with

22        Grant.  He handled the whole thing.

23   Q.   And you never had any discussions, nor did

Page 281

1            THE WITNESS:  I just said I had

2                    already seen the building

3                    and I would do it without

4                    Terrence.  It was one of the

5                    conversations we had on the

6                    phone.

7    Q.   You're not even answering Mr. Quinn's

8         question.  Let me try to make it easier.

9         I don't want to be confusing to you.  I

10        want to be fair to you, but I want you to

11        be fair to me.  Let's start off this way.

12        It would be fair to say that you never

13        made an offer in writing --

14   A.   Right.

15   Q.   Let me finish.  You never made an offer in

16        writing to lease the premises that we've

17        been discussing, the Pure Country Saloon,

18        correct?

19   A.   Correct.

20   Q.   All right.  So the writing part's out of

21        the way now.  All right.  As far as a

22        verbal offer to lease the premises, is it

23        fair to say that on your first meeting

Page 282

1        with Ms. Knudsen out there, you never made

2        a verbal offer to lease the premises?

3    A.   Correct.  She gave me the quote.

4    Q.   She gave you the quote, but you never

5        either counteroffered or said I accept,

6        correct?

7    A.   Correct.

8    Q.   All right.  So when would be -- in your

9        testimony, when would be the first time

10       you made any verbal request to lease the

11       premises that we've been referring to as

12       the Pure Country Saloon?

13   A.   When I asked to put a backup lease.  I

14       asked if she was working on the lease, and

15       she said she was working on the lease.

16       And I said, well, can I put a backup lease

17       on there, and she said that wasn't

18       necessary -- I don't remember what her

19       explanation was.

20   Q.   Are you referring -- go ahead.  Are you

21       finished?  I don't want to interrupt you.

22       Okay.  Are you referring to the

23       conversation that is part of the tape we

Page 284

1                    confuses things.  He's

2                    talking about before that

3                    event on the 13th.

4    A.    There had been no written offer.

5    Q.    And no verbal offer?  You never came in

6          and said, I'll lease this space -- I'm

7          making an offer to lease it for 4500,

8          3500, 2500 a month?  You never made an

9          offer to her -- a counteroffer to what she

10         told you that very first day, did you?

11   A.    No.

12   Q.    Okay.  Do you still have the -- and again,

13         I'm not familiar with this term -- the

14         rent rolls on LeCroy shopping center?

15   A.    Those were sent to Grant, and he called me

16         when he went over them.  I went by his

17         office, and if he has them, he would have

18         them on file.

19   Q.    And you never personally had them in your

20         possession?

21   A.    No.

22   Q.    And if I understood what you said earlier

23         -- and I want to be fair, but I think you

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 286

1     million?

2    Q.    And I'm not begrudging you for being a

3     good business person.  That's what a good

4     business person does, right?

5    A.    Right.

6    Q.    You were trying to get a good deal, right?

7    A.    Right.

8    Q.    And you wouldn't begrudge Ms. Forney if

9     she didn't feel like that a million

10     dollars was an appropriate offer, would

11     you?

12    A.    No.

13    Q.    Regardless of your race, correct?

14    A.    My race?

15    Q.    Of anyone's race.  I mean, if she didn't

16     feel it was worth -- that it was worth

17     more than a million dollars, that would be

18     good business on her part, to not accept a

19     million, correct?

20    A.    Correct.

21    Q.    Whether you were black, white, Asian,

22     Hispanic, or whatever, correct?

23    A.    Correct.

Page 303

1    A.    Every bar in town --

2    Q.    -- same adverse media coverage that your

3          bar got during that same time frame?

4    A.    No.

5    Q.    Okay.  Can you understand -- setting aside

6          race, can you understand why a landlord

7          would not want his property to get that

8          kind of adverse media attention?

9    A.    Can I understand that?

10   Q.    Yeah.

11   A.    Yes.

12   Q.    Okay.  The demographic maps that you

13         discussed, do you actually own one?

14   A.    You can get a demographic -- I can have

15         you --

16              MR. QUINN:  That's not the

17                    question.  Do you have one?

18   A.    They change --

19              MR. QUINN:  Just answer the

20                    question, and we can go

21                    home.

22   A.    No.

23   Q.    How do you get one?

Page 304

1    A.    You can go to the Chamber of Commerce and

2          get -- they'll e-mail you anything you

3          want.

4    Q.    Did you refer to demographic maps when you

5          were looking into your sports bar?

6    A.    It was -- I already knew where

7          Celebrations was.  I already know what the

8          demographics are from having been here for

9          14 years.  You know, I didn't have to look

10         at any demographics for that.

11   Q.    So is that a no, you didn't look at one?

12   A.    No.

13   Q.    Okay.  We talked a little bit about the

14         offer, the verbal offer, the written offer

15         on the lease premises there at Pure

16         Country.  Based on what you've said here

17         today, it appears that the only time you

18         said anything about a backup lease was

19         after the alleged discriminatory statement

20         that you said Amy made that first visit,

21         correct?

22   A.    I don't understand the question.

23   Q.    The only time you ever mentioned a backup

Page 305

1    lease was after this first visit to the

2    property?

3  A.    Right.

4  Q.    Okay.  You had already decided to go with

5    Friday's after the first visit to the

6    property, correct?

7  A.    Correct.

8  Q.    You never intended to lease this space at

9    $4,500 a square foot, did you?

10  A.    We came back and tried to.

11  Q.    You never intended to lease this space at

12    $4,500 a square foot, did you?

13  A.    I offered to pay whatever -- I -- I

14    offered to sign a lease.

15  Q.    For $4,500 a square foot?

16  A.    For whatever she wanted to write it for.

17  Q.    Oh, you didn't care what the amount was?

18    That was not important to you?

19         MR. QUINN:  Object to the form.

20  A.    Of course it's important to me.

21  Q.    You didn't care what the price of the

22    lease was by square foot?

23         MR. QUINN:  I think he's already

Exhibit F

# FREEDOM COURT REPORTING

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5    TERRENCE LONG & BARRY BARR,
6         Plaintiffs,
7              CIVIL ACTION NO:
8    v.        2:07-CV-00881-WKW-WC
9
10   ARONOV REALTY MANAGEMENT, INC.,
11   AMY CLARK KNUDSEN, & MEIYING
12   FORNEY,
13        Defendants.)
14        S T I P U L A T I O N S
15
16        IT IS STIPULATED AND AGREED
17   by and between the parties through their
18   respective counsel, that the deposition of
19   ******************************************
20        SCOTT HARRIS
21   ******************************************
22   may be taken before Kim Duckett,
23   Commissioner, at 401 Adams Avenue,

**2**

1    Montgomery, Alabama, on June 23rd, 2008,
2    beginning at 10:00 A.M.
3         IT IS FURTHER STIPULATED AND
4    AGREED that the signature to and the
5    reading of the deposition by the witness is
6    waived, the deposition to have the same
7    force and effect as if full compliance had
8    been had with all laws and rules relating
9    to the taking of depositions.
10        IT IS FURTHER STIPULATED AND
11   AGREED that it shall not be necessary for
12   any objections to be made by counsel to any
13   questions, except as to the form or leading
14   questions, and that counsel for the parties
15   may make objections and assign grounds at
16   the time of trial, or at the time said
17   deposition is offered in evidence, or prior
18   thereto.
19        IT IS FURTHER STIPULATED AND
20   AGREED that notice of filing of the
21   deposition by the Commissioner is waived.
22
23

