**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERRENCE LONG & BARRY BARR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **V.** | ) | **Civil Action No.:** |
| | ) | **2:07-CV-00881-WKW-WC** |
| **ARONOV REALTY MANAGEMENT,** | ) | |
| **INC., ARONOV REALTY BROKERAGE,** | ) | |
| **IMC., AMY CLARK KNUDSEN, &** | ) | |
| **MEIYING FORNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT BY
DEFENDANT ARONOV REALTY BROKERAGE, INC.**

Defendant **Aronov Realty Brokerage, Inc.** states as follows in support of summary judgment.

**INTRODUCTION**

Plaintiffs Terrence Long and Barry Barr have sued Aronov Realty Management Inc. ("Aronov Management"), Aronov Realty Brokerage, Inc. ("Aronov Brokerage"),[1] Amy Clark Knudsen ("Knudsen"), and Meiying Forney ("Forney") for racial discrimination under 42 U.S.C. §§ 1981 and 1982. Plaintiffs claim that Knudsen, a real estate broker who works for Aronov Brokerage, made a racially discriminatory remark to Barr when showing him property at LeCroy Village Shopping Center ("LeCroy"), which is owned by Forney.[2] Barr is the former owner of Celebrations, a night club in Montgomery that received much adverse publicity for criminal

---

[1] Aronov Brokerage was added as a Defendant on July 16, 2008. *See* Am. Compl. ¶ 6. Knudsen worked for Aronov Management before she began working for Aronov Brokerage in August 2006. (Knudsen Dep. at 29:23—30:4.) For purposes of this brief, any reference to "Aronov" will include either or both of these Aronov entities.

[2] Defendants deny that Knudsen made this statement, but for the purpose of summary judgment, Aronov Management must assume that it is true.

activity when it was open, and he claims that Knudsen said that LeCroy did not want a "black club" like Celebrations. Plaintiffs claim they were denied the opportunity to purchase or lease the property due to race or affiliation with an African-American clientele. However, the undisputed facts show neither Knudsen nor Aronov played a role in the owner's decision not to sell the property and that the Plaintiffs never even offered to lease the property. Therefore, even assuming for purposes of summary judgment that Knudsen made the alleged discriminatory remark, the Plaintiffs cannot establish that these Defendants intentionally discriminated against them under §1981 or §1982.

With respect to Barr's attempt to purchase the property, the undisputed facts show that LeCroy was not for sale when he made an offer, that it had previously been listed for $1.9 million, that Barr offered $1 million minus a 10% sales commission to be paid by the seller, that Knudsen conveyed this offer to Forney, and that Forney rejected the offer, without any input or influence from Knudsen or Aronov, because the price was so low. It is also undisputed that Knudsen never communicated to Forney the race of either Plaintiff or their clientele. Finally, it is undisputed that Long never made an offer to purchase the property and that the purchase was something Barr did completely on his own.

Concerning a lease of the property, it is undisputed that Barr said he would need at least $100,000.00 to $150,000.00 in improvements, that he already knew that an existing LeCroy tenant was interested in expanding into the space, and that he never made a written or verbal offer to lease the property. Barr claims that he eventually asked to be put on a "back-up" lease, but it is undisputed that he did not describe any concrete financial terms (either accepting the quoted rent, making a counter-offer, or changing the amount of needed improvements) and that he made this request for a back-up lease after he had already decided to go with another location

for his sports bar.  Finally, it is undisputed that the owner chose to lease the vacant space to a good existing tenant so they could expand.

As further set forth below, this Defendant is entitled to summary judgment on all of the Plaintiffs' claims against it.

## MATERIAL UNDISPUTED FACTS

Plaintiff Barr is Caucasian and is the former owner of Celebrations, a nightclub in Montgomery.  (Am. Compl. ¶ 10.)  In April 2007, Long, an African-American, approached Barr about opening a sports bar and asked Barr to find a location for the business.  *Id.* at ¶ 10.

The LeCroy Village Shopping Center ("LeCroy") in Montgomery is owned by Meiying Forney, who lives in California.  (Am. Compl. ¶ 13; Knudsen Dep. 50:6-13.)  LeCroy's tenants have included a cake shop, engraver, cooking school for children, insurance office, hair salon, dry cleaners, wireless provider, costume jewelry store, refrigeration repair shop, barbershop, and a personnel office. (Knudsen Dep. at 66:20—67:20, 69:14-23.)   It also currently has a sports pub called Doodle Hoppers, which has been a tenant since Forney purchased it.  (Forney Decl. ¶ 3; Knudsen Dep. at 67:21—68:16.)

