**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERRENCE LONG and** | ) | |
| **BARRY BARR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:07-cv-00881-WKW-WC** |
| **ARONOV REALTY MANAGEMENT,** | ) | |
| **INC., AMY CLARK KNUDSEN, and** | ) | |
| **MEIYING FORNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS'
ARONOV REALTY MANAGEMENT, AMY KNUDSEN AND ARONOV REALTY
BROKERAGE'S MOTIONS FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

The plaintiffs have sued the defendants, Aronov Realty Management, Aronov Realty Brokerage, (collectively referred to as "Aronov") and Amy Knudsen ("Knudsen") under 42 U.S.C. §§ 1981 and 1982 alleging that they were discriminated against because of race in the leasing and purchasing of real property.  The defendants have filed motions for summary judgment (Docs. 37, 50, 52) on all of the plaintiffs' claims.  As will be shown below, the motions are without merit and should be denied.

## II.  FACTUAL ALLEGATIONS

In late April or early May of 2007, plaintiffs Barry Barr ("Barr") and Terrence Long ("Long") decided to enter into a business venture to operate a sports bar in Montgomery, Alabama ( Long 57:10-59:7).  Barr had previously ran the Montgomery nightclub, Celebrations, and Long was a

former professional baseball player with several organizations.[1]  (Barr 50:14-23, 55:12-16; Long 26:10-28:5).  Long is an African-American.  Celebrations operated a "hip hop" format and its customer base was primarily African-American.  (Barr 66:1-67:12, 77:16-78:11, 263:14-18; Long 86:18-87:8).  Around that same time, Barr contacted Montgomery real estate agent and defendant, Amy Knudsen ("Knudsen"), about the possibility of leasing space at the LeCroy Shopping Village located at 3667 Debby Drive in Montgomery. (Barr Depo p. 150:2-9, 151:15-23).

Barr had closed Celebrations in April 2008, for various reasons, including the loss of his mother to pancreatic cancer, a lack of police protection in the area, and the City of Montgomery's ban of the use of off-duty Montgomery police officers as security guards.  (Barr 82:12-17; 105:7-23, 106:1-20).   Barr had operated a nightclub/restaurant in the same location for 14 years.  (Barr 50:1-23 ).    Over the years Barr's establishments included Texas Steakhouse, Sport Rock and Celebrations. (Barr 50:1-23).

Not long after closing Celebrations, Barr and Long began having discussions about opening a sports bar.  (Barr 112:10-113:19 ).  Long told Barr about his athletic background and his interest in giving back to the African-American community by opening a sports bar.  (Barr 113:1-19; Long 82:2-12).  Long told Barr that he wanted to bring in some of the famous athletes that he had played with, provided food, and also showcase local talent for his Montgomery based record label.  (Barr 113:1-19).  Barr liked the concept Long proposed and thought it could be very profitable.  (Barr 120:21-121:6).  The two entered into a verbal agreement for Barr to handle the operations side of the business.  (Barr 121:2-6, 123:13-17 ).

---

[1]Long played professionally in the majors with the New York Mets, Oakland A's, San Diego Padres, Kansas City Chiefs, and New York Yankees.  (Long 26:10-28:5).

During one of their initial conversations, Long asked Barr if he would handle finding a location for the bar.  (Barr 122:3-17; Long 57:17-22).  Long wanted the bar to be located on the east side of town, somewhere in the area of the Montgomery Mal toward Vaughn Road.  (Long 60:9-22). Long did not care if Barr leased or bought the location, as long as he found a suitable location. (Long 93:5-18).  In that regard, Barr initially found the TGI Friday's building on Southeastern and made a $400,000 offer to purchase through his real estate agent, Grant Sullivan.  (Barr 122:18-21, 124:18-125:4).  Barr's plan was to buy the Friday's building and lease it back to the bar.  (Barr 125:1-4).  Barr spoke with Aronov agent Robert Long about the Friday's building.  (Barr 125-126). Barr told Robert Long  that he was looking at setting up a sports bar that catered primarily to the African-American community.  (Barr 126:11-14).  Barr and Long did not purchase the Friday's building because it was tied up in a ground lease and could not be sold until January 2008.  (Barr 127:8-15).  After looking at the Friday's location, Barr next looked that Pure Country location at LeCroy.  (Barr 129:18-130:5).  This was the first time that Barr had met Knudsen. (Barr 150:2-6).

Knudsen was a real estate agent with Aronov Realty Brokerage and had worked for Aronov Realty Management immediately preceding meeting with Barr.  (Knudsen: 29:23-30:10).  Knudsen had a long standing relationship with Meiying Forney and was responsible for leasing property for Meying Forney in Montgomery, Alabama.  (Ex. - Meiying Forney Answers to Interrogatories p.3 #3).  While there was no current written agreement in place between Forney and Aronov and/or Knudsen, Forney has testified that "Amy Knudsen handles the selling and/or leasing of all my property."  (Ex.  - Meiying Forney Answers to Interrogatories p. 3 #3).

Barr arrived at the Pure Country location and Knudsen opened the property started showing

him around the building.  (Barr 152:21- 153:3). At the beginning of the meeting, as she was showing

the property, Knudsen stated that they "didn't want a black club there and they didn't want that

Celebrations thing."  (Barr 153:8-12).  Knudsen repeated this comment twice and on the third time,

Barr asked her if she knew who he was.  (Barr 153:15-22)[2]. Knudsen  said that his name was familiar

and Barr told her that he had owned Celebrations.  (Barr 153:15-22).

After Barr told Knudsen who he was, he tried to talk to her and explain that any negative

publicity that Celebrations had was the result of issues in the parking lot, not issues in the club itself.

(Barr 154:1-12).  Knudsen said that she had probably formed her opinions through the media. (Barr

154:9-12).  Barr asked Knudsen about leasing the Pure Country property.  (Barr 151:7-10).  Knudsen

the quoted Barr a leasing price of $4,500 per month with no leasehold improvements included.[3]

(Barr 154:14-16, 159:14-21).

Barr knew what the owners of Pure Country paid in rent and knew that the price that he was

quoted by Knudsen was almost double that amount.  (Barr 155:5-13).  In addition, the space needed

a lot of work and Barr told Knudsen that it would cost between 100 to 150 grand to improve the

space.[4]  (Barr 156:4-8 ).  Due to the rental price and the complete failure to offer to make any

concessions for leasehold improvement, Barr told Knudsen that they would go ahead and try to

obtain the Friday's space.  (Barr154:19-23).