**3**

1              I N D E X
2
3    WITNESS:
4    SCOTT HARRIS
5
6    EXAMINATION BY                    PAGE
7    Mr. Quinn ....................  5
8
9         DEFENDANT'S EXHIBITS
10   There were no Defendant's Exhibits marked
11   to this deposition.
12        PLAINTIFF'S EXHIBITS
13   NO.                          PAGE
14   1..............................12
15
16
17
18
19
20
21
22
23

**4**

1         A P P E A R A N C E S
2    APPEARING ON BEHALF OF THE PLAINTIFF(S):
3
4    WIGGINS, CHILDS, QUINN & PANTAZIS
5      BY: Mike Quinn & Kevin Jent
6         301 19th Street North
7         Birmingham, Alabama 35203
8
9
10   APPEARING ON BEHALF OF THE DEFENDANT(S):
11
12      BRADLEY, ARANT, ROSE & WHITE
13      BY: CHARLES STEWART III
14      401 Adams Avenue, Suite 780
15      Montgomery, Alabama 36104
16
17      BALL, BALL, MATTHEWS & NOVAK
18      BY: N. Gunter Guy
19   2000 Interstate Park Drive, Suite 204
20      Montgomery, Alabama 36109
21
22   ALSO PRESENT: AMY KNUDSEN, BARRY BARR
23

                                          1 (Pages



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-**

# FREEDOM COURT REPORTING

**5**

1      SCOTT HARRIS,
2  being first duly sworn, was examined and
3  testified as follows:
4
5  EXAMINATION BY MR. QUINN:
6    Q  State your name for the record?
7    A  Joseph Scott Harris.
8    Q  And where are you employed?
9    A  At Aronov Realty Brokerage, Inc.
10    Q  And what is your position with
11  them?
12    A  Senior vice president.
13    Q  And how long have you held the
14  position of senior vice president?
15    A  Eleven years.
16    Q  Prior to that, what were you doing?
17    A  I was with Aronov as well in
18  another position.
19    Q  How long have you been with Aronov?
20    A  Since 1987.
21    Q  Okay.  And tell me what other
22  positions you've held with Aronov prior to
23  the one you hold now.

**6**

1    A  I was a property manager and
2  leasing agent.  I was hired as a property
3  manager and leasing agent in '87.  And
4  then in '97 I was promoted to vice
5  president and then a couple of years ago
6  to senior vice president.
7    Q  Okay.  In the first position that
8  you held, property manager leasing?
9    A  Right.
10    Q  What were your duties and
11  responsibilities?
12    A  I was responsible for the bottom
13  line operations of a portfolio of office
14  and industrial properties.  I was
15  responsible for leasing the properties and
16  managing the properties.
17    Q  Okay.  And I'm sorry, I may have
18  asked you this, but how long have you been
19  in your present position?
20    A  For a couple of years.
21    Q  And what are your duties and
22  responsibilities in that job?
23    A  I'm responsible for overseeing our

**7**

1  -- the profitability and the employees in
2  our commercial division which includes our
3  brokerage division and our office and
4  industrial division.
5    Q  Okay.
6    A  And I'm also the qualifying broker
7  for the company for the Aronov Realty
8  Brokerage, Inc. and Aronov Realty
9  Management, Inc.  And I also -- I am
10  actively involved in leasing and
11  investment sales and commercial sales.
12    Q  So you still do sales even though
13  you also manage?
14    A  Correct.
15    Q  And in your position, do you
16  actually have the responsibility over
17  employees of Aronov?
18    A  Yes.
19    Q  Okay.  What employees do you have
20  responsibility over?
21    A  Employees I have responsibility
22  over -- direct responsibility?
23    Q  Uh-huh.

**8**

1    A  The individual names?
2    Q  No, no, no, the positions.  The
3  people that you supervise.  I don't need
4  their names, I need to know what their
5  positions and what they do?
6    A  There is a property manager and
7  leasing agent that handles our office and
8  industrial portfolio.
9    Q  Just one person?
10    A  Yes.
11    Q  Who is that?
12    A  Neil Bernie.
13    Q  Okay.
14    A  And then Sherry Cavanaugh is the
15  manager of our -- of a mini warehouse
16  complex and she actually oversees the
17  managers of two other mini warehouse
18  complexes.
19    Q  Okay.
20    A  And then Dawn Casey is -- she
21  really is my assistant, but she also
22  handles the Baptist Hospital account that
23  we handle the leasing on.  And Gloria

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

13

1  employee of Aronov Realty Management,
2  Inc., her card says she is?
3      MR. STEWART: Object to form.
4      A I don't know.
5      Q Could that be an old card?
6      A Yes, sir, it could be.
7      Q All right. And tell me again so I
8  understand it, the difference between what
9  Aronov Realty Brokerage, Inc. does and
10 what Aronov Realty Management, Inc. does.
11     A Aronov Realty Brokerage, Inc. is a
12 company that leases and sells commercial
13 real estate in the commercial division.
14 Aronov Realty Brokerage, Inc. also has a
15 division that sells residential real
16 estate -- is responsible for brokering,
17 selling residential real estate primarily
18 for third parties but Aronov Realty
19 Brokerage, Inc. also sells and leases for
20 the -- can sell and lease for the
21 portfolio that Aronov Realty Management,
22 Inc. leases. Aronov Realty Management,
23 Inc. is really a management company and

14

1  leasing company for a portfolio of
2  properties.
3      Q So rather --
4      A So the brokerage company is
5  responsible -- really primarily focuses on
6  selling and leasing and the management
7  company primarily focuses on managing and
8  leasing and some development work.
9      Q Managing and leasing, not just
10 managing?
11     A Correct. Managing and leasing and
12 development. They also have a financial
13 services division.
14     Q Okay. Do you know a Meiying
15 Forney?
16     A I've not met Ms. Forney that I'm
17 aware of, but I know the name.
18     Q Who was representing her as of May
19 of 2007 --
20     MR. STEWART: Object to the form.
21     Q -- in leasing the property that --
22 the shopping center property that's in
23 dispute here?

15

1      MR. STEWART: Object to form.
2      A I don't know.
3      Q You don't know?
4      A I don't know.
5      Q Okay. Do you know who was
6  responsible for leasing the property at
7  LeCroy Shopping Village?
8      MR. STEWART: Object to form.
9      A I don't know who was -- no, sir.
10     Q Did Aronov Realty Brokerage, Inc.
11 -- well I think I've already asked you.
12 Let me make sure I've got this straight so
13 I can back this all up. Amy worked for
14 the brokerage company as of May of 2007;
15 is that right?
16     A Yes. She -- I believe in '06 is
17 when she first started working for the
18 brokerage.
19     Q Are you aware that Amy showed the
20 property LeCroy Shopping Village to my
21 client in May of 2007?
22     A Yes, sir.
23     Q Okay. When she was showing that

16

1  property in May of 2007, who was she
2  representing?
3      A I don't believe she was
4  representing anybody. I think she was
5  acting as a transaction broker.
6      Q As a transaction broker for who?
7      A As a transaction broker for Ms.
8  Forney.
9      Q Okay. How would she have been
10 acting as a transaction broker for Ms.
11 Forney if there was no relationship
12 between Ms. Forney and the brokerage
13 company?
14     MR. STEWART: Object to form.
15     A Because that's the type of
16 relationship that a real estate company
17 defaults to if there is no written
18 agreement.
19     Q Okay. I'm going get educated
20 today. So there was no written agreement
21 with Ms. Forney?
22     A That's my understanding. There was
23 no written listing agreement is my

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

25

1 again.
2     Q That owns or is in any way involved
3 in managing or leasing LeCroy Shopping
4 Village?
5     A Other than Ms. Knudsen, no, sir.
6     Q Was there anybody else that could
7 show that property other than Ms. Knudsen?
8     A I don't know if there was anybody
9 else -- other people could show it. I
10 don't know if anybody else was showing,
11 any other real estate agents.
12     Q Okay.
13     A As long as that person was
14 receiving their instruction from Ms.
15 Forney.
16     Q Okay. Have you ever had a
17 conversation with Ms. Forney?
18     A Not that I can remember.
19     Q If in fact she were to have a
20 relationship with the brokerage company,
21 how would that happen?
22     MR. STEWART: Object.
23     A I'm not sure I'm following you.