Knudsen is a commercial real estate broker at Aronov Brokerage, which leases and sells commercial and residential real estate. (Knudsen Dep. at 28:17—30:5; Harris Dep. at 13:14-22.)   After Forney purchased LeCroy, she asked Knudsen for help leasing space if Knudsen ever learned of a tenant who might work well there.   (Knudsen Dep. at 59:18-21, 61:22—62:8.)   Knudsen had no written agency agreement for leasing the LeCroy property.[3]   When Knudsen

---

[3] At some point before the events giving rise to this litigation, Knudsen had a written agreement with Forney to lease spaces in another of Forney's buildings, East Park Plaza on Atlanta Highway, which used to be owned by Aronov Management but was purchased by Forney.  (Knudsen Dep. 47:9—50:5.)  That written agreement has expired. *Id.* at 48:13-20.   Knudsen leased space for Forney at the East Park Plaza during the time she worked at Aronov Management and Aronov Brokerage and after the written agreement expired. *Id.* at 51:8-18.  In addition to East Park Plaza, Knudsen has leased space for Forney at Office Park Circle, another building Forney owns located off Vaughn Road. *Id.* at 54:2—55:1.

was showing the LeCroy property to Barr in May 2007, she was not representing anyone. (Harris Dep. at 16:3-5.)  She was acting as the transaction broker, the type of relationship that a real estate company defaults to when there is no written agreement with one of the parties.  *Id.* at 16:4-18.  Other people, besides Knudsen, could show the LeCroy property.  *Id.* at 25:6-11. Knudsen called the LeCroy property an "open listing" because Forney negotiated and communicated with some potential tenants on her own.  (Knudsen Dep. at 59:10-17.)  In leasing Forney's properties, Knudsen has leased to several African-American tenants, including a church, a music store, a hair dresser, a teaching/curriculum consulting business, an insurance company, and a mortgage company.  *Id.* at 55:5—58:8.

Until April 2007, a bar called Pure Country was located in LeCroy in the space next to Doodle Hoppers. (Forney Decl. ¶ 4; Knudsen Dep. at 65:11-15.)  Before Pure Country closed, beginning sometime in late 2006 or early 2007, Doodle Hoppers expressed an interest to Forney in expanding its business. (Forney Decl. ¶ 5.)  Knudsen learned in either November or December 2006 that Doodle Hoppers needed to expand. (Knudsen Dep. 80:22—81:1.)

In May 2007, Barr learned that the Pure County space at LeCroy was for lease.  (Am. Compl. ¶ 12.)  Grant Sullivan first contacted Knudsen on behalf of Barr and told her that he had a client who was a retired baseball player[4] and wanted to open a sports bar. *Id.* at 83:16—84:11. Knudsen had never heard of Sullivan's client before and did not know who he was.  *Id.* at 84:18—85:3.  Sullivan never told Knudsen that Long was African-American.  *Id.* at 172:12-17. Knudsen told Sullivan that an existing tenant was considering expanding into the space but that she would accommodate his request to see the property.  *Id.* at 97:5-21; Sullivan Dep. at 11:10-16.  Knudsen obtained a key to show the property, and Mr. Barr showed up to see it. (Knudsen Dep. at 85:18—86:2, 97:22—98:3.)

---

[4] As set forth above, Plaintiff Terrence Long is the plaintiff who is a retired baseball player.  *See* Am. Compl. ¶ 3.

At this first meeting, Knudsen said she told Barr that LeCroy was a very nice center, everyone there works well together, and the main concern was to avoid any problems with security similar to those at Celebrations with police involvement over knifings, stabbings, shootings, drug problems, altercations, and bad publicity in the newspapers and radio. *Id.* at 99:1-21. Barr then informed Knudsen that he was the manager at Celebrations. *Id.* at 100:3-6. He also told her that he was working with a baseball player to find a place for a sports bar. *Id.* at 103:6-9. Although Knudsen's recollection is that Barr said he needed improvements in the range of $300,000.00 (Knudsen Dep. at 103:22—104:1), Barr's recalls saying the space would need $100,000.00 to $150,000.00 in improvements (Barr Dep. at 156:16-18). Knudsen quoted him a monthly rental rate of $4,500.00 with no leasehold improvements. (Knudsen Dep. at 118:8-12; Barr Dep. at 154:14-16.) Knudsen did not set the price; Forney set the price before Barr ever asked to see the property, and that was the amount she wanted Knudsen to quote. (Knudsen Dep. at 119:6-17, 178:8-12.) After the meeting, Knudsen gave Forney a follow-up report, advising of Barr's request for improvements, but Knudsen did not communicate an offer to lease the space because Barr never made a formal or informal offer to lease the space. *Id.* at 179:23—181:5, 181:14-183:12.

Barr said that one of the first things Knudsen said to him when showing him the property was "they didn't want a black club there and they didn't want that Celebrations thing." (Barr Dep. at 153:8-12.)[5] Barr said he explained that the problems with Celebrations were "a parking lot issue" that "had nothing to do with the club." *Id.* at 154:1-4. He told her who he was, who Long was, and what Long was looking at doing. *Id.* at 154:6-9. Knudsen told him she had

---

[5] Knudsen denies making a reference to a "black" club; she said she mentioned the name Celebrations because of the safety concerns and the terrible publicity it had received. (Knudsen Dep. at 111:19—112:7.) According to Knudsen, Barr said the problems at Celebrations were caused by a "roving gang of black troublemakers" and underage people who could not get in. *Id.* at 112:8-22. Knudsen has been to the bar only once, fourteen years ago in 1994. *Id.* at 110:1-21. She had no knowledge of it being a hip-hop bar or an African American bar. *Id.* at 115:15-22.

probably formed her opinions through the media and was "very nice about it." *Id.* at 154:8-12. At this meeting, Barr told Knudsen it would probably be better if he "went with the Friday's thing[, another location,] and tried to work that deal out." *Id.* at 154:19-23. Barr understood, when he first looked at the LeCroy space, that the owner of Doodle Hoppers had already asked about leasing the space. *Id.* at 162:17-20, 163:23—164:6. Barr admits to understanding why an owner would not want his property to get the type of adverse media attention that Celebrations received. (Barr Dep. at 303:5-11.)