---

[2]At first, Barr thought that Grant Sullivan was using Knudsen to play a joke on him.
(Barr 153:7-12, 157:4-8).

[3]The $4,500 rental rate was derived by using $9.00 per hour.  (Knudsen 121:6-12).
Interestingly, the August 27, 2007, Loopnet Internet listing the shopping center for sale indicated
that the rental rate was $8.00 per square foot.  (PEX F - LoopNet Internet Listing p. 1).

[4]Part of this amount was caused by the need to add kitchen equipment.  (Barr:156:4-7).

After the Friday's deal fell through, Barr made an offer to purchase the LeCroy Shopping Village through his agent Grant Sullivan. (Barr 125:7-12, 129:18-130:17; 185:16-186:8 ). Sullivan had conversations with someone at Aronov concerning the rent rolls at the property. (Barr 181:1-11 ). The purpose of looking at the rent rolls was to determine a value for making an offer on the property. (Barr 181:12-15). Based upon the rent rolls and knowledge that the Montgomery Mall had just sold for 4.4 million dollars, Barr and Sullivan believed that the value of the LeCroy was around 1.1 to 1.2 million dollars. (Barr 175:20-176:3 ). Thus, they made an offer to purchase the property for 1 million dollars. (Barr 176:1-7 ). The contract presented to Forney through Knudsen was dated May 23, 2006. (Ex. - Offer of Purchase). Forney did not counter this offer, which was communicated to Sullivan through Knudsen. (Barr 182:11-13; Knudsen   ).

After the offer to purchase the property fell through, Barr called Knudsen to arrange a time to bring Long to look at the property. (Barr 184:3-4, 17: - 185:6).   Knudsen told Barr that they could not look at the space because they property was tied up in Bankruptcy. (Barr 184:3-185:6 ). Barr then asked Knudsen if they could put a back-up lease on the property. (Barr 282:8-19). Knudsen stated that she was working on a lease for another party and that Barr's back up lease would not be necessary. (Barr 282:8-19 ).

After that conversation with Knudsen, Barr went to Woodmere Tavern and told its owners and managers, Mike Morin and Mark Cranage what had happened with Knudsen. (Barr 184:1-14). Cranage then called Knudsen to ask about viewing the property. (Barr 184:8-14, 185 ;7-9, 187:4-16; Cranage 38:1-40:21). Knudsen told Cranage that she remembered him from having a country-western bar in Millbrook, that she was familiar with Woodmere's format and that they were the kind of people that were wanted at LeCroy. (Barr 166:3-9; Cranage p. 46:14-16). During

a second conversation Knudsen told Cranage that others were looking at the building, but they could get them in to see the building as soon as possible. (Cranage 45:14-20). Knudsen told Cranage that Doodle Hoppers was interested in the property but she was not sure if they had the money to lease the new location. (Cranage 45:14-20). Knudsen informed Cranage that if they were going to get him into the property it had to be done soon. (Cranage 63:1-4). Knudsen also told Cranage that she did not want Barr to come in with a place like Celebrations. (Cranage 63:12-22).

Cranage told Knudsen that there would have to be a build-out done. (Cranage 58:11-19). Cranage spoke with Little and Knudsen about any concessions that would be made in order to allow him to make the necessary improvements to the building. (Cranage 58:13-23).

Cranage arranged to meet with Don Little to view the property. (Cranage 47:18-48:7 ). Little is an attorney who represents Meiying Forney on collection matters and was representing her in her efforts to lease the Pure Country location in regard to the issues present by Pure Country's bankruptcy filing.[5] (Knudsen ; Ex. D - Forney Responses to Interrogatories p.4 #6). Little had filed a Motion to Lift the Automatic Stay related to the Pure Country bankruptcy on Forney's behalf in bankruptcy court. (See Ex. H  - Motion to Lift Stay).

Cranage met with Little on June 13, 2007, to view the Pure Country location. (Cranage p. 48:13-49:17 ). Cranage was carrying a video recorder at the time and made a tape of the meeting with Little. (Cranage 49:15-50:5 ). During the meeting, Little told Cranage that the bankruptcy proceeding would be resolved on the next Monday, and he (Little) could go ahead and enter into lease negotiations at that time and get drafts of a lease for everyone to view. (Ex. I - Cranage Declaration

---

[5]Knudsen and Little were friends and Knudsen had introduced Little to Forney and recommended him as her attorney. (Knudsen p. 77:1-78:2; PEX D Forney Interrogatory Responses p.  4 #6).

Ex 1. - Tr. 14:5-12)[6].  Cranage asked Little if he was in competition for the space with anyone except

Doodlehoppers.   (Tr. 20:8-18).  Little responded

> Well, we're trying – you're going to get me in
> trouble.  We're trying to avoid it, but the
> Celebrations guy wants it real bad and we
> really are trying to dodge that.

(Tr. 20:19-23).  Little also told Cranage that if was serious about leasing the property he would have

to

> start humping and start figuring and get up
> with [them] quick, because there are two that
> are, you know, really looking hard and trying to
> check on things. **But they're not doing the same
> thing you're doing, apparently.**

(Tr. 3:16-22).

Cranage then asked if Barr had made an offer to lease the property.  (Tr. 21:1-2).  Little

responded to this inquiry by stating

> Oh, yeah.  Yeah I mean she even gave him
> a high-ass rent and, shit, he didn't even
> blink.  Now, naturally, he's going to do it
> through somebody else.

(Tr. 21:3-6).  Little later stated

> But, like I said, she's dodging the Celebrations
> crowd.  She's trying to avoid that.  She
> doesn't want – she's not putting up with a
> whole bunch of crap going on.  And by the
> way, what would you do – what would you be
> willing to include in the lease about something to
> keep the parking lot quiet?  Because let me tell

---

[6]Tr. ___ refers to Exhibit 1 to PEX I (the Cranage Declaration) which is the transcript of
the June 13th conversation between Cranage and Little.

> you, you've got a group of old white tenants,
> white people.  The Cake Design place here--
>
> and these are big white tenants.  And sometimes
> drug shit, black ghetto fight situation kicks off out
> there they're all leaving.  And the landlord ain't
> going to put up with that.

(Tr. 26:4-13, 18-22).  Little also told Cranage

> Yeah, I think I'm finished Monday with bankruptcy.
> That's completely free from it Monday.  I could
> actually go ahead and go into lease negotiations
> now and get drafts and everyone look.  And there's
> no way we could get a lease finished by Monday.
> I'm sure you want to look it over and do some specs
> and stuff.