26

1     Q If she wanted Aronov to help her
2 lease or sell that space at LeCroy
3 shopping center, how would she go about
4 doing that?
5     A She would talk to one of our
6 independent contractors or employees.
7     Q Okay. And why would she talk to
8 them?
9     A To describe what services she was
10 interested in having Aronov perform.
11     Q And is that the way that the
12 relationship is always done for the
13 leasing or the selling of a piece of
14 commercial property such as a shopping
15 center, that the relationship is between
16 the independent agent?
17     MR. STEWART: Object to form.
18     A I wouldn't say it's always the
19 case.
20     Q Okay. Was there -- to your
21 knowledge, was there anybody else who had
22 a relationship with Ms. Forney who could
23 show the property?

27

1     MR. STEWART: Object to form.
2     A Within Aronov?
3     Q Yes.
4     A Not that I'm aware of.
5     Q So is it your testimony that the
6 only one in -- the only person with Aronov
7 that could show that property was Ms.
8 Knudsen?
9     A No. Anybody could have shown it
10 within the company. But our typical --
11 our typical procedure would be since Amy
12 Knudsen knew the property the best and was
13 working with Ms. Forney on the property
14 that they would work through Amy if there
15 was a prospect for that property within
16 Aronov.
17     Q Well, then that creates confusion
18 in my mind. Earlier you said that Ms.
19 Knudsen had an independent transactional
20 agreement with Ms. Forney to try and lease
21 the property, right?
22     MR. STEWART: Object to form.
23     A She was acting as a transaction

28

1 broker, right.
2     Q A transaction broker?
3     A Right.
4     Q Okay. But the relationship, if
5 other people from Aronov could show the
6 property, was with Aronov not Ms. Knudsen,
7 right?
8     MR. STEWART: Object to form.
9     A It was with Aronov Realty
10 Brokerage, Inc. through Ms. Knudsen.
11     Q And tell me, somebody who doesn't
12 know a thing in the world about real
13 estate, what that agreement between her
14 and the brokerage company was.
15     MR. STEWART: Object to form.
16     Q What was it called first?
17     MR. STEWART: Same objection.
18     A It would be called a transaction
19 brokerage agreement.
20     Q And are transaction brokerage
21 agreements usually but in writing?
22     A Sometimes they are and sometimes
23 they are not.

7 (Pages 25 to 28)

Exhibit G

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5
6  CIVIL ACTION NO.: 2:07-CV-00881-WKW-WC
7
8  TERRENCE LONG & BARRY BARR,
9      Plaintiff(s),
10  vs.
11  ARONOV REALTY MANAGEMENT,
12  INC., AMY CLARK KNUDSEN, &
13  MEIYING FORNEY,
14      Defendant(s).
15
16  DEPOSITION OF
17  MARK CRANAGE
18  JOB NO. 1101-58771
19
20  BEFORE:  Victoria M. Castillo
21  Certified Court Reporter and
22  Notary Public
23  ACCR# 17, Expires 9/30/2008

## Page 2

1      In accordance with Rule 5(d) of
2  The Alabama Rules of Civil Procedure, as Amended,
3  effective May 15, 1988, I, Victoria M. Castillo, am
4  hereby delivering to CHARLES A. STEWART, III, ESQ.
5  the original transcript of the oral testimony taken
6  on the 24th day of June, 2008, along with exhibits.
7      Please be advised that this is
8  the same and not retained by the Court Reporter,
9  nor filed with the Court.
10
11  S T I P U L A T I O N
12
13      IT IS STIPULATED AND AGREED, by
14  and between the parties through their respective
15  counsel, that the deposition of MARK CRANAGE may be
16  taken before Victoria M. Castillo, Commissioner, at
17  BRADLEY, ARANT, ROSE & WHITE, Alabama Center for
18  Commerce, 401 Adams Avenue, Suite 780, Montgomery,
19  Alabama 36104 on the 24th day of June, 2008.
20      IT IS FURTHER STIPULATED AND
21  AGREED that the signature to and the reading of the
22  deposition by the witness is waived, the deposition
23  is said to have the same force and effect as if

## Page 3

1  full compliance had been had with all laws and
2  rules of Court relating to the taking of
3  depositions.
4      IT IS FURTHER STIPULATED AND
5  AGREED that it shall not be necessary for any
6  objections to be made by counsel to any questions,
7  except as to form or leading questions, and that
8  counsel for the parties may make objections and
9  assign grounds at the time of trial, or at the time
10  said deposition is offered in evidence, or prior
11  thereto.
12      IT IS FURTHER STIPULATED AND
13  AGREED that notice of filing of the deposition by
14  the Commissioner is waived.
15
16
17
18
19
20
21
22
23

## Page 4

1  I N D E X
2
3  EXAMINATION BY:    PAGE NUMBER:
4  Mr. Stewart    7
5  Mr. Guy    87
6  Mr. Quinn    111
7  Mr. Stewart    113
8
9  EXHIBITS:    PAGE NUMBER:
10  Defendant's Exhibit 1    79
11  Defendant's Exhibit 2    79
12  Defendant's Exhibit 3    80
13  Defendant's Exhibit 4    82
14
15
16
17
18
19
20
21
22
23

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

EXHIBIT
G
ALL-STATE LEGAL®

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 21

1    A.    Two, maybe three.

2    Q.    Has he ever been to your house?

3    A.    He come out and -- he hasn't been

4 inside my house. He's been up to -- driving by. I

5 think him and Mike come up and seen I've got horses

6 and stuff.

7    Q.    How many times?

8    A.    Once I believe.

9    Q.    You-all ever go on vacations or

10 holidays together?

11    A.    No, sir.

12    Q.    Are your spouse's friends?

13    A.    They know each other, but they are

14 not friends. They don't know each other well at

15 all -- I mean, that well.

16    Q.    How is it that you got involved in

17 this case?

18    A.    We were at -- we were down in the

19 office, and I was working -- I was looking at

20 possibly getting out of Woodmere Tavern, but doing

21 without Mike knowing until I had somewhere to go.

22 My dad agreed -- he initially, before my step mom

23 passed away, was backing me in Madison's, and he

## Page 22

1 agreed to back me to go ahead and leave Woodmere,

2 and I was looking for another location. During

3 approximately the same time, my dad had a stroke,

4 and Barry was in the office, and he was talking

5 about trying to find another location, and he

6 mentioned that he was trying to get Pure Country

7 Saloon and that it wasn't available. I had several

8 folks that used to come up to Heartland Dance

9 Center that were -- Pure Country was a country

10 bar -- that asked me if I'd look into that -- and I

11 was going to look into it. I mentioned to Barry

12 that I thought it was still available, and he told

13 me it wasn't -- that he was told that it was not

14 available. So he asked me if I would call Aronov

15 and find out if I would be able to get to it -- he

16 felt he was being discriminated against because of

17 the type of club he had.