After Barr viewed the Pure Country space, Sullivan contacted Knudsen and asked if Forney would sell LeCroy; Knudsen responded that it was not for sale but that he could make an offer. (Knudsen Dep. at 107:11-15; Forney Decl. ¶ 6.) She told Sullivan that the property had been listed for $1.9 million a couple of years earlier. (Knudsen Dep. at 107:15-18; Forney Decl. ¶ 6.) Knudsen furnished him with rent figures so he could determine the income from the shopping center. (Knudsen Dep. at 108:1-5; Barr Dep. at 181:6-15.) Barr then offered $1 million for the property, minus a ten percent sales commission to be paid by the seller. (Forney Decl. ¶ 9.) Long's name was nowhere on the written offer. (Knudsen Dep. at 174:21-23.)

Knudsen emailed Barr's offer to Forney, who told Knudsen that it was so far below what she needed that she was not going to make a counteroffer. (Knudsen Dep. at 122:10-15, 175:4-12; Forney Decl. at ¶ 9.) Knudsen relayed this information to Sullivan. (Knudsen Dep. at 122:16-23, 175:13-16.) Neither Knudsen nor anyone else at Aronov played a role in Forney's decision not to make a counter-offer to Barr. (Forney Decl. ¶ 9.)

This offer to purchase the property was the only written offer ever made by Barr concerning LeCroy. (Knudsen Dep. at 174:15-20.) Barr never told Sullivan that he wanted to make another higher offer for the property. (Sullivan Dep. at 20:22—21:3.) Sullivan agreed that

this was the "end of the deal, so to speak." *Id.* at 21:4-6. No further offers, either written or oral, were made by Barr, Long, Sullivan, or anyone that Sullivan was representing for a different price on the property. *Id.* at 175:17—176:21. Barr never had a conversation directly with Knudsen about purchasing the property; Sullivan handled the whole thing. (Barr Dep. at 238:16-22.) Barr admits that he has no facts or evidence or reason to believe that the decision not to make a counter-offer was racially motivated. *Id.* at 182:14-17. He does not begrudge Forney if she did not feel that his offer of one million dollars was appropriate. *Id.* at 286:8-12.

After meeting with Knudsen, Barr asked Mark Cranage, who worked at Woodmere Tavern at the time, to see if he could get the Pure Country space because he felt like he was being discriminated against. (Cranage Dep. at 22:11-17.) Cranage called Knudsen and said that, during his second conversation with Knudsen, she mentioned that someone with a black club was interested in it. *Id.* at 38:1-11, 45:20-22. Cranage also testified that Knudsen said she "didn't want [Barr] coming into [LeCroy] with a place like Celebrations." *Id.* at 63:13-22. He does not recall that Knudsen used the term "black club." *Id.* at 64:15-21, 87:5-15. Cranage testified, "And I really honestly can't say that she said black club. I knew she mentioned Celebrations." *Id.* at 67:5-7.

Cranage recalls that Knudsen set up an appointment time for him to see the space with Don Little ("Little"), Forney's attorney; the property was part of Pure Country's bankruptcy, and Little had the key. (Cranage Dep. at 47:18-20; Knudsen Dep. at 143:3-12, 144:3-7, 150:2-11.) When Cranage met with Little, Little made racially discriminatory remarks about African-Americans; Cranage recorded this meeting on videotape at the request of Barr. (Cranage Dep. at 103:12-15.) Cranage and Little also discussed rent concessions in the range of two months' rent, close to $10,000.00. *Id.* at 58:20—60:12. Cranage was made aware that Doodle Hoppers was

looking at the space.  *Id.* at 61:19-21.  Based on the condition of the building, Cranage believes it would have rented for something between four and five thousand dollars per month.  *Id.* at 61:22—63:3.

By the time Cranage viewed the property, Forney had already approved moving forward with allowing Doodle Hoppers to expand into the space.  (Knudsen Dep. at 157:23—158:7.)  Doodle Hoppers ultimately negotiated a lease and moved into the Pure Country space. *Id.* at 164:12-16.  Forney did not pay for any improvements to the property for Doodle Hoppers. *Id.* at 166:6-9.  Doodle Hoppers received some beneficial rent payments over time in order to put in a vent hood that was going to cost approximately $10,000.00.  *Id.* at 167:5-11.

Before Barr got Cranage involved, he says he called Knudsen about seeing the property again, that she asked if his client was still Long, and, when he said yes, that she said the property was tied up in bankruptcy.[6] *Id.* at 184:17—185:3.  At some point after Cranage looked at the space, Barr contacted Knudsen about looking at the building again, and Knudsen said that she might be able to get in touch with the attorney who had the key.  (Barr Dep. at 179:15-23.)  By this time, Knudsen had already told Forney about Barr's need for extensive improvements, that he wanted to move another tenant that was already in a space, and that he was the former owner of Celebrations. (Knudsen Dep. at 137:3-11.)   Forney was not interested in making such extensive improvements and could not have afforded these improvements.  *Id.* at 137:19—138:3.  Knudsen also spoke to Barr about other properties that he had asked about, specifically the former Copeland's location and the Capitol Plaza.  (Knudsen Dep. at 139:8-21.)  Knudsen followed up on these properties for him, but the owner of Capitol Plaza wanted a retail