(Tr. 14:5-12).  Little also told Cranage that Forney would give an allowance for leasehold improvements and that she would give "like" half rent for the first six months to total up to expenses, if he came up with a reasonable list of what expenses were expected to be.  (Tr. 18:22-19:7).

After Cranage's visit with Little, Barr contacted Knudsen.  (Barr 176:13-19 ) He again asked her about putting a back up lease on the property.  (Barr 179:14-16).  After much pressure, Knudsen finally told Barr that she might be able to get in touch with the attorney who had the key and let him in the building.  (Barr 179:19-23).

Scott Harris is employed as the Senior Vice President of Aronov Realty Brokerage, Inc.. (EX J - Scott Harris Depo p. 5).  Harris is also the Senior Vice President of Aronov Realty Management. (Harris Depo p. 46).  In addition, Harris serves as the qualifying broker for both Aronov Realty Management and Aronov Realty Brokerage. (Harris Depo p. 7).  Owen Aronov, Jake Aronov, Jenny Autrey and Harris are all officers in both Aronov Realty Management and Aronov Realty Brokerage. (Harris Depo p. 21).   Even though he was on the Board of both companies and was Senior Vice

President of both companies, Harris did not know if the companies in any way commingled their profits, losses or revenues, or whether they stood alone. (Harris Depo p. 50). Both companies also have the same Human Resources Department. (Harris Depo p. 60). In addition, Aronov Realty Management employees also lease and sell commercial and office properties. (Harris Depo 56:19-57-1). In the Defendant Aronov Realty Management, Inc's Conflict Disclosure Statement filed with this Court on October 30, 2007, Aronov Realty Brokerage, Inc. is listed as a wholly owned subsidiary of Aronov Realty Management, Inc. (See Doc. 13).

### III.  SUMMARY JUDGMENT STANDARD

The standard of review for a summary judgment is well-established. This Court recently re-stated the standard as follows:

> We review the granting of a motion for summary judgment de novo, applying the same standards used by the district court. Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted, if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.

The basic issue before the court on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most

9

favorable to the nonmoving party.  If reasonable minds could differ on the inferences arising form

undisputed facts, then a court should deny summary judgment.

> Once the movant . . . satisfies its initial burden under Rule 56(c) of
> demonstrating the absence of a genuine issue of material fact, the
> burden shifts to the nonmovant to come forward with specific facts
> showing that there is a genuine issue for trial.  Otherwise stated, the
> nonmovant must demonstrate that there is indeed a material issue of
> fact that precludes summary judgment.  A mere scintilla of evidence
> supporting the nonmoving party's position will not suffice; there must
> be enough of a showing that the jury could reasonably find for that
> party. The nonmoving party may avail itself of all facts and justifiable
> inferences in the record taken as a whole.  The evidence of the non-
> movant is to be believed, and all justifiable inferences are to be drawn
> in his favor.  Where the record taken as a whole could not lead a
> rational trier of fact to find for the non-moving party, there is no
> genuine issue for trial.

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(internal citations and quotations

omitted).

Rule 56 provides that a summary judgment is to be granted only if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  The procedure a district court in the Eleventh Circuit must

follow in deciding motions for summary judgment is set out in *Clark v. Coats & Clark*, 929 F.2d 604

(11th Cir. 1991):

> The moving party bears the initial burden to show the district court, by
> reference to materials on file, that there are no genuine issues of
> material fact that should be decided at trial. Only when that burden has
> been met does the burden shift to the non-moving party to demonstrate
> that there is indeed an issue of material fact that precludes summary
> judgment.

*Id*. at 608.

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993). The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hairston*, 9 F.3d at 919 (quoting *Anderson*, 477 U.S. at 255). In order to make clear that the non-moving party has no duty to present evidence showing a disputed issue of fact unless and until the moving party has met its initial burden, the *Coats & Clark* court analyzed *Adickes* as holding the following:

> To summarize, the *Adickes* rule remains the general rule. The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party being the burden of proof at trial will not be able to meet that burden. Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial.

*Coats & Clark*, 929 F. 2d at 608.

If the moving party carries this burden and shows the lack of a material question of fact and its entitlement to judgment as a matter of law, then -- and only then -- the party opposing the motion

must show the existence of a genuine issue of material fact. *Hairston*, 9 F.3d at 918 (citing *Matsushita*, 475 U.S. at 586-87; *Coats & Clark*, 929 F.2d at 608). The substantive law defines which facts are "material." *Anderson*, 477 U.S. at 248. A factual dispute is "genuine" if "a reasonable jury could return a verdict for the non-movant," and there is "a real basis in the record" for the factual dispute. *Hairston*, 9 F.3d at 919 (citing *Anderson*, 477 U.S. at 248; *Matsushita*, 475 U.S. at 586-87)).

A plaintiff attempting to prove employment discrimination, including race discrimination, may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *U.S. Postal Service v. Aikens*, 460 U.S. 711, 714-715 (1983). *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 (11th Cir. 1987).

The indirect method of showing discrimination is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). The burden is initially on the plaintiff to show a prima facie case of discrimination. Upon this showing, the burden of production shifts to the employer to articulate legitimate, nondiscriminatory reasons for the employment action taken. *Burdine*, 450 U.S., at 258. If the defendant satisfies this burden, the plaintiff must prove that the articulated reasons are a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S., at 804-805.

Once the employer articulates a legitimate reason for the action, the presumption of discrimination created by the prima facie case disappears from the case. *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742, 2747 (1993). However, this does not mean that evidence of pretext is insufficient to prove discrimination, but only that proof of pretext is not per se proof of

12

discrimination. "The disappearance of the presumption . . . does not compel summary judgment in favor of a Title VII defendant. . . . The 'ultimate question' remains the same: whether the plaintiff can persuade the trier of fact that she has been the victim of intentional discrimination." *See Howard v. BP Oil Co.*, 32 F.3d 520, 525 (11th Cir. 1994).

The quantum of proof necessary to defeat a motion for summary judgment when the defendant presents a legitimate, non-discriminatory reason for its decision was discussed by the Eleventh Circuit in *Howard*. The Eleventh Circuit, interpreting *St. Mary's Honor Center*, stated:

> *St. Mary's* holds that proof that a defendant's articulated reasons are false is not proof of intentional discrimination; it is merely evidence of intentional discrimination. However, evidence of intentional discrimination is all a plaintiff-appellant needs to defeat a motion for summary judgment. That evidence must be sufficient to create a genuine factual issue with respect to the truthfulness of the defendant's proffered explanation.