18    Q.    Do you remember when that took place?

19    A.    Had to have been probably the

20 beginning of June. That's about the time my father

21 got sick the first time.

22    Q.    When you say you were in the office,

23 where was that?

## Page 23

1    A.    At Woodmere Tavern.

2    Q.    And who all was there?

3    A.    Mike Morin -- he was there visiting

4 Mike. I was just in the back of the office doing

5 my computer stuff, and I just overheard what they

6 said.

7    Q.    Are you saying that before that

8 moment you had been thinking about getting out of

9 Woodmere Tavern and opening your own place?

10    A.    Yes, sir.

11    Q.    That people who had come to

12 Heartland --

13    A.    That used to go to Pure Country.

14    Q.    -- that used to go to Pure Country,

15 they are the ones that got you interested in Pure

16 Country?

17    A.    Well, they had made mention because

18 some would go there and then also come in Woodmere,

19 and they asked me why don't you just get that place

20 and do the same thing that you did up in Heartland,

21 and I just thought about looking into it.

22    Q.    Did you know Fannin, the owner of

23 Pure Country?

## Page 24

1    A.    He's another one I know of. And

2 after he shut down Pure Country, he came into

3 Woodmere. And he's just like Amy -- I wouldn't

4 know him by face, but he introduced himself to me.

5 I met him once.

6    Q.    What did he tell you about Pure

7 Country in terms of why he was out of business?

8    A.    I couldn't specifically say, but it's

9 a lot of things that -- I guess a lot of people

10 that lose their business are going to blame

11 everything else -- and I don't know -- could have

12 been anything from the area to the location.

13    Q.    Did he tell you he was bankrupt?

14    A.    Pardon?

15    Q.    Did he tell you that the business was

16 bankrupt?

17    A.    No, sir.

18    Q.    Or in bankruptcy?

19    A.    No, sir.

20    Q.    Or that he was going to have to get

21 out of it?

22    A.    No, sir.

23    Q.    Did he tell you that his place was

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
**Court Reporting * Legal Videography * Trial Services**

---

Page 37

1    Q.    Who is Bob? Is there an individual
2  named Bob?
3    A.    Bob?
4    Q.    Bob, yes. I was trying to think -- I
5  thought the tape started out. It sounded like it
6  started out?
7    A.    No. I call my dad Pop.
8    Q.    Maybe it was Pop and the court
9  reporter wrote down Bob. Actually, it doesn't even
10  make the transcript. It's on the tape version, but
11  it didn't make the transcript. I guess we're going
12  back to the beginning of June. Barry is in your
13  office. He's said he's felt discriminated against
14  because of the type of club he had. Are those the
15  words that he used?
16    A.    Pretty much.
17    Q.    Did he say anything else?
18    A.    Well, I mean the conversation came up
19  where I said I thought the property was available,
20  and I kind of looked at it as an opportunity to
21  where I could find out if it was available. And if
22  I seen down there or word got out that I was
23  looking at it and got back to Woodmere, well I'd be

Page 38

1  doing it. Because he asked me, he said -- why
2  don't you call and find out if it is available.
3    Q.    Okay. Did you call them right then?
4    A.    Yes, sir.
5    Q.    Was he in the room?
6    A.    Yes, sir.
7    Q.    Who did you call?
8    A.    Amy Knudsen.
9    Q.    How did you know to call her?
10    A.    Barry provided the phone number for
11  me, and it was for Aronov.
12    Q.    Did you get her when you placed the
13  call?
14    A.    I think initially I got Aronov, and
15  they gave me the number for her.
16    Q.    Did you speak with anyone at Aronov,
17  or just like the operator?
18    A.    Whoever answered the phone.
19    Q.    Did you discuss what you were doing
20  in that phone call?
21    A.    No.
22    Q.    How did you reach her then, on a cell
23  phone?

Page 39

1    A.    I believe so.
2    Q.    And what phone were you calling from?
3    A.    From Woodmere Tavern.
4    Q.    Is that a hard-line phone that you
5  have in the place?
6    A.    Yes.
7    Q.    What is the phone number there?
8    A.    Well, there is two phone numbers --
9  279-0802 and 274-0437.
10        MR. GUY: I'm sorry, you fade off
11  for me here -- it's 0437?
12        THE DEPONENT: Yes, sir.
13        MR. GUY: Thank you, sir.
14    Q.    (Mr. Stewart) Do you know which of
15  those numbers you called her on?
16    A.    No. It is a phone that if one is
17  being used, it will go to the other number.
18    Q.    And where did you place the call
19  from, the office?
20    A.    From the office.
21    Q.    And were both Mike and Barry in there
22  when the call was made?
23    A.    Yes, sir.

Page 40

1    Q.    Was the conversation recorded?
2    A.    No.
3    Q.    Did anyone take notes of the
4  conversation?
5    A.    I couldn't tell you if Barry did or
6  not.
7    Q.    Did you yourself take any notes of
8  conversations with Amy at any time that you talked
9  with her?
10    A.    Just at the time where I made that
11  call and she said she would talk to me about the
12  club. And I told her who I was, what places I've
13  had.
14    Q.    Let's talk about the first
15  conversation that you had with her. Tell me what
16  you said and what she said.
17    A.    Just more or less that I was
18  interested in that location in finding a place, and
19  that some of my customers in Heartland had told me
20  that they were interested in me possibly opening
21  another --
22    Q.    Anything else?
23    A.    I don't really recall a lot from

10 (Pages 37 to 40)

Page 45

1   Q.   Is that 334?
2   A.   Correct.
3   Q.   Is that still your cell phone number?
4   A.   Yes, sir.
5   Q.   Was she on her cell phone, or was she
6 at the office?
7   A.   I believe she was on her cell phone.
8 I really couldn't tell you.
9   Q.   How long a conversation was the
10 second one?
11   A.   I have no idea.
12   Q.   Tell me what you-all discussed in the
13 second conversation.
14   A.   She had discussed that there was
15 other people looking at it, and she was kind of in
16 a hurry for me to look at it and see if it's
17 something I would be interested in. She had
18 mentioned that Doodle Hoppers was interested in it
19 and that she wasn't sure if they had the money to
20 go into the new location. And she mentioned that
21 there was a guy with a black club that wanted --
22 that was interested in it.
23   Q.   Were those the words she used?

Page 46

1   A.   Yes, sir.
2   Q.   Was she any more specific?
3   A.   Pardon?
4   Q.   Was she any more specific?
5   A.   I don't believe in that point in time
6 that she come out and said the guy from
7 Celebrations. But in during one of our
8 conversations, both her and the attorney mentioned
9 Celebrations.
10   Q.   But you don't know if it was
11 mentioned in this conversation?
12   A.   I really -- we've had several -- I
13 mean, quite a few phone conversations.
14   Q.   And we are going to get to them. I
15 am just trying to -- best I can --
16   A.   I really couldn't tell you exactly
17 which conversation a lot of this stuff happened in.
18   Q.   Did you record the second
19 conversation?
20   A.   On the phone?
21   Q.   Yes, sir.
22   A.   I recorded none of our conversations
23 on the telephone.