---

[6] Barr never told anyone at Aronov what Knudsen allegedly said to him.  *Id.* at 195:8-10.  His complaint against Aronov is that Knudsen discriminated against him.  *Id.* at 217:23—218:4.

establishment, not a sports bar or nighttime establishment, and the Copeland's location had ground restrictions that would not allow Barr to stay open during the hours he wanted. *Id.*

Knudsen said Barr never asked her to write a lease or said that he would pay the $4,500.00 asking price. (Knudsen Dep. at 140:21—141:7.)  Barr admits that he never made a written offer to lease the Pure Country space. (Barr Dep. at 281:15-19.)  He did not make a verbal offer to lease the space at the first meeting with Knudsen.  *Id.* at 282:1-3.  Knudsen gave him a rent quote, but he did not make a counteroffer or accept the quoted rent.  *Id.* at 282:3-7.  Barr claims he asked to be put on a back-up lease, but Knudsen told him they were "working on [another] lease" and "that wouldn't be necessary."  *Id.* at 282:13-19.  Knudsen remembers telling Barr that a lease was pending with Doodle Hoppers and that she was working out the details. (Knudsen Dep. at 141:8-15.)  The only time Barr made a verbal request for a lease was when he asked to be put on a back-up lease; however, this was after he had decided to go with the Friday's space, and he admits that he did not make an offer of any specific financial terms when he asked for the back-up lease. (Barr Dep. at 284:5-11, 304:23—305:7.)

As mentioned above, Doodle Hoppers had been a tenant since Forney purchased LeCroy. (Forney Decl. at ¶ 3.)  They wanted to expand into the Pure Country space.  *Id.* at ¶ 10.  Because they were a good tenant, Forney decided to rent the space to them.  *Id.*  In all of her dealings with Forney, Knudsen has never mentioned the race of a tenant, a prospective tenant, purchaser, or prospective purchaser.  *Id.* at ¶ 7. Knudsen has never mentioned the race of the clientele of any business to Forney.  *Id.*  Specifically, Knudsen never mentioned the race of Barr, Long, or their clientele to Forney.  *Id.* at ¶ 8.  Before this lawsuit was filed, Forney did not know the race of Barr, Long, or their clientele.  *Id.* at ¶ 11.

Long had no involvement in viewing or trying to buy the LeCroy property. He never paid Barr start-up money or anything related to the venture or project. (Long. Dep. at 11:16-20.) He never met Knudsen before Barr's deposition in this case. *Id.* at 12:16-20. He has never had any communications with her. *Id.* at 13:1-3. Long does not know Sullivan, Barr's agent who first contacted Knudsen, and has never met him. *Id.* at 16:18-22. Long did not meet Barr until 2007. *Id.* at 50:1-6. It was at their second meeting that Long said he wanted to open a sports bar and asked Barr if he "had anything he was about to do" and said "[he'd] like to do some business with [Barr]." *Id.* at 52:12—53:4. No partnership documents were signed and no formal partnership agreement was entered into; Long wanted him to find a location for the sports bar. *Id.* at 54:4—55:4. They did not discuss who was going to put up the money, what the partnership agreement would be like, who would manage the bar, or anything like that. *Id.* at 58:9—19. They met once to view the Copeland's space, and this made a total of three meetings. *Id.* at 66:22—69:6. After Barr met with Knudsen at the Pure Country space, he contacted Long about the meeting. *Id.* at 72:19—73:3. Long testified as follows about that conversation:

> Q:    … What is it you recall about the conversation, just Celebrations came up?
> A:    Celebrations came up, and that apparently she didn't know that he was the guy who owned Celebrations until he told her.
> Q:    Okay. Anything else you remember about your conversation with Mr. Barr about Ms. Knudsen?
> A:    No, that was it.
> Q:    What did you get out of that conversation? I mean, what was your impression of what he was telling you?
> A;    Nothing.
> Q:    Okay. That's what I'm saying, did you get anything out of it.
> A:    No, I got nothing out of it.
> Q:    Okay. And I think I know the answer to this, but the location over there, the Le Croy shopping center, did you even known there was anything for lease over there prior to him telling you about it?
> A:    No.
> Q:    Okay. Were you supposed to be at the meeting where he met with Ms. Knudsen the first time?
> A:    No.

Q:   Okay.  Did you ever ask him to set up a time for you to go over to Le Croy and look at this retail – this space for lease?

A:   No.

Id. at 74:3—75:10.

Q:   Did you get the impression that there was a problem with Celebrations, that y'all couldn't get that spot or something, or do you remember anything else about the conversation.

A:   I don't remember anything else about the conversation.

Id. at 76:16-22.

Long later testified to recalling that, after Barr's meeting with Knudsen, "….[T]hat a statement was made about black people. I don't know where it came from or who it came from, but a statement was made about the Celebrations crowd, that they didn't want that Celebrations crowd in that area." *Id.* at 84:4-22.   He admits that the Celebrations crowd included black and white people. *Id.* at 86:18-23.   He has no evidence that Knudsen knew his race, and Barr never said he told Knudsen that Long was African-American.  *Id.* at 86:11-18.  Also, Barr never asked Long to sign a lease for LeCroy. *Id.* at 109:16—110:11.

Regarding the purchase offer that was made by Barr, Long testified:

Q:   Did you have any discussions with Mr. Barr or were you involved in any way with his offer to purchase the Le Croy Shopping Village?