*Howard*, 32 F.3d at 525. "Under *St. Mary's*, a plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Id.* at 526. *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997)("Once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law.")

## IV.  ARGUMENT

### A.    Discriminatory Leasing Pursuant to 42 U.S.C. §§ 1981 and 1982

Plaintiffs Barr and Long bring claims pursuant to 42 U.S.C. § 1981 and 1982 alleging that they were discriminated against in the leasing of property because of their association with African-

13

Americans and because of Long's race. Sections 1981 and 1982 both serve to prohibit race discrimination and are construed similarly. *See   CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1955-6 (2008).  "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts." *Ferrill v. The Parker Group, Inc.* 168 F.3d 468, 472 (11th Cir. 1999).  § 1982 reads

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property.

In interpreting § 1981, the Eleventh Circuit has stated

> a defendant who acts with no racial animus but makes job assignments on the basis of race can be held liable for intentional discrimination under § 1981.

> In other words," the court explained, "ill will, enmity, or hostility are not prerequisites of intentional discrimination" under § 1981.

*Ferrill* at 473, n. 7.  *See also Goodman v. Lukens Steel Co.,* 482 U.S. 656, 669, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (1987)(stating that intentional discrimination under § 1981 only requires that decisions be based on race, it does not require that those decisions be motivated by hostility or animus).  Furthermore, the Eleventh Circuit has held that § 1981 prohibits discrimination based upon racial association.  *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888 (11th Cir. 1986); *See also Kelser v. Alcazar Shriners, et al.*, 2007 WL 484551 (M.D. Ala., Watkins J.)(finding that a plaintiff stated a valid cause of action under § 1981 when it alleged that the defendants would not allow him to hold "Latino Night" on their premises because they "did not want any Latinos in the facility.").

The Supreme Court has held that a white plaintiff had standing to sue under § 1982 when a neighborhood association denied him the right to assign his membership in a community recreational facility to an African-American. *Sullivan v. Little Hunting Park, Inc.* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Furthermore, a mall tenant may assert a claim of discrimination under §§ 1981 and 1982 if the discrimination is based upon the race of one of its employees. *Guides, LTD., v. Yarmouth Group Property Management, Inc.,* 295 F.3d 1065 (10th Cir. 2002); *See also Hudson Valley Freedon Theater, Inc. v Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982)(corporation had standing to sue under § 1981 when its grant application was denied because it sought to involve the African-American and Hispanic communities).

## A.    Plaintiffs Can Prove Discrimination Pursuant To §§ 1981 and 1982

To establish a claim for race discrimination pursuant to both §§ 1981 and 1982, Plaintiffs must show that

> (1)    that the plaintiff is a member of a racial minority or is associated with members of a racial minority;
>
> (2)    that the defendant intended to discriminate on the basis of race; and
>
> (3)    that the discrimination concerned one or more of the activities enumerated in the statute.

*Kinnon v. Arcoub, Gopman & Associates, Inc.,* 490 F.3d 886, 891 (11th Cir. 2007); *Parr, supra* 791 F.2d at 890.

Plaintiff Long is African-American. Both Long and Barr sought to open a sports bar that catered primarily to the African-American community. In addition, Barr's previous establishment was frequented primarily by African-American customers and both Knudsen and Little made

15

comments which establish that they thought Celebrations' clientele was predominantly African-American.  Therefore, the plaintiffs satisfy the first prong.  *See e.g., Sullivan; Parr; Guides.*

Plaintiffs may establish that the defendants intended to discriminate through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination."  *Bass v. Bd. of Commissioners,* 256 F.3d 1095, 1103 (11th Cir. 2001).   As will be shown below, the plaintiffs can establish an intent to discriminate both through direct and circumstantial evidence.

Finally, contrary to the defendant's assertions, this case is about more than just the 1 million dollar offer to purchase the LeCroy Village.  When Plaintiffs' counsel read the defendants' briefs, he thought he had mistakenly picked up and started reading materials filed in another case.  The record clearly shows that the plaintiffs made a valid offer to Amy Knudsen to lease the Pure Country site.  The defendants even admit this in their brief, yet at the same time they argue that no offer was ever made.  At the very least there is a question of fact which should be presented to a jury for resolution and summary judgment should not be granted.

> 1.    **There Is A Question of Fact As To Whether Or Not The Plaintiffs Made An Offer To Lease The Pure Country Space**

The defendants argue that Barr and Long never made an offer to lease the Pure Country Space.  However, the record, along with their own recitation of the facts show otherwise.  Barr's testimony shows that he did make an offer to lease the space.  The events that took place can by summarized as follows

> \*  Barr and Knudsen meet to view the property. Knudsen
> makes comments about not wanting a black club. Barr asks
> for $100K to $150K in leasehold improvements. Knudsen
> quotes a rental price of $4,500 per month with no leasehold

improvements.

* Barr attempts to purchase the TGI Friday's Property
  but is unsuccessful.

* Barr then presents a written offer to purchase LeCroy
  which is turned down by Forney.

* Barr contacts Knudsen and asks to view the property again,
  this time with Long.  Knudsen tells him that he cannot because
  the property is in bankruptcy.  Knudsen also tell Barr that she is
  working on a lease for another party.  Barr tells Knudsen that they
  would like to put a back up lease on the property.  Knudsen tells
  him no.

* Cranage contacts Knudsen who arranges for him to meet Don Little
  and view the property. Little offers to begin drafting and to start
  the negotiation process on the Pure Country location with Cranage.

There is little doubt that Barr attempted to engage in lease negotiations for the Pure Country location and actually attempted to put a back up lease on the property at the $4,500 price.  The defendant's brief almost reads as if Barr never even expressed interest in leasing the Pure Country location from Forney.  That is simply not true and an extremely misleading and disingenuous position to take with the Court at summary judgment.

The facts show that Barr, while acting on Long's behalf and with his permission, attempted to enter into leasing negotiations with Meying Forney, through her long-time real estate agent, Amy Knudsen.  Barr toured the property with Knudsen, received a quote from Knudsen, communicated his needs regarding leasehold improvements to Knudsen, and turned down the price that Knudsen quoted him. The price offered by Knudsen was based upon $9.00 per square foot.  (Knudsen 121:9-12). The price listed on the Loop Net listing was $8.00 per square foot.  (Ex. F p. 1).

17

After unsuccessfully bidding on another property,[7] the plaintiffs made an offer to purchase the entire shopping center.  When that offer was rejected, Barr contacted Knudsen to make an offer and was told that she was working on a lease for another party.  Barr then made an offer to put a back up lease on the property.  Knudsen stated that it would not do any good.