Page 47

1   Q.   Did she ever leave a message on an
2 answering machine of yours?
3   A.   Yes, sir, several times.
4   Q.   And did you save those messages?
5   A.   Yes, sir.
6   Q.   And where are those messages saved?
7   A.   On my cell phone.
8   Q.   So if we wanted to today, we could
9 listen to those conversations while we are sitting
10 here?
11   A.   Yes, sir.
12   Q.   In this second conversation -- and I
13 understand you've told me sometimes these
14 conversations move together, but at this point all
15 I'm asking for is your best recollection -- did you
16 actually set up an appointment time to go look at
17 the place?
18   A.   She set up an appointment time
19 with -- I got the name on here -- Don Little.
20   Q.   And do you know Don Little?
21   A.   Just in the time I have met him.
22   Q.   And do you know when it was that it
23 was set up that you go look at it?

Page 48

1   A.   On the 13th of June. I just have it
2 on this tape right here.
3   Q.   And did you actually call Don Little?
4   A.   I really can't recollect if he called
5 me or I called him.
6   Q.   Before the meeting?
7   A.   Yes, sir.
8   Q.   Was there anything else you-all
9 discussed in the second conversation?
10   A.   With Amy?
11   Q.   Right.
12   A.   I couldn't tell you.
13   Q.   Tell me about your conversation with
14 Don Little, the phone conversation.
15   A.   Just that I was interested in going
16 and looking at the location, and then we just
17 mainly set up a time to go look at it.
18   Q.   And that was June 13 then that you
19 were going to meet, the time?
20   A.   Yes, that was the date that they set
21 -- that he set up for me to go look at it.
22   Q.   And what time on June 13th were you
23 supposed to meet?

12 (Pages 45 to 48)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

Page 57

```
 1     A.   I believe so.
 2     Q.   -- that Barry Barr was interested in
 3  getting recorded?
 4     A.   Yes, sir.
 5     Q.   Do you know when it was that you
 6  played the tape for Barry Barr?
 7     A.   It would have probably been shortly
 8  after the meeting with Don Little.
 9     Q.   Like same-day, next-day kind of
10  thing?
11     A.   Possibly, yes, sir.
12     Q.   And did you talk to Amy Knudsen after
13  that day?
14     A.   Yes.
15     Q.   When was the next time you spoke with
16  Ms. Knudsen?
17     A.   It might have been shortly after that
18  meeting, telling her that I did go and look at the
19  location.
20     Q.   And tell me what you-all discussed.
21     A.   I told her that even though I was not
22  interested, I believe I told her I was interested
23  in the property.
```

Page 58

```
 1     Q.   And what did she say?
 2     A.   And during the tape, I believe they
 3  mentioned some build-out stuff, and whatnot, and I
 4  can't even really recall what the whole
 5  conversation was.  I don't remember what's even on
 6  the tape.  But it was conversations as to that.
 7  And even in -- you will see with the phone call
 8  messages that her messages were up to even a week
 9  afterwards where we were still talking about my
10  renting the location.
11     Q.   Did you discuss with Amy Knudsen that
12  you would want to do some build-out?
13     A.   I told her there would have to be
14  build-out done, and Don Little I believe afforded
15  me some avenues or some choices I could make and
16  that they would -- like I said, I haven't listened
17  to the video in a year, but I was under the
18  understanding that they were going to make some
19  concessions for me to get into that location.
20     Q.   And so you talked with Don Little
21  about the concessions that they would make, or the
22  concept?
23     A.   Yes, sir.  Don Little and Amy, yes.
```

---

Page 59

```
 1     Q.   At any time did you discuss a dollar
 2  figure on the concessions?
 3     A.   I believe so.  I'm not sure what it
 4  was.  I can't recollect.  I know there was some
 5  dollar figures mentioned.  I believe in the
 6  video -- and I can't say -- I don't have it in
 7  front of me.  I know they wrote it out.  I never
 8  read the transcript.  But like I said, it's been
 9  years since I have listened to that.  I believe I
10  told him what I thought it would cost to go in
11  there and that they would make some concessions as
12  far as build-out time.  And I think he said
13  something about repairing some things -- I can't
14  remember what it was.
15     Q.   At the time you were looking at it,
16  what were you talking about in terms of build-out
17  concessions?
18     A.   Possibly -- about two or three
19  months.  That's what I usually try to do.
20     Q.   And how much money were you talking
21  about?
22     A.   As far as rent or --
23     Q.   No, as any type of rent concession?
```

Page 60

```
 1     A.   I don't recall.
 2     Q.   Would it have been some huge amount
 3  of money?
 4     A.   I don't believe it would have been
 5  huge, no.
 6     Q.   Like ten, fifteen thousand, something
 7  --
 8     A.   If they were going to rent -- and I
 9  can't even remember what the rent was going to
10  be -- it would have been two months, or whatever
11  that would have been.  I imagine it would have come
12  close to ten thousand.  But there was some other
13  times too that I had concerns with.  And like I
14  said, I just can't recollect what they were.
15     Q.   Anything else that you talked with
16  Amy about or Little about in terms of rent -- the
17  amount of the rent, the concessions, build-out
18  dollars, and so forth?
19     A.   Not that I can recall right now.
20     Q.   Anything else that you and Amy
21  discussed in this first conversation after the
22  videotaping?
23     A.   Pardon?
```

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 61

1    Q.   Is there anything else that you and
2  Amy discussed in this first conversation after the
3  videotaping?
4    A.   I don't recall.
5    Q.   Did you actually quote her a figure
6  to lease the space?
7    A.   I believe that we had talked about a
8  figure, but that's just another one of the
9  non-recollection things. I can't — I really put
10  this to bed a year ago.
11    Q.   So you don't have any recollection as
12  you sit here today what the lease was going to be,
13  how many dollars per square foot, or --
14    A.   I know it was something that I'm
15  pretty sure I would have — if I wanted to pursue
16  the location, I was going to do. They made it
17  attractive enough to where I was going to probably
18  do it. I would have done it.
19    Q.   Did you understand at the time that
20  they still had Doodle Hoppers looking at it?
21    A.   Yes, sir.
22    Q.   How much would space like that rent
23  for, in your opinion, at that time?

## Page 62

1    A.   In the condition of that building --
2  I would say between four and five thousand dollars
3  a month approximately.
4    Q.   Do you recall anything else from this
5  first conversation at the videotaping?
6    A.   No, sir.
7    Q.   How did you leave it with Ms. Knudsen
8  at that time?
9    A.   That I was still interested in the
10  property.
11    Q.   And did you tell her you would get
12  back with her, or how —
13    A.   I don't recollect.
14    Q.   I guess what I'm getting at is: It
15  sounds like you're having this conversation after
16  looking at it, you tell her you're still interested
17  in it in -- but in terms of making a formal offer,
18  either oral or in writing to lease the space, you
19  hadn't gotten to that point?
20    A.   Right.
21    Q.   You told her that you would have to
22  talk to your partner or get back with her, or words
23  to that effect?