A:   No.

Id. at 77:6-10.

Q:   Okay. So that was – as far as you know, that was just something that Mr. Barr did on his own.

A:   Yes.

Id. at 78:3-6.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); FED. R. EVID. 56.  The moving party must initially advance a showing that "there are no genuine issues of material fact that should be decided at trial." *Weston Group Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1361 (11th Cir. 1999). A claim should be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Slagle v. ITT Hartford*, 102 F.3d 494, 497 (11th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  The undisputed facts and relevant law in this case show that these Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims.  Because they have carried their initial burden with the filing of its motion and brief, Plaintiffs may not rest on the mere allegations or denials in their pleadings.  Plaintiffs, by declarations or as otherwise allowed by Rule 56, must establish a genuine issue of material fact, as determined by an examination of the substantive law. *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.  As established below, Plaintiffs cannot meet their burden with respect to any of their claims.

## ARGUMENT

### I.    Plaintiffs' *Prima Facie* Case

A plaintiff must establish the following elements in a race discrimination claim under §1981 or §1982:  "(1) that the plaintiff is a member of a protected class; (2) that the defendant intended to discriminate against the plaintiff on the basis of race; and (3) that the defendant's racially discriminatory conduct abridged a right enumerated in the statute." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007); *see also CBOCS West, Inc. v.*

*Humphries*, 128 S. Ct. 1951, 1955-56 (2008) ("[O]ur precedents have long construed §§ 1981 and 1982 similarly.); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 440 ("In light of the historical interrelationship between § 1981 and § 1982, we see no reason to construe these sections differently when applied, on these facts, to the claim of Wheaton-Haven that it is a private club."); *Selden Apartments v. U.S. Dept. of Hous. & Urban Dev.*, 785 F.2d 152, 159 (6th Cir. 1986) (citing to numerous cases in which sections 1981 and 1982 and the Fair Housing Act use the same tests and have the same elements); *Bafford v. Township Apartments Assocs.*, No. 8:06-CV-657-T-27TGW, 2007 WL 4247763, at *4 (M.D. Fla. Nov. 30, 2007); *Bell v. Mike Ford Realty Co.*, 857 F. Supp. 1550, 1556-57 (S.D. Ala. 1994) (noting that section 1982 uses the *McDonnell-Douglas* framework).

In a Section 1981 case, the statute requires that all persons have equal rights to

> make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The statute goes on to define "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1982 protects the rights "to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

The analysis for determining whether a § 1981 or § 1982 plaintiff has established a *prima facie* case or can survive summary judgment parallels the framework used in Title VII cases. *See Johnson v. Fulton Concrete Co.*, 330 F. Supp. 2d 1130, 1336-37 (N.D. Ga. 2004) (noting that the Eleventh Circuit has stated that Title VII and § 1981 claims use the same analytical framework); *Bell v. Mike Ford Realty Co.*, 857 F. Supp. 1550, 1556-57 (S.D. Ala. 1994) (noting that section

1982 uses the *McDonnell-Douglas* framework).  Both § 1981 and § 1982 cases "require[] proof

of intentional discrimination."  *Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946, 949-50 (11th

Cir. 1991) (citations omitted).  In this case, the undisputed facts show that these Defendants did

not intend to discriminate against the Plaintiffs and their conduct did not abridge the Plaintiffs'

rights to make or enforce contracts or to lease or purchase property.

**II.     Plaintiffs Cannot Establish Intent to Discriminate.**

    **A.     Plaintiffs Cannot Present Direct Evidence of Discrimination.**

The Plaintiffs may prove the second element of their claims through either direct or

circumstantial evidence.  *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th

Cir. 2007).  Direct evidence of discrimination is evidence that, if believed, would prove the

existence of the fact in issue without inference or presumption.  *Bass v. Bd. of County Comm'rs.*,

256 F.3d 1095, 1105 (11th Cir. 2001).  Only the most blatant remarks, the intent of which could

be nothing more other than to discriminate on the basis of race, constitute direct evidence of

discrimination.  *Id.* at 1105.  For statements of discriminatory intent to constitute direct evidence

of discrimination, they must be made by a person involved in the challenged decision and related

to that particular decision.  *Id.*  Remarks by non-decision-makers or remarks unrelated to the

decision-making process itself are not direct evidence of discrimination.  *Id.*; *Standard v.*

*A.B.E.L. Servs., Inc.*, 161 F.2d 1318, 1330 (11th Cir. 1998).[7]  Also, if the plaintiff's evidence is

---

[7] In *Hodges v. Stone Savannah River Pulp and Paper*, 892 F. Supp. 1571 (S.D. Ga. 1995) (Title VII discrimination case), the court looked at whether a supervisor's statement could be viewed as direct evidence when the supervisor was not the decision-maker.  The plaintiff was hired by the defendant into a general position, and within a year of her hire, she sought to be transferred into a more specialized, electrical position.  The court looked at whether a remark by the electrical supervisor that "there would be no women working in his department" constituted direct evidence of discrimination.  *Id.* at 1579.  The court held that, even if the supervisor had made this remark, "the opinions of employees or rumors about supervisors' attitudes are irrelevant unless clearly connected to the attitudes of supervisors." *Id.* (citing *Stone v. Galaxy Carpet Mills, Inc.*, 841 F. Supp. 1181, 1188 (N.D. Ga. 1993)).  The court also held that the plaintiff "failed to establish a causal nexus between the [supervisor's] remarks and the transfer decision." 892 F. Supp. at 1579 (citing *Williams v. Mead Coated Bd., Inc.*, 836 F. Supp. 1552, 1572 (M.D. Ala.

subject to more than one interpretation or suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).