Later, during that same time period, Mark Cranage called Knudsen and asked to view the property.  Knudsen immediately arranged with Forney's attorney on the Pure Country matter, to allow Cranage to see the property.  Forney's attorney, then began to negotiate with Cranage and offered to start writing a lease on the property when it became available the next Monday, after the bankruptcy stay had been lifted.  Forney's attorney also told Cranage that Knudsen was trying to "dodge the Celebrations crowd" and that she had offered Barr a "high ass rent" and he did not even blink.

It is evident that the plaintiff's engaged in or attempted to engage in a real property related transaction that is covered under both §§ 1981 and 1982.  Just because Knudsen, Little and Forney refused to deal with them in the leasing of the property and a written lease was never presented does not mean that their actions were not covered under the statutes.  As a federal court in Tennessee stated

> Recent cases make clear that the statutes prohibit all forms of discrimination, sophisticated as well as simple-minded, and thus disparity of treatment between whites and blacks, burdensome application procedures, and tactics of delay, hindrance, and special treatment must receive short shrift from the courts.... [t]he courts will look beyond the form of a transaction to its substance and proscribe practices

---

[7]The defendants' brief insinuates that the plaintiffs had no intention of leasing at Pure Country when they offered the back up lease because they had already turned down Knudsen's first quote and focused on the TGI Friday's property.  The evidence is undisputed that the plaintiffs had already discovered that the TGI Friday's property would not be available to them and had made the offer to buy LeCroy at the time they offered the back up lease on the Pure Country location.

> which actually or predictably result in racial
> discrimination, irrespective of defendant's motivation.

*Hobson v. George Humphreys, Inc.*, 563 F.Supp. 344, 350 (W.D.Tenn. 1982)(quoting *McHaney v.*

*Spears*, 562 F.Supp. 566, 573 (W.D.Tenn 1981).

The evidence before the Court, especially when read in a light most favorable to the plaintiffs, paints a picture of two individuals who agreed to enter into a business venture and who actively sought to lease a property but were denied the opportunity because of racial reasons. One individual was in charge of securing a location. He was Caucasian, but had previously ran a bar which had the perception, whether actual or imagined, of having predominately African-American clientele. He made numerous attempts to negotiate a lease, offered to purchase the property, offered to lease the property and offered to write a back-up lease on the property. All of these efforts were rebuffed without even the hint of a counteroffer. The record does not support the defendants' contention that the plaintiffs never made an offer to lease the property. Since the defendants advanced no other arguments regarding the discriminatory failure to lease, summary judgment cannot be granted.

### 2.     The Comments Made By Little And Knudsen Are Direct Evidence Of Race Discrimination

The comments made by Don Little and Amy Knudsen constitute direct evidence of race discrimination. Little's exact words to Mark Cranage were

> "[w]e're trying to avoid it, but the Celebrations guy wants
> this real bad and we really are trying to dodge that,."

(Tr. 20), and

> [b]ecause let me tell you, you've got a group of old **white tenants,**
> **white people.** The Cake Design place here– and these are
> **big white tenants**. And sometimes drug shit, **black ghetto fight**
> situation kicks off out there they're all leaving. **And the landlord**

**ain't going to put up with that.**

(Tr. 26).  Knudsen's comments to Barr were that they "**didn't want a black club there** and they didn't want that Celebrations thing."[8]  (Barr 153:8-12).  These words evince a discriminatory motive on behalf of Forney which led to the denial of the lease to Barr and Long.  The defendant will no doubt argue that Knudsen's and Little's comments cannot be attributed to Forney or that they constitute no more than "stray" remarks of a non-decision maker.  They will be wrong.  Little and Knudsen were both long standing agents acting on behalf of Meying Forney in a variety of ventures, including specifically the leasing of the Pure Country location as it relates to prospective tenants and the former tenant Pure Country who was in bankruptcy .  Forney's claim does not rise and fall on her knowledge of Long's race, the race of the majority of the Celebrations' clientele, or the fact that Long and Barr were seeking to open a sports bar that catered primarily to the African-American community. Her liability is premised upon the actions of her agents.  .

It is clear in Alabama that a principal can be bound by the statements of an agent.  It is without question that Little was an agent of Forney and was speaking for Forney when he showed the property to Mark Cranage.  Little represented Forney in the bankruptcy related to the property that he was showing. He had a key to the property.  In addition, Little had an established relationship with Forney in that he represented her on other matters related to the collections of rents.  Finally, Little offered to draft and negotiate a lease with Cranage on behalf of Forney.

The question of whether an attorney had the authority to bind a client is determined by the agency law of the state in which suit is brought.  *Tucker v. Housing Authority of Birmingham Dist.*, 507 F.Supp.2d 1240, 1274 (N.D. Ala. 2006)(citing *Hayes v. Nat'l Serv. Indus.* 196 F.3d 1252, 1254

---

[8]Knudsen's comments alone are sufficient to create liability for both her and Aronov.

(11th Cir. 1999); *Glazer v. J.C.Bradford & Co.,* 616 F.2d 167, 168 (5th Cir. 1980)).[9]  In Alabama,

"admissions by an attorney concerning a matter within his employment typically bind his client

without *any evidence* of whether the client actually authorized the admission." *Tucker* at 1273 (citing

*Lawrence v. Gayle*, 312 So.2d 385, 387 (Ala. 1975)).  Also, "[i]t is elementary that the ommissions

and commissions of an attorney are to be regarded as acts of the client whom he represents."

*SouthTrust Bank v. Jones, Morrison, Womack, & Dearing, P.C., et al.,* 939 So.2d 885, 903 (Ala. Civ.

App. 2005).    The *SouthTrust* court finally stated

> **a principal is liable for the intentional torts of
> its agent - even if the agent's acts were unknown
> to the principal, were outside the scope of the
> agent's authority, and were contrary to the
> principal's express directions - if the agent's
> acts were in furtherance of the principal's
> business and were not wholly for the gratification
> of the agent's personal objectives.**

939 So.2d at 905-06 (emphasis added).  "A summary judgment on the issue of agency is generally

inappropriate because agency is a question of fact." *Wallace v. Frontier Bank, N.A. et al.,* 903 So.2d

792, 801 (Ala. 2004).    Finally, there is abundant case law holding that liability under §§ 1981 and

1982 can be premised upon a principal/agent relationship.