## Page 63

1    A.   Something like that. But I do
2  remember that she had made mention in one of our
3  conversations that we need to -- you know, if we're
4  going to do something, we need to do it soon.
5    Q.   Did she offer an explanation why?
6    A.   During our conversations, I mean it
7  had absolutely had to do with the fact that she
8  didn't want to look like -- which I was kind of
9  confused on how I would be able to come in and get
10  that place if she told him the people from Doodle
11  Hoppers were getting it, and then all of a sudden I
12  would show up as a tenant. That kind of confused
13  me at first, how she would explain that. But it
14  was totally that she just didn't want Barry coming
15  into it with a place like Celebrations.
16    Q.   She said that?
17    A.   Yes, sir.
18    Q.   Was that in this conversation?
19    A.   It was in one of our conversations.
20    Q.   She didn't want Barry to come in with
21  a place like Celebrations?
22    A.   Right.
23    Q.   Did she say anything further about

## Page 64

1  that?
2    A.   No, I believe she was pretty
3  straightforward. I mean, she didn't elaborate on
4  what his problems were. I don't think she knows
5  what his problems were, except for what she might
6  have read in the papers.
7    Q.   You said earlier that Amy said that
8  there was a guy with a black club that was
9  interested in it. In here you said that she didn't
10  want Barry to come up with a place like
11  Celebrations. Is that what she said?
12    A.   Pretty sure. I think at one point
13  she understood — I made her understand I know who
14  she was talking about.
15    Q.   But I mean, did she use "a place like
16  Celebrations" or "a black club"?
17    A.   Might have been Mr. Little that used
18  black club. She might have used Celebrations.
19    Q.   And I take your answer that you just
20  don't remember, since it's been a year ago?
21    A.   Yes, sir.
22    Q.   Was anybody listening in on this
23  conversation with Ms. Knudsen?

16 (Pages 61 to 64)

Page 65

1   A.   No, sir.
2   Q.   And again this conversation was not
3 recorded?
4   A.   No, sir.
5   Q.   That's true?
6   A.   Yes, sir.
7   Q.   Make sure we are talking about the
8 same thing.
9   A.   The only thing I'm going to say I
10 have is just her phone messages to call her back.
11   Q.   And I want to hear those. But I'm
12 one of those people if I'm asking a certain line of
13 questions, I got to keep on going, or I'll forget
14 something.
15   A.   Yes, sir.
16   Q.   So that's all you recall about this
17 conversation?
18   A.   Yes, sir.
19   Q.   Can you tell me about the next
20 conversation you had with her?
21   A.   We've had conversations on it.
22   Q.   And I know you had conversations
23 like, you know, where you would call and leave a

Page 66

1 message on her phone and she would do the other.
2 I'm really just more interested in substantive
3 conversations. Conversations where you actually
4 spoke about the place. Were there any others that
5 you had like that?
6   A.   They were all pretty much the same --
7 if you are interested, you need to do something,
8 and I will need to know.
9   Q.   And did you ever get to the point
10 where you actually specifically made an offer to
11 lease the place?
12   A.   I believe we did come to terms. What
13 the terms were, I don't recall.
14   Q.   And how it is that you didn't end up
15 leasing the space if you actually came to terms?
16   A.   Because I wasn't going to lease it to
17 begin with. I was just getting to the point where
18 I knew I had the location if I wanted it.
19   Q.   And in any of these conversations,
20 did the subject of Celebrations come up?
21   A.   With Amy?
22   Q.   Yes.
23   A.   It might have once or twice. Again,

Page 67

1 they were very apprehensive of Barry, I think,
2 pursuing this. I don't think she knew that I knew
3 Barry, and I really didn't know Barry, except for
4 my partner. When she mentioned black club, you
5 know, I pretty much knew Celebrations. And I
6 really honestly can't say that she said black
7 club. I knew she mentioned Celebrations. Don
8 Little did mention black club.
9   Q.   Any other discussions that you-all
10 had about this property?
11   A.   Keep asking me questions, you might
12 spur my memory. I really -- other than trying to
13 set up to go in there and operate -- and I think I
14 discussed with her some of the stuff that I asked
15 Don about. But other than that, like I said I
16 really can't remember a lot of it.
17   Q.   At any time did you tell her that the
18 landlord would have to invest $300,000 in the
19 property before you'd lease the space?
20   A.   No, sir.
21   Q.   Does that sound like a lot of money
22 to you?
23   A.   It sounds like a no-deal situation to

Page 68

1 me.
2   Q.   At any time did you have a face-to-
3 face meeting with Amy Knudsen?
4   A.   No. I wouldn't be able to tell you
5 if that was Amy when she walked in the door.
6   Q.   How is it that you actually came to
7 terms on the lease, but then got out of it? That's
8 the part that I'm confused about. Does that make
9 sense the you?
10   A.   At the time -- and I don't know how
11 Amy found out about the recording. She called me.
12 I was down at my barn at time. I remember when it
13 was. And she asked me about a recording, and she
14 was a little bit excited about it, and told me --
15 and I told her, I said -- Amy, I'm in the same
16 situation -- if Mike actually knew I was down there
17 looking at that place -- then I said -- I was
18 deceptive. I told her I did recorded it for my
19 father and Barry listened to it. She told me --
20 well, you need to destroy that recording.
21   Q.   She used those words?
22   A.   Yes, sir.
23   Q.   Are you sure about that?

17 (Pages 65 to 68)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 85

1　armed, and we had them for a short period. I seen
2　it wasn't necessary, and plus I had a little bit of
3　a conflict with the guy that ran the security.
4　　Q.　Who is that, Ted Shiek(sic)?
5　　A.　They call him Chief, I believe.
6　　Q.　Did you also tell him that you kept
7　your place safe and secure by charging a cover
8　charge?
9　　A.　We started charging cover charge
10　because my partner wanted to charge a cover
11　charge. I never wanted to charge. But I believe
12　that keeps a lot of people that are walking in my
13　club that don't have money in their pocket that are
14　just strolling around.
15　　Q.　Which, in turn, leaves for a safer or
16　more secure environment?
17　　A.　I believe so.
18　　Q.　Did you also tell him that you have a
19　dress code at your place?
20　　A.　Yes, sir. I believe I told him that.
21　I do have a dress code at my place.
22　　Q.　Did you ever talk with an attorney by
23　the name of Wayne Sabel?

## Page 86

1　　A.　No, sir.
2　　Q.　Bobby Segall?
3　　A.　No, sir.
4　　Q.　And when you and I spoke, was it just
5　to set up a time to meet and view the DVD?
6　　A.　Yes, sir.
7　　Q.　Did we discuss anything else?
8　　A.　I don't believe so.
9　　Q.　Did I ever call you and threaten you,
10　or anything like that?
11　　A.　No.
12　　Q.　Have we seen or listened to all
13　recordings, voicemails, messages, or anything else
14　that you might have?
15　　A.　I know you have listened to these. I
16　don't know if you have listened to that. I am sure
17　you have.
18　　Q.　You mean watched the actual DVD?
19　　A.　You've got everything I've got that
20　would pertain to this, yes, sir.
21　　Q.　You don't have any written notes or
22　anything at home?
23　　A.　I don't believe so.