It is undisputed in this case that neither Knudsen nor Aronov was a decision-maker on whether to reject or accept Barr's offer to purchase the property. A decision-maker is "a person involved in the challenged decision." *See Trotter v. Bd. of Trustees,* 91 F.3d 1449, 1453-54 (11th Cir. 1996). In *Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999) (discussing decision-maker within the context of a retaliation claim), the Eleventh Circuit looked to whether a co-employee could be considered a decision-maker. The Eleventh Circuit held that because a co-employee did not have the authority to terminate plaintiff and because there was no evidence that the co-employee recommended termination, the co-employee could not be considered a decision-maker. *Id.* Additionally, the court held that simply supplying the decision-maker "with information (apparently favorable to [plaintiff]) which he may or may not have considered in making his decision to terminate . . . does not show that [the co-employee] made the decision." *Id.* There is no evidence, or even a suggestion, by the Plaintiffs in this case that Knudsen or Aronov played a role in the decision to reject Barr's purchase offer. Also, the undisputed evidence shows that Forney decided to lease the property to an existing tenant because it was a good tenant who wanted to expand. There is no evidence that Knudsen or Aronov had the authority to make a decision as to whom the property would be leased or that they made a decision not to lease to Plaintiffs. Therefore, because Knudsen's statement was not made by a decision-maker, it is not direct evidence of discrimination.

---

1993). Because the electrical supervisor was not a decision-maker with respect to the transfer decision, his statement was not relevant to whether there was discrimination. *Id.*

Additionally, Knudsen's statement is subject to more than one interpretation. Taken in context, it is clear that Knudsen, who has a demonstrated history of renting Forney's properties to African-Americans, did not have a discriminatory motive if she made a statement to Barr about a "black club" like Celebrations. The undisputed evidence shows that Knudsen's concern was not one of race; it was merely about the bad publicity Celebrations had received for criminal activity. Plaintiff Barr admitted that he could not begrudge a property owner for not wanting a tenant that would attract the type of publicity that Celebrations had received, and Plaintiff Long even testified that black *and* white patrons frequented Celebrations. Additionally, Knudsen did not know that Long was African-American. With the undisputed facts showing that Celebrations was the subject of adverse publicity, that Celebrations' customers were black and white, and that Knudsen was unaware of Long's race, it is clear that Knudsen's statement is subject to more than one interpretation. Therefore, Knudsen's statement is not direct evidence of discrimination.

This case presents an interesting analysis of direct evidence applicable to discrimination cases because most cases on this issue address whether a "blatant" statement made by a non-decision-maker is direct evidence of discriminatory intent *of the decision-maker*, not necessarily the discriminatory intent of the person who made the statement. This is because most cases are employment cases where the individual actors have not been sued, and courts must address the issue of whether the actor who made the statement played a role in the defendant's decision. This case is different, however, because the individual actor—the one alleged to have made the statement—has been sued with the decision-maker, raising the issue of whether Knudsen's statement can be viewed as direct evidence against her and Aronov, who was also a non-decision-maker but who was Knudsen's employer. Again, however, because the statement, taken in context of the entire conversation between Barr and Knudsen, is subject to more than

one interpretation (*i.e.*, that the LeCroy owner and tenants did not want a tenant who created so much bad publicity), it is not direct evidence of an intent to discrimination by Knudsen or Aronov on the basis of race.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).  Therefore, the Court must look at the Plaintiffs' case under the circumstantial evidence analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), where, assuming a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the challenged action.  *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).

> **B.    Plaintiffs Cannot Meet the Requirements under the Circumstantial Evidence Analysis.**
>
> > **(1)    Plaintiffs cannot establish a *prima facie* case.**

The Eleventh Circuit has applied the standard Title VII *prima facie* elements to Section 1981 claims of discrimination in employment cases, but the Eleventh Circuit has not yet articulated the appropriate *prima facie* elements to apply in cases outside the traditional employment context.  *Munnings v. Fedex Ground Package Sys., Inc.*, 2008 WL 1849003, at *17 (M.D. Fla. Apr. 22, 2008) (citing *Kinnon*, 490 F.3d at 889, 891, 893)).  Those courts that have articulated a *prima facie* test have had trouble distinguishing it from the elements of a Section 1981 cause of action.  *Id.* (citing *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1353 (N.D. Ga. 2005)).  However, courts have consistently required Section 1981 plaintiffs to identify similarly situated persons outside of the plaintiffs' protected class who were treated more favorably by the defendants.  *Id.* (citing *Benton v. Cousins Props., Inc.*, 230 F. Supp. 2d 1351, 1370 (N.D. Ga. 2002); *Kinnon*, 490 F.3d at 893; and *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1273 (11th Cir. 2004)).