Knudsen was also acting as Forney's agent when she made the comments to Barr on the first

meeting.    According to Forney, Knudsen acts as her exclusive agent for her properties in

Montgomery.  (Ex. D).  Forney owns the LeCroy Shopping Village.  Knudsen was showing Barr the

Pure Country space at LeCroy in order to lease it on Forney's behalf.  Clearly, Knudsen was acting

---

[9]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the 11th Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

on Forney's behalf and at least in the furtherance of her business when she made the statements to Barr.

Furthermore, both Knudsen and Aronov can be held liable for **all** of the discrimination alleged (both leasing and selling of real property) based upon Knudsen's conduct.  It is undisputed that Knudsen was at least an employee of Aronov Brokerage when she made the statements and conducted herself in the discriminatory manner described in this brief.  (See Harris 10:9-18).  An individual acting as an agent can be held liable under both §§ 1981 and 1982.  *See Dillon v. AFBIC Development Corp.,* 597 F.2d 556, 562 (5th Cir. 1979)( finding that "an agent who assists his principal in committing a tort is liable as a joint tortfeasor.")[10].  Furthermore, the law is equally clear that Aronov can be held liable for Knudsen's discriminatory actions in representing Forney in the sale and purchase of the property at LeCroy.  *Id.* at  563 (citing *United States v. Northside Realty Assoc.*, 474 F.2d 1164 (5th Cir. 1973) *cert denied* 424 U.S. 977.  As such, the defendants' arguments against liability are without merit.

It is clear from the forgoing that Forney, Knudsen and Aronov can be held liable for the statements and actions of Don Little and Amy Knudsen.  These statements were made in an attempt to lease a property which Forney owned.  The property needed to be leased because the previous tenant had not paid rent in several months and had filed bankruptcy.  Both Little or Knudsen had formal business relationships with Forney.  They both made representations at the time that they made the statements that they were acting on behalf of Forney in leasing the property that she owned.  Therefore, the plaintiffs have at the very least created a question of fact as to the issue of whether

---

[10]Discriminatory leasing practices in violation of §§ 1981 and 1982 as well as the Fair Housing Act are considered actions in tort to which traditional agency laws apply.  *Dillon* at 562-563.

Knudsen and Little were acting as Forney's agents at the time these statements were made.

Both Little's and Knudsen's statements are direct evidence of discrimination.[11]  Where the plaintiff uses direct evidence to prove discrimination "it is incorrect to rely on the *McDonnell Douglas* test because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas,* no such inference is required in the case of direct evidence." *Id.* at 1104. Furthermore, at the summary judgment stage "where a non-movant presents direct evidence that creates a genuine issue of material fact, the only issue is one of credibility; thus, there is no legal issue for the court to decide." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742-43 (11th Cir. 1996)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253-55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)(stating that credibility determinations are a jury function); *See also*, *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir. 1997)(stating that "[w]here, the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.").

The Eleventh Circuit has defined direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir. 1999). It is firmly established in this circuit that "actions or statements of an employer reflect[ing] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee" constitutes direct evidence. *Merritt v. Dillard Paper Co.,* 120 F.3d 1181,1189(11th Cir. 1997)(citing *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990)); *E.E.O.C. v. Alton*

---

[11]These statements are admissible as an admission by a party opponent pursuant to Federal Rule of Evidence 801(d)(2).  *See Tucker* at 1276.

23

*Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990)(general manager's statement that 'if it were his

company he wouldn't hire any black people' was direct evidence);  *Haynes v. W.C. Caye & Co., Inc.,*

52 F.3d 928, 930 (11th Cir. 1995)(statement questioning whether 'sweet little old lady could get tough

enough' to do job and statement that 'a woman was not competent enough to do this job' constitute

direct evidence); *Burns v. Gadsden State Community College,* 908 F.2d 1512, 1518 (11th Cir.

1990)(statement that 'no woman would be named to a B scheduled job' constitutes direct evidence);

*Sennello v. Reserve Life Ins. Co.,* 872 F.2d 393, 395 (11th Cir. 1989)(statement that 'we can't have

any women in management' constitutes direct evidence); and *Bell v. Birmingham Linen Serv.,* 715

F.2d 1552, 1553, 1557 (11th Cir. 1983)(supervisor's statement that he would not put a woman in a

washerman position because 'every woman in the plant would want to go into the washroom'

constitutes direct evidence).

Indeed, comments from decision makers that were less directly connected to the challenged

employment decisions have been found to constitute direct evidence.  See, *e.g. Alton Packaging*

*Corp.,* 901 F.2d at 923(comments by a decision maker "that if it was his company he wouldn't hire

any black people," and "you people can't do a ____ thing right" were direct evidence); *Beverage*

*Canners, Inc.,* 897 F.2d at 1068 (fact that the plant manager and a supervisor "frequently made

flagrant, revolting, and insulting racially derogatory remarks towards and in the presence of blacks"

was direct evidence); *Buckley v. Hospital of America,* 758 F.2d 1525, 1527-28, 1530 (11th Cir.

1985)(in an ADEA case, direct evidence included the decision-maker's telling the plaintiff that she

had "lost her temper due to her advanced age," that the hospital needed "new blood," and that he

wanted to attract  younger doctors and nurses).

The remarks made by Knudsen and Little were not mere stray remarks made by

nondecisionmakers and were definitely related to the decision making process. As stated above, Knudsen and Little were both acting on Forney's behalf. Forney lives in California and relies on Knudsen to handle the selling and leasing of all her property. (Ex. P. 3 #3). In addition, Little was Forney's attorney in an active litigation matter concerning the Pure Country space. He had a key and was showing the property on Forney's behalf. The remarks in question were made during the leasing process either directly to plaintiff Barr or to Cranage who was seeking to lease the property.

The comments leave no doubt that the race of the clientele at Barr's previous and future establishment was the reason that Barr was denied the ability to lease the property. Knudsen explicitly said that **"they"** did not want a black club there on 3 occasions. This statement was made directly to plaintiff Barr while he was looking at the property. Little (caught on video) reiterated Knudsen's sentiment and told Cranage that LeCroy had a lot of big, **white** tenants who would leave if the **black ghetto** fight situation kicked off. There can be little dispute that both of these statements show an intent to discriminate based on race - no inference is needed. The United States Supreme Court held that a union could not "categorize racial grievances as unworthy of pursuit." *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 669, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (1987). The Court quoted approvingly from the District Court

> A union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, **or in deference to the perceived desires of its white membership, is liable under both Title [VII] and § 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities.**

*Id.* Furthermore, these statements made by two individuals closely intertwined to the leasing process.