## Page 87

1　　　　MR. STEWART: Let me look back in
2　my notes. I think that's all I have for you. I
3　know these other guys might have something for
4　you.
5　　Q.　(Mr. Stewart) Just to be clear -- as
6　I understand your testimony, you cannot testify
7　under oath that Amy Knudsen ever used the word
8　"black" in speaking with you; is that right?
9　　A.　Yes.
10　　Q.　You know that she used the term
11　"Celebrations"?
12　　A.　Yes, sir.
13　　Q.　But she never, as far as you know,
14　referred to the race of the people that were there?
15　　A.　Right, yes, sir.
16　　　　MR. STEWART: That's all I have.
17　Mr. Guy.
18　　　　MR. GUY: Do you want to go
19　first?
20　　　　MR. QUINN: I am not going.
21
22　EXAMINATION BY MR. GUY:
23　　Q.　Mr. Cranage, I'm Gunter Guy, and I

## Page 88

1　represent Meiying Forney who has been sued in this
2　case. Do you know who Meiying Forney is?
3　　A.　No, sir.
4　　Q.　If I told you she was the owner of
5　LeCroy Shopping Center, does that mean anything to
6　you?
7　　A.　No, sir.
8　　Q.　So her name has never been mentioned
9　to you in any conversations you had with either
10　Ms. Knudsen or Mr. Little?
11　　A.　The only thing that I have ever heard
12　that referred to her was the owner of the shopping
13　centers. I've never heard her name.
14　　Q.　In what reference was that made?
15　　A.　Just Don Little saying, you know,
16　when he'd refer that he's representing them when he
17　was showing the place. And then Barry had
18　mentioned that he had asked about buying the
19　shopping center from the owners.
20　　Q.　Anything other than in that
21　connotation?
22　　A.　No, sir.
23　　Q.　When you say Mr. Little mentioned

22 (Pages 85 to 88)

Page 101

1  before this time that he comes over to Woodmere and
2  asks you to do this?
3      A.    I'd say several dozen times. He's
4  been in Woodmere where my DJs were. I've been in
5  his place. Him and Mike were friends, so it kind
6  of -- I couldn't avoid him.
7      Q.    So when he came over, was it just the
8  three of you meeting there at Woodmere Tavern?
9      A.    We weren't meeting. He was in there
10  talking with Mike. I overheard his conversation.
11     Q.    Was it during business hours?
12     A.    It was during the hours during the
13  day when we weren't open when I normally do my
14  purchasing and ordering.
15     Q.    So if I understand your testimony,
16  you agreed to do that to help him out? Is that
17  what I understand?
18     A.    Not so much to help him out, as when
19  he started saying that it wasn't right that they
20  wouldn't rent to me and that the place is still
21  offered. But that was after I told him that I
22  understood that the place was still available.
23     Q.    But you also said earlier that you

Page 102

1  were interested in the place, too?
2      A.    Yes, I was at one time.
3      Q.    So did you use the deception of doing
4  it for Barry so that your boss wouldn't know? Is
5  that kind of --
6      A.    It was going to go under that -- kind
7  of that hat. Everything that I was checking out
8  kind of for myself until I seen how far this thing
9  possibly would go that I was doing it for Barry.
10  If I was seen down there looking at the place and
11  it got back to my partner --
12     Q.    Prior to this meeting with Barry,
13  what other action had you taken to try to find your
14  own place?
15     A.    Just putting my feelers out, going
16  around, looking at different places.
17     Q.    Had you ever called up any agents or
18  employees of any?
19     A.    No, because this is probably
20  initially either the first or second place I
21  thought of. I thought of the Circuit City
22  building, and I understood that was a ten $10,000
23  lease. So that's totally beyond my scope of what I

Page 103

1  can make here in this town.
2      Q.    So your meeting with Barry just
3  coincidentally went hand-in-hand with your thought
4  about going out on your own?
5      A.    Absolutely. When he was talking with
6  Mike about it, my back was to him at my computer.
7  When I overheard him say that, I said -- I
8  understand that's still available.
9      Q.    So then was it your idea to use the
10  DVD recorder?
11     A.    Yes, sir.
12     Q.    Did Barry just ask you to use a tape
13  recorder?
14     A.    He said if you could record the
15  conversations, he said that --
16     Q.    And have you ever told Mr. Morin that
17  you were actually looking for property yourself?
18     A.    He knows now.
19     Q.    He now knows?
20     A.    Yes, sir.
21     Q.    Would you agree with me that there
22  was a time before Celebrations closed that it was
23  getting some pretty bad publicity in the

Page 104

1  newspapers, on the radio, TV, and all that?
2      A.    Yes, sir. What I feel is unfair
3  publicity.
4      Q.    But it was getting the publicity,
5  whether unfair or not, right?
6      A.    Right.
7      Q.    You were in that business, so you
8  know more about what's going on than the average
9  person?
10     A.    I know incidents could happen that
11  could turn your business around at the drop of a
12  hat and not be your fault, or anything that you
13  could prevent.
14     Q.    But the average John-Q citizen
15  wouldn't probably know that?
16     A.    Absolutely.
17     Q.    So his place of business,
18  Celebrations, was had some very negative publicity
19  for a while there, did it not?
20     A.    Even taking into consideration that
21  there are three other clubs in that parking lot and
22  a drive-through late-night eating place. Krystal's
23  down there on Atlanta Highway, they have people

26 (Pages 101 to 104)

Exhibit H

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

## Page 1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5

6  CIVIL ACTION NO.: 2:07-CV-00881-WKW-WC

7

8  TERRENCE LONG & BARRY BARR,

9  Plaintiff(s),

10  vs.

11  ARONOV REALTY MANAGEMENT,

12  INC., AMY CLARK KNUDSEN, &

13  MEIYING FORNEY,

14  Defendant(s).

15

16  DEPOSITION OF

17  GRANT SULLIVAN

18  JOB NO. 1101-58771

19

20  BEFORE:  Victoria M. Castillo

21  Certified Court Reporter and

22  Notary Public

23  ACCR# 17, Expires 9/30/2008

## Page 2

1  In accordance with Rule 5(d) of

2  The Alabama Rules of Civil Procedure, as Amended,

3  effective May 15, 1988, I, Victoria M. Castillo, am

4  hereby delivering to CHARLES A. STEWART, III, ESQ.

5  the original transcript of the oral testimony taken

6  on the 24th day of June, 2008, along with exhibits.

7  Please be advised that this is

8  the same and not retained by the Court Reporter,

9  nor filed with the Court.

10

11  STIPULATION

12

13  IT IS STIPULATED AND AGREED, by

14  and between the parties through their respective

15  counsel, that the deposition of GRANT SULLIVAN may

16  be taken before Victoria M. Castillo, Commissioner,

17  at BRADLEY, ARANT, ROSE & WHITE, Alabama Center for

18  Commerce, 401 Adams Avenue, Suite 780, Montgomery,

19  Alabama 36104 on the 24th day of June, 2008.

20  IT IS FURTHER STIPULATED AND

21  AGREED that the signature to and the reading of the

22  deposition by the witness is waived, the deposition

23  is said to have the same force and effect as if

## Page 3

1  full compliance had been had with all laws and

2  rules of Court relating to the taking of

3  depositions.

4  IT IS FURTHER STIPULATED AND

5  AGREED that it shall not be necessary for any

6  objections to be made by counsel to any questions,

7  except as to form or leading questions, and that

8  counsel for the parties may make objections and

9  assign grounds at the time of trial, or at the time

10  said deposition is offered in evidence, or prior

11  thereto.

12  IT IS FURTHER STIPULATED AND

13  AGREED that notice of filing of the deposition by

14  the Commissioner is waived.

15

16

17

18

19

20

21

22

23

## Page 4

1  INDEX

2

3  EXAMINATION BY:                 PAGE NUMBER:

4  Mr. Stewart                          7

5  Mr. Guy                             16

6

7  EXHIBITS:                       PAGE NUMBER:

8  (No Exhibits were Marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

EXHIBIT

ALL-STATE LEGAL®

H

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 9

1    Q.    And to your knowledge, has anyone in
2    your dealings with Aronov done that -- mentioned
3    the race of tenants or prospects?
4    A.    I'm not sure I understand the
5    question.
6    Q.    Any of the agents at Aronov ever
7    referred to the race of a potential tenant?
8    A.    You mean in last 62 years?
9    Q.    In your dealings with Aronov?
10   A.    Not that I remember.
11   Q.    How did you get involved in this deal
12   with the LeCroy Shopping Center? Could you just
13   tell us briefly?
14   A.    Barry contracted me. He and a fellow
15   by the name of Terrence Long were interested in
16   leasing the building at LeCroy Shopping Center, and
17   I believe Amy had the building listed for lease.
18   I'm not sure, but for some reason I contacted Amy
19   and asked her if she would show the property to
20   Barry and to Mr. Long, and she agreed that she
21   would met him and show the property to him.
22   Q.    And did you-all discuss anything else
23   in that first conversation with her?