In this case, the undisputed facts show that the Plaintiff cannot identify a similarly situation person outside of the Plaintiffs' protected class who was treated more favorably. First of all, regarding purchase of the property, Forney still owns the property. Therefore, there is no similarly situated person who was allowed to purchase the property at Barr's price or at any other price. Second, regarding leasing the property, Barr admits that he said the owner would have to make $100,000.00 or $150,000.00 in improvements if he were going to lease the property. Forney ended up leasing the property to an established, existing tenant, who had already expressed an interest before Barr ever viewed the property, so that tenant could expand, and the undisputed evidence shows that the improvements that tenant needed cost only in the range of $10,000.00. Thus, there is no similarly situated non-African-American who was allowed to lease the property with the owner making $100,000.00 to $150,000.00 in improvements. For this reason, the Plaintiffs cannot establish a *prima facie* case of discrimination under §§ 1981 and 1982, and their claims fail.

> **(2)**  **Defendants have met their burden of articulating a legitimate, non-discriminatory reason, and Plaintiffs cannot establish that the reason is pretext.**

Even if the Plaintiffs could establish a *prima facie* case of discrimination by identifying a similarly situated person outside their protected class who was treated more favorably by the Defendants, Defendants are entitled to summary judgment because they have articulated a legitimate, non-discriminatory reason for the challenged action, and the Plaintiff can present no evidence of pretext. If a legitimate, non-discriminatory reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *Joe's Stone Crab, Inc.*, 220 F.3d at 1286. As has been stated many times by courts in this circuit and others, a defendant's burden with respect to a legitimate, non-discriminatory reason is one of

production, not persuasion, and it is "exceedingly light."  *Holifield v. Reno*, 115 F.2d 1555, 1564 (11th Cir. 1997).

As mentioned above, the facts of this case are somewhat different from those usually addressed in 1981 and Title VII cases because, here, neither Knudsen nor Aronov actually made a "challenged action."  They played no role in Forney's decision not to make a counteroffer to Barr's purchase offer, and neither Plaintiff ever made an offer to lease the property.[8]  So, while Barr alleges that Knudsen made a racially discriminatory statement, there is no "challenged action" that can be attributed to Knudsen or Aronov.  Even if there were, however, and assuming for purposes of summary judgment that Knudsen made a comment about a "black club," Knudsen has testified that the concern over Barr's lease of the property, as the former owner of Celebrations, was about all of the adverse publicity regarding criminal activity at Celebrations. It goes without saying that an owner of a building who wants to keep the building fully occupied is justified in considering whether a new tenant will invite bad publicity and news reports about criminal activity, and Barr admitted that a concern over bad publicity is reasonable.  Thus, these Defendants have met their burden of articulating a legitimate, non-discriminatory reason, and Plaintiffs have no evidence that this reason is pretext for unlawful discrimination.  As set forth above, Barr admitted in his deposition that Celebrations was the subject of bad publicity, so there can be no question that Knudsen's concerns were really pretext for unlawful discrimination.

In summary, Plaintiffs cannot establish intentional discrimination by Knudsen or Aronov. They have no direct evidence of discrimination because the statement allegedly made by

---

[8] Although Barr said he asked Knudsen to write a back-up lease written, he admits that his request did not include any financial terms (i.e., he never offered to rent the space for a certain amount of money or with a certain amount of improvements being made).  Previous discussions had revealed his need for extensive improvements in the range of at least $100,000.00 to $150,000.00, and he had never come to any terms of agreement about the monthly rent. Thus, his request for a back-up lease did not contain concrete financial terms that could be considered by the owner. Furthermore, Barr admits that he had already decided to move into another space when he requested the "back-up" lease, that Knudsen told him she was already working on "the other lease" for Doodle Hoppers, and that Doodle Hoppers did ultimately lease the property.

Knudsen was not made by a decision-maker and, more important, taken in context, is subject to more than one interpretation. Therefore, the Plaintiffs' evidence must be analyzed under the *McDonnell-Douglas* burden shifting framework. Under this framework, the Plaintiffs cannot establish a *prima facie* case of discrimination because they cannot identify a similarly situated person outside their protected class who was allowed to purchase or lease the property. Even if the Plaintiffs could establish a *prima facie* case, the Defendants are still entitled to summary judgment because the Plaintiffs cannot present evidence that the Defendants' legitimate, non-discriminatory reason is pretext.

### III.  Plaintiffs Cannot Establish that Their Rights Under § 1981 or § 1982 Were Abridged by Knudsen or Aronov.

Assuming that the Plaintiffs could somehow establish intentional discrimination by Knudsen or Aronov, they must still show that their rights under § 1981 or § 1982 were abridged by these Defendants' conduct. *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007). Plaintiffs cannot meet this burden.

#### A.  Long was not involved in the purchase offer, and these Defendants were not involved in the decision to reject Barr's offer to purchase.

One of the Plaintiffs' claims in this lawsuit is that they were denied the right to purchase LeCroy because of race. However, the undisputed facts set forth above show that Long never wanted to purchase the property and was in no way involved in the offer to purchase the property. His name was not on the written purchase offer. He testified that he never had any discussions with Barr about purchasing the property and that he was not involved in any way with Barr's offer to purchase the property. He said the purchase offer was something Barr did all on his own. Under these facts, Plaintiff Long simply cannot claim that these Defendants

abridged his rights to make or enforce a purchase contract under § 1981 or to purchase property under § 1982.