25

As the Eleventh Circuit has stated

> [S]tatements made by a supervisory official who plays
> some role in the decision making process are generally
> admissible. *See, e.g., Miles v. M.N.C. Corp.,* 750
> F.2d 867, 873-75 (11th Cir. 1985). Moreover, such
> statements can constitute direct evidence of discrimination.

*Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997). Therefore, summary judgment should not be granted.

### 3.      Plaintiff's Have Presented Circumstantial Evidence of Race Discrimination In Leasing

Even if the Court determines that the plaintiffs have not provided direct evidence of race discrimination, the evidence submitted certainly constitutes powerful circumstantial evidence of discrimination. As stated above, the plaintiffs are protected by both 42 U.S.C. §§ 1981 and 1981 on the basis of their race (Long) and their association or affiliation with a customer base that is primarily African-American (Barr and Long). Also, the plaintiffs made attempted to lease the property in question but were rebuffed in every way. Therefore, they need only to show that the defendants intended to discriminate against them.

### a.      The Comments Are Circumstantial Evidence Of Racial Bias

First, the comments listed above, by both Knudsen and Little, are powerful circumstantial evidence of race discrimination. The Eleventh Circuit has held that a plaintiff may prove pretext by showing that the decision maker has made comments showing a retaliatory animus. *Miles*, *supra* at p. 873. *See also La Fleur v. Wallace State Community College,* 955 F.Supp 1406, 1419 (M.D. Ala. 1996)(holding that evidence of racial slurs by a decision maker, in connection with other

circumstantial evidence of discrimination was sufficient for a determination of pretext.); *Shager v. Upjohn Company*, 913 F.2d 398, 402-403 (7th Cir. 1990)(stating that slurs that may even be considered to be "stray remarks" could be relevant evidence of a discriminatory motive especially when coupled with evidence of the insincerity of the defendant's articulated reason.)   More importantly the Eleventh Circuit has stated that:

> "[d]isparate treatment analysis requires that none of the participants in decision-making process be influenced by racial bias.... Thus, the motivations of both the [decision maker] and the [subordinate] are pertinent."

*Jones v. Gerwens*, 874 F.2d 1534, 1541 n.13(11th Cir. 1989).   This bias may be shown through statements of racial slurs or comments which do not amount to direct evidence of discrimination. *Boyce v. Belden*, 2002 WL 171697, n1 (M.D.Ga. 2002)(quoting *Jones v. Bessemer Carraway,* 151 F.3d 1321, 1323 n.11 (11th Cir. 1998)(per curiam)(stating that "language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the *prima facie* case.").

Knudsen's and Little's comments go far beyond the comments listed above.  They are made by agent's of the property owner actively engaged in communications dealing with the leasing of the property at issue.  The certainly indicate a particular bias toward renting the property in question to an establishment that would even potentially have an African-American customer base.  The comments show an intent to discriminate in order to please the existing white tenant base at the LeCroy Shopping Center.  There is no question that these comments are evidence of racial bias relating to the decision in question and therefore summary judgment cannot be granted.

**b.    The Treatment of Cranage Shows Racial Bias**

The treatment received by a Caucasian prospective tenant seeking a place for his Country-Western bar also shows that racial bias played a substantial or motivating factor in the treatment received by Barr and Long. It is a fundamental tenet of discrimination law that a plaintiff can use evidence that a similarly situated individual was treated in a preferable manner to prove intentional discrimination. *McDonald v. Santa Fe Trail Transportation Co*., 427 U.S. 273, 283 n.11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). In *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d (1973), the United States Supreme Court stated that:

> "On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejections was in fact pretext. **Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained or rehired.** Petitioner may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied to members of all races.

(emphasis added); *Accord*, *Wright v. Efficient Lighting Systems*, 2003 WL 20022538 (7th Cir.)(stating that "[a] showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate nondiscriminatory reason for the adverse job action was a pretext for racial discrimination.")(quoting *Gordon v. United Airlines*, 246 F.3d 878, 892 (7th Cir. 1992); *See also Hargett v. National Westminster Bank, USA*, 78 F.3d 836 (2nd Cir. 1996)(same).

The evidence in this case shows that Cranage was treated in a much more favorable manner than Barr and Long. After Barr had been denied access to the property on the second occasion he asked to bring Mr. Long for a tour, Cranage called Knudsen and was almost immediately put in touch with Little who arranged to meet him for a tour. In addition, Cranage was never told that he could

not write a lease on the property or even put a back up lease on the property as Barr was. Instead, Little told Cranage that he could start writing the lease on the property for his review immediately and that negotiations could begin the following Monday after the bankruptcy matter which Little was handling for Forney had cleared up. Cranage was also promised rent credits for leasehold improvements. When Barr mentioned a figure for leasehold improvements, he was told the landlord would not meet that request and a counter proposal, similar to the proposal made to Cranage was never discussed.[12] There was no negotiation with Barr, even though Knudsen testified that negotiation was common in her business. (Knudsen 179:11-17). This disparate treatment, especially in light of the comments described above, are sufficient for a jury to determine that race was the reason the plaintiffs were never allowed to lease the Pure Country space.

Finally, there is abundant evidence, which the defendants' completely ignore, that the Doodle Hopper's lease would not have prevented Cranage from leasing the property. Cranage testified that although Doodle Hoppers was mentioned, he was told that they did not have a firm deal and if he wanted to get into the property, he would be able to do so. Little told Cranage that they could start working on a lease immediately. Knudsen told Cranage that Doodle Hoppers wanted the property but she was not sure that they had the money to get it done. Knudsen also told Cranage that he needed to act quick if he wanted to get into the property. In contrast, Barr was given a flat no from Knudsen when he asked to put a lease and back up lease on the property. He was not even allowed to attempt to negotiate with Forney or Knudsen after he viewed the property. Knudsen did not even

---

[12]The fact that Knudsen quoted Barr a rental price based on $9.00 per square foot in May 2007, when there is evidence that the property was leasing at $8.00 a square foot in August is further evidence of discrimination and bolsters the comment made by Little that Knudsen had quoted Barr a higher rental price.

want him to bring Long in to view the property, much less put a lease on the property.    This is further evidence of discrimination and is evidence which shows that the defendants' articulated reason is not true and is merely a pretext for discrimination.