## Page 10

1    A.    Probably how much rent are they
2    asking -- those are the normal questions that I
3    would ask about -- how long a lease do they want,
4    and that type of thing.
5    Q.    Do you remember the terms of the
6    conversation at this time, or anything that you-all
7    discussed?
8    A.    No.
9    Q.    Did you talk to her at any other
10   time?
11   A.    Probably, but I don't remember when
12   it might have happened.
13   Q.    Do you recall any topics that you
14   discussed at any later time?
15   A.    Nothing other than, again, how much
16   rent, that type of thing. At a later date, I
17   talked to her about Barry decided he wanted to make
18   an offer to purchase the shopping center, and at a
19   later date we talked about the purchase of the
20   shopping center. In fact, I wrote a contract that
21   I gave to Amy to present to the owners. I believe
22   that followed the leasing conversation.
23   Q.    Do you remember what the terms of the

## Page 11

1    rental were?
2    A.    No.
3    Q.    Do you remember if Barry Barr was
4    insisting on some improvements being made to the
5    property before he can lease it?
6    A.    No.
7    Q.    Do you remember any discussion of
8    $300,000 in improvements?
9    A.    No.
10   Q.    Do you remember any discussion about
11   there being another tenant within LeCroy who had an
12   interest in the property?
13   A.    It seems to me that there was someone
14   that was like next door that had expressed an
15   interest in it. Other than that, that's all I
16   know.
17   Q.    And do you know where you got that
18   information from?
19   A.    No.
20   Q.    Do you remember what the purchase
21   offer that Mr. Barr made on the property was?
22   A.    Do you have the document here?
23   Q.    I have the document, but in this room

## Page 12

1    I don't.
2         MR. GUY: I have it.
3         MR. STEWART: Wait, it was in
4    yesterday's deposition. I have yesterday's
5    exhibits. Hold on a second. I do have it.
6         THE DEPONENT: By the way, when
7    it's all over with, can I have a copy of the
8    deposition? Is that legal to do? I'd like a copy
9    of the deposition. Do I just contact you about
10   that?
11        MR. STEWART: Yes.
12        THE DEPONENT: When would that be
13   available?
14        MR. STEWART: That is up to her.
15   Probably about a week or so.
16   A.    It's a million dollars.
17   Q.    (Mr. Stewart) But you don't have an
18   independent recollection of that amount being
19   discussed?
20   A.    Well, it was a million dollars.
21   Q.    Okay. You are referring to the lease
22   itself?
23   A.    No, this is the sales contract.

3 (Pages 9 to 12)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 17

1    or typically negotiated?
2        A.    Yes.
3        Q.    You know what I'm saying -- typically
4    there is an offer, and then maybe a counter-offer,
5    and discussions about what can be done to come to
6    an actual agreement.  Is that the typical kind of
7    thing in your business?
8        A.    Yes.
9        Q.    And as far as the sales contract that
10   Barry made here in this particular instance that
11   you have been referring to that has previously been
12   marked in some other depositions -- for the record,
13   would you just give me the date on those, please,
14   sir?
15       A.    May 23rd of '07.
16       Q.    And just for the record I guess, is
17   that your signature and Barry's at the bottom?
18       A.    Yes.
19       Q.    And I believe you said that it was
20   communicated to you that that offer was rejected,
21   right?
22       A.    Yes.
23       Q.    And you already said that's not

Page 18

1    untypical, that that sometimes happens, right?
2        A.    I'd say norally what happens is:  He
3    makes an offer; it's presented -- if it's not
4    acceptable, normally the owner will counter the
5    offer and initial the changes, and the contract
6    would be given back to me, and I would go to my
7    client and see if my client was willing to initial
8    the changes and move forward with the deal.  That's
9    normal.  It's not that it never happens, but it's
10   very -- in my opinion, it's very unusual to have
11   somebody just reject a contract altogether and
12   never make a counter-offer.
13       Q.    And that's particularly in the case
14   where something is for sale that there would be a
15   counter-offer between the parties?
16       A.    Usually, yes.
17       Q.    Were you aware that this property was
18   not even up for sale at the time that the offer was
19   made?
20       A.    I don't remember.
21       Q.    Do you have a recollection or are you
22   testifying or would you testify that it was your
23   understanding it was for sale, or you just don't

Page 19

1    remember?
2        A.    Don't remember.
3        Q.    So if the property wasn't even up for
4    sale -- if the evidence in this case is that it
5    wasn't being offered for sale at the time, then
6    under those circumstances, it might not be that
7    unusual for the owner just to reject the offer
8    without a counter-offer, correct?
9        A.    If the owner did not want to sell it
10   at any price, yes.
11       Q.    Any price -- there is always maybe a
12   price, right?
13       A.    If there is, there is usually a
14   counter-offer.
15       Q.    But what I'm saying is:  You didn't
16   find this property listed anywhere for sale with an
17   amount, correct?
18       A.    No.
19       Q.    And that was never communicated to
20   you?
21       A.    No.
22       Q.    Mr. Barr just came to you and said I
23   want to make an offer to purchase this property,

Page 20

1    right?
2        A.    Yes.
3        Q.    And you did this due diligence before
4    I guess you made the offer?
5        A.    I believe I asked Amy to give me the
6    rental income, the expenses, and so on and so
7    forth, so that I could look at the net operating
8    income to see if the value of the property was --
9    and I don't remember exactly, but I think that was
10   the sequence of events that she gives me the
11   information, and I evaluate the property -- or
12   maybe Barry made the offer, and then I asked for
13   the information.  I don't know.  I don't remember.
14       Q.    And it wouldn't be unusual for to
15   want that information so you could try to -- but
16   all I saying is in this particular case Barry --
17   not Mr. Long -- but Barry wanted to make an offer
18   to purchase, and you communicated that?
19       A.    Yes.
20       Q.    To her?
21       A.    Yes.
22       Q.    And Barry on the other hand did not,
23   when it was rejected, he didn't say -- well, let's

5 (Pages 17 to 20)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 21

1  go up on a hundred thousand dollars or two hundred
2  thousand dollars, or anything like that?
3       A.    No, he did not.
4       Q.    That was the end of the deal, so to
5  speak?
6       A.    Yes.
7             MR. GUY:  That's all I have.
8  Thank you, sir.
9             MR. QUINN:  No questions.
10            11:50 a.m.
11            ***********************
12            FURTHER DEPONENT SAITH NOT
13
14
15
16
17
18
19                  --
20
21
22
23

## Page 22

1            CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6            I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription and that the foregoing represents a
11 true and correct transcript of the testimony given
12 by said witness upon said deposition.
13            I further certify that I am
14 neither of counsel nor of kin to the parties to the
15 action, nor am I in anywise interested in the
16 result of said cause.
17
18
19
20
21
   _____
22 Victoria M. Castillo, Certified Court Reporter
   ACCR# 17, Expires 9/30/2008
23 Commissioner and Notary Public

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376