Likewise, Barr cannot establish that any of his rights were abridged by these Defendants' conduct with respect to his Barr's offer to purchase LeCroy. An individual may be liable for federal civil rights violations under Sections 1981 and 1982. However, for an individual to be personally liable, she must "be personally involved in the discrimination" or must "authorize[], direct[], or participate[] in the alleged discriminatory conduct." *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 514 (3d Cir. 1986) (Title VII and section 1981 case). The Tenth Circuit has succinctly stated that "[a] claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement." *Allen v. Denver Public School Bd.*, 928 F.2d 978, 983 (10th Cir. 1991) (citation omitted) (determining that defendant had no contact with the decisionmaker in Title VII, 1981, and 1983 case), *overruled on other grounds by Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000) (overruling *Allen* to the extent that a plaintiff need only establish that his position was not eliminated in order to prevail on his discrimination claim); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("We agree with the Tenth Circuit, however, that in order to make out a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.'").

The undisputed facts in this case show that Knudsen and Aronov played no role in the decision to reject Barr's purchase offer. The property was not for sale when he tried to buy it. It had been for sale previously, and the asking price was $1.9 million. When his agent, Sullivan, asked Knudsen for the property's rent figures in order to make a valuation of the property, Knudsen provided them. When Barr made an offer of $1 million, Knudsen conveyed the offer to

Forney.  Forney then decided, without any input or influence from Knudsen or anyone else at Aronov, to reject Barr's offer.  The offer was so much lower than what she needed to get out of the property that she decided not to make a counter-offer.  The undisputed evidence shows that Barr is Caucasian, Knudsen did not know Long's race, and that she never mentioned the race of Barr, Long, or their clientele to Forney.  Barr has no evidence that Forney's decision not to make a counter-offer was based on discrimination, and he testified that he would not begrudge an owner for rejecting an offer that she thought was too low.  In short, Knudsen did everything Barr wanted her to do in connection with his purchase offer, and there is simply no evidence that Knudsen or Aronov did anything to abridge Barr's rights under § 1981 to make or enforce a contract or to abridge his rights under § 1982 to purchase property.

**B.    Neither Plaintiff made an offer to lease the LeCroy property in question.**

Not only do Plaintiffs fail to establish that their §§ 1981 or 1982 rights were abridged by these Defendants with respect to the purchase offer, they cannot establish that their rights were abridged with respect to any attempt to lease the property.  Barr's own deposition testimony makes it clear that the Plaintiffs never even offered to lease the property.  He admits that he never made a written offer to lease the Pure Country space. At the first meeting with Knudsen, Barr did not make a verbal offer to lease the space.  Knudsen gave him a rent quote, but he did not make a counteroffer or say that he accepted the rent at the quoted price.  He claims he asked to be put on a back-up lease, but Knudsen told him they were "working on [another] lease" and "that wouldn't be necessary."  This was his first verbal request to enter into any type of lease, and it occurred after he had already decided to go with the Friday's space.  Barr also admits that he never offered to lease the space for any specific amount of money.  Thus, neither Barr nor Long offered to lease the space at LeCroy.  Barr visited the site and expressed his need for the

owner to make $100,000.00 to $150,000.00 in improvements. He was told that the owner would not invest that much in improvements. After being quoted the $4,500.00 per month rental rate, he never said he would take the space at that price, and he never made a counter-offer for another price. At most, he was investigating the property and trying to determine whether to make an offer to lease it. Later, after he decided to rent another space, for some reason he asked Knudsen to be put on a back-up lease (again, without offering to pay a certain amount of agreeing to forego the $100,000-$150,000 in improvements he required), but by this time Knudsen was working on a lease with Doodle Hoppers, who ended up leasing the property. Plaintiffs simply cannot claim that any conduct by the Defendants abridged their rights to lease the LeCroy property. All they did was inquire about the property and indicate to Knudsen that the financial terms (the lease amount and cost of improvements) were unacceptable. Then, they asked to be put on a back-up lease with no definite offer of financial terms, and this occurred *after* they had decided to rent at another location and *after* Knudsen was already working on the lease for Doodle Hoppers. There is no evidence that Knudsen or Aronov did anything to keep the Plaintiffs from leasing the property. Even taking Plaintiff Barr's testimony as true and assuming that Knudsen made a statement about "black clubs," the undisputed evidence shows that she never conveyed any information to Forney about the Plaintiffs' race or the race of their prospective clientele. The undisputed evidence shows that Forney wanted to rent to Doodle Hoppers because it was a good tenant and that she wanted to work with it in expanding its business. There is simply no basis in fact or law for the Plaintiffs' claim that these Defendants abridged their rights under § 1981 to make or enforce a lease contract or their rights under § 1982 to lease the property in question. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims against them.

Respectfully submitted this the 23rd day of July, 2008.

s/ Quindal C. Evans
Charles A. Stewart III (STE067)
Quindal C. Evans (EVA040)
Bradley Arant Rose & White LLP
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail:  cstewart@bradleyarant.com
Email: qevans@bradleyarant.com
**Attorneys for Defendant Aronov Realty
Brokerage, Inc.**

CERTIFICATE OF SERVICE

I certify that on July 23, 2008, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Kevin W. Jent                              N. Gunter Guy
C. Michael Quinn                           Ball, Ball, Matthews & Novak, P.A.
Counsel for the Plaintiff                  P.O. Box 2148
Wiggins, Childs, Quinn & Pantazis, LLC     Montgomery, AL 36102-2148
The Kress Building
301 19th Street North
Birmingham, AL 35203

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: Not applicable.

s/ Quindal C. Evans
Of Counsel