**B.    Discriminatory Refusal to Sell Real Property Pursuant to §§ 1981 and 1982**

**1.    Prima Facie Case**

The majority of the defendants briefs are devoted to the claim that the plaintiffs were not allowed to purchase the property because of the race of their clientele.  A plaintiff establishes a prima facie case of failure to sell property by proving: (1) that he is a member of a racial minority; (2) that he applied for and was qualified to purchase the property; (3) that the owner rejected the plaintiff's offer; and (4) that the property remained available thereafter.  *Dept. of Housing and Urban Development v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990).  The plaintiffs easily meet this standard.

As stated above, Barr's prior affiliation with African-Americans at Celebrations and Barr's and Long's stated purpose to start a club that catered to the African-American community qualify for the member of a racial minority prong.  *See e.g., Sullivan; Parr; Guides*.  Barr submitted an written application on behalf of himself with the intention that he would lease the space back to the bar he opened with Long.  Forney rejected Barr's offer and within a short time thereafter the property was on the market for sale.  Therefore, both Barr and Long can bring a claim for discriminatory refusal to sell.[13]

---

[13]Long's claim is based upon two pieces of evidence.  The first is his testimony that he gave Barr authority to find a location for the sports bar and did not care whether he leased it or bought it.  The second is Barr's testimony that he planned on buying the property and leasing the Pure Country space back to the venture he was entering with Long.  Therefore, the decision not to sell the property or to even negotiate with Barr interfered with Long's ability to own or lease

## 2.    The Articulated Reason Is A Pretext for Discrimination[14]

The reason articulated by Forney for the failure to accept the offer is that she did not feel that it was large enough.  There is no explanation why she did not make a counteroffer to the original offer.  Knudsen herself testified that the asking price is generally negotiable.  (See Defendant Forney's Brief p. 6; Knudsen Depo 179:11-17).  Forney's brief further states "[i]t is not uncommon to negotiate what common to negotiate what someone is asking for the property and what someone is willing to offer for the property."  (Forney's Brief p. 6).  If that is the common practice, then why did Forney not enter into negotiations with Barr for the purchase for the property.  The answer can be found in the comments made by Knudsen and Little.

As previously argued, both Knudsen and Little made comments which evinced a discriminatory motive.  These comments show that the long-term white tenants at LeCroy did not want a black club to move into the shopping center. It appears from these comments that keeping the black club out of LeCroy was a the primary motivation in any transaction dealing with this real estate. The facts that Forney did not make a counteroffer, the property was on the market within a couple of months, in addition to the comments made by Knudsen and Little are sufficient evidence that race played a substantial or motivating factor in the decision to not sell the property to Barr and warrant a denial of summary judgment.

### C.    Liability of Aronov Realty Management

Aronov Realty Management ("Management") argues that it cannot be held liable for

property and his rights to make a contract.

[14]As argued above, the comments made by Knudsen and Little, which are properly attributable to Forney, constitute direct evidence of discrimination and therefore, an analysis of Forney's articulated reason is not necessary and summary judgment should be denied.

any of the above-described actions because (1) it was not a joint employer; (2) it was not Knudsen's employer and she did not act as its agent.  As will be shown below, Brokerage's arguments fail and it can be held liable for Knudsen's conduct.

### 1.    Management is a Joint Employer

In order to prove that an entity is a joint employer under the federal anti-discrimination laws a plaintiff must show that the Management and Aronov Realty Brokerage are a single employer which is "highly integrated with respect to ownership and operations."  *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987)(citing *Fike v. Gold Kist, Inc.* 514 F.Supp. 722, 726 (N.D.Ala.) *aff'd* 664 F.2d 295 (11th Cir. 1981).  The standards to be used in making this determination are (1) the interrelation of operations; (2) centralized control of labor relations, (3) common management, and (4) common ownership.  *Id.*  When these factors are view in light of the evidence presented in this case, it is obvious that Aronov Brokerage and Aronov Realty Management could be considered joint employers of Knudsen and therefore both liable for her actions.

In regard to interrelation of operations, the evidence is that these are two very closely related companies.  The companies share offices and a human resources department .  (Terry Decl ¶ 4, 6).  The companies use the same 401K and retirement plan.  (Terry Decl. ¶ 5).  The companies are both managed by Scott Harris, who was Knudsen's supervisor at both companies.  The same company does payroll for both entities.  Finally, 6 of the 8 Management officers are shared by both companies.  Management employees also are allowed to sell and lease commercial properties, just like Ms. Knudsen.

The companies also have a centralization of labor relations.  As stated before, the companies share a human resources department and have the same retirement plan.  Also, the payroll for both

companies is performed by the same entity paid by Management..

The last two factors weigh heavily in favor of joint employer status. Aronov Realty Brokerage is a wholly owned subsidiary of Aronov Realty Management. Scott Harris is the qualifying broker for both companies and is considered the supervisor over both companies. In addition, the fact that the companies share 6 out of 8 officers is a telling indicator that these entities should be treated as a joint employer. Given this abundant evidence, there is a question of fact as to whether Aronov Realty Management and Aronov Realty Brokerage are joint employers and summary judgment should be denied.

### 2.    Knudsen Was Acting As A Management Agent

The evidence also shows that Knudsen was acting as an agent on behalf of Aronov Management when she showed the property to Barr. When Barr met Knudsen, she handed him a card which said Aronov Realty Management. At that moment Barr believed he was dealing with a representative of Aronov Realty Management. It was easy for Barr to form that belief given the degree of interrelatedness between the Aronov companies. Furthermore, given that Aronov Brokerage is a wholly owned subsidiary of Aronov Management and the fact that Scott Harris serves as qualifying broker and supervisor for both entities, Knudsen's actions can be imputed to Management.

Respectfully submitted,

/s/ Kevin W. Jent
C. Michael Quinn
Kevin W. Jent
Attorneys for Plaintiffs

33

**OF COUNSEL**

**WIGGINS, CHILDS, QUINN**
      **& PANTAZIS, LLC**
The Kress Building
301 19th St. N.
Birmingham, AL 35203
(205) 314-0500


**CERTIFICATE OF SERVICE**

      I do hereby certify that I have filed the above and foregoing today, August 11, 2008, by CM/ECF, with copies being served on:

Charles A. Stewart, III
Quindal C. Evans
Bradley, Arant, Rose & White, LLP
401 Adams Ave, Suite 780
Montgomery, Alabama 36104

N. Gunter Guy, Jr.
BALL, BALL, MATTHEWS & NOVAK, P.A.
P. O. Box 2148
Montgomery, Alabama 36102-2148


                              /s/ Kevin W. Jent
                              OF COUNSEL