**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERRENCE LONG and** | ) | |
| **BARRY BARR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:07-cv-00881-WKW-WC** |
| **ARONOV REALTY MANAGEMENT,** | ) | |
| **INC., AMY CLARK KNUDSEN, and** | ) | |
| **MEIYING FORNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' EVIDENTIARY SUBMISSION IN OPPOSITION
TO ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**COME NOW** the plaintiffs in the above-styled matter and submit the following

evidentiary submission in opposition to all of the defendants' motions for summary judgment.

Ex. A -   Barry Barr Deposition

Ex. B -   Terrence Long Deposition

Ex. C -   Amy Knudsen Deposition

Ex. D -   Forney Responses to Interrogatories

Ex. E -   Offer of Purchase

Ex. F -   Loop Net Internet Webpage

Ex. G -   Mark Cranage Deposition

Ex. H -   Motion to Stay

Ex. I -   Mark Cranage Declaration with Exhibit (Transcript)

Ex. J-   Scott Harris Deposition

Ex. K -        Knudsen Business Card

Respectfully submitted,

/s/ Kevin W. Jent
C. Michael Quinn
Kevin W. Jent
Attorneys for Plaintiffs


**OF COUNSEL**

**WIGGINS, CHILDS, QUINN
    & PANTAZIS, LLC**
The Kress Building
301 19th St. N.
Birmingham, AL 35203
(205) 314-0500

**CERTIFICATE OF SERVICE**

I do hereby certify that I have filed the above and foregoing today, August 11, 2008, by CM/ECF, with copies being served on:

Charles A. Stewart, III
Quindal C. Evans
Bradley, Arant, Rose & White, LLP
401 Adams Ave, Suite 780
Montgomery, Alabama 36104

N. Gunter Guy, Jr.
BALL, BALL, MATTHEWS & NOVAK, P.A.
P. O. Box 2148
Montgomery, Alabama 36102-2148

/s/ Kevin W. Jent
OF COUNSEL



**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


TERRENCE LONG & BARRY BARR,

          Plaintiffs,

vs.                          CIVIL ACTION NO.

                             2:07-CV-00881-WKW-WC

ARONOV REALTY MANAGEMENT,

INC., AMY CLARK KNUDSEN,

& MEIYING FORNEY,

          Defendants.

          *     *     *     *     *

          DEPOSITION OF BARRY BARR,

taken pursuant to notice and stipulation

on behalf of the Defendants, in the

offices of Bradley, Arant, Rose & White,

401 Adams Avenue, Suite 780, Montgomery,

Alabama, before Nicole Paulk, Certified

Court Reporter and Notary Public in and

for the State of Alabama at Large, on

April 15, 2008, commencing at 9:42 a.m.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

---

Page 2

1      APPEARANCES
2
3    For the Plaintiffs:
4        C. Michael Quinn, Esquire
         Kevin W. Jent, Esquire
5        Wiggins, Childs, Quinn &
         Pantazis, LLC
6        The Kress Building
         301 19th Street North
7        Birmingham, Alabama 35203
8    For the Defendants Aronov Realty
     Management and Amy Clark Knudsen:
9
         Charles A. Stewart, III, Esquire
10       Bradley, Arant, Rose & White, LLP
         Alabama Center for Commerce
11       401 Adams Avenue, Suite 780
         Montgomery, Alabama 36104
12
     For the Defendant Meiying Forney:
13
         N. Gunter Guy, Jr., Esquire
14       Ball, Ball, Matthews & Novak, PA
         Post Office Box 2148
15       Montgomery, Alabama 36102-2148
16   Also Present:
17       Terrence Long
18
19
20
21
22
23

---

Page 3

1           STIPULATIONS
2
3        It is stipulated and agreed by
4    and between counsel representing the
5    parties that the deposition of BARRY BARR
6    may be taken before Nicole Paulk, Court
7    Reporter and Notary Public in and for the
8    State of Alabama at Large, without the
9    formality of a commission; and all
10   formality with respect to other procedural
11   requirements is waived; that objections to
12   questions, other than objections as to the
13   form of the questions need not be made at
14   this time, but may be reserved for a
15   ruling at such time as the deposition may
16   be offered in evidence or used for any
17   other purpose by either party as provided
18   by the Federal Rules of Civil
19   Procedure.
20          *   *   *   *   *
21           I N D E X
22   Examination                     Page
23   By Mr. Stewart                    5

---

Page 4

1    By Mr. Guy                      229
2    By Mr. Stewart                  301
3    By Mr. Guy                      310
4    Defendants' Exhibits            Page
5    1 - Notice of Deposition of       200
6       Plaintiff
7    2 - Plaintiff Barry Barr's General
8       Objections/Responses to
9       Defendants' Request for
10      Production Included in the
11      Notice of Deposition Dated
12      March 19, 2008
13   3 - Plaintiff Terrence Long's
14      Objections/Responses to
15      Defendants' Request For
16      Production Included in the
17      Notice of Deposition Dated
18      March 19, 2008
19   4 - Texas Steakhouse Income        203
20      Statement
21   5 - 2005 Individual Income Tax     203
22      Return, prepared for Barry Barr
23   6 - 2006 Individual Income Tax     203

---

Page 5

1       Return, prepared for Barry Barr
2    7 - 2007 Individual Income Tax     203
3       Return, prepared for Barry Barr
4    8 - Proposal to Lease              204
5    9 - Audio tape insert              205
6    10- Complaint                      215
7    11- Sullivan Wills Real Estate     236
8       Purchase and Sales Agreement
9    12- "For Sale" Flier for Former TGI  290
10      Friday's Restaurant
11   13- Internet Printout, LeCroy      291
12      Shopping Village For Lease
13          *   *   *   *   *
14          BARRY BARR, of lawful age,
15   having first been duly sworn, testified as
16   follows:
17           EXAMINATION
18   BY MR. STEWART:
19   Q.   Mr. Barr, my name is Chuck Stewart.  We
20   met before your deposition began.  I
21   represent Aronov and Amy Knudsen in the
22   lawsuit that you've brought against them,
23   and I'm going to ask you some questions

---

2  (Pages 2 to 5)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 6

1    today about your lawsuit, okay?
2  A.  Okay.
3  Q.  Have you ever given your deposition
4    before?
5  A.  Yes.
6  Q.  Okay. When did you give your deposition
7    before?
8  A.  Different lawsuits. A lawsuit that --
9    would you like for me to name the
10    lawsuits?
11  Q.  Please.
12  A.  A wrongful death lawsuit filed by the
13    Beasley firm against Celebrations, a
14    deposition where I sued State Farm, and
15    that's all that I recall.
16  Q.  Okay. Having given your deposition
17    before, you've probably heard what I'm
18    about to tell you, but each lawyer is
19    different on how they do depositions, so
20    I'll just tell you what I've said, and if
21    it's redundant, then I apologize to you.
22    I'm going to ask you some questions today.
23    Your answers will be under oath, so it's

Page 7

1    extremely important that you understand
2    the question that I ask you when I do,
3    okay?
4  A.  Yes.
5  Q.  If you don't understand the question, just
6    tell me and I'll try to rephrase it --
7    just by saying, Chuck, that's a dumb
8    question or I don't understand what you're
9    asking me or would you rephrase the
10    question -- just something to let me know
11    you didn't understand it, okay?
12  A.  Yes.
13  Q.  If you give an answer without stopping me
14    and telling me you don't understand
15    something, I'm going to have to assume
16    that you understood it, okay?
17  A.  Correct.
18  Q.  Okay. If you want to take a break, get
19    some water, walk around, smoke a
20    cigarette, place a phone call, anything
21    like that, you just let me know and I'll
22    be happy to stop at any time.
23  A.  Understood.

Page 8

1  Q.  If there's a question pending -- if I've
2    asked you a question, though, and you
3    haven't given your answer, I'll probably
4    ask you to go ahead and answer the
5    question or let me -- I may ask you to let
6    me finish a line of questioning before we
7    take a break, but I'll be more than happy
8    to stop.
9  A.  I understand.
10  Q.  Do you understand that the deposition
11    we're taking today is one that you have
12    the right to read and sign after it's
13    taken?
14  A.  Yes, sir.
15  Q.  Do you want to exercise that right?
16  A.  Yes, sir.
17  Q.  Do you understand that the deposition
18    you're giving today can be used against
19    you at trial, for cross-examination or any
20    other purpose?
21  A.  Yes.
22  Q.  Do you understand that you're subject to
23    the laws of perjury just as if you were

Page 9

1    testifying live in a courtroom?
2  A.  Yes.
3  Q.  How old are you?
4  A.  56.
5  Q.  What's your date of birth?
6  A.  1/29/52.
7  Q.  What's your social security number?
8  A.  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.
9  Q.  Are you married?
10  A.  Yes.
11  Q.  How long have you been married?
12  A.  Three years.
13  Q.  What's your wife's name?
14  A.  Kristen Thrasher Barr.
15  Q.  Is it Kristen with a K or a C?
16  A.  K.
17  Q.  K-R-I --
18  A.  -- S-T-E-N.
19      MR. GUY: Mr. Barr, you speak
20        kind of softly, so if you
21        would --
22      THE WITNESS: Speak up?
23      MR. GUY: As much as you can so

2100 Third Avenue North, Suite 960 * Birmingham, AL 35203
1-800-888-DEPO or 205-251-4200

Page 10

1          that I can hear down here.
2          THE WITNESS: Okay. Sorry.
3          MR. GUY: That's okay. If I say
4          something, just please don't
5          -- I don't mean to interrupt
6          you, but if I can't hear, I
7          might say something. Thank
8          you, though.
9          THE WITNESS: Okay.
10   Q.   Is Kristen Barr your first wife?
11   A.   No, sir.
12   Q.   Have you been married, then, to others?
13   A.   She's my third.
14   Q.   Third? Okay. Can you tell me the names
15        of your first and second wives?
16   A.   First wife, Peggy Sue Barr.
17   Q.   Okay. And your second wife?
18   A.   Clair Mise Barr.
19   Q.   Where do you live?
20   A.   500 Bristol, B-R-I-S-T-O-L, Court. That's
21        Montgomery, 36117.
22   Q.   And how long have you lived there?
23   A.   Eleven years.

Page 11

1   Q.   Where did you live before that?
2   A.   Where did I live before there? 500
3        Bristol Court; Arbor Station Apartments
4        when I first moved here.
5   Q.   Are those the only two places you've lived
6        in Montgomery?
7   A.   No. I had a home on Red Barn Lane; it's
8        in Carriage Hills.
9   Q.   Okay. Anywhere else you've lived in
10       Montgomery?
11   A.  No, sir.
12   Q.  When did you first move to Montgomery?
13   A.  In '93.
14   Q.  Had you ever lived in Montgomery before
15       1993?
16   A.  No, sir.
17   Q.  Okay. And in 1993, you first lived at
18       Arbor Station Apartments?
19   A.  Right. Arbor Station, then Red Barn for a
20       year and a half, and then moved to Towne
21       Lake.
22   Q.  Okay. Where did you live before
23       Montgomery?

Page 12

1   A.   Federal prison.
2   Q.   What federal prison?
3   A.   In Atlanta.
4   Q.   What were you in prison for?
5   A.   Drug possession with the intent to
6        distribute.
7   Q.   When were you convicted of that crime?
8   A.   '89.
9   Q.   Have you ever been convicted of any other
10       crimes?
11   A.  I've had a DUI.
12   Q.  One?
13   A.  Two, back in the '70s.
14   Q.  Any others? Those are the only three
15       convictions?
16   A.  Right.
17   Q.  Okay. And before you were in federal
18       prison in Atlanta, where did you live?
19   A.  I lived in Columbus, Georgia.
20   Q.  What was your address in Columbus?
21   A.  I don't recall.
22   Q.  What road was it on?
23   A.  I don't recall.

Page 13

1   Q.   How long did you live in Columbus,
2        Georgia?
3   A.   Often when I had a place -- because I had
4        a business in Columbus, and my wife at
5        that time was a flight attendant, and so
6        we lived in Atlanta and in Columbus.
7   Q.   Where did you live in Atlanta?
8   A.   Dunwoody.
9   Q.   What address?
10   A.  It's off Mount Vernon Road, and the road
11       doesn't even exist anymore. I couldn't
12       tell you.
13   Q.  Do you remember the name of the road at
14       the time?
15   A.  No.
16   Q.  How long did you live in Atlanta and in
17       Columbus?
18   A.  Approximately -- you know, that was -- I
19       was raised in Atlanta, so that was -- I
20       spent most of my life in Atlanta. And I
21       guess I was in Columbus about, you know,
22       back and forth for about seven or eight of
23       those years, approximately.

4 (Pages 10 to 13)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

| | Page 14 |
|---|---|
| 1 | MR. GUY: I'm sorry. Did you say |
| 2 | seven or eight? |
| 3 | THE WITNESS: Seven or eight, |
| 4 | right. |
| 5 | Q. Were you born in Atlanta? |
| 6 | A. Born in Phenix City -- Columbus, Georgia. |
| 7 | Q. In Phenix City or Columbus, Georgia? |
| 8 | A. Well, my understanding is that we lived in |
| 9 | Phenix City but they had to carry me |
| 10 | across to the hospital in Columbus. I |
| 11 | don't... |
| 12 | Q. So you grew up in Phenix City? |
| 13 | A. I left Phenix City when I was 6 and moved |
| 14 | to Atlanta. |
| 15 | Q. Did your father get transferred there? |
| 16 | A. Yes. |
| 17 | Q. What did he do? |
| 18 | A. Worked with Singer Company. |
| 19 | Q. The sewing machine company? |
| 20 | A. No, it's wholesale. |
| 21 | Q. And when you moved to Atlanta at 6, you |
| 22 | then attended Atlanta city schools or |
| 23 | public schools, private school? |

| | Page 15 |
|---|---|
| 1 | A. Public schools. |
| 2 | Q. Did you graduate from high school there? |
| 3 | A. Did not. |
| 4 | Q. Did you graduate from high school? |
| 5 | A. I joined the Marine Corps and got a GED. |
| 6 | Q. When did you join the Marine Corps? |
| 7 | A. '69. |
| 8 | Q. What did you do in the marines? |
| 9 | A. What was my MOS? |
| 10 | Q. Yes, sir. |
| 11 | A. 1381 combat engineer. |
| 12 | Q. When did you get out of the Marine Corps? |
| 13 | A. In '71. |
| 14 | Q. Were you honorably discharged? |
| 15 | A. Yes. |
| 16 | Q. Where were you separated? |
| 17 | A. Pardon? |
| 18 | Q. Where were you separated from the Marine |
| 19 | Corps? |
| 20 | A. In Camp Pendleton, California. |
| 21 | Q. And in 1971, what did you do? |
| 22 | A. Went to -- started college. |
| 23 | Q. Where did you start college? |

| | Page 16 |
|---|---|
| 1 | A. Went to West Georgia in Carrollton. |
| 2 | Q. And did you go continuously there? |
| 3 | A. No. I actually left and went down to |
| 4 | Disney World in Orlando. |
| 5 | Q. Okay. To work? |
| 6 | A. To work. |
| 7 | Q. Did you live in Orlando at the time? |
| 8 | A. Lived in Kissimmee. |
| 9 | Q. And how long did you work at Disney World? |
| 10 | A. One year. |
| 11 | Q. Why did you leave? |
| 12 | A. To go back to school, college. |
| 13 | Q. Were you fired? |
| 14 | A. No. |
| 15 | Q. When you went back to school, did you then |
| 16 | go back to Carrollton? |
| 17 | A. No, sir. Went to -- actually went to |
| 18 | Columbus College in Columbus, Georgia, and |
| 19 | then went to Auburn University, and then |
| 20 | went back and finished at Columbus |
| 21 | College. |
| 22 | Q. What year did you finish? |
| 23 | A. '79, '80. I'm not -- approximately. |

| | Page 17 |
|---|---|
| 1 | Q. Okay. So sometime in that eight years |
| 2 | between the time that you started college |
| 3 | and finished college -- eight or nine |
| 4 | years -- I assume you worked places too? |
| 5 | A. Worked -- yes, sir. I mean -- |
| 6 | Q. I mean, did you like go to college for a |
| 7 | year or work for a year or -- |
| 8 | A. I mean, even when I was in college -- I |
| 9 | mean, I was drawing the GI bill, but when |
| 10 | I was in college, I worked at gyms and |
| 11 | health spas and -- do you want specifics? |
| 12 | Q. Well, I'll get into that in a second, but |
| 13 | I guess I was just trying to -- you didn't |
| 14 | go full time to college for eight or nine |
| 15 | years? |
| 16 | A. Sometimes I'd take a full load and |
| 17 | sometimes I'd just... |
| 18 | Q. Okay. While you were living in Kissimmee, |
| 19 | did you go to college? |
| 20 | A. No, sir. |
| 21 | Q. So in 1971 you started college; you left |
| 22 | and went Disney World after about a year? |
| 23 | A. Right. |

5 (Pages 14 to 17)

Page 18

1  Q.   Okay.  You worked there for a year, so
2       that gets us up to about 1973?
3  A.   Correct.
4  Q.   Then you're saying you went to Columbus,
5       Georgia where you went to Columbus
6       College?
7  A.   Now, I'm not sure if that's exactly the
8       year.  It's approximately.
9  Q.   Okay.  Approximately 1973, you went to
10      Columbus College in Columbus, Georgia?
11 A.   Correct.
12 Q.   And where did you live when you were
13      there?
14 A.   In apartments called Cloister.
15 Q.   Okay.  How long did you go when you first
16      went to Columbus College?
17 A.   Two years.
18 Q.   And then did you quit going to college for
19      a while and work fully?
20 A.   No.  I was working at Olympic Health Spa
21      while I was...
22 Q.   Okay.  You said you went to college for
23      two years at Columbus College.  Was that a

Page 19

1       continual two years?
2  A.   Yes.
3  Q.   And were you taking a full load?
4  A.   Some quarters I was; some quarters I
5       wasn't.
6  Q.   And you were working at the health spa at
7       the time?
8  A.   Olympic Health Spa.
9  Q.   And is that in --
10 A.   Columbus, Georgia.
11 Q.   What were you doing at Olympic Health Spa?
12 A.   Started off as a -- putting people on
13      programs, and then wound up managing the
14      club.
15 Q.   What did you do next for employment?
16 A.   What did I do next?
17 Q.   Yes, sir, after you managed the Olympic
18      Health Spa in Columbus, Georgia?
19 A.   I worked for -- actually, I got a job with
20      Martin Theaters, and they gave me the
21      theater in Auburn called -- at the time it
22      was called the War Eagle Theater -- to
23      manage.

Page 20

1  Q.   And how long did you manage the War Eagle
2       Theater in Auburn?
3  A.   About a year and a half.
4  Q.   Why did you leave Olympic Health Spa?
5  A.   Because I wanted to go to a bigger
6       college.
7  Q.   So you left voluntarily?
8  A.   I asked -- applied for the job with Martin
9       Theaters.
10 Q.   Gotcha.  And was Martin Theaters located
11      in Columbus?
12 A.   That's their -- it's the Carmike Cinemas
13      now.
14 Q.   But that was their home office?
15 A.   Correct, still is.
16 Q.   And you worked with Martin Theaters for
17      about a year and a half before you stopped
18      working there?
19 A.   I had to return back to Columbus.  My
20      father had terminal cancer.
21 Q.   Where were you living in Auburn when you
22      lived there?
23 A.   At Ski Lodge Apartments.

Page 21

1  Q.   Is that the only place you lived in
2       Auburn?
3  A.   I lived under the drive-in screen that
4       Martin Theaters owned.  There was
5       apartments up under there.
6  Q.   Anywhere else in Auburn?
7  A.   That's it.
8  Q.   And your first stint there at Columbus
9       College, were you always living in the
10      Cloister Apartments?
11 A.   Yes, sir.
12 Q.   When you returned to Columbus to be with
13      your father, where did you live then?
14 A.   With my parents, because I had to help
15      take care of him.
16 Q.   And how long did you stay there with your
17      parents?
18 A.   Until I finished -- finished college and
19      my father passed away.
20 Q.   Did you work when you were living in
21      Columbus during this stint?
22 A.   Did I work in Columbus?
23 Q.   Yes, sir, during this stint when you were

6 (Pages 18 to 21)

Page 22

```
1         back taking care of --
2    A.   Yes, sir. I went back to work for Olympic
3         Health Spa.
4    Q.   And is that the only place you worked
5         until your father passed away?
6    A.   Yes, sir.
7    Q.   Did your father pass away before or after
8         you finished college?
9    A.   You know, it was right about the same
10        time, so I don't know exactly.
11   Q.   Okay. Where did you next work after this
12        stint with Olympic Health Spa?
13   A.   I'd have to think about it. I don't know
14        that I can even recall where I went. I'm
15        trying to think where my first job was
16        after college. It was -- I'm drawing a
17        total blank. I can't think.
18   Q.   What's the first job you recall after
19        finishing college?
20   A.   I went to work with -- I wound up buying
21        -- went to work with Country's Barbecue
22        and wound up buying Country's Barbecue in
23        Auburn, Alabama.
```

Page 23

```
1    Q.   How long did you work at Country's before
2         you bought it?
3    A.   It was about -- approximately a year.
4    Q.   Did you do anything other than work at
5         Country's Barbecue during the time you
6         were employed there?
7    A.   It's pretty much a full-time job.
8    Q.   Okay. How long did you operate the
9         Country's Barbecue before you got out of
10        that business?
11   A.   Until '89.
12   Q.   Until you went to prison?
13   A.   It was a forfeiture sale.
14            MR. GUY: Did you say what year
15        you started the Country's?
16            THE WITNESS: It was '82 when I
17        purchased it.
18   Q.   So from '82 to '89, that was the only
19        thing you did for employment?
20   A.   Right.
21   Q.   Were you there on a day-to-day basis
22        managing the business?
23   A.   Yes.
```

Page 24

```
1    Q.   And it was placed into a forfeiture sale
2         by the federal government?
3    A.   Federal government.
4    Q.   As a result of the drug conviction?
5    A.   Correct.
6    Q.   Had you owned it as a sole proprietorship?
7    A.   It was in a partnership.
8    Q.   And who was your partner?
9    A.   Tommy Sorrell, S-O-R-R-E-L-L.
10   Q.   And where does Tommy Sorrell live?
11   A.   Columbus, Georgia.
12   Q.   Did he also get convicted?
13   A.   No.
14   Q.   Was there an actual trial in your drug
15        conviction or was that a plea?
16   A.   Plea.
17   Q.   After you got out of federal prison, why
18        did you move to Montgomery?
19   A.   Well, also during this time when I had
20        Country's Barbecue, I also opened up a
21        restaurant in Columbus called Texas
22        Steakhouse of Alabama that also went into
23        forfeiture. And the reason I moved to
```

Page 25

```
1         Montgomery is because the -- I still owned
2         the rights to the name Texas Steakhouse of
3         Alabama, and the demographics I was
4         familiar with, because the two cities are
5         about the same size, and the demographics
6         are very similar.
7    Q.   What do you mean by demographics?
8    A.   Well, population, per capita income.
9    Q.   Did you own property in Montgomery?
10   A.   No, sir.
11   Q.   So --
12   A.   I came here and built a Texas Steakhouse.
13   Q.   Why Montgomery instead of Auburn?
14   A.   I just told you, the demographics. Auburn
15        --
16   Q.   Well, why not move back to Auburn?
17   A.   Auburn wasn't -- the demographics weren't
18        the same. You're looking at a town of
19        200,000 as opposed to a town of, you know,
20        a part-time student population of 15,000,
21        and...
22   Q.   Okay. Why didn't you start a Texas
23        Steakhouse of Columbus, Georgia?
```

7 (Pages 22 to 25)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 26

1  A.  There was already one there.
2  Q.  Okay. So that's the reason you moved to
3     Montgomery?
4  A.  Correct.
5  Q.  When were you married to Peggy Sue Barr?
6  A.  From -- I was 28 when we got married, so
7     you can subtract that, and it's whatever
8     -- late '70s, '80.
9  Q.  How long were you married to her?
10  A.  I was married to her for four years.
11  Q.  Where does she live?
12  A.  She lives, last I heard, in Pennsylvania.
13  Q.  Where in Pennsylvania?
14  A.  I have no clue.
15  Q.  What town did she live in last time you
16     knew where she lived?
17  A.  In Atlanta.
18  Q.  Okay. And then Claire Barr, when were you
19     married to her?
20  A.  '93, '94.
21  Q.  For those two years?
22  A.  One year.
23  Q.  One year. And where does she live?

Page 27

1  A.  Atlanta.
2  Q.  Is that where y'all lived when you were
3     married?
4  A.  No, sir. Lived here.
5  Q.  Is she from Montgomery?
6  A.  She's from Columbus.
7  Q.  Peggy Sue Barr, where was she from?
8  A.  Columbus.
9  Q.  So when you came here to build a Texas
10     Steakhouse, you were single?
11  A.  Yes, sir.
12  Q.  Did you start a corporation, or how did
13     you go about going into the Texas
14     Steakhouse business?
15  A.  Subchapter S.
16  Q.  Is there anybody else involved in the
17     Subchapter S corporation?
18  A.  Well, I was -- I had no money, so my
19     mother, Eustice Thompkins (phonetic), a
20     guy named John Wayne Thomas, I believe is
21     his last name, and a Megan Cia, C-I-A, I
22     believe --
23  Q.  C-A --

Page 28

1  A.  C-I-A. It's Chinese. It would be in the
2     corporate papers who put the money up.
3        MR. GUY: What did you say your
4        mother's name was?
5        THE WITNESS: Hazel. Hazel
6        Maybarn (phonetic).
7        MR. GUY: I missed somebody. I
8        thought you said -- before
9        you said Mr. Thomas.
10        THE WITNESS: Eustice Thompkins.
11        MR. GUY: Thompkins?
12        THE WITNESS: Thompkins.
13        MR. GUY: That was a person in
14        this --
15        THE WITNESS: Correct.
16        MR. GUY: Can you spell that?
17        THE WITNESS: I can make it
18        easier. He goes by Stacy.
19        Stacy Thompkins.
20        MR. GUY: Thank you. Sorry,
21        Chuck.
22        MR. STEWART: No problem.
23  Q.  How did you know Eustice Thompkins?

Page 29

1  A.  He worked at the -- for LongHorn
2     Steakhouse in Atlanta and then had gone to
3     work for the one in Columbus, the Texas
4     Steakhouse.
5  Q.  And John Wayne Thomas, how did you know
6     him?
7  A.  Was introduced -- when we were looking for
8     financing, was introduced to him.
9  Q.  Where does he live?
10  A.  Best of my knowledge, he's still in
11     Atlanta.
12  Q.  And Megan Cia, where is she from?
13  A.  Atlanta.
14  Q.  And how did you get to know her?
15  A.  Through John Wayne Thomas.
16  Q.  Who introduced you to John Wayne and
17     Megan?
18  A.  I don't recall.
19  Q.  Did you use a local bank?
20  A.  Compass Bank did a very small portion
21     then -- when there were some cost runovers
22     they did -- but everything -- it was paid
23     -- the people put up the money.

8  (Pages 26 to 29)

**2100 Third Avenue North, Suite 960 * Birmingham, AL 35203**
**1-800-888-DEPO or 205-251-4200**

Page 30

1  Q.  All right.  And what was the name of the
2      Subchapter S corporation?
3  A.  Texas Steakhouse of Alabama.
4  Q.  Inc.?
5  A.  I guess.
6  Q.  Is it still a corporation?
7  A.  Yes, it is.
8  Q.  Does it still operate any business?
9  A.  No.
10 Q.  Since moving to Montgomery, have you
11     started any other corporations?
12 A.  I don't have any other corporations.  I
13     have other -- I mean, I have a car wash
14     that's the same partnership, but no other
15     corporations.
16 Q.  The name of the partnership that owns the
17     car wash, what's it called?
18 A.  It's just Barry Barr and Grant Sullivan.
19 Q.  That's the name of the partnership?
20 A.  Well, that's --
21 Q.  Does it have a formal name, or is it just
22     the two people?
23 A.  It's just -- it's Woodmere Car Wash, and

Page 31

1      it's...
2  Q.  Is there a formal written partnership
3      agreement?
4  A.  No.  It's just an agreement.  I own 75
5      percent of it, and he owns 25.
6  Q.  So there's the one corporation that's not
7      currently operating; there's the one
8      partnership Woodmere Car Wash is run by.
9      Is there any other entity that you do
10     business through?
11 A.  Personally, that's it.
12 Q.  Has there been any other business through
13     which you've done business since living in
14     Montgomery?
15 A.  I mean, I have commercial rental property.
16 Q.  Anything else?
17 A.  I built and sold a tanning salon ten years
18     ago.
19 Q.  Anything else?
20 A.  That's all I recall.
21 Q.  So you've --
22 A.  You're talking about just in Montgomery?
23 Q.  Right now I'm just talking about just in

Page 32

1      Montgomery.  The commercial rental
2      property, is that just commercial rental
3      property that you own in your own name?
4  A.  Correct.
5  Q.  Do you have any partners in the commercial
6      rental property?
7  A.  Grant Sullivan.
8  Q.  How many pieces of commercial rental
9      property are we talking about today?
10 A.  Just one.
11 Q.  What is that?
12 A.  It's Woodmere.
13 Q.  And the tanning salon, what's the name of
14     it?
15 A.  Sunkissed Tans.
16 Q.  Where is it located?
17 A.  It was located at the shopping center on
18     the corner of Taylor and Vaughn, where
19     Sinclair's is.  It was there for -- in
20     fact, they just closed it.  It was there
21     for like ten years and they...
22 Q.  With respect to the commercial rental
23     property, the Woodmere property that you

Page 33

1      have, what role do you play in the
2      commercial rental property, if any?
3  A.  Collect the rent.  I mean, I don't even --
4      I mean, they just -- the building is
5      leased out and has been for -- ever since
6      we owned it.
7  Q.  Okay.  You don't do anything day to day
8      with the running of that?
9  A.  No.
10 Q.  Okay.  The tanning salon is out of
11     business and has been for a while?
12 A.  It's closed I think in the last year.  I
13     sold it about eight years ago.
14 Q.  The car wash.  How long have y'all been
15     operating Woodmere Car Wash?
16 A.  Six and a half years.
17 Q.  Have there ever been any other partners?
18 A.  No.
19 Q.  Do you have any day-to-day
20     responsibilities with respect to the
21     running of Woodmere Car Wash?
22 A.  We have a guy that takes care of it, and I
23     meet him over there once a week to go over

9 (Pages 30 to 33)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 34

1    everything.
2  Q.   What do you do on a daily basis for
3    employment?
4  A.   At one time I was doing condos down at the
5    beach till the hurricane hit, and then I
6    started buying hunting land. And now
7    everything's kind of at a standstill.
8  Q.   When you said you were doing condos at the
9    beach, what do you mean by that?
10 A.   Buying them, preconstruction.
11 Q.   And were you doing that through a
12    partnership?
13 A.   No, I did it -- well, I have -- Mike Morin
14    did one with me, and then I still have a
15    rental that Grant and I own.
16 Q.   And where is that?
17 A.   It's in San Destin, Baytowne Wharf.
18 Q.   The one that Mike Morin -- the guy you
19    used his name a second ago, where is he
20    from?
21 A.   He's from -- he lives here.
22 Q.   What does he do?
23 A.   Out in Towne Lake.

Page 35

1  Q.   Do what?
2  A.   Towne Lake.
3  Q.   He lives in Towne Lake?
4  A.   Right.
5  Q.   Does he work?
6  A.   He owns Woodmere Tavern.
7  Q.   Okay. When you were buying hunting land,
8    were you buying it with anyone?
9  A.   No, I bought it personally.
10 Q.   Where did you buy?
11 A.   Coosa, Bullock County, Lowndes County.
12 Q.   Were you developing land any or just
13    buying it and leasing it?
14 A.   Just buying it to resell.
15 Q.   To resell? And that was in your own name?
16 A.   Correct.
17 Q.   Since moving to Montgomery, have you done
18    anything else to earn income?
19 A.   No.
20 Q.   Do you own any property from running the
21    businesses, other than what we've talked
22    about?
23 A.   Any other businesses?

Page 36

1  Q.   Yeah.
2  A.   No.
3  Q.   Do you own any other property, other than
4    what we've already talked about?
5  A.   Let me go through the properties that I
6    own. Is that what you'd like for me to
7    do?
8  Q.   Yeah.
9  A.   I just sold the 40 acres in Coosa; I've
10    got 183 acres in Bullock; I have 63 acres
11    in Bullock; and I have 100 acres in
12    Lowndes County. I have my house in Towne
13    Lake, and, of course, the commercial that
14    I told you about, a building on Woodmere
15    and the car wash.
16 Q.   Where do you bank?
17 A.   Sterling Bank.
18 Q.   How long have you banked at Sterling Bank?
19 A.   I guess about five years now.
20 Q.   Is that for both personal and business?
21 A.   Correct.
22 Q.   Before Sterling Bank where did you bank?
23 A.   SouthTrust, personal and business.

Page 37

1  Q.   How long did you bank with SouthTrust?
2  A.   From the time I moved here, from '93.
3  Q.   To five years ago?
4  A.   Right.
5  Q.   Any other places that you've banked other
6    than those two banks since 1993?
7  A.   We have a loan through a bank in Opelika
8    that was Farmers Emergence, who's been
9    bought out now by RCB or somebody; I don't
10    know who it is. That's who the car wash
11    is financed through.
12 Q.   Okay. Any others?
13 A.   That's it.
14 Q.   Okay. Other than your wife, do you have
15    any relatives that live in Alabama?
16 A.   Yes.
17 Q.   Many?
18 A.   My father's family was from Brundidge,
19    Alabama.
20 Q.   And are they all Barr?
21 A.   Barrs.
22 Q.   Any other last names?
23 A.   Hutto.

10  (Pages 34 to 37)

Page 38

1    MR. GUY: I'm sorry, what did you
2    say? Hutto?
3    THE WITNESS: Hutto.
4  Q.  Any other last names of relatives in
5    Alabama?
6  A.  That's the only two I'm aware of.
7  Q.  Okay. You said that you had been a party
8    to two lawsuits, one a wrongful death
9    lawsuit that was filed by the Beasley firm
10   against Celebrations, and one where you
11   sued State Farm. Was the wrongful death
12   lawsuit filed here in Montgomery County?
13 A.  Correct.
14 Q.  And when was that filed?
15 A.  I'd have to look at the dates.
16 Q.  Approximately when was it?
17 A.  Seven, eight years ago. It wasn't -- they
18   waited two years, until the last day to
19   file it, and then it went on for two years
20   after that.
21 Q.  And was it ultimately settled, or did it
22   go to trial?
23 A.  I won.

Page 39

1  Q.  It went to trial?
2  A.  It went to trial and I won.
3  Q.  Who represented you in that case?
4  A.  Dan Taliaferro.
5  Q.  You said your deposition was taken?
6  A.  Correct.
7  Q.  Who took your deposition from the Beasley
8    firm?
9  A.  You know, I take that back. I don't know
10   if they ever did a depo with me. And I'm
11   -- in that. There were so many
12   depositions that went on. I'm not even --
13   I'm not positive. I can't recall if, you
14   know -- I'll just have to say I'm not
15   positive they did that, but I mean, it
16   went on for two years and there was a lot
17   of depositions in it. I take that -- I
18   mean, they had to.
19 Q.  Okay. Do you recall who the lead lawyer
20   was over at the Beasley firm in your case?
21 A.  Les -- Les Pittman.
22 Q.  Les Pittman, okay. And then the State
23   Farm lawsuit, when was that filed?

Page 40

1  A.  Three years ago.
2  Q.  Was that on account of hurricane damage?
3  A.  Hail damage.
4  Q.  Hail damage?
5  A.  Uh-huh.
6  Q.  Where was it filed?
7  A.  Beasley filed it for me.
8  Q.  Where was it filed, here in Montgomery?
9  A.  Here.
10 Q.  Is it still pending?
11 A.  We won it.
12 Q.  And by winning it, what do you mean?
13 A.  It settled. It was --
14 Q.  Did it actually go to trial?
15 A.  No, it didn't go to trial; they just
16   settled with us.
17 Q.  And who was your lawyer over that Beasley
18   firm?
19 A.  Clint Black? Is that his name?
20 Q.  It's not Clint Black, but I know who
21   you're talking about.
22   MR. QUINN: That's a country
23   music singer.

Page 41

1  Q.  Clint Carter?
2  A.  Carter, yes.
3  Q.  Do you remember who represented State Farm
4    in that case?
5  A.  I thought he did.
6    MR. GUY: Me?
7    THE WITNESS: Yeah.
8    MR. GUY: No.
9  Q.  David Allred?
10 A.  Their office was right next door to
11   Beasley's down there.
12 Q.  Okay. Nix, Holtsford, then, at the time,
13   wasn't it?
14   MR. QUINN: It was somebody that
15   looked like you.
16   MR. GUY: That's not a good
17   thing. Careful.
18   THE WITNESS: I really thought it
19   was you.
20   MR. GUY: No, not me.
21 Q.  Well, we'll move on.
22   MR. GUY: Nix, Holtsford does
23   State Farm.

11 (Pages 38 to 41)

Page 42

1      MS. KNUDSEN: Rushton, Stakely
2         does too.
3      MR. STEWART: It would be Mike
4         Beers, don't you think, or
5         Mike Jackson?
6      MR. GUY: I don't know.
7      MR. QUINN: Those names don't
8         ring a bell?
9      THE WITNESS: No, sir.
10  Q.  That's okay. Any other lawsuits that
11      you've filed?
12  A.  That I filed?
13  Q.  Yes, sir.
14  A.  No.
15  Q.  Any other lawsuits that any business of
16      yours has filed?
17  A.  I mean, there's been lawsuits filed. One
18      was filed against -- I don't think it was
19      ever filed. We just -- I looked at the
20      video and settled it. We gave -- and I
21      couldn't even tell you who the guy was.
22      Dan handled that also, and hopefully he
23      would have the files on that. We just

Page 43

1      gave him a $5,000 settlement. There was
2      never a lawsuit filed or anything.
3   Q.  What was the allegation in the lawsuit?
4      It was against Celebrations?
5   A.  Against one of the security guys.
6   Q.  Okay. For what?
7   A.  For -- you know, just that he was -- had
8      injured him.
9   Q.  And how was there a film of it?
10  A.  Because I have 15 cameras inside the
11      business.
12  Q.  Tell me about the cameras that were inside
13      the business. Did they record --
14  A.  Absolutely.
15  Q.  And did you keep the recordings?
16  A.  For 30 days.
17  Q.  Do you still have any of the recordings?
18  A.  Well, obviously, we've been closed for a
19      year, so we have no need for them.
20  Q.  Did you destroy the recordings?
21  A.  We threw all the tapes away.
22  Q.  Do you have any tapes left?
23  A.  No.

Page 44

1   Q.  How long have you been closed?
2   A.  April 1 made one year.
3   Q.  April 1, 2007?
4   A.  Correct.
5   Q.  And when is it that you destroyed the
6      tapes?
7   A.  When we were -- they -- we had 30 days to
8      get out. During -- sometime during April,
9      we threw -- when I was cleaning the
10     building out, we just threw everything in
11     the dumpster.
12  Q.  Is there anybody, whether it's Dan
13     Taliaferro or Beasley, Allen, that would
14     have tapes of activities that took place
15     in Celebrations while you were in
16     business?
17  A.  It's possible.
18  Q.  If you come across any tapes, we'd ask you
19     to preserve them and turn them over to
20     your lawyer, okay?
21  A.  I'd love to.
22  Q.  Okay. Other than the threatened lawsuit
23     against the security guy for injuring the

Page 45

1      patron at Celebrations, were there any
2      other threatened lawsuits?
3   A.  No.
4   Q.  Were there any other settlements that were
5      paid to anybody by Celebrations?
6   A.  Not that I recall.
7   Q.  Was Celebrations a corporation?
8   A.  It was d/b/a.
9   Q.  And what was it?
10  A.  Texas Steakhouse of Alabama, d/b/a
11     Celebrations.
12  Q.  And did Texas Steakhouse of Alabama have
13     liability insurance?
14  A.  Yes.
15  Q.  Who with?
16  A.  We were required to.
17  Q.  Who did you have insurance with?
18  A.  You know, I don't recall. I don't know.
19     We had -- the Belcher Agency handled some
20     of the insurance. Troy Campbell handled
21     -- he might have had the parking lot
22     liability. Once again, when we were filed
23     -- a wrongful death lawsuit is filed

12  (Pages 42 to 45)

Page 46

```
 1        against you, it doesn't matter whether you
 2        win or not; you can no longer -- or you're
 3        no longer deemed insurable for liquor
 4        liability, so you have to put up a
 5        $100,000 bond, so you really -- they
 6        require you, even though you did not lose
 7        the lawsuit -- imagine that -- you still
 8        have to -- it's called self-insurance.
 9    Q.   Is it just the first 100,000 that's
10        self-insured or --
11    A.   100,000 is all you have to put up.
12    Q.   Okay. And you put it up with the state?
13    A.   It's -- all you have to do is have a
14        letter from your accountant showing that
15        you have assets of 100,000, and that has
16        to be filed with the ABC Board.
17    Q.   Okay. So was the liquor license on file
18        with the ABC Board in the name of Texas
19        Steakhouse of Alabama?
20    A.   I'm not sure.
21    Q.   Okay. It would have been either Texas
22        Steakhouse of Alabama or Celebrations?
23    A.   D/b/a Celebrations.
```

Page 47

```
 1    Q.   Okay. The liquor license was not in your
 2        name personally?
 3    A.   No.
 4    Q.   Is that right?
 5    A.   Correct.
 6    Q.   Did anybody run Celebrations with you?
 7    A.   I never -- well, you want the names of the
 8        managers that we've had over the years or
 9        --
10    Q.   No, I'm not asking for the names of the
11        managers, but was there anybody else that
12        -- some other company or individual that
13        you partnered with, with your corporation,
14        anything like that?
15    A.   No.
16    Q.   All of it was run through Texas Steakhouse
17        of Alabama?
18    A.   Correct.
19    Q.   Okay. Your insurance was through the
20        Belcher Agency or Troy Campbell --
21    A.   That's the only two I recall. I don't --
22        that I saw checks written to. One of them
23        would have been a workman's comp policy,
```

Page 48

```
 1        and one of them would have been the
 2        liability.
 3    Q.   Okay. Does Troy Campbell live here in
 4        town?
 5    A.   Here or Prattville. He's local, yes.
 6    Q.   And is it Troy Campbell d/b/a Campbell
 7        Insurance Agency?
 8    A.   He's a broker. I mean, I've got his
 9        business card still; it says Troy Campbell
10        and broker.
11    Q.   Where are the corporate records of Texas
12        Steakhouse?
13    A.   In a warehouse.
14    Q.   Here in town?
15    A.   Uh-huh.
16    Q.   Is that a yes?
17    A.   Yes.
18    Q.   What warehouse is that?
19    A.   Out on Taliaferro Drive.
20    Q.   Is that related to Dan Taliaferro?
21    A.   No.
22    Q.   Is there a name of the warehouse? Does it
23        have a name?
```

Page 49

```
 1    A.   It's owned by Frank Thomas.
 2    Q.   Do you personally have any licenses in
 3        your name?
 4    A.   What kind of license?
 5    Q.   Any kind of license?
 6    A.   I have a driver's license.
 7    Q.   Other than a driver's license?
 8    A.   No.
 9    Q.   Have you ever been licensed here in the
10        State of Alabama by some other entity
11        other than the department of public
12        safety?
13    A.   No.
14    Q.   Tell me about the setup there at
15        Celebrations.
16            MR. GUY: Chuck, before you get
17                into that, I sure need a
18                break.
19            (Brief recess.)
20    Q.   Let me go back and clear up something that
21        I thought I was confused on and found out
22        that others were too. Did Texas
23        Steakhouse of Alabama ever operate a
```

Page 50

1    business that was a Texas Steakhouse?
2  A.  Yes.
3  Q.  Okay.  And where was the Texas Steakhouse
4    located?
5  A.  Where Celebrations is.  We've been there
6    14 years.
7  Q.  Okay.  So Texas Steakhouse operated for a
8    while and then Celebrations became --
9  A.  Sports Rock.
10  Q.  Sports Rock.  Okay.  Let me do that, then.
11  A.  Texas Steakhouse of Alabama; Texas
12    Steakhouse of Alabama d/b/a Sports Rock.
13  Q.  Sports Rock?
14  A.  Yeah.  And then we remodeled into Texas
15    Steakhouse d/b/a Celebrations.  And that
16    covers the 14 years.
17  Q.  How long was it a Texas Steakhouse?
18  A.  Two and a half years, I guess.
19  Q.  And how long was it Sports Rock?
20  A.  Approximately four, four and a half years.
21  Q.  And Celebrations?  The remainder of the
22    14?
23  A.  The last seven years, whatever it is.

Page 51

1  Q.  Okay.  During all that time, those 14
2    years -- and you gave me the breakdown of
3    the ownership --
4  A.  Correct.
5  Q.  Was it always the same?
6  A.  No.
7  Q.  Tell me how the ownership changed.
8  A.  As we -- we bought people back out, as we
9    -- with -- with profits.
10  Q.  And tell me how the course of that went,
11    who you bought out first and so forth.
12  A.  I think the first person we bought out was
13    Stacy Thompkins.
14  Q.  Do you remember when that was?
15  A.  It was within a year.  I'd say '94.
16  Q.  And then who else did you buy out?
17  A.  John Wayne, and that was within the second
18    year.  And then Megan.  I'm not -- I
19    couldn't give you the date on that.
20  Q.  But she was next?
21  A.  Yes.
22  Q.  Was that within the first five years?
23  A.  Probably a little longer than that.

Page 52

1  Q.  Did that just leave your mother?
2  A.  Yes.
3  Q.  And is your mother still -- does she still
4    have an ownership interest?
5  A.  My mother just passed away.
6  Q.  When did she pass away?
7  A.  Last year.
8  Q.  I'm sorry.  Up until the time she passed
9    away?
10  A.  She owned 100 percent.
11      MR. GUY:  I'm sorry.  Did you say
12      she owned 100 percent?
13      THE WITNESS:  Correct.
14  Q.  Now, did she live in Columbus, Georgia all
15    during this time?
16  A.  She -- I have two brothers.  She lived in
17    Columbus, but she would stay part time in
18    Dawsonville with my older brother, and
19    then she would stay at my house part time,
20    so she just kind of went back and forth,
21    but her permanent address I guess would
22    have been in Columbus.
23  Q.  And your other brother lives where?

Page 53

1  A.  Dawsonville.
2  Q.  So both of your brothers live in
3    Dawsonville?
4  A.  No.  Dawsonville and then my other brother
5    lives in Columbus.
6  Q.  Have they ever lived inside Alabama?
7  A.  Well, my older brother was born in -- we
8    were all born in Phenix City, I guess.
9  Q.  That's right.  Ever since graduating from
10    high school, have either one of them lived
11    in --
12  A.  No, no.
13  Q.  Do you have any sisters?
14  A.  No, just two brothers.
15  Q.  What was your mother's name?
16  A.  Hazel May.
17  Q.  That's right, you told me that.  Did she
18    ever participate in physically operating
19    Texas Steakhouse?
20  A.  No.
21  Q.  Or Sports Rock or Celebrations?
22  A.  No.
23  Q.  Okay.  When you said, we bought people out

14 (Pages 50 to 53)

Page 54

1    with the profits, you were talking about
2    your mother there, and you?
3  A.   Right.
4  Q.   But you didn't have an ownership interest
5    in the business, did you?
6  A.   My mother put the money up.
7  Q.   Were you paid a salary?
8  A.   Yes, consulting fee.
9  Q.   Did you work at Texas Steakhouse
10    throughout the entire 14 years?
11  A.   I worked -- yes.
12  Q.   Physically there at the site, day in, day
13    out?
14  A.   Not necessarily day in and day out,
15    because, as I've told you, I did other
16    things too.
17  Q.   At the beginning did you work there every
18    day?
19  A.   Yes.
20  Q.   And when did it change that you quit
21    working there every day?
22  A.   When I became too old to do the late night
23    thing.

Page 55

1  Q.   When was that?
2  A.   When we were doing the Sports Rock thing,
3    it would go till 2 o'clock in the morning,
4    and I just couldn't do it, so I did the
5    daytime things. I'd go up and do the
6    ordering and take the deliveries and then
7    had a manager that did the night.
8  Q.   And if I understand you correctly, that
9    started at the time that you started the
10    Sports Rock place?
11  A.   Correct.
12  Q.   And while the business was called
13    Celebrations, did you have the same
14    schedule where you did the day-to-day
15    things like ordering and stuff?
16  A.   Yes.
17  Q.   Was there ever a time where you were just
18    an absent owner and other people ran it
19    for you?
20  A.   I've kept -- what do you mean by absent
21    owner? I've always done the numbers, the
22    P&Ls, and kept up with the daily
23    operations. I mean, if something moved

Page 56

1    one percentage point, then I knew about
2    it, and so that's -- you know, that was
3    what my job was. I spent at least two
4    days a week going over what we did, what
5    we did wrong that weekend, what we did
6    right, what we could improve on. If we
7    had a problem with a percentage, you know,
8    then we had to just -- we had to find it,
9    because in the bar business, you work the
10    margins and you work on -- you won't last
11    long.
12  Q.   When you say one percent, you're talking
13    about income, if you were off one
14    percent --
15  A.   I don't understand the question. Well, we
16    have numbers that we're going to -- our
17    goal is to, say, to do a 21 to 22 percent
18    liquor cost, and all of a sudden it moves
19    and it's up 26, 27 percent, then usually
20    you have a problem with an employee.
21  Q.   Pouring too much liquor or stealing from
22    you?
23  A.   Or some going out the back door.

Page 57

1  Q.   Okay. So you monitored that as well as
2    profits from food and so forth?
3  A.   If I had not, it would not have been there
4    14 years.
5  Q.   Okay. And then you said you had managers
6    that came in and ran the place at night?
7  A.   Right.
8  Q.   How many managers did you have at
9    Celebrations all total?
10  A.   Always one on duty.
11  Q.   Okay. And how many different managers did
12    you have at Celebrations?
13  A.   Over a period of seven years?
14  Q.   Yes, sir.
15  A.   Two.
16  Q.   Who were they?
17  A.   Vince Saele, and my wife.
18  Q.   Vince Saele, was he your first manager?
19  A.   He was there all the way back. He was
20    there five years. He was there for Sports
21    Rock.
22  Q.   And where is he now?
23  A.   Gators.

15 (Pages 54 to 57)

Page 58

1  Q.  And your wife, when you talk about her,
2      you're talking about your current wife?
3  A.  Correct.
4  Q.  Did she become the manager after you got
5      married or before?
6  A.  Beforehand.
7  Q.  And these managers ran the shop from the
8      time you left until closing; is that
9      right?
10 A.  Sorry?
11 Q.  Did they run it from the time you left the
12     business during the day to closing?
13 A.  Right.
14 Q.  Okay.  So you were actually operating as
15     the manager during the daylight hours, and
16     then you had a night manager as well?
17 A.  Correct.
18 Q.  And then how many other employees did you
19     have at Celebrations?
20 A.  Well, when we first remodeled to
21     Celebrations, we did a '70s/'80s thing,
22     and we were open, I guess, five, six days
23     a week -- I don't know, approximately

Page 59

1      five, six days a week.  So, of course, the
2      amount of employees we had then -- at the
3      end when we were only operating two nights
4      a week on Friday and Saturday, we had a
5      total of about 24, 25 employees.
6  Q.  Okay.  At some time, Celebrations changed
7      its theme from a '70s/'80s place to
8      something else?
9  A.  It just -- the '70s/'80s theme ran out,
10     and we remodeled and went to a Top 40
11     format.
12 Q.  And how long did the Top 40 format last?
13 A.  Well, it -- couple years.
14 Q.  Did you then remodel and go to another
15     format?
16 A.  Never remodeled.  It's just as the
17     demographics in the one-three-five mile
18     radius there; it changed.  It became from
19     a predominantly white bar to 50/50, and
20     then it reached the point that we decided
21     from a business point of view to go to a
22     hip hop format, which caters to the black
23     community.

Page 60

1  Q.  And is that what it was when the bar was
2      closed?
3  A.  Correct.
4  Q.  So there were actually, I guess, three
5      different types of Celebrations --
6      '70s/'80s, Top 40, and then hip hop?
7  A.  Correct.
8  Q.  The '70s/'80s period, how many years of
9      the Celebrations' seven years was it
10     '70s/'80s?
11 A.  Each one of them was about -- you know,
12     two, two and a half years was about what
13     each one of them...
14 Q.  Okay.  Other than you and your manager,
15     was anybody else involved in running
16     Celebrations during its seven years?
17 A.  No.
18 Q.  How many employees did you have during the
19     Top 40 format?
20 A.  I don't recall.  I'd have to look at my
21     records.
22 Q.  Would it have been more than the 24 to 25?
23 A.  During the '70s and '80s?

Page 61

1  Q.  Well, you said you had 24 to 25 during the
2      '70s --
3  A.  No.  I said at the end, on two nights a
4      week we had 20 -- but you're
5      understanding, that was -- that's
6      security, you know, that's everybody.  But
7      we were only open two nights a week,
8      whereas on the '70s and '80s, when we
9      started there, we were open five or six
10     nights a week, so we would, of course,
11     have more people.  And in the bar
12     business, you have a lot of people that
13     work one, two nights, part time, so it's
14     not like full time.
15 Q.  So you're saying when you first opened,
16     you were open five or six nights a week
17     and you went down to two nights?
18 A.  Correct.
19 Q.  When you went to the Top 40 format, did
20     you go back to being open more nights a
21     week?
22 A.  It was still open five or six nights a
23     week.

16 (Pages 58 to 61)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 62

1  Q.  Well, did I misunderstand you, then?  Was
2      it two nights a week you started off and
3      you later went to five or six?
4  A.  No.  The '70s/'80s was five or six nights
5      a week.  When we remodeled and did the Top
6      40, it was still five or six nights, then
7      we eventually went down to four nights a
8      week.  We did a comedy night; we did a
9      band night on Thursday, and then we did a
10     Friday and Saturday dance night.  And then
11     when we went to the hip hop thing, by that
12     time, we had gotten down to two nights a
13     week.
14 Q.  Strictly dance, Friday and Saturday?
15 A.  Strictly dance.
16 Q.  Did the number of employees go down when
17     you moved down the number of nights per
18     week?
19 A.  Of course.
20 Q.  And can you give me an estimate of how it
21     varied for the 24 to 25?
22 A.  I don't understand the question.
23 Q.  When you went down to two nights a week,

Page 63

1      you said you had 24 or 25 employees
2      working there, including security?
3  A.  Correct.
4  Q.  And I'm asking did it ever go below the 24
5      to 25.
6  A.  I don't -- I don't know, without looking
7      at the records.
8  Q.  And those are the records that you've got
9      in the warehouse?
10 A.  Correct.
11 Q.  Are any of your records stored on a
12     computer?
13 A.  No.
14 Q.  Were they ever?
15 A.  No.
16 Q.  Are they just --
17 A.  I mean, they were all put on a computer
18     and printed out on spreadsheets.  I'm not
19     even sure if we have the computer anymore.
20     Everything was printed out and was put --
21     whatever we were required -- my accountant
22     told me whatever we were required -- the
23     business -- we were shutting the business

Page 64

1      down.  The only reason the corporation is
2      still there intact was to make sure there
3      were no outstanding debts.  You know,
4      every now and then something will come in,
5      so that's why we've kept the corporation
6      open.  We just did the last tax return on
7      it.
8  Q.  Okay.  Had you ever run a bar before
9      getting into Celebrations and Sports Rock?
10 A.  A bar in Columbus back in -- I don't even
11     know.  It's when I was at -- when I was in
12     college over there, a bar called Rumors.
13 Q.  What type of format was Rumors?
14 A.  That was -- it was the '70s and '80s, so I
15     guess it was Top 40, '70s and '80s.
16 Q.  And who actually ran Rumors?
17 Q.  Who ran it or who owned it?
18 Q.  Owned it.
19 Q.  Pardon?
20 Q.  Who owned it?
21 A.  A guy named Dana Horn.
22 Q.  Does he live in Columbus?
23 A.  I haven't seen him in 20 years.

Page 65

1  Q.  Any other bars that you were involved in
2      running or operating?
3  A.  Just when I was at Disney World.  That's
4      where I learned how to bartend.
5  Q.  Okay.  Let me clear up one other thing
6      that I didn't understand very well.  The
7      Woodmere property that you said that you
8      own --
9  A.  Correct.
10 Q.  You own the entire strip mall?
11 A.  No, I own the building next door.
12 Q.  The building next door to what?
13 A.  Called the Smoke Samurai or something -- I
14     don't know -- and then the car wash.  Both
15     of those are adjacent to the strip.  The
16     strip mall is owned by Mike Morin.
17 Q.  Okay.  Before this lawsuit was filed, had
18     you ever claimed to have been the victim
19     of some type of discrimination?
20 A.  No.
21 Q.  Help me understand who --
22 A.  I take that back.  I need to rephrase
23     that.  Did I ever file anything saying

17  (Pages 62 to 65)

Page 66

1    that I was discriminated against, no. Did
2    I make statements about -- after going --
3    changing my format to a hip hop format and
4    having the -- you know, being treated
5    different, yes. I made statements to
6    media that I was definitely -- and I was
7    asked then, was it a race thing, and I
8    said absolutely. I mean, I've got 14
9    years worth of records and the fire
10   department was in my place more in six
11   months than it had been the previous 13
12   years.
13 Q.  Okay. Other than with Celebrations, did
14   you ever claim that you were the victim of
15   discrimination?
16 A.  No.
17 Q.  So you're saying the very first time you
18   claimed victim of discrimination is when
19   you went to the hip hop format?
20 A.  Correct.
21 Q.  Tell me what you mean by that.
22 A.  Hip hop?
23 Q.  No, discrimination -- you were the victim

Page 67

1    of discrimination. What do you mean you
2    were the victim of discrimination when you
3    went to the hip hop format?
4 A.  Well, it was very obvious that after being
5    there 14 years and all of a sudden, when
6    we went to a black format -- and just like
7    I said, you know, everything was treated
8    differently. I mean, I had a city
9    councilman, you know, tell me I needed to
10   change my format to a country western.
11 Q.  Who was that city councilman?
12 A.  Glenn Pruitt.
13 Q.  You said the --
14        MR. QUINN: Tell him all of it.
15        Give him the history.
16 Q.  You said the fire department came in your
17   store more in the two and a half years
18   than in the 13 years combined?
19 A.  In six months -- and if I'm not mistaken,
20   I still have all these files also. But
21   not one time in 14 years was I ever
22   overcrowded or had a violation.
23 Q.  So the fire department coming in was just

Page 68

1    to check on overcrowding?
2 A.  Correct. You have, you know, to make sure
3    your sprinklers are up to code, fire
4    extinguishers are up to code. They have a
5    list they have to check.
6 Q.  And how do you claim that was
7    discrimination?
8 A.  I just told you they were in there more in
9    six months than they had been in the
10   previous 13 years.
11 Q.  Did they say anything, or is it just the
12   fact that they came more often when you
13   were in the hip hop format that makes you
14   feel like that was some type of
15   discrimination?
16 A.  Well, I think it kind of speaks for
17   itself. I mean, I don't know what you
18   want me to say. I don't understand your
19   thought on that at all.
20 Q.  I'm trying to understand your thought on
21   that. You're the one that said you were
22   the victim of discrimination and said that
23   the fire department came in more within

Page 69

1    six months than they did in the entire
2    history. I'm trying to understand why
3    just the fact that the fire department
4    comes to your operation after you change
5    formats, that constitutes some type of
6    discrimination. That's what I'm asking.
7 A.  Well, with an additional ten police cars
8    sitting in the parking lot, pulling
9    everybody out of their cars checking their
10   driver's licenses -- it was a combined --
11   you know, it's fire department, police
12   department. You know, the fire department
13   would show up and they'd have three or
14   four policemen with them and seal off the
15   exits and march everybody outside and do a
16   count, and I wouldn't be over. And it's
17   just disruptive to your business. I mean,
18   they put 500 people out the door, and then
19   tell everybody, okay, we made a mistake
20   and you can go back in. I mean, do you
21   not think that would be disruptive to your
22   business? And it hadn't happened in the
23   13 years before.

18 (Pages 66 to 69)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 70

1  Q.  Did you record this type of conduct
2      anywhere?
3  A.  Every bit of it.
4  Q.  How did you do that?
5  A.  It's on cameras and everything.
6  Q.  Did you save any of those films?
7  A.  No.
8  Q.  Did you write down the times that you feel
9      like the police was out there or the fire
10     department was out there in an unjustified
11     manner?
12 A.  We would have to check with my attorney
13     that was handling all that -- and that's
14     Wayne Sable (phonetic) -- and see if he's
15     got any files on that.
16 Q.  Is that to say that you gave Wayne Sable
17     all those files?
18 A.  At one time he had -- I mean, we -- this
19     was a year-long...
20 Q.  Year-long?
21 A.  It was an ongoing thing. I mean, it
22     was...
23 Q.  Well, my question was, did you give Wayne

Page 71

1      Sable your files?
2  A.  I don't recall if he has them or not.
3  Q.  Do you have them?
4  A.  I don't recall if I have them or not.
5  Q.  If you have them, they're in the
6      warehouse?
7  A.  I moved everything out of the business,
8      and I would be glad to bring them to you
9      if they're in my warehouse.
10     MR. QUINN: If they're relevant.
11     MR. STEWART: Well, they may be;
12        that's what I'm trying to
13        figure out.
14 Q.  So going back to my original question as
15     we went down this line, did you make notes
16     or keep records of the times that the fire
17     department came there --
18 A.  Absolutely. I documented every single
19     thing.
20 Q.  -- that the police came by?
21 A.  Yes.
22 Q.  You documented all that?
23 A.  Yes.

Page 72

1  Q.  Did you document the statement by the city
2      councilman?
3  A.  Document it how?
4  Q.  That's what I'm asking. I haven't even
5      gotten there yet.
6  A.  I mean, how do you document that? I mean
7      -- yeah, I went on a black talk show. A
8      lady called me up and asked me about it,
9      and I told her yeah, that I was told that
10     I needed to go to a country western
11     format, and after being there -- you know,
12     I've been on both sides of -- from
13     predominantly white where blacks wouldn't
14     even come to that side of town to 50/50
15     and then where it was predominantly black,
16     and I've seen both sides of the spectrum.
17     And I just happen to feel that
18     African-Americans have just as much right
19     to have a nice place to go to as whites
20     do.
21 Q.  Okay. My question was about
22     documentation. Let me ask it a different
23     way. Did you keep running notes of events

Page 73

1      that you thought were wrongful by the
2      city?
3  A.  We kept a log, a manager's log of
4      everything. And once again, as to where
5      that is, I would have to see if I can
6      locate it or see if Wayne Sable has it.
7  Q.  Okay. Anything other than the manager's
8      log?
9  A.  Well, you know, all the police, or anytime
10     the fire department comes, they have to
11     fill out a form, you know, and if there's
12     any infractions or whatever, so they give
13     you a copy of it. I had 14 years of
14     those. I had -- ABC, the only infraction
15     I ever had in 14 years with the ABC was
16     two bottles of the same kind of liquor
17     being opened up behind the bar. And let's
18     see. The police department, you know,
19     when they -- when they came up and there
20     was -- you understand there was three
21     other white bars that operated in the same
22     -- Kokopelli's, Gators, and Head on the
23     Door. And one night they shut

19 (Pages 70 to 73)

Page 74

1　　　Celebrations down, and we asked the
2　　policeman why the rest of the bars
3　　wouldn't be shut down, and he said because
4　　the perpetrator was black.
5　Q.　The police officer said that?
6　A.　Yes. And so our question was, are you
7　　saying that blacks do not go in these
8　　other bars. And anyway, they -- yeah, we
9　　had all that written in the log books and
10　　stuff like this, and I really hope that I
11　　still have the log books, because I'd like
12　　for you to see them.
13　Q.　Okay. The police officer who made the
14　　comment about the reason you were being
15　　shut down was because the perpetrator was
16　　black, do you have his name written down
17　　anywhere?
18　A.　No. He never came back to the front.
19　　When the manager questioned him about,
20　　what do you mean by that, then he -- and
21　　all it was, was a black guy had grabbed
22　　somebody's purse in the parking lot, and
23　　they caught him and...

Page 75

1　Q.　Go ahead.
2　A.　That's it.
3　Q.　Oh, okay. I didn't know you were finished
4　　with your answer. Were you there that
5　　night?
6　A.　No.
7　Q.　Were you there the night the fire
8　　department came?
9　A.　No. But they always would call me at home
10　　and I would talk to them and...
11　Q.　Are you able to tell us what race the
12　　police officer was that made the statement
13　　about closing you down?
14　A.　He was white.
15　Q.　How do you know that?
16　A.　Because my manager told me.
17　Q.　And who was the manager at the time?
18　A.　Jonathan Smith -- I don't even know how to
19　　pronounce his last name. When Kristen
20　　wasn't there, he was the assistant manager
21　　who would fill in for her.
22　Q.　Can you spell his last name?
23　A.　S-M-I-T-A-R-T, Smithart.

Page 76

1　Q.　Okay. So there was a period of time
2　　between the two managers where Jonathan
3　　was the manager?
4　A.　He was a bartender who was trained to do a
5　　manager -- when a manager was off, he
6　　would fill in.
7　Q.　Okay. And would your employment records
8　　or your records there in the warehouse
9　　have contact information for Jonathan
10　　Smithart and your manager?
11　A.　I would say he's in Tuscaloosa.
12　Q.　What's he doing in Tuscaloosa?
13　A.　No clue.
14　Q.　But would your records have contact
15　　information on these individuals that
16　　worked for you?
17　A.　I'm sure they do. I mean, we have
18　　applications that -- you know, they're
19　　years old.
20　Q.　Okay. So did anyone other than Jonathan
21　　Smithart, your wife, and this other
22　　individual you named, Vince Saele,
23　　actually act as managers of Celebrations?

Page 77

1　A.　Well, it was -- we have another -- I can't
2　　think of her name. We had another
3　　bartender that was trained, but I don't
4　　even know if she ever actually acted as a
5　　manager or not.
6　Q.　Do you know the name of that one, the
7　　other bartender?
8　A.　No.
9　Q.　Are those the only managers, then?
10　A.　Yeah.
11　Q.　You were going through the list of other
12　　reasons that you felt like you were being
13　　treated differently. Were there other
14　　examples where you felt like you were
15　　being treated differently?
16　A.　Well, every time there was anything that
17　　happened in the parking lot, then, you
18　　know, it was automatically -- they had one
19　　time I think 100-something calls to
20　　Celebrations -- and remember, we were open
21　　two days a week -- and 67 of them were
22　　during hours of operation when we weren't
23　　even open, and yet they were credited to

20　(Pages 74 to 77)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 78

1    -- and I'm sure this is all public record;
2    that's how we got it, from the police
3    department -- and 67 of them was during
4    when we weren't even open, so it was very
5    obvious. When you operate a business for
6    that many years in that location and then
7    when you change the format to something
8    that people don't agree with, then, you
9    know -- it was very obvious that they
10   didn't want a black bar on the east side
11   of town.
12   Q.   And who is they didn't want a bar on the
13       east side of town?
14   A.   I would imagine it's the -- you know, the
15       whites that...
16   Q.   Is that what you mean by that?
17   A.   That's what I mean.
18   Q.   You said that you had 200 calls, 67 of
19       which were made during hours that y'all
20       weren't --
21   A.   I didn't say 200 calls. I said I have --
22       they came up with some statistic saying it
23       was 100-and-something calls. But when you

Page 79

1    looked at them, you know, it was just
2    Celebrations, Celebrations, and it would
3    be in the middle of the day when we're not
4    even -- or nights that we weren't even
5    open.
6    Q.   And you believe that Wayne Sable has this
7        information as well?
8    A.   I would hope he still has it.
9    Q.   Okay. And do you have any statistics from
10       before you went to the hip hop format?
11   A.   Statistics? I'm sure the police
12       department does.
13   Q.   But did y'all compile statistics like
14       these statistics you've just given me
15       during the hip hop period --
16   A.   The only statistic we kept up with, which
17       is what we were responsible for, which is
18       inside the club. The parking lot is a
19       public parking lot. There was three other
20       bars there. So I'm not sure exactly what
21       you're asking. Everything that we logged
22       and we documented is inside our business,
23       which is what we're responsible for.

Page 80

1    Q.   And so these logs that you're talking
2        about, they would be in the manager's log?
3    A.   Correct.
4    Q.   Okay. And that manager's log would be
5        available for time periods before you went
6        to the hip hop format?
7    A.   Absolutely, if I have the log books. I
8        closed the business a year ago. I
9        don't...
10   Q.   Was there any effort by your business to
11       do a better job of keeping up with the
12       logs once you went to the hip hop format
13       and you started detecting this
14       discrimination?
15   A.   It was never like -- it was part of their
16       job. They had to sit down every night and
17       do an incident report if there was any
18       incidents. Anything that was a problem --
19       if there was a problem, they had to pull
20       the tape, put the incident report with it.
21       I mean, it was -- what do you want me to
22       tell you? I mean...
23   Q.   Okay. So the manager's log has been kept

Page 81

1    all along?
2    A.   Ever since day one.
3    Q.   Okay. And --
4    A.   It's something that I learned in the
5        restaurant business, and it's just
6        something that I continued on. It was
7        just -- especially with the fact that I
8        didn't always see them. It was a good way
9        to communicate. They left things in there
10       like the toilet in the men's room is
11       broken and stuff. And then I would come
12       in and -- it was just a communication.
13   Q.   Gotcha. Incident reports that you kept,
14       were they kept in a file folder called
15       incident reports, or how were they
16       maintained?
17   A.   They were kept in a file, incident
18       reports. And I don't have a clue where
19       they are, if it was, you know, an instance
20       where they had to have somebody to leave.
21       I told you we recorded and kept the tapes
22       30 days, then they start recording over
23       them again.

**2100  Third  Avenue  North,  Suite  960  *  Birmingham,  AL  35203**
**1-800-888-DEPO  or  205-251-4200**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 82

1  Q.   When you had an incident that you recorded
2       on tape and you knew it might come back
3       up, you suspected a lawsuit or --
4  A.   It stayed in a file.
5  Q.   And did you ever destroy those tapes?
6  A.   I don't know if I have them or not.
7  Q.   Okay. At any time did Celebrations hire
8       an independent contractor to provide
9       security?
10 A.   Yes.
11 Q.   When was that?
12 A.   When they -- the police -- we had off-duty
13      policemen that we had hired to work in the
14      parking lot for 14 months, and when the
15      city decided to pull them out of the
16      parking lot, we got -- we hired a private
17      security company.
18 Q.   And what company was that?
19 A.   The last one we had was Silent Sentry, but
20      the first one -- I just can't even think
21      what the first one was.
22 Q.   Would that be in your records?
23 A.   Well, it would be in our checks, where we

Page 83

1       wrote checks.
2  Q.   Was it just the two companies that you had
3       as independent contractors?
4  A.   Right.
5  Q.   Was Silent Sentry the first one or --
6  A.   The last one.
7  Q.   And who did you deal with at Silent
8       Sentry?
9  A.   Dana -- I can't recall his name. Dana.
10      He's one of the -- he's the head guy over
11      there.
12 Q.   His last name isn't Cheeks, isn't it?
13 A.   No. Mr. Cheeks owns Silent Sentry.
14 Q.   He isn't related?
15 A.   He's married to his daughter.
16 Q.   The one that went to law school?
17 A.   The daughter? I don't know.
18 Q.   Can you tell me anything else about the --
19 A.   I can tell you who owns it, Michael
20      Montgomery.
21 Q.   And does he live here in town?
22 A.   I believe he lives in Millbrook or
23      Prattville.

Page 84

1  Q.   Okay. Were they required to report to
2       you?
3  A.   We had a meeting every Monday, and they
4       had to do incident reports if there was
5       anything that happened in the parking lot.
6  Q.   Did they have to do incident reports
7       inside the place?
8  A.   No. The two companies I'm talking to were
9       only outside security.
10 Q.   Was it the same with the off-duty police
11      officers, they were outside only?
12 A.   They were outside only.
13 Q.   Why did the city decide to pull the
14      off-duty police out of your parking lot?
15 A.   Well, I guess you'd have to ask Bobby
16      Bright that.
17 Q.   Nobody told you why?
18 A.   Well, I can tell you my theory.
19 Q.   What's your theory?
20 A.   Because when they went into Montgomery
21      Mall and sealed off the mall and tried to
22      -- you know, there was a big -- you know,
23      when the black community rose up and was

Page 85

1       all upset because they went and sealed off
2       the mall, one of the local TV guys called
3       me and was talking to me, and I was -- I
4       was just starting to have similar
5       problems. You know, this is not a problem
6       that was, you know, just unique to
7       Celebrations. I mean, if you'll go to
8       Montgomery Mall that just sold for $4.4
9       million and go all the way down that
10      Eastern By-Pass, I think you'll notice
11      that just about every major chain is
12      closed. Now, what kind of problem did
13      they have? Problems in the parking lot
14      where people perceived it was unsafe to
15      go? I mean, on this TV show, he asked me,
16      if Emory Folmar was still the mayor, would
17      we be having these problems, and I said,
18      absolutely not. And it apparently upset
19      the mayor. The night that John Wilson,
20      which was the police chief -- the night he
21      was forced to retire, they pulled the
22      police out of my parking lot at 10 o'clock
23      that night.

22  (Pages 82 to 85)

Page 86

1  Q.  With no explanation?
2  A.  With no explanation.
3  Q.  And so is it your theory that the city of
4      Montgomery has intentionally pulled
5      security out of parking lots that have
6      predominantly African-American -- what's
7      the word I'm looking for -- people who
8      come to shop there or African-American
9      customers, that they've intentionally
10     pulled it so that people feel unsafe there
11     and that the malls close down?
12 A.  I don't know what their intentions are. I
13     can't speak for them. All you can do is
14     look at the properties that's closed and
15     make your own assumption.
16 Q.  But I was asking about -- you're the one
17     who said, I have a theory, and I was
18     trying to understand what that theory is.
19 A.  Well, I had police in my parking lot for
20     14 months with zero problems in the
21     parking lot.
22         MR. QUINN:  14 months or 14
23             years?

Page 87

1          THE WITNESS:  14 months.
2  Q.  Go ahead.
3  A.  And we got absolutely no support from the
4      city in trying to control the parking lot.
5      The problem was not inside the club; the
6      problem -- we had fewer problems when we
7      went to the hip hop format than we had
8      ever had inside the club. The problem in
9      the parking lot is the people that you do
10     not allow into the club, people without
11     IDs, which is usually your drug dealers
12     and your people that -- they don't have
13     IDs because they have outstanding
14     warrants, and it's the people that's
15     underage.
16 Q.  I'm still trying to understand what your
17     theory is. You said zero problems for 14
18     months in the parking lot, then when the
19     police were pulled out, you started having
20     problems in the parking lot?
21 A.  Right.
22 Q.  Okay. And you said you had this theory
23     that -- and I didn't understand. You said

Page 88

1      when they sealed off the mall, and then
2      you went into if Emory was still the
3      mayor, would we still have these problems,
4      and your answer was no. The night Wilson
5      was retired, they pulled the police out of
6      my parking lot and the problems began, and
7      Bobby Bright was somehow involved in this.
8      I'm trying to understand what your theory
9      is.
10 A.  Well, I think the city is not only -- I
11     don't know if they're capable of -- or
12     they -- they're doing nothing to stop
13     this. Have you noticed that every chain
14     -- Tony Roma's, Copeland's, Friday's,
15     Roadhouse, Smokey Bones, even a Cracker
16     Barrel within a mile have closed? I mean,
17     these are all national chains.
18 Q.  What --
19 A.  I mean, it's not something that -- I mean,
20     that's -- like I was trying to say, I
21     don't know if you're saying that all this
22     was created in Celebrations' parking lot,
23     or did these businesses close for -- why

Page 89

1      did they close?
2  Q.  What's your theory?
3  A.  Well, I talked to the regional directors
4      of most of them. They said that the
5      perception became that it was not safe to
6      come to that side of town at night. And I
7      feel -- and that's only my opinion. I
8      feel like the city hasn't done enough to
9      support these businesses.
10 Q.  So in not providing off-duty police
11     officers to these other buildings, they
12     went out of business as well?
13 A.  Well, some of them -- Friday's had an
14     off-duty policeman working there. But the
15     rules changed for having off-duty
16     policemen working, to where if you weren't
17     a restaurant, you couldn't do it. You
18     know, we even requested that during
19     Christmastime -- I don't know if you ever
20     noticed there on Vaughn Road that the
21     police are out there directing traffic,
22     you know, for the Christmas shoppers, and
23     we even requested that we just pay them to

23 (Pages 86 to 89)

Page 90

1     just stay out there later to direct
2     traffic because the traffic with the four
3     bars there was a problem. It was -- you
4     know, it had gotten congested. And they
5     didn't even want to do that, so...
6  Q.  And I'm still trying to figure out what
7     your theory is. Is your theory that the
8     city no longer supports businesses that
9     cater to African-American customers?
10 A.  You know, Publix on Vaughn Road was just
11    robbed, Sonic on Vaughn Road. It has
12    nothing to do with African-Americans. I
13    just think they're not doing enough.
14    They're not being firm enough with -- you
15    know, they need to get tough. You know,
16    Dr. Patella, that was just home-invaded,
17    lives next door to me. I mean, had four
18    armed guys running by my house. The
19    police chief lives one block away. I'm
20    just telling you that I feel like the city
21    hasn't done enough to -- they've let crime
22    get out of control. And once again,
23    that's just my personal opinion.

Page 91

1  Q.  So you're not attributing any racial
2     motive for them pulling the police out of
3     your parking lot?
4  A.  I would say yes. I was told later on that
5     it was because, one, I had been an Emory
6     Folmar backer, and two, that the Rose
7     Supper Club downtown had requested police
8     too, off-duty police, and they said they
9     couldn't do that.
10 Q.  Who was it that told you these two things?
11 A.  I don't remember.
12 Q.  Was it someone with the city?
13 A.  I don't know. Seems like it was a
14    policeman or something that told me.
15 Q.  Okay. You said that the people who were
16    causing the problems were the ones that
17    you did not allow into your bar?
18 A.  Correct.
19 Q.  These were people out IDs and underage
20    drinkers?
21 A.  Yes, sir.
22 Q.  And you described the people without IDs
23    as being primarily drug dealers?

Page 92

1  A.  Well, I'd say people without IDs usually
2     have outstanding warrants, is what we've
3     found. We've actually arrested people in
4     our parking lot that have had as many as
5     10, 15 outstanding warrants on them.
6  Q.  And were these people who were denied
7     access to your club?
8  A.  Correct.
9  Q.  And what did they do to cause problems
10    after being denied access to your club?
11 A.  They would hang out in the parking lot,
12    and we would ask them to move, no
13    loitering, then they would sometimes, you
14    know, become abusive. They'd harass
15    customers, cause problems. I mean, cause,
16    you know...
17 Q.  Was there any pattern to the race of these
18    individuals?
19 A.  What do you mean, pattern?
20 Q.  Were they African-American? Were they
21    Caucasian?
22 A.  Mainly African-American.
23 Q.  Did any of these types of problems outside

Page 93

1     the club exist when you were not a hip hop
2     club?
3  A.  Oh, absolutely.
4  Q.  Did it exist with any greater frequency
5     when you were not a hip hop club?
6  A.  We had -- going all the way back to Sports
7     Rock, we would have as many as, you know,
8     20, 30 white kids fighting in the parking
9     lot, and it never was an issue.
10 Q.  How often did you have 20 or 30 white kids
11    fighting in the parking lot?
12 A.  Well, over 14 years, I don't know. But
13    several times over that, you know, the
14    Prattville guys would be down here with
15    the Montgomery guys, and it was just a...
16 Q.  Is that a one-time event that you're
17    talking about?
18 A.  No.
19 Q.  Did it happen more than once?
20 A.  More than once, yes. And that's --
21 Q.  Were you around when it happened?
22 A.  One night I was -- they called me at home,
23    and I drove up there when they were...

24 (Pages 90 to 93)

Page 94

1 Q. How far did you live from Celebrations?
2 A. 15, 20 minutes.
3 Q. And you got up there and observed a fight?
4 A. They had -- everybody was outside and they
5    were still -- just like kids being -- you
6    know, just running their mouths. And then
7    they would fight, and they would break up
8    one and then they would -- another one
9    would fight. And the police were called,
10   and all they did was they broke it up and
11   sent everybody home.
12 Q. Other than that occasion, do you recall
13   any others?
14 A. Well, there was other incidents, yeah. I
15   mean, there's --
16 Q. Before you became a hip hop bar, is what
17   I'm asking.
18 A. Yeah. We had just as many incidents in
19   the parking lot then as we did as a hip
20   hop.
21 Q. Okay. So you detected no change in the
22   level of problems in the parking lot --
23 A. Well, the --

Page 95

1 Q. Is that true?
2 A. Well, there was more trying to hang out,
3    and then they -- it was -- you know, they
4    had a couple that -- like the last one out
5    there, an 18-year old kid, not old enough
6    to get in the club, you know, pulled a gun
7    and shot a guy in the leg. You know, they
8    had one shooting out there that had
9    started down at the Rose Supper Club, and
10   the kids were in the Wendy's right there
11   in front of me. We walked outside and the
12   car stopped in the middle of Vaughn Road
13   and jumped out and emptied a gun, hit
14   nobody, but they didn't realize we had
15   security there. And my security chased
16   him across the apartments over there, got
17   him out of the lake out there, got his
18   gun, had him on the ground handcuffed when
19   the police got there, and then the next
20   day it was written up as shooting at
21   Celebrations.
22 Q. Did you detect any difference in the
23   amount of problems in the parking lot

Page 96

1    after you became a hip hop bar?
2 A. Any what?
3 Q. Any difference in the problems in the
4    parking lot. Was there --
5 A. Well, I think --
6 Q. I mean, I've asked the question, and you
7    didn't answer it, but you told me about
8    these two incidents --
9 A. Well, rephrase the questions then.
10 Q. Okay. I think the question was this: Did
11   you detect any difference between problems
12   in the parking lot before you were a hip
13   hop bar as compared to after you were a
14   hip hop bar?
15 A. We probably had more people trying to hang
16   out in the parking lot, was why I had to
17   hire additional security, to keep -- you
18   know, you would have 50, 60 people
19   gathering up out there.
20 Q. And you did not have that before you were
21   a hip hop bar?
22 A. Oh, yeah. I mean, some nights we would
23   have 100 kids out there. You know, they

Page 97

1    would get down at the end of the parking
2    lot -- it's a pretty big parking lot.
3 Q. Okay. So did you detect any difference in
4    the level of problems in the parking lot
5    after you became a hip hop bar?
6 A. The problem I feel like was when the
7    fourth bar opened. Gators switched over
8    from a restaurant to a bar, and it
9    completely overloaded the parking lot.
10 Q. Was that after or before you were a hip
11   hop bar?
12 A. That was after.
13 Q. Okay. So you basically had the same level
14   of problems in the parking lot out there
15   until Gators opened up its bar at night,
16   and then you noticed an increase?
17 A. Yes.
18 Q. Before Gators opened up its nighttime bar
19   operation, you did not notice any
20   difference between the problems in the
21   parking lot before and after the hip hop
22   bar?
23 A. Well, we had a policeman working there

Page 98

1   before that, and so it was -- when we
2   noticed the rise in the parking lot
3   problem was when they closed down, you
4   know, the Rose Supper Club one time.  We
5   looked out there and there was 300 people
6   in our parking lot because they had
7   nowhere to go.
8         MR. STEWART:  Will you read back
9         the question, please?
10        (Requested portion of record
11        read, Page 97, Line 18.)
12  Q.  Can you answer that question?
13        THE WITNESS:  Could you repeat
14        it?
15        (Requested portion of record
16        read, Page 97, Line 18.)
17  A.  And I had said that -- yes.  The problem
18      was that we had more people trying to
19      conjugate out there, and that was a
20      problem, trying to keep everybody moving
21      in the parking lot.
22  Q.  And that was a problem that existed before
23      Gators opened up its nighttime bar

Page 99

1   activity; is that right?
2   A.  Yes.
3   Q.  Okay.  And how long was it after you
4       became a hip hop bar until Gators opened
5       up its nighttime bar?
6   A.  Probably a year.
7   Q.  Were you having -- well, let me ask a
8       different question.  Did you still have
9       off-duty police officers in your parking
10      lot before Gators opened its nighttime
11      bar?
12  A.  He had -- yes.  Vince actually went with
13      me down to meet with the new police chief,
14      Art Baylor, and asked -- we went down
15      there and begged for the -- you know, to
16      be allowed to use policemen.  And so, you
17      know, Vince had bought -- you know, I put
18      Vince in the deal with Phillip Goodman.
19      Phillip Goodman is the one that built
20      Gators and has been there nine years.
21      Vince has been there just a short time.
22  Q.  So when Phillip quit running it and Vince
23      took over, he opened up the nighttime

Page 100

1   operation?
2   A.  Yes.
3   Q.  And what's Vince's last name?
4   A.  Saele.
5   Q.  And how do you know Vince Saele?
6   A.  He worked for me for five years.
7   Q.  He was the manager guy that you talked
8       about?
9   A.  Right.
10  Q.  And the two of you went down there after
11      he opened up the nighttime bar and said,
12      please don't pull the police?
13  A.  No, they had already pulled the police.
14      We were trying to get them back out there.
15  Q.  They had already pulled the police before
16      Gators opened its nighttime bar?
17  A.  Right.
18  Q.  Do you know how far in advance of that
19      they did?
20  A.  No.
21  Q.  After they pulled the police, did you
22      immediately notice any type of problem?
23  A.  We started having more people trying to

Page 101

1   gather out there.  You know, like I said,
2   it's a big parking lot, and we would have
3   a group down here -- and the private
4   security just does not get the same
5   respect as off-duty policemen.
6   Q.  Who is it that you went down and talked to
7       at the city with Vince Saele about?
8   A.  I can tell you who all was in the meeting.
9   Q.  Okay.
10  A.  Art Baylor, Major West, Vince Saele,
11      Willie Cook, and Glenn Pruitt.
12  Q.  Okay.  And do you have any recollection as
13      to the day that that meeting took place?
14  A.  No, I do not.
15  Q.  Do you have any record of it anywhere?
16  A.  I doubt it.
17  Q.  Did you have any shootings in the parking
18      lot before you became a hip hop bar?
19  A.  There had been weapons fired in the
20      parking lot, yes.
21  Q.  On how many different occasions?
22  A.  I don't know.
23  Q.  Is that information recorded somewhere?

26 (Pages 98 to 101)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 102

1  A.  Maybe with the police department. We
2      didn't have, at that time, outside
3      security.
4  Q.  Okay. After you became a hip hop bar, did
5      you have any shootings in the parking lot?
6  A.  Yes.
7  Q.  How many?
8  A.  At that time, that was before we had
9      outside security, so that's when we did
10     incident reports on them.
11 Q.  How many shootings did you have while it
12     was a hip hop bar?
13 A.  I wouldn't know without looking at the
14     records.
15 Q.  Would it be more than ten?
16 A.  No.
17 Q.  More than five?
18 A.  Probably around five. Once again, you
19     know, putting it in context, when somebody
20     comes out of Burger King, and it started
21     -- this problem started in another bar,
22     and they stop on Vaughn Road and do that,
23     just because my security chases them down

Page 103

1      and catches them and then it's written up
2      as Celebrations, I think is kind of
3      unfair.
4  Q.  Okay. Do you know whether there were any
5      shootings in your parking lot before you
6      were a hip hop bar?
7  A.  Absolutely.
8  Q.  Do you know how many?
9  A.  I mean, kids have always pulled out guns
10     and shot them up in the air.
11 Q.  Well, there's a difference between
12     shooting a gun and shooting them up in the
13     air.
14 A.  When I was a hip hop bar, you know, the
15     18-year old shot a guy in the leg and then
16     -- I don't know. Somebody else got shot
17     in the leg. But mainly it was the same
18     thing; they'd pull the guns and shoot them
19     up in the air.
20 Q.  Okay. Did you detect any difference in
21     the number of shootings in your parking
22     lot after the hip hop bar?
23 A.  Well, at this point, we had outside

Page 104

1      security, so, of course, you know, I was
2      more aware of it, you know, whereas before
3      they would -- you know, it was like, well,
4      somebody -- you know, I'd always hear
5      about it, you know, somebody pulled out a
6      gun and shot up in the air, you know. I
7      mean...
8  Q.  So is your answer you don't know?
9  A.  I don't know.
10 Q.  Okay.
11         MR. STEWART:  It's coming up on
12              12. I can keep going for a
13              little bit longer and then
14              we can break for lunch or we
15              can break now.
16         (Off-the-record discussion.)
17         (Lunch recess taken.)
18 Q.  So have you got anything we need to talk
19     about as a result of the lunch break?
20 A.  No, but I apologize if I seemed a little
21     tense. You know, I feel like I'm reliving
22     something that was very frustrating, and
23     so with that in mind, go ahead. Beat me

Page 105

1      up.
2  Q.  No, no, no. I'm not going to beat you up.
3         (Off-the-record discussion.)
4  Q.  Tell me this and we'll get off this
5      Celebrations topic.
6  A.  Thank you.
7  Q.  Why is Celebrations closed today?
8  A.  Because -- and I'll make this as short as
9      I can. I lost my mother to pancreatic
10     cancer in the last year. I had battled
11     with the city to -- the problem is a
12     city-wide problem; it's not something that
13     was just limited to my parking lot. The
14     last night, when the 18-year old kid shot
15     somebody in the leg, the news people,
16     Channel 12, called me up and wanted me to
17     come out and stand in front of my building
18     and give an interview as to why this
19     18-year old kid, which had not been in my
20     business or anything like this, shot
21     somebody in my parking lot. Well, the
22     same night, in case y'all don't remember,
23     three people were shot at ATM machines,

Page 106

1    one of them at Carmichael Road, who --
2    Alan Worrell and I have a condo at the
3    same place down at the beach, so he's a
4    very good friend of mine. But when I
5    asked the TV people, are you going to get
6    Alan Worrell and put him in front of
7    Sterling Bank and ask him -- you know, I
8    said, what seems more of a public safety
9    interest, people being robbed and shot at
10   an ATM machine or an 18-year-old kid
11   that's in a public parking lot -- not a
12   private parking lot, a public parking lot
13   -- pulling a gun at a random thing and
14   shooting somebody in the leg. And they
15   looked at me and they said, we're not
16   aware of that. And that's when I just had
17   enough. One of the owners of the shopping
18   center, his wife was down having dinner
19   with us at my house, and I gave him a
20   60-day notice.
21   Q.   Who was the owner?
22   A.   Justin Dennerman (phonetic) was the --
23        he's the managing partner. It's been --

Page 107

1    it's the Kushner Group out of Atlanta.
2    And K-N-U -- I'm sorry on my spelling. I
3    went to Auburn. I apologize.
4         MR. GUY: Are you saying the
5             Kushner Group owns that
6             shopping center?
7         THE WITNESS: Correct. It was
8             bought from Ed Fatsinger
9             (phonetic), who was my
10            landlord for, you know, 13
11            of the 14 years. I'd love
12            for you to talk with either
13            one of them as to what kind
14            of tenant I was.
15        MR. GUY: I'm sorry. I did not
16            get the name of the person
17            you were eating dinner with
18            either.
19        THE WITNESS: Justin Dennerman.
20   Q.   And the Fatsinger, where does he live?
21   A.   He lives here.
22   Q.   He's a Montgomery person?
23   A.   Oh, absolutely. He owns Festival. That's

Page 108

1    where his office is.
2    Q.   And is there a realty company that manages
3         that shopping center?
4    A.   I think that -- I mean, Ed always did it
5         himself. And then Justin and them,
6         assumingly, they do it themselves, but
7         like my -- where Celebrations was, a guy
8         that I do some work with, Paul Register,
9         has Southern Property Management,
10        McGinnis, they rented that building -- you
11        know, I helped them kind of rent it. So I
12        don't know how they do it. I don't think
13        there's a specific, you know, group that
14        represents them. I think they do it
15        themselves.
16   Q.   Okay. Is there a tenant out there at the
17        location where Celebrations is that's sort
18        of like the tenant in charge of collecting
19        rent or doing anything like that?
20   A.   No. It all goes through Kushner.
21   Q.   So you said the 18-year-old shot someone
22        in the parking lot; the same night three
23        people were shot in front of ATM machines.

Page 109

1    You got a call from Channel 12; they
2    wanted an interview with you. You had
3    these folks over to dinner --
4    A.   They were down visiting and we had had
5         dinner, then the next day I got up and --
6         well, it might have been -- I might have
7         waited till Monday, and I gave him a
8         60-day notice.
9    Q.   Okay. And is that the notice in your
10        lease that you had, is a 60-day notice?
11   A.   Actually, my lease had been up as of
12        January 1st, and they had extended my
13        lease.
14   Q.   Month-to-month or year-long?
15   A.   Well, they had done it for three months, I
16        think, to start with, and then we were
17        going to -- because everything was going
18        -- we had had no problems out there in,
19        you know, eight months, and then...
20   Q.   So there had been a period of eight months
21        before this kid was shot in the parking
22        lot where you had no problems?
23   A.   Right.

28  (Pages 106 to 109)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 110

1  Q.  And when the lease ended, was it January
2  of '07?
3  A.  '07. And then they extended it to --
4  January, February, March -- till April 1st
5  -- or it might have been four months.
6  They would have the paperwork.
7  Q.  Okay. Was there actually a written lease
8  extension agreement?
9  A.  Yes.
10  Q.  Do you have a copy of that?
11  A.  I wouldn't know where it was.
12  Q.  And was it extended for that short a
13  period of time for a reason?
14  A.  I asked them to.
15  Q.  I mean, were you thinking about closing
16  down the business or moving the business
17  or what?
18  A.  Well, I was thinking about -- I was trying
19  to weigh all my options. Obviously, you
20  know, my mother -- went through a rough
21  time there with my mother, with pancreatic
22  cancer, and I was, you know, had just -- I
23  just went to them and said, listen, I just

Page 111

1  haven't had time to really decide; I want
2  an extension on my lease. And they gave
3  it to me.
4  Q.  When was it that your mother passed away
5  with pancreatic cancer?
6  A.  I guess June of last year.
7  Q.  June of '07?
8  A.  Right.
9  Q.  When in June?
10  A.  Pardon?
11  Q.  Do you remember what day in June?
12  A.  No.
13  Q.  Was it the beginning of June or the end of
14  June?
15  A.  The first of June.
16  Q.  Okay. Was one of the reasons that you
17  asked for such a short-term lease that you
18  were thinking about moving to a different
19  location?
20  A.  Yes, considered it.
21  Q.  Okay. And was one of the reasons that you
22  asked for a short-term lease that you were
23  thinking about getting out of the bar

Page 112

1  business altogether?
2  A.  Considered it.
3  Q.  Were there any other reasons you asked for
4  a short-term lease?
5  A.  No.
6  Q.  At the time you asked for a short-term
7  lease, had you already start talking with
8  Mr. Long about doing business together?
9  A.  I had not even met him.
10  Q.  When did you first start talking about
11  doing business with him?
12  A.  I had heard about him, and I knew that he
13  frequented the club, and people always
14  said they wanted us to meet. And I
15  actually met him after I closed the club
16  on April the 1st. It was when he came by
17  when we were in there preparing to take
18  everything out of the club.
19  Q.  And tell me how the conversation went for
20  you to start talking about doing business
21  together.
22  A.  With Mr. Long?
23  Q.  Uh-huh.

Page 113

1  A.  He just -- you know, he came up,
2  introduced himself. We talked, talked
3  about, you know, his playing sports and so
4  forth, and I just -- he told me that he
5  was interested in doing a predominantly --
6  something for the black community, to give
7  something back to the community, and he
8  wanted to do some kind of sports bar that
9  would be predominantly for the black
10  community and kind of told me what his
11  ideas were as far as, you know -- I mean,
12  like when we were sitting there talking,
13  A-Rod calls him on the phone. And he was
14  telling me he'd like to bring some of
15  these people he played ball with,
16  celebrities, and he wanted to do food; he
17  wanted -- he has a record label that he
18  does local talent with, and he wanted that
19  included into the format.
20  Q.  Is Mr. Long from Montgomery?
21  A.  Prattville, I believe.
22     THE WITNESS: Prattville,
23     Millbrook?

29 (Pages 110 to 113)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 114

1   MR. LONG: Millbrook.
2   A.   But he's very well-known, very well-liked
3        here in the community just from...
4   Q.   From what?
5   A.   Just from everybody -- just my association
6        with him and being with him.
7   Q.   Okay. Do I understand that he played
8        baseball at some point?
9   A.   He played with --
10       THE WITNESS: The last team you
11       were with was New York?
12  Q.   I have to ask you.
13  A.   He played for two professional major
14       league teams, the last one being New York.
15  Q.   When did he leave New York?
16  A.   I can't -- two years ago? I can't answer
17       that.
18  Q.   Okay. And had he moved back to Millbrook
19       at the time that y'all had this
20       conversation?
21  A.   He lives out off Pike Road -- off Old Pike
22       Road on 12 acres of land with a good
23       little fishing pond.

Page 115

1   Q.   Okay. So he had moved back to Pike Road
2        at the time y'all were having this
3        conversation?
4   A.   Yes.
5   Q.   How did you meet him?
6   A.   He came by Celebrations after we were
7        closed and introduced himself.
8   Q.   So that was just -- no one introduced
9        y'all?
10  A.   No. People had tried to introduce us for
11       a long time, you know.
12  Q.   And you said that he brought up the
13       subject of wanting to do a bar
14       predominantly for blacks that's a sports
15       bar concept?
16  A.   Right.
17  Q.   How would you have a sports bar that's
18       predominantly for African-Americans?
19  A.   Well, with the location, demographics.
20  Q.   And did y'all talk about any location at
21       the time of this first conversation?
22  A.   I just told him that I would look around
23       and see what was available and take it

Page 116

1        from there.
2   Q.   Before April 1, 2007, did you talk to any
3        other realty companies, management
4        companies, or landlords about renting
5        space to move Celebrations into?
6   A.   No, I was -- no. I did have an interest
7        in the Copeland's building when it came up
8        for auction, but was out of town when it
9        sold for whatever it sold for, 280, 320.
10  Q.   So if I understood your testimony, you
11       were interested in the Copeland's building
12       but you never talked to anyone about
13       buying it?
14  A.   No, I -- you asked me before I closed,
15       right?
16  Q.   Right.
17  A.   That was before I closed, the building was
18       coming up for auction. I negotiated a
19       lease on the building after I closed
20       during the same time we were looking at
21       LeCroy. I mean, I can tell you every
22       building that's leased out on that side of
23       town.

Page 117

1   Q.   Okay. Let's stick with my question, then
2        we'll move on to that too. But right now
3        my question was, did you talk to any
4        landlord, building owner, realty company,
5        or real estate management company about
6        leasing space to move Celebrations into?
7   A.   I don't recall.
8   Q.   I mean, we're just talking a year ago.
9   A.   Well, short-term is the first thing to go.
10  Q.   Is that your answer?
11  A.   I mean, if you'll give me time to think
12       about it. I don't even -- to move
13       Celebrations, the only thing -- no, I
14       can't think of anything -- anybody I
15       talked to, period.
16  Q.   Did you ever talk to Grant Sullivan about
17       it?
18  A.   To Grant?
19  Q.   Uh-huh, about finding you a place to move
20       Celebrations into.
21  A.   Well, that's not Celebrations. With
22       everything that had transpired with the
23       city, I had no desire to do anything with

30  (Pages 114 to 117)

Page 118

1    Celebrations whatsoever. What we were
2    looking at doing was another concept,
3    which was the sports bar.
4    Q.    But before you came up with this other
5    concept, had you ever talked with Grant
6    Sullivan about finding a different spot
7    for Celebrations?
8    A.    We might have talked about it, I don't
9    know, but I never looked at anything.
10    Q.    Do you recall ever attempting to move
11    Celebrations somewhere else rather than
12    close it down?
13    A.    No.
14    Q.    At any time?
15    A.    No.
16    Q.    Okay. And is it your testimony that you
17    voluntarily closed Celebrations down?
18    A.    Yes.
19    Q.    Because you were tired of the hassle?
20    A.    Well, after the last -- I gave that
21    reason. I told them -- well, I gave them
22    a notice, 60-day notice.
23    Q.    Okay. Did you still have a license to

Page 119

1    operate Celebrations at the time you
2    closed?
3    A.    Yes.
4    Q.    Had anyone told you that you were going to
5    lose that license?
6    A.    No.
7    Q.    Was there ever a time when you were at
8    risk of losing that license?
9    A.    The mayor carried me up in front of city
10    council and tried to have my license
11    revoked, and they voted 7-2 in my favor.
12    Q.    When was that?
13    A.    I guess in '06.
14    Q.    Did they tell you at that time that if you
15    had any further problems out there,
16    though, they might have to reconsider that
17    decision?
18    A.    What they did was they made the whole
19    shopping center pick up and increase
20    security and made each bar out there pick
21    up a percentage of the security. So they
22    finally accepted responsibility there was
23    more than one bar there.

Page 120

1    Q.    Did the Celebrations location have a no
2    loitering policy on the lease?
3    A.    On the lease?
4    Q.    Yeah, with the lease that you had on
5    Celebrations, a no loitering policy?
6    A.    I don't know how you would have a no
7    loitering -- that's a public parking lot.
8    You have to post signs, then at that
9    point, you can enforce it, which we did.
10    We put no loitering signs out there. I
11    don't know why it would be in the lease.
12    Q.    So it's not in the lease?
13    A.    Not that I'm aware of. I mean, I signed
14    that lease 14 years ago.
15    Q.    Okay. Let's go back. I'm sorry. I got
16    sidetracked myself. Mr. Long came around
17    after you closed, and y'all had this
18    conversation. Did you decide at that
19    first meeting that you were going to go
20    into business with him?
21    A.    At first it was going to be more of a
22    consulting thing, and then after meeting
23    with him a couple more times, I liked what

Page 121

1    he was -- what he wanted to do and felt
2    like it could be very profitable. And
3    then at that time, we discussed me being,
4    you know, part of the -- you know, doing
5    the operations -- handling the operations
6    part of it.
7    Q.    During the first conversation?
8    A.    No.
9    Q.    Okay. First conversation is all I'm
10    talking about now. First conversation --
11    A.    First conversation, he told me what he was
12    interested in doing, told me what he
13    wanted -- food, you know, a
14    sports-oriented -- so he could use his
15    contacts to promote it. He wanted a place
16    where his local talent, his record label,
17    he could have them in there and entertain.
18    And basically that's it.
19    Q.    Okay. How did y'all leave it after that
20    first conversation?
21    A.    I told him that I would look into it and
22    get back with him.
23    Q.    And so did he talk with you at the time

31    (Pages 118 to 121)

Page 122

1    about being a consultant, that first
2    conversation?
3  A.   I don't know if we called it a consultant
4    or not. He just asked me if I would be
5    interested in helping him find a place.
6    And I -- you know, I just asked him why he
7    was coming to me, and he said that, you
8    know, my club was, you know, the only club
9    he hung out at and he -- I've been there
10   14 years. There's not too many people
11   that survive in that business 14 years.
12   So that's how it started. And there was
13   no -- you know, it was after I had found,
14   you know, several locations that I went
15   back to him and told him that if we were
16   going to do this, that I would like to be
17   part of it.
18 Q.   Okay. What location did you find for him?
19 A.   I looked at the Friday's building, and I
20   think Grant made an offer for me for
21   $400,000 on that building.
22 Q.   Any other buildings you looked at?
23 A.   Well, we looked at the Copeland's building

Page 123

1    also.
2  Q.   Any others?
3  A.   The LeCroy, the old Pure Country. Looked
4    at the -- that old grocery store down by
5    the flea market. It was way too big for
6    anything we needed. I looked at two
7    places in the Barnhill shopping center,
8    where Barnhill's just went out of
9    business.
10 Q.   Are you saying two places in Barnhill?
11 A.   That shopping center over there. There's
12   -- it's over by Montgomery Mall. It's
13   where World's Gym is.
14 Q.   Okay. Any other places?
15 A.   Looked at -- I met with -- as a matter of
16   fact, I even called Amy at one time about
17   the -- and she told me she already leased
18   it, and then Alan Worrell had me meet with
19   Danny Clements when they ran into a
20   problem over there with Freddie B's, to
21   see if there was -- it was just not
22   something I was interested in; it was too
23   big.

Page 124

1  Q.   Okay.
2  A.   And then they called me about the Fox &
3    Hound building before they went out of
4    business -- too many restrictions.
5  Q.   Okay. Any other place you looked?
6  A.   Actually went in the building or --
7    describe what you mean by look. Are you
8    saying that I physically went into
9    buildings and looked at them?
10 Q.   Well, yes, I'm asking that question. I'm
11   also asking about somebody you may have
12   contacted or placed a phone call to.
13 A.   Of the buildings I've told you about, I
14   can tell you who I talked to.
15 Q.   I'm not asking that right now; I'm just
16   asking about locations.
17 A.   That's all I recall now.
18 Q.   Okay. As far as the Friday's building,
19   that would be on the Eastern Boulevard?
20 A.   Southeastern.
21 Q.   Southeastern. And you said Grant offered
22   to buy it for 400,000?
23 A.   I did. At this point, when I talked to

Page 125

1    Terrence and had then decided to become
2    involved in it, I was going to buy the
3    real estate and lease it back to the
4    business.
5  Q.   Okay. And who did you talk to about the
6    Friday's building?
7  A.   Robert Long, I believe. I actually met
8    with the guy that had bought -- I made an
9    offer for $400,000 on it. They said it
10   was tied up in a ground lease until
11   January, and then somehow it got sold for
12   even $5,000 less than I offered on it.
13 Q.   It would be tied up in a ground lease
14   until January?
15 A.   Until January.
16 Q.   Of what year?
17 A.   '08.
18 Q.   '08. And do you know who owned the
19   Friday's building?
20 A.   Well, the guy that I met with afterwards
21   is the guy that bought it from I guess the
22   Friday's corporation. He was an oriental
23   guy that Mr. Long introduced me to.

32 (Pages 122 to 125)

Page 126

1   Q.   And Mr. Long is a realtor with Aronov?
2   A.   Correct.
3   Q.   Did you actually meet with Mr. Long?
4   A.   Several occasions.
5   Q.   Did you tell Mr. Long what you were trying
6        to do?
7   A.   Absolutely.
8   Q.   What did you tell Mr. Long?
9   A.   That we were trying to do a sports bar
10       oriented with food, with entertainment.
11  Q.   Did you tell him that you were primarily
12       attempting to cater to the
13       African-American community?
14  A.   Yes, I did.
15  Q.   And what did Mr. Long say?
16  A.   In what way? He didn't say anything.
17  Q.   Was Mr. Long the one who held the listing
18       on the building?
19  A.   I believe so.
20  Q.   Okay. Did you have a real estate agent
21       that represented you in the transaction?
22  A.   Grant Sullivan.
23  Q.   But you didn't use Grant Sullivan for

Page 127

1        these conversations with Mr. Long?
2   A.   No.
3   Q.   You did it all yourself?
4   A.   Yes.
5   Q.   So what did Mr. Long try to do in terms of
6        trying to get the Friday's building for
7        you?
8   A.   Well, that became a non-issue when the guy
9        we -- we had looked at LeCroy and then
10       decided to -- because we wanted to make
11       the offer on the Friday's building, and
12       then they said -- that's when they came up
13       and said it was on a ground lease and
14       wouldn't be sold until -- that Friday's
15       was still on the hook until January '08.
16  Q.   Did you try to do something different at
17       the time you learned it was on a ground
18       lease as far as the Friday's building is
19       concerned?
20  A.   Did I try to do something different?
21  Q.   Uh-huh.
22  A.   That's when somebody had told me that Pure
23       Country had closed, and that's when I had

Page 128

1        Grant set up an appointment with...
2   Q.   By doing something different, I meant with
3        respect to the Friday's building. For
4        example, did you try to lease it until the
5        end of the ground lease and then purchase
6        it or anything like that?
7   A.   No.
8   Q.   Did you submit a proposed contract for
9        purchase of the Friday's building?
10  A.   Yes.
11  Q.   So you presented them with an offer in the
12       form of a contract --
13  A.   Right.
14  Q.   -- and then that's when they told you it's
15       on a ground lease?
16  A.   That's what Grant Sullivan told me.
17  Q.   Okay. And do you know whether or not it
18       actually is on a ground lease?
19  A.   I have no clue.
20  Q.   Okay. You said it ended up selling for
21       5,000 less?
22  A.   I offered 400,000, and I was told -- once
23       again, this is just hearsay -- that it

Page 129

1        sold for 395,000.
2   Q.   And do you know to whom it sold?
3   A.   To the oriental gentleman that I met.
4   Q.   And do you know what Friday's is now
5        operating as?
6   A.   Now? It's not operating as anything.
7   Q.   It's just sitting there?
8   A.   Right.
9   Q.   So he's got to wait until the January --
10  A.   No. I don't know how he purchased the
11       building. All I'm telling you is that I
12       was told it was on a ground lease and
13       could not be done anything with it until
14       '08. And then the next thing I heard was
15       that this guy had bought it and was doing
16       an all you can eat buffet there and that
17       he owns them all over the southeast.
18  Q.   Okay. Did you look at the Copeland's
19       building next, after Friday's?
20  A.   No. I went to LeCroy.
21  Q.   So is the order, you looked at the
22       Friday's building first and then you
23       looked at the LeCroy?

33 (Pages 126 to 129)

Page 130

1  A.  Right.
2  Q.  Okay.  When is it that you first looked at
3      the LeCroy building?
4  A.  I don't know what the exact date is.
5      Sometime first of May.
6  Q.  When did you look at the Friday's
7      building?
8  A.  I don't know the date.
9  Q.  Had you already made an offer to purchase
10     the Friday's building and had it -- and
11     then learned that it was in this ground
12     lease before you ever even looked at
13     LeCroy?
14 A.  No, I -- no, I don't -- no.  I don't
15     recall the dates on the contract.  You
16     know, I think the offer was made after I
17     looked at the LeCroy building.
18 Q.  Okay.  And then when was it that you
19     looked at the Copeland's building?  You
20     had the one time that you said that you
21     looked at it -- I got sort of confused
22     when you were talking about the Copeland's
23     building.  Can you straighten me out

Page 131

1      there?
2  A.  Well, that was after everything that went
3      with LeCroy.  We looked at LeCroy.
4  Q.  Okay.  And who was it that had the listing
5      on the Copeland's building?
6  A.  Mr. Long.
7  Q.  And did you talk with Mr. Long after the
8      LeCroy thing fell through about leasing or
9      buying the Copeland's building?
10 A.  Leasing.
11 Q.  Had your business concept changed then, as
12     far as buying the real estate and leasing
13     it back?
14 A.  No.
15 Q.  Why did you just talk about leasing, then,
16     with Copeland's?
17 A.  Well, because they were going to lease it
18     for $3,500 a month.
19 Q.  And that was just a better deal?
20 A.  It's pretty cheap for...
21 Q.  Okay.  Did Copeland's own the Copeland's
22     building, or how did that work?
23 A.  It was a gentleman that bought it out of

Page 132

1      -- they had an auction, and he paid a
2      total of $320,000 for a building that was
3      originally $2.6 million in investments, so
4      he got a pretty good deal on it.
5  Q.  So what happened with the Copeland's
6      building?
7  A.  They -- Mr. Long -- we actually did a
8      lease with a 90-day due diligence, and
9      then afterwards -- then he gave us a rider
10     from Wal-Mart, which, you know,
11     specifically in there -- as soon as I read
12     the rider -- you know, I mean, I never
13     would have wasted my time looking at
14     either one of the buildings if you read
15     what Wal-Mart says.  They have total
16     control over all outparcels, and you're
17     not even supposed to do $10,000 -- if you
18     do $10,000 improvements, you're supposed
19     to get their approval.
20 Q.  Why am I not surprised?  Who actually
21     wrote up the lease with what you had with
22     the 90-day due diligence?
23 A.  I think Mr. Long did.

Page 133

1  Q.  Okay.  And was it for 3500 a month?
2  A.  I think it had triple net in it.  I cannot
3      -- we have a copy of the lease.
4  Q.  And so when you got the --
5  A.  When he gave me the rider from Wal-Mart, I
6      called him back immediately after reading
7      it and told him, I said, there is no way
8      we can do here what we're talking about
9      doing.  I mean, it specifically states in
10     there, you know, that -- about
11     entertainment, you know, about any kind of
12     club.
13 Q.  Okay.  And that would have prevented you
14     from doing the whole concept, in your
15     opinion?
16 A.  Yes.  I mean, I didn't want to fight with
17     Wal-Mart about it.
18 Q.  Okay.  When you say rider, are you talking
19     about ground restrictions on the use of
20     the property?
21 A.  That's what I call it.  I don't know what
22     the correct -- I'm not a real estate
23     agent.  He just handed me a book, almost,

34  (Pages 130 to 133)

Page 134

1     and said, you need to read this.
2   Q.   Did Wal-Mart actually own the ground that
3     Copeland's sat on?
4   A.   No, but they -- that's what I didn't
5     understand. The only thing -- and I'm not
6     sure if they lease their area. I've met
7     the guys that own the shopping center --
8     they're the ones from St. Louis -- and
9     they do not own Copeland's ground. And
10    how they can have the restrictions on it
11    like that, I don't know.
12  Q.   Who is it that -- the folks from St.
13    Louis, do you know their names?
14  A.   I don't know. I've got their business
15    card. They're the ones that own three
16    shopping centers. They own Barnhill; they
17    own the one where Macaroni Grill is; and
18    they own the one where Wal-Mart is.
19  Q.   All right. When was it that you had the
20    Copeland's thing fall through?
21  A.   It would be on the contract. I don't know
22    what the date is.
23  Q.   Okay. And when you say it would be on the

Page 135

1     contract, if we looked at the lease,
2     there's a date on the lease. It would be
3     the date that you decided you couldn't do
4     it?
5   A.   I called him back the -- after reading the
6     thing, I called him back the next day and
7     told him, forget about the 90-day due
8     diligence, period. I said, this is not a
9     doable thing. I said, I'm not putting
10    money in and then going to war with
11    Wal-Mart.
12  Q.   And what did Robert say about that?
13  A.   He said fine, he understood.
14  Q.   Did he help you with any other properties?
15  A.   Only two that I recall him helping with is
16    the Friday's -- at that point, he asked me
17    to meet with I guess the guy who had
18    bought the Friday's building. He said he
19    wanted to meet me because he had decided
20    not to do the buffet there and wanted to
21    know if I would be interested in
22    purchasing that building, at which time he
23    told me that he wanted, I don't know, 450,

Page 136

1     460. He had put some money into the
2     building. And I just told him not -- you
3     know, it had the same restrictions on it
4     that Copeland's did.
5   Q.   Oh, did it? Did it have the same
6     restrictions?
7   A.   It's an outparcel to the Wal-Mart. I
8     don't know the subordinate -- I don't
9     know. Like I said, I'm not a real estate
10    agent. I just -- they have control over
11    those outparcels.
12  Q.   Okay. Did you ever deal with Robert Long
13    again on any other property?
14  A.   I don't recall. I might have called him.
15    He was very nice, very helpful, and he --
16    if I had a question about something, I
17    would have definitely called him.
18  Q.   Did you ever feel that Robert Long was
19    discriminating against you or your
20    business?
21  A.   No.
22  Q.   Did you ever feel that he was
23    discriminating against Mr. Terrence Long?

Page 137

1   A.   No.
2   Q.   And then the next building you said was
3     this old grocery store by the flea market?
4   A.   Yeah, well, I just went over there --
5     actually, got over there, and it's like
6     27, 30,000 square feet, and it's just not
7     something that I was interested in. Never
8     even...
9   Q.   Okay. Did you actually talk to a realtor
10    about that property?
11  A.   Actually, I talked to the people that
12    owned it out of Atlanta.
13  Q.   Do you remember their names?
14  A.   Willie Cook the city councilman, he got
15    their number for me.
16  Q.   You said the two places in Barnhill's by
17    the Montgomery Mall?
18  A.   Barnhill I think is the name of the
19    business that went out of business, the
20    family cooking place, which is 14,000
21    square feet. And then the other building
22    is the old Alabama Power building, same
23    shopping center.

35  (Pages 134 to 137)

Page 138

1 Q.   Same shopping center as the Barnhill's?
2 A.   Right.
3 Q.   Okay. And what was wrong with that space?
4 A.   It backs up -- the Alabama Power building
5      backs up to that nursing home, which is
6      not a doable situation. And then there
7      was so many structural problems with the
8      -- to start with, I didn't need 14,000
9      square feet. And I'm still on
10     communication with them about that. You
11     know, they are now coming back and saying
12     they'll do -- the inside of it was in
13     real, real bad shape.
14 Q.  Okay. So the old Alabama Power Company
15     building backs up to a nursing home, which
16     is not practical for someone who wants to
17     open a sports bar; is that --
18 A.  Right.
19 Q.  And then the 14,000 square feet, you're
20     still in negotiations with them now?
21 A.  Well, not in negotiations. It's still --
22     Paul Register is the one that brought them
23     to me, and he -- you know, he's called me

Page 139

1      back and said they're still interested in
2      doing something in that location.
3 Q.   Where does Paul Register work?
4 A.   Southern Property, I believe, is the name
5      of it.
6 Q.   Okay. So you've never actually submitted
7      a lease or sale contract to them for
8      purchase or lease?
9 A.   No.
10 Q.  Freddie B's. You said you looked at it
11     and it was too big?
12 A.  Well, I had called Amy about it a long
13     time ago, I think before it was leased,
14     and then I had somebody ask me to meet
15     with Danny Clements, who was owed
16     500-something thousand dollars, and see if
17     there was anything doable there. And it
18     was just -- I looked at their business
19     plan. I looked at their -- and it's
20     exactly where I said it would be, broke
21     before it got started.
22 Q.  You say you looked at their business plan?
23 A.  Yeah.

Page 140

1 Q.   Were you thinking about running the
2      business?
3 A.   No, absolutely not. They just wanted --
4      when I met with them that day, the guy
5      from California was there and they gave me
6      the business plan and they gave me a set
7      of the plans. We went over to the
8      building and looked at the building, and I
9      said, you know, 55,000 square feet. Dave
10     & Busters Atlanta, Dallas, Houston, draw
11     areas of -- back to demographics. Will it
12     work for this 4 million draw area in
13     Montgomery?
14 Q.  What was Freddie B's originally?
15 A.  Freddie B's was a -- you mean what was the
16     location?
17 Q.  Uh-huh.
18 A.  Some grocery store, is all I know.
19 Q.  And then they turned it into a bar called
20     Freddie B's?
21 A.  They attempted to.
22 Q.  Did it ever get off the ground?
23 A.  Ms. Knudsen did the lease; she could tell

Page 141

1      you.
2 Q.   Pardon me?
3 A.   Ms. Knudsen did the lease; she could tell
4      you.
5 Q.   Can you tell me what you understand?
6 A.   I was called in to see if it was -- it was
7      at a dead standstill. Danny Clements was
8      owed 560-something thousand dollars; the
9      landlords had put $600,000 into the
10     heating and air, and they just said go in
11     and see if there's anything salvageable.
12     And I looked at it and said, this is
13     exactly what I said to start with; it's
14     too big.
15 Q.  So it never actually opened and operated?
16 A.  No, it has not.
17 Q.  And who owned Freddie B's?
18 A.  Freddie Beasley.
19 Q.  Freddie Beasley?
20 A.  Fred Beasley, football player.
21 Q.  Okay. He owned it?
22 A.  Correct.
23 Q.  And who managed the company for him; do

36  (Pages 138 to 141)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 142

1    you know?
2  A.  I have no clue. I met the gentleman that
3    it was his concept from California, and
4    then as we asked him questions about his
5    business plan, you know, a $5 million
6    investment, and his return on his
7    investment was $12,000 a month, and I'm
8    going like --
9  Q.  You won't live that long?
10 A.  Well, I'm going like -- and then he got
11    real -- so that was -- that's neither here
12    nor there. It's a bad plan. I think
13    Mr. Beasley got taken advantage of. And
14    it's -- like I said, I've been doing this
15    for a long time. I'm good at it; I've got
16    a good track record. And they asked me to
17    talk to him before he did it, and he had
18    made up his mind, so...
19 Q.  When you say they asked you to talk to him
20    before he did it, who asked you to talk
21    with --
22 A.  Rad Dotson (phonetic), who is with one of
23    the radio stations, said, you know, will

Page 143

1    you talk to Freddie about doing this, and
2    what do you think about it. And I just
3    briefly told you, you know, I'm a numbers
4    person. I mean, you can look at it -- you
5    know, what works in Atlanta, will it work
6    in Montgomery? Very doubtful. So --
7  Q.  But are you saying that Freddie B's wanted
8    you to invest in it, to buy it from him?
9  A.  Well, they -- actually, when -- I don't
10    know if that's what they -- when I had
11    this meeting with Danny Clements and the
12    gentleman was there, I don't know if
13    that's what that meeting was about. They
14    were trying to keep the project going. It
15    was at a standstill. They had pulled
16    everyone out of the building. And I just
17    told them I had no interest in it
18    whatsoever.
19 Q.  How did you get introduced to the deal,
20    through this radio personality?
21 A.  Well, I think everybody in town knew about
22    it, but Rad is good friends with the
23    Beasleys, and his mother -- or whatever --

Page 144

1    I don't really know. He just said, what
2    do you think about it, and I just said, I
3    think it's not a doable thing in
4    Montgomery.
5  Q.  Was there a realty company involved in
6    that?
7  A.  Aronov had the lease on the building.
8  Q.  Did Grant Sullivan get involved on your
9    behalf?
10 A.  No, he did not. Jerry Willis is his
11    partner, which I think had something to do
12    with the lease too.
13 Q.  When was that, that you were asked
14    to look at Freddie B's?
15 A.  I don't recall. It was since the job has
16    been shut down. It's been in the last six
17    months probably.
18 Q.  But it's your understanding that Jerry
19    Willis represented Fred Beasley?
20 A.  I don't know who represented who.
21 Q.  Okay. What did you look at next? You
22    said the Fox & Hound building?
23 A.  I mean, I met with them before it ever

Page 145

1    closed.
2  Q.  And when was that?
3  A.  In fact, it was -- Fox & Hound was closing
4    because Freddie B's had to buy out their
5    lease, from what my understanding was,
6    because they were going to open this
7    facility there that would be in direct
8    competition with Fox & Hound. So that's
9    what I was told by the people that owned
10    the shopping center.
11 Q.  Who did you talk with at Fox & Hound?
12 A.  I don't know who was who. Paul Register
13    is the one who carried me over there.
14 Q.  Who is Paul Register?
15 A.  Southern Property.
16 Q.  Okay, thanks. I knew I heard that name.
17    And then did you actually offer up any
18    money for a lease or a sale on that
19    building?
20 A.  No.
21 Q.  When was it that you looked at the Fox &
22    Hound?
23 A.  That's been within the last couple months,

37  (Pages 142 to 145)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 146

1   right before it closed. I don't know how
2   long it's been closed, but it's been
3   within the last two or three months.
4   Q.   Okay. Have there been any other buildings
5        that you've looked at for opening this
6        sports bar?
7   A.   Not that I recall.
8   Q.   Are you still looking for buildings to
9        open this sports bar?
10  A.   Well, no. It kind of came to a standstill
11       for right now. Terrence is pretty
12       involved in his record label. I mean, you
13       know, he got real involved -- he's
14       traveling a lot and everything, so it's
15       just kind of on hold.
16  Q.   Okay. Is that the only reason it's on
17       hold, because Terrence is involved in his
18       record label and is traveling a lot?
19  A.   Why else does there need to be a reason
20       for it to be on hold?
21  Q.   I don't know. I just asked you a
22       question.
23  A.   It's just on hold.

Page 147

1   Q.   All right. So are you actively looking at
2        properties now to put a sports bar in?
3   A.   I'm actively, yes, open to -- and you can
4        call the one that's -- the only one I'm
5        dealing with right now is Paul Register
6        with Southern Property. And like I said,
7        he's called me back and said that the
8        Barnhill guys still want to talk about it,
9        even though I told them that I wasn't
10       interested because it was in such bad
11       shape.
12  Q.   Why are you working with Register and not
13       with Grant?
14  A.   Well, Paul is new in the business and he's
15       more into -- he has time to do this. I
16       mean, you know, is there anything that
17       says I have to deal with Grant because
18       he's my friend and partner?
19  Q.   No. I just asked a question.
20  A.   Paul is marrying a very good friend of
21       mine, and I met him through her, and we
22       just kind of hit it off and he's just been
23       trying to help me.

Page 148

1   Q.   Any other real estate agents that you've
2        worked with in trying to look at
3        properties?
4   A.   Well, I -- Frank Thomas, I looked at, you
5        know, land with him. We never purchased
6        anything together. He did sell a piece of
7        my property. That's all I can think of.
8   Q.   No other agents you can think of?
9   A.   Huh-uh.
10  Q.   Is that a no?
11  A.   That's a no.
12  Q.   And did you and Mr. Long -- and this time
13       I'm talking about Terrence Long -- ever
14       put together a written business plan for
15       your operation?
16  A.   Well, I've been doing this for quite a
17       while. I mean, there's, you know...
18  Q.   Is that a no?
19  A.   No.
20  Q.   Okay. Have you ever submitted any type of
21       application for a loan to get the business
22       going with any bank?
23  A.   Why would I want to do that when we could

Page 149

1   pay cash for it?
2        MR. GUY: I'm sorry?
3        THE WITNESS: We pay cash.
4   A.   Every single piece of property I have is
5        paid for in full. I have no loans, except
6        -- excuse me. On my house I have a little
7        bit.
8   Q.   Okay. Have there been any corporate or
9        partnership documents created for this
10       sports bar concept with Terrence Long?
11  A.   No.
12  Q.   Any kind of written documentation at all?
13  A.   No, just the lease. You know, just the
14       documentation such as the offers on the
15       building and the lease.
16  Q.   Okay. Have you ever in the past had a
17       major dispute with any of your landlords?
18  A.   With any of my landlords?
19  Q.   Uh-huh, or any owner of any shopping mall
20       that you were involved in?
21  A.   No.
22  Q.   Have you ever leased property from Aronov
23       Realty?

38  (Pages 146 to 149)

Page 150

1   A.   No.
2   Q.   How long have you known Amy Knudsen?
3   A.   The first day I met her was at LeCroy.
4   Q.   You never had met or seen her outside of
5        that transaction?
6   A.   Never.
7   Q.   And is it the best of your recollection
8        that that was around the first of May?
9   A.   Yes.
10  Q.   What is your understanding about the
11       relationship of Amy Knudsen, Aronov,
12       Meiying Forney -- well, let's start with
13       those, the relationship between them.
14  A.   I don't know what their relationship is,
15       other than Amy Knudsen works for Aronov;
16       Aronov was --
17  Q.   Did you ever talk to Meiying Forney?
18  A.   No.
19  Q.   When is the first time you knew who
20       Meiying Forney was?
21  A.   I don't know if it was before we filed the
22       lawsuit or afterwards -- no, I take that
23       back. It's when I made an offer to buy

Page 151

1        the shopping center, and at that time, her
2        name appeared on the contract.
3   Q.   Okay. Let's talk about that. When did
4        the offer take place?
5   A.   After I met Mrs. Knudsen there over at
6        LeCroy.
7   Q.   When you met Ms. Knudsen over at LeCroy,
8        were you there to inquire about leasing
9        the Pure Country space or buying it?
10  A.   Leasing.
11  Q.   At the time you looked at it, was it for
12       sale?
13  A.   I wasn't aware that the shopping center
14       was for sale at that time.
15  Q.   Was the Pure Country space for sale?
16  A.   Not to my -- I was there because I was
17       told that it had closed and it was for
18       lease.
19  Q.   Okay. Who told you that?
20  A.   Grant Sullivan.
21  Q.   Did Grant Sullivan go with you to meet
22       with Amy Knudsen at LeCroy?
23  A.   No. He called and set up the meeting.

Page 152

1   Q.   Did you ever talk to Amy Knudsen before
2        going over there and meeting with her at
3        the property?
4   A.   I don't know if I did or not. I might
5        have spoken to her on the phone or
6        something to set up a time when we were
7        going to meet or something. I don't know.
8   Q.   Were you present when Grant Sullivan
9        called Amy Knudsen to set up the meeting?
10  A.   No.
11  Q.   Did Grant tell you anything that Ms.
12       Knudsen said to him about this meeting?
13  A.   No.
14  Q.   Do you remember what day of the week it
15       was when you met over there?
16  A.   No.
17  Q.   Do you recall the actual day?
18  A.   No.
19  Q.   Do you remember what time of day it was?
20  A.   No.
21  Q.   Tell me about the meeting. How long did
22       it last?
23  A.   Probably 30, 40 minutes.

Page 153

1   Q.   Okay. What did y'all do?
2   A.   She opened up the building and started
3        showing me the building.
4   Q.   What did y'all talk about?
5   A.   I didn't talk much; she did.
6   Q.   What did she say?
7   A.   Well, at first I thought it was actually
8        Grant playing a trick on me. You know,
9        almost the first thing out of her mouth
10       when we were talking about the place was
11       they didn't want a black club there and
12       they didn't want that Celebrations thing.
13       And I kept looking at her like -- and I
14       thought Grant put her up to it or
15       something. So about the third time she
16       mentioned Celebrations and all that crap
17       going on out there and everything, I asked
18       her if she knew who I was, at which point
19       she said, your name sounds familiar. And
20       I told her who I was, and to say she
21       looked shocked would be -- she looked more
22       than shocked.
23  Q.   What did she say at that point?

Page 154

1  A.  Well, we actually talked a little bit, and
2      I tried to explain to her, I said, that
3      was a parking lot issue up there and it
4      had nothing to do with the club, and I
5      hope you don't think that has anything to
6      do with this. And at that point I told
7      her who I was doing this for and told her
8      who Terrence Long was and what he was
9      looking at doing. And she said that she
10     probably had formed her opinions through
11     the media, and she was, you know, very
12     nice about it. And I left.
13 Q.  Okay.
14 A.  After -- well, after discussing the rent.
15     She quoted me $4,500 on the rent, no
16     lease, no improvements.
17 Q.  Anything else you discussed that first
18     day?
19 A.  Just told her that I thought that we would
20     -- we'd go ahead and go with the -- that
21     it would probably be better if we went
22     ahead and went with the Friday's thing and
23     tried to work that deal out.

Page 155

1  Q.  I'm sorry. You lost me there. Work with
2      the Friday's thing?
3  A.  Yeah.
4  Q.  Why is that?
5  A.  Well, because they didn't have -- it was
6      just -- they were going to give me nothing
7      -- no consideration for leasehold
8      improvements. The rent, I knew about what
9      Tony had paid there at Pure Country, and
10     that was almost double what he had paid.
11     And, you know, if I could buy the Friday's
12     building for $400,000, I mean, it's a
13     better deal.
14 Q.  Okay. Anything else y'all discussed?
15 A.  Not that I recall.
16 Q.  Okay. You said that you went in there,
17     that she opened up the building and showed
18     you around the building?
19 A.  Correct.
20 Q.  You got the impression that it needed a
21     little bit of work before you would
22     actually be willing to rent the space?
23 A.  It needed a lot of work.

Page 156

1  Q.  Did you quote her any number at that time
2      on what it would cost to improve the space
3      to your liking?
4  A.  I told her I think it would -- because we
5      needed kitchen equipment and stuff, it
6      would probably span, you know, 100 to 150
7      grand, redoing the building.
8  Q.  Could it have been more like 300 or
9      400,000 that you quoted her?
10 A.  No.
11 Q.  No?
12 A.  Oh, absolutely not. I mean, how many
13     square feet is the building?
14     MR. QUINN: Don't ask questions,
15         just answer.
16 Q.  Is it 100 to $150,000 that you would need
17     in improvements?
18 A.  Right.
19 Q.  No more than that?
20 A.  No more than that.
21 Q.  All right. You said that she said they
22     didn't want a black club there?
23 A.  Correct.

Page 157

1  Q.  Those are actually words she used?
2  A.  Word for word.
3  Q.  Did you ask her what she meant by that?
4  A.  No, because I thought -- I mean, it's
5      pretty obvious what she meant. And I
6      thought it was being directed at me as a
7      joke, because, you know, Grant had set the
8      meeting up. He worked with Aronov for 15
9      years, and I thought -- and then the fact
10     that she kept mentioning Celebrations. I
11     actually thought it was them trying to be
12     funny. And then when I realized that she
13     really didn't realize who I was, that's
14     when I said, Amy, do you realize who I am.
15 Q.  Okay. And when you say they didn't want a
16     black club there, who was she talking
17     about?
18 A.  I don't know.
19 Q.  Is it she didn't want a black club there?
20     MR. QUINN: Object to the form.
21         He's already answered the
22         question. He doesn't know.
23     MR. STEWART: Object to the form.

40  (Pages 154 to 157)

Page 158

1  Q.   And she specifically said she didn't want
2       a Celebrations there?
3  A.   She referred to Celebrations several
4       times, yes, about the problems we had in
5       the parking lot, and that's when we had a
6       little talk. Amy, you know, you don't
7       understand that it is a parking lot
8       problem, and I explained to her about
9       having fewer problems inside the club than
10      I ever had. And she said that, you know,
11      that she agreed and that she -- like I
12      said, that she probably formed her
13      opinions on what she heard in the media.
14 Q.   Okay. But you specifically recall her
15      using the words "black club"?
16 A.   Absolutely.
17 Q.   No question in your mind?
18 A.   No question in my mind.
19 Q.   Okay. After talking with her about the
20      parking lot and how it was a problem with
21      the parking lot and how y'all didn't have
22      any problems within your property, did you
23      appear to get the impression that she was

Page 159

1       then open to talking with you about
2       leasing the property?
3  A.   No.
4  Q.   Well, why did you keep talking to her
5       about it then?
6  A.   Well, I -- when, that day?
7  Q.   Uh-huh.
8  A.   I left after that, and I just -- you know,
9       I just decided that it would be better to
10      pursue the -- you know, the Friday's
11      building. I actually had no desire to be
12      in a place where, you know, I wasn't
13      wanted.
14 Q.   Okay. You said that she actually
15      discussed with you on this first visit
16      that the rent would be $4,500 per month?
17 A.   Right.
18 Q.   She actually told you on the first meeting
19      that there would be no leasehold
20      improvements at all?
21 A.   Right.
22 Q.   When in the conversation did she tell you
23      that?

Page 160

1  A.   I don't know, just -- when we first got
2       there, walking around, or in the middle of
3       it. I don't know when. We were there 30,
4       45 minutes.
5  Q.   Was it at the beginning of the walking
6       around or at the end?
7  A.   It was probably more when I was leaving
8       the building.
9  Q.   So after having the conversation with you
10      about what they did or did not want there,
11      she was discussing lease terms with you?
12 A.   Well, I asked her what the lease would be.
13 Q.   Okay. Were you asking her what the lease
14      would be because you were still interested
15      in leasing the building?
16 A.   Yes, I was interested in leasing the
17      building.
18 Q.   So it was sometime after talking about the
19      rent amount and the leasehold improvements
20      that you left that day and thought it
21      would be better to go look at the Friday's
22      building because you didn't want to be
23      somewhere that you weren't wanted?

Page 161

1  A.   Well, when they quote you $4,500 on a
2       space that big when you could purchase
3       Friday's for -- you know, the offer I made
4       was $400,000.
5  Q.   You were asking about lease terms when you
6       had already decided you weren't interested
7       in the property?
8       MR. QUINN: Object to the form.
9  A.   Why wouldn't I? I mean, I was already
10      there and had spent -- why would I not
11      want to know what the lease was?
12 Q.   Okay. Anything else that y'all discussed
13      there on the first occasion?
14 A.   Not that I recall.
15 Q.   You said that Tony paid one half that
16      amount in rent for the Pure Country space?
17 A.   And once again, that's hearsay. I was
18      told he paid $2,500.
19 Q.   Who told you that?
20 A.   I don't know. Somebody in the...
21 Q.   Excuse me? Somebody in the what?
22 A.   It was just hearsay.
23 Q.   Right. I just asked you who told you

41 (Pages 158 to 161)

Page 162

1      that.
2   A.   I don't know.  It's easy to find out.
3          MR. GUY:  I'm sorry, I didn't
4          hear you.
5          THE WITNESS:  I said it's easy to
6          find out.
7          MR. GUY:  Who told you?
8          THE WITNESS:  No, what he paid.
9          MR. GUY:  I'm sorry.  I didn't
10         understand.  Thank you, sir.
11  Q.   Do you know who's leasing the space
12       currently?
13  A.   Yes.
14  Q.   Who?
15  A.   I believe it's the guy from Doodle
16       Hoppers.
17  Q.   Did you understand that the guy from
18       Doodle Hoppers had already asked about
19       leasing that space?
20  A.   Yes.
21  Q.   Were you told that the guy from Doodle
22       Hoppers had sort of a first right of
23       refusal to that space?

Page 163

1   A.   No, absolutely not.  Said he didn't have
2        the money to do it with.
3   Q.   No.  Did Amy tell you that he had the
4        first right of refusal to that space?
5   A.   No.
6   Q.   Did Amy tell you they had been negotiating
7        with him about leasing the space?
8   A.   She mentioned that he had looked at it,
9        about expanding it over there, but she
10       never said he had the first right of
11       refusal.
12  Q.   Well, words to that effect, that there was
13       somebody already looking at the space?
14       Did you know that?
15  A.   Well, I knew --
16         MR. QUINN:  And he's asking you
17         what you learned from her,
18         not what you may have
19         learned later.  He'll ask
20         you that in a minute.
21  A.   -- that somebody else was looking at the
22       building.
23  Q.   You did know that somebody else was

Page 164

1        looking at the building on this first
2        occasion?
3   A.   Right.
4   Q.   And did you know who it was?
5   A.   Well, she said it was the guy from Doodle
6        Hoppers.
7   Q.   Did you understand from the first meeting
8        that the guy from Doodle Hoppers would
9        have to turn down the space before it
10       would be available for rent by anybody
11       else?
12  A.   No, I did not.
13  Q.   So did you have the impression that
14       whoever said I want to lease it first got
15       it?
16  A.   Yes, that was the impression I got.
17  Q.   Was it a statement that was actually made
18       to you, though?
19  A.   I'm not sure.  If you can rephrase the
20       question...
21  Q.   Well, she didn't actually tell you that,
22       whoever gets to me first gets it, or words
23       to that effect, did she?

Page 165

1   A.   Well, she -- I don't recall exactly how it
2        was worded.
3   Q.   When did you first learn that Doodle
4        Hoppers did have the first choice at
5        leasing that space?
6   A.   I never did.  I sent somebody in there to
7        -- and they offered him a lease right
8        there on the spot.
9   Q.   Huh?  Tell me about that.  What are you
10       saying?
11         MR. QUINN:  Tell him what you're
12         talking about.
13  A.   I sent Mark Cranage in there -- it's all
14       right there in writing -- and offered him
15       -- after she insinuated to me that she was
16       working on a lease with somebody, I drove
17       to Woodmere Tavern and -- to talk to them
18       about it.  And Mark picked the phone up
19       and called Amy, and to our shock, she
20       said, oh, yeah, we can get you in.
21       Because I had asked to get back in the
22       building to let Terrence get in to see the
23       building, and she said we couldn't get in

42  (Pages 162 to 165)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 166

1    the building because it was in bankruptcy.
2    I said, Amy, we've already been in the
3    building. Anyway, she told Mark that that
4    was -- that he was the kind of people --
5    she remembered him from having the country
6    western place up in Millbrook. She was
7    familiar with Woodmere's format, you know,
8    and she said, you're the kind of people we
9    want in here; we've got other people
10   looking at the building; we can get you in
11   there as quickly as possible to look at
12   it. And I think if you read the tape, I
13   think it's self-explanatory after that.
14   So if there was a lease they were working
15   on then, then why did the attorney that
16   represents the shopping center offer him a
17   lease, that he'd have it ready by that
18   Monday? It's very confusing to me.
19 Q.  So the whole Mark Cranage video was your
20      idea?
21 A.  Well, yeah, actually, it was.
22 Q.  What did you want to do?
23 A.  I wanted to see if it was what was going

Page 167

1    on that I thought was going on, and that
2    was that I was being treated differently.
3 Q.  Okay. Did you tell Mark Cranage to take a
4      video camera in there and record?
5 A.  Actually, I asked him if he would take the
6      recorder in there, and he took the video
7      thing in there on his own.
8 Q.  Okay. Was there any meeting or
9      conversation that you had with Amy Knudsen
10     after the first visit to the property?
11 A.  I called her several times on the phone.
12 Q.  Okay. Did you call her several times on
13     the phone before or after Mark Cranage
14     went in?
15 A.  I called her after Mark went in to see the
16     building, just to see if she'd let me in
17     the building.
18 Q.  Why did you want to get in the building?
19 A.  I just wanted to see if she'd let me in
20     the building.
21 Q.  To see if --
22 A.  If I was being discriminated against.
23 Q.  And did she say you can get into the

Page 168

1    building?
2 A.  She said I could not.
3 Q.  Did she say that she would have to get the
4      key from anybody?
5 A.  She said that -- then after I asked her,
6      you know, if -- had anybody been into the
7      building at that point, then she told me
8      that, well, you know, that she might could
9      get in touch with that lawyer that's
10     handling the bankruptcy to get us into the
11     building. And then I asked her about a
12     piece of property over on Southern
13     Boulevard and we discussed that.
14 Q.  What about the property on Southern
15     Boulevard? What was that?
16 A.  They had a piece of property over there in
17     the same shopping center where the flea
18     market is that was -- you know, I just
19     asked her about it and could she check on
20     that for me; it was her listing. She said
21     that she would and she'd get back with me.
22 Q.  Did she ever get back with you?
23 A.  We never discussed it.

Page 169

1 Q.  Did she ever call you back subsequent to
2      that day?
3 A.  I don't recall.
4 Q.  Did you ever ask her about that property
5      ever again?
6 A.  I just remember the one conversation.
7 Q.  Okay. So the whole purpose of your
8      talking with Amy after Mark Cranage went
9      into the building was just to build your
10     case?
11 A.  Well, just to verify if it's, you know,
12     what I thought was going on. The day that
13     I went in Woodmere Tavern -- I mean,
14     you've got a guy that's been in the bar
15     business 20-something years, and his
16     managing partner is sitting there, and I'm
17     saying I think they're giving me the
18     run-around. And Mark said, well, let me
19     call and see what they say. And it was
20     just, you know -- stunned everybody in the
21     room that she would just blatantly put --
22     we'll put you at the front of the list;
23     you're the kind of people that we want in

43 (Pages 166 to 169)

Page 170

1    there. And like I said -- I don't think I
2    have to comment on that.
3    Q.    And you think the statement, you're the
4        kind of people we want in there, is a
5        racist statement?
6    A.    Absolutely.
7    Q.    What about that is a racist statement?
8    A.    Well, she goes into this history about a
9        country western bar, and Woodmere is
10       predominantly white. LeCroy shopping
11       center is -- and you're forgetting that I
12       made an offer to buy the shopping center.
13   Q.    I'm not asking about that right now. Keep
14       going.
15   A.    But both are predominantly a white club.
16       You know, that space has been a bar for
17       I'm assuming 30-something years, nothing
18       but a bar, and it's all right for it to be
19       a predominantly white bar, but it's not
20       all right for it to be predominantly
21       black. That was what I interpreted.
22   Q.    Had Woodmere had any experience like
23       Celebrations had had in the parking lot?

Page 171

1    A.    They had four cars broken into this
2        weekend. I mean, I don't know. They've
3        had -- they've had --
4    Q.    Any shootings in the parking lot?
5    A.    They've had three shootings in the parking
6        lot. I mean, they had a guy pull a gun
7        and shoot three holes through the ceiling.
8    Q.    Three what?
9    A.    Three holes through the ceiling.
10   Q.    Other than those examples, do you know
11       whether the experience at Woodmere was
12       like the experience out at Celebrations?
13           MR. QUINN: Object to the form.
14               You can answer, if you can.
15   A.    What, now?
16   Q.    Do you know from your personal knowledge
17       whether the experience at Celebrations was
18       anything like the experience at Woodmere
19       Tavern?
20   A.    One was predominantly black; one was
21       predominantly white.
22   Q.    I'm talking about the violence in the
23       parking lot, the problems in the parking

Page 172

1    lot.
2    A.    I have no knowledge of it.
3    Q.    Okay. And as you sit here today, do you
4        know whether when Amy allegedly said that,
5        you're the type of people we want in
6        there, whether she was talking about
7        tenants who were not problem tenants?
8    A.    I think she was referring to -- after
9        going into detail with him about their
10       format -- what's your format that you're
11       going to use, you know, you're wanting to
12       do the country western; that's perfect;
13       we'll move you to the front of the line.
14       I think country western speaks for exactly
15       what those kind of people are.
16   Q.    Rednecks?
17   A.    No.
18   Q.    White people?
19   A.    I don't know. Do you listen to country
20       music?
21   Q.    No.
22           THE WITNESS: I asked a question,
23               didn't I?

Page 173

1            MR. STEWART: And I answered it.
2    Q.    But my question is, if she said this
3        statement, do you have any idea whether it
4        was meant to be racial?
5    A.    About the country western?
6    Q.    Right. I understand the suspicion you
7        have, but do you have any evidence or
8        facts that the statement was racial at
9        all, is all I --
10           MR. QUINN: Object to the form.
11               What have we been talking
12               about the last 20 minutes
13               other than what she said and
14               what she was thinking?
15           MR. STEWART: Counsel, counsel,
16               counsel. Middle District of
17               Alabama. Object to the form
18               is fine. You know that.
19           MR. QUINN: Just trying to speed
20               things along here.
21   Q.    Do you?
22   A.    Do I what?
23   Q.    Have any facts or evidence that this

Page 174

1    statement, if it was, in fact, made --
2  A.   In my opinion, it was.
3  Q.   I know what your opinion is. I'm asking
4       you if you have any facts or evidence that
5       it was.
6  A.   Well, I --
7          MR. QUINN: Object to the form.
8  A.   I think the tape speaks for itself. I
9       think what she said on our first meeting
10      speaks for itself, and I think anybody
11      that can't take and put that in context
12      when they refer to, what's your format
13      going to be, country western or something
14      like Woodmere, which is a predominantly
15      white club, and you can't put that in
16      context and a person of average
17      intelligence can't figure out exactly what
18      was going on there? So it's my opinion,
19      is all I can give you.
20 Q.   Okay. That's all I'm asking. How many
21      times do you think you talked to Amy after
22      y'all met there face to face?
23 A.   I have no clue, but it's very simple. We

Page 175

1       can get my cell phone records, and it'll
2       all be there.
3  Q.   And that's probably a good idea, so what
4       is your cell phone number?
5  A.   657-2277.
6  Q.   And who is your service with?
7  A.   Verizon.
8  Q.   You had the one meeting in person with
9       Amy. Did you ever meet with her again?
10 A.   Not that I recall, no.
11 Q.   Did you ever see her again until today?
12 A.   Not that I recall.
13 Q.   And I want you to do the best you can for
14      me in terms of telling me what
15      conversations you had with her on the
16      telephone after that first meeting. I
17      know you said you can look at your cell
18      records and tell me how many times. I'm
19      not really asking --
20 A.   I think Grant got the rent rolls to
21      determine what the cap rates were on the
22      shopping center. We looked at them, and
23      since the Montgomery Mall had just sold

Page 176

1       for 4.4, we felt like it was worth
2       somewhere around a million one, a million
3       two. I offered a million dollars on the
4       shopping center. I think Grant handled
5       all that; I don't think I talked to her.
6       I think he sent her the contract and told
7       me there was not even a counteroffer.
8  Q.   Okay. And when did you talk to her again?
9  A.   I don't -- I don't know. I mean, I
10      brought the tape today of -- that I had
11      found of conversations that I -- I left
12      her messages and stuff, and then on the
13      tape is this -- the day after Mark had
14      gone in and she had showed him the
15      building. And I called up and asked, and
16      she seemed very uncomfortable with it, and
17      so I changed the subject to the place over
18      there on the Southern Boulevard. And
19      that's it.
20 Q.   Okay. The record doesn't reflect what
21      tape we're talking about, so we probably
22      need to put that in some context. You
23      brought a tape with you to the deposition?

Page 177

1  A.   Correct.
2  Q.   That tape had not been provided to us
3       before today; is that correct?
4  A.   Correct.
5  Q.   No transcript had been provided to us
6       before today; is that correct?
7  A.   Correct.
8  Q.   Okay. And the tape contains a call to Amy
9       Knudsen on June 13, 2007?
10 A.   I couldn't tell you what the day is.
11 Q.   It's labeled June 13 and 14 on the
12      outside. Is that your handwriting?
13 A.   On the tape?
14 Q.   On the outside of the tape, the paper
15      that's there. Did you write the date on
16      there?
17 A.   I don't know. I'd have to see it.
18 Q.   You called her, left her a message on her
19      machine, correct?
20 A.   A couple of times, yes.
21 Q.   You called Aronov and left a message
22      there?
23 A.   Correct.

Page 178

1  Q.  They offered to give you her cell phone
2      number, I believe, and you said, I already
3      called the cell phone; is that correct?
4  A.  I don't recall.
5  Q.  And then you actually spoke with Amy the
6      next day, is that correct, the day after
7      this series of leading messages?
8  A.  Correct.
9  Q.  And then at that time you thanked her for
10     calling you back and said that something
11     was wrong with your cell phone and you
12     didn't get the message?
13 A.  Battery's dead.
14 Q.  Okay.  You talked to her about getting a
15     backup lease on the property?
16 A.  Right.
17 Q.  And she said that you could possibly get a
18     backup lease on the property?
19 A.  I didn't listen to the tape.  I don't -- I
20     don't remember.
21     MR. QUINN:  He's just asking is
22        what you recall now.
23 Q.  Do you recall if y'all discussed that?

Page 179

1  A.  Yeah.  I asked if they were working on a
2      lease because they just offered Mark a
3      lease.  And I said, well, can I get a
4      backup lease on it.
5  Q.  And she said you possibly could?
6  A.  She didn't seem real anxious.  I don't
7      remember.
8      THE WITNESS:  Maybe I should have
9         listened to the tape before
10        I gave it to them.
11 Q.  Well, I'm just asking you what you recall.
12     Do you recall whether she said one way or
13     the other about the backup lease?
14 A.  No, I don't.
15 Q.  Do you recall that she offered to give you
16     the phone number of the person with the
17     key so that you could call and go look at
18     the property?
19 A.  Well, I told you after I -- you know, that
20     she finally said that the guy, the
21     attorney, whoever it was, that she might
22     be able to get in touch with him and get
23     us in the building.

Page 180

1  Q.  Okay.  And that you said you didn't need
2      to see the property because you had
3      already seen the property already?
4  A.  Right.
5  Q.  And then you talked about this other
6      property near the flea market, you said?
7  A.  Correct.
8  Q.  And you wanted somebody to check on the
9      restrictions and get back to you?
10 A.  Correct.
11 Q.  Other than that conversation that you have
12     recorded, were there any other
13     conversations that you had with Amy
14     Knudsen?
15 A.  Recorded or just conversations?
16 Q.  Any other conversations?
17 A.  I don't recall any.
18 Q.  So you could have or could not have had
19     any conversations, but you don't recall
20     what you talked about if you did; is that
21     a fair summary?
22 A.  Well, the only ones that I recall are the
23     ones that I -- that we've spoken about.

Page 181

1  Q.  Okay.  Then let's shift to the
2      conversation with Grant Sullivan.  He got
3      the rent rolls on the LeCroy shopping
4      center?
5  A.  Yes.
6  Q.  Where did he get that from?
7  A.  I guess from Amy.  I don't know.
8  Q.  Okay.  So someone at Aronov, Amy or
9      somebody, had provided Grant Sullivan with
10     the rent rolls on the property?
11 A.  Correct.
12 Q.  And the purpose of looking at the rent
13     rolls was to come up with some sort of
14     value for purchasing the property?
15 A.  Correct.
16 Q.  We've already established that you don't
17     know whether, at the time that y'all were
18     looking at this property, that it was for
19     sale or listed for sale?
20 A.  When I first originally went in to look at
21     it for leasing it, I was not aware that it
22     was for sale.
23 Q.  Okay.  And do you know whether at the time

46  (Pages 178 to 181)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 182

1   you went in to look at it that it was
2   placed on the market?
3   A.   Do I know when it was placed on the
4   market?
5   Q.   Do you know if it was placed on the
6   market?
7   A.   No, I don't.
8   Q.   Do you know if it had been on the market
9   before you went to look at it?
10  A.   I don't know.
11  Q.   Do you know why there was no counter to
12  the one million one or one million two?
13  A.   No.
14  Q.   Do you have any facts or evidence or
15  reason to believe that it was racially
16  motivated?
17  A.   No.
18       MR. STEWART:  Would now be a good
19          time to take a break?
20       (Brief recess.)
21  Q.   The meeting at the property with Amy that
22  we discussed before the break, I think you
23  had said it may have lasted 30 or 40

Page 183

1   minutes.  Could it have lasted longer than
2   that?
3   A.   Could have.
4   Q.   Okay.  In fact, did you not attempt to
5   contact on several different occasions
6   Mr. Long, Mr. Terrence Long, to come view
7   the property?
8   A.   That day?
9   Q.   Yeah.
10  A.   No, absolutely not.
11  Q.   Did you not call him from the property, as
12  you and Amy were looking at it, on your
13  cell phone?
14  A.   I don't believe so.  I might have called
15  him when I was leaving the property or
16  something like that, but I don't --
17  Q.   Well, weren't y'all waiting for him to
18  show up to look at it?
19  A.   I don't recall that.  You know, it was --
20  that's -- what I was doing was looking at
21  buildings, and when I found buildings --
22  however, there is one conversation that I
23  would like to -- you keep asking me if I

Page 184

1   had other conversations with Amy.  The day
2   I told you I went to Woodmere with Mike
3   Morin -- because I had just called Amy to
4   ask her if me and Terrence Long could get
5   in the building and she said, no, it's
6   tied up in bankruptcy.  And that's when I
7   drove to Woodmere and was talking to Mike
8   and Mark.  And we were in there, I don't
9   know, 15, 20 minutes, and Mark said -- I
10  told them what I thought was going on, and
11  Mark said, well, let me call.  So I talked
12  to her that day before Mark called, and
13  then she -- that's -- I just -- you follow
14  that?
15  Q.   No.  No, I didn't.  I got the impression
16       --
17  A.   Before I went to Woodmere, I had been on
18  the phone with Amy and asked her if
19  Terrence and I could get in the building,
20  that, you know -- I don't know if this is
21  the time when the Friday's thing and he
22  wanted to go ahead and do something
23  immediately.  And then she asked me if my

Page 185

1   client was still Terrence, and I said yes.
2   And she said, well, it's tied up in
3   bankruptcy; you can't get in.  And that's
4   when I told her, well, it was in
5   bankruptcy when you let me in before;
6   well, we can't do it now.  At that point
7   is when I drove up there and talked to
8   Mike and Mark and Mark made the phone call
9   to her.
10  Q.   Was this conversation you just told us,
11  was it record?
12  A.   No.
13  Q.   Is there anything else y'all discussed in
14  the phone conversation?
15  A.   Just trying to get into the building.
16  Q.   Okay.  And why did you want to get in the
17  building?
18  A.   To let Terrence look at it, because I told
19  him it needed some work.  And that's when
20  the Friday's thing fell through.  At this
21  point he wanted to move ahead and do
22  something immediately.
23  Q.   To lease the property?

47 (Pages 182 to 185)

Page 186

1  A.  To do -- to do something -- he wasn't
2      interested in waiting around until, you
3      know, this supposed ground lease with
4      Friday's came up or whatever.
5  Q.  Okay.  So you were trying to get Terrence
6      Long to go over there with you to look at
7      the property?
8  A.  Correct.
9  Q.  And you were told that she didn't have the
10     key, that it was in bankruptcy?
11 A.  Right.
12 Q.  And do you recall when that conversation
13     took place?
14 A.  It's the same day that I went to Woodmere.
15     I'm sure.
16 Q.  Is there anything else you recall from the
17     conversation?
18 A.  No.
19 Q.  Were you still interested in leasing the
20     space at that time?
21 A.  Yes.
22 Q.  Okay.  Then is the visit that Mr. Cranage
23     makes to the property the same day as this

Page 187

1      phone call?
2  A.  No.
3  Q.  When was it?
4  A.  She said, we need to get you in there this
5      afternoon; she gave him the attorney's
6      number.  He called the attorney, and I
7      think there was a day or two in there
8      before he actually got in to see the
9      building.
10 Q.  Okay.  And you understand that it was an
11     attorney who actually met him at the
12     property and let him in?
13 A.  Don Little.
14 Q.  And who do you understand Mr. Little to
15     represent?
16 A.  The shopping center.
17 Q.  So this call that you've just described to
18     us, this call that took place before you
19     went to Woodmere Tavern, did it happen on
20     the very day you went to Woodmere Tavern?
21 A.  Yes.
22 Q.  And you went there and told the guys what
23     happened, and at that time, Mark placed

Page 188

1      the phone call that very afternoon?
2  A.  Same afternoon.
3  Q.  Okay.  The first day that you were there,
4      do you recall saying that you needed more
5      space than was available there?
6  A.  I asked if there could be more space made
7      available.
8  Q.  Did you say that you needed 8,000 square
9      feet instead of 6,000 square feet and it
10     would be necessary to get the space next
11     door where the barber shop was located?
12 A.  No.
13 Q.  That didn't take place?
14 A.  I asked her if that space -- if it could
15     be moved and would it be possible, but it
16     wasn't part of the criteria.  I mean, you
17     downsize whatever you're going to do.  It
18     would have been nice to have the space.
19 Q.  And on that first day, you were told that
20     someone was already in the process of
21     working out a lease on the property?
22 A.  I was told that someone was looking at the
23     property.

Page 189

1  Q.  Okay.  Did you, at the time, talk about
2      having a condo at the beach that you were
3      going to have to sue somebody over?
4  A.  That I was what?
5  Q.  Had a condo at the beach you were going to
6      have to sue somebody over?
7  A.  Well, that's -- you know, I don't have a
8      lawsuit against anybody about a condo at
9      the beach.
10 Q.  Do you recall talking with Amy about that?
11 A.  Absolutely not.
12 Q.  You don't recall saying that you had to
13     sue the contractor who did the build-out
14     or the seller of the condo at the beach?
15 A.  I don't discuss my personal stuff with
16     strangers.
17 Q.  Is that a no?
18 A.  No.  And there's no lawsuit against
19     anybody.
20 Q.  Okay.  If this particular property at
21     LeCroy shopping center was not listed for
22     sale or for lease at the time that you
23     went and looked at it, how did you know

Page 190

1      that there was a potential that it would
2      be at some point in the future?
3  A.   How did I know what?
4  Q.   How did you know that it would be listed
5      for sale or lease at some time?
6  A.   I had no clue. I mean, somebody told me
7      they were closed down. I had Grant check
8      on it. Ms. Knudsen's name was up on the
9      thing, and he -- Grant called her and set
10     up the meeting.
11 Q.   Okay. When you say "up on the thing," I
12     guess I interpreted --
13 A.   Up on a sign.
14 Q.   On a sign that says this space for lease?
15 A.   Correct.
16 Q.   There wasn't any one of those signs out
17     there.
18 A.   There was one on the door when I went
19     there.
20 Q.   What did it say?
21 A.   It said for lease or whatever, then it was
22     -- a week later it was gone, and then
23     there's just the big sign there, the

Page 191

1      Aronov sign.
2  Q.   And what did the big sign say?
3  A.   Just Aronov, for lease, office space for
4      lease or -- I don't know exactly word for
5      word.
6  Q.   So there was always a lease sign on it?
7  A.   There was only one on the building the
8      first time that I went over there. Then
9      after that, they just -- you know, I drove
10     by there and it had been taken down.
11 Q.   Are you sure that sign didn't say
12     something about the property -- if you had
13     any questions about the property to call
14     Aronov, as opposed to an actual lease
15     sign?
16 A.   No, it was a lease sign.
17 Q.   On the Pure Country space?
18 A.   Right, on the front door.
19 Q.   Okay. How about Tony Fannin (phonetic).
20     Do you know Tony Fannin?
21 A.   Yes.
22 Q.   How do you know him?
23 A.   Through the bar business.

Page 192

1  Q.   Are y'all friends?
2  A.   Acquaintances.
3  Q.   And what businesses does he run?
4  A.   Does he run now? I have no clue.
5  Q.   What did he do at the time?
6  A.   He ran Pure Country.
7  Q.   Have you talked to him since you went out
8      there?
9  A.   No.
10 Q.   You haven't talked to him since the
11     lawsuit was filed?
12 A.   No.
13 Q.   And you haven't talked to him about the
14     lease terms that he had?
15 A.   No.
16 Q.   Do you know where he lives now?
17 A.   No.
18 Q.   Do you know the Hudsons, Jeannie, Todd, or
19     Steven Hudson?
20 A.   No.
21 Q.   Phillip Stewart?
22 A.   No.
23 Q.   Jeff Strong?

Page 193

1  A.   No.
2  Q.   Sam McGarr (phonetic)?
3  A.   No.
4  Q.   Have you ever dealt with him?
5  A.   Not that I know of.
6  Q.   Do you know any of the tenants that are in
7      LeCroy shopping center?
8  A.   No.
9  Q.   Do you know anyone associated with Doodle
10     Hoppers?
11 A.   The guy that -- ever who he is called me
12     up and wanted to know if I wanted to buy
13     Doodle Hoppers -- this is after I looked
14     at LeCroy -- and talked to me about
15     expanding over to that part right there.
16     And I told him, I said, bigger is not
17     always better, you know, and that's just
18     one of those conversations -- I figured he
19     had somebody call me, because I didn't
20     know him. Only thing I had seen was his
21     picture off the internet. And that's -- I
22     don't have any desire to do business with
23     him.

49  (Pages 190 to 193)

Page 194

1  Q.  Why is that?
2  A.  He's a pedophile, raped a 12-year old
3      girl, 18 years in prison.
4  Q.  Okay.  And who is that?  What's the guy's
5      name?
6  A.  I don't know.
7  Q.  Did you ever tell anybody that before
8      today?  I'm not talking about your lawyer.
9      Have I told them?
10 Q.  No --
11         MR. QUINN:  Don't talk about what
12            you've told us.
13 Q.  I'm not asking what you've told your
14     lawyer.
15         MR. QUINN:  His question is, have
16            you ever told anybody that.
17 A.  Yes.
18 Q.  Who?
19 A.  Mike Morin.
20 Q.  Okay.  Who else?
21 A.  My wife.
22 Q.  Amy Knudsen?
23 A.  I don't know if I told her or not.

Page 195

1  Q.  Okay.  Now, as you sit here today, are
2      there any other conversations that you had
3      with Amy?
4  A.  No, not to my knowledge.
5  Q.  Any other that you had with anybody at
6      Aronov?
7  A.  Not to my knowledge.
8  Q.  Did you ever call anybody at Aronov and
9      say, let me tell you what Amy said to me?
10 A.  No.
11 Q.  Did you ever report her conduct to the
12     Alabama department of real estate
13     people --
14 A.  No.
15 Q.  -- whatever that is called?  Alabama Board
16     of Realtors?
17 A.  No.
18 Q.  Have you ever reported it to anybody,
19     other than your lawyer?
20         MR. QUINN:  You can answer that,
21            but you can't say what was
22            said.
23 A.  I went to Wayne Sable, who is my attorney

Page 196

1      here, and showed him what I had.
2  Q.  Okay.  Have you recorded any other phone
3      conversations?
4  A.  No.
5  Q.  Has anybody recorded any other phone
6      conversations for you?
7  A.  No.
8  Q.  Is there anywhere that you have written
9      down notes of what you discussed with Amy
10     Knudsen?
11 A.  No.
12 Q.  Is there anyplace where you've typed
13     notes?
14 A.  No.
15 Q.  Do you have any kind of diary or journal
16     of calls?
17 A.  No.
18 Q.  Do you have any phone message slips that
19     relate to this?
20 A.  No.
21 Q.  Did you send e-mails to anyone?
22 A.  No.  I mean, do I send e-mails --
23         MR. QUINN:  About this.

Page 197

1  A.  No.
2  Q.  Did you discuss what happened with Amy
3      with Terrence Long?
4  A.  After I met with my -- with Wayne Sable.
5      Up to this point, I had told him nothing
6      about what was going on.
7  Q.  Okay.  What did you tell him?
8  A.  Told him --
9  Q.  Not Wayne Sable; Terrence Long.
10 A.  We had a meeting at Wayne's office and --
11         MR. QUINN:  Huh-uh.
12 Q.  Nothing that you discussed with Wayne
13     Sable, even if Terrence Long was there,
14     okay?
15 A.  What we told -- but it was we.
16 Q.  Okay.  That's fine.  I'm not entitled to
17     know that.  Did you ever discuss this with
18     Terrence Long without a lawyer present?
19 A.  Yes.
20 Q.  When?
21 A.  After we left that day.
22 Q.  What did y'all discuss?
23 A.  He asked me why I hadn't told him what was

Page 198

1    going on, and I told him that I didn't
2    think it would come to this and that --
3    honestly, he's a professional baseball
4    player and has played ball all over the
5    United States, and actually, I was
6    embarrassed that something like this could
7    go on in this day and time.
8  Q.  Okay.  Anyone else y'all discussed about
9    this case without a lawyer present?
10 A.  Asked him if he wanted to see the tape,
11   and he said no.  I asked him why not, and
12   he said it would probably upset him too
13   much or -- I don't know if that's the
14   exact words he used or not.
15 Q.  Anything else you discussed?
16 A.  Fishing.
17 Q.  About this case?
18 A.  No.
19 Q.  Did y'all ever settle on a name for the
20   bar you wanted to call your sports bar?
21 A.  T. Long's.  T. Long's Sports Bar and
22   Grill.
23 Q.  Why did you file this lawsuit?

Page 199

1  A.  Because I think I was -- my opinion --
2    extremely discriminated against.
3  Q.  What do you hope to accomplish?
4  A.  Make sure it doesn't happen again.
5  Q.  Make sure what doesn't happen again?
6  A.  That people aren't discriminated against
7    in this way.
8  Q.  Why didn't you sue the City of Montgomery
9    or Bobby Bright when you felt that you
10   were being discriminated against there?
11 A.  Well, actually, had I not shut my bar
12   down, I probably should have, but I shut
13   it down on my own.
14 Q.  Did you ever see a lawyer about suing the
15   City of Montgomery?
16 A.  Yes.
17 Q.  Was that Wayne Sable?
18 A.  Yes.  That's why he would have all the
19   files.
20   MR. STEWART:  Mike, I --
21   MR. QUINN:  Talk to Kevin.
22   MR. STEWART:  Kevin, I marked as
23     Exhibit 1 the notice of the

Page 200

1    deposition, and I've got
2    copies for you in case
3    you're like me and you don't
4    have copies.  Do you need
5    one?
6    MR. JENT:  I've got it.
7    MR. STEWART:  Okay.
8  Q.  I'll give you Exhibit 1, Mr. Barr.
9    MR. STEWART:  Do you need one
10     over there, Mike?
11   MR. QUINN:  No, we can look at it
12     together.  Thanks.
13 Q.  Have you seen Exhibit 1 before?  I'll let
14   you put your glasses on before you answer
15   that question.
16     (The referred-to document was
17       marked for identification as
18       Defendants' Exhibit No. 1.)
19 A.  My arms aren't long enough anymore.  Have
20   I seen this?
21 Q.  Yes.  This is the deposition notice for
22   your deposition.
23 A.  Yes.

Page 201

1  Q.  And did you see the Schedule A that was on
2    Page 3 that asks you to bring certain
3    things to your deposition?
4  A.  Yes.
5  Q.  And have you, in fact, brought things
6    responsive to this Schedule A to your
7    deposition?
8  A.  I gave my attorneys everything I had in
9    the file.
10 Q.  Okay.  Let's look at Paragraph Number 1.
11   What have you given to your attorneys that
12   would be records, notes, memoranda,
13   correspondence, audio, or video
14   recordings?
15 A.  Paragraph 2?
16 Q.  One.
17   MR. JENT:  He's on Page 3.
18 A.  What have I given to them?
19 Q.  Yeah.
20 A.  The audio/video recordings.  There is no
21   correspondence.  I think maybe some of my
22   phone records might have been in there,
23   highlighted.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 202

1  THE WITNESS: The chronological
2  --
3  MR. JENT: We do have an
4  attorney-client work product
5  objection in our objections.
6  We'll provide a --
7  MR. STEWART: As to the
8  chronology? Is that what
9  you're talking about?
10  MR. JENT: Yeah. He did
11  something for us.
12  MR. STEWART: I understand that.
13  I think I've got one of
14  those too, so I'm not going
15  to ask you for yours.
16  Q.  You say you turned over phone records?
17  A.  Well, I think -- everything that I had is
18  in one file. When you told me to bring
19  this, I pulled it out and I found that
20  tape in the bottom of the file.
21  Q.  Okay. Let me mark what I've been handed
22  as documents responsive to this notice. I
23  was given Exhibits 4 through 7, which

Page 203

1  appear to be income statements and income
2  tax returns.
3  (The referred-to documents were
4  marked for identification as
5  Defendants' Exhibits Nos. 4,
6  5, 6, and 7.)
7  A.  Correct.
8  Q.  Do you recall if you have any phone
9  records with highlights on them?
10  MR. QUINN: He has never seen
11  those.
12  A.  Well, it might have been pertaining to
13  something else.
14  Q.  I'd ask you to go back and look for these
15  highlighted phone records and produce them
16  to your attorneys so they can turn them
17  over to us.
18  MR. JENT: Did we give you this?
19  It's the lease on the
20  Copeland's.
21  MR. QUINN: We didn't give them
22  that.
23  MR. JENT: Well, that's their

Page 204

1  copy.
2  MR. STEWART: We'll mark that
3  Exhibit 8, then.
4  (The referred-to document was
5  marked for identification as
6  Defendants' Exhibit No. 8.)
7  MR. QUINN: You can see all the
8  things that Wal-Mart
9  requires in order to have a
10  piece of property on their
11  property line.
12  Q.  I think I've already asked you if you had
13  notes or memoranda, and you've told me
14  that you do not?
15  A.  No, sir. The only thing that I have is
16  the chronological that Mr. Sable asked me
17  to do.
18  Q.  Okay. And the only audio recording,
19  you've produced to us today -- I guess we
20  ought to set aside a sticker for it
21  somewhere. Number 9. And I'll just write
22  audio on it. And we can probably just
23  make a xerox copy of the paper that goes

Page 205

1  in it so we'll know what we're talking
2  about. And you only have the one video
3  recording that's been turned over to us?
4  (The referred-to document was
5  marked for identification as
6  Defendants' Exhibit No. 9.)
7  A.  Correct. I mean, one copy.
8  MR. JENT: One actual recording
9  is what he's asking.
10  A.  Yeah, one recording.
11  Q.  You have no correspondence to and from
12  Aronov?
13  A.  The only thing I had from Aronov is
14  leases. Anything with me and Robert Long,
15  it was all in there. I gave them
16  everything I had, which is barely
17  anything.
18  MR. JENT: It's in our
19  disclosures.
20  Q.  You have no e-mail correspondence between
21  you and Aronov?
22  A.  No.
23  Q.  None between you and Amy Knudsen?

52 (Pages 202 to 205)

Page 206

1   A.   No.
2   Q.   No correspondence between you and Amy
3        Knudsen?
4   A.   No.
5   Q.   No correspondence of any kind between you
6        and Meiying Forney?
7   A.   And who?
8   Q.   Meiying Forney.
9   A.   No.
10  Q.   No notes regarding any telephone
11       conversations?
12  A.   No.
13  Q.   Is that correct?
14  A.   Yes.
15  Q.   Did you pay any money to any of the
16       defendants in this case, whether as a fee
17       or anything?
18  A.   You're referring to Amy or -- no.
19  Q.   Or to Aronov?
20  A.   No.
21  Q.   Look at Paragraph 7 and see if you have
22       anything that -- it's on Page 4 of that
23       notice.

Page 207

1   A.   No.
2   Q.   No scheduling or appointment books,
3        journals or calendars that have any
4        activity on it relating to this case?
5   A.   No. Everything I have related to this
6        case was in the package I brought them.
7        Any of the journals or anything like that,
8        as far as appointments, I would imagine
9        you could go to Grant and -- he keeps
10       better records than I do.
11  Q.   Okay. Number 9 asks for statements. Do
12       you have any statements from anybody?
13  A.   No.
14  Q.   What are you claiming in terms of damages
15       in this case?
16       MR. QUINN: Tell him as best you
17            can, if you understand what
18            you're entitled to.
19  A.   I don't know. You mean financially or --
20  Q.   Yeah.
21  A.   -- or what?
22  Q.   Just whatever you're claiming in terms of
23       damages.

Page 208

1   A.   Well, we've been without a business now
2        for a year. There's financials on
3        Celebrations. You know, we netted about
4        $750,000 a year out of there on two nights
5        a week. We were planning on doing -- we
6        felt like on a low end we could do a
7        million a year or a million two.
8   Q.   Net or gross?
9   A.   Gross.
10  Q.   How much profit would that be?
11  A.   Well, you can look at these right here.
12       When you say gross -- you're saying gross.
13       I'm talking about gross net.
14  Q.   What's gross net?
15  A.   That's -- the only thing coming out of it
16       is -- we were actually netting $750,000.
17  Q.   You mean all the money that comes in the
18       door --
19  A.   If you'll look at the other -- the
20       expenses, you know, there's a $140,000
21       consulting fee in there; there's -- I mean
22       -- can you ask your question in a
23       different way? I mean, I don't know

Page 209

1        exactly what you're trying to get at.
2   Q.   Yeah, I was going to.
3   A.   What have I lost? All I can do is give
4        you a guesstimate.
5   Q.   Are you saying that the refusal to sell or
6        lease this one building to you has
7        prevented you from making a living?
8   A.   I'm saying that if we would have had that
9        building, then we would have been up and
10       running, yes.
11  Q.   That's the only building in town that
12       would be available to you to run a
13       business out of?
14  A.   You have a list of all the businesses I've
15       looked at and the reasons why they would
16       not work. That has been a bar for
17       30-something years. And do I think it
18       would be -- what with the concept that
19       Mr. Long wanted to do, do I think it was
20       -- would be profitable? I think with his
21       reputation here in the city, it was enough
22       that I felt like that I was willing to buy
23       the real estate, and that's how strong I

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 210

1   feel about it. I feel it was an excellent
2   concept and would have done very well.
3   Q.   Did you look at any land that you could
4        purchase and build a freestanding building
5        on without any restrictions?
6   A.   No.
7   Q.   Talk to any contractors about building a
8        place?
9   A.   No.
10  Q.   Why not?
11  A.   Why, when you can -- because it -- I
12       didn't. I wanted a -- the easiest way,
13       the quickest way to get up and running is
14       to go into an existing -- for instance,
15       one that's already had a liquor license.
16       They cannot deny you a liquor license
17       where there's already been an existing
18       liquor license. It's already got the
19       plumbing and electrical that's set up for
20       this type operation. It's just the
21       easiest thing, is to find an existing
22       operation that's already set up.
23  Q.   Can you, yourself, get a liquor license?

Page 211

1   A.   No.
2   Q.   Why not?
3   A.   Because I'm a felon.
4   Q.   So the only way you can get a liquor
5        license is to take over another club?
6   A.   Absolutely not. I mean, just -- I don't
7        know. How does the guy at Doodle Hoppers
8        got one?
9             MR. QUINN: That's a question,
10            not an answer, remember?
11  A.   Someone else puts it in -- you know, I
12       could put it in my wife's name.
13  Q.   So you could get one that way?
14  A.   Through the corporation.
15  Q.   You could get one that way?
16  A.   Uh-huh.
17  Q.   Is that yes?
18  A.   Yes. I could be president of the
19       corporation.
20  Q.   So you could build a freestanding building
21       and open a bar?
22  A.   Yeah, if you wanted to spend two and a
23       half, three million dollars.

Page 212

1   Q.   I mean, if it's your only option, why
2        aren't you doing it?
3   A.   Because I'm sitting on a bunch of private
4        real estate and I don't have two and a
5        half, three million dollars to do it.
6   Q.   Have you looked at any other towns to open
7        up a bar in?
8   A.   I've looked in Prattville. I actually
9        have another pro athlete up there that's
10       wanting to do something similar, and we've
11       looked up there.
12  Q.   Have you looked down at the beach?
13  A.   No.
14  Q.   Looked in any other town other than
15       Prattville and Montgomery?
16  A.   No.
17  Q.   Why haven't you looked at that option?
18  A.   What, the beach?
19  Q.   No, some other town other than Prattville
20       or Montgomery?
21  A.   Because Mr. Long came with me -- this is
22       where he wanted to do it. This is his
23       home, and so the opportunity was here.

Page 213

1   Q.   Why haven't you, yourself, struck out on
2        your own to have one without Mr. Long?
3   A.   Well, because I wanted to do this concept
4        with him.
5   Q.   Well, how long are you going to claim that
6        the defendants in this case owe you a
7        living because you were prevented from
8        opening a bar --
9             MR. QUINN: Object to the form.
10  Q.   What period of time are you seeking this
11       money for?
12            MR. QUINN: Object to the form.
13            You can answer it if you
14            can.
15  A.   I can't answer.
16  Q.   You have no idea what period of time?
17  A.   I have no clue.
18  Q.   At some point would you agree that you
19       have to move on?
20  A.   Well, I do other things. I was buying and
21       selling land. I managed lately to sell
22       and close one piece of property and have a
23       contract on another one, so it's not --

54  (Pages 210 to 213)

Page 214

1   you know, I worked harder at this than I
2   ever have, but land's just not selling.
3   Q.   Does Mr. Terrence Long talk with you at
4        times about opening a bar, or has that
5        idea been abandoned?
6   A.   No. Every time we talk, we talk about it.
7        MR. STEWART: Y'all haven't sent
8        any subpoenas out to third
9        parties, I guess.
10  Q.   You've produced in response to 16 some tax
11       returns. I had asked for federal and
12       state for five years. Do you know if you
13       have those?
14  A.   We have three years.
15  Q.   Do you not have the two other --
16  A.   I didn't realize when I went by my
17       accountants --
18       MR. QUINN: Let him answer this.
19       MR. JENT: I submitted
20       objections. I think that's
21       overly broad as to the time
22       period. I mean, I submitted
23       written objections today,

Page 215

1        and that's why you only have
2        three years.
3        MR. STEWART: Okay. We can fuss
4        about that later.
5        MR. JENT: Yeah. My 30 days
6        hasn't even -- on my
7        objection period.
8   Q.   Have you collected any documents from
9        other parties or friends for use in this
10       case?
11  A.   No. I mean, Grant gave me the contracts
12       that I turned over to them.
13  Q.   Okay. I'm going to mark the complaint
14       Exhibit 10. You've got one in front of
15       you, but take the one that's marked. That
16       way we make sure --
17       MR. STEWART: Here's one for you,
18       Mike.
19       (The referred-to document was
20       marked for identification as
21       Defendants' Exhibit No. 10.)
22  A.   Is this the same thing?
23  Q.   Uh-huh. I hope. This is the complaint

Page 216

1        that was filed in this lawsuit. Did you
2        review the complaint before it was filed?
3   A.   Yes, I did.
4   Q.   Did you find all the information in it to
5        be accurate?
6   A.   I did.
7   Q.   Are there any changes you feel need to be
8        made to the complaint?
9   A.   No.
10       MR. JENT: If you want to take a
11       moment to look through it
12       just to be sure.
13       THE WITNESS: I read it this
14       morning.
15       MR. JENT: Okay.
16  Q.   When you read it this morning, did you see
17       any instances of discrimination missing
18       from your complaint?
19       MR. JENT: Object to the form.
20       MR. QUINN: I'm sorry. I wasn't
21       listening.
22       MR. JENT: I knew.
23       MR. QUINN: You knew I wasn't

Page 217

1        listening, didn't you?
2        MR. STEWART: You need to decide
3        which one of you is going to
4        object, but that's okay.
5        MR. QUINN: I'm sorry.
6   Q.   As you read the complaint this morning,
7        did you see anything that was left out
8        that you thought was important?
9   A.   No.
10  Q.   Okay. Are there any other ways that you
11       believe that you've been discriminated
12       against that we have not talked about here
13       thus far?
14  A.   No.
15  Q.   Were there any witnesses, other than who
16       we've already discussed -- we've already
17       talked about Mark Cranage --
18  A.   Mike Morin.
19  Q.   Anybody else that you claim was a witness
20       to the discrimination that you claim in
21       this case?
22  A.   No.
23  Q.   What are your claims against Aronov in

55   (Pages 214 to 217)

Page 218

1    this case?
2         MR. QUINN: Object to the form.
3         You can answer if you know.
4    A.  She represents Aronov.
5         MR. QUINN: Yeah. I think he had
6              already answered that. You
7              asked that earlier.
8    Q.  Are there any other documents, other than
9         what we've talked about in this
10        deposition, that support your claim that
11        we haven't talked about?
12   A.  No.
13   Q.  Have you talked to anyone else who says
14        that they feel like Amy Knudsen
15        discriminated against them?
16   A.  No.
17   Q.  Have you talked to anyone else that said
18        that they felt like Aronov had
19        discriminated against them?
20   A.  No.
21   Q.  May I see Exhibit 4?
22   A.  (Witness complies.)
23   Q.  Thanks. Exhibit 4 is the Texas Steakhouse

Page 219

1    income statement for the month ending
2    12/31/06. That's Celebrations, correct?
3    A.  Correct.
4    Q.  Do you have income statements for years
5         other than 2006?
6    A.  Sure.
7    Q.  Attached as Page 2 is 2007 for three
8         months.
9    A.  Just the three months that we were open.
10   Q.  Okay. But I can -- if I wanted to, I can
11        ask your lawyers for other years and those
12        documents would be available?
13   A.  Yes.
14   Q.  Assuming they would allow me to have them?
15   A.  Absolutely.
16   Q.  Of this total income for year ending 2006,
17        956,664.34, the only portion that actually
18        went into your pocket is this consulting
19        expense?
20   A.  Yes.
21   Q.  The 314,200.54? Is that right?
22   A.  Correct.
23   Q.  The rest of the money that appears on

Page 220

1    Defendants' Exhibit 4 did not go into your
2    pocket; is that right?
3    A.  Correct.
4    Q.  In the year 2007, just those three months,
5         your consulting expense was 142,395.45?
6    A.  Yes.
7    Q.  None of the other figures that appear on
8         Page 2 of Exhibit 4 went into your pocket?
9    A.  No.
10   Q.  Is that right?
11   A.  When we closed the account out, I mean, I
12        think that's what that -- to my knowledge,
13        no.
14   Q.  I'm not sure I understand your answer.
15        The $142,395.45 is what you personally
16        earned from operating Celebrations in
17        those first three months of 2007?
18   A.  If you'll look at my tax return, it shows
19        you -- it's got the 1099 and then exactly
20        what it was. It was -- it's got the exact
21        number on my 1099, which I believe was
22        150.
23   Q.  Okay. So was 150,526 your income for that

Page 221

1    year?
2    A.  Right.
3    Q.  You earned no other income from any other
4         source during 2007?
5    A.  No.
6    Q.  Is that right?
7    A.  No, just the land I sold. I did a 1031
8         tax-free exchange.
9    Q.  Okay. So in this claim that you've got,
10        that you've essentially been stopped from
11        earning a living, are you claiming
12        $314,200 a year, or what number are you
13        claiming?
14   A.  I don't know how to answer that. I mean,
15        this was a whole different concept that we
16        were intending on doing. We felt like
17        that it would be more -- double, that we
18        would be able to do double the business
19        that we did there, just because we were
20        going to be open four nights and because
21        of his association with the -- his T.
22        Long Entertainment and his access to
23        celebrities, that we were going to do

56 (Pages 218 to 221)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 222

1    special events and everything. We were
2    also going to do food. So we -- that's --
3    if I had to sit down and -- that's what I
4    would say, that we would probably do twice
5    what was -- because that's only based on
6    two nights a week; that's all we were
7    open.
8    Q.    Defendants' Exhibit 4 is two nights a
9    week?
10   A.    Two nights a week.
11   Q.    In the first year, did you expect to make
12   twice what you made at Celebrations?
13   A.    Absolutely.
14   Q.    In other words, $600,000?
15   A.    Anytime that you have a new business, then
16   -- a bar or restaurant, it's always that
17   initial wow. Everybody's going to go out.
18   Keeping them there is the hard part.
19   Would I make over $600,000? No. In this
20   case, I would have a partner and we would
21   have to decide at that point how profits
22   were distributed.
23   Q.    Y'all haven't gotten to that part?

Page 223

1    A.    No.
2    Q.    Are you able to tell us today what you
3    would have earned had this not happened to
4    you?
5    A.    I can't say.
6    Q.    Are you claiming emotional distress in the
7    case?
8    A.    I'd say it's caused me a little bit.
9    Q.    Have you seen any doctors?
10   A.    No.
11   Q.    Have you --
12   A.    I just got, you know, take -- have a
13   prescription for Xanax for anxiety, and I
14   have a prescription for Sonata because I
15   can't sleep.
16   Q.    Are you claiming that's all because of
17   this Aronov --
18   A.    No. It's a cumulation of losing my mother
19   and closing a business and working on
20   something like this as hard as I did and
21   having it blow up in my face.
22   Q.    Can you describe to us the emotional
23   distress that you're attributing to Aronov

Page 224

1    and to Amy and to --
2    A.    I can't answer that.
3    Q.    Too hard to separate it from everything
4    else?
5    A.    I don't understand what the question is.
6    Q.    I just want to know in your own words what
7    you claim is the emotional distress that
8    you've suffered because of these events.
9          MR. QUINN: How it made you feel.
10   A.    How it made me feel? It's like I
11   described to you. I mean, I felt like I
12   let Terrence down. I went through months
13   with this, working on this, trying to find
14   a location, really felt real strong about
15   it. You know, I really thought it was
16   going to be a home run -- not to use a
17   pun, but, you know, was real excited about
18   it, needed to get back into something
19   because of what I had been through the
20   year before. And to just have it blow up
21   in your face, it's just not a good thing.
22   It doesn't give you a good feeling. I
23   felt like a failure.

Page 225

1    Q.    Who is your regular doctor?
2    A.    Regular doctor was Mont Highley. He just
3    recently retired, and he had all my
4    records sent over to Dr. Dailey.
5    Q.    Who is that?
6    A.    Internal medicine over at...
7    Q.    Over where?
8    A.    It's at East -- Baptist East. Not at
9    Baptist; it's in that office building
10   there.
11   Q.    Any other physicians that you've seen for
12   treatment in the last 20 years?
13   A.    Got a bunch of screws and plates in me, if
14   you want all the --
15   Q.    In the last 20 years, you have?
16   A.    Oh, yeah. Do you want all of them?
17   Q.    Yeah.
18   A.    Two in the elbow; two in my -- two in both
19   elbows; two in my left shoulder; just had
20   one removed two years ago from my jaw; two
21   back operations; one knee; just
22   orthopaedic stuff -- three rotator cuff.
23   Q.    What orthopaedic?

57 (Pages 222 to 225)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 226

1  A.   Everybody from Jimmy Andrews to
2       Dr. Hartzog to Dr. Mike Freeman.  And even
3       Jack Hughston, Hughston Clinic.
4  Q.   The one in Columbus?
5  A.   Right.
6  Q.   Any other orthopaedics?
7  A.   I'm sure I've seen some in between there,
8       but that's the ones I remember.
9  Q.   Ever been hospitalized?
10 A.   Yeah.
11 Q.   How many times?
12 A.   Just for surgeries.
13 Q.   Where?
14 A.   Hughston Clinic and here at Baptist East.
15      Most of the orthopaedic stuff was done as
16      an outpatient.
17 Q.   Where other than Baptist East and Hughston
18      Clinic?
19 A.   Where what?
20 Q.   What other hospitals other than Baptist
21      East and Hughston Clinic?
22 A.   That's all I recall.
23 Q.   Why do you have so many screws in you?

Page 227

1  A.   Mountain biking, snow skiing, sports.
2  Q.   Do you attend church?
3  A.   Yes.
4  Q.   Where do you go to church?
5  A.   Saint James.
6  Q.   Are you claiming in this case that Amy
7       Knudsen acted maliciously towards you?
8  A.   I think she did.
9  Q.   Why do you think that?
10 A.   Because I just think it's very obvious
11      that, you know, when I drove up in my
12      Hummer and got out and she was very
13      pleasant and very cheerful and just
14      showing me around and then went right am
15      to her spiel about they don't want a black
16      night club there.  And then she made
17      several comments about Celebrations,
18      which, as I've already told you, I thought
19      she was kidding, and then finally
20      realized.  And I think after telling her
21      who I was and what our intentions were
22      there, she had no intention of doing
23      business with me.

Page 228

1  Q.   Anything else?
2  A.   No.
3       MR. STEWART:  Y'all, that's all
4           I've got for now.  I pass
5           the witness.  But I may have
6           some more questions, but I'm
7           not really sure how to deal
8           with the tape recording.  I
9           mean, I've listened to it,
10          but I may have some
11          questions after I get a
12          transcript of it.  We can
13          handle that by telephone.
14      MR. QUINN:  We can handle that --
15          yeah.  You may can even
16          submit them to me if you
17          want to.  I just don't want
18          to sit for another lengthy
19          deposition -- or sit any
20          longer for a lengthy
21          deposition.
22      MR. GUY:  Don't get upset at the
23          second man.  I always get

Page 229

1       that.  Do you need to take a
2       break before we get started?
3  THE WITNESS:  No.
4           EXAMINATION
5  BY MR. GUY:
6  Q.    Mr. Barr, my name is Gunter Guy, and I
7        represent Meiying Forney in this lawsuit
8        that you've filed along with Mr. Long.
9        I'll try not to repeat myself, as lawyers
10       who come second often say, but sometimes
11       we do.  And it's not for trying to be
12       repetitive in any means, but just
13       sometimes I don't either hear what you
14       said or I'm writing something down or for
15       whatever reason, so I'll try not to do
16       that, but please excuse me if I do.  And
17       I'm going to try to jump around to issues
18       that I have questions about that haven't
19       already been asked.  But first let me ask
20       you this.  Have your civil rights ever
21       been restored -- reinstated because you're
22       a felon?  Have you ever had that
23       reinstated?

**2100 Third Avenue North, Suite 960  *  Birmingham, AL 35203**
**1-800-888-DEPO  or  205-251-4200**

Page 230

1  A.  We're working on a full pardon right now
2      because I was a Vietnam vet, and after
3      seven years, I can apply to have my -- you
4      have to go through a full pardon. And
5      actually, Wayne Sable has started the
6      process on that.
7  Q.  I understand. But my question is, they
8      haven't been yet?
9  A.  No.
10 Q.  And they've never been reinstated since
11     you were convicted?
12 A.  No.
13 Q.  All right. Now, do you know Meiying
14     Forney?
15 A.  No.
16 Q.  Have you ever met her?
17 A.  No.
18 Q.  Do you even know what nationality or race
19     she is?
20 A.  No.
21 Q.  During any of these conversations that you
22     had with Ms. Knudsen, were there any
23     specific references to Ms. Forney's

Page 231

1      position on the leasing or sale of this
2      property, specifically references to her?
3  A.  Said that she was not -- would not put any
4      money into leasehold improvements.
5  Q.  Okay. Were there any specific references
6      to what you claim to be discriminatory
7      statements? Let me strike that and be
8      more specific. Were there any specific
9      references to a position by Ms. Forney
10     that you considered to be discriminatory?
11 A.  No.
12 Q.  With regard to statements by Don Little
13     that were on that tape, are you aware of
14     any specific references directly
15     attributable to Ms. Forney that you
16     believe to be discriminatory?
17 A.  I think that was between him and Amy. I
18     don't remember her name being mentioned.
19 Q.  Okay. With regard to Don Little, I do not
20     remember if you acknowledged or said -- he
21     is an attorney, correct?
22 A.  Correct.
23 Q.  Did you know that?

Page 232

1  A.  No.
2  Q.  Was that explained to you by someone?
3  A.  Yes.
4  Q.  Who explained that to you?
5  A.  Mark Cranage, who went in there and did a
6      thing and said that he was the attorney
7      that represented the shopping center --
8      had represented the shopping center for 15
9      years and that this lady had recently
10     purchased it in the last couple of years.
11 Q.  You understand -- as far as this lawsuit
12     is concerned, do you understand that Don
13     Little was a bankruptcy attorney?
14 A.  I have no clue.
15 Q.  Okay. So have you read any of the
16     documents that were produced in your
17     initial disclosures about the bankruptcy
18     proceeding?
19 A.  Right.
20 Q.  Did you notice that Don Little was the
21     bankruptcy attorney for Ms. Forney in that
22     proceeding?
23 A.  Well, he --

Page 233

1  Q.  I'm just asking you --
2  A.  I read -- I saw where he was handling the
3      bankruptcy, but I'm assuming that's what
4      attorneys do.
5  Q.  All I'm trying to establish here, you
6      understood him to be the attorney
7      representing the bankruptcy, right?
8  A.  I only knew him as the attorney that
9      represented the shopping center. That's
10     how it was described to me.
11 Q.  All right. Very good. Has Don Little
12     ever been represented to you to act as a
13     real estate agent on behalf of Ms. Forney?
14 A.  No.
15 Q.  Okay. The only person that has acted as a
16     real estate agent of any kind has been Ms.
17     Knudsen, correct?
18 A.  Correct.
19 Q.  All right. Do you know of any other
20     alleged acts of discrimination, whether by
21     hearsay or personal knowledge, concerning
22     Meiying Forney in the Montgomery
23     community?

59 (Pages 230 to 233)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 234

1   A.   I don't even know her.
2   Q.   Okay. But --
3   A.   No.
4   Q.   It's just a question, though.
5        MR. QUINN: Remember, yes or no.
6   A.   No.
7        MR. QUINN: It just makes things
8        easier.
9   Q.   Would you turn to your lawsuit in
10       Paragraph 20, please? It says in
11       Paragraph 20 that Barr discovered that the
12       LeCroy shopping center was for sale and
13       approached Knudsen with a one million
14       dollar offer to purchase the shopping
15       center. Correct?
16  A.   Correct.
17  Q.   It goes on to say that this offer was
18       turned down with no counteroffer. My
19       question to you is, from what information
20       did you discover that the LeCroy Shopping
21       Village was for sale?
22  A.   I don't know if I had Grant call Amy up
23       and ask her if it was for sale or -- I

Page 235

1        don't know how --
2   Q.   Well, let me ask you this: Is that a true
3        statement, that you discovered it was for
4        sale?
5   A.   Well, somebody told me it was for sale.
6   Q.   You just don't remember who?
7   A.   I don't remember who, no.
8   Q.   Have you ever seen a document of any kind
9        that indicated it was for sale?
10  A.   No.
11  Q.   Okay. And when I say that, I'm
12       specifically referring to the time upon
13       which you made the offer. Are you aware
14       that it was actually for sale personally?
15  A.   Well, I was told -- I mean, they gave us
16       the rent rolls so we could set the cap
17       rates and come up with a value of the
18       property, so I'm assuming they were saying
19       it was for sale.
20  Q.   So you're making that assumption based on
21       your discussions with Grant Sullivan?
22  A.   Right. True.
23  Q.   All right. Just so I'm clear, the

Page 236

1        document that was produced in the
2        disclosures, which is a purchase and sales
3        agreement -- have you seen that document?
4        (The referred-to document was
5        marked for identification as
6        Defendants' Exhibit No. 11.)
7   A.   Has it got my signature on it?
8   Q.   Well, actually, it doesn't. That's one
9        thing I wanted to ask you about.
10       MR. GUY: Can I have an exhibit
11       sticker?
12       MR. STEWART: I think we're on 9.
13       No --
14       MR. GUY: 10 was the complaint.
15       MR. STEWART: Yeah.
16       MR. GUY: I'm sorry. I didn't
17       make extra copies.
18  A.   I don't know if this -- I mean, it was
19       presented to Amy. I wouldn't know. I
20       mean, I thought there was one that I
21       signed. I mean, I remember the contract.
22  Q.   Well, let me ask you a couple of questions
23       about this document. You would agree with

Page 237

1        me that at least on the two pages I have
2        here, your name does but your signature
3        does not appear, right?
4   A.   Right.
5   Q.   Do you think there are other pages to this
6        document?
7   A.   I don't know. You'd have to ask
8        Mr. Sullivan. He's the one that -- Grant
9        Sullivan.
10  Q.   Mr. Sullivan has a copy of this?
11  A.   Yeah. He's the one that sent -- that's
12       his handwriting.
13       MR. QUINN: It's cut off.
14       MR. JENT: Oh, stop.
15       MR. GUY: Is that our problem?
16       MR. JENT: Yeah. The problem is
17       our copy center didn't
18       unfold the pages.
19       MR. QUINN: They didn't think the
20       signature mattered.
21       MR. GUY: So you have other pages
22       for me? Okay. I'll tell
23       you what we'll do; we'll

**2100 Third Avenue North, Suite 960 * Birmingham, AL 35203**
**1-800-888-DEPO or 205-251-4200**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 238

1    substitute that, then, if
2    you'll just make me another
3    copy. That was my question.
4  Q.  All right. Your attorney has one that's
5    got a signature on it. I'm sorry, but I
6    didn't get that.
7  A.  I thought I remembered signing it.
8  Q.  So when it indicates in Paragraph 20 that
9    you approached Knudsen with a one million
10    dollar offer, really, Grant Sullivan did,
11    correct?
12  A.  He had the conversation with her over the
13    phone. He got the cap rates, told me to
14    come by and look at the cap rates. He
15    said, this is what you should offer.
16  Q.  Okay. I'm just trying to establish -- I
17    just want to understand your earlier
18    testimony. You never had a discussion
19    directly with Ms. Knudsen about purchasing
20    it for one million dollars, did you?
21  A.  I don't think so. I think it was all with
22    Grant. He handled the whole thing.
23  Q.  And you never had any discussions, nor did

Page 239

1    Grant Sullivan have any discussions
2    directly with Meiying Forney, correct, to
3    your knowledge?
4  A.  Not to my knowledge.
5  Q.  I'm going to -- I'm going to be skipping
6    around a little bit, okay? Let me go to
7    asking you some questions that you were
8    talking about your income. And I'm going
9    to refer to -- and I don't know the
10    exhibit number, but to the income
11    information that you provided here today
12    and the -- whatever exhibit number it is.
13    It's the one that's the Texas Steakhouse
14    January to December income statement.
15    Would you just look at that with me,
16    please? It's probably sitting right there
17    in front of you. Okay. Just so I
18    understand, you closed down Texas
19    Steakhouse d/b/a Celebrations voluntarily,
20    correct?
21  A.  Correct.
22  Q.  And you actually closed that down -- and
23    what month was it?

Page 240

1  A.  April 1st.
2  Q.  So that's why this second page of this --
3  A.  January through March.
4  Q.  Right. And that would have been the
5    ending period of which it was operated,
6    right?
7  A.  Correct.
8  Q.  So you voluntarily closed that business
9    down April 1, 2007, correct?
10  A.  Correct.
11  Q.  And what I remember you stating earlier --
12    and you correct me if I'm wrong -- is that
13    for the previous six months or so before
14    you closed it down, you had really had no
15    problems in the parking lot, no real news
16    media coverage or anything, everything was
17    running okay, because all the bars in that
18    area had gotten together on their
19    security; is that right?
20  A.  Correct.
21  Q.  Okay. And at the time that you
22    voluntarily closed it down, your income
23    out of Celebrations slash Texas Steakhouse

Page 241

1    for the year 2006 was $314,200?
2  A.  Correct.
3  Q.  And for the first three months of 2007,
4    your consulting expense was $142,395?
5  A.  If you look at my taxes, it's $150,000.
6  Q.  Okay. So there's another $8,000 in there
7    somewhere. But just from the steakhouse,
8    though?
9  A.  Right. No, no, that whole 1099 is from --
10  Q.  I'm sorry.
11  A.  It was -- I was paid $150,000 for the
12    first three months of '07.
13  Q.  So on your own volition, you decided to
14    give up that income for the reasons you
15    previously stated to us in this
16    deposition, correct?
17  A.  Correct.
18  Q.  Okay. And that was before you ever had
19    any discussions with Mr. Long, correct?
20  A.  Correct.
21  Q.  Okay. Did I misunderstand you earlier? I
22    thought you had said at some point during
23    some questioning by Mr. Stewart that in

**2100 Third Avenue North, Suite 960 * Birmingham, AL 35203**
**1-800-888-DEPO or 205-251-4200**

Page 242

```
 1      the business venture with Mr. Long, that
 2      you had already determined that you were
 3      going to make a $140,000 consulting fee.
 4      Did I misunderstand that?
 5   A. Yes. I --
 6   Q. You never said that?
 7   A. No.
 8   Q. All right. So would it be fair to say,
 9      then, as far as the proposed business
10      venture with Mr. Long, you didn't know
11      what you were going to get paid in any
12      respect, correct?
13   A. Correct.
14   Q. Had there been any kind of proposals done
15      on a planned business, as far as costs,
16      operating expenses, profit, and that kind
17      of thing by any accountant, lawyer, or
18      anybody else?
19   A. Until you find the location, you can't do
20      that.
21   Q. So your answer is no?
22   A. No.
23   Q. So other than your experience in this
```

Page 243

```
 1      business for 14 years, which you've
 2      already said --
 3   A. 20-something years.
 4   Q. 20-something years -- projections about
 5      income, expenses, exact cost, what you
 6      were going to make out of the thing,
 7      projected clientele, all that is basically
 8      speculation, other than your experience?
 9         MR. QUINN: Object to the form.
10         You can answer.
11   A. True.
12   Q. Okay. Was it my understanding that
13      Mr. Long was going to put up one million
14      dollars in cash to buy the Pure Country
15      Saloon as evidenced by this sales --
16   A. I was going to.
17   Q. You were going to do it. Okay.
18   A. When I said cash, I was going to write a
19      check for it.
20   Q. I understand.
21   A. And --
22   Q. Go ahead.
23         MR. QUINN: Just answer his
```

Page 244

```
 1         question.
 2   A. Write a check for it.
 3   Q. What I'm trying to understand is, had
 4      Mr. Long indicated to you what, if any,
 5      monies he was putting up?
 6   A. He was going to put 50 percent of the
 7      money up for -- we were going to be 50/50
 8      partners in the business. Now, he would
 9      put up 50 percent of whatever it took for
10      the leasehold improvements, on the
11      inventory, whatever we needed. If they
12      had taken the offer on the LeCroy shopping
13      center, I would have then gone to him
14      saying, I'm purchasing this; do you want
15      in on the real estate part of it. If not,
16      I felt strong enough about it that I
17      wanted the real estate anyway.
18   Q. Okay. So as far as Mr. Long is concerned,
19      though, there was no prior commitment on
20      his part to put up any money?
21   A. On the business?
22   Q. Yes.
23   A. What our agreement was, I would find a
```

Page 245

```
 1      location. If it was a lease, then we
 2      would split the cost of opening the
 3      business, the leasehold improvements,
 4      whatever, the licensing, and if I
 5      purchased the building, he had an a option
 6      to either buy half the building or not. I
 7      told him that I had preferred to buy the
 8      real estate.
 9   Q. But all of what you're saying is verbal
10      discussions, nothing in writing, right?
11   A. Right.
12   Q. So if he did not like whatever deal you
13      proposed, he certainly could have backed
14      out of it, correct?
15   A. Yes.
16   Q. In other words, whatever terms you came up
17      with, none of those had actually been put
18      down in writing or officially negotiated
19      to a conclusion, correct?
20   A. We both signed the lease on the Copeland's
21      building before we got the rider from
22      Wal-Mart, so that's a --
23   Q. Hold on. That's after the fact, though,
```

Page 246

1    right? I'm talking about on this. When
2    this came up to buy Pure Country, nothing
3    had been put in writing, correct?
4  A.   Right.
5  Q.   Between you and Mr. Terrence Long,
6    correct?
7  A.   Correct.
8  Q.   Now, other than this one offer to purchase
9    this building, okay -- and I heard what
10   you said earlier in response to Mr.
11   Stewart about these other places that you
12   looked at, but other than the proposal to
13   purchase Pure Country, have you made an
14   offer to purchase any other establishment,
15   in writing?
16 A.   Friday's.
17 Q.   Friday's, okay. And that was after you
18   originally decided not to do it? You made
19   a purchase -- or was that part of what you
20   talked about earlier? Okay. I take it
21   back. It was part of what you talked
22   about earlier, wasn't it?
23 A.   Yes.

Page 247

1  Q.   And then you found out it had this issue
2    with Wal-Mart, correct?
3  A.   No. When I made an offer on Friday's, it
4    was -- we didn't even know about the
5    problem with Wal-Mart then. We were never
6    presented a rider. But they turned --
7    they said that they couldn't do anything
8    with it because of the ground lease.
9  Q.   I'm sorry. You did testify --
10 A.   The rider only showed up when we did the
11   Copeland's.
12 Q.   So you made an offer on Friday's?
13 A.   Correct.
14 Q.   Then you made an offer -- and that was
15   actually before you made an offer on Pure
16   Country, correct, the offer on Friday's?
17 A.   Actually -- before I tried to buy Pure
18   Country?
19 Q.   Yes.
20 A.   I tried to lease it first.
21 Q.   Okay. But it was before you tried to
22   lease it, wasn't it?
23 A.   I met with her sometime the first of May,

Page 248

1    made the offer sometime -- I mean, the
2    contract would have the date on it on the
3    Friday's building, and then it was tied up
4    in the ground lease, is when I came back
5    and attempted to purchase LeCroy.
6  Q.   Okay. Well, let's talk about the dates
7    here. I want to get this straight too.
8    In your lawsuit, you state that on May
9    10th you met with Ms. Knudsen at the
10   LeCroy shopping center. Now, earlier you
11   said you didn't remember that date. Was
12   it fresher in your mind earlier when maybe
13   you remembered the date, or do you have
14   something that evidences the exact date
15   that you met with Ms. Knudsen as proposed
16   in your lawsuit?
17 A.   I don't know if I called Grant and got his
18   -- what day he'd set up the appointment.
19   He keeps a diary.
20 Q.   So if this is correct, based on your
21   complaint, you met with Ms. Knudsen for
22   the very first time on May 10th, correct?
23 A.   Correct.

Page 249

1  Q.   And then on May the 23rd, you made an
2    offer through Mr. Sullivan to purchase the
3    property, right? So that would have been
4    some 13 days later, correct?
5  A.   Yes, if that's what it states.
6  Q.   Okay. And then on June the 13th, you sent
7    Mr. Cranage in to tape Ms. -- I guess you
8    actually sent him over there to just tape
9    whoever was going to show it, and it
10   turned out to be Mr. Little, because you
11   didn't -- did you know it was going to be
12   Mr. Little?
13 A.   No.
14 Q.   Okay. Did you think it was going to be
15   Ms. Knudsen?
16 A.   Mark's the one that set the appointment
17   up, and...
18 Q.   But you agree that you were in on doing
19   it?
20 A.   Absolutely. Absolutely. I sent him over
21   there.
22 Q.   I understand.
23 A.   I asked him to do it.

63 (Pages 246 to 249)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 250

1  Q.  I'm just trying to find out were you there
2      when he called to make the appointment.
3  A.  Well, he -- I think that he called Amy
4      back or maybe she gave him the lawyer's
5      number and he had called him. I'm not
6      sure how that went down.
7  Q.  You're just not real sure how that worked?
8  A.  Right. But I am definitely the one that
9      asked him to go over there.
10 Q.  I understand. Assuming that this
11     transcript is correct, that occurred on
12     June 13th, which was about 20 days or so
13     after the offer to purchase was made, if
14     my calculating is right. There's 31 days
15     in May and another 13 days, so another
16     eight days after the eight days in May
17     left and 13 days in June. I'm just saying
18     it was about 20 days later when you
19     attempted to set this up; is that right?
20 A.  If that's what it says.
21 Q.  I guess what I'm confused about here is --
22     and again, this is me trying to listen to
23     your testimony -- I was under the

Page 251

1      impression you said that after you got
2      through talking to Ms. Knudsen, that you
3      went over to Woodmere Tavern -- let me
4      just look at my notes -- and told them
5      about what had happened. Is that not what
6      you said earlier? I guess you talked to
7      Mr. Cranage? Do you remember what you
8      said?
9  A.  Yeah.
10 Q.  Okay. Tell me again what you said about
11     that. Am I incorrect?
12 A.  The time I'm talking about is not when I
13     met her over there. It's a time I called
14     her on the phone and asked her if Terrence
15     and I could get in --
16 Q.  Okay. Is that the tape-recorded
17     statement?
18 A.  No. There's no recording on that one at
19     all. I was riding in my vehicle, and
20     that's when I rode over to Woodmere just
21     to talk to Mike.
22 Q.  So this was sometime after your first
23     meeting with her but before you made the

Page 252

1      offer to purchase?
2  A.  No. This is after -- I had been in to see
3      the building; we had then made an offer on
4      Friday's -- then that was because of the
5      ground lease -- and it was after that that
6      I called her and said, well, it's tied up
7      in a ground lease; he's wanting to do
8      something immediately, still interested in
9      maybe getting back in the building, and
10     she said we couldn't get in the building.
11     And that's when I drove to Woodmere. And
12     then -- and --
13 Q.  What I'm trying to figure out -- I'm just
14     trying to figure out was that before or
15     after you made the offer to purchase --
16 A.  Oh, that was after. I had already made
17     the offer.
18         MR. JENT: Which offer?
19 Q.  The offer to purchase Pure Country for one
20     million dollars.
21 A.  The LeCroy shopping center.
22 Q.  You made an offer to purchase the whole
23     shopping center?

Page 253

1  A.  The whole shopping center.
2  Q.  So it wasn't just Pure Country you were
3      offering to purchase; it was the whole
4      shopping center?
5  A.  Why would I have the rent rolls on the
6      whole shopping center?
7  Q.  Sir, I don't know anything about your
8      business, okay? I'm just trying to
9      understand what happened. All I'm trying
10     to figure out is -- this is what
11     discovery's about. Your offer was to
12     purchase the whole shopping center?
13 A.  Correct.
14 Q.  And so your discussion with -- who was it
15     at Woodmere that you had the discussion
16     with?
17 A.  Michael Morin and Mark Cranage.
18 Q.  And is Michael Morin the owner of Woodmere
19     Tavern?
20 A.  Yes, he is.
21 Q.  And are you social friends with him as
22     well?
23 A.  Yes.

**2100 Third Avenue North, Suite 960 * Birmingham, AL 35203**
**1-800-888-DEPO or 205-251-4200**

Page 254

1  Q.  Do you have any ownership interest in that
2      at all?
3  A.  No.
4  Q.  Okay.  And just -- again, just trying to
5      make sure I understand.  Do you have any
6      idea what that date was prior to you
7      sending Mark Cranage over there?
8  A.  No.
9  Q.  But it wasn't the same day?
10 A.  No.  He went over -- I think Mark will
11     probably...
12 Q.  Sir?
13 A.  I think Mark could probably tell you the
14     exact day, because it was like they wanted
15     him to come over that afternoon, then they
16     wanted him to come back the next day and
17     he couldn't, so it was like two days later
18     before he came back.
19 Q.  Did you say your current wife's name is
20     Kristen Thrasher Barr?  Is that right?
21 A.  Uh-huh.
22 Q.  And you've been married three years?
23 A.  Right.

Page 255

1  Q.  Do you have any children?
2  A.  We've been together 13 years.
3  Q.  And when you say "been together" -- you've
4      only been married three years?
5  A.  Right.
6  Q.  What I did not believe anybody asked you
7      is, is she from the Montgomery area?
8  A.  Brooksville.  She was raised in
9      Brooksville, Florida, outside of Tampa.
10     She has lived here for a long time.
11 Q.  Does she have any relatives over the age
12     of 19 that reside in any of the counties
13     surrounding Montgomery?
14 A.  No.
15 Q.  The middle district is made up of a number
16     of different counties --
17 A.  Well, Birmingham is the closest one.  She
18     has an aunt there.
19 Q.  And I believe you said that you had some
20     kin folks in Alabama that were Huttos?
21 A.  Huttos and Barrs.
22 Q.  And Barrs.  Are any of those -- well, are
23     the Huttos in Bullock County?  There's

Page 256

1      some Huttos I know in Bullock County.
2  A.  I'm sure they're probably -- because we
3      just buried my aunt down there this
4      weekend --
5  Q.  So it might be the same?
6  A.  -- Josie.
7  Q.  This girl I know is named Heather, and I
8      just know her husband is from down in that
9      area.
10 A.  All the Huttos and Barrs are...
11 Q.  And I don't know if you've been asked, and
12     maybe you -- do you have any children over
13     the age of --
14 A.  I have no children.
15 Q.  All right.  The conviction -- the felony
16     conviction for drugs, was that in Lee
17     County or was that a federal charge?
18 A.  That was in Columbus, Georgia.  It's a
19     federal charge.
20 Q.  I'm not familiar that much with the ABC
21     Board and their liquor license regulation,
22     but I assume you are since you've been in
23     that business for a long time.  And

Page 257

1      because you are a convicted felon, you
2      cannot hold a liquor license, correct?
3  A.  That's true.
4  Q.  But someone related to you can hold it
5      without any problems?
6  A.  If she's not a felon.
7  Q.  But she's obviously your wife, so it's all
8      right if another member of your family
9      holds a liquor license?
10 A.  Yes.
11 Q.  Who was going to hold the liquor license
12     in the proposed business with Mr. Long?
13 A.  It would have been in the corporation name
14     and Mr. Long and my wife's.
15 Q.  So you intended your wife to be part of
16     the business venture, correct?
17 A.  Correct.
18 Q.  Okay.
19        MR. QUINN:  You've got to say
20     yes.
21        THE WITNESS:  Yes.
22        MR. QUINN:  Can't nod your head.
23 Q.  Does she have any personal knowledge about

65  (Pages 254 to 257)

Page 258

1    the events of which we're testifying here
2    today?
3 A.   Yes.
4 Q.   What kind of knowledge can you tell me
5    about that she has information about?
6 A.   She knows everything that I know.
7 Q.   Okay. But just because you told her?
8 A.   Just because we've discussed it.
9 Q.   But did she have any interaction herself
10    with either Ms. Knudsen, Aronov, Ms.
11    Forney, or anybody else involved?
12 A.   No.
13 Q.   So her only information is through you?
14 A.   Correct.
15 Q.   Based on what you testified to earlier
16    about your former business, Celebrations,
17    it would be fair to say that it had gotten
18    a lot of notoriety through the media,
19    correct, the problems that were going on
20    out there?
21 A.   The problems were in the parking lot.
22 Q.   I know. I'm not -- I'm not arguing your
23    point with you, okay? You've made your

Page 259

1    point clear. I'm just asking you, it
2    would be fair to say it had gotten a lot
3    of attention through the media, correct?
4 A.   Absolutely.
5 Q.   Whether the attention it got in your
6    opinion was fair or not, you would agree
7    with me that it had gotten a lot of media
8    attention, correct?
9 A.   Yes.
10 Q.   And based on what you told me, it would be
11    fair to say that you think it had gotten
12    unfair media attention, correct?
13 A.   Yes.
14 Q.   So what people were hearing about
15    Celebrations you would agree with me was
16    generally negative, correct?
17 A.   Not always. It was the number one night
18    spot in town.
19 Q.   Okay. Well, I'm talking about through
20    media based on what was going on out
21    there. The city council was trying to
22    shut you down, weren't they?
23 A.   Well, they voted 7 to 2 the last time to

Page 260

1    keep me open, so I mean, I don't know
2    where y'all keep getting this thing that
3    they were trying to shut me down. If they
4    were trying to shut me down, they would
5    vote 7 to 2 to shut me down.
6 Q.   I'm not arguing whether they shut you down
7    or not. I'm asking you just would it be a
8    fair statement that there was at least a
9    good bit of notoriety about your club in
10    an attempt by the city to shut it down.
11    Would that be a fair statement?
12 A.   I think there's a few people that are in
13    the city that have the same mentality as
14    Ms. Knudsen and would love to see me shut
15    down.
16 Q.   You know, Mr. Barr, I'm not trying to be
17    --
18        MR. QUINN: You need to just
19          answer --
20        THE WITNESS: I thought that was
21          a fair answer.
22        MR. QUINN: Well, it was a good
23          answer, but it's not -- it's

Page 261

1    --
2 A.   There are people probably that would have
3    liked to have seen me shut down, but like
4    I told you, the last time they voted 7 to
5    2 to keep me open.
6 Q.   Look, that's on the record. I'm not going
7    to argue with you that they didn't vote to
8    shut you down. I understand what you've
9    told me. I'm just simply asking you, you
10    were in front of the city council for a
11    vote because they were either unhappy with
12    the business out there -- "they" being the
13    city council and the city leaders -- were
14    unhappy with it or they were attempting to
15    shut you down. Wouldn't that be a fair
16    statement?
17 A.   The mayor?
18        MR. QUINN: See, I think that's
19          what -- I think this was a
20          mayor thing.
21 Q.   Well, whoever it was. Okay. Would it be
22    a fair statement that the mayor was
23    attempting to shut you down? Would that

66 (Pages 258 to 261)

Page 262

1    be a fair statement?
2    A.   Yes.
3    Q.   Okay.  Would it be a fair statement that
4         in his attempt to shut you down, it was
5         getting a lot of media attention?
6    A.   Yes.
7    Q.   Okay.  And would it be fair that during
8         this attempt for the mayor to shut you
9         down while it was getting media attention,
10        that most of that media attention was
11        negative towards your business?
12   A.   Yes.
13   Q.   And would you agree with me that unless a
14        person was closely connected with the
15        situation, such as yourself or a police
16        officer or somebody that was kind of
17        familiar with what was going on, the
18        average citizen only knew what was being
19        reported in the news media, correct?
20   A.   Correct.
21   Q.   And because of what you testified to
22        earlier, I'm under the impression -- you
23        tell me if I'm wrong -- but you really

Page 263

1         didn't feel like you were getting a fair
2         shake in the media about what was going on
3         with Celebrations?
4    A.   Correct.
5    Q.   Clarify this for me.  Was the proposed
6         sports bar that you and Mr. Long planned
7         on opening, was that a different type of
8         establishment than Celebrations?
9    A.   Absolutely.
10   Q.   Okay.  I thought I understood that, but I
11        wasn't sure.  It really wasn't clarified
12        for me.
13   A.   If I --
14   Q.   Well, let me finish.  Whereas Celebrations
15        at the end, as I understood it, was being
16        operated more as a hip hop music bar where
17        you go and dance and drink, right?
18   A.   Correct.
19   Q.   And it was open two nights a week?
20   A.   Correct.
21   Q.   The planned business for the venture I'm
22        going to call between you and Mr. Long was
23        a sports bar -- restaurant slash sports

Page 264

1         bar where he could also show off talent
2         that he was -- that was part of his record
3         label, right?
4    A.   Correct.
5    Q.   Okay.  Now, you had not operated anything
6         similar to that in some time, had you?
7    A.   Sports Rock.  It was -- all it was, was a
8         takeoff of a club I had called Sports
9         Rock.
10   Q.   Well -- all right.  I'm not saying you had
11        not ever operated -- I'm saying you had
12        not operated something similar to that in
13        a while.  And when I say "a while," let me
14        try to get my notes here.  You had
15        operated Celebrations for seven years, so
16        for at least seven years, you had not
17        operated anything similar to a sports bar?
18   A.   Yes.
19   Q.   Yes, you had or yes, you agree with me?
20   A.   Yes, I agree with you.
21   Q.   I know we're getting near the end of the
22        day.  Just bear with me, Mr. Barr.  Are
23        you aware of any sports bar in Montgomery

Page 265

1         which caters primarily to the
2         African-American community that has been
3         successful in the past?
4    A.   No.
5    Q.   I wanted to get a little clarification
6         about something else.  Earlier you were
7         talking about the problems at Celebrations
8         in the parking lot, and I believe you said
9         that the Rose Supper Club had been shut
10        down and that was one thing that lead to a
11        larger number of people coming to your
12        club; is that right?
13   A.   Coming to the parking lot.
14   Q.   That's what I'm trying to get a
15        clarification on.  I'm trying to
16        understand, when you made that statement,
17        were you referring to clientele or were
18        you referring to basically where the
19        trouble was coming from; that's what I
20        didn't understand.
21   A.   No, just clientele.  That's --
22   Q.   So in other words -- go ahead.  I don't
23        want to interrupt you.

67 (Pages 262 to 265)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 266

1  A.   Well, that's all I was referring to. When
2       you close a club down that usually holds
3       500 people, I mean, they -- they go
4       somewhere else.
5  Q.   Okay. So let me just make sure I get a
6       clarification on that. The Rose Supper
7       Club, for the record, is a predominantly
8       black --
9  A.   Predominantly black.
10 Q.   -- bar or dance club?
11 A.   Dance club, right.
12 Q.   And it was downtown, right?
13 A.   Yeah, still is.
14 Q.   Well, that's what I was trying to figure
15      out. Did it get closed down by the city,
16      or did they close down voluntarily?
17 A.   By the city.
18 Q.   Okay. So the city shut it down?
19 A.   Right.
20 Q.   Okay. Do you know why they shut it down?
21 A.   I believe it was an overcrowding
22      violation, and it was -- just shut them
23      down for a short period of time, then they

Page 267

1       reopened.
2  Q.   So you're saying -- well, how long were
3       they shut down; do you know?
4  A.   I don't know.
5  Q.   But during the period they were shut down,
6       you experienced an increase in your
7       clientele; is that right?
8  A.   Yes.
9  Q.   And was this part of the reason that there
10      was trouble in the parking lot out there?
11      Because that's what I'm trying to figure
12      out, whether those two are connected at
13      all. The shutting down of the Rose Supper
14      Club, did it have any relationship to the
15      trouble that was happening in the
16      Celebrations parking lot?
17 A.   None.
18 Q.   Okay. You were just mentioning that as an
19      aside, then, when you said it was shut
20      down? I'm trying to understand what
21      relationship the Rose Supper Club being
22      shut down had to do with your business,
23      the Celebrations business?

Page 268

1  A.   It had nothing to do with it.
2  Q.   Okay. I don't think you were asked this
3       question, but who is your accountant
4       presently?
5  A.   Marcus Wolf.
6  Q.   Marcus Wolf?
7  A.   Wolf & Taunton.
8  Q.   And how long has he been your accountant?
9  A.   I guess ten years.
10 Q.   With regard to the lease on the Friday's
11      establishment that you talked about
12      earlier, which you later found out had a
13      problem with the ground lease on it, but
14      not originally --
15 A.   That was an offer.
16 Q.   Okay. That was an offer. Did you ever
17      have a lawyer or Grant Sullivan or anybody
18      look at that lease?
19 A.   Yes.
20 Q.   Okay. Who?
21 A.   It wasn't a lease. We wrote a contract on
22      Friday's, and at that time we had not seen
23      the rider on the Wal-Mart. And so when

Page 269

1       they rejected the offer of $400,000 about
2       the ground lease, you know, Grant wrote
3       the contract.
4  Q.   That answers my question. Do you have an
5       attorney or real estate person that
6       generally you use whenever you enter into
7       negotiations to lease or buy a piece of
8       property or a building or anything like
9       that?
10 A.   Grant's always done everything until this
11      year. I started on this land. I use Bill
12      Fuller.
13 Q.   And Bill is a lawyer or --
14 A.   He's a real estate lawyer.
15 Q.   Real estate lawyer. But you're just
16      saying he's only been used here recently?
17 A.   Yes, this last year.
18 Q.   Who is he with -- or is he by himself?
19 A.   Fuller? He's over there -- do you know
20      where the old Sports First -- he's in
21      Marcus's old office.
22 Q.   Okay. That's fine. We can locate him.
23 A.   Bill Fuller and -- what's the other guy

68 (Pages 266 to 269)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 270

1   with him? He's a young guy, so --
2 Q.   So other than recently with Mr. Fuller,
3   it's fair to say Grant's helped you with
4   all your real estate --
5 A.   Right, and whichever attorney he uses. He
6   uses a bunch of them.
7 Q.   Okay. And all I'm trying to find out --
8   like, when you buy a piece of property,
9   you don't have a lawyer you typically go
10   to and say, I want this lawyer to close
11   it, something like that?
12 A.   No.
13 Q.   Okay. Did you ever attempt to go back and
14   lease the Celebrations location again, or
15   is there somebody already in that?
16 A.   Somebody is already in it.
17 Q.   Who is in that?
18 A.   I don't know who it is. It's a jackpot.
19 Q.   Do you know when they leased it? Was it
20   before this occurred?
21 A.   When did they lease it? I don't
22   understand the question.
23 Q.   Here's what I'm trying to find out.

Page 271

1   You've said that you lost this lease and
2   it's caused you damages. Okay. Did you
3   ever go back and try to lease the
4   Celebrations location?
5 A.   No.
6 Q.   You never spoke with them about trying to
7   lease it? I mean, it would have fit what
8   you and Mr. Long were trying to do,
9   correct?
10 A.   Possibly.
11 Q.   Okay. What about the -- and I'm just
12   going to throw out some places, and I
13   don't know anything about them other than
14   I know they're vacant. I heard you
15   mention a while ago the Macaroni Grill and
16   the LongHorn Steakhouse there, similar
17   location. Have you checked on either of
18   those?
19 A.   I've got the package on Macaroni Grill
20   I've just gotten, and LongHorn Steakhouse
21   is still open.
22 Q.   I thought it had closed.
23 A.   It's the last one left.

Page 272

1 Q.   Okay. Are you and Mr. Long restricted to
2   that area over there, as far as the place
3   you're going to own?
4 A.   If we're going to do one that caters to
5   the black community, that's the
6   demographics we're looking for, a
7   one-three-five mile radius right there.
8   We don't want to go any further west or
9   south than Troy Highway, but that's the
10   area we want to be in. The problem I felt
11   like I had with Celebrations is because
12   it's the perception of Vaughn Road being
13   east Montgomery, and there was a lot of
14   people that just didn't like that.
15 Q.   Okay. But you were going to open up a
16   totally different kind of establishment,
17   as I understand?
18 A.   But it was going to be predominantly -- we
19   were catering to the black community.
20 Q.   That's not my question. But it was going
21   to be a sports bar; it wasn't going to be
22   a hip hop dance place, right?
23 A.   It would have entertainment, yes.

Page 273

1 Q.   I know, but --
2 A.   It's a different concept, yes.
3 Q.   Do you actually have any demographic
4   studies or maps concerning the city of
5   Montgomery, or are you just basing this
6   all on your personal knowledge?
7 A.   I've had all --
8 Q.   Answer --
9 A.   Do I have them in my possession, no.
10 Q.   Have you ever seen them?
11 A.   Yes.
12 Q.   You've seen demographic maps?
13 A.   Yes.
14 Q.   Where have you seen them?
15 A.   It takes about two seconds to get them
16   from the Chamber of Commerce.
17 Q.   Okay. So you've seen them; you've gotten
18   them?
19 A.   Yes.
20 Q.   Do you have any in your possession?
21 A.   No.
22 Q.   So you could tell me -- well, when is the
23   last time you looked at one?

69 (Pages 270 to 273)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 274

1  A.   For Montgomery?
2  Q.   Yes, sir.
3  A.   Probably in the last year.
4  Q.   What black talk show did you go on? You
5       said something about that earlier. I
6       don't remember you saying a name. Do you
7       remember what the name of it was?
8  A.   I don't even know the lady's name. She's
9       out of Millbrook. I didn't go on the
10      show; she called me up at home.
11 Q.   How do you know Rad Dotson?
12 A.   From doing radio advertising with him for
13      10, 15 years.
14 Q.   And what station did you advertise on?
15 A.   Went through the whole spectrum as we
16      changed our format. Went through, you
17      know, 96 to 98 when it was a country
18      station to 96.9 JAMZ when it was hip hop.
19 Q.   Does he sell for -- who?
20 A.   For that -- they own all those radio
21      stations.
22 Q.   Is it Cumulus?
23 A.   I don't think it's Cumulus.

Page 275

1  Q.   Or whatever it is now?
2  A.   I think it's Clear Channel.
3  Q.   Clear Channel? Okay. You would agree
4       with me, would you not, that regardless of
5       a person's race, skin color, national
6       origin, whatever, that if a complaint or
7       call was made to the MPD or fire
8       department regarding a business, it would
9       be appropriate for them to check those
10      complaints if lodged, wouldn't you?
11 A.   Yes.
12 Q.   You still have your lease, I believe you
13      said, didn't you, that -- I believe it's
14      the Kushner Group that owns the -- you've
15      still got that lease?
16 A.   The 14-year old lease?
17 Q.   Whichever lease you were operating on at
18      the time you were closed.
19 A.   I don't know if I have a copy. It's in
20      those files. I moved all those files out
21      to the warehouse. I moved everything that
22      I was told by Marcus Wolf that I needed to
23      keep.

Page 276

1  Q.   You know, this is something -- I may be
2       showing my ignorance here, but on this
3       income statement, which I always thought
4       was like a profit loss statement showing a
5       net income -- I don't see a net income on
6       there. Are there any pages missing from
7       this document, Exhibit -- what is that,
8       Exhibit 4? I see where it says gross
9       income from sales; I see cost of sales; I
10      see operating expenses --
11 A.   The whole P&L comes -- it's probably about
12      eight pages long.
13 Q.   Okay. So in order for me to understand a
14      little more about this operation, there
15      are some pages missing that I need, right?
16 A.   Well, I can have my accountant --
17 Q.   I agree. I'm just trying to make sure
18      that you agree with me; there are some
19      pages missing that indicate what the net
20      income was --
21 A.   I think that's pretty sufficient, but if
22      you need more, I'll be glad to get them
23      for you.

Page 277

1  Q.   Okay. Well, we'll follow up on that
2       request with your attorney.
3            MR. GUY:  Do you see what I'm
4       saying, Mike?
5            MR. QUINN:  Yeah. It says Page
6       1. I don't --
7            THE WITNESS:  I just don't know
8       what may be on the other
9       pages, because obviously, it
10      doesn't have a net income --
11           MR. JENT:  My guess is this is
12      what his accountant gave
13      him. That's something we'll
14      deal with.
15           MR. QUINN:  Yeah. We'll take
16      care of it.
17           MR. GUY:  I'll follow up with
18      something. Just give me a
19      minute, Mike. I'm trying to
20      skip over stuff.
21           MR. QUINN:  That's all right.
22 Q.   You never made or no one on your behalf
23      made actually an offer to lease the Pure

2100 Third Avenue North, Suite 960 * Birmingham, AL 35203
1-800-888-DEPO or 205-251-4200

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 278

1  Country Saloon premises, correct?
2  A.  No, I did. I asked, you know, for --
3  Q.  You asked her for a quote --
4  A.  Yeah, right.
5  Q.  -- but you never made an offer?
6  A.  We were never allowed back in the
7      building. An offer --
8  Q.  But -- go ahead. I'm just asking you a
9      question, you never made an offer, though,
10     did you? I understand --
11 A.  I asked for a lease then.
12 Q.  Okay. Hold on just a second. Let me make
13     sure I get it straight, because I don't
14     want to misinterpret what you said. I
15     understood you to ask her lease terms, and
16     you said she quoted you $4,500, I guess a
17     month, plus you said no improvements to
18     the property, whatever that language is,
19     right -- no leasehold improvements, right?
20 A.  Right.
21 Q.  Okay. I never heard you say -- and you
22     correct me if I'm wrong -- that you
23     actually said, I accept, or here is a

Page 279

1      counterproposal. Is that true?
2  A.  I can't answer that in one word.
3  Q.  Okay. Well, go ahead and answer it, then,
4      in whichever way you feel best.
5  A.  Read what Mr. Little said in there in one
6      of our conversations with her. I told her
7      that I wanted to do a lease, and in his
8      own words in there, he says that he didn't
9      even blink an eye; he wanted to go ahead
10     and sign the lease -- in his words,
11     talking about Amy.
12 Q.  No, sir. No, sir.
13 A.  I'm not going to argue with you about it.
14     It's right there in black and white.
15 Q.  You're talking about the video tape of
16     Mr. Cranage talking to Mr. Little?
17 A.  Yes.
18 Q.  That's not what I'm asking you. Let's
19     make sure we're clear, now. I'm just
20     asking you, did you make an offer to lease
21     the premises?
22 A.  I asked to put a backup lease on it. I
23     asked to lease it -- he even says it on

Page 280

1      his own thing, that they had to move on it
2      quick because I didn't blink an eye.
3          MR. JENT:  He's not asking you
4              what Mr. Little said; he's
5              asking what you said.
6  Q.  I'm asking you what you said.
7  A.  She wouldn't even discuss the lease with
8      me.
9          MR. QUINN:  That's what we're
10             getting at. The
11             conversation you had with
12             her --
13         THE WITNESS:  She --
14         MR. QUINN:  Let me finish.
15             Either the first time when
16             she quoted you $4,500, which
17             was double what you knew it
18             was, or later in telephone
19             conversations or any other
20             time, did you ever say, I
21             want a lease.
22         THE WITNESS:  Yes.
23         MR. QUINN:  When?

Page 281

1          THE WITNESS:  I just said I had
2              already seen the building
3              and I would do it without
4              Terrence. It was one of the
5              conversations we had on the
6              phone.
7  Q.  You're not even answering Mr. Quinn's
8      question. Let me try to make it easier.
9      I don't want to be confusing to you. I
10     want to be fair to you, but I want you to
11     be fair to me. Let's start off this way.
12     It would be fair to say that you never
13     made an offer in writing --
14 A.  Right.
15 Q.  Let me finish. You never made an offer in
16     writing to lease the premises that we've
17     been discussing, the Pure Country Saloon,
18     correct?
19 A.  Correct.
20 Q.  All right. So the writing part's out of
21     the way now. All right. As far as a
22     verbal offer to lease the premises, is it
23     fair to say that on your first meeting

2100 Third Avenue North, Suite 960 * Birmingham, AL 35203
1-800-888-DEPO or 205-251-4200

Page 282

1  with Ms. Knudsen out there, you never made
2  a verbal offer to lease the premises?
3  A.  Correct. She gave me the quote.
4  Q.  She gave you the quote, but you never
5  either counteroffered or said I accept,
6  correct?
7  A.  Correct.
8  Q.  All right. So when would be -- in your
9  testimony, when would be the first time
10  you made any verbal request to lease the
11  premises that we've been referring to as
12  the Pure Country Saloon?
13  A.  When I asked to put a backup lease. I
14  asked if she was working on the lease, and
15  she said she was working on the lease.
16  And I said, well, can I put a backup lease
17  on there, and she said that wasn't
18  necessary -- I don't remember what her
19  explanation was.
20  Q.  Are you referring -- go ahead. Are you
21  finished? I don't want to interrupt you.
22  Okay. Are you referring to the
23  conversation that is part of the tape we

Page 283

1  heard?
2  A.  No. This would have been when I called
3  her and was trying to get Terrence in to
4  see the building the day that I went over
5  to Woodmere.
6  Q.  Well, I don't want to -- you haven't
7  listened to that tape, but it sounds a lot
8  like what you said on that tape. Are you
9  sure it's not the time that you talked to
10  her and you taped the conversation?
11  A.  Well, I didn't listen to the tape, but I
12  can assure you that I offered to put a
13  lease -- a backup lease on it when I knew
14  she wasn't going to let me -- I mean, they
15  weren't going to let me in the building.
16  Q.  So let me understand. So you offered to
17  put a backup lease --
18  A.  Well, she kept saying they were working on
19  this lease, but when I sent Mark in there,
20  they offered him a lease there on the
21  spot.
22  Q.  But again --
23  MR. QUINN: When you do that, it

Page 284

1  confuses things. He's
2  talking about before that
3  event on the 13th.
4  A.  There had been no written offer.
5  Q.  And no verbal offer? You never came in
6  and said, I'll lease this space -- I'm
7  making an offer to lease it for 4500,
8  3500, 2500 a month? You never made an
9  offer to her -- a counteroffer to what she
10  told you that very first day, did you?
11  A.  No.
12  Q.  Okay. Do you still have the -- and again,
13  I'm not familiar with this term -- the
14  rent rolls on LeCroy shopping center?
15  A.  Those were sent to Grant, and he called me
16  when he went over them. I went by his
17  office, and if he has them, he would have
18  them on file.
19  Q.  And you never personally had them in your
20  possession?
21  A.  No.
22  Q.  And if I understood what you said earlier
23  -- and I want to be fair, but I think you

Page 285

1  said that based on those rent rolls -- is
2  that R-O-L-L-S?
3  A.  Right.
4  Q.  -- that you believed that the net worth on
5  that shopping center -- or maybe not the
6  net worth but an appropriate offer on that
7  at the time was 1.1 or 1.2 million -- I
8  may be mistaken -- and that you offered a
9  million?
10  A.  Right.
11  Q.  So it would be fair to say that you didn't
12  even offer what the rent rolls indicated
13  was an appropriate value, that you offered
14  something less than that?
15  A.  Well, I was looking for a deal, one; two,
16  there's a lot of things to consider on
17  rent rolls, and that's length of the
18  leases, who the tenant is, were they a
19  triple A tenant or what. There's a lot of
20  variables that go into that that I don't
21  even understand. And Grant looked at it
22  and said it could be worth a million one,
23  a million two; why don't you offer a

72 (Pages 282 to 285)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 286

1  million?
2  Q.  And I'm not begrudging you for being a
3     good business person.  That's what a good
4     business person does, right?
5  A.  Right.
6  Q.  You were trying to get a good deal, right?
7  A.  Right.
8  Q.  And you wouldn't begrudge Ms. Forney if
9     she didn't feel like that a million
10    dollars was an appropriate offer, would
11    you?
12 A.  No.
13 Q.  Regardless of your race, correct?
14 A.  My race?
15 Q.  Of anyone's race.  I mean, if she didn't
16    feel it was worth -- that it was worth
17    more than a million dollars, that would be
18    good business on her part, to not accept a
19    million, correct?
20 A.  Correct.
21 Q.  Whether you were black, white, Asian,
22    Hispanic, or whatever, correct?
23 A.  Correct.

Page 287

1  Q.  I mean, you're a good business person, and
2     Ms. Forney, owning a shopping center,
3     certainly has to be a good business person
4     in order to make it profitable, correct?
5  A.  Correct.
6  Q.  Was Grant -- so -- yeah.  He was going to
7     get a commission too on that purchase, of
8     10 percent, on that offer of a million
9     dollars, is my understanding from this.
10 A.  If that's what it says, yes.
11 Q.  Well, that had to be discussed with you,
12    because he was -- 10 percent, I guess,
13    would have been -- had to be paid to him,
14    which would really have even netted less
15    than the million offer, correct?
16 A.  If that's what it states.
17 Q.  Well, I don't want to misstate it.  Just
18    look and see.
19 A.  It's pretty simple.  It tells you the
20    commission rate is on there; it tells you
21    who's going to pay it; and in this case,
22    it's paid by the seller.
23 Q.  I'm just trying to establish -- you've

Page 288

1  sued my client for discrimination.  All
2  I'm trying to figure out from you is, you
3  would agree with me that the real bottom
4  line on this contract, if it had been
5  accepted, would not even have been a
6  million dollars to Ms. Forney; it would
7  have been 900,000 at least, because she
8  would have had to pay 10 percent
9  commission.  And does it say who would pay
10 closing costs?  It says rents and leases
11 shall be prorated at closing.  I don't
12 know what it says about --
13 A.  Well, that 10 percent wouldn't have gone
14    to Grant.
15       MR. QUINN:  Just answer the
16       question.
17 Q.  Do what, now?
18 A.  It's split with them.
19       MR. QUINN:  This isn't worth
20       arguing about.  Just answer
21       the question.
22 Q.  That's not my question.  I don't care who
23    it's split with.  My question is my

Page 289

1  client.  She would not have netted, even
2  by the terms of this, more than $900,000;
3  you would agree?
4  A.  I don't know exactly what she would net.
5  Q.  Well, a million less 10 percent.  Ten
6     percent is $10,000.
7  A.  It's 900 -- it's -- how about 100,000?
8  Q.  I'm sorry.  It would have been 100,000.
9     So it would have been 900 that she would
10    have at the very most netted out of this?
11 A.  Yes.
12 Q.  Okay.  Is it your position in this case,
13    Mr. Barr, that the alleged discrimination
14    is because of who you are and your
15    affiliation with Celebrations?
16       MR. QUINN:  Object to the form.
17       You can answer if you know.
18 A.  Could you rephrase the question?
19       MR. GUY:  Could you read it back
20       to him, please, ma'am?
21       (Requested portion of record
22       read, Page 289, Line 13.)
23       MR. QUINN:  I object to the form.

73 (Pages 286 to 289)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 290

1  Q.  You can answer now.
2  A.  Yes.
3       MR. GUY:  That's all I have, but
4       I do want to have an
5       opportunity to discuss a
6       couple of things with Chuck
7       before I finish.  I don't
8       know if he's got some more
9       questions, but let me get
10      that opportunity before I
11      finish.
12      (Brief recess.)
13 Q.  Let me show you what I marked as
14      Defendants' Exhibit Number 12, which was
15      produced by your attorneys in their
16      initial disclosures.  I just wanted to ask
17      you if you recognize that document.
18      (The referred-to document was
19      marked for identification as
20      Defendants' Exhibit No. 12.)
21 A.  Where we made an offer on the Friday's
22      bidding.
23 Q.  And did Grant Sullivan make that offer for

Page 291

1      you as well?
2  A.  Yes, he did.
3  Q.  With your consent and approval?
4  A.  Yes, he did.
5  Q.  Is there a date on there?
6  A.  May 23.
7  Q.  So the offer on the Friday's building and
8      the offer on the shopping center, LeCroy
9      shopping center, were made on the same
10     day, correct?  If you need to refresh your
11     recollection, look at -- actually, your
12     attorney's got the full exhibit --
13          MR. QUINN:  It's got the date on
14          it.  So the answer is yes.
15 A.  Yes.
16          MR. QUINN:  Why is that so hard?
17          Yes/no.
18          (Off-the-record discussion.)
19 Q.  Let me show you Defendants' Exhibit 13.
20     And again, this was given to us in initial
21     disclosures.  And again I'll ask, have you
22     ever seen that document?
23     (The referred-to document was

Page 292

1      marked for identification as
2      Defendants' Exhibit No. 13.)
3  A.  I don't remember ever having seen it.
4  Q.  Okay.  Very good.  It appears that it was
5      probably just given to us by your
6      attorneys who looked it up online.  All
7      right.  You had said earlier that you were
8      prepared to pay the million dollars in
9      cash out of your own pocket for the LeCroy
10     shopping center, right?
11 A.  Right.
12 Q.  Okay.  Is that personal assets of yours
13     that you have in a bank or institution
14     somewhere here?
15 A.  At the time, that was in the Sterling Bank
16     sitting in a checking account.
17 Q.  Okay.  That's my question.  So it's your
18     sworn testimony that on 5/23, when you
19     made the offer on the LeCroy shopping
20     center, you had a million dollars in a
21     Sterling Bank account?
22 A.  It was right at a million, then I have a
23     line of credit there also.  So yes, I

Page 293

1      could have written a check for it.
2  Q.  Other than your home and the approximate
3      million dollars that you had in a bank
4      account on that day, did you have any
5      other assets, liquid assets of any kind?
6  A.  I mean, what do you consider -- I had
7      stocks.  I had probably --
8  Q.  That's what I'm asking.  You have stocks?
9  A.  I did at that time.  I've cashed them out
10     and put them in land since then.  That was
11     with AG Edwards, Dickie Blondheim.
12 Q.  That's my question.  So you had stocks or
13     an investment account with AG Edwards --
14 A.  Right.
15 Q.  And who was your --
16 A.  Dickie Blondheim, B-L-O-N-D-H-E-I-M, or
17     something like that.
18 Q.  Is that part of this million, or did you
19     have a separate investment account with AG
20     Edwards of a different worth?
21 A.  That was different.
22 Q.  That was different.  Can you tell me how
23     much worth you had in your AG Edwards

74  (Pages 290 to 293)

Page 294

1        account as of May 23rd of 2007?
2   A.   I don't recall.
3   Q.   And is it your testimony that today you do
4        not have the million dollars in Sterling
5        Bank any longer?
6   A.   In my checking account?
7   Q.   Whatever account?
8   A.   I've probably got four or five hundred
9        thousand in an account and probably --
10       like I said, I've bought a substantial
11       amount of land that I paid cash for.
12  Q.   Okay.  And then I believe you said that
13       you had also cashed in some of your stocks
14       or other assets in your AG Edwards
15       account?
16  A.   I cashed that account out, put it in land.
17  Q.   All right.  Well, I don't want to misstate
18       anything, but from what I'm hearing from
19       you, it's fair for me to say that since
20       your unsuccessful attempt to find a place
21       to open up a sports bar with Mr. Long, you
22       have taken your money and you have placed
23       it in other investments, correct?

Page 295

1   A.   Part of them.
2   Q.   Okay.  How much would you say you have
3        placed in other investments since that
4        time?
5   A.   Half a million dollars.
6   Q.   Half a million, okay.  And how much is in
7        land, of that half a million?
8   A.   That's what I put in there, is about a
9        half million.  I bought land in
10       foreclosure that's worth double that.
11       I've got a half million dollars tied up --
12       now, that's just in land.  That's not
13       counting my home.  That's not counting
14       commercial buildings or anything like
15       that.
16  Q.   I'm just trying to figure out from the
17       money that was going to be used to
18       purchase a piece of property for your
19       venture with Mr. Long, you have now
20       withdrawn about a half a million of that
21       money and put it in other investments,
22       correct?
23  A.   Right.

Page 296

1   Q.   And what would be the best method, if I
2        wanted to figure out -- I know you've
3        testified to the best of your ability
4        today, but what would be the best method
5        for me to actually get the information
6        relative to these properties you own and
7        other investments you own?  Would that be
8        through your accountant?  Would he have
9        all the documentation from your purchases
10       and everything?
11  A.   I've got all the deeds myself or either
12       the attorney Bill Fuller has closed all
13       those properties.
14  Q.   All right.  The tape that Mark Cranage had
15       from going to the Pure Country Saloon with
16       Mr. Little, who has possession of the
17       original of that tape?  Your attorneys do?
18  A.   I don't think it's the original of it.  I
19       think Mark has the -- we've all got copies
20       of it.
21  Q.   Again, you're going to where I want to go,
22       and I just want to find out, after the
23       tape was made, which was on June 13th, did

Page 297

1        you view it sometime shortly thereafter?
2        Did he call you up and say, hey, I've got
3        a tape?
4   A.   Yes, sir.
5   Q.   Was it on the same day?
6   A.   I don't remember if it was the same day or
7        not.
8   Q.   Is this a -- the 8 millimeter tape or is
9        it a small DVD?
10  A.   It seems like he brought it over on a DVD.
11  Q.   Okay.  Here's what I would ask of you --
12  A.   You're going to have to ask him that.  He
13       came over to my house and showed it to me,
14       and...
15  Q.   But it's your belief to this day that he
16       still has the original?
17  A.   I can't say.  It seems like I told him to
18       make me a copy and my attorney -- I said
19       just go ahead and burn two or three copies
20       and bring them to me, you know.
21  Q.   Okay.  And did you turn over all the
22       copies to your attorney?
23  A.   I don't know if I still have one or not.

75 (Pages 294 to 297)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 298

1    THE WITNESS: I know y'all have
2        one --
3  Q.   Are all the copies --
4  A.   I think Wayne --
5  Q.   I'm sorry. I didn't mean to interrupt
6        you. I thought you were done.
7  A.   I think Wayne Sable still has one, and I
8        might have one. I don't know.
9  Q.   Are all the copies he made on DVD?
10 A.   All the ones I've seen, yes.
11 Q.   I'm just trying to understand. What you
12       gave to your attorneys, who then made a
13       copy for us, is a DVD -- or CD, I don't
14       know what it is -- DVD, because it's a
15       video, right? So again, I'm just -- are
16       there any other tapes besides that one on
17       that day that Mr. Cranage has made, any
18       other audio or video tapes by anybody else
19       --
20 A.   No. Whatever he had, that little video
21       camera was the -- that's it.
22 Q.   Okay. Do you still have any social
23       connection with Mr. Cranage or Mr. Morin?

Page 299

1  A.   Mr. Morin lives up on Lay Lake. I see him
2        once every two weeks. I called Mark
3        yesterday and told him that I was going to
4        do my deposition, and that was the first
5        conversation I've had with him in weeks --
6        or months. I mean --
7  Q.   What does he do again? Does he still work
8        at Woodmere?
9  A.   He's the managing partner. He actually --
10       he does run it. Mike's never -- doesn't
11       go there.
12 Q.   So Mr. Cranage is the managing partner at
13       Woodmere Tavern?
14 A.   Correct.
15 Q.   Okay. What is his phone number or how do
16       you contact him?
17 A.   657 -- Woodmere Tavern. I'm not sure what
18       his cell number is.
19 Q.   Do you know what time he shows up at
20       Woodmere Tavern for work?
21 A.   When I -- my car wash is next door, and
22       the times I see him there is usually in
23       the daytime. It's during -- on Mondays

Page 300

1        and Tuesdays. It's kind of the same thing
2        that I used to do at Celebrations. I did
3        orders and deliveries on Mondays and
4        Tuesdays, so it's usually -- and I'm
5        assuming it's at night.
6  Q.   When you see him during the daytime, is it
7        usually in the afternoon?
8  A.   Well, it's around lunch. And I don't even
9        see him; I see his vehicle over there
10       sometimes.
11 Q.   When you talked to him the other day and
12       told him you were giving your deposition,
13       did y'all discuss anything in particular,
14       or what was your purpose in telling him
15       that?
16 A.   Just telling him that -- because he had
17       asked me, you know, a while back, to let
18       him know when this thing was coming up,
19       and I basically asked him if they were
20       going to do a deposition on him and he
21       said he hadn't heard anything.
22 Q.   Do you know where he lives?
23 A.   He lives in Millbrook, I think, or up in

Page 301

1        that area.
2        MR. GUY: Okay. That's all I
3        have. Thank you.
4        MR. STEWART: I have a few more
5        questions but not many.
6        EXAMINATION
7  BY MR. STEWART:
8  Q.   Going back to the media attention that
9        Celebrations got in the 2006-2007 time
10       frame, are you aware of any other bar in
11       town that got that kind of media
12       attention?
13 A.   Well, I think -- I don't know if you
14       remember when they closed down all the
15       black bars in town on Thanksgiving with
16       the Turkey Day Classic. That kind of was
17       the big news for a month there, because
18       they came in with the --
19 Q.   I'm talking about the kind of media
20       attention you got -- regular media
21       attention like you got out there with all
22       these news stories in the newspapers, all
23       the Channel 12, Channel 8 --

76 (Pages 298 to 301)

Page 302

1  A.  That was like a random thing.  We would
2      have something and it would be in the news
3      and then nothing would happen for a while
4      and then we would have something and it
5      would be in the news again.
6  Q.  Yeah.  But my question is, are you aware
7      of any other bar that got the same media
8      attention that your bar got?
9  A.  Well, the Rose sure gets a lot of it, and
10     --
11 Q.  See, I don't remember anything about the
12     Rose, but I remember turning on the TV, it
13     seemed like every week there was a
14     different story at Celebrations for a
15     while.  Is your recollection different?
16 A.  Yeah, because I -- I mean, I had to deal
17     with it, you know.  We went for months
18     there without, you know, like I said,
19     having any problems or anything, so
20     that's...
21 Q.  Okay.  Well, other than the Rose club and
22     your bar, are you aware of any other bar
23     in town that got the --

Page 303

1  A.  Every bar in town --
2  Q.  -- same adverse media coverage that your
3      bar got during that same time frame?
4  A.  No.
5  Q.  Okay.  Can you understand -- setting aside
6      race, can you understand why a landlord
7      would not want his property to get that
8      kind of adverse media attention?
9  A.  Can I understand that?
10 Q.  Yeah.
11 A.  Yes.
12 Q.  Okay.  The demographic maps that you
13     discussed, do you actually own one?
14 A.  You can get a demographic -- I can have
15     you --
16        MR. QUINN:  That's not the
17           question.  Do you have one?
18 A.  They change --
19        MR. QUINN:  Just answer the
20           question, and we can go
21           home.
22 A.  No.
23 Q.  How do you get one?

Page 304

1  A.  You can go to the Chamber of Commerce and
2      get -- they'll e-mail you anything you
3      want.
4  Q.  Did you refer to demographic maps when you
5      were looking into your sports bar?
6  A.  It was -- I already knew where
7      Celebrations was.  I already know what the
8      demographics are from having been here for
9      14 years.  You know, I didn't have to look
10     at any demographics for that.
11 Q.  So is that a no, you didn't look at one?
12 A.  No.
13 Q.  Okay.  We talked a little bit about the
14     offer, the verbal offer, the written offer
15     on the lease premises there at Pure
16     Country.  Based on what you've said here
17     today, it appears that the only time you
18     said anything about a backup lease was
19     after the alleged discriminatory statement
20     that you said Amy made that first visit,
21     correct?
22 A.  I don't understand the question.
23 Q.  The only time you ever mentioned a backup

Page 305

1      lease was after this first visit to the
2      property?
3  A.  Right.
4  Q.  Okay.  You had already decided to go with
5      Friday's after the first visit to the
6      property, correct?
7  A.  Correct.
8  Q.  You never intended to lease this space at
9      $4,500 a square foot, did you?
10 A.  We came back and tried to.
11 Q.  You never intended to lease this space at
12     $4,500 a square foot, did you?
13 A.  I offered to pay whatever -- I -- I
14     offered to sign a lease.
15 Q.  For $4,500 a square foot?
16 A.  For whatever she wanted to write it for.
17 Q.  Oh, you didn't care what the amount was?
18     That was not important to you?
19        MR. QUINN:  Object to the form.
20 A.  Of course it's important to me.
21 Q.  You didn't care what the price of the
22     lease was by square foot?
23        MR. QUINN:  I think he's already

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Video * Litigation Support * Trial Services**

Page 306

1        answered it; of course, he
2        did.
3        MR. STEWART: He didn't say that;
4        you said that.
5        MR. QUINN: No, I didn't.
6        THE WITNESS: I just said it. Of
7        course, I did.
8  A.  Yes, I did.
9        MR. QUINN: I just objected --
10  Q.  Did you intend to lease the space at
11    $4,500 a square foot?
12  A.  Yes, I would have.
13  Q.  You would have done that?
14  A.  Yes.
15  Q.  Even though it was twice what the prior
16    tenant paid?
17  A.  Well, I don't know that for sure. I just
18    said that was hearsay that I heard that
19    was twice what he paid.
20  Q.  If you found out that it was true, that it
21    was twice what he paid, would you have
22    paid $4,500 a square foot for that space?
23  A.  Yes, I would.

Page 307

1  Q.  How much were you paying over at
2    Celebrations?
3  A.  $6,700 a month. Right at $7,000.
4  Q.  Okay. And you said there was -- oh, I
5    know what it was. You didn't intend to
6    lease the space without improvements being
7    made to the space, did you?
8  A.  Without me doing them?
9  Q.  Without the landlord doing improvements to
10    the property.
11  A.  I asked if there were any leasehold --
12    would there be any consideration, which is
13    normally done through rent or whatever
14    like that, and they said no, the landlord
15    wouldn't put any money into the --
16  Q.  And you had no intention of leasing the
17    property unless she did?
18  A.  Well, I would have to do it myself.
19    Sometimes you get leasehold improvements;
20    sometimes you don't.
21  Q.  Have you ever talked with Mark Cranage
22    about Amy Knudsen at any other time?
23  A.  About?

Page 308

1  Q.  Other than the conversation you told us
2    that you had at Woodmere Tavern where he
3    then placed the call to Amy?
4  A.  I talked to him when he brought the tape
5    over to my house and gave it to me.
6  Q.  Has he spoken with Amy Knudsen on any
7    other occasion to your knowledge?
8  A.  The only thing I know about is he said he
9    had a message on his cell phone when she
10    called and said if there's a tape, it
11    better disappear. He'll need to tell you.
12  Q.  Amy called --
13  A.  Amy called Mark Cranage and left a message
14    on there saying, if there's a tape, it
15    needs to be gone; I could lose my job. I
16    mean, that's -- you can -- that's you and
17    Mark Cranage. I mean...
18  Q.  Any other times that Mark Cranage either
19    talked with Amy Knudsen or had a message
20    from her like that?
21  A.  I have no knowledge.
22  Q.  Do you know if the conversation you've
23    just said took place where she left the

Page 309

1    message, if that recording was saved?
2  A.  I have no knowledge.
3  Q.  When did you find out that that statement
4    had been made?
5  A.  I don't know, a few days after that. He
6    was -- or it might have been a week later.
7    I don't know when it was.
8  Q.  Did you ask him to save it?
9  A.  No. I don't even -- did I ask him to save
10    it? No, I didn't ask him to save it.
11  Q.  You didn't? Have you talked to Grant
12    Sullivan about any conversations that
13    Grant Sullivan may have had with Amy?
14  A.  No. I just told him that I was having a
15    deposition and...
16  Q.  Do you know of any other conversations
17    that Grant Sullivan had with Amy Knudsen?
18  A.  No.
19  Q.  Did Amy tell you when you were out at the
20    property why they didn't want another
21    Celebrations out there?
22  A.  She just made a reference to the parking
23    lot.

**2100 Third Avenue North, Suite 960 * Birmingham, AL 35203**
**1-800-888-DEPO or 205-251-4200**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

Page 310

```
 1          MR. STEWART: I think that's all
 2       I have.
 3          EXAMINATION
 4       BY MR. GUY:
 5    Q.    You mentioned you go to Saint James United
 6       Methodist Church, I believe?
 7    A.    Right.
 8    Q.    What about any other social organizations
 9       of any kind in the Montgomery area?  Are
10       you a member of any social organizations?
11    A.    I started, with Grant, the Public Safety
12       Insurance Fund, which I -- after closing
13       Celebrations, after being on it for the
14       last -- I got off the -- got off that this
15       year.
16    Q.    So you're not on that board anymore?
17    A.    No.
18    Q.    Any other organizations, social groups of
19       any kind?
20    A.    I'm on the board of Metro Fitness.
21    Q.    I was going to ask you, do you still work
22       out?  Is that where you work out, Metro
23       Fitness?
```

Page 311

```
 1    A.    Metro Fitness.  And then I belong to
 2       Wynlakes Country Club.  That's where I
 3       play tennis.
 4    Q.    Anything else, as far as any other social
 5       groups of any kind?  You're not -- are you
 6       in any kind of organizations or groups
 7       related to your service in the military?
 8    A.    No.
 9          MR. GUY: Thank you, sir.  I
10          appreciate it.
11          (The deposition of BARRY BARR
12          concluded at approximately
13          5:07 p.m. on April 15, 2008.)
14
15
16
17
18
19
20
21
22
23
```

2100 Third Avenue North, Suite 960 * Birmingham, AL 35203
1-800-888-DEPO or 205-251-4200

B

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


TERRENCE LONG & BARRY BARR,

      Plaintiffs,

vs.               CIVIL ACTION NO.

                 2:07-CV-00881-WKW-WC

ARONOV REALTY MANAGEMENT,

INC., AMY CLARK KNUDSEN,

& MEIYING FORNEY,

      Defendants.

        *    *    *    *    *

      DEPOSITION OF TERRENCE LONG,

taken pursuant to notice and stipulation

on behalf of the Defendants, in the

offices of Bradley, Arant, Rose & White,

401 Adams Avenue, Suite 780, Montgomery,

Alabama, before Nicole Paulk, Certified

Court Reporter and Notary Public in and

for the State of Alabama at Large, on May

7, 2008, commencing at 10:12 a.m.

Page 2

```
 1                    APPEARANCES

 2

 3    For the Plaintiffs:

 4           Kevin W. Jent, Esquire
             Wiggins, Childs, Quinn &
 5             Pantazis, LLC
             The Kress Building
 6           301 19th Street North
             Birmingham, Alabama 35203
 7
      For the Defendants Aronov Realty
 8    Management and Amy Clark Knudsen:

 9           Quindal Evans, Esquire
             Bradley, Arant, Rose & White, LLP
10           Alabama Center for Commerce
             401 Adams Avenue, Suite 780
11           Montgomery, Alabama 36104

12    For the Defendant Meiying Forney:

13           N. Gunter Guy, Jr., Esquire
             Ball, Ball, Matthews & Novak, PA
14           Post Office Box 2148
             Montgomery, Alabama 36102-2148

15

16

17

18

19

20

21

22

23
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 3

1                    STIPULATIONS

2

3            It is stipulated and agreed by

4    and between counsel representing the

5    parties that the deposition of TERRENCE

6    LONG may be taken before Nicole Paulk,

7    Court Reporter and Notary Public in and

8    for the State of Alabama at Large, without

9    the formality of a commission; and all

10   formality with respect to other procedural

11   requirements is waived; that objections to

12   questions, other than objections as to the

13   form of the questions need not be made at

14   this time, but may be reserved for a

15   ruling at such time as the deposition may

16   be offered in evidence or used for any

17   other purpose by either party as provided

18   by the Federal Rules of Civil

19   Procedure.

20            *      *      *      *      *

21                  I N D E X

22   Examination                        Page

23   By Mr. Guy                          4

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 4

```
 1        By Ms. Evans                    112

 2        By Mr. Guy                      121

 3        Defendants' Exhibits           Page

 4        1 - Notice of Deposition of       7

 5            Terrence Long

 6        2 - Plaintiff Terrence Long's     7

 7            Response to Request for

 8            Production of Documents

 9                  *    *    *    *    *

10                TERRENCE LONG, of lawful age,

11        having first been duly sworn, testified as

12        follows:

13                       EXAMINATION

14        BY MR. GUY:

15   Q.   State your name for the record.

16   A.   Terrence Long.

17                MR. GUY:  Are we going to have

18                    usual stipulations today?

19                MR. JENT:  That's fine.

20   Q.   Mr. Long, I think I've been introduced to

21        you before.  My name is Gunter Guy, and I

22        represent Meiying Forney in the lawsuit

23        that you, along with Barry Barr, have
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 5

```
 1        filed in the United States District Court
 2        for the Middle District of Alabama.  And
 3        today we are here to take your deposition.
 4        Do you understand that?
 5   A.   Yes.
 6   Q.   And is there anything that you can tell us
 7        about today that would prevent you from
 8        giving your deposition today, any problems
 9        you're experiencing or anything like that,
10        that would cause you not to be able to
11        testify today?
12   A.   No.
13   Q.   All right.  Have you ever given a
14        deposition before?
15   A.   No.
16   Q.   Okay.  Well, let me just say this, then,
17        as kind of a beginning to the
18        deposition -- and I'm sure your attorney
19        may have spoken with you about this.  But
20        I'm just going to ask you questions about
21        this lawsuit and some questions about
22        yourself that may relate to the lawsuit,
23        and during the course of doing that, if
```

Page 6

```
 1        you do not understand a question or you

 2        need a question clarified, please just ask

 3        me to do so; do you understand that?

 4   A.   Yes.

 5   Q.   All right.  It is important that you

 6        answer aloud so the court reporter can

 7        take down what you say.  And I may remind

 8        you from time to time to do that.  I don't

 9        mean to be discourteous, but I will do

10        that from time to time, okay?

11   A.   Okay.

12   Q.   At the same time, we need to try not to

13        talk over each other, as they say.  I'll

14        try to finish my question and let you

15        answer, and then I want you to finish your

16        answer before I ask you another one.  And

17        if I cut you off for any reason, just let

18        me know and I'm going to let you finish

19        your answer.  Do you understand that?

20   A.   Yes.

21   Q.   All right.  Now, first, I've marked as

22        Defendants' Exhibit Long Number 1 your

23        notice of deposition for today.  Have you
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 7

1        seen that?

2                        (The referred-to document was

3                        marked for identification as

4                        Defendants' Exhibit No. 1.)

5    A.    Yes.

6                   MR. GUY:  Off the record just a

7                        second.

8                        (Off-the-record discussion.)

9    Q.    I'm sorry.  Did you say you had seen that?

10   A.    Yes.

11   Q.    Okay.  And as I understand, you and the

12         attorney on your behalf have filed a

13         response to that request for production of

14         documents, and let me show you that.  It's

15         marked as Defendants' Exhibit Long Number

16         2; is that right?

17                        (The referred-to document was

18                        marked for identification as

19                        Defendants' Exhibit No. 2.)

20                   MR. GUY:  Is that your response?

21                   MR. JENT:  That's our response.

22                        And just to be clear, it's a

23                        response to an earlier

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 8

```
 1                        notice.  His deposition was

 2                        noticed for the 15th --

 3            MR. GUY:  That's correct, and we

 4                        continued upon agreement

 5                        until today because we ran

 6                        out of time last time.

 7            MR. JENT:  Right.

 8    Q.    I know this is your response, but I still

 9          want to ask you a few questions about it

10          just to make sure, because I've been an

11          attorney for 25 years, and sometimes when

12          you file a response to these requests,

13          maybe there's a miscommunication from time

14          to time.  So let me just ask you a few

15          questions about this, and you can look

16          along if you want to at the request.

17          Look, actually, at the request, and you're

18          welcome to look at your response too.  But

19          the first request is about any documents

20          in your possession, custody, or control

21          regarding any of the issues in this

22          lawsuit, and it says including but not

23          limited to all records, notes, memoranda,
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 9

```
 1          correspondence, audio or video recordings.

 2          And the response -- there's a general

 3          objection, and then the response says

 4          please see attached audio cassette, income

 5          statement, and documents produced with

 6          initial disclosures.  Now, I don't want to

 7          get too carried away, but I know

 8          Mr. Barr's deposition was taken earlier

 9          and this was the same response to

10          Mr. Barr's request for his deposition,

11          because the questions were the same.  What

12          I'm trying to ask here to you, Mr. Long,

13          is, do you have any audio cassettes or

14          income statements or documents to produce

15          that were in your possession, related to

16          any of the issues in this lawsuit?

17    A.    No.

18    Q.    Okay.  So you don't have -- just to be

19          clear, you don't have any correspondence

20          from Amy Knudsen or Aronov Realty, do you?

21    A.    No.

22    Q.    You don't have any correspondence from

23          Meiying Forney, do you?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 10

```
 1   A.    No.

 2   Q.    Okay.  Do you have any documents related

 3         to y'all's attempts -- "y'all" being -- I

 4         should be more specific.  Do you have any

 5         documents relating to Mr. Barr and your

 6         attempts to lease any properties that

 7         Aronov attempted to lease to you?

 8   A.    No.

 9   Q.    Okay.  So would it be fair to say that

10         Mr. Barr had all the documents and

11         correspondence and information and notes

12         that pertain to this lawsuit and you don't

13         have any?  Is that a fair statement?

14   A.    Yes.

15   Q.    Okay.  And you don't have any audio

16         recordings, video recordings, e-mails, or

17         anything of that type, telephone messages

18         that relate to any of the defendants in

19         this case; is that correct?

20   A.    No.

21   Q.    All right.  You might want to turn to

22         Number 4 of the request, please, sir.

23         Okay.  Number 4 relates to any cancelled
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 11

```
 1          checks or financial records of whatever
 2          description that reflect any sums paid to
 3          the defendants.  And the response there is
 4          see documents produced with the initial
 5          disclosures.  Again, aside from what
 6          Mr. Barr may have responded -- and that's
 7          what I'm trying to separate here today --
 8          do you have any checks or financial
 9          records that relate to any sums paid to
10          any of the defendants in this case?
11   A.     No.
12   Q.     Okay.  Have you paid any sums to anybody
13          in connection with any of the issues in
14          this case?
15   A.     No.
16   Q.     Did you ever pay Mr. Barry Barr any
17          start-up money or anything related to this
18          venture or project that you wanted to do
19          with him?
20   A.     No.
21   Q.     Did you read over any documents or do
22          anything in preparation for your testimony
23          here today?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 12

1   A.   No.

2   Q.   Number 6 in the requests there before you

3        is -- and you can actually look on either

4        one of those documents I think, 1 or 2,

5        but it talks about basically the identity

6        of any witnesses who may have knowledge of

7        this case; do you see that?

8   A.   Yeah.

9   Q.   And there was an initial disclosure in

10       this case, and I just want to ask you

11       about some names of some people, and I

12       want to know if you know them at all or

13       know anything about what they might say in

14       this case.  All right?

15  A.   All right.

16  Q.   First of all, do you know or have you ever

17       met previously Amy Knudsen, before you saw

18       her in this room, I guess, the day that

19       Mr. Barr's deposition was taken?

20  A.   No.

21  Q.   So you didn't know her before Mr. Barr's

22       deposition was taken?

23  A.   No.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 13

1   Q.   Had you ever communicated with her in any

2        way before this lawsuit for any reason?

3   A.   No.

4   Q.   Okay.  What about Aronov Realty

5        Management, Inc., or any other division of

6        Aronov Realty?  Have you ever had any

7        dealings with any of them, anybody with

8        Aronov before?

9   A.   Yes.

10  Q.   Okay.  Who is that?

11  A.   I bought my first house through Aronov

12       through -- what's her name -- last name is

13       -- Catherine Berman.

14  Q.   Cathy Berman?

15  A.   Yeah.  This was like in, say, 2001.  And

16       then I sold that house and she found me a

17       new house, the house that I'm living in

18       now.  And I rented a place off of Wares

19       Ferry Road through Joey -- Joey Long.

20  Q.   And he's also with Aronov?

21  A.   If I'm not mistaken.

22  Q.   All right.  You think he was?

23  A.   If I'm not mistaken, yeah, I think he was.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 14

1   Q.   And he helped you rent a house?

2   A.   No, he helped me rent a building.

3   Q.   What was that for?

4   A.   Studio.  Recording studio.

5   Q.   And what was his name again?  I'm sorry.

6   A.   Joey Long.

7   Q.   All right.  Anybody else with Aronov or

8        any other dealings with Aronov that you

9        can recall?

10  A.   No.

11  Q.   And when was that second house that you

12       bought with Cathy, just approximately?

13  A.   2003.

14  Q.   Did you have any problems with Cathy or

15       Joey in your dealings with them?

16  A.   No.

17  Q.   Did you at any time ever feel that they

18       were discriminatory toward you in any of

19       your dealings with them?

20  A.   No.

21  Q.   Other than the allegations in this

22       lawsuit, have you ever heard anybody say

23       anything about Amy Knudsen?

Page 15

1   A.   No.

2   Q.   What about Meiying Forney?

3   A.   No.

4   Q.   Do you even know Meiying Forney?

5   A.   No.

6   Q.   That's okay.  I have to ask these

7        questions.  I know some of them may seem a

8        little, you know, maybe ridiculous to you,

9        but it's important that I know what you

10       might say if you go to trial, okay?

11  A.   Okay.

12  Q.   Do you know Mark Cranage?  Have you ever

13       heard that name before or know who that

14       is?

15  A.   I've heard the name before, but I don't

16       know him personally.

17  Q.   Okay.  I think he has something to do with

18       Woodmere Tavern, possibly, or something

19       like that.  Does that ring a bell?

20  A.   Yeah, I've been to the establishment once

21       or twice.

22  Q.   You have been to Woodmere before?

23  A.   Yeah.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 16

1   Q.    Just for social issues, to go have a

2         drink, or anything related to this case?

3   A.    No, just to go.

4   Q.    Okay.  Do you think you may have met him

5         there, or -- I guess what I'm saying -- I

6         want to make sure I'm clear.  I know

7         you're saying you've been to Woodmere

8         Tavern before, but have you ever met

9         Mr. Cranage?

10  A.    No.

11  Q.    What about Don Little?  Have you ever

12        heard that name or do you know who he is?

13  A.    I've heard the name, never met him.

14  Q.    I will tell you he's an attorney in town

15        that may have some information about this

16        case.  Do you know anything about that?

17  A.    No.

18  Q.    Okay.  What about Mr. Grant Sullivan?

19        Have you ever met Grant Sullivan before?

20  A.    No.

21  Q.    Do you know him?

22  A.    No.

23  Q.    I'll let you know that you may remember

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 17

```
 1          Mr. Barr testifying that he's a real

 2          estate agent as well with Sullivan & Wills

 3          here in Montgomery and, you know, leases

 4          property and does that kind of thing.

 5          Does that ring a bell and have you ever

 6          had any dealings with him in connection

 7          with what he does?

 8   A.     No.

 9   Q.     How about socially, have you ever met

10          Mr. Grant Sullivan?

11   A.     No.

12   Q.     All right.  And now those are all the

13          witnesses that were initially disclosed to

14          us in this case.  Since the case was

15          filed, do you know of any other persons

16          who may be a witness to any of the claims

17          made by you or Mr. Barr in this case that

18          I did not discuss right there?

19   A.     No.

20   Q.     I believe I asked you about video

21          recordings or audio recordings, but I may

22          not have asked you about photographs.  Are

23          there any photographs that you have that
```

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 18

```
 1          touch on any of the issues in this case?

 2   A.     No.

 3   Q.     There's an Item Number 12 on the requests

 4          that's a typo, but let me ask you without

 5          the typo.  It basically asks for a list of

 6          all the damages you complain of that have

 7          been incurred as a result of the alleged

 8          -- and it says legal malpractice.  I think

 9          that's just an accident.  Let me ask you

10          differently.  Do you have any

11          documentation, Mr. Long, that relates to

12          any damages that you're claiming in this

13          case?

14   A.     No.

15   Q.     Are you claiming any damages in this case

16          related to loss of income?

17   A.     Well, I wanted to open a place and, you

18          know, I couldn't.  So as far as the

19          income, I can't talk about that, because

20          I've never opened a place, and that's why

21          I wanted to get with Mr. Barr.

22   Q.     I understand.  And we're going to get into

23          that a little bit later.  And that's a
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 19

```
 1        fair answer that you gave me, and maybe as

 2        we explore it a little bit more, we can

 3        talk about it.  So are you telling me that

 4        you're really not claiming a loss of

 5        income because you didn't ever get a

 6        chance to open it up and know what loss of

 7        income you may have had?  Is that a fair

 8        statement?

 9   A.   Yes.

10               MR. JENT:  I object to the

11                    characterization, but --

12               MR. GUY:  Well, is he claiming

13                    loss of income or not,

14                    Kevin?

15               MR. JENT:  Loss of -- I mean, if

16                    you say income, it's loss of

17                    what the business would have

18                    made.  I don't know if you

19                    want -- you know, I don't --

20                    I mean, he could have opened

21                    the business -- he could

22                    have opened a bar and could

23                    have made, you know, what it
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 20

1            would have made.  You know,

2            that's something --

3      MR. GUY:  Well, let me ask it

4            this way.

5  Q.   Do you have any documentation maybe where

6       you got an accountant to do it or an

7       expert of any kind that in any way did a

8       -- and I'm going to use the word

9       "feasibility study" of what kind of money

10      you could have made if this bar had

11      opened?

12  A.  No.

13  Q.  Turn to Number 16 on the request for

14      production of documents.  It asks for you

15      to produce all your federal and state

16      income tax returns for the preceding five

17      years up to the date of the alleged

18      occurrence, and I think you and your

19      attorney objected to that.  I don't want

20      to get into the objection right now.  Let

21      me just ask you this.  Do you have income

22      tax returns, federal and state, for the

23      last five years?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 21

```
 1   A.    Yes.

 2                   MR. GUY:  I want to talk to you

 3                        off the record about that

 4                        later, okay?

 5               MR. JENT:  Okay.

 6   Q.    Some of the other questions deal with your

 7         employment records, and I'm going to talk

 8         about that in a minute.  From what I've

 9         gathered there and during our discussion

10         about Defendants' Exhibits 1 and 2 is that

11         Mr. Barr basically had all the

12         documentation of any kind that we're aware

13         of relevant to any of the issues in this

14         case; you don't really have anything in

15         your possession.  Is that a fair

16         statement?

17   A.    Yes.

18   Q.    Let me ask you just some personal

19         questions, if you don't mind, and these

20         are related to the possibility of striking

21         a jury in this case, to know a little

22         something about you.

23   A.    Okay.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 22

| | | |
|---|---|---|
| 1 | Q. | What is your full name again, Terrence? |
| 2 | A. | Terrence Dion Long. |
| 3 | Q. | Would you spell your middle name? |
| 4 | A. | D-I-O-N. |
| 5 | Q. | Just D-I-O-N? |
| 6 | A. | Yes, right. |
| 7 | Q. | And where were you born, please, sir? |
| 8 | A. | Montgomery, Alabama. |
| 9 | Q. | And where did you go to high school? |
| 10 | A. | Stanhope Elmore. |
| 11 | Q. | And did you graduate from there? |
| 12 | A. | Yes. |
| 13 | Q. | And what year was that? |
| 14 | A. | 1994. |
| 15 | Q. | And after graduating from high school, |
| 16 | | what did you do? |
| 17 | A. | Got drafted to major league baseball. |
| 18 | Q. | Straight out of high school? |
| 19 | A. | Yes. |
| 20 | Q. | Who drafted you? |
| 21 | A. | New York Mets. |
| 22 | Q. | Okay.  After being drafted, what happened? |
| 23 | A. | I played five years in the minors. |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 23

```
 1   Q.   Okay.  Who did you play for, a number of

 2        teams or one team?

 3   A.   One team, just the Mets, the Mets minor

 4        league system.

 5   Q.   Just in their system for all their minor

 6        teams?  I mean, which ones did you play

 7        for?

 8   A.   My first year I played in Kingsport,

 9        Tennessee.

10   Q.   Is that Double A, Triple A?

11   A.   No, that's A-ball.

12   Q.   A-ball?  Okay.  All right.  Then after

13        that, what did you do?

14   A.   I went to Pittsfield, Massachusetts.

15   Q.   All right.  Another minor league for the

16        Mets?

17   A.   Yeah.

18   Q.   What division is that?

19   A.   That's another A-ball team.

20   Q.   Oh, they did have two A-ball teams?  All

21        right.  Where from there?

22   A.   Columbia, South Carolina.

23   Q.   All right.  How about that one?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 24

1    A.    Long season A-ball.

2    Q.    Did you say long season?  An extended

3          season A-ball?

4    A.    Yes, extended season.

5    Q.    All right.  And after that?

6    A.    Binghamton, New York.

7    Q.    All right.  What about that one?

8    A.    Double A.

9    Q.    And after that?

10   A.    Norfolk, Virginia.

11   Q.    Boy, you were having fun, weren't you?

12         What about that one?

13   A.    Triple A.

14   Q.    That's Triple A?

15   A.    Yeah.

16   Q.    What's the name of the Norfolk, Virginia

17         team?

18   A.    Tides, T-I-D-E-S.

19   Q.    Just Norfolk Tides?

20   A.    Yes.

21   Q.    All right.  And after that?

22   A.    Well, I went to the majors that year.

23   Q.    All right.  Before we get to your major --

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 25

| | | |
|---|---|---|
| 1 | | what major team did you go to? |
| 2 | A. | New York Mets. |
| 3 | Q. | Before we get to that, let me ask you |
| 4 | | this.  The five years I believe you said |
| 5 | | you were in the minors, right? |
| 6 | A. | Yeah. |
| 7 | Q. | What years were those?  What years are we |
| 8 | | talking about that you were in the minors? |
| 9 | A. | '94 to '99. |
| 10 | Q. | Okay.  During the time that you were |
| 11 | | playing baseball, were you employed in any |
| 12 | | other capacity? |
| 13 | A. | No. |
| 14 | Q. | And was that your sole source of income, |
| 15 | | playing in the minor leagues? |
| 16 | A. | Yes. |
| 17 | Q. | Okay.  Did you maintain a residence here |
| 18 | | in Alabama, or did you just pretty much |
| 19 | | live wherever your baseball team was at |
| 20 | | the time? |
| 21 | A. | Both.  I have a residence in Alabama -- |
| 22 | Q. | You had a home here, right? |
| 23 | A. | Yes. |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 26

```
 1   Q.    Okay.  You didn't have your own house at

 2         that time?

 3   A.    No.

 4   Q.    All right.  So did you go to the Mets in

 5         '99?  Was that your first year with them,

 6         or was it 2000; do you remember?

 7   A.    My first year in the majors?

 8   Q.    Yes, sir.  I'm sorry.

 9   A.    It was the end of '99 I got called up.

10   Q.    I didn't say that right when I said the

11         Mets.  I didn't mean the minor teams.

12         With the majors with the New York Mets was

13         '99?

14   A.    Yes.

15   Q.    What month was it; do you know?

16   A.    I'd say around September.

17   Q.    So it was pretty late in the season?

18   A.    Yeah, pretty late in the season.

19   Q.    Okay.  And how long did you play for the

20         New York Mets?

21   A.    Just that month, just the month of

22         September.

23   Q.    Okay.  And what happened in the, I guess,
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 27

```
 1        2000 season?  Who did you play for then?
 2   A.   At the end of the season, I got traded to
 3        Oakland.
 4   Q.   All the way across the country.
 5   A.   All the way.
 6   Q.   And how long did you play for the Oakland
 7        A's?
 8   A.   From 2000 to 2003.
 9   Q.   And after 2003, what happened?
10   A.   Traded to San Diego.
11   Q.   Was that actually in 2003 you got traded,
12        or was it the next year?
13   A.   The trade was in the off-season of 2003,
14        so my first year was 2004 in San Diego.
15   Q.   And how long did you play for the Padres?
16   A.   One year, one season.
17   Q.   And after that?
18   A.   Signed a free agent deal with Kansas City.
19   Q.   All right.  And how long did you play with
20        the Royals?
21   A.   Just one season.
22   Q.   So that brings us to 2005; is that right?
23   A.   Yes.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 28

1    Q.    Did you play after 2005?

2    A.    Yes, with the Yankees, New York Yankees.

3    Q.    Okay.  I was thinking you're about to play

4          with the Yankees.  Is that the next year?

5    A.    Yes.

6    Q.    So you played for them in 2006?

7    A.    Yes.

8    Q.    All right.  One year?

9    A.    Yes.

10   Q.    All right.  And anybody after the Yankees?

11   A.    No.

12   Q.    And I'm assuming that during the years

13         from '94 at least through 2006, playing

14         baseball was your sole source of income?

15   A.    Yes.

16   Q.    And from 2006 until today as you sit here,

17         have you been living in the Montgomery

18         area?

19   A.    Yes.

20   Q.    I mean, you've been back here since that

21         time?

22   A.    Yes.

23   Q.    Do you have any residences outside of

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 29

```
 1        Alabama?

 2   A.   No.

 3   Q.   And I didn't ask you, but where do you

 4        live right now, please, sir?

 5   A.   Pike Road.

 6   Q.   Can you give me an address, please?

 7   A.   4351 Fair Meadow Lane.

 8   Q.   Fair --

 9   A.   Meadow, M-E-A-D-O-W.

10   Q.   Thank you, sir.  Fair Meadow Lane.  That's

11        in Pike Road?

12   A.   Yes.

13   Q.   And have you lived there since -- when?

14   A.   I bought the house in, say, roughly around

15        2003.

16   Q.   Okay.  That's the one that Cathy sold you?

17   A.   Yeah.  The second one, yeah.

18   Q.   Okay.  So you actually bought that house

19        while you were playing with the A's or

20        around the time you were playing with the

21        Padres?

22   A.   Yes.

23   Q.   Okay.  And the other one that she sold you
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 30

```
 1          in 2001, which I guess was when you were

 2          still playing with the A's, where was it

 3          located?

 4    A.    In Wynridge.

 5    Q.    Do you remember the address on it?

 6    A.    8337 Marsh Point Drive.

 7    Q.    Good memory.  Most people can't remember

 8          where they used to live.  Now, are you

 9          married, please, sir?

10    A.    Yes.

11    Q.    Can you tell me your wife's name?

12    A.    Latresa.

13    Q.    Can you spell it for the court reporter?

14    A.    L-A-T-R-E-S-A; Tyson, T-Y-S-O-N; Long,

15          L-O-N-G.

16    Q.    Is Tyson her maiden name?

17    A.    Yes.

18    Q.    Where is she from, please, sir?

19    A.    Montgomery.

20    Q.    And do you have any children?

21    A.    Yes.

22    Q.    How many children?

23    A.    Three boys.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 31

| | | |
|---|---|---|
| 1 | Q. | None of them are over the age of 19, are |
| 2 | | they? |
| 3 | A. | No. |
| 4 | Q. | Where do they go to school? |
| 5 | A. | Saint James.  Two of them go to Saint |
| 6 | | James. |
| 7 | Q. | The other one's not in school? |
| 8 | A. | He's in day care, Harvest Temple. |
| 9 | Q. | Where? |
| 10 | A. | Harvest, H-A-R-V-E-S-T. |
| 11 | Q. | Thank you, sir.  All right.  Now, are both |
| 12 | | your parents still living? |
| 13 | A. | Yes. |
| 14 | Q. | And where do they live? |
| 15 | A. | My mom lives in Millbrook. |
| 16 | Q. | Okay.  That's when you went to Stanhope |
| 17 | | Elmore, right? |
| 18 | A. | Yes. |
| 19 | Q. | Okay.  What's her name, please, sir? |
| 20 | A. | Nancy, N-A-N-C-Y, Long. |
| 21 | Q. | Okay.  And has she lived there -- well, I |
| 22 | | know she lived there back when you were |
| 23 | | going to school there, I assume? |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 32

```
1   A.    Yes.

2   Q.    And she's lived there continuously since

3         then?

4   A.    Yes.

5   Q.    Is she remarried or anything?

6   A.    No.

7   Q.    Okay.  And do you have any other brothers

8         and sisters over the age of 19 that live

9         in the Montgomery area?

10  A.    Yes.

11  Q.    Okay.  How many do you have?

12  A.    Two brothers living in the Montgomery

13        area.

14  Q.    Do they live in Montgomery County?

15  A.    Yes.

16  Q.    What are their names, please?

17  A.    Richard Long.

18  Q.    And what's the other one?

19  A.    Keith Peterson.

20  Q.    Now, what does Richard do?

21  A.    He works for the City of Montgomery.

22  Q.    Do you know if -- is he married?

23  A.    Yes.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 33

```
 1   Q.   And do you know his wife's name, by

 2        chance?

 3   A.   Juanita.

 4   Q.   Do you know what she does, please, sir?

 5   A.   No.

 6   Q.   And what about Keith Peterson?

 7   A.   He's a barber.

 8   Q.   He's a barber?

 9   A.   Yes.

10   Q.   Where is his shop?

11   A.   In Millbrook.

12   Q.   And is he married?

13   A.   No.

14   Q.   And I forgot to ask you what your mother

15        does.  What does your mother do?

16   A.   She's an LPN.

17   Q.   Where is she an LPN, please, sir?

18   A.   At prison up in -- she goes back and forth

19        from Staton -- she does the prisons.

20   Q.   She works with some of the prisons?

21   A.   Yes.

22   Q.   Is she actually an employee of the State,

23        then?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 34

```
 1   A.   Yes.

 2   Q.   She's with DOC somehow, or works with

 3        them?

 4   A.   Yes.

 5   Q.   All right.  Any other brothers and

 6        sisters?  I mean any other siblings other

 7        than Richard and Keith?

 8   A.   In Montgomery or just in general?

 9   Q.   Well, just in Montgomery right now.  And

10        when I say Montgomery -- actually, when we

11        strike a jury -- I don't remember all the

12        counties, but it could be Autauga County

13        and counties -- Lee County.  It can be as

14        far over as Lee County and as far as south

15        as Barbour and Bullock and Covington and

16        several of those counties, so anywhere in

17        south Alabama.  Anybody live nearby?

18   A.   No.

19   Q.   Okay.  Any other siblings are out of state

20        or somewhere else?

21   A.   Yeah, my oldest brother is out of state.

22   Q.   All right.  What about sisters?  Do you

23        have any sisters?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 35

```
 1   A.    No.

 2   Q.    And what about your dad?  You said he was

 3         still living?

 4   A.    Yes.

 5   Q.    Where does he live?

 6   A.    In Selma.

 7               MR. GUY:  Off the record.

 8               (Off-the-record discussion.)

 9   Q.    Okay.  Well, let me just ask you about

10         your dad anyway.  Did he ever live here in

11         Montgomery?

12   A.    No.

13   Q.    Okay.  What is his name, though, just --

14   A.    Richard.  Richard Long.

15   Q.    Okay.  And he lives in Dallas County?

16   A.    Yes.

17   Q.    And what does he do?

18   A.    He's a truck driver.

19   Q.    Now, are you -- do you and your wife

20         attend church anywhere here in Montgomery?

21   A.    Yes.

22   Q.    Where is that, please, sir?

23   A.    Antioch.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 36

1    Q.    Is that the Baptist church?

2    A.    Yes.

3    Q.    Where is that?

4    A.    Off of Mount Meigs Road.

5    Q.    I knew I had seen it somewhere, couldn't

6          remember where it is.  How long have you

7          attended church out there, just

8          approximately?

9    A.    Just a year.

10   Q.    What about prior to that?

11   A.    Jackson Chapel.

12   Q.    Where is that, please?

13   A.    Millbrook.

14   Q.    Anywhere else in Montgomery or this area?

15   A.    No.

16   Q.    Okay.  And what about any clubs or

17         organizations, whether, you know, social

18         or business related?  Are you a member of

19         any clubs or organization of any kind?

20   A.    No.

21   Q.    What about your wife?

22   A.    No.

23   Q.    Are you a member of any country clubs or

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 37

| | | |
|---|---|---|
| 1 | | anything like that? |
| 2 | A. | No. |
| 3 | Q. | Are you presently employed in any |
| 4 | | capacity? |
| 5 | A. | I run my own company. |
| 6 | Q. | Yeah, let's talk about that.  What company |
| 7 | | is that? |
| 8 | A. | It's an entertainment company. |
| 9 | Q. | Is that based here in Montgomery? |
| 10 | A. | Yes. |
| 11 | Q. | And what's the name of it, please, sir? |
| 12 | A. | It's Long Money, L-O-N-G, M-O-N-E-Y, |
| 13 | | Entertainment. |
| 14 | Q. | Okay.  Long Money Entertainment? |
| 15 | A. | Yes. |
| 16 | Q. | And does the "money" part of that stand |
| 17 | | for somebody else that's involved with |
| 18 | | you? |
| 19 | A. | No. |
| 20 | Q. | Okay.  So it's just solely owned by you? |
| 21 | A. | Yes. |
| 22 | Q. | And how long has it been in existence? |
| 23 | A. | Two years. |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 38

1    Q.    Is it incorporated?

2    A.    Yes.

3    Q.    So it's been in existence approximately

4          two years?

5    A.    Yes.

6    Q.    Who incorporated it for you?

7    A.    Donald Jackson.

8    Q.    Is that an attorney?

9    A.    Yes.

10   Q.    Who is he with?

11   A.    He's just a private firm.

12   Q.    And what's its purpose?

13   A.    As far as -- just promoting concerts.

14   Q.    Okay.  Anything else?

15   A.    Birthday parties.

16   Q.    Anything else?

17   A.    CDs, selling CDs.

18   Q.    Now, when you say "selling CDs," I guess

19         earlier, maybe in Mr. Barr's deposition --

20         and correct me if I'm wrong -- I think he

21         mentioned something about you wanted to

22         promote -- in this bar that y'all were

23         looking to establish or this sports bar

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 39

 1          you were looking to establish, you were

 2          looking to promote people that were

 3          looking to make it in the music business?

 4     A.   Yes.

 5     Q.   When you say "selling CDs," are you

 6          talking about individuals' CDs or are you

 7          talking about just CDs in general?

 8     A.   As far as -- let me explain this.

 9     Q.   Yeah, help me.

10     A.   Printing CDs.  I have a CD duplicator and

11          a printer.  If people around the city want

12          CDs of their music pressed up, I can do

13          that for them.

14     Q.   Okay.  So if I wanted -- if I was a singer

15          -- and I'm not, trust me -- and I wanted

16          to make a CD so I could try to sell it or

17          send it out or just maybe do it for fun,

18          you could actually do that for me?

19     A.   Yes.

20     Q.   So that's what you meant when you said

21          "selling CDs"?

22     A.   Yes.

23     Q.   All right.  What else does your business

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 40

```
 1          do?

 2    A.    Record in the studio.

 3    Q.    Anything else specifically?

 4    A.    No.

 5    Q.    And where is it located, the business?

 6    A.    It was at Wares Ferry, and then I moved

 7          it, and I've just been working pretty much

 8          -- I stopped the studio part, because I

 9          just moved everything to my house until I

10          find another building.

11    Q.    Okay.  So it would be fair to say that

12          right now most everything is at your

13          house, then?

14    A.    Yes.

15    Q.    So you're kind of working out of your

16          house?

17    A.    Yes.

18    Q.    All right.  And then you said it was

19          previously on Wares Ferry Road?

20    A.    Yes.

21    Q.    Where on Wares Ferry, please, sir?

22    A.    5516.

23    Q.    Is that Wares Ferry downtown or Wares
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 41

```
 1              Ferry out in east --
 2      A.      Right by Twain Curve, so whichever part --
 3              behind Eastdale Mall.
 4      Q.      Okay.  Yeah, out what I call the east part
 5              of Wares Ferry.  Okay.  Was it in -- it
 6              wasn't in Twain Curve, but it was right
 7              there near it?
 8      A.      Yes.
 9      Q.      Okay.  I'm just trying to picture where it
10              was.
11      A.      Right next to the animal hospital.
12      Q.      All right.  How long was it there?  How
13              long was your studio there?
14      A.      Maybe a year.
15      Q.      Did you lease that from somebody?
16      A.      Yes.
17      Q.      Who did you lease it from, please?
18      A.      Joey Long.
19      Q.      And it wasn't suitable, or you just
20              decided that area -- that location wasn't
21              working out?  Any particular reason you
22              wanted to move it?
23      A.      Yes.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 42

```
 1   Q.   Why is that?

 2   A.   It's just I wasn't home a lot when I first

 3        opened.  And I like to deal with certain

 4        type of people, and with the music, it can

 5        get certain type of people that -- the

 6        people that want to make music, it's fine,

 7        but people that don't, just friends

 8        hanging out, it's not a hang-out spot.

 9   Q.   Okay.  So for that reason, you decided

10        just to move it, then?

11   A.   Yes.

12   Q.   And do you have plans to build another

13        place or to have another place

14        immediately?  What I mean is -- I

15        misstated that.  Do you have immediate

16        plans to get another studio somewhere away

17        from your home at this point?

18   A.   Yes.

19   Q.   Where is that; do you know already?

20   A.   I have a couple places in mind.

21   Q.   You're looking for some places, then?

22   A.   Yeah.

23   Q.   But you haven't actually gotten a place
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 43

```
 1          yet?
 2    A.    No.
 3    Q.    I think I asked you this, but let me make
 4          sure.  As far as Long Money Entertainment,
 5          Inc., is concerned, there are no other
 6          shareholders or business partners in that
 7          with you?
 8    A.    No.
 9    Q.    Okay.  Do you have any employees?
10    A.    No.
11    Q.    And I may have asked you this too --
12          sometimes I do that -- and I don't mean to
13          be repetitive.  But after playing baseball
14          through 2006, has this been the only other
15          business that you've been involved in?
16    A.    Yes.
17    Q.    The Long Money Entertainment, Inc.?
18    A.    Yes.
19    Q.    And I assume, as far as a source of
20          income, you also have some kind of pension
21          or money that you get through your
22          professional baseball career?
23    A.    Yes.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 44

```
 1   Q.    I think I understood you when you first
 2         started this deposition, you've never
 3         given a deposition before, right?
 4   A.    No.
 5   Q.    Have you ever testified in a case before?
 6   A.    No.
 7   Q.    Have you ever been a plaintiff in a
 8         lawsuit before?
 9   A.    No.
10   Q.    So this is the first time you've ever been
11         a party or a plaintiff in a lawsuit; is
12         that right?
13   A.    Yes.
14   Q.    Have you ever been sued before?
15   A.    No.
16   Q.    Have you ever filed bankruptcy before?
17   A.    No.
18   Q.    Have you ever been married before?
19   A.    No.
20   Q.    Okay.  So --
21   A.    This is my first --
22   Q.    This is your first wife?
23   A.    Yes.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 45

```
 1              MR. GUY:  Let's take a quick

 2                  break.

 3              (Brief recess.)

 4   Q.   Before I get off information about you

 5        personally, when were you and your wife

 6        married?

 7   A.   November '02.

 8   Q.   And was that here in Montgomery County?

 9   A.   Yes.

10   Q.   And I think I also forgot to ask you

11        anything about her family.  Does her

12        family live here in Montgomery County?

13   A.   Yes.

14   Q.   Are her parents both still living?

15   A.   Yes.

16   Q.   And what's her mother's name?

17   A.   Odell, O-D-E-L-L, Tyson.

18   Q.   And what about the father?

19   A.   J.C. Tyson.

20   Q.   And what does Mr. Odell Tyson do?

21   A.   Mrs. Odell Tyson.

22   Q.   I'm sorry.  I apologize.  Mrs. Odell

23        Tyson.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 46

1   A.   She works for -- a nurse, a private nurse.

2   Q.   She's a private nurse?

3   A.   Yes.

4   Q.   And what about Mr. J.C. Tyson?

5   A.   He works for Water Works, Montgomery Water

6        Works.

7   Q.   All right.  And does she have any brothers

8        or sisters that live in Montgomery County

9        or the surrounding area?

10  A.   Yes.

11  Q.   What are their names, please, sir?

12  A.   I have no idea.

13  Q.   Okay.  Does she have some pretty big

14       extended family here in this area?  What I

15       mean is aunts, uncles and that kind of

16       thing as well?

17  A.   I don't know.  I can't say.

18  Q.   And I forgot to ask about you.  Do you

19       have any other relatives, aunts, uncles?

20  A.   Yes.

21  Q.   What are their last names?

22  A.   Peterson.

23  Q.   Peterson?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 47

```
 1   A.   Yes.

 2   Q.   Any other last names of any other

 3        relatives of your family?

 4   A.   No.

 5   Q.   So it would be Petersons or Longs, would

 6        mostly be your family?

 7   A.   Yes.

 8   Q.   And with her, Tyson is all you know?

 9        Anybody else on her mother's side?

10   A.   Meadows.

11   Q.   Meadows?

12   A.   Yes.

13   Q.   Okay.  Thank you, sir.  And I also forgot

14        to ask you, have you ever been in any

15        criminal problems before, had any criminal

16        charges filed against you?

17   A.   No.

18   Q.   No criminal convictions?  And I'm not

19        talking about speeding or anything like

20        that; I'm talking about any, like, DUIs or

21        felonies of any kind or anything like

22        that.

23   A.   No.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 48

```
 1   Q.    Tell me about your association with
 2         Mr. Barr.
 3   A.    Okay.  I met -- I attended his club,
 4         Celebrations, you know, a couple of times
 5         during the off-season and visited a lot of
 6         clubs in Montgomery, and just to me
 7         personally, from a personal point of view,
 8         I felt like it was one of the safer spots
 9         for me to go and just heard a lot of good
10         things about him.  And I knew once I came
11         out, once I stopped playing ball, I wanted
12         to, you know, get into my own thing on
13         that level, sports bar type place, and
14         knew that he had run Sports Rock before
15         that, and it was a nice place.
16   Q.    All right.  So you had actually been to
17         his club during the off-season while you
18         were still playing baseball?
19   A.    Yes.
20   Q.    And do you remember what year it was the
21         first time you ever went over there to his
22         club?
23   A.    No.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 49

```
 1   Q.   Okay.  So as far as you know, it could

 2        have been the last year you were with the

 3        Yankees or it could have been before that?

 4   A.   It was before that, but I just don't know

 5        the approximate year.

 6   Q.   Okay.  And what was it about his place

 7        that you liked, other than I think you

 8        said it was a safe spot?  Anything else?

 9   A.   That's my main -- that's my only

10        importance.

11   Q.   You just felt comfortable in there?

12   A.   Yes.

13   Q.   And was that because of anything that he

14        did or his club did, or was that because

15        of just the people that were there?  Just

16        can you tell me a little bit more about

17        why you felt safe there?

18   A.   Security-wise, he had -- you know, he had

19        ample amount of security for the place

20        that he ran.

21   Q.   Was it any different clientele than other

22        clubs you had been in?

23   A.   No.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 50

| | | |
|---|---|---|
| 1 | Q. | Okay.  When was the first time you met |
| 2 | | Mr. Barr? |
| 3 | A. | I think the first time I met him was maybe |
| 4 | | last year, was the first time we finally |
| 5 | | met in person. |
| 6 | Q. | So that would actually be 2007? |
| 7 | A. | Yes. |
| 8 | Q. | Do you remember what month or part of the |
| 9 | | year that you met? |
| 10 | A. | No. |
| 11 | Q. | You don't even remember what part of the |
| 12 | | year it was, whether it was the early part |
| 13 | | of the year, middle part of the year, last |
| 14 | | part of the year? |
| 15 | A. | I'd say the middle part of the year, I |
| 16 | | guess. |
| 17 | Q. | Well, let me ask it this way.  There's an |
| 18 | | allegation in the complaint that was filed |
| 19 | | in this case on your behalf that says, in |
| 20 | | April 2007, Long approached Barr |
| 21 | | concerning his interest in opening a |
| 22 | | sports bar in Montgomery, Alabama.  Do you |
| 23 | | have a recollection if it was in April of |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 51

```
1         2007?

2    A.   Like I said, I don't know what month.  I

3         know it was early, but I didn't know

4         exactly what month.

5    Q.   Okay.  And was that the first time that

6         you met him, was when you approached him

7         concerning your interest in opening a

8         sports bar in Montgomery?  I mean, was

9         that the occasion upon which you met him

10        the first time?

11   A.   No.

12   Q.   Okay.  What was the occasion upon which

13        you met him the first time, if you recall?

14   A.   Introduction.

15   Q.   You just said hello, this is who I am?

16   A.   Yes.

17   Q.   Tell me about that conversation as best

18        you can remember it.

19   A.   It was short.  He just happened to be at

20        his club one night; I was there and

21        introduced myself.

22   Q.   Okay.  That was what I was going to ask

23        you; was it at the club?
```

Page 52

1    A.    Yeah.

2    Q.    So you just met him at the club and said,

3          hey, I'm Terrence Long, nice to meet you,

4          that kind of just brief social greeting

5          kind of thing?

6    A.    Yes.

7    Q.    All right.  When was the next time that

8          you met him?  Would it have been this time

9          that you approached him about opening a

10         sports bar, or would you have had any

11         other occasion to meet him?

12   A.    I had no other occasion to meet him after

13         that, so that's the next time I met him.

14   Q.    And I don't know where this April came

15         from; it could have come from Mr. Barr.

16         But you're saying you don't have a

17         recollection but you do recall meeting him

18         to express an interest in opening a sports

19         bar?

20   A.    Yes.

21   Q.    Okay.  Tell me about that meeting, just

22         what you recall.

23   A.    Just -- in the meeting, I told him that I

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 53

```
 1        wanted to open up a sports bar.  And I

 2        asked him if he had anything that he was

 3        about to do, and I told him I'd like to do

 4        some business with him.

 5   Q.   All right.  If my notes are correct, I

 6        believe Mr. Barr testified that he closed

 7        Celebrations on April 1st of 2007.  I

 8        don't know if you recall his deposition

 9        the other day.  Do you remember that?

10   A.   I don't remember --

11   Q.   Do you remember that he did close

12        Celebrations last year?

13   A.   Yeah.

14   Q.   Okay.  When you met him the first time,

15        based on what you told me earlier, I'm

16        assuming that it must have been before

17        that time, then, when it was still open?

18   A.   Yeah, it was still open.

19   Q.   Okay.  When you met him the second time

20        and you say you talked to him about what

21        he would like to do, had he closed it by

22        that time?  Is that a recollection of

23        yours?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 54

```
 1   A.   I don't know.

 2   Q.   You don't remember?

 3   A.   I don't know.

 4   Q.   Okay.  All right.  Anything else about

 5        that conversation?  You just basically

 6        wanted to talk to him about opening a

 7        sports bar and wanted to know -- I don't

 8        want to put words in your mouth -- would

 9        he be willing to help you and be a part of

10        it?  Is that a fair statement; you wanted

11        to see if he would be a part of it?

12   A.   Yeah, that's fair.

13   Q.   Well, I don't want to put words in your

14        mouth.  Other than it was just a

15        conversation -- that's all it was, right?

16        No documents were signed or anything like

17        that?

18   A.   No.

19   Q.   You didn't come prepared to enter into an

20        agreement on that day, right?

21   A.   No.

22   Q.   Were you looking for a partner or were you

23        just looking for him to get the thing set
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 55

1          up or did you have anything in mind at

2          that time?

3    A.    Location.  I wanted him to find a

4          location.

5    Q.    All right.  When you went to him and met

6          with him the first time, was it your

7          intent that you would actually open and

8          manage the bar yourself without any

9          involvement on his part, or were you

10         seeking to do that as well?

11   A.    I don't understand the question.

12   Q.    Okay, that's fair.  Here's what I'm trying

13         to find out.  You liked his place,

14         Celebrations, right, and you liked the way

15         he ran it, correct?

16   A.    Yes.

17   Q.    So did you call him up to talk with him

18         about opening a sports bar?  Did you call

19         him up?  How did your meeting get

20         arranged?

21   A.    Through a friend of mine that worked at

22         his bar.

23   Q.    Who is that?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 56

1   A.   Her name was Adrienne (phonetic).

2   Q.   Do you know her last name?

3   A.   No.

4   Q.   Okay.  So you called her up and said, hey,

5        can you get me in touch with Mr. Barr,

6        with Barry, so I can talk to him?  Is that

7        a fair statement?

8   A.   That's fair.

9   Q.   Did he call you or did you call him; do

10       you remember?

11  A.   It wasn't a call.  It was just, I was

12       there; he was there; and we met that

13       night.

14  Q.   I'm talking about the second time.

15  A.   The second time?

16  Q.   Yeah, the second time.

17  A.   I reached out to him and left a message,

18       and he got back in touch with me.

19  Q.   Okay.  So the second time you just kind of

20       called out to him, saying I'd like to meet

21       with you or something?

22  A.   Yes.

23  Q.   And he got back in touch with you?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 57

1    A.    Yes.

2    Q.    Where did you meet?

3    A.    I don't recall.

4    Q.    It wasn't at the bar?

5    A.    No, it wasn't.

6    Q.    You don't remember where it was?

7    A.    No.

8    Q.    His house?

9    A.    No.

10   Q.    All right.  So let's talk about the second

11         time.  That's what I want to concentrate

12         on.  When you went there -- I want to

13         understand again -- what was your purpose,

14         just to get him to help you find a

15         location, or was it anything else?

16   A.    Yeah, it was something else.

17   Q.    Okay.  So did you want him to help you

18         find a location?

19   A.    I wanted him to help me find a location.

20   Q.    What else did you want?

21   A.    I wanted him to go in business with me.  I

22         wanted him to be my partner.

23   Q.    So you did reach out to him and say, hey,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 58

```
 1          do you want to be a partner with me, so to

 2          speak?

 3   A.     Yes.

 4   Q.     And so you discussed it when you met with

 5          him on this occasion?

 6   A.     Yeah, we discussed it.

 7   Q.     Okay.  Anything else?

 8   A.     No.

 9   Q.     What about -- did you discuss who was

10          going to put up money or that kind of

11          thing?

12   A.     No.

13   Q.     Did you discuss about, you know, what the

14          partnership agreement was going to be or

15          anything like that?

16   A.     No.

17   Q.     Did you discuss who was going to manage

18          the bar or anything like that?

19   A.     No.

20   Q.     Okay.  So would it be fair to say that it

21          was just a kind of general conversation

22          about, hey, this is what I'd like to do;

23          are you interested?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 59

1  A.   We both agreed if we found a location that

2       we were going to go through with it.

3  Q.   Okay.  So you got as far as agreeing, in

4       this meeting, that if you found a

5       location, you were going to go through

6       with it?

7  A.   Yes.

8  Q.   Okay.  What plans or work had been done as

9       far as setting this up?  I mean, had you

10      done any preliminary plans before you met

11      with Mr. Barr about the sports bar or how

12      it was going to be run and that kind of

13      thing?  Had anything been done preliminary

14      to meeting with him?

15 A.   No.

16 Q.   Okay.  So it was just an idea in your

17      head?

18 A.   Yes.

19 Q.   Okay.  Had you ever tried, prior to

20      meeting with Mr. Barr, to do this, you

21      know, without him?

22 A.   No.

23 Q.   Did you care where it was located?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 60

1    A.    Did I care where it was located?

2    Q.    Where it was located, yes, sir.  Did you

3          care where it was located?  I mean, did

4          you have a specific idea that you said,

5          Mr. Barr, this is the area I want it to

6          be?  Did you have that in your mind at the

7          time you met with him?

8    A.    Yes.

9    Q.    Okay.  Where did you want it to be?

10   A.    No further than the Montgomery Mall area.

11   Q.    So you wanted in the Montgomery Mall area?

12   A.    And back up towards Vaughn Road area.  I

13         don't know what side of town you would

14         label that, but --

15   Q.    No, I'm just talking about location-wise.

16         You wanted it somewhere in the area of

17         Montgomery Mall up toward Vaughn Road?

18   A.    Up the area that way.  I guess they would

19         call that the east side of town.

20   Q.    But somewhere on the by-pass; is that a

21         fair statement?

22   A.    That's a fair statement.

23   Q.    Near the by-pass there?

Page 61

```
 1    A.    Yes.

 2    Q.    Did y'all discuss anything else about it,

 3          other than where you wanted it located?

 4    A.    No.

 5    Q.    Okay.  At the same time that you met with

 6          him, other than the area of where you

 7          wanted it located, did you specifically

 8          discuss any places that you were

 9          interested in?  What I mean is, locations

10          that were already there and you said, how

11          about check out this place or check out

12          that place?

13    A.    No.

14    Q.    All right.  Did you tell him that you were

15          going to put up the money for it?

16    A.    No.

17    Q.    Did he discuss anything about him putting

18          up money for it?  And I'm again talking

19          about in this meeting that we're talking

20          about here.

21    A.    At that meeting, no.

22    Q.    All right.  Anything else discussed at

23          that meeting other than location and that
```

Page 62

1          you wanted him to be a partner with you in

2          it?

3     A.   No.

4     Q.   Was it a fairly short meeting?

5     A.   Short, very short.

6     Q.   Okay.  When you left that meeting, what

7          was your impression of what was going to

8          be done at that time?

9     A.   That Mr. Barr was going to find us a

10         location.

11    Q.   Okay.  Did you believe that to be the

12         initial thing that you needed to do, was

13         find a location before anything else was

14         done?

15    A.   Yes.

16    Q.   Okay.  When is the next time you met with

17         him?

18    A.   I don't recall.

19    Q.   Okay.  Have you ever had another meeting

20         with him since that time?  And I don't

21         mean in relation to this lawsuit, okay?

22    A.   I met with him once at the Copeland's

23         building; I think it is right in front of

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 63

```
 1        Wal-Mart.

 2   Q.   Yes, sir.  The old Copeland's restaurant?

 3   A.   Yes.

 4   Q.   So you actually met Mr. Barr there?

 5   A.   Yeah, we met.

 6   Q.   To look at that as a potential site?

 7   A.   Yes.  And Robert Long was there also.

 8   Q.   Robert Long?

 9   A.   Yes.

10   Q.   Who is Robert Long?

11   A.   He's also a realtor.

12   Q.   Okay.  Not related to you?

13   A.   No.

14   Q.   Okay.  I mean, I knew Richard, you said,

15        was your brother, so that's where that

16        threw me off for a second.  So Robert Long

17        was there too?

18   A.   Yes.

19   Q.   Is he with Aronov too?

20   A.   If I'm not mistaken.  Whoever had the

21        building up for lease.

22   Q.   It's whoever's name was on the sign?

23   A.   Yes.  But I knew Robert, so I knew it was
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 64

 1          him there.

 2    Q.    So you actually knew Mr. Robert Long?

 3    A.    Yes.

 4    Q.    How did you know him?

 5    A.    I just met him before.  I just met him a

 6          couple of times before.

 7    Q.    Okay.  Who else was there besides you,

 8          Mr. Robert Long, Barry Barr?  Anybody else

 9          there at Copeland's that time?

10    A.    No.

11    Q.    Okay.  And did you just meet there to look

12          at Copeland's and see if it could work out

13          as a potential sports bar?

14    A.    Yes.

15    Q.    Okay.  So you just kind of walked through

16          it, talked about it, and that was the end

17          of it?

18    A.    That it was.

19    Q.    Okay.  And do you remember when that was?

20    A.    No.

21    Q.    I think Mr. Barr maybe testified about

22          this, and it looks like it was a proposal

23          to lease the former Copeland's restaurant.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 65

```
 1          It's Defendants' Exhibit 8.  Do you see

 2          it?

 3                          (The referred-to document was

 4                           marked Defendants' Exhibit No.

 5                           8 in a prior deposition and is

 6                           not attached hereto.)

 7                      MR. JENT:  I know what you're

 8                           talking about.

 9                      MR. GUY:  I'll let you look at

10                           it.

11    Q.    Anyway, I think it's got your name on it

12          too, Mr. Long.  This was to Mr. Barr's

13          deposition, Defendants' Exhibit 8,

14          proposal to lease -- I can't pronounce the

15          landlord's name.  A-B-E is his first name,

16          Javani, J-A-V-A-N-I.  And if you would,

17          Mr. Long, look at this, and I'll ask you

18          to see if that's your signature on the

19          second page of that document.

20    A.    Yes.

21    Q.    Okay.  Was that signed at the time that

22          you met there that day or immediately

23          following; do you know?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 66

```
 1   A.    It wasn't signed that day.

 2   Q.    Okay.  Within a few days thereafter?

 3   A.    I don't recall.

 4   Q.    You don't remember?  I think -- what date

 5         is your signature on that, or when is it

 6         dated?

 7   A.    11/6/07.

 8   Q.    Okay.  Do you think it was sometime either

 9         right around the first of November or the

10         end of October that you were there at

11         Copeland's?

12   A.    I don't remember the exact time we was

13         there.

14   Q.    Okay.  Well, and I'm not asking you to

15         remember the exact time.

16   A.    Yeah, I don't remember.  I met him over

17         there one day; I don't remember when.

18   Q.    Well, do you remember signing this

19         proposal to lease sometime after you met

20         with him about Copeland's?

21   A.    Yes.

22   Q.    All right.  So that's three meetings that

23         we've now discussed that you've had with
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 67

```
 1          Mr. Barr -- the initial meeting where you

 2          just actually met him; the second meeting

 3          where you talked about, you know, actually

 4          opening up a sports bar and wanting him to

 5          be a partner and talking about, you know,

 6          him finding a location; and then the

 7          meeting at Copeland's.  Any other times

 8          that you've met with Mr. Barr?

 9   A.     No.

10   Q.     Outside of this lawsuit, too; let me add

11          that.  Outside of this lawsuit?

12   A.     Outside the lawsuit, yes.

13   Q.     All right.  When else have you met with

14          him?

15   A.     I don't know the exact date, but I just

16          met him at the little bar off Vaughn Road

17          in the -- I don't know the shopping

18          center.  It's where Dominique's used to

19          be, where the little grocery store used to

20          be, right past Vaughn and Pike.

21   Q.     Yeah, I know where you're talking about.

22   A.     I met him there once.

23   Q.     Was that to look at the place?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 68

```
 1    A.    No, it's a bar they have open over there.

 2    Q.    Okay.  Crockmier's?  Met him at

 3          Crockmier's?

 4    A.    Yeah, that's the name of it.

 5    Q.    Okay.  That's fine.  And when was that,

 6          that you met Mr. Barr at Crockmier's?  Was

 7          that recently?

 8    A.    No, no.

 9    Q.    We're talking about last year again?

10    A.    Yeah, it was last year.  It was last year.

11    Q.    Let me put everything in perspective.

12          This lawsuit was filed in October of 2007

13          -- October 2nd of 2007.  So what was the

14          occasion that you met Mr. Barr for at

15          Crockmier's, if you recall?  Just social?

16    A.    Just social.

17    Q.    Okay.  Nothing to do with finding a

18          location?

19    A.    No.

20    Q.    Nothing to do with this lawsuit?

21    A.    No.

22    Q.    All right.  Any other times you've met

23          with Mr. Barr?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 69

 1    A.    No.

 2    Q.    So in regards to you wanting to open up a

 3          sports bar and getting Mr. Barr to help

 4          you, anything related to that, you've only

 5          met with him three times?

 6    A.    Yes.

 7    Q.    Now, you said that -- I believe earlier --

 8          that when you had been at Mr. Barr's

 9          establishment that was called

10          Celebrations, that you felt safe there,

11          you liked the atmosphere, that kind of

12          thing, right?

13    A.    Yes.

14    Q.    Okay.  And did you ever become aware --

15          and I don't know when you were playing

16          baseball as it relates to these kinds of

17          things, but the discussions we had with

18          Mr. Barr during his deposition about some

19          of the troubles they were having out at

20          Celebrations with -- you know, he said the

21          police were not -- let me just say this.

22          Do you remember those discussions during

23          his deposition?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 70

1    A.    Some of them.

2    Q.    Okay.  Did you remember any of those

3          things going on?  Were those happening

4          when you were here in Montgomery, the

5          problems he was having out there?

6    A.    No.  I just know nothing happened when I

7          was there and that's all.

8    Q.    Okay.  But what I'm trying to find out is

9          this -- and I don't know how it relates to

10         the time that you were playing baseball.

11         You know, there were discussions about the

12         city council trying to take away his

13         license and those kind of things, trouble

14         he was having in his parking lot.  Were

15         you aware of those kind of things at any

16         time prior to you meeting with him in

17         2007?

18   A.    No.

19   Q.    So you weren't even aware of that ever

20         happening?

21   A.    No.

22   Q.    Was the first time you ever heard about

23         that at the deposition of Mr. Barr the

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 71

1        other day?

2    A.   That's the first time I ever heard that

3         from him.  I've heard people speak about

4         it.

5    Q.   Well, that's what I'm saying when I ask if

6         you've ever heard about it.  Where or on

7         what occasions did you ever hear other

8         people talking about it, just in the news?

9    A.   No, not in the news, just in general, just

10        people talking about it.

11   Q.   Okay.  What kind of things do you remember

12        people talking about?

13   A.   I guess people were talking about the -- I

14        never heard they were trying to shut him

15        down.  I never heard that.  I heard about

16        the city council, but not in detail, so --

17   Q.   All right.  Did you ever hear about any of

18        the shootings in the parking lot or that

19        kind of thing?

20   A.   I heard about someone shooting.

21   Q.   And I'm not trying to be specific.  I'm

22        just saying the problems in the parking

23        lot; let's put it that way.

Page 72

```
 1   A.    Yes.

 2   Q.    I'm not trying to pin you down to a

 3         particular thing, just did you hear about

 4         problems in the parking lot?  Whether

 5         Celebrations was responsible for it or

 6         not, did you hear about the problems out

 7         there?

 8   A.    Yes.

 9   Q.    Were you ever there when any of that

10         happened?

11   A.    No.

12   Q.    And I don't know that I asked you this,

13         but can you give me just your best

14         estimate about how many times you may have

15         gone to Celebrations?  You know, more than

16         10, more than 20, less than 10?  I don't

17         know.

18   A.    Less than 10.

19   Q.    Okay.  Did Mr. Barr ever discuss with you

20         any conversations he had with Ms. Amy

21         Knudsen?  Or let me say has he ever

22         discussed with you any of those

23         discussions he had with Amy Knudsen?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 73

```
 1   A.    I recall one.

 2   Q.    Just one?

 3   A.    Yes.

 4   Q.    When was it?

 5   A.    I guess the first time he went over there.

 6   Q.    Okay.  So is it your recollection that

 7         sometime after he went over there the

 8         first time, he discussed some -- he made

 9         some comments about discussions he had

10         with Ms. Knudsen?  That's what you recall?

11   A.    That's what I recall.

12   Q.    Okay.  What was that discussion you had

13         with Mr. Barr about Ms. Knudsen?

14   A.    It was -- like I said, it was really

15         brief.  He was telling me that

16         Celebrations -- however you want to put

17         it, Celebrations came up in the

18         conversation.

19   Q.    Like that was a problem with you getting

20         the place?

21   A.    I can't say that.

22   Q.    Well, I don't want to put words in your

23         mouth.
```

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 74

```
 1   A.    No.

 2   Q.    I'm trying to help, and maybe I shouldn't

 3         help.  What is it you recall about the

 4         conversation, just Celebrations came up?

 5   A.    Celebrations came up, and that apparently

 6         she didn't know that he was the guy who

 7         owned Celebrations until he told her.

 8   Q.    Okay.  Anything else you remember about

 9         your conversation with Mr. Barr about Ms.

10         Knudsen?

11   A.    No, that it was.

12   Q.    What did you get out of that conversation?

13         I mean, what was your impression of what

14         he was telling you?

15   A.    Nothing.

16   Q.    Okay.  That's what I'm saying, did you get

17         anything out of that?

18   A.    No, I got nothing out of it.

19   Q.    Okay.  And I think I know the answer to

20         this, but the location over there, the Le

21         Croy shopping center, did you even know

22         there was anything for lease over there

23         prior to him telling you about it?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 75

```
 1   A.    No.

 2   Q.    Okay.  Were you supposed to be at the

 3         meeting where he met with Ms. Knudsen the

 4         first time?

 5   A.    No.

 6   Q.    Okay.  Did you ever ask him to set up a

 7         time for you to go over to Le Croy and

 8         look at this retail -- this space for

 9         lease?

10   A.    No.

11   Q.    Okay.  Any other conversations that you

12         can recall where Mr. Barr had a discussion

13         with you about anything that Ms. Knudsen

14         said or did?

15   A.    No.

16   Q.    So that's the only time, just that one

17         time?

18   A.    That's the only time I recall.

19   Q.    Okay.  You don't recall him calling you

20         while he was there with Ms. Knudsen?  Do

21         you remember that, on the phone possibly?

22   A.    I didn't receive a call.

23   Q.    Okay.  I'm just checking.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 76

1    A.    Yes.

2    Q.    You don't have a recollection of that?

3    A.    No.

4    Q.    Very good.  Any other -- and just to make

5          sure, so that's the only time you can

6          recall Mr. Barr and you having any

7          discussion about Ms. Knudsen, is that one

8          time?

9    A.    Yes.

10   Q.    And all you remember about it is something

11         about Celebrations and what else?  What

12         did you tell me?

13   A.    That it was.

14   Q.    That was it?

15   A.    Yeah.

16   Q.    Did you just get the impression that there

17         was a problem with Celebrations, that

18         y'all couldn't get that spot or something,

19         or do you remember anything else about the

20         conversation?

21   A.    I don't remember anything else about the

22         conversation.

23   Q.    Okay.  Did you have anything to do or were

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 77

```
 1        you aware of him sending anybody in to

 2        video or attempt to video Ms. Knudsen or

 3        anybody else with Aronov relating to the

 4        leasing of the Le Croy shopping area?

 5   A.   No.

 6   Q.   Did you have any discussions with Mr. Barr

 7        or were you involved in any way with his

 8        offer to purchase the Le Croy Shopping

 9        Village?

10   A.   No.

11                   MR. GUY:  Let me take a short

12                       break.

13                   (Brief recess.)

14   Q.   The document that was previously provided

15        as an exhibit to Mr. Barr's deposition --

16        Defendants' Exhibit 11, I believe -- and

17        it is the offer to purchase the Le Croy

18        shopping center by Mr. Barr, made to

19        Meiying Forney for a million dollars.  And

20        my question to you -- and it's dated May

21        23rd of 2007.  And I just want to ask, did

22        you have anything to do with that, any

23        discussions with him, or were you part of
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 78

```
 1        that offer?

 2   A.   No.

 3   Q.   Okay.  So that was -- as far as you know,

 4        that was just something Mr. Barr did on

 5        his own?

 6   A.   Yes.

 7   Q.   And I kind of want to understand, again,

 8        as far as anything formal, if Mr. Barr

 9        let's say purchased the Le Croy shopping

10        center, if he had got that, no details had

11        been worked out between you and Mr. Barr

12        about the arrangements for him to lease

13        the club back to you and what you were

14        going to pay or -- none of those kind of

15        details had been worked out, right?

16   A.   No.

17   Q.   Nothing in writing to commit you to that

18        or to say that, you know, those kind of

19        things would have worked out?

20   A.   No.

21   Q.   Okay.  When Mr. Barr talked to you --

22        strike that.  When did Mr. Barr talk to

23        you about suing Ms. Knudsen, Aronov
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 79

```
 1          Realty, and Meiying Forney?

 2    A.    I don't recall.

 3    Q.    Did he come to you and talk to you about

 4          the possibility of y'all having a claim

 5          against them?

 6    A.    He mentioned it to me, yes.

 7    Q.    Do you know when the first time he

 8          mentioned it to you was?

 9    A.    No.

10    Q.    Do you remember what was said?  And let me

11          ask you this.  Was it with your attorney?

12          Because I don't want to know that.  Was

13          there anytime before you met with your

14          attorneys that you ever met with Mr. Barr

15          to talk about any litigation against the

16          defendants in this case?

17    A.    No.

18    Q.    All right.  So to be fair, prior to you

19          meeting with Mr. Barr and an attorney,

20          which in this case I think it was a local

21          attorney here that you actually met with

22          the first time -- but prior to that, you

23          and Mr. Barr never got together and
```

Page 80

```
 1          discussed any litigation against any of

 2          the named defendants here?

 3   A.     No.

 4   Q.     Outside the presence of any of the

 5          attorneys involved in the case on you or

 6          Mr. Barr's behalf -- outside of their

 7          presence, have you and Mr. Barr ever

 8          discussed this case or anything about this

 9          case?

10   A.     No.

11   Q.     Okay.  Have you ever discussed it with

12          anyone else other than Mr. Barr outside

13          the presence of your attorneys?

14   A.     No.

15   Q.     At any time during any conversations with

16          Mr. Barr about his attempt to lease or buy

17          the Le Croy Shopping Village, was it ever

18          made known to you that you were the

19          problem?  Do you understand what I'm

20          asking you?  Was there ever any mention by

21          Mr. Barr that you were the holdup in

22          getting the shopping center leased or

23          purchased?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 81

```
 1   A.    Me, personally?

 2   Q.    Yes, sir.

 3   A.    No.

 4   Q.    Okay.  That was never made known to you,

 5         was it?

 6   A.    No.

 7   Q.    In the lawsuit that was filed on your

 8         behalf -- have you read that recently or

 9         have you ever read it?

10   A.    No.

11   Q.    Okay.  Let me read Paragraph 10.  It says

12         (as read:)  "In April 2007, Long

13         approached Barr concerning his interest in

14         opening a sports bar in Montgomery,

15         Alabama that would cater primarily to the

16         African-American community.  Long asked

17         Barr to be his partner in this venture and

18         to work on finding a location for the

19         business."  Was it your intention in

20         opening this to cater primarily to the

21         African-American community, or just to

22         anybody?

23   A.    I would have to say to the
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 82

1       African-American community.

2  Q.   Okay.  You didn't expect anybody other

3       than African-Americans to come into your

4       establishment?

5  A.   No, but I know that was going to be the

6       majority of the people there.

7  Q.   Did you tell him that, that you wanted to

8       cater to the African-American community?

9       That's a specific question.

10  A.   Yes.

11  Q.   You did?

12  A.   Yes.

13  Q.   Okay.  Did you tell him -- I believe you

14       testified that you wanted to open this so

15       that some of the people that -- I guess

16       talent that you try to find could show off

17       their talent at your bar?  Was that a

18       purpose as well?

19  A.   Yes.

20  Q.   Okay.  So when you said cater primarily to

21       the African-American community, you just

22       expected that to be who would

23       predominantly come there, but you weren't

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 83

```
 1          going to exclude anybody else, were you?
 2   A.     No.
 3   Q.     Is there any reason that you couldn't have
 4          opened a bar anywhere else in Montgomery,
 5          other than the locations that you
 6          mentioned to me earlier?
 7   A.     Repeat the question for me.
 8   Q.     I guess what I'm trying to figure out is,
 9          you said that you wanted an area near
10          Montgomery Mall all the way to, say,
11          Vaughn Road.  Was there any reason you
12          couldn't have found a location other than
13          those places?
14   A.     Like I said, Mr. Barr was looking for
15          locations.  I wasn't personally looking
16          for locations.
17   Q.     Okay.  Paragraph 33 of your complaint says
18          (as read:)  "The failure to lease or sell
19          the property as described above was based
20          upon the plaintiff Long's race."  Do you
21          have any evidence -- direct evidence --
22          that the failure of this property to be
23          leased or sold to Mr. Barr was based upon
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 84

1          your race?  That's never been mentioned,

2          has it, your race, as far as why this

3          property was not leased or sold?

4    A.    Well, no, it was mentioned --

5    Q.    I'm sorry?  I thought I asked you about

6          that and you said --

7    A.    -- by Mr. Barr, that a statement was made

8          about black people.  I don't know where it

9          came from or who it came from, but a

10         statement was made about the Celebrations

11         crowd, that they didn't want that

12         Celebrations crowd in that area.

13   Q.    Okay.  Now, this is what we went over

14         earlier and I was trying to ask.  So you

15         do remember a conversation with Mr. Barr

16         that has to do with the Celebrations

17         crowd?

18   A.    That was mentioned, yes.

19   Q.    Okay.  In which conversation was it

20         mentioned?

21   A.    That was mentioned the time he met with

22         Ms. Knudsen.

23   Q.    Okay.  What else was mentioned at the time

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 85

| | | |
|---|---|---|
| 1 | | he met with Ms. Knudsen?  Let's go back |
| 2 | | over that. |
| 3 | A. | That was it. |
| 4 | Q. | Well, you said earlier there was a |
| 5 | | conversation about Celebrations and that's |
| 6 | | all you remembered.  Are you now |
| 7 | | remembering there was a discussion about |
| 8 | | the type of crowd that was at |
| 9 | | Celebrations? |
| 10 | A. | Yes. |
| 11 | Q. | And this is something he told you when you |
| 12 | | talked to him about him looking at this |
| 13 | | place, right? |
| 14 | A. | After his conversation with Ms. Knudsen. |
| 15 | Q. | And was that over the phone? |
| 16 | A. | Yes. |
| 17 | Q. | But you're saying it was not while he was |
| 18 | | there with her? |
| 19 | A. | No. |
| 20 | Q. | And you're sure about that? |
| 21 | A. | I didn't talk to him when he was there |
| 22 | | with her. |
| 23 | Q. | All right.  Now, other than him mentioning |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 86

```
1          Celebrations and the crowd at

2          Celebrations, what else was mentioned?

3    A.    That was it.

4    Q.    Okay.  Well, you just said -- did he

5          mention anything about the fact that the

6          crowd was predominantly black or that it

7          had to do with your race?

8    A.    Me, personally?

9    Q.    Yes.

10   A.    No.

11   Q.    Okay, sir.  Do you have any evidence that

12         Ms. Knudsen knew who you were or what your

13         race was?

14   A.    No.

15   Q.    Okay.  Did Barry Barr ever tell you that

16         he told her what your race was?

17   A.    No.

18   Q.    Okay.  When you went to Celebrations, was

19         it only black people that went there, only

20         black individuals that were at

21         Celebrations when you were there, or were

22         there also white individuals?

23   A.    Yeah, there were also white individuals.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 87

```
 1    Q.    Okay.  So it wasn't just a black club; it

 2          was a club that was open and had all

 3          different kinds of people that went in

 4          there, right?

 5    A.    Yes.  Majority black.

 6    Q.    You're characterizing it as majority

 7          black?

 8    A.    Yes.

 9    Q.    So when he discussed with you his

10          conversation with Ms. Knudsen, wasn't it

11          the issue of Celebrations and what

12          happened there that was the problem?

13    A.    Yes.

14    Q.    Okay.  Did he tell you in this

15          conversation that he had with you after he

16          met with Ms. Knudsen that it was his

17          affiliation with you that was the problem?

18          Did he mention that?

19    A.    I don't recall that.

20    Q.    Okay.  You're saying it didn't happen or

21          you just don't recall?

22    A.    I don't recall.

23    Q.    Okay.  And really, other than you meeting
```

Page 88

```
 1            with him on a couple other occasions, you

 2            didn't have any affiliation with Mr. Barr

 3            prior to this, did you?

 4    A.      No.

 5    Q.      When you say it was going to be a sports

 6            bar -- and I believe that's what you used,

 7            right, the term?

 8    A.      Yes.

 9    Q.      Tell me what you understand a sports bar

10            to be, or what did you envision this bar

11            to be when you say a sports bar?

12    A.      Okay.  My idea I had, I wanted to be open

13            possibly seven days a week.  I wanted to

14            take one night of the week for, like, a

15            showcase for local talent.  The other

16            nights I just wanted to run my bar with

17            big screen TVs, you know, just watching

18            games and just running a sports bar.  But

19            one night I wanted to showcase the artists

20            in town.

21    Q.      Right, through your other business?

22    A.      Yes.

23    Q.      All right.  And that's kind of how I
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 89

```
 1          understand a sports bar.  There are other

 2          sports bars in town, right?

 3   A.     Yes.

 4   Q.     Some of them -- and I can't even think of

 5          the names.  Sports bars usually, would you

 6          agree with me, are a place where people go

 7          have dinner, drinks, and maybe they've got

 8          a lot of TVs in there where you can watch

 9          all kind of different channels where you

10          can watch sports on them, right?

11   A.     Yes.

12   Q.     You've been to them?

13   A.     Yes.

14   Q.     I'm sure you've been to them all over the

15          country, right?

16   A.     Yes.

17   Q.     In my mind -- and you tell me if you think

18          differently -- that's different than

19          Celebrations.

20   A.     Yes.

21   Q.     Celebrations was a dance club, right?

22   A.     Yes.

23   Q.     I haven't heard you say anything about
```

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 90

```
 1          this bar that you were going to open to be

 2          a dance club.  You didn't want it to be a

 3          dance club?

 4    A.    No.

 5    Q.    Okay.  So would it be fair, again, for me

 6          to understand that what you're saying is

 7          the sports bar that you wanted to open was

 8          not really going to be anything similar to

 9          Celebrations in the sense that

10          Celebrations was a dance club and you were

11          wanting to open a sports bar, other than

12          the one night a week you wanted to

13          showcase some talent?

14    A.    Yes.

15    Q.    And you're talking about just your talent,

16          being able to sing or do whatever they

17          were going to do, and I don't know, maybe

18          dance, I'm not sure, but it wouldn't be

19          open as a dance club?

20    A.    No.

21    Q.    Okay.  Do you know whether or not that

22          information was ever made known to Ms.

23          Knudsen or anybody else?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 91

1    A.    No.

2    Q.    You didn't make it known to Ms. Knudsen or

3          anybody else, did you?

4    A.    No.

5    Q.    Did you make it known to anybody else with

6          Aronov that that's what you wanted to do?

7    A.    No.

8    Q.    Other than Mr. Barr, did you make it known

9          to anybody else about what you were really

10         wanting to do?

11   A.    No.

12   Q.    Okay.  Did you understand or know that

13         Mr. Barr was a convicted felon?  Did you

14         know that before he gave his deposition

15         here the other day?

16   A.    No.

17   Q.    Okay.  Didn't know anything about his

18         background, then, other than, you know,

19         the fact that he ran Celebrations?

20   A.    No.

21   Q.    Did you understand or know when you met

22         with him and talked about this sports bar

23         that he couldn't get a liquor license?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 92

```
 1         Were you aware that he couldn't do that?

 2    A.   No.

 3    Q.   So he didn't bring that up or make it

 4         known to you that the liquor license would

 5         have had to have been in somebody else's

 6         name?

 7    A.   No.

 8    Q.   Did you discuss when you met with him --

 9         and again, I may have asked this -- about

10         him being a consultant to you after

11         opening up this sports bar or how he would

12         get paid?  Those are really two different

13         questions, but --

14    A.   Well, I had talked to him about helping me

15         with it, so I guess you could say a

16         consultant, but we didn't talk about any

17         payments.

18    Q.   About what you would pay him for that?

19    A.   No.

20    Q.   And when you asked him to find a place for

21         this sports bar, was there any discussion

22         about whether he would buy it or lease it

23         or you would buy it or lease it, or how
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 93

```
 1          that would work out?  Was there any

 2          discussion about that, you know, in

 3          detail?

 4    A.    No.

 5    Q.    Okay.  Was he going to have to get your

 6          approval of the location before it was

 7          actually leased?

 8    A.    No.

 9    Q.    Okay.  So he could have just leased it --

10          got the lease, entered into it, before he

11          ever discussed with you anything about the

12          place?  That was okay with you?

13    A.    That was okay with me.

14    Q.    Okay.  What about purchasing it?  He could

15          have purchased it -- you didn't have any

16          discussions with him about whether it was

17          going to be leased or purchased?

18    A.    No.

19    Q.    Now, have you ever been an owner or been

20          involved in, in any way, the operation of

21          a sports bar?

22    A.    No.

23    Q.    What about any other kind of business?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 94

```
 1          Any other kind of business other than the

 2          business you're currently operating?

 3    A.    No.

 4    Q.    That's the only business you've ever been

 5          involved in operating?

 6    A.    Yes.

 7    Q.    Do you have any friends or acquaintances

 8          aside from Mr. Barr that know anything

 9          about that, that you could have consulted

10          with or gotten advice from?

11    A.    No.

12    Q.    I think Mr. Barr testified in his

13          deposition -- he said -- and I'm going to

14          try to quote this -- that you had told him

15          that you wanted to give something back to

16          the community.  Do you remember if that

17          was a discussion you had with him?

18    A.    Yes.

19    Q.    Was that with the sports bar too?

20    A.    Yes.

21    Q.    Was that in connection with letting local

22          people come in and show off their talent

23          too?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 95

```
 1   A.    Yes.

 2   Q.    Now, he said you had a record label.  Is

 3         that the Long Money label, or is there a

 4         different label that you actually have --

 5         or do you have a label yet?

 6   A.    Yes, I have a label.

 7   Q.    What's the name of your label?

 8   A.    Long Money Music Group.

 9   Q.    Is it a separate incorporation, or is it

10         part of your --

11   A.    It's part of Long Money Entertainment.

12   Q.    That's what I'm trying to say.

13   A.    Yes.

14   Q.    Did you intend on being active in the

15         management or operations of the sports

16         bar?

17   A.    Yes.

18   Q.    Is this still something you're trying to

19         pursue?

20   A.    Yes.

21   Q.    And are you still dealing with Mr. Barr on

22         it, or are you doing anything on your own?

23   A.    Well, I haven't been doing anything right
```

Page 96

```
 1        now, but it's something I want to pursue

 2        in the future.

 3   Q.   You haven't given up on it?

 4   A.   No.

 5   Q.   Are you still looking for places to try to

 6        lease, or do you know if that's even

 7        happening?

 8   A.   I haven't, no.

 9   Q.   Well, this lawsuit was filed, but aside

10        from this lawsuit, are you still

11        communicating with Mr. Barr about trying

12        to locate a place?

13   A.   We haven't spoken of it lately, no.

14   Q.   Have you spoken of it since the lawsuit

15        was filed, to your knowledge?

16   A.   No.

17   Q.   You haven't?

18   A.   No.

19   Q.   And there are some other people that

20        you've dealt with, with Aronov, that you

21        mentioned before, like Robert Long and

22        then the lady that you dealt with through

23        your house, and then there's one that you
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 97

```
 1            dealt with, with your business.  What was

 2            his name?

 3   A.       Joey.

 4   Q.       Joey.  Have you discussed with them or has

 5            Mr. Barr discussed with them any efforts

 6            to get you another place or locate a place

 7            to lease?

 8   A.       No.

 9   Q.       Do you have an idea about the kind of

10            money that will be required to open up a

11            sports bar?

12   A.       No.

13   Q.       Is that a consideration of any kind for

14            you before you open it up, what kind of

15            money it's going to cost you?

16   A.       No.

17   Q.       So you -- and I'm not trying to be

18            all-inquisitive, but you're not worried

19            about getting the money or having the

20            money to open up the sports bar; you've

21            got that either set aside or you can get

22            it, is what you're saying?

23   A.       Yes.
```

Page 98

1    Q.    Have you put out any records through your

2          business?

3    A.    Locally, yes.

4    Q.    You have?

5    A.    Yes.

6    Q.    And have you had any local talent that

7          you've got signed up or anything?

8    A.    Yes.

9    Q.    Can you give me just an idea?  How many?

10   A.    Five, six.

11   Q.    Where do they showcase their talent right

12         now, or where can they?

13   A.    Well --

14   Q.    They go outside Montgomery or --

15   A.    Yes.

16   Q.    Okay.  Where would they go?

17   A.    We go to Atlanta, you know, just all the

18         surrounding areas around here.

19   Q.    Okay.  And you mentioned to me too that I

20         guess in addition to the record label and

21         the talent that you're trying to develop,

22         you said you promote concerts as well?

23   A.    Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 99

```
 1   Q.    Have you promoted some concerts?

 2   A.    Yes.

 3   Q.    Can you give me some names of some people

 4         where you've promoted their concerts?

 5   A.    I did a Jim Jones concert, did a Rick Ross

 6         concert.

 7   Q.    All right.  Anybody else?

 8   A.    Those are the two majors, yes.

 9   Q.    Okay.  And where were their concerts held?

10   A.    At the Rose Supper Club.

11   Q.    Is that back open?

12   A.    Yes.

13   Q.    Oh, it is?

14   A.    Never closed.

15   Q.    Okay.  I thought it did.  I thought that

16         -- okay.  Maybe I'm -- maybe I

17         misunderstood somebody when I thought that

18         it had closed at one time.  I thought that

19         Mr. Barr testified and said that one of

20         the reasons he had a lot of people at his

21         club at one time was because the Rose

22         Supper Club had closed down.

23   A.    It wasn't closed down.  From my
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 100

```
 1            understanding, it wasn't closed down.

 2            Maybe shut down for a week or so, but from

 3            my understanding, it's never been closed

 4            down.

 5    Q.      Have you ever been to the Rose Supper

 6            Club?

 7    A.      Yes, I've been there before.

 8    Q.      It's still downtown, kind of near

 9            downtown?

10    A.      On High Street.

11    Q.      Okay.  So that's where you've been

12            promoting some concerts here recently?

13    A.      No, that wasn't recently.

14    Q.      Okay.  When was the Jones and Ross?

15    A.      Jim Jones was last year.  Ross was maybe

16            the most recent one, and that was in --

17            did it on a Sunday night.  I'm trying to

18            think of what month.  It was maybe --

19    Q.      This year?

20    A.      Yeah, three or four months ago.

21    Q.      And I guess what you do is locate or get

22            the talent and then make arrangements with

23            location as far as bringing the talent in
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 101

```
 1          and then working out a deal with like Rose
 2          Supper Club, with what kind of money you
 3          make off that, right?
 4   A.     Yes.
 5   Q.     How you presell tickets and that kind of
 6          thing?
 7   A.     Well, you're not allowed to sell tickets;
 8          it's a night club.  You have to do a set
 9          price at the door and that's it.
10   Q.     I see.  All right.  And then I believe you
11          said you also do some birthday parties?
12   A.     Yes.
13   Q.     Is that for older folks or younger folks
14          or both?
15   A.     I've done both.
16   Q.     All right.  And do you have a place to do
17          that, or do you have to lease a place
18          whenever you do that?
19   A.     The person having the party is responsible
20          for leasing the place, and I do all the
21          decorations and everything else.  If they
22          want a DJ, I've got my own personal DJ,
23          and if they need equipment, I've got
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 102

```
 1          equipment.

 2    Q.    I see.  And I think I asked you earlier if

 3          you've got any employees, and you said no.

 4          You just go out and get people to help you

 5          do these things?

 6    A.    Yeah.

 7    Q.    Subcontract it out to individuals or

 8          something, pay them to come help you?

 9    A.    If I have to, yes.

10    Q.    Or they might be just friends that help

11          you?

12    A.    Yeah.

13    Q.    Or maybe your wife or something like that?

14    A.    Yes.

15    Q.    Okay.  Now, was profitability of the club

16          important to you?

17    A.    Was it important to me?

18    Q.    Yeah.  That was probably a poor question.

19          Did you expect to make a profit off the

20          club that you were going to own, the

21          sports bar?

22    A.    Yes.

23    Q.    If it didn't make a profit, did you have
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 103

1           an idea about how long you would continue

2           to operate it, if it did not make a

3           profit?

4    A.     No.

5    Q.     You just would do it until you felt like

6           you didn't need to do it anymore?

7    A.     Yes.

8    Q.     Okay.  Did you intend to serve food at the

9           sports bar?  I assume you did.

10   A.     Yes.

11   Q.     So it would be typical food and drinks,

12          and then, like you said, you would have

13          TVs and entertainment and that kind of

14          thing, right?

15   A.     Yes.

16   Q.     So I guess it stands to reason you've got

17          to have people come buy the food and drink

18          to make a profit off of it?

19   A.     Yes.

20   Q.     You're going to have expenses associated

21          with a business, and you've got to have

22          income that outperforms your expenses in

23          order to make a profit, right?

Page 104

```
 1   A.   Yes.

 2   Q.   Okay.  So if it didn't make a profit or --

 3        at some point, that would have been at

 4        least a consideration for you, if it did

 5        not make a profit, right?

 6   A.   Yes.

 7   Q.   So this gets back to a question we started

 8        to talk to earlier.  In this case, you

 9        know, you've sued my client, Ms. Forney,

10        and Ms. Knudsen and Aronov Realty, you and

11        Mr. Barr have, and you realize you're

12        asking for damages in this case.  Do you

13        understand that?

14   A.   Yes.

15   Q.   Okay.  What damages are you asking for?

16        What are you asking a jury to award you in

17        this case, and what for?  Do you know?

18   A.   I went into it to open a sports bar, and

19        that was my intentions from the start.

20   Q.   All right.  Well, I understand that.  And

21        you say it's still your intention, right?

22   A.   Yes.

23   Q.   But you still haven't found another place
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 105

```
 1           to open up the sports bar, have you?

 2   A.      No.

 3   Q.      So obviously, finding a location is an

 4           issue, correct?

 5   A.      Yes.

 6   Q.      And aside from the issues in this lawsuit,

 7           you haven't found another place to open it

 8           either, have you?

 9   A.      No.

10   Q.      And it would be fair to say that you don't

11           have any idea of what kind of money you

12           could be making, if anything, from this

13           sports bar if it were open, do you?  I

14           mean, as we sit here today, you have no

15           information or evidence that you could

16           tell me about that would substantiate that

17           you could have made money from this even

18           if it was open, do you?

19   A.      Me, personally, no.

20   Q.      Okay.  And certainly -- well, strike that.

21           So as far as any damages are concerned,

22           other than you haven't been able to open

23           this bar -- I'm trying to find out, are
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 106

```
 1            you asking for, you know, some kind of

 2            lost income?  Is that part of it, or do

 3            you agree with me that it would be just

 4            purely speculative whether you would even

 5            have any income from this bar?

 6   A.       I can't say that because I haven't opened

 7            one.

 8   Q.       That's what I'm saying.  So we don't know

 9            whether you would have had income or not,

10            do we?

11   A.       No.

12   Q.       Okay.  So what other damages have you

13            suffered, other than the allegation in the

14            lawsuit that you weren't able to get this

15            place, this particular place?  What other

16            allegations -- what other damages do you

17            have that you're asking a jury to

18            compensate you for?  Have you suffered in

19            any way personally from not being able to

20            open up this bar -- your reputation or

21            anything like that, is what I'm saying.

22            Has that hurt your reputation in any way?

23   A.       It hurts me personally.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 107

```
 1   Q.   What about in the community?  Do you know

 2        anybody who feels differently about you

 3        because you haven't been a able to open up

 4        this bar?

 5   A.   I haven't heard anything.

 6   Q.   You're just saying personally you'd like

 7        to get this bar open?

 8   A.   Yes.

 9   Q.   But you personally are not still actively

10        trying to find a place, right?

11   A.   No.

12   Q.   And you haven't got anybody on your behalf

13        actively trying to find a place on your

14        behalf, as far as you know, do you?

15   A.   No.

16   Q.   Okay.  Have you seen a doctor or -- and I

17        know this may sound a little silly, but

18        I'm going to ask you.  Have you gone to

19        any kind of psychiatrist, psychologist, or

20        counselor of any kind?  Has that affected

21        you in any way?

22   A.   No.

23   Q.   I know.  It's important that I ask you
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 108

```
 1            that because I want to know whether you

 2            have or not.  I'm not suggesting that you

 3            should.  You haven't done that, have you?

 4    A.      No.

 5    Q.      Have you lost any out-of-pocket expenses

 6            as of today because you didn't get this

 7            location?

 8    A.      No.

 9    Q.      Okay.  As we sit here today, you've never

10            even been to the location, have you?

11            You've never even been to the location

12            that Mr. Barr was trying to lease, right?

13            As I understand it, you've never seen it,

14            right?

15    A.      I haven't seen the place.  I've been to

16            the shopping center.

17    Q.      You've been to Le Croy, right?

18    A.      Yes.

19    Q.      But you haven't been to the shopping

20            center -- strike that.  You've been to the

21            shopping center, but you've never been to

22            that particular bar that was trying to be

23            leased?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 109

1    A.    No.

2    Q.    Okay.  And I think there's a Doodle

3          Hopper's there that may actually be

4          leasing that space now.  Have you ever

5          been in there?

6    A.    No.

7                MR. GUY:  Off the record just a

8                     second.

9                {Brief recess.)

10   Q.    I want to go back to Defendants' Exhibit 8

11         to Mr. Barr's deposition.  Do you remember

12         me asking you about this lease that you

13         signed on or about November 6th of '07?

14         Do you remember I showed that to you?

15   A.    Yes.

16   Q.    Why is it that you signed that lease; do

17         you know?  None of the other leases that

18         Mr. Barr signed relating to this, trying

19         to find a place, were signed by you.  Do

20         you know why you were asked to sign this

21         lease, who told you to sign it?

22   A.    Well, Mr. Barr asked me to sign it.

23   Q.    Okay.  But he had never asked you to sign

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 110

| | | |
|---|---|---|
| 1 | | any other of the leases that we've looked |
| 2 | | at or offers to purchase, right? |
| 3 | A. | No. |
| 4 | Q. | Had anything changed or was anything |
| 5 | | different in November of '07 than it was |
| 6 | | back in May of '07? |
| 7 | A. | I've just never seen anything else. |
| 8 | Q. | Okay. But that's the only lease, the one |
| 9 | | for the Copeland's, that you were asked to |
| 10 | | sign, right? |
| 11 | A. | Yeah. |
| 12 | Q. | Long Money Entertainment, your business? |
| 13 | A. | Yes. |
| 14 | Q. | I don't know that I asked you |
| 15 | | specifically. You may have said, but when |
| 16 | | did you actually incorporate that |
| 17 | | business? |
| 18 | A. | I incorporated it in '06. |
| 19 | Q. | Okay. And does it file income tax |
| 20 | | returns? |
| 21 | A. | Yes. |
| 22 | Q. | And who is your accountant? |
| 23 | A. | I was using my baseball one, MIA, from |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 111

```
 1        Cleveland, Ohio.

 2   Q.   That's who does your baseball?

 3   A.   Yes.

 4   Q.   And is that an acronym for the name of the

 5        business?

 6   A.   Yes, McCormack Advisors.

 7   Q.   McCormack?

 8   A.   Yeah.

 9   Q.   And they're in Cleveland, Ohio?

10   A.   Yes.

11   Q.   And are they currently still doing your

12        taxes and things?

13   A.   Yes.

14   Q.   They still do that?

15   A.   Yes.

16   Q.   So they also file the taxes for the Long

17        Money Entertainment?

18   A.   Yes.

19   Q.   Has it been profitable at any time since

20        2006, Long Money Entertainment?

21   A.   Yes.

22   Q.   It has been?

23   A.   Yes.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 112

```
1    Q.    And when I say "profitable," let me make
2          sure you and I are on the same page.  I'm
3          saying that it's filed taxes indicating a
4          profit as opposed to -- I'm not just
5          asking you, have you generated income from
6          the thing; I'm asking you is the income
7          more than the expenses?
8    A.    Yes.
9    Q.    Okay.  I also did not ask you, please,
10         sir, what is your date of birth?
11   A.    2/29/1976.
12   Q.    And what is your social security number?
13   A.    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.
14   Q.    Let me repeat that back to you, please.
15         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?
16   A.    Yes.
17   Q.    Making sure.  That's all I have.  Thank
18         you, sir.
19                         EXAMINATION
20         BY MS. EVANS:
21   Q.    I'm going to kind of bounce around a
22         little bit, because I have follow-up
23         questions.  If you get confused about
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 113

```
 1            where I am, just let me know, okay?  Is

 2            there any reason that your testimony today

 3            wouldn't be truthful?  Are you on any kind

 4            of medications or anything?

 5   A.       No.

 6   Q.       Okay.  And I know we talked about your

 7            wife.  Other than working at home and

 8            taking care of your boys, does she have

 9            any other sort of job?

10   A.       No.  She's going to school.

11   Q.       What's she studying?

12   A.       Criminal law.

13   Q.       Criminal law?

14   A.       Yes.

15   Q.       So is it an undergraduate program?

16   A.       Yes.

17   Q.       And where is that at?

18   A.       AUM.

19   Q.       Okay.  How long has she been doing that?

20   A.       This will be her fourth year.

21   Q.       Okay.  Have you ever been the victim of

22            discrimination before?

23   A.       No.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 114

1    Q.    Not at a job or otherwise?

2    A.    No.

3    Q.    All right.  Let's go back to your jobs for

4          just a second.  You played -- you know, we

5          went over each year where you played, in

6          Kingsport and so on and so forth.  Did you

7          play at each one of those for a year

8          exactly or did you ever switch in the

9          middle of a season?

10   A.    Never switched in the middle of a season.

11   Q.    Okay.  So they were all just the one year?

12   A.    Yeah.  The first two were just short

13         seasons; the seasons lasted just a few

14         months.

15   Q.    Okay.  I was a little confused on the

16         timing.  Okay.  Then you went to the Mets

17         and you were traded.  Do you know why you

18         were traded from the Mets?

19   A.    Oakland sent Kenny Rogers to the Mets,

20         basically, for me.  It was a straight up

21         trade, and I went to Oakland.

22   Q.    And when you were traded from Oakland, was

23         it just for, you know, business reasons

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 115

```
 1        again, traded to I guess San Diego after

 2        that?

 3   A.   Yeah, business reasons, yes.

 4   Q.   Okay.  And then when you were traded to

 5        the Padres -- or you were a free agent; is

 6        that right?

 7   A.   Yes.

 8   Q.   You were a free agent to Kansas City?

 9   A.   Yes, signed with Kansas City.

10   Q.   And why did you do that?

11   A.   That was -- money.

12   Q.   Money?  Okay.  That's fine.  I just wanted

13        to make sure that you weren't, you know,

14        unhappy with where you were or anything

15        like that.

16   A.   No.

17   Q.   Then you went to the Yankees?

18   A.   Yes.

19   Q.   Same reason?

20   A.   Yes, yes.

21   Q.   Okay.  Kansas City was fine; you just made

22        more money?

23   A.   Yeah.  Yeah, it was fine.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 116

```
 1   Q.   Okay.  And then you left the Yankees and
 2        you left professional ball; is that right?
 3   A.   Yes.
 4   Q.   Why was that?
 5   A.   I just wanted to spend more time with the
 6        kids.
 7   Q.   Okay.  Did you have two boys at that
 8        point?
 9   A.   I had all three of my boys.
10   Q.   All three?
11   A.   Yes.
12   Q.   Okay.  And when you were playing for these
13        teams, were they traveling with you, or
14        were they based out of Montgomery?
15   A.   They came during the summer.  They came
16        around June and left right before school
17        started back.
18   Q.   Okay.  Long Money Entertainment, you said
19        you have -- Long Money Music Group is a
20        part of that?
21   A.   Yes.
22   Q.   Are there any other parts?
23   A.   No.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 117

```
 1   Q.   No other parts, okay.  And I was just

 2        confused.  You said you have five or six

 3        -- is it groups under Long Money Music or

 4        is it five or six CDs that you've done?

 5   A.   I've done five or six CDs -- it depends.

 6        It's five solo artists and one group,

 7        which I consider as one.

 8   Q.   Okay.  And you said you had not gone to

 9        any counselors or psychologists or

10        psychiatrists?

11   A.   No.

12   Q.   And I just want to make sure I didn't miss

13        it.  You don't have any untreated mental

14        effects from the facts that you have

15        alleged in your complaint?

16   A.   No.

17   Q.   And you're not on any medicine?

18   A.   No.

19   Q.   Okay.  Do you have local bank accounts?

20   A.   Yes.

21   Q.   What banks are those with?

22   A.   Amerifirst Bank.

23   Q.   I'm sorry?
```

Page 118

| | | |
|---|---|---|
| 1 | A. | Amerifirst. |
| 2 | Q. | Amerifirst? |
| 3 | A. | Yes. |
| 4 | Q. | And is that your professional and your |
| 5 | | personal? |
| 6 | A. | No. |
| 7 | Q. | Personal? |
| 8 | A. | Just my business accounts. |
| 9 | Q. | Okay.  And your personal accounts, who are |
| 10 | | those with? |
| 11 | A. | Huntington Bank. |
| 12 | Q. | Huntington? |
| 13 | A. | Yes. |
| 14 | Q. | And at Amerifirst, do you have a banker |
| 15 | | that you work with? |
| 16 | A. | Yes. |
| 17 | Q. | Who is that? |
| 18 | A. | Cheryl Reed. |
| 19 | Q. | Cheryl Reed? |
| 20 | A. | Yes. |
| 21 | Q. | Do you know if that's C-H-E-R-L-Y or -- |
| 22 | A. | C-H-E-R-Y-L. |
| 23 | Q. | Right, Y-L, thank you.  And at Huntington |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 119

```
 1          Bank, do you have a banker that you work

 2          with?

 3   A.     That's my CPA, John Palguta,

 4          P-A-L-G-U-T-A.

 5   Q.     So you said he's also your CPA?

 6   A.     Yes.

 7   Q.     For your personal stuff?

 8   A.     That was my baseball stuff.

 9   Q.     For your baseball stuff?

10   A.     Yes.

11   Q.     Where is Huntington?

12   A.     Cleveland.

13   Q.     Cleveland, okay.  Do you have a cell

14          phone?

15   A.     Yes.

16   Q.     Who is your carrier?

17   A.     Sprint.

18   Q.     And how long have you been with Sprint?

19   A.     Since '96 maybe, '97.

20   Q.     Oh, wow.  Okay.  And do you also have a

21          home phone?

22   A.     Yes.

23   Q.     And who is your carrier there, is it
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 120

| | | |
|---|---|---|
| 1 | | BellSouth? |
| 2 | A. | BellSouth. |
| 3 | Q. | Okay.  Do you use e-mail? |
| 4 | A. | Yes. |
| 5 | Q. | You do?  And how many e-mail accounts do |
| 6 | | you have? |
| 7 | A. | Just one. |
| 8 | Q. | Just one, okay.  And who is that through? |
| 9 | A. | AOL. |
| 10 | Q. | AOL, okay.  Did you ever communicate with |
| 11 | | Mr. Barr through e-mail? |
| 12 | A. | No. |
| 13 | Q. | Did you ever e-mail anybody about opening |
| 14 | | up a sports bar? |
| 15 | A. | No. |
| 16 | Q. | And let me just make sure.  I think we |
| 17 | | asked questions all around it, but I'm not |
| 18 | | sure I ever heard definitively.  You had a |
| 19 | | business plan in your mind, but you never |
| 20 | | wrote anything down for a sports bar; is |
| 21 | | that correct? |
| 22 | A. | No. |
| 23 | Q. | You never wrote anything down? |

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 121

```
 1   A.    No.

 2   Q.    Okay.  I think that's all I have.

 3                    EXAMINATION

 4         BY MR. GUY:

 5   Q.    I've got to ask this.  Why Cleveland, Ohio

 6         for where you -- you know, to get somebody

 7         to manage your -- is that just somebody

 8         that recommended another group that works

 9         -- another professional baseball player or

10         something?  How did you end up getting

11         somebody out of Cleveland, Ohio to handle

12         your business affairs?

13   A.    Because my agent was based out of

14         Cleveland.

15   Q.    Who is your -- who was your agent?

16   A.    Casey Close.

17   Q.    Is that with a C or an L?

18   A.    C.

19   Q.    Is it C-L-O-S-E?

20   A.    Yes.

21   Q.    And that was your agent?

22   A.    Yes.

23   Q.    Was that your agent the entire time you
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 122

1        were in baseball?

2    A.    Yes.

3    Q.    Do you still do anything with -- well, is

4          it a Mister or Missus?

5    A.    Mister.

6    Q.    Do you still do anything with him?

7    A.    If I need him to do something, yes.

8    Q.    So that's just kind of a part of who he

9          recommended to you, and you've been with

10         that group, MIA and Huntington Bank, since

11         then?

12   A.    Yes.

13   Q.    So that's where all your personal accounts

14         are, right, is what you're saying, still

15         with Huntington Bank?

16   A.    Yeah.

17   Q.    There are no Huntington Banks anywhere

18         near here, are there?

19   A.    No.

20   Q.    And so Amerifirst just has business

21         accounts for you?

22   A.    Yes.

23   Q.    Okay.  Just something else that I wanted

Page 123

| | | |
|---|---|---|
| 1 | | to make sure -- and you may have answered |
| 2 | | this, and again, I apologize.  I remember |
| 3 | | Mr. Barr testifying in his deposition that |
| 4 | | said -- and I don't know if he said T.L. |
| 5 | | or Mr. Long or Terrence, but said that you |
| 6 | | were going to put up a million dollars in |
| 7 | | cash.  I don't know if you remember that |
| 8 | | the other day when he was here.  Did you |
| 9 | | ever tell him that specifically, that I'm |
| 10 | | willing to put up a million dollars in |
| 11 | | cash or anything to that effect? |
| 12 | A. | No, I'm not -- and maybe I heard it wrong. |
| 13 | | I don't think that's what he said. |
| 14 | Q. | Okay.  Well, maybe I heard it wrong.  And |
| 15 | | again, there's a record in the case, so -- |
| 16 | | was there anything similar to that? |
| 17 | | Because I know I wrote down during his |
| 18 | | deposition -- and unfortunately, I don't |
| 19 | | have it with me.  I know it was just sent |
| 20 | | to me recently.  But I'm pretty sure he |
| 21 | | said -- I put T.L. was going to put up a |
| 22 | | million dollars in cash.  But let me just |
| 23 | | say it this way.  You're saying you never |

Page 124

```
 1        said that, right?

 2   A.   No.

 3   Q.   Okay.  But I don't think there's any doubt

 4        you were going to put up whatever cash was

 5        needed to open up the bar, right?

 6   A.   Yes.

 7   Q.   Okay.  And did you ever or have you ever

 8        reviewed that videotape that was provided

 9        to us?  Have you ever looked at that?

10   A.   No.

11   Q.   Okay.  Have you ever listened to the audio

12        tape that was provided to us of Mr. Barr's

13        conversation with Ms. Knudsen?

14   A.   No.

15   Q.   If I wanted to try to contact that MIA,

16        how would I do that?

17   A.   216 --

18   Q.   Hold on.  Let me get back to my spot.  So

19        that's McCormack --

20   A.   McCormack Advisors.

21   Q.   Is it investment advisors?  Is that what

22        the I stands for?

23   A.   Yeah.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 125

1    Q.    Okay.  And that's in Cleveland, right?

2    A.    Right.

3    Q.    All right.  What was that number again?

4    A.    216-522-1200.

5    Q.    Okay.  Thank you very much.  Thank you,

6          sir.

7                    (The deposition of TERRENCE

8                     LONG concluded at

9                     approximately 12:51 p.m. on

10                    May 7, 2008.)

11

12

13

14

15

16

17

18

19

20

21

22

23



# FREEDOM COURT REPORTING

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  TERRENCE LONG & BARRY BARR,
6      Plaintiffs,
7                  CIVIL ACTION NO:
8  v.        2:07-CV-00881-WKW-WC
9
10  ARONOV REALTY MANAGEMENT, INC.,
11  AMY CLARK KNUDSEN, & MEIYING
12  FORNEY,
13      Defendants.)
14      S T I P U L A T I O N S
15
16      IT IS STIPULATED AND AGREED
17  by and between the parties through their
18  respective counsel, that the deposition of
19  ******************************************
20      AMY KNUDSEN
21  ******************************************
22  may be taken before Kim Duckett,
23  Commissioner, at 401 Adams Avenue,

**2**

1  Montgomery, Alabama, on June 23rd, 2008,
2  beginning at 11:30 A.M.
3      IT IS FURTHER STIPULATED AND
4  AGREED that the signature to and the
5  reading of the deposition by the witness is
6  waived, the deposition to have the same
7  force and effect as if full compliance had
8  been had with all laws and rules relating
9  to the taking of depositions.
10      IT IS FURTHER STIPULATED AND
11  AGREED that it shall not be necessary for
12  any objections to be made by counsel to any
13  questions, except as to the form or leading
14  questions, and that counsel for the parties
15  may make objections and assign grounds at
16  the time of trial, or at the time said
17  deposition is offered in evidence, or prior
18  thereto.
19      IT IS FURTHER STIPULATED AND
20  AGREED that notice of filing of the
21  deposition by the Commissioner is waived.
22
23

**3**

1          I N D E X
2
3  WITNESS:
4  AMY KNUDSEN
5
6  EXAMINATION BY                PAGE
7  Mr. Quinn ..................... 5
8  Mr. Guy....................... 169
9
10      DEFENDANT'S EXHIBITS
11  There were no Defendant's Exhibits marked
12  to this deposition.
13
14      PLAINTIFF'S EXHIBITS
15  NO.                    PAGE
16  1.............................. 28
17  2.............................. 76
18  3.............................. 92
19  4.............................. 122
20
21
22
23

**4**

1      A P P E A R A N C E S
2  APPEARING ON BEHALF OF THE PLAINTIFF(S):
3
4  WIGGINS, CHILDS, QUINN & PANTAZIS
5      BY: Mike Quinn & Kevin Jent
6      301 19th Street North
7      Birmingham, Alabama 35203
8
9
10  APPEARING ON BEHALF OF THE DEFENDANT(S):
11
12  BRADLEY, ARANT, ROSE & WHITE
13      BY: Charles Stewart, III
14      401 Adams Avenue, Suite 780
15      Montgomery, Alabama 36104
16
17  BALL, BALL, MATTHEWS & NOVAK
18      BY: N. Gunter Guy
19  2000 Interstate Park Drive, Suite 204
20      Montgomery, Alabama 36109
21
22  ALSO PRESENT: BARRY BARR & SCOTT HARRIS
23

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

**5**

1      AMY KNUDSEN,
2  being first duly sworn, was examined and
3  testified as follows:
4
5  EXAMINATION BY MR. QUINN:
6      Q  State your name, please.
7      A  Amy Knudsen.
8      Q  And Ms. Knudsen, where do you live?
9      A  In Montgomery, Alabama.
10     Q  What is the address, please?
11     A  2926 Jamestown Drive.
12     Q  How long have you lived there?
13     A  Fourteen years.
14     Q  Anyone live with you there?
15     A  Occasionally, my youngest daughter.
16     Q  How old is she?
17     A  Twenty-four.
18     Q  Are you presently married?
19     A  No, sir.
20     Q  Have you been married?
21     A  Yes, sir.
22     Q  Who were you married to?
23     A  John Knudsen.

**6**

1      Q  And how long were you married to
2  him?
3      A  A little over -- almost seventeen
4  years.
5      Q  And when were you divorced?
6      A  March 4th, 1994.
7      Q  Just the one daughter from that
8  marriage?
9      A  No, sir.
10     Q  Is that daughter from another
11  marriage?
12     A  No, sir.
13     Q  What other children?
14     A  I have Esther Joy Knudsen Morrison,
15  John George Knudsen, the fourth, and
16  Margaret Grace Knudsen.
17     Q  How long have you lived in
18  Montgomery?
19     A  Since 1977.
20     Q  Where did you live before that?
21     A  Batavia, Illinois.  Crown Point,
22  Indiana -- Batavia, Illinois, and then one
23  year in Crown Point, Indiana.

**7**

1      Q  What caused you to move to
2  Montgomery?
3      A  My ex-spouse was a minister.
4      Q  Where did you meet your ex-husband?
5      A  He was a Geneva football player and
6  I was a Batavia cheerleader.
7      Q  Geneva?
8      A  Illinois.
9      Q  Did you grow up in Illinois?
10     A  Yes, sir.
11     Q  Where in Illinois did you grow up?
12     A  Batavia, Illinois.
13     Q  And he grew up --
14     A  Geneva, Illinois.  Actually,
15  Batavia, Illinois, but the school district
16  was Geneva.
17     Q  Did y'all go to the same school?
18     A  No, sir.
19     Q  Went to different schools.  So you
20  met while in high school?
21     A  Yes, sir.
22     Q  Did you both go to the same
23  college?

**8**

1      A  Yes, sir.
2      Q  Where did you go to college?
3      A  Hyles-Anderson College.
4      Q  Where is that?
5      A  Crown Point, Indiana.
6      Q  I've never heard of that.  It's a
7  small college?
8      A  Yes, sir.
9      Q  Is it affiliated with any
10  organization?  Is it a private school?
11     A  Yes, sir.
12     Q  Who owns it?  Is it owned by a
13  church or a group?
14     A  No.  I don't know the ownership.
15     Q  Okay.  And is it a liberal arts?
16  What kind of a college is it?
17     A  I guess you would call it a
18  religious or liberal arts school.
19     Q  What was your major?
20     A  Secondary education.
21     Q  And did you marry your husband
22  while in college or after y'all got out of
23  college?

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

9

1    A I graduated and then married him.
2    Q The secondary education degree,
3  what were you going to do with that? Were
4  you going to teach?
5    A I have a major in English and a
6  minor in music.
7    Q Did you teach?
8    A I did.
9    Q Where did you teach?
10    A I taught at the school affiliated
11  with the church here in Montgomery, and I
12  also did student teaching.
13    Q Okay. You confused me there.
14    A Sorry. I did student teaching
15  first.
16    Q And where did you do the student
17  teaching?
18    A At a small -- well, at a small
19  school affiliated with a church that I
20  attended.
21    Q And where was that? Was that in
22  Illinois?
23    A No.

10

1    Q That was here?
2    A No. That was in Crown Point,
3  Indiana.
4    Q Crown Point, Indiana. Okay. So
5  after you graduated from college, did you
6  move to Crown Point?
7    A It's either Crown Point or there is
8  Hammond and Merrillville, and I can't
9  remember my exact address or town exactly,
10  but it was right near there, you know,
11  right around in the -- the towns all kind
12  of mesh.
13    Q Okay. Now, the education -- the
14  secondary education training that you got
15  with, I think you said with English and
16  what else?
17    A Music.
18    Q English and music. Was it any way
19  limited in scope to what or where you
20  could teach? In other words, did you have
21  to teach in a school that was affiliated
22  with that college?
23    A No.

11

1    Q Okay. But I think you indicated
2  that you went to a -- to do your training
3  at a school that was part of the church
4  that you attended?
5    A No. It was a -- the school -- it
6  was just a regular high school.
7    Q Okay. What high school was it?
8    A I think it was called Hammond
9  Baptist High, I think. It's been many
10  years.
11    Q Okay. I understand. I think you
12  indicated the college, though, was a
13  religious college?
14    A Yes, sir, had a religious emphasis.
15    Q And what religious emphasis, what
16  denomination?
17    A No denomination.
18    Q No denomination. Okay. It was
19  private, right?
20    A Yes.
21    Q Not a public college but a private
22  college?
23    A Yes, sir.

12

1    Q And do you know how it funded
2  itself other than through just students
3  going? What was the college called again?
4    A Hyles-Anderson College.
5    Q Okay. Approximately how many
6  students?
7    A Two thousand, three thousand. I
8  really don't know. It's been so long, I
9  can't remember.
10    Q You said that your husband became a
11  minister?
12    A Yes, he did.
13    Q What kind of -- what denomination?
14    A Independent.
15    Q Where did he preach?
16    A When are you talking about?
17    Q Well, did he study in college to be
18  a minister?
19    A Yes, sir.
20    Q At that same school?
21    A Yes, sir.
22    Q Okay. And I take it that he would
23  be an unaffiliated -- he would be a

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

13

1  minister, but he would not be affiliated
2  with any denomination?
3      A Convention? Are you trying to say
4  convention?
5      Q No. I guess conventional
6  denomination, Baptist, Methodist,
7  Catholic, Presbyterian.
8      A The church was Baptist but not
9  affiliated with a convention.
10     Q Okay.
11     A Independent.
12     Q Yes. Now that explains it. And so
13  he became an independent Baptist minister?
14     A Yes, sir.
15     Q Okay. And where -- did y'all --
16  when did you -- you moved here in '77,
17  right?
18     A Yes, sir.
19     Q And how long had you been out of
20  school when you moved to Montgomery?
21     A Me personally?
22     Q Yeah. When did you graduate from
23  college?

14

1      A '76.
2      Q Those things are just supposed to
3  roll right off, your graduation from high
4  school, your graduation from college,
5  graduation from law school, when you got
6  married. Sorry. '76. And so it would
7  have been a year later when you moved to
8  Montgomery? About a year later?
9      A Approximately, because I --
10     Q And I'm not holding you to days and
11  months, just --
12     A -- took twenty hours, and I
13  graduated in three and a half years.
14     Q Okay. When you came to Montgomery,
15  what church did your husband go to?
16     A Friendship Baptist Church.
17     Q And what did you do? Did you work?
18  Did you go to work?
19     A I taught in the school, I played
20  the organ, I taught Sunday School class, I
21  acted as the church secretary at times, I
22  worked in the church nursery.
23     Q Where was that church, Baptist

15

1  church?
2      A Virginia Loop Road.
3      Q How long was he the minister of
4  that church?
5      A Fourteen -- thirteen, fourteen
6  years.
7      Q And during that thirteen to
8  fourteen years that he was at that church,
9  did you continue to teach in the school
10  and teach Sunday school and be the
11  secretary and all -- and play the organ
12  and all of those things?
13     A I worked part-time at Gayfers at
14  Montgomery Mall. I just had various
15  responsibilities.
16     Q Okay.
17     A I don't think I was teaching at the
18  school at that time then.
19     Q Okay. Did you have -- did you ever
20  receive a certification from the State of
21  Alabama to teach?
22     A No, sir.
23     Q After being at that church for

16

1  those fourteen years, did he move to
2  another church?
3      A Yes.
4      Q Where did he go?
5      A We started another church called
6  Liberty Baptist Church.
7      Q Did he start the other church, this
8  first church he was at? Did he start it,
9  or was it already in existence?
10     A It was in existence.
11     Q So he became its pastor?
12     A Yes, sir.
13     Q But then he left and started his
14  own church?
15     A The first church was disbanded.
16     Q And so he started up a new church?
17     A Yes.
18     Q And I'm sorry. What did you say
19  the name of it was?
20     A Liberty Baptist Church.
21     Q And where was it located?
22     A Ray Thorington Road.
23     Q How big did it get? How big a

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

17

1  church is it? Is it still in existence?
2  A No, sir.
3  Q How long did it last?
4  A I can't remember.
5  Q Again, it was an independent
6  Baptist church?
7  A Yes, sir.
8  Q And under no convention?
9  A No, sir.
10  Q Was its teachings different from
11  the normal Baptist teachings that are
12  within the convention?
13  MR. STEWART: Object to the form.
14  A I don't know what you mean.
15  Q Well, I'm trying to figure out why
16  it was independent.
17  A It just wasn't affiliated with a
18  convention, the Southern Baptist
19  Convention.
20  Q Okay. But its beliefs and its
21  teachings were Baptist? They were pretty
22  in line with the other Baptist churches, I
23  guess is what I'm saying and its religious

18

1  teachings?
2  A It was Bible based. I mean, it was
3  a Bible based church. I really -- you
4  know, I would have to have a list of the
5  conventions that you're talking about to
6  tell you what would be different.
7  Q Okay. How long did that church
8  last?
9  A You already asked me that.
10  Q Did you tell me how long it lasted?
11  A I said I don't remember.
12  Q Okay. What did he do after that?
13  A He went to -- he did different
14  things.
15  Q Did he stop being --
16  A He sold cemetery property, he went
17  to Life College for a while, he sold real
18  estate for a while.
19  Q Did you help him start up this new
20  church? Were y'all still married then?
21  A Yes, we were.
22  Q And did you help him in starting
23  this church up?

19

1  A Yes, I guess I did.
2  Q And at what point did you and he
3  get divorced?
4  A March 4th, 1994.
5  Q And he was -- was he a minister
6  then?
7  A No, sir.
8  Q So he quit being a minister and
9  started other jobs?
10  A Yes, sir.
11  Q Okay. And what job was he working
12  when y'all got divorced?
13  A I believe he was selling real
14  estate.
15  Q Okay. Had you started selling real
16  estate when y'all got divorced?
17  A No, sir.
18  Q What were you doing when y'all got
19  divorced?
20  A I was working as a paralegal.
21  Q Okay. Here in Montgomery?
22  A Yes, sir.
23  Q What firm?

20

1  A Beasley, Wilson.
2  Q How long did you work for the
3  Beasley firm?
4  A '88 to -- I think it was '88, '87
5  or '88 to '93 or '94.
6  Q Now, prior to -- was that a
7  full-time job?
8  A No, sir.
9  Q Part-time?
10  A Uh-huh.
11  Q What other -- and prior to that,
12  other than I think you indicated that you
13  worked part-time in a department store --
14  A Permanent part-time.
15  Q -- what other jobs did you have
16  between the department store and the
17  Beasley firm? What other kinds of jobs
18  did you hold?
19  A After my third child was born, I
20  did some -- I no longer worked permanent
21  part-time or did it just a little while,
22  and then after that, I did some fragrance
23  modeling just whenever they would call me.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | 21 |
|---|---|
| 1 | Q  Who was that with? |
| 2 | A  Gayfers. |
| 3 | Q  Any other significant jobs before |
| 4 | getting into real estate? |
| 5 | A  I feel like all my jobs were |
| 6 | significant. |
| 7 | Q  I didn't mean it that way.  Did you |
| 8 | ever hold a full-time job while you were |
| 9 | married, or were most of them part-time |
| 10 | jobs? |
| 11 | A  I believe that the job with |
| 12 | Beasley, Wilson became full-time, and then |
| 13 | I went to work with Sirote and Permutt. |
| 14 | Q  Here in Montgomery? |
| 15 | A  Yes, sir. |
| 16 | Q  When did you do that?  When did you |
| 17 | go to work for them? |
| 18 | A  I think it was '93.  Might have |
| 19 | been January of '94.  Could either -- |
| 20 | right before I got divorced. |
| 21 | Q  Who did you work for at the Beasley |
| 22 | firm? |
| 23 | A  I worked with Tom Methvin.  I |

| | 23 |
|---|---|
| 1 | A  I did. |
| 2 | Q  How long did you work for them? |
| 3 | A  Two and a half years. |
| 4 | Q  And anybody in particular that you |
| 5 | worked for there? |
| 6 | A  Fred Simpler. |
| 7 | Q  What kind of law did he do? |
| 8 | A  Securities, bond lawyer. |
| 9 | Q  And did you leave the Beasley firm |
| 10 | voluntarily to go to the Sirote firm? |
| 11 | A  Yes, sir. |
| 12 | Q  And did you leave the Sirote firm |
| 13 | voluntarily? |
| 14 | A  Yes, sir. |
| 15 | Q  And when did you leave them? |
| 16 | A  About -- it was about two and a |
| 17 | half years. |
| 18 | Q  What did you do after that? |
| 19 | A  Thorington and Gregory. |
| 20 | Q  Is that another law firm? |
| 21 | A  Yes. |
| 22 | Q  What kind of law do they do? |
| 23 | A  They did bonds, securities. |

| | 22 |
|---|---|
| 1 | worked with several of the attorneys. |
| 2 | Q  Okay.  And you were a paralegal? |
| 3 | A  Yes.  I started out as a paralegal |
| 4 | assistant and was promoted then to working |
| 5 | as a paralegal.  Frank Wilson, Tom |
| 6 | Methvin, Jerry Beasley. |
| 7 | Q  And did you actually go to |
| 8 | paralegal school, or did you get |
| 9 | on-the-job training and became a paralegal |
| 10 | as a result of the on-the-job training you |
| 11 | got from the Beasley firm? |
| 12 | A  I took advantage of any continuing |
| 13 | legal education, I got on-the-job |
| 14 | training, and then I studied through a |
| 15 | course at Samford University-Cumberland |
| 16 | for National Association of Legal |
| 17 | Assistants. |
| 18 | Q  All right.  And I'm sorry.  Did you |
| 19 | say that you were at Sirote when you got |
| 20 | divorced? |
| 21 | A  Yes, sir. |
| 22 | Q  Did you continue to work for Sirote |
| 23 | after the divorce? |

| | 24 |
|---|---|
| 1 | Q  And how long did you work for them? |
| 2 | A  One year. |
| 3 | Q  Then what? |
| 4 | A  Balch and Bingham. |
| 5 | Q  Here in Montgomery? |
| 6 | A  Yes. |
| 7 | Q  All of these were in Montgomery? |
| 8 | A  Yes. |
| 9 | Q  And, again, was it bond and |
| 10 | securities at Balch and Bingham? |
| 11 | A  No. |
| 12 | Q  What did you do there?  Who did you |
| 13 | work for? |
| 14 | A  I worked with John Bowman, Jr. |
| 15 | Q  And what kind of work did he do? |
| 16 | A  He did some plaintiffs work, some |
| 17 | defense work, focused on creditors, |
| 18 | bankruptcy.  But we were not limited to |
| 19 | one person.  I worked as a paralegal for |
| 20 | the firm. |
| 21 | Q  Okay. |
| 22 | A  In whatever capacity they needed |
| 23 | me.  But my focus was bankruptcy, |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

25

1  creditors, bankruptcy.
2      Q How long did you do that?
3      A Four years.
4      Q Okay.
5      A Almost five, close.
6      Q And then after that -- did you
7  leave voluntarily?
8      A I did.
9      Q Any particular reason why you left?
10     A John changed jobs and an
11 opportunity came up for me to work with
12 SunCom.
13     Q What is that?
14     A In outside sales.
15     Q What is SunCom?
16     A A wireless company.
17     Q And how long did you do that?
18     A Three and a half years. Three and
19 a half years.
20     Q And then what did you do after
21 that?
22     A Two and a half years. Two and a
23 half years.

26

1      Q Okay. Then what did you do after
2  that?
3      A I went to work for Aronov.
4      Q Did you -- and when you went to
5  work for Aronov, what was the job that you
6  went to work with them? What job was it?
7      A Leasing the Aronov portfolio.
8      Q Did you have to have your real
9  estate license in order to do that?
10     A Yes, sir.
11     Q When did you get your real estate
12 license?
13     A I believe it was September of 2003.
14     Q And I'm not wise to the real estate
15 ways. When you get your license, does it
16 -- do you have to get a separate license
17 for commercial as opposed to residential?
18     A No, sir.
19     Q So you just, you take the classes,
20 you get certified, and you can sell
21 either; is that right?
22     A That's correct. Wait, wait. That
23 is not correct. I don't know that you get

27

1  certified. That's not -- that's your
2  word.
3      Q That's my word. That's my word.
4  But I guess the point -- what I'm trying
5  to determine is when you get your real
6  estate license, is it a specialized
7  license for commercial?
8      A There is no differentiation.
9      Q Okay. And how often do you have to
10 renew that license?
11     A Every two years.
12     Q Have you renewed your license each
13 of those two years?
14     A Yes, sir.
15     Q And are you presently -- do you
16 presently have a license?
17     A Yes, sir.
18     Q And did you renew it in '06,
19 September of '06, and it's good through
20 September of '08?
21     A Yes, sir.
22     Q And the reason I know that is
23 because I'm looking at '06. But this one

28

1  is issued August the 16th of '06 and
2  expires September the 30th of '06. It's
3  not for two years. It's a State of
4  Alabama Real Estate Commission -- can you
5  tell me what this one is that would only
6  be for that limited amount of time? I'll
7  mark it as Plaintiff's 1 and show it to
8  you.
9  (Whereupon, Plaintiff's Exhibit 1 was
10 marked for identification and the same is
11 attached hereto.)
12     Q Do you know what that is? Well, it
13 says it's a Real Estate Commission --
14     A Yes. I believe that's when my
15 license changed from management to
16 brokerage.
17     Q Okay. And it actually says Aronov
18 Realty Brokerage, Inc., on there. So this
19 is your real estate license for you to be
20 a broker for Aronov Realty Brokerage; is
21 that right? Not a broker but a
22 salesperson?
23     A Yes, sir.

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

29

1   Q Okay. When you got your real
2 estate license, you went to work for
3 Aronov?
4   A Yes, sir.
5   Q Did you work for any other real
6 estate company before you came to work for
7 Aronov?
8   A No, sir.
9   Q And have you worked for Aronov --
10 is Aronov the only real estate company
11 that you have worked for?
12   MR. STEWART: Object to form.
13   A Yes, sir.
14   Q And so you have worked for them
15 since 2003?
16   A Yes, sir.
17   MR. STEWART: Object to form.
18   Q And when I say them so that he
19 won't object anymore, I'm talking about
20 any, all of the Aronov companies. You
21 have worked only for Aronov companies in
22 real estate; is that right?
23   A I've worked for Aronov Realty

30

1 Management, Inc., and then I work now for
2 Aronov Realty Brokerage, Inc.
3   Q Got you. And you went to Aronov
4 Brokerage August of '06?
5   A That's when my license changed.
6   Q Did your license change before you
7 went or after you went to the brokerage
8 company, or was it around the same time?
9   A I would say approximately that
10 time.
11   Q Okay. Now, when you were with the
12 management company, who was your immediate
13 boss?
14   A My broker and immediate supervisor
15 was Scott Harris -- is Scott Harris, was
16 Scott Harris.
17   Q Was Scott Harris. Okay. And tell
18 me what you did for the management group.
19 What were your duties?
20   A My responsibility was to market and
21 lease office portfolio.
22   Q Now, did --
23   A Specifically, Executive Park.

31

1   Q And was that owned by Aronov?
2   A I don't know.
3   Q But you were given a specific
4 portfolio to go out and try to lease? Let
5 me withdraw it, and let's do it this way:
6 I suspect that when you first get into
7 real estate and this was brand-new to you
8 that rather than have you completely on
9 your own out there finding your own stuff
10 to lease that they give you a building or
11 a complex that you were responsible for.
12 Is that what they did here to start you
13 off, they gave you a portfolio of
14 properties that it was your responsibility
15 to try and lease?
16   A It was not my responsibility alone.
17   Q Okay. But it was in a particular
18 area?
19   A They were properties that it was my
20 understanding were managed through the
21 realty management company.
22   Q Okay. Were they all office space?
23   A Yes.

32

1   Q So when you started, you started by
2 leasing office space?
3   A Yes.
4   Q Okay. How long did you exclusively
5 lease office space?
6   A Well, I don't know exactly, but
7 until I leased a space at East Park Plaza
8 very -- within probably a very short
9 period of time that it was sold, Aronov
10 sold -- they owned it and they sold it and
11 I leased a space there.
12   Q And was that -- was that a
13 commercial piece, or was that also office
14 space?
15   A It was -- it had office, and it had
16 -- it also had some retail that -- it had
17 a hair salon, which was really --
18 normally, you don't have hair salons in
19 office.
20   Q So are you telling me that that was
21 your first venture in the commercial?
22   A No.
23   Q No. Okay.

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

33

1  A I did sell a building that was in
2  Executive Park.
3  Q Okay.
4  A Rather than lease, they wanted to
5  buy it.
6  Q Well, let's do it this way rather
7  than me asking the specific question.
8  Tell me how you -- well, first, when you
9  went to work for Aronov, did they give you
10  any specific training for what you would
11  be doing?
12  A Yes. I had some tapes that I
13  listened to, some materials that had
14  videotapes all about office leasing. I've
15  given those to Mr. Stewart -- to Quinn.
16  Q Okay. And would that -- would you
17  have done that training shortly after
18  going to work for them?
19  A Shortly after? Yes.
20  Q And so after getting the training
21  for office leasing, how long would you say
22  you did that before you transitioned into
23  more commercial, shopping center, that

34

1  kind of leasing?
2  A The first transaction that I did
3  was a hair salon at East Park Plaza
4  outside of the normal office perimeters.
5  Q And when was that?
6  A Do you have -- I don't know the
7  exact date of the lease.
8  Q Just generally, do you know what
9  year?
10  A I think it was sometime in 2006, I
11  think, but I don't remember.
12  Q All right. After that time, after
13  you leased that hair salon, did there ever
14  come a point while you were with the
15  management group that you were leasing
16  more commercial type space like the hair
17  salon than you were office space?
18  A My primary focus was office space.
19  I don't know what percentage, but I would
20  say that there was a higher percentage in
21  office.
22  Q Now, as part of your training for
23  office space, did you get any training in

35

1  antidiscrimination policies in leasing
2  office space? Or put another way, did you
3  get any training on discrimination and how
4  to avoid it in leasing office space?
5  A Well, it was addressed in my real
6  estate course, of course.
7  Q Okay.
8  A And it was also addressed whenever
9  we would have continuing education.
10  Q Okay. How often did you have
11  continuing education?
12  A About once every two years. There
13  were also some employment -- there was
14  employment training specifically addressed
15  to discrimination.
16  Q Okay. Now, when you first went to
17  work for Aronov, did you go salaried and
18  commission to start work?
19  A Well, salary is your word. What my
20  word is it was called an earn in.
21  Q And what did you understand that to
22  mean?
23  A That meant that my leasing

36

1  commissions contributed to my earn in.
2  Q Okay.
3  A And I could not participate in any
4  kind of sales commissions until I had met
5  my earn in.
6  Q Got you.
7  A So it really wasn't a salary. It
8  was a -- it was commissions deferred over
9  a length of time.
10  Q It was like a draw; is that right?
11  A It was an earn in.
12  Q Okay. And how long did it take you
13  to get to the point where you had paid
14  that earn in and you could take part in
15  sales commissions?
16  A Each year, it varied.
17  Q Okay.
18  A The first year, of course, it was
19  -- I probably didn't participate in any
20  sales commission.
21  Q So it was a yearly thing?
22  A Correct, annualized.
23  Q Y'all would set it each year?

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

37

1    A It was annualized.
2    Q All right. And did your actual
3 paycheck come from Aronov Management,
4 Inc., Aronov Realty Management, Inc.?
5    A It did until --
6    Q Yeah. I'm talking about while you
7 were there.
8    A While I was working with Aronov
9 Realty Management, Inc., it came from
10 Aronov Realty Management, Inc.
11    Q Okay. Any specific training from
12 Aronov on discrimination?
13    MR. STEWART: Object to form.
14    Q You've told me that you got
15 training in your real estate classes, and
16 you've told me that you got continuing
17 education. Did Aronov do the continuing
18 education, or was it -- would you go to a
19 seminar given by somebody else?
20    MR. STEWART: Object to form.
21    A Aronov provided an opportunity for
22 their agents to attend continuing
23 education required in order to retain

38

1 their license.
2    Q I take it other than the hair
3 salon, you had done some other commercial
4 leasing before you came over to the
5 brokerage group; is that right? And when
6 I say commercial, I'm talking about other
7 than office.
8    A After I did the first lease with
9 the hair salon, the owner asked me to work
10 on a renewal for a Mary Kay group. They
11 are really not retail. They are -- they
12 only lease as an office, a place to hold
13 meetings, but they do not sell retail from
14 that location. It was more a place. So
15 yes, I did that after she -- after I did
16 -- which was in a former Aronov managed
17 property.
18    Q Okay. Do you remember doing any
19 other properties like that before going
20 over to the brokerage group?
21    A I must have. I must have done
22 some -- I'm not quite sure when I
23 transitioned to -- I'm not sure when the

39

1 very first lease that would be considered
2 shopping center, I'm not sure exactly when
3 that lease commenced.
4    Q Okay.
5    A But I believe it was probably
6 sometime in 2006. Sometime in 2006.
7    Q Don't know whether it was before or
8 after becoming brokerage?
9    A Yes, it was before I became a
10 broker, yes.
11    Q It was? Okay.
12    A I came with the brokerage.
13    Q Now, when you moved over to
14 brokerage, if I understand the earlier
15 testimony, you did not -- you did not keep
16 the office space portfolio that you had,
17 but that didn't mean if the opportunity
18 arose, you could not lease that office
19 space; is that right?
20    A No. I was still working on that
21 office space.
22    Q You were? Okay.
23    A I was still working --

40

1    Q So you still --
2    A But any of the independent brokers
3 could work and lease in that space.
4    Q Did you --
5    A But when an opportunity presented
6 itself, I would definitely lease any of
7 the properties in the management.
8    Q Did you spend as much time leasing
9 the office space as you had when you were
10 with the management group?
11    A My boss asked me the same thing,
12 and I don't know. I didn't keep track of
13 how much time I was spending where.
14    Q Did you receive performance
15 evaluations while you were with the
16 management group? Did they give
17 performance evaluations on how you were
18 doing?
19    A Not specifically. We would review
20 my goals.
21    Q Right. Okay.
22    A I had goals to reach.
23    Q How were you doing reaching your

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

41

1  goals in management?
2      MR. STEWART:  Object to form.
3      Q  Did you reach your goals each year?
4      A  Probably not.  I probably set them
5  so high that I -- almost impossible to
6  reach.
7      Q  Did you have any particular
8  problems while you were working in
9  management with any of your superiors?
10      A  No.
11      MR. STEWART:  Object to form.
12      Q  Did any of them ever criticize your
13  performance?
14      A  I welcomed any constructive
15  criticism.
16      Q  But as far as being told you were
17  underproducing or underperforming, did you
18  ever get any of that kind of criticism?
19      A  No.
20      Q  Tell me how it came about that you
21  moved from management over to brokerage.
22  How did that happen?  Was it your idea,
23  somebody else's idea, a team idea?  Just

42

1  how did it happen?
2      A  I had so many -- I was involved
3  with the chamber and I had many, many
4  contacts through my other sales position
5  and I was getting calls from people that
6  were very happy with how I had -- my
7  customer service in my other job and when
8  it came time for them to have an office
9  change or -- they called me and I was
10  getting more and more of that as my name
11  was established.
12      Q  Okay.  Was it mostly office stuff,
13  or was it both office and other things
14  such as shopping centers, commercial, that
15  kind of thing?
16      A  There was an occasional, such as
17  there was an occasional shopping center
18  type need.
19      Q  Okay.  Did you develop any kind of
20  a relationship with any particular
21  shopping center before going to the
22  brokerage company?
23      A  I don't know what you mean.

43

1      Q  Well, you said that you had done
2  one deal in a shopping center before you
3  moved over.
4      A  It really wasn't a shopping center.
5  You misunderstood.
6      Q  Well, now, I know about --
7      A  It was East Park Plaza that was
8  formally leased through Aronov Realty
9  Management, Inc., and it was sold, and
10  very quickly after that, I received a
11  prospect because I was used to leasing
12  that space and so that's why I knew of and
13  was leasing that space, that particular
14  strip center.
15      Q  Okay.  I take it that you were
16  aware that it was unlawful to discriminate
17  in leasing.  You could not refuse to lease
18  to someone because of their race?
19      A  Absolutely.
20      Q  And you knew that from the time you
21  became a real estate agent?
22      A  Yes.
23      Q  At any point in time at any of your

44

1  other jobs, had anybody ever accused you
2  of discrimination?
3      A  Never.
4      Q  At any of your other jobs before
5  getting into real estate, had you ever
6  been involved with a discrimination
7  complaint of any type; that is, a
8  witness --
9      A  Please tell me -- give me your
10  definition of discrimination.
11      Q  Sure.  Where someone where you
12  worked either accused you or accused
13  somebody else that you were a witness of
14  of discriminating against them because
15  they were black, because they were a
16  female, because they were too old.  That
17  kind of thing is what I'm talking about.
18      A  There was an occurrence against me
19  that could have been perceived as sexual
20  harassment.
21      Q  And when was that?
22      A  Sirote and Permutt.
23      Q  And was that someone -- someone

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**45**

1  accusing you of sexual harassment?
2      A  No, sir.
3      Q  Or you accusing someone else of
4  sexual harassment?  Tell me about that.
5      A  There was a partner in the
6  Birmingham office who was making innuendos
7  telephone and in person when --
8  occasionally.
9      Q  To you?
10      A  Yes, sir.
11      Q  Okay.  Did you make a complaint?
12      A  I did not make a complaint;
13  however, it became apparent to the firm
14  that he was doing it to -- I was not
15  special.  He was in general behaving that
16  way towards women in the law firm, and I
17  was asked if -- and so, of course, I said
18  yes.
19      Q  They did an investigation?
20      A  Yes, sir.
21      Q  I'm familiar with that, I think.
22  Since becoming a real estate agent, other
23  than this case, have you been involved in

**46**

1  any complaints of discrimination?
2      A  No, sir.
3      Q  When you get paid, do they cut
4  taxes, or are you self-employed and have
5  to do self-employment tax and all that
6  other stuff?
7      A  No.  They take my taxes.
8      Q  They take out --
9      A  Unless I ask them not to, and
10  there, on occasion, I've asked them not to
11  take taxes out.
12      Q  Okay.
13      A  Because I always get taxes back.
14      Q  Do you have a retirement plan with
15  Aronov?
16      A  I participate in a 401-K.
17      Q  And do they provide medical
18  insurance?
19      A  I pay.
20      Q  You pay a portion of it?
21      A  Yes, sir.
22      Q  Do you have any clients -- when you
23  made the transition over, did you have any

**47**

1  clients that you considered yours when you
2  came to the brokerage firm company?
3      A  A client, according to real estate
4  law, would be someone that you entered
5  into a written listing agreement.
6      Q  So the answer to that would be no?
7      A  Correct.
8      Q  Did you have any --
9      A  I did -- let me take that back.  I
10  believe that there was a written listing
11  agreement for East Park Plaza with Ms.
12  Forney after she asked me to go ahead and
13  lease the spaces over there once she
14  became an owner, so I did have one
15  initially.
16      Q  Okay.  And where was that property
17  located?
18      A  Atlanta Highway East Park Plaza.  I
19  just told you about it.
20      Q  I know, but I'm not familiar.  The
21  one -- that's the one you -- okay.
22      A  Yes, sir.
23      Q  Yeah.  I made that connection.  I

**48**

1  just wasn't sure where it was located.
2      A  Yes, sir.
3      Q  And how big a space is it?
4      A  It's eighteen thousand square feet.
5      Q  Room for how many tenants?
6      A  There are -- the majority of the
7  spaces are twelve hundred square feet.
8  There is one that was forty-eight hundred
9  square feet.  It's been demised down to
10  twenty-four hundred square feet.  So most
11  of the spaces, though, are twelve -- about
12  twelve hundred square feet.
13      Q  And did you tell me that there is a
14  written agreement for that space?
15      A  There was an expired written
16  agreement.
17      Q  When was that -- do you know when
18  that written agreement was entered into?
19      A  I don't.  I don't, and I -- I gave
20  all that information to my attorneys.
21      Q  Were you responsible for getting
22  that written agreement --
23      A  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

49

1  Q -- with Ms. Forney?
2  A Yes.
3  MR. STEWART: Let me just warn you,
4  let him -- make sure he's finished his
5  question before you answer. A couple of
6  times, y'all have been talking over each
7  other.
8  THE WITNESS: I'm sorry.
9  MR. STEWART: That's okay.
10  Q How did you develop this
11  relationship with Ms. Forney? How did it
12  start?
13  A I was -- that was part of my
14  responsibility because it was owned by
15  Aronov -- let me take that back. It was
16  part of my responsibility to lease it as
17  Aronov Realty Management, Inc., and it was
18  subsequently sold and I received a call
19  about that space and, of course, we didn't
20  -- we weren't managing it any longer, so I
21  called the person who worked with Ms.
22  Forney to -- represented Ms. Forney in the
23  sales transaction, Josh Hall, and said

50

1  that there was a prospect for leasing in
2  East Park Plaza. He said I really don't
3  want to handle the leasing. Would you
4  like to handle the leasing, and I'll have
5  Ms. Forney call you.
6  Q Did you develop the relationship
7  with Ms. Forney by telephone?
8  A I believe it was over the
9  telephone, and I also had to -- well, that
10  was it. And E-mail.
11  Q Because she lives in California, as
12  I understand it; is that right?
13  A She does.
14  Q Have you ever met her?
15  A Yes.
16  Q At what point in time did you meet
17  her?
18  A That's a good question. I believe
19  it was sometime in 2006, I think.
20  Q Now, once you started -- once you
21  were asked will you undertake the leasing,
22  I take it that you entered into a written
23  agreement with her for this particular

51

1  space or strip? Was it a shopping center?
2  A It's a mixed use strip center of
3  office -- mostly office. At that time, it
4  was mostly office.
5  Q Okay. But you did enter into a
6  written agreement with her?
7  A I believe so.
8  Q And did you actively rent space for
9  her in that place both while you were with
10  management and after you moved over to
11  brokerage?
12  A Yes.
13  Q Okay. And was that ongoing until
14  the written agreement expired?
15  A Yes.
16  Q Did it continue after the written
17  agreement expired?
18  A Yes.
19  Q Approximately how many spaces do
20  you believe that you have rented for her
21  in that place?
22  A I leased -- I worked with a hair
23  salon, I did a renewal, and then two

52

1  others, three, four.
2  Q Okay.
3  MR. STEWART: Is that total, or is
4  that in addition to the hair salon
5  renewal?
6  THE WITNESS: Five total, I
7  believe.
8  Q What -- and this may tax your
9  memory a bit, but what spaces did you
10  rent? What kind -- was it mostly still
11  office that you did in that place?
12  A Are you asking me what type of
13  profession the tenants engaged in?
14  Q Yeah. Yeah, I am.
15  MR. GUY: Let's make sure we're
16  clear on the record. Are you still
17  talking about East Park Plaza?
18  MR. QUINN: Right, we're still
19  talking about East Park Plaza, yes.
20  MR. GUY: You keep referring to it
21  as "that place."
22  MR. QUINN: That's because I can't
23  remember the name.

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

53

1    MR. GUY: That's okay. Write it
2  down, because I just didn't want to be
3  confused on that.
4    MR. QUINN: We're talking about
5  East Park Plaza.
6    A  Hair salon; did a renewal and an
7  expansion for Mary Kay, which was an
8  office use; small church; and a music
9  studio and a belly dancer.
10    Q  Okay. And -- all right. And then
11  that expired, the written agreement
12  expired?
13    A  I guess it did.
14    Q  And I think I've asked you, and you
15  don't remember when it expired, do you?
16    A  I don't.
17    Q  Was it sometime in '07?
18    A  I don't remember.
19    Q  Sometime last year?
20    A  I don't remember.
21    Q  Okay. What other properties of Ms.
22  Forney's have you had a written agreement
23  for?

54

1    A  None.
2    Q  What other properties have you been
3  able to help her lease other than this one
4  that we've just talked about?
5    A  Office Park Circle off of Vaughn
6  Road.
7    Q  Okay.
8    A  It's all office.
9    Q  And approximately how many leases
10  do you think you've done for her there?
11    A  Approximately, seven.
12    Q  All office? What type of tenants?
13    MR. STEWART: Object to form.
14    A  One is a physical therapist office,
15  another one is a consulting group, another
16  one is another physical therapy, another
17  is a medical equipment group, another one
18  is an insurance company, another one is a
19  mortgage group, and the other one, I'm not
20  exactly sure what he -- he's some type of
21  a consultant.
22    Q  Any others for her other than the
23  LeCroy Shopping Center and those two?

55

1    A  No, sir.
2    MR. QUINN: Y'all want to break and
3  get something to eat?
4    (Whereupon, a break was taken.)
5    Q  The tenants in these other two
6  properties for Ms. Forney -- the tenants
7  in the other two properties for Ms.
8  Forney, were any of them African-American?
9    A  Yes.
10    Q  Which one?
11    A  Okay. The church was
12  African-American.
13    Q  What was the name of that small
14  church?
15    A  Legacy.
16    Q  All right.
17    A  The music -- Thompsons Music, Piano
18  and Music.
19    MR. GUY: Did you say, I'm sorry,
20  Thompsons?
21    THE WITNESS: Thompsons.
22    A  The initial hair dressers was
23  African-American, and I'm not sure what

56

1  the compilation of races were with the
2  Mary Kay, but there were like ten women on
3  the lease. And then the belly dancer is
4  Brazilian or --
5    Q  I was going to ask you --
6    A  She's wonderful.
7    Q  Yeah. And just strictly out of
8  curiosity, does she teach? Is that what
9  she does?
10    A  She does.
11  (Whereupon, an off-the-record discussion
12  was held.)
13    Q  Was that it?
14    A  In that property. And then the
15  other --
16    MR. GUY: I'm sorry. When you say
17  "that property" --
18    THE WITNESS: That was at East Park
19  Plaza.
20    MR. GUY: I'm sorry. I just want
21  to make sure we're clear on the record.
22    THE WITNESS: It's okay. I should
23  have been clear.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

1  Q And then the Office Park Circle is
2  the other one?
3  A Well, there is Vaughn Office Park.
4  There are two separate buildings.
5  Q Uh-huh.
6  A In Vaughn Office Park Oliver two
7  were two twin African-American girls,
8  ladies.
9  Q What was that called?
10  A Oliver two.
11  Q Is that a hair dresser?
12  A No. They are consulting. They are
13  teachers, and they are writing curriculum
14  for health and whatever that course is in
15  high school. Okay. That one. She's --
16  they are African-American. And then
17  Benchmark Insurance is African-American.
18  The mortgage company, they vacated the
19  space, but they are African-American.
20  There is a Korean tenant. Now, Josh Hall
21  leased to them, but -- and then the other
22  -- what's his name? It's Sims. I really
23  don't know his nationality. He could be

58

1  African-American. I don't know.
2  Q All right.
3  A And then the other two, Tricounty
4  Medical I don't know because they are a
5  corporation, and then HealthSouth or
6  Select Medical, I don't know what their
7  compilation is because they are a
8  corporation.
9  Q Okay. Thank you. Now, let's --
10  and I think we established this before
11  lunch, but the only other affiliation you
12  had was LeCroy Shopping Center; is that
13  right?
14  A With Ms. Forney?
15  Q Yeah, with Ms. Forney.
16  A Yes, sir.
17  Q All right. Did you have a written
18  agreement for the Office Park Circle?
19  A No.
20  Q How does that work? I'm just
21  curious. Well, let me ask it this way:
22  Why isn't there a written agreement?
23  A Well, initially, I was leasing for

59

1  her at East Park and she was very happy
2  with my performance and she acquired
3  Office Park and asked me to work with
4  them, as well, and Josh Hall was also
5  leasing there, as well. Josh is an
6  appraiser, and he really couldn't give it
7  the attention, so I was working with her
8  on that. I would get an occasional call.
9  And then LeCroy.
10  Q So that's not unusual, then, for
11  there not to be a written agreement
12  between the owner?
13  A It probably is more unusual, but it
14  is called an open listing or an open --
15  it's open. She wanted to negotiate some
16  of her own renewals, and she communicated
17  with some of the tenants herself.
18  Q Okay. How did you get LeCroy?
19  A She asked me if I ever learned of
20  anyone that might work well in LeCroy
21  Shopping Village and --
22  Q And -- I'm sorry. I interrupted
23  you. Go ahead.

60

1  A That's it.
2  Q At the point in time that she
3  contacted you about LeCroy, were you
4  familiar with LeCroy?
5  A Yes.
6  Q And how were you familiar with it?
7  Why were --
8  A In what way?
9  Q How did you know about it? Had you
10  leased any other space in there, had you
11  been involved with any tenant there? How
12  did you know about LeCroy? Or did you
13  just know that it existed?
14  A I knew it existed. I live in
15  midtown. I shopped at Montgomery Mall all
16  the time. And I'm trying to remember if I
17  had ever -- I may have shopped over at
18  LeCroy.
19  Q How big a space is LeCroy?
20  A Thirty-eight thousand square feet.
21  Q How many tenants if it's full?
22  A Well, some spaces can be expanded
23  or divided. All the spaces are different

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

61

1 configurations. So I can give you an
2 approximate, if you'll give me a second.
3    Q Okay.
4    A And you want to know number, how
5 many?
6    Q Approximately, yeah.
7    A Okay. Sixteen or seventeen.
8    Q To your knowledge, have all of them
9 ever been rented at one time? Has the
10 place been full at any point in time that
11 you know of?
12    A I don't know. Ms. LeCroy leased --
13 I mean, owned it, so.
14    Q But I take it that it was
15 purchased? Or did she still own it when
16 you started leasing it?
17    A No.
18    Q No. It was purchased, right?
19    A Ms. Forney purchased it.
20    Q Right. But kept the same name?
21    A Yes.
22    Q Okay. How did you -- did Ms.
23 Forney just call you just like she had

62

1 with the other properties and said would
2 you please help me lease this space?
3    MR. STEWART: Object to the form.
4    Q Is that how it worked?
5    A I believe that she said if you
6 learn of anyone that might work well at
7 LeCroy, would you help me lease there,
8 something like that.
9    Q Was it a particular space in the
10 shopping center that she wanted your help
11 trying to lease?
12    A Yes. Any of the vacant spaces.
13    Q How many vacant spaces were there
14 at that time?
15    A I don't remember.
16    Q When you say work well, what do you
17 mean by that?
18    MR. STEWART: Object to the form.
19    A For example, I get numerous calls
20 for hair salons, numerous. Everybody
21 does. You can't fill a whole strip center
22 with hair salons. It would destroy
23 everyone's business.

63

1    Q Sure.
2    A So you try to get businesses that
3 synergize. You have cake designs. It has
4 to do with weddings and birthday parties.
5 It's nice if you have something that
6 complements that so that when the invitees
7 come that it can help synergize the whole.
8    Q I got you. I understand. And one
9 of the spaces that was available there was
10 a space that had been occupied by a lounge
11 called the Pure Country Lounge which was,
12 I believe, a cowboy, country type
13 establishment? Did you know that?
14    A I knew of Pure Country. I knew of
15 the business Pure Country.
16    Q Okay. Did you make -- did you
17 determine when she asked you to help her
18 lease that space that that was one of the
19 spaces that she wanted your help in
20 leasing?
21    MR. STEWART: Object to form.
22    A Not at that time.
23    Q At the time that this first

64

1 started, that space was not open?
2    A Correct.
3    Q Pure Country was still in
4 operation?
5    A Yes.
6    Q Okay. When do you believe that you
7 began leasing space there at LeCroy?
8    A I'm trying to think which my first
9 lease was there. I think my first lease
10 was to a -- they'd said a computer
11 company, but they needed storage and also
12 to run a business and it was an outreach
13 of my office leasing.
14    Q Okay.
15    A And the perimeters of what they
16 needed didn't fit your traditional office
17 and I called and said does this type use
18 interest you and she said yes and that, I
19 believe, was my first lease there. It was
20 more of an office lease.
21    Q And so that probably was while you
22 were still with the management company; is
23 that right?

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

1    A It probably was. I can't say for
2    sure unless you have something to refresh
3    my mind.
4    Q No, I don't. Okay. So you knew
5    Pure Country was in that shopping center?
6    A Yes, sir.
7    Q How soon after you started helping
8    her lease that property before Pure
9    Country closed down and that space became
10   available?
11   A I believe the last day of operation
12   was somewhere around the end of April
13   2007, but I don't know -- I don't want to
14   speculate and guess an exact date but
15   sometime late April.
16   Q And before attempting to lease that
17   space after it came open, how many other
18   leases do you believe you had done on
19   LeCroy? Just the one you told me about?
20   A Oh, before that one came available?
21   Q Yes. Before Pure Country became
22   available, how many other spaces had you
23   rented in that shopping center? You've

66

1    already told me about the one, the office
2    kind of thing.
3    A Uh-huh.
4    Q Did I understand, you did end up
5    leasing that?
6    A Sir?
7    Q You leased that?
8    A Leased what?
9    Q The office.
10   A Yes.
11   Q You completed that lease?
12   A Yes.
13   Q Okay. All right. And now I'm
14   asking you whether there were any others
15   before Pure Country?
16   A Yes.
17   Q Do you remember them?
18   A Yes.
19   Q What were they?
20   A The first space, nine hundred
21   square feet, it was leased for a dry
22   cleaners and a wireless provider, you
23   know, off the wall, you know, wireless

67

1    telephones and wireless service. I think
2    -- and they had some gift baskets there,
3    too. I leased a beauty salon and a little
4    jewelry -- a little jewelry place where
5    she sold some costume jewelry. I did a
6    renewal and an expansion for Fine Line
7    Engravers. Let's see. I leased just
8    briefly one of those internet computer
9    where I think they -- they couldn't
10   continue because of legislation. They
11   gambled or something about like some kind
12   of monopoly or, you know, they had little
13   -- like a computer cafe. And then a
14   refrigeration repair shop, a barbershop, a
15   place where they had -- a birthday party,
16   children's birthday parties that they
17   taught cooking to children. I can't think
18   what -- Chef and Me. I'm trying to think
19   time frame as much as I can remember. And
20   a personnel office for day workers.
21   Q Okay. Now, am I right that Pure
22   Country wasn't the only bar and lounge?
23   There was also -- Doodle Hoppers was also

68

1    in there; is that right?
2    A One of the tenants that occupied at
3    LeCroy is Doodle Hoppers.
4    Q What kind of an establishment is
5    that?
6    MR. STEWART: Object to form.
7    A When you say what kind --
8    Q I don't know at all. I mean, was
9    it -- did the name signify the kind of
10   drinks that it served or the kind of food
11   that it served? Was it just a bar? What
12   was it?
13   A Primarily, karaoke, and they were a
14   late-night establishment. They served
15   food, hamburgers and basic food late at
16   night.
17   Q And how much space did -- how big a
18   place was it?
19   A Twenty-eight hundred square feet.
20   Q Was it in there when you started
21   your relationship with Ms. Forney?
22   A Yes. It's been there a long time.
23   Q Long time. Okay. Most of the

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

69

1 tenants -- are most of the tenants in
2 there long-term?
3     A When you say most, there is a core
4 group of tenants that --
5     Q Core group? And about how many
6 make up that core group?
7     A Well, can you give me perimeters,
8 like how long they need to be to be
9 included in a core group?
10     Q Oh, I don't know. I was using your
11 term. Who would you have identified as
12 the, I guess, long-time established
13 tenants in that shopping center?
14     A There is a printing company, a cake
15 designs, there is a chiropractic company,
16 an insurance company, and I don't know if
17 Fine Line Engravers would be included. I
18 think they've been there a while. I don't
19 know exactly -- I can't remember how long
20 they've been there, but -- there was
21 another internet kind of -- a guy that
22 taught internet games, Dungeons and
23 Dragons and -- but he left.

70

1     Q Okay. Were there any -- other than
2 Doodle Hoppers and Pure Country, were
3 there any other tenants who operated at
4 night and into the late night?
5     A At night and into the late night.
6 I didn't lease to these folks, but there
7 was at one point a recording studio. I
8 don't know what their hours of operations
9 were. They might have been late-night.
10     Q Were they there during this period
11 of time when Pure Country came open?
12     A No.
13     Q Okay.
14     A I don't believe they were.
15     Q Were they before that or after
16 that?
17     A Before.
18     Q Okay. Do you remember whether that
19 space had been rented to somebody else at
20 this point this time?
21     A Which space, now?
22     Q The music --
23     A The recording studio space?

71

1     Q Yeah, the recording studio. That's
2 what I'm talking about.
3     A Subsequently, it was leased, and
4 it's been leased again.
5     Q And what kind of tenant is in
6 there?
7     A She calls it a shoe place, but
8 she's never been opened, so.
9     Q What about the one before that?
10     A Medical transcribing company.
11     Q So at the time when you were
12 leasing, as far as you know, Pure Country
13 and Doodle Hoppers were the only ones in
14 that shopping center that remained open
15 late into the evening?
16     A There was a tenant briefly that she
17 had her own clothing, and I understand
18 that sometimes she was open later at
19 night, but I don't know that from personal
20 experience.
21     Q Who was that? What was the name of
22 that place?
23     A I can't remember. It was an

72

1 unusual -- I can't remember.
2     Q And it was there at this same time?
3     A Yes.
4     Q Now, when -- and I'm sorry if I'm
5 repeating myself, but when -- Pure Country
6 was open for a period of time after you
7 started leasing that space, leasing the
8 shopping center?
9     A Yes, it was.
10     Q Did you know the owner of Pure
11 Country?
12     A No.
13     Q How did you learn that that space
14 was going to become available and that Ms.
15 Forney wanted you to help her lease it?
16     A It was either Sam McGharr, who
17 manages her properties for her, or Ms.
18 Forney herself.
19     Q How do you spell McGharr? Do you
20 know?
21     A M-c-G-h-a-r-r.
22     Q Now, this Sam McGharr, did he work
23 for her?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

73

1    A I really don't know what their
2   relationship was other than I know that he
3   collected rent and kept an accounting and,
4   also, if a space became available and
5   needed some -- any kind of work done such
6   as the air-conditioning, ceiling tiles
7   replaced, cleanup, I called him.
8    Q Did he have --
9    A I don't know whether he did it,
10  coordinated doing it, but he managed that
11  part of her properties.
12   Q Was he located here in Montgomery?
13   A He's Cake Designs. He's an
14  occupant at LeCroy.
15   Q Do you remember having a
16  conversation with him about leasing Pure
17  Country, that space?
18   A A specific conversation?
19   Q Any part of any conversation with
20  him about that particular space that you
21  can remember that you can tell me.
22      MR. STEWART: At what time?
23   Q From the time the space came open

74

1   through the events that are the result of
2   this lawsuit.
3    A We -- he discussed that Mr. Fannin
4   had not been paying, Pure Country had not
5   been paying, and that it was possible that
6   it might become available, but Mr. Fannin
7   wanted to work things out if possible.
8   And Ms. Forney is a very loyal person, and
9   she would probably -- you know, tried her
10  best to work with her tenants on -- if
11  they are having issues. I think he
12  changed his name, went back and -- trying
13  to build his business.
14   Q Did you have any other
15  conversations with Mr. -- how do you
16  pronounce it?
17   A Sam McGharr?
18   Q Did you have any other
19  conversations with McGharr following that
20  conversation in which you learned that
21  they had not been able to work it out and
22  that the space was available?
23   A I can't recall a specific

75

1   conversation, but we talked regularly
2   about all different issues with the
3   tenants.
4    Q How much time do you think elapsed
5   between the time he told you they were
6   trying to work it out and the space became
7   available to lease?
8    A Well, the space was not available
9   to lease until there was a lift of stay
10  granted from the bankruptcy court.
11   Q At what point in time did you learn
12  that that piece of property -- that that
13  particular piece of the shopping center
14  was part of a bankruptcy proceeding?
15   A I believe it was sometime in --
16  sometime in March or April.
17   Q Okay. Because you told me earlier
18  that in April of '07, that was when they
19  severed their ties with Pure Country.
20   A Well, you would have to check the
21  dates on the bankruptcy proceeding, but I
22  believe that he filed two different types
23  of bankruptcy. One is a reorganizational

76

1   bankruptcy where he could have reaffirmed
2   the debt or Chapter 7, which means the
3   debt is discharged.
4    Q Did you ever see any of the
5   paperwork on the bankruptcy?
6    A Yes.
7    Q Let me show you what I've got here.
8   Let me show you this document. Have you
9   seen this document before?
10  (Whereupon, Plaintiff's Exhibit 2 was
11  marked for identification and the same is
12  attached hereto.)
13   A No.
14   Q No. And the reason I'm showing it
15  to you, it appears to be a motion that was
16  filed by Don Little trying to get the
17  property -- the stay lifted from the
18  property so that -- I guess so that it
19  could be leased. Were you aware at any
20  point in time that Don Little was
21  attempting to get the stay lifted on the
22  property?
23   A Yes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

77

1    Q Okay. Do you know who Don Little
2  is?
3    A Yes.
4    Q Prior to this dealings with the
5  Forney piece of property, had you had any
6  -- did you know Don Little?
7    A Yes.
8    Q How long had you known Don Little?
9    A Many years.
10    Q How did you know him?
11    A I was introduced by a friend.
12    Q And did you know him both on a
13  friendly as well as a professional level?
14    A Yes.
15    Q Did you -- did y'all socialize
16  together?
17    A At one time.
18    Q So you knew him quite well. He was
19  a regular acquaintance of yours?
20    A Regular acquaintance.
21    Q Well, let's just put it he was a
22  friend of yours?
23    A Yes.

78

1    Q And he was still a friend of yours?
2    A Yes.
3    Q Okay. Prior to -- well, before we
4  move there, let me see if I've got this
5  all covered. Was there a point in time --
6  well, withdraw that and ask this: While
7  the stay was in effect as part of the
8  bankruptcy, were you still allowed to show
9  the property to prospective tenants?
10    A I did not have a key to the
11  property. I had to call and ask for Mr.
12  Little to either open the property or drop
13  me off the key, and I immediately returned
14  it back to him.
15    Q But just because it was part of the
16  bankruptcy, there was a stay on it as part
17  of the property, that didn't mean that you
18  couldn't show the property, correct?
19    A Correct.
20    Q And was it your understanding that
21  the reason for the stay was because the
22  person who owned the establishment that
23  was paying the rent on the property had

79

1  gone bankrupt?
2    A That's right.
3    Q Thus, no more payments were being
4  made on the place, and actually finding a
5  tenant would be a good thing for the
6  bankruptcy; i.e., at least you would have
7  somebody renting the space and paying for
8  the monthly payments?
9      MR. GUY: Object to the form.
10    Q Do you understand my question?
11    A Those are your words. My words are
12  that the landlord wants income from any of
13  her property.
14    Q Okay. We're saying the same thing.
15  In other words, just because it was under
16  the stay didn't mean that you didn't need
17  to be looking for a tenant to rent that
18  space?
19    A Well, actually, one of her tenants
20  had already been expressing that they
21  needed to expand.
22    Q I was going to ask you that next.
23  You jumped the gun on me here. Let's

80

1  establish that the stay, number one,
2  didn't keep you from being able to show
3  the property, right? It just became more
4  difficult because you had to get the key?
5    A The stay in and of itself did not
6  preclude me from showing the property.
7    Q And even though the gentleman who
8  owned the establishment was in bankruptcy,
9  Ms. Forney, the owner, still wanted to
10  rent that space and the sooner the better?
11      MR. STEWART: Object to the form.
12    Q Correct?
13    A Ms. Forney, of course, wanted
14  income on any of her property.
15    Q Okay. One of the possibilities was
16  that Doodle Hoppers would expand; is that
17  right?
18    A The number one possibility, the
19  desired possibility was that Doodle
20  Hoppers --
21    Q Okay. And when did you learn that?
22    A I learned that Doodle Hoppers
23  needed expansion either December or

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

81

1 November of 2006.
2    Q Were you looking for them another
3 place?
4    A There was the Trainmaster space
5 that was next to them, and discussions had
6 been made about expanding them the other
7 direction rather than the Pure Country
8 direction. And I never saw them, but I
9 was told that they priced out specific
10 ways to do that in order to meet City
11 code.
12    Q Did you know the owner of Doodle
13 Hoppers?
14    A I did not know the owner of Doodle
15 Hoppers. I met her once.
16    Q Who is "her"?
17    A Her name was Jeanie Hudson.
18    Q When were you first -- other than
19 Doodle Hoppers, when were you first
20 contacted by anybody else to look at that
21 piece of property where Pure Country was?
22    A I'm trying to put it in time frame.
23 There was a real estate agent with Junior

82

1 Towns, Wallace Litchfield, called and
2 wanted the key.
3    Q Do you remember when that was?
4    A I don't specifically remember when
5 that was. And then Grant Sullivan called
6 me.
7    Q Okay. Now, before we get to Grant,
8 did this gentleman who called to get the
9 key, do you know whether he actually got
10 the key and whether he showed the
11 property?
12    A No, never did.
13    Q Never did?
14    A No.
15    Q So it was just a call, can I get
16 the key, and then not following through?
17    A Well, he was primarily a
18 residential agent, and residential agents
19 handle transactions differently. They
20 have lock boxes, and they are not used to
21 this type of commercial property, and in
22 addition, there was open alcohol and
23 dangerous -- it could have been a

83

1 dangerous environment. There were no
2 lights. You could trip, you could fall.
3 There were -- it was not a safe place for
4 anyone to go unauthorized. When I say
5 unauthorized, unaccompanied or --
6    Q Who was he -- do you know who he
7 was going to show it to?
8    A I don't have any idea.
9    Q But he just kind of just decided
10 not to do it?
11    A Correct.
12    Q Okay. And so then the next call,
13 tell me about that.
14    A I believe the next call was Grant
15 Sullivan.
16    Q Okay. And Grant Sullivan called,
17 and tell me what he told you. Tell me
18 about that conversation.
19    A Grant said that he -- that someone,
20 a client, his client learned that Mr.
21 Fannin had closed Pure Country and Mr.
22 Fannin was going around telling people
23 that it was available and he asked if he

84

1 and his client could come and look at it,
2 tour the property.
3    Q And what did you say?
4    A I said I would have to get the key,
5 I'll have to be able to open it. I had no
6 way of accessing the space.
7    Q All right. Was that all that was
8 said at that time?
9    A He said that it was -- his client
10 was a retired baseball player, and he
11 wanted to open a sports bar.
12    Q That's what Grant Sullivan said to
13 you?
14    A I think so. I can't promise, but I
15 believe -- you know, some of it's
16 confusing, but I believe that's what he
17 said at that point.
18    Q Did he tell you who the pro
19 baseball player was?
20    A I don't think so. He might have.
21    Q Did you know who it was? When you
22 heard the name, was it someone you knew?
23    A I had never heard the name nor was

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1  I familiar with him, and I really like
2  baseball. I'm sorry. But I had never --
3  I never -- I never had heard of him ever.
4      Q   Okay. After the conversation, what
5  happened next? Did you get the key for
6  Grant?
7      A   Grant set a time to tour the space,
8  and I believe -- I can't remember how I
9  got the key.
10     Q   And so did you show the property?
11     A   Yes.
12     Q   And you showed the property to Mr.
13 Barr?
14     A   Yes.
15     Q   Prior to this, had you ever met Mr.
16 Barr before?
17     A   Not in person, that I can remember.
18     Q   Okay. Did you know who Mr. Barr
19 was? And I'm talking about at the time
20 you're getting ready to show him the
21 property --
22     A   No.
23     Q   -- do you know who he is or

86

1  anything about him at all?
2      A   No.
3      Q   Do you know how long -- I'm
4  switching gears a little. Do you know how
5  long Mr. Little had been representing Ms.
6  Forney?
7      A   No.
8      Q   I am assuming -- had you had any
9  other dealings with the lawyer Little,
10 with Don Little and Ms. Forney? In other
11 words --
12     A   Yes.
13     Q   So he had represented her in some
14 other stuff, too?
15     A   Collections.
16     Q   And that -- okay. Collections.
17 Okay. So he represented her, as far as
18 you knew, for collections, and he was
19 representing her in the bankruptcy?
20     A   I have no personal knowledge of his
21 representation arrangements.
22     Q   Okay.
23     A   I don't know that at all.

87

1      Q   I understand, but let me explore
2  that just a little bit. You've told me
3  that you knew him personally.
4      A   Yes.
5      Q   And you also knew him
6  professionally.
7      A   Yes.
8      Q   The professionally, was it through
9  your association with Ms. Forney that you
10 knew him professionally?
11     A   Not -- not --
12     Q   Not just that?
13     A   Correct.
14     Q   Okay. But you did know that he
15 represented Ms. Forney in some capacity?
16     A   I knew that he was working on
17 collections matters for tenants that had
18 not paid their rent pursuant to their
19 lease.
20     Q   And you knew that before you ever
21 knew that he was involved in this
22 particular piece of property, Pure
23 Country?

88

1      A   Yes.
2      Q   Did you have anything to do with
3  him getting Ms. Forney's business? Did
4  you introduce them?
5      A   I did introduce them.
6      Q   How did that come about?
7      A   There was a tenant -- I'm trying to
8  think now. There was a tenant that
9  defaulted and she works with Saxon Main on
10 her closings and Saxon did not want to
11 work on her collections and so she asked
12 if there was anyone that might work on
13 some collections and it was my
14 understanding he had done some collections
15 work.
16     Q   Okay.
17     A   And all I did was say he does some
18 collections work. She was in town, and
19 they -- that's all I did. Was, you know,
20 completely up to her whether or not she
21 wanted --
22     Q   And she being Ms. Forney?
23     A   Correct. Ms. Forney -- they met

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

89

1  privately.
2      Q  Okay.  At what point in time did
3  you put a real estate sign with your name
4  on it on the Pure Country space?
5      A  I don't believe there was one
6  there.
7      Q  You don't?  Are you sure?
8      A  I don't remember.
9      Q  When a space comes open there at
10 the LeCroy Shopping Center, would it be
11 normal procedure for you to put a sign on
12 the space with Aronov and your name so
13 that --
14     A  Sometimes.  Not always, but
15 sometimes if I -- and -- sometimes.  And
16 there is -- I don't know if Sam has any of
17 my signs or not.  I don't know.
18     Q  So sitting here today, you do not
19 remember whether a sign was up at Pure
20 Country or not with your name on it; is
21 that right?
22     A  I'm trying to remember.  I'm
23 trying --

90

1      Q  If you can't remember, that's fine.
2      A  I can't remember.  If it was there,
3  it was very briefly.  I don't remember
4  because I don't remember -- I don't
5  remember.
6      Q  Okay.  When you met with Mr. Barr,
7  did you give him a card?
8      A  I don't know if I did or not.
9      Q  I'm going to show you what was
10 marked as Plaintiff's Exhibit 1 to the
11 last deposition, Mr. Harris' deposition.
12 Do you recognize that card?
13     A  Yes.
14     Q  Is that your card?
15     A  It was my card when I worked with
16 Aronov Realty Management, Inc.
17     Q  Right.  Do you remember giving Mr.
18 Barr a card when y'all met?
19     A  It's possible, but I don't -- I try
20 don't specifically remember.  I try to
21 give most of my prospects a card.
22     Q  At this particular time, if you
23 gave him a card, would you have had a card

91

1  that had you as a management employee?
2      A  No.  If I gave him that card, it
3  was probably because it was in my car and
4  I hadn't cleaned out my car and it got
5  mixed up or something because I had my
6  brokerage cards at that point.  So I might
7  have just -- if I gave him that card, it
8  was probably because it was just one
9  sitting in my car, which I sometimes
10 keep --
11     Q  Did you have both --
12     A  Yes.
13     Q  -- cards for management and cards
14 for brokerage at this point in time?
15     A  I shouldn't have because I threw
16 all mine away that I remember.  You know,
17 but he could have gotten that from
18 somebody else.  I mean, I gave out my
19 cards every time I could get a chance, at
20 all kinds of ambassador meetings, at
21 chamber of commerce meetings, every
22 meeting I could get to, every person that
23 would take one.  One guy said to me one

92

1  day, he said you know that's -- you know,
2  you've already given me -- that's the
3  third time you've given me your card, so
4  you know, I am known to give out cards,
5  yes.
6      Q  Okay.
7      A  But --
8      Q  Do you have one of your brokerage
9  cards with you?
10     A  I do.
11     Q  Could I see one, please?
12     A  Sure.
13     Q  We're going to mark it, and we'll
14 get some copies made.
15     A  You don't have to make any copies.
16 I'll give you some more.  You want some
17 more?  How many do you need?  Will you
18 give them to your friends?
19     Q  Well, unfortunately, I live in
20 Birmingham.
21     A  That's okay.
22 (Whereupon, Plaintiff's Exhibit 3 was
23 marked for identification and the same is

23  (Pages 89 to 92)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

93

1  attached hereto.)
2      Q  So this is what your card would
3  look like.  Okay.  So it's basically the
4  same except it's got Aronov Realty
5  Brokerage instead of Aronov Realty
6  Management.  Okay.  Your boss at the
7  brokerage company was the same boss you
8  had at the management company; is that
9  right, this guy?
10     A  My supervisor?
11     Q  Yeah, your supervisor was Mr.
12 Harris?
13     A  Mr. Harris was my qualifying
14 broker.
15     Q  Okay.  And that was going to be my
16 next question.  He was the qualifying
17 broker for both companies?
18     A  I don't know that.
19     Q  You don't know that?
20     A  No.
21     Q  Okay.  But was he your qualifying
22 broker while you were with management?
23     A  I believe so.

94

1      Q  And he was your qualifying broker
2  when you were with brokerage?
3      A  I know that.  I don't know that he
4  was my qualifying broker in management,
5  though.
6      Q  Was he your supervisor at
7  management, when you were at management?
8      A  I reported to him.
9      Q  You reported to him.  Okay.
10     A  But I believe that when I became an
11 employee of Aronov Realty Management,
12 Inc., that my supervise -- my qualifying
13 broker was a man named Jeff Weil.
14     Q  Do you know whether Mr. Harris was
15 a broker for the management company?
16     A  There are titles -- there is a
17 qualifying broker and then there are
18 associate brokers.  I'm an associate
19 broker.  Some of the other -- some of my
20 other work associates are also brokers.
21 Some are not.
22     Q  But what about Mr. Harris?  What
23 was he at management?

95

1      A  At that point, to ask what his
2  position was, I really don't know.  I
3  don't know if he was the associate broker
4  or qualifying broker, but I believe that
5  Jeff Weil, it was my understanding -- but
6  I might be wrong.
7      Q  Okay.
8      A  I could very well be wrong.  But I
9  reported to Scott Harris.
10     Q  Right.  And when you moved, you
11 still reported to Scott Harris?
12     A  That's correct.
13     Q  When you got over in the brokerage
14 company?
15     A  When I changed responsibilities,
16 Mr. Harris -- I still reported to the
17 senior vice president of the commercial
18 division.
19     Q  Was he the senior vice president
20 for the commercial division of both the
21 brokerage company and the management
22 company?
23     A  I don't know.

96

1      Q  Okay.
2      MR. STEWART:  If you're changing
3  lines of questions, can we take a
4  five-minute break?
5      MR. QUINN:  Sure.
6      (Whereupon, a break was taken.)
7      Q  Did you ever see the lease that Ms.
8  Forney had with Tony Fannin and William
9  Hastings for the space where Pure Country
10 was?
11     A  I saw a part of it.  There were
12 some parts missing.  What I saw had -- it
13 was incomplete.
14     Q  Okay.  Let's get back where we
15 were.  When you met Mr. Barr to show him
16 the property, I think you've testified
17 that the only thing you knew at that point
18 in time was that he wanted to open a
19 sports bar with a former baseball player,
20 and you were told that by Grant?
21     A  No.
22     Q  No.  What was your understanding?
23     A  My understanding was that this

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

97

1 former baseball player wanted to tour the
2 space because he was interested in opening
3 a sports bar.
4     Q  Okay.
5     A  And I told Grant that there was
6 already a tenant in the space -- I mean,
7 in the center that needed expansion space
8 and that they had already been approached
9 and were working on actually converting
10 their establishment to the Pure Country
11 space, but I would accommodate Grant.
12 He's someone that -- as a courtesy, that I
13 would meet him and his client to tour the
14 space.
15     Q  Okay.
16     A  You don't know Grant, but Grant is
17 pretty pushy, and says we just want to see
18 the space, we just have -- you know, we
19 just want to see the space and push and
20 push and push and okay, Grant, we can go
21 see the space.
22     Q  All right.  So when Mr. Barr shows
23 up, you're assuming that this is -- does

98

1 Mr. Barr tell you who he is?
2     A  I believe he said his name, and I
3 wondered where Grant was.
4     Q  Well, tell me what you remember
5 about y'all's meeting.  Tell me what was
6 said.  During the time that you were
7 showing him the space, tell me everything
8 that you remember at that point in time
9 that the two of you said to each other.
10     A  He walked up, we shook hands, he
11 introduced himself, and we started
12 chatting about just the weather and
13 typical hi, how are you kind of stuff and
14 he asked me about the Aronov development
15 down at the beach called Aqua and then
16 started talking about that he owned some
17 -- a condominium or had an option on a
18 condominium and how the construction was
19 very poor, how difficult it was to get a
20 good contractor, and he went into detail
21 about the furniture, the cabinets and that
22 he probably was going to have to sue them
23 in order for them to correct the problems

99

1 at this condominium at the beach.  And
2 then we started talking about the parking
3 lot.  We were looking at the parking lot,
4 and I said, you know, this is a very nice
5 center and everyone works well together or
6 did work well together and that if they
7 were -- if he was considering leasing, you
8 know, that I wanted to make sure up front
9 that our main concern was for the health
10 and safety of the invitees to the
11 establishment and that -- and, also, the
12 health and safety of the other tenants in
13 the center, and I said we don't -- for
14 example, we would like to avoid any kind
15 of problems through security measures like
16 there have been over at Celebrations and
17 with police involvement with knifing,
18 stabbings, shootings, drug trans --
19 supposed drug problems, altercations,
20 continual bad publicity in the newspapers,
21 on the radio.
22     Q  Now, you said all this to him?
23     A  I probably said some of it.

100

1     Q  Well, I'm asking you to tell me
2 what you said, not --
3     A  Okay.  Well, I said something to
4 that effect, and he said stop, wait a
5 minute, this -- you know, I was the
6 manager of Celebrations, and he said that
7 all that problem was caused by a roving
8 gang of black troublemakers.  And it
9 struck me right then and there that that's
10 the second time that I've heard him say
11 that.
12     Q  When was the first time you heard
13 him say that?
14     A  Well, when I was involved in
15 leasing a Dave and Busters type
16 establishment at Atlanta Crossing, he
17 called me and wanted me to introduce him
18 to the tenant who was going to lease over
19 there at Atlanta Crossing, Fred Beasley,
20 who is -- was at the time a pro football
21 player, and he said put in a good word for
22 me and I said, you know, who are you and
23 he said Celebrations and I said oh, my

25 (Pages 97 to 100)

# FREEDOM COURT REPORTING

101

1  goodness, you've had a lot of problems
2  over there and then that same phrase came,
3  well, that's all -- it's all caused by a
4  roving gang of black troublemakers and
5  underaged people who sit in the parking
6  lot and can't get in.  And he went into
7  the same explanation then, and it just, my
8  head clicked at that point who he was.
9  And I said -- so then he said that -- then
10  he went into his explanation about at that
11  time that it was because the police didn't
12  do their job and that -- then he said that
13  the owners of the strip center didn't do
14  their job.  They were supposed to have
15  security.  And then at that point, he
16  never one -- well --
17      Q  He said all of this to you?
18      A  Yes, he did.
19      Q  I'm asking you to tell me exactly
20  what you remember being said at this
21  meeting with Mr. Barr.
22      A  Yeah.
23      Q  Okay.

102

1      A  Yes, sir, he did.
2      Q  Okay.  Well, go on.
3      A  He did say that.
4      Q  Okay.
5      A  Because I was hoping -- I was
6  hoping that I could hear something that
7  would say I, too, am very interested in
8  the health and safety of my invitees; I,
9  too, am very interested in the health and
10  safety of any of the people that are going
11  to be my neighbors.  I kept hoping and
12  waiting to hear it.
13      Q  Well, tell me what you did hear.
14      A  I told you.
15      Q  Is that all?
16      A  It was constantly -- every question
17  I asked or everything I said, it was it
18  wasn't his fault what happened at
19  Celebrations, he had no control at
20  Celebrations.  It was just one blame on
21  these roving gang of black troublemakers
22  and that -- and that these underaged
23  people that hung out in the parking lot

103

1  and that the police didn't do their job,
2  that he had gotten bad publicity and,
3  finally, that he told me that he chose to
4  close down Celebrations.
5      Q  Okay.
6      A  And he said that he was now working
7  with this baseball player to help find a
8  place because he had heard about Fred
9  Beasley's place for a sports bar.  I said
10  well, you know, we would love to have a
11  sports bar here.
12      Q  Okay.
13      A  And so we went in, and we -- he
14  said wasn't this a Brannigans or
15  Bronnigans, and I said I don't know, but I
16  think it used to be.  And he said well,
17  all that up there has to come out and he
18  started telling me all the things that
19  would have to change and he said now, that
20  other -- that other tenant right down
21  there, we'd need to move that person out
22  and he said and, of course, the landlord
23  would spend about three hundred thousand

104

1  dollars for us to do our improvements,
2  right?  And at that time, I said no.  I
3  said the landlord probably will not.  I
4  said it's not usually will she invest any
5  kind of money for improvements.  It's if
6  you do choose to lease it, it would be
7  as-is.  I said occasionally, the landlord
8  may offer some beneficial rent, but it
9  would depend upon the terms of the lease,
10  it would depend upon many, you know,
11  factors, on what your offer would be.
12      And then we walked around, and he
13  -- I believe he took some photographs and
14  -- and then he called, and he -- I said
15  when is your associate or your client
16  coming, and he said well, he was supposed
17  to be here, and he called and he said that
18  Mr. Long had just gotten out of the shower
19  and that -- I said well, I'll wait.  I'll
20  wait.  Can he come?  And so we walked
21  around some more, walked around some more.
22  He called him back.  And finally, he said
23  -- I think it was by that time almost

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

105

1  10:30, and our appointment was at 9:00
2  o'clock, and he said I guess he's not
3  going to come.
4      Q  Was that it?
5      A  And we walked out and he said he
6  was going to meet him to eat at Chappies
7  or somewhere and -- I'm trying to think if
8  there was anything else.  He may -- I
9  believe there was some discussion about
10  the improvements, that there was no vent
11  hood, so if they wanted to serve food,
12  there would have to be, you know, that.
13  There was no gas to the building, there
14  were -- you know, different details that
15  you talk about when you are touring a
16  space.
17      Q  Okay.  Have you told me everything
18  you think that you can remember that was
19  said?
20      A  There may have been other things
21  said.  Right this minute, I've told you
22  what I can remember right this minute.
23      Q  Uh-huh.

106

1      A  But there are days when I can't
2  even remember my children's names, so I
3  will try my best.  That's to my best of my
4  recollection how the conversation
5  progressed.
6      Q  Okay.  Is LeCroy in a predominantly
7  white area?
8      A  I don't know the demographics.
9      Q  The bar that had been there, do you
10  know how long this particular country bar
11  had been there?
12      A  I would be guessing.  Somewhere
13  around eight to ten years maybe.  Maybe,
14  maybe not.  I'm guessing.
15      MR. STEWART:  Don't guess.
16      THE WITNESS:  I'm sorry.
17      Q  Do you know that its tenants were
18  predominantly white?
19      MR. STEWART:  Object to form.
20      A  I never have ever met Tony Fannin.
21  I've never -- no.
22      MR. STEWART:  The question was --
23      A  No, I do not know the compilation

107

1  of their invitees.
2      Q  Was this the only meeting that you
3  had with Mr. Barr in person?
4      A  Yes, sir.
5      Q  After that meeting with Mr. Barr,
6  did you have any other conversations with
7  Grant Sullivan about either Mr. Barr or
8  the space?
9      A  Yes.
10      Q  Tell me about those.
11      A  Mr. Sullivan called and wanted to
12  know if Ms. Forney would sell LeCroy
13  Shopping Village, and my response was that
14  it was not listed for sale; however, he
15  was welcome to make an offer.  And I said
16  I think a couple years ago or a year ago,
17  Josh Hall had it listed for one point nine
18  million.  And then we discussed the
19  tenants that were there and the income and
20  he did some calculation.  Okay.  I don't
21  know that he did, but he asked me with the
22  reason for wanting to know about the net
23  operating income.  That's what he told me.

108

1      Q  Did you furnish him with any rent
2  roles or anything like that so that he
3  could determine the income from the
4  shopping center?
5      A  I believe I did.
6      Q  And subsequent to that, you
7  received an offer on the property, didn't
8  you?
9      A  Yes, sir.  May I -- I believe there
10  is something else I remember about that
11  first conversation with Mr. Barr.  I'm
12  having trouble sometimes time-wise when we
13  had it, but I do remember that he did
14  mention some other properties that he had
15  looked at.
16      Q  Okay.
17      A  But -- I think he did, but that
18  might have been in another conversation,
19  but it's possible that he told me that he
20  had looked.  I think --
21      Q  Do you remember the property he
22  said that he might have looked at?
23      A  I believe he had said he was

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

109

1  looking at -- there was a property down
2  the street, a stand-alone building next to
3  the Pizza Hut.  It was the former Chili's
4  I think.
5      Q  How about Friday's?
6      A  Friday's.  That was it.  Friday's.
7      Q  So he did mention the fact that he
8  had looked at the former Friday's
9  building?
10     A  I believe he did.
11     Q  And --
12     A  And the Macaroni Grill I believe he
13 did.
14     Q  Now, he also -- you agree that he
15 told you who Terrence Long was, the ex
16 baseball player?
17     A  I knew from he and Grant that the
18 -- that it was an ex-baseball player.
19     Q  Okay.  Now, how familiar were you
20 with the kind of clientele that
21 Celebrations had?
22        MR. STEWART:  Object to form.
23     A  I was not.

110

1      Q  Had you ever been to Celebrations?
2      A  Once.
3      Q  When you went, did you notice that
4  it was a predominantly black bar?
5         MR. STEWART:  Object to form.
6      Q  Well, I might need to ask you when
7  you went?
8      A  Yes, you do.
9      Q  When did you go?
10     A  I went the summer -- remember I
11 said I got divorced --
12     Q  Yeah.
13     A  -- in March of 1994, and I believe
14 that it was that summer because I had
15 never been to a bar or anything before
16 being a minister's wife.  I was curious,
17 and I went with one of my little legal
18 assistant friends.  She wanted to go.  And
19 we ran into Grant.  And that was, I
20 believe, in 1994.  I believe it was right
21 then.
22     Q  And at that point in time, was it a
23 country western?

111

1      A  I have no idea.  I don't know -- I
2  just, I see a picture of a room and us
3  standing and talking and music and -- but
4  I can't remember if there was a ball, I
5  can't -- but that's -- I really didn't
6  remember the clientele.
7      Q  1994, there probably was a ball,
8  and it was probably going around with
9  lights and all that good stuff.  Okay.
10     A  Uh-huh.
11     Q  But he did talk -- he did tell you
12 at that time that despite the fact that he
13 had owned Celebrations, the problems with
14 Celebrations and he had shut down
15 Celebrations that this was going to be a
16 sports bar?  He told you that, didn't he?
17     A  I believe he said a sports bar,
18 yes.
19     Q  Okay.  Did you bring up
20 Celebrations first and then he told you he
21 was the owner?
22     A  I probably did, yes.
23     Q  And when you brought it up, you

112

1  brought it up to talk about the problems?
2      A  Absolutely.  Health and safety of
3  their invitees and all the terrible,
4  terrible publicity.
5      Q  Did you ever make reference to the
6  fact that it was a black club?
7      A  Never.
8      Q  Did you ever say that --
9      A  He did.
10     Q  Okay.  You've told me that.
11     A  Black troublemakers.  That was his
12 words, not mine.
13     Q  Who were underage, couldn't get in
14 the bar --
15     A  No, no.
16     Q  -- and would stay out in the
17 parking lot?
18     A  A roving gang of black
19 troublemakers.  He did not say the age of
20 the gang, but he said that in addition,
21 there were underaged people who hung out
22 in the parking lot that he could not --
23     Q  He had no control over?

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

113

1  A  Correct.  He could not assure his
2  invitees' safety.
3  Q  Well, now, what gave you the
4  impression that that same group of rove
5  blacks would frequent his place if he
6  rented this space at LeCroy?
7  A  Nothing.  Nothing, sir.
8  Q  Nothing.  Okay.
9  A  No.  My concern was that he would
10  take responsibility for the security of
11  his invitees.
12  Q  But didn't he tell you that the
13  reason for the lack of security was he
14  could get no police help or City help?
15  Didn't he tell you that during that
16  meeting?  Didn't you tell me he blamed it
17  on the police not patrolling it?
18  A  He blamed it on everybody except
19  himself.
20  Q  What could he as the tenant of the
21  property do about the parking lot that is,
22  I believe, a public parking lot and the
23  problems that are existing in that parking

115

1  Q  What was Doodle Hoppers selling?
2  A  That's what I mean.  Doodle Hoppers
3  and -- and whatever tenant -- you know,
4  historically, the only two would have been
5  Doodle Hoppers who had adult beverages and
6  Pure Country who had adult beverages.
7  Q  Okay.  Did you ever -- during any
8  of the conversation, did you ever admit to
9  Mr. Barr that you may have -- you may have
10  gotten your opinions about Celebrations
11  from the press and that maybe --
12  A  In polite conversation, I might
13  have said such a thing, but it wasn't just
14  the press.
15  Q  Okay.  You knew that Celebrations
16  was a hip-hop bar, did you not?
17  A  I did not.
18  Q  Did you know that it was frequented
19  by mostly African-Americans?
20  A  I did not.
21  Q  You didn't know that?
22  A  No, sir.
23  Q  How did you know what you knew

114

1  lot?
2  A  No, sir.
3  MR. STEWART:  Object to form.
4  MR. GUY:  Object to the form.
5  A  No, sir.  I would say that that is
6  a private parking lot.  It is not a public
7  parking lot.
8  Q  But it's not --
9  A  It's on private property.
10  Q  But it's not just his parking lot,
11  is it?  He's one of the tenants of that
12  parking lot, is he not, one of many
13  tenants whose clients use that parking
14  lot?
15  A  He would be a tenant whose invitees
16  imbibed in adult beverages.  The other
17  invitees other than Doodle Hoppers would
18  not be selling adult beverages.
19  Q  I'm sorry.  I didn't understand.
20  What?
21  A  None of the other tenants would
22  have people come in and sell adult
23  beverages to them.

116

1  about Celebrations that you mentioned to
2  him that day?  How did you know about it?
3  A  There were -- it was in the -- on
4  the news.
5  Q  Okay.  How many times do you think
6  you saw something about it on the news?
7  A  Many times.
8  Q  A whole bunch of times?
9  A  In the newspaper.
10  Q  Okay.  How many times do you think
11  you saw something about it in the
12  newspaper?
13  A  Many times.
14  Q  Any other places?  Did you ever
15  talk to any people about it?
16  A  It was discussed at chamber of
17  commerce gatherings.  I don't know
18  specifically with who.
19  Q  All right.
20  A  Just in Montgomery, it was
21  constantly, you know, a frightening place,
22  a very frightening -- it would be a
23  frightening place.

29  (Pages 113 to 116)

# FREEDOM COURT REPORTING

117

1  Q Okay. Did Aronov do any leasing in
2  the place where Celebrations was?
3  A No.
4  Q And despite having heard all of
5  that and read all of that, seen all of
6  that, you didn't know it was a black bar,
7  a black hip-hop bar?
8  MR. STEWART: Object to form.
9  A Sir, I'd never been there since
10 1994.
11 Q I know. That wasn't my question,
12 though. Seeing all that you saw on TV and
13 all that you saw in the newspapers and all
14 that you heard at the chamber of commerce
15 meetings and everywhere else, are you
16 telling me that despite hearing all of
17 that, you did not know and it was never
18 mentioned that it was a black hip-hop bar
19 and that the problems were with blacks?
20 MR. STEWART: Object to form.
21 A No.
22 Q Okay. We got off -- I was about to
23 show you this lease when we got into that.

118

1  Can you remember anything else that y'all
2  may have discussed in that first meeting
3  that you haven't told me?
4  A Security. That's another -- let's
5  see. I believe we did discuss the rent.
6  I believe we had a cursory discussion of
7  the rent.
8  Q Did you quote him a price?
9  A I believe I did.
10 Q Do you remember what it was?
11 A I believe it was forty-five hundred
12 a month.
13 Q How did that compare to what the
14 other tenant was paying? If you don't
15 know, I guess we can look. The landlord
16 creditor motion that I showed you earlier,
17 it shows that the rent was two thousand
18 eight hundred -- it was twenty-eight
19 hundred dollars. Do you remember that as
20 being how much Tony Fannin and his group
21 were paying for it?
22 A I did not have any knowledge of
23 what actually Tony Fannin was paying or

119

1  did pay to that point because there had
2  been some discussions with the landlord
3  and Mr. McGharr and Mr. Fannin when they
4  were trying to work things out.
5  Q So -- okay.
6  A But I didn't price it. Ms. Forney
7  priced what she wanted out of that
8  property. That was what she wanted me to
9  quote.
10 Q So the -- what did you say it was?
11 Forty-eight hundred?
12 A Forty-five hundred.
13 Q Forty-five hundred?
14 A I think that's what I quoted.
15 Q So the forty-five hundred came from
16 Ms. Forney and not from you?
17 A That's correct.
18 Q And when did she tell you that
19 that's how much she wanted to quote?
20 A I think in, you know, one of our
21 initial discussions.
22 Q Okay. You knew it was in
23 bankruptcy, right, but you didn't know

120

1  what the rent was?
2  A I didn't -- I had nothing to do
3  with rent collections.
4  Q Okay. Well, let me ask you this:
5  Have you rented the space since it was
6  shown to Mr. Barr?
7  A Yes.
8  Q And how much did you charge?
9  A It was an escalating lease.
10 Q So what did it begin at?
11 A It began at -- because Doodle
12 Hoppers chose to keep their present
13 location while they were renovating the
14 new location, it was a blended rate
15 between the two, and then they agreed to
16 make all of the additional improvements on
17 the space.
18 Q Who is "they"?
19 A Doodle Hoppers, the tenant. And
20 once they got -- did some estimates, there
21 was a tremendous amount of electrical that
22 needed repair, so Ms. Forney decided on
23 four thousand a month.

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

121

1  Q All right. Let's go back. You did
2  quote them an amount, it was forty-five
3  hundred, that was set by Ms. Forney?
4  A Yes.
5  Q Okay.
6  A But there is always room for
7  negotiation if someone wants to make an
8  offer. I think that's right. I believe
9  that's right, but you know, I would have
10 to -- nine dollars a square foot is what
11 she wanted to charge, which is very much
12 in --
13  Q Okay. Did you get this purchase
14 and sales agreement from Gordon Sullivan
15 after y'all's conversation about the
16 property for sale?
17  MR. GUY: You mean Grant Sullivan.
18  Q Grant Sullivan?
19  A I received it from Grant Sullivan.
20 He faxed it over, I believe.
21  Q And you recognize that as being the
22 offer?
23  MR. GUY: I'm sorry. Did you mark

122

1  that, Mike?
2  MR. QUINN: Yeah. It's number 4.
3  (Whereupon, Plaintiff's Exhibit 4 was
4  marked for identification and the same is
5  attached hereto.)
6  A Yes, I believe this is what I
7  received.
8  Q Did you respond to that or make a
9  counteroffer?
10  A Ms. Forney was E-mailed. I scanned
11 it, and I also faxed it to her, and she
12 said that she was not going to make a
13 counteroffer, that it was so far below
14 what she needed to get out of the center
15 that she chose not to.
16  Q All right. Did you communicate
17 that to anybody?
18  A To Grant?
19  Q To Grant?
20  A I did.
21  Q How did you communicate that to
22 Grant? Did you call him?
23  A I called him.

123

1  Q Okay. So you called him, and you
2  told him that that was so low that she was
3  not going to respond?
4  A No.
5  Q What did you tell him?
6  A I said that she has chosen not to
7  counteroffer.
8  Q Did you tell him anything else?
9  A And that she was not going to
10 accept the offer.
11  Q Did he respond in any way to that?
12  A Yes, he did.
13  Q Tell me what he said.
14  A He started saying that it wasn't
15 worth that, that there was crime in the
16 area, that it was a terrible place, that
17 she would be lucky to get it, that if she
18 -- when she was ready to change her mind
19 to let him know, that -- and I said, well,
20 Grant, you and I have a difference of
21 opinion. I love midtown. I love this
22 part of the town. I don't feel there is
23 -- that I'm in danger and that it's been

124

1  very safe over here at LeCroy. We've
2  never had any problems or very -- I take
3  that back. I said we have very few
4  instances or occurrences and I'm sorry
5  that your client feels that it's such a --
6  that my -- you know, that Ms. Forney
7  should just give it away. I don't --
8  she's made this decision and --
9  Q Were there any other discussions
10 about buying or selling the property after
11 this with anybody?
12  A Mr. Barr.
13  Q Tell me about that.
14  A He called me up.
15  Q When did he call you? After --
16  A After this.
17  Q After you had talked to Grant?
18  A Yes.
19  Q Tell me about that conversation.
20  A Well, he started apologizing for
21 Grant and Grant's comments. I guess Grant
22 had talked to him about what he had said
23 to me and that he had bullied -- tried to

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

125

1 bully me, and he -- Mr. Barr tried to be
2 very charming, and he said that they just
3 want to find a place, and so I said, well,
4 I would be glad to help you find a place
5 somewhere, you know, somewhere else that
6 you could purchase or buy. And by the
7 way, I suggested the Copeland's and then
8 -- and I think there was another building
9 on there. And then he wanted me to -- and
10 I don't know if this was this conversation
11 or a subsequent conversation, but he asked
12 me about a listing that one of our other
13 agents had at Capitol Plaza, and I
14 followed up on that for him.
15     Q Did he ever ask to go back into the
16 property to see it again?
17     A He did. I believe he did.
18     Q When did he do that? Was that the
19 conversation after you'd talked to Grant
20 or the subsequent conversation?
21     A After I had talked to Grant
22 sometime.
23     Q And what did you tell him about

127

1 didn't even show up the first time when he
2 made an appointment and didn't show up.
3     Q Okay.
4     A So I really felt like somebody that
5 was truly interested would have shown up.
6 Don't you?
7     Q Did you tell him that you could get
8 the key?
9     A Yes. I said that an attorney had
10 it but that, you know, I -- I couldn't
11 just drop everything and -- and go right
12 now.
13     Q Okay. Did you mention to him
14 anything about the bankruptcy at that
15 point in time?
16     A Of course, I did. I'm sure he knew
17 about the bankruptcy.
18     Q Did you tell him about the
19 bankruptcy? You didn't mention that you
20 mentioned that the first meeting or your
21 personal meeting with him.
22     A You're right. I forgot to tell
23 you.

126

1 going to see the property again?
2     A I said -- told him I do not have
3 the key, I did not have the key. He can
4 be very demanding and pushy.
5     Q Who?
6     A Mr. Barr.
7     Q You had only met him once. How do
8 you come to that conclusion?
9     A Well, on the phone, he wanted to
10 see it right then and there. He wanted to
11 go back and see it right then and there,
12 and I can't just drop -- I couldn't just
13 drop everything at that moment because he
14 was pushing to -- you know, I was
15 available, I waited an hour and a half for
16 Mr. Long. I waited and waited and waited
17 and took time away from other things and
18 waited and waited and then he calls me and
19 wants me again to drop everything. I
20 don't know that he was going to show up.
21 He didn't show up this first time.
22     Q Well, did you --
23     A He had already seen it. Mr. Long

128

1     Q I gave you every --
2     A I know you did.
3         MR. STEWART: Let him finish the
4 question, please.
5         THE WITNESS: Yes.
6     Q And you did not tell me that that
7 was mentioned in the first meeting with
8 him, and I gave you every opportunity.
9 Are you now saying you now remember that
10 in the first meeting, you told him that it
11 was under a bankruptcy stay or not?
12     A Yes, I did.
13         MR. STEWART: Object to form.
14     A But he already knew. I guess
15 that's why I didn't --
16     Q How do you know that he knew? Did
17 he say --
18         MR. STEWART: Y'all need to quit
19 cutting -- she wasn't even finished with
20 her answer. Y'all are cutting each other
21 off.
22     Q How do you know that he knew? Did
23 he say to you I know that it's in

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

129

1  bankruptcy?
2  A  Yes, because he knew Tony Fannin
3  had told him that.
4  Q  When did he tell you that Tony
5  Fannin had told him that it was in
6  bankruptcy?
7  A  That first meeting.
8  Q  That first meeting?
9  A  Uh-huh.
10  Q  And you're sure that he said to you
11  Tony Fannin, the owner of the place, has
12  told me it's in bankruptcy, or are you
13  remembering his testimony when his
14  deposition was taken and you were sitting
15  over there and you were hearing everything
16  that Mr. Barr knew?
17  MR. STEWART:  Object to form.
18  A  I have not reviewed his testimony.
19  I did not review his testimony.  But the
20  only way he knew that the property was
21  even available was because of Tony Fannin
22  and what Tony Fannin had told him because
23  that's what Grant told me.

130

1  Q  Grant told you.  Mr. Barr didn't
2  tell you.  Grant told you?
3  A  Grant told me initially that the
4  reason he knew that the property had been
5  vacated was that Mr. Barr was a friend of
6  Mr. Fannin and that Mr. Fannin had told
7  him that it was available.
8  Q  Okay.  So --
9  A  I didn't think it merited
10  mentioning.  I thought it was a given that
11  he knew it was in bankruptcy.  That's why
12  he was there.  I mean, that's why he was
13  there that day.
14  Q  So it wasn't mentioned, then, in
15  the first --
16  A  Yes, I'm sure it was mentioned.
17  I'm absolutely sure that bankruptcy had to
18  have been mentioned because I told him we
19  could not -- he could not -- I said when
20  did you want it, and he said immediately,
21  and I said, well, we -- you know, not even
22  immediately because it's in bankruptcy.
23  We don't know.

131

1  Q  Now, are you sure that took place
2  the first conversation, or is that what
3  you told him over the telephone when he
4  wanted to see it again and he was, as you
5  said, being persistent about seeing it?
6  A  I know that bankruptcy was
7  mentioned in the very first meeting.
8  Under what context, I don't remember, but
9  it was mentioned and he knew.
10  Q  Was it mentioned in the second --
11  in the telephone conversation you had with
12  him?
13  A  I believe it was again.
14  Q  Did you tell him there was a stay
15  on the property and --
16  A  Yes.
17  Q  -- that you could not show it to
18  him?
19  A  I probably told him there was a
20  stay on the property and that I did not
21  have the keys and, therefore, I couldn't
22  show it to him because I didn't have the
23  keys because he wanted to see it.

132

1  Q  All right.
2  A  At his convenience.
3  Q  At what point did you tell him that
4  Doodle Hoppers, the present tenant, wanted
5  to expand into that space and that that
6  was being looked at?
7  A  At the initial meeting.
8  Q  Okay.  And did you tell him that
9  they had the right of first refusal?
10  A  No.
11  Q  Did they have the right of first
12  refusal?
13  A  There was no -- nothing in writing
14  for the right of first refusal.  That is
15  just -- Ms. Forney is a very loyal person,
16  and if she has a relationship already, it
17  was her preference that they had an
18  established clientele, they had an
19  established pay history, they had an
20  established presence, and so it makes
21  sense in leasing that you would give an
22  established business in your properties,
23  if they need expansion, to work with them

33  (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

133

1  if possible, if it worked out.
2      Q  If somebody else, though, wanted to
3  lease the property and actually made an
4  offer on it, would you have -- could you
5  still tell that person no, we're not going
6  to accept that offer because we're going
7  to still give Doodle Hoppers an
8  opportunity to do it?
9          MR. STEWART: Object to form.
10     Q  Or would you have to take that
11 offer from them?
12         MR. STEWART: Object to form.
13     A  Any offer that comes through me,
14 that is given to me, I have an obligation
15 as a licensee to inform my customer that
16 an offer has been made.
17     Q  Okay.  That answers that.  Was
18 Doodle Hoppers also thinking about moving
19 to the Trainmaster space?  Didn't you tell
20 me that that was in the works, too?
21     A  No.  That was initially before the
22 Pure Country space --
23     Q  Before it came open?

134

1      A  -- became available.  You know,
2  that was something that had been discussed
3  because they were having people standing
4  out in the -- on the sidewalk in lines
5  waiting to get in because there was
6  occupancy, you know, a certain occupancy.
7  So they were looking into expansion.
8      Q  Okay.  Now, in this telephone
9  conversation with Mr. Barr, how did the
10 conversation end?
11     A  Which telephone conversation?  Do
12 you have anything in writing that -- is
13 that the one that you transcribed, or
14 which conversation are you talking about?
15     Q  I don't know what you're talking
16 about.  I'm talking about the one between
17 Mr. Barr and yourself that we were just
18 talking about a minute ago when he called
19 after Grant -- after you had talked to
20 Grant and he told you he wanted to see it,
21 you told him you didn't have the key.  How
22 did y'all leave it?
23     A  That one was about the third

135

1  conversation we had.
2      Q  Okay.
3      A  The first one was him talking about
4  wanting to see some other locations.
5      Q  Okay.
6      A  And apologizing and charming.
7      Q  I'm sorry.  I thought that was the
8  same conversation.
9      A  No, sir.  To my recollection, he
10 did not ask to go and tour the property
11 again in that conversation.
12     Q  Okay.  So then there was another
13 conversation in which he wanted to tour
14 the property, and he wanted to tour it
15 with his partner, because that's when you
16 were telling me about why should I wait
17 because an hour and a half and he didn't
18 show and all of that.  But did you
19 understand that that was the reason he
20 wanted to see it again was so that Mr.
21 Long could see the property?
22         MR. STEWART: Object to form.
23     A  I don't know what you're saying.

136

1      Q  In the conversation that I believe
2  you said was the third conversation when
3  you told him you wanted to get the key
4  and he was very persistent about seeing
5  it, did you under --
6      A  He was persistent about the time
7  frame of seeing it.  Drop everything.
8      Q  Okay.  Did you under --
9      A  That's what I meant.
10     Q  Did you understand that he wanted
11 to go into it again so that Mr. Long could
12 see it?
13         MR. GUY: Object to the form.
14     A  I believe that that could have been
15 part of his reasoning.
16     Q  Okay.
17     A  At that point --
18     Q  You've answered my question.
19     A  Okay.
20     Q  How did y'all leave it at the end
21 of that conversation?  Were you going to
22 get the key and call him back and set up a
23 time?  Was he going to go over there and

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

137

1 meet you? How did y'all leave that
2 conversation?
3    A  Well, at that point, Ms. Forney had
4 been informed that he wanted three hundred
5 thousand dollars in improvements, that he
6 wanted to move the other tenant that was
7 already in the space, and that at that
8 point, it was really -- and then she had
9 been informed that he was the former owner
10 of Celebrations, and with all the
11 problems, that it really wasn't urgent at
12 all in her mind --
13    Q  Okay.
14    A  -- to open it up again to someone
15 that could not -- wasn't interested in the
16 health and safety of the invitees nor the
17 other tenants.
18    Q  Okay.
19    A  And she didn't have three hundred
20 thousand dollars that she told me. You
21 know, that was just -- it was over. When
22 she heard the three hundred thousand
23 dollars, there was no -- she wasn't -- it

138

1 just -- you know, his terms -- the terms
2 that he suggested at the first meeting he
3 never said changed. He never said on the
4 telephone the terms have changed, my needs
5 have changed, I would like, you know, to
6 -- there was -- you know, so there would
7 be no reason to tour the property. He had
8 already seen the property. He knew the
9 property.
10    Q  All right.
11    A  And so it wasn't urgent. I would
12 have opened up the property or made
13 arrangements but not on an urgent basis.
14 We -- and she had chosen to move forward
15 with the prior -- with the tenant who she
16 already had in --
17    Q  Doodle Hoppers?
18    A  Correct.
19    Q  Okay. Now --
20    A  It was a business decision.
21    Q  Did you have any other
22 conversations with Mr. Barr after that
23 conversation, that last one that we just

139

1 talked about?
2    A  I know that we had a conversation,
3 and which one, whether it was the second
4 or the third, I don't -- I can't tell you
5 for sure, but it was -- he wanted to know
6 about the Capitol Plaza.
7    Q  Okay.
8    A  And I told him that the owners of
9 Capitol Plaza had said that they preferred
10 to have a retail establishment. They
11 weren't ready to have a sports bar or
12 nighttime establishment there at that
13 point in time. I also told him that I had
14 spoken with Robert Long in our office and
15 that there were ground restrictions so
16 that they could not keep the Copeland's
17 open the hours that they wanted to, plus
18 there had to be a certain percentage of
19 the income in food-based sales, and so
20 that turned out -- you know, that would
21 not have worked for him.
22    Q  Okay. I'm going to ask you some
23 questions now, and we can move along a lot

140

1 quicker if can you answer yes or no to
2 these questions, okay, as best you can.
3 If it needs an explanation, you can offer
4 it, but we've been here a long time and I
5 know everybody is getting tired and I know
6 I'm getting tired and I know you're
7 getting tired and we can get on through
8 this. It is not necessary for you to tell
9 me things over and over again. I get it
10 the first time, okay?
11    Did you ever tell -- in this
12 meeting, did you ever tell Mr. Barr that
13 you could not show him the building
14 because it was tied up in bankruptcy?
15    MR. STEWART:  Which meeting are you
16 talking about?
17    Q  I'm talking about the telephone
18 conversation, either one of them.
19    MR. STEWART:  Object to form.
20    A  I don't remember.
21    Q  Okay. Did he ever ask you to write
22 a lease?
23    A  No.

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

141

1    Q  Did he ever tell you that he would
2  take the asking amount of forty-five
3  hundred dollars?
4    A  No.
5    Q  Did he ever tell you that he would
6  take it site unseen?
7    A  No.
8    Q  Did you ever tell him that there
9  was a lease pending and that you were
10  actually working out the details of that
11  lease with somebody else?
12    A  Yes.
13    Q  And that would have been Doodle
14  Hoppers?
15    A  Yes.
16    Q  Okay.  Are you familiar with the
17  Woodmere Tavern?
18    A  Yes.
19    Q  Have you frequented the Woodmere
20  Tavern?
21    A  I have -- yes, I have frequented it
22  back in '94 and '95.
23    Q  Okay.  Did you know Mike Morin?

143

1    Q  Did you tell him you would have to
2  get the key?
3    A  I did.  I said that I did not have
4  the key, that it was involved in
5  bankruptcy.  But he knew that, too,
6  because Tony Fannin told everybody.
7    Q  Okay.  Did he tell you he knew
8  that?
9    A  Yes.
10    Q  Did he tell you that he was
11  involved with Woodmere?
12    A  Yes.
13    Q  You knew Woodmere to be a country
14  and western place?
15    A  No.
16    Q  Did you know what it was?  Did he
17  tell you what it was?
18    A  No.
19    Q  That it was a country western?
20    A  No.  It was -- it was a -- just a
21  -- no, it was not -- I did not know it to
22  be a country and western bar.
23    Q  Okay.  Did you tell him that you

142

1    A  No.
2    Q  Did you prior to -- at any time,
3  did you know Mark Cranage, C-r-a-n-a-g-e?
4    A  No.
5    Q  Do you remember getting a telephone
6  conversation from Mark Cranage about
7  seeing the property over where Pure
8  Country was?
9    A  Yes.
10    Q  Tell me what you remember about
11  that conversation.
12    A  Can you be more specific?
13    Q  Did he ask to see the property?
14    A  He did.  He asked to see the dance
15  floor.
16    Q  The dance floor?
17    A  Uh-huh.
18    Q  Which would be --
19    A  Had one of the finest dance floors
20  in Montgomery.
21    Q  Okay.  Which would be inside the
22  property?
23    A  Yes.

144

1  would arrange through the attorney for him
2  to see the property?
3    A  I cannot remember.  My memory was
4  that I gave him the attorney's number
5  because he wanted to see it on a Thursday
6  night and I had another appointment.  I
7  could not be there.  And he said -- I said
8  I can't -- he said I just want to see the
9  floor, I want to see the dance floor.
10    Q  Okay.
11    A  And I said, well, you can look at
12  the dance floor, but I don't have the key.
13    Q  Are you telling -- okay.  Was he
14  calling to look at the dance floor and not
15  calling about leasing the space, or was he
16  calling about leasing the space because of
17  the dance floor?
18    A  He -- okay.  Do you want me to
19  elaborate or say yes or no?
20    Q  Well, you really can't answer yes
21  or no to that question because I was
22  asking you two questions.
23    MR. STEWART:  The ground rules have

36  (Pages 141 to 144)

145

1 changed.
2     A   Okay.  Now you've changed your
3 mind?
4     Q   Yeah, I've changed my mind because
5 this yes or no ain't going to work.
6     A   Okay.
7     Q   Explain to me why he --
8     A   The conversation --
9     Q   Explain to me your understanding of
10 why he wanted to see the property and
11 whether it included possibly leasing it.
12     A   Okay.  He identified himself on the
13 telephone as a manager of Woodmere Tavern.
14 He asked -- told me that Tony Fannin had
15 come there, said that he was in bankruptcy
16 and he was -- that it was available, that
17 he knew that Doodle Hoppers was in the
18 process of their due diligence in deciding
19 whether they wanted to lease the space.
20 He then told me that Phillip Stewart, one
21 of the principals at Doodle Hoppers, was a
22 convicted pedophile, and he then directed
23 me to the website and showed me the

146

1 website where Mr. Stewart came up as
2 having a felony, being incarcerated for a
3 felony.  He then said that he had always
4 wanted to own his own place.  He said that
5 he was either part owner or owner of a
6 country and western bar -- establishment
7 up in Prattville where there was line
8 dancing.  He said that some of the ladies
9 that worked at Woodmere were interested in
10 line dancing, and he said I understand it
11 has one of the best dance floors in
12 Montgomery and he said I would really like
13 to see it.  He said I don't want my boss
14 to know that I'm looking, but I have
15 looked at some other spaces for lease and
16 I'm almost at the point of leasing another
17 space and I would just like to look at
18 this one.  I understand that you're
19 already in due diligence -- well,
20 negotiations with Doodle Hoppers, but I
21 thought you might want to know about the
22 criminal history of who you are working
23 with.  And he said if it's possible, I

147

1 would like to at least see the dance floor
2 before I lease this other space in case
3 this other one falls through and in case
4 you decide not to lease to them since now
5 you know that he is a felon.
6     Q   Okay.
7     A   And I said well, I -- he said I
8 need to see it right away, and here's
9 where I really don't remember.  I thought
10 that I gave him Mr. Little's telephone
11 number and I said here is the person with
12 the key.  If you want to go look at the
13 dance floor, you need to call him.  But
14 maybe I called Mr. Little and said he's
15 going to meet you over there on Thursday
16 night.  I can't be there.  Will you open
17 the door?  He wants to look at the dance
18 floor.
19     Q   Is that it?
20     A   Oh, no, that isn't it.  Then we
21 discussed -- I said to him --
22     Q   Who is "we"?  You're talking to
23 Little or are you talking to --

148

1     A   No, Mr. Cranage or the person on
2 the phone who identified himself as Mark
3 Cranage.  I said to him I don't ever see
4 Woodmere in the newspaper or, you know,
5 that y'all don't have any problems over
6 there.  How do you keep the parking lot
7 safe for your invitees?  He said that's
8 very important to us because if you can't
9 provide security to the ladies, they will
10 not come, and he said if the ladies don't
11 come, the men won't come.  And he said so
12 there are certain things that we don't
13 allow such as wife-beater shirts, certain
14 type dress that we don't encourage and we
15 are also very careful to make sure that
16 any parking areas are thoroughly secured.
17 And I said if the property were available,
18 your type of security and concern about
19 the health and safety of your invitees is
20 the kind that we would want.
21     Q   Okay.  Anything else?
22     A   I can't think of anything else
23 right now.

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

149

1  Q  Had Mr. Little shown the property
2  before this that you know of?
3  A  I do not know other than he might
4  have gone and unlocked the property for
5  Doodle Hoppers because they were getting
6  due diligence and they were getting
7  estimates on the vent hood and the gas
8  lines and there was a lot of pest control,
9  so he might have opened it without me
10  knowing.  They would have contacted him
11  directly.
12  Q  At the time that you asked -- if
13  you asked Mr. Little to show the property,
14  because I think you've indicated --
15  A  I asked him to open the door.  He
16  had the key.  I did not say please tour
17  the property like a leasing agent.  I
18  asked him to open -- unlock the door.
19  Q  Are you now sure that that's what
20  you did?
21  A  For health and safety.
22  Q  Are you now sure that that is what
23  you did rather than telling Mr. Cranage to

150

1  call Mr. Little?
2  A  I cannot -- honestly, I -- I cannot
3  remember if Mr. Cranage called Mr. Little
4  and made that arrangement or if -- my
5  memory was that Mr. Cranage and Mr. Little
6  found a mutually convenient time to meet,
7  but it could -- it's possible that it
8  would -- that I might have -- he might
9  have said Thursday night at 6:00 or
10  whenever and, I might have called Mr.
11  Little, but I cannot remember.
12  Q  But in any event, either through
13  Mr. Cranage contacting him or through you
14  contacting him, he was going to let Mr.
15  Cranage in to look at the property?
16  A  At the dance floor.
17  Q  Including the dance floor?
18  MR. STEWART:  Object to form.
19  Q  Was the property still in the same
20  dangerous condition that you had indicated
21  to me some time ago it was in when you --
22  when the homeowner -- or the residential
23  agent wanted to come see the property?

151

1  A  I'm not sure.  I know some of the
2  health -- like there was trash and garbage
3  and yucky stuff and open liquor and --
4  some of that may have been, by that time,
5  had been -- may have been addressed.  I
6  don't know.
7  Q  Did you -- had you, prior to
8  telling Little to let him in, had a
9  conversation with Little in which you had
10  told him any of the things that had
11  transpired between you and Mr. Barr?
12  A  Would you say that again, sir?
13  Q  Now, earlier you said that Ms.
14  Forney knew -- and then you listed a whole
15  lot of things, the three hundred thousand
16  dollars for improvements, the Celebrations
17  and the problems at Celebrations, those
18  things.  I am assuming that she knew those
19  things because you told her.  Is that
20  right?
21  A  Yes.  Well, not just me but Mr.
22  McGharr, too, the -- she really --
23  historically, she asks him, too, because

152

1  he lives there.  Any -- on any of the
2  properties, there are times, it's my
3  understanding, that she consults him,
4  like, you know, so -- just out of an
5  abundance of caution.
6  Q  Had you told Little about any of
7  your conversations or meeting with Barr?
8  A  I'm sure that I mentioned that I
9  had met with Mr. Barr at Celebrations.
10  Not Celebrations.  Okay.  I told him that
11  I had met Mr. Barr at the Pure Country
12  space.
13  Q  Did you tell him that Mr. Barr was
14  the former owner of Celebrations?
15  A  I'm sure I probably did.
16  Q  Did he know what Celebrations was
17  and the problems at Celebrations?
18  A  You would have to ask him what he
19  knew.
20  Q  Did he mention to you that he knew
21  of the problems at Celebrations?
22  A  I don't know if he specifically,
23  but everybody knew.  It was public record

38  (Pages 149 to 152)

# FREEDOM COURT REPORTING

153

1  and knowledge.
2  Q Okay. Did you tell him anything
3  that you thought he should know before he
4  showed the property or before he opened
5  the door so that Mr. Cranage could go into
6  the property other than he wants to look
7  at the dance floor?
8  A I'm not quite understanding the
9  question.
10  Q I'm trying to find out whether you
11  had any conversation with Mr. Little
12  before he opened the door for Cranage to
13  go in, whether you had any conversation
14  with him about who this guy was, why he
15  was looking at the space --
16  A I did tell --
17  Q -- whether he was a possible tenant
18  for the space, any of that, or did you
19  just say open the door and let him in?
20  A I did identify Mr. Cranage as an
21  employee of Woodmere Tavern.
22  Q Okay.
23  A I identified Mr. Cranage, that he

155

1  MR. STEWART: Whenever you get to a
2  breaking point, let me know.
3  MR. QUINN: We can break right now.
4  (Whereupon, a break was taken.)
5  Q Have you told me everything you can
6  remember about the conversation that you
7  and Little had before he let Cranage look
8  at the property?
9  A Yes, what I can remember. It was
10  very short.
11  Q Okay. Do you know whether Mr.
12  Little had authority from the owner to
13  show the property to possible tenants of
14  the property?
15  A You would have to ask him.
16  Q Had you known him to ever show
17  tenants the property before this?
18  A He did -- he had a collections
19  matter at Vaughn Road office and he did
20  show the property and was able to get a --
21  well, I'm not sure how it was handled,
22  whether it was a tenant that wanted to get
23  out of their lease and was going into

154

1  told me about Mr. Stewart and led me to
2  the --
3  Q Excuse me. I'm sorry. Go ahead.
4  A Led me to the website, the felony
5  website. I told him that he was in the
6  process of looking for a space to lease,
7  but I told him that I told Mr. -- I told
8  -- I told Little that I told Mr. Cranage
9  that we were still in due diligence and
10  negotiations with Doodle Hoppers and that
11  Mr. Cranage had asked that that meeting be
12  confidential because he did not want to be
13  fired by his boss. And I never mentioned
14  Celebrations bar at that time at all. As
15  far as he knew -- as far as I knew, there
16  wasn't even a potential with Celebration
17  at that point.
18  Q Okay.
19  A They could have submitted a letter
20  of intent. They could have done many
21  things. His good friend Grant could have
22  helped him many times if he was really
23  interested.

156

1  collections and he -- either the tenant
2  found the -- he handled it.
3  Q Other than the collections -- and
4  that was on -- this one that you're
5  talking about, was that on behalf of Ms.
6  Forney that he was doing that?
7  A He handled the collections matter.
8  I don't know what their relationship --
9  Q It was one of Ms. Forney's --
10  A It was in one of Ms. Forney's
11  properties that she owns.
12  Q Okay. And prior to him showing the
13  property on this instance with Mark
14  Cranage, had you ever had the occasion to
15  ask him to show any other property or to
16  make any other property available?
17  A I didn't ask him to show the
18  property. Those are your words.
19  Q Right, and that's why I changed
20  that. Yeah. Did you ever have any other
21  time --
22  A There was no reason for me to have
23  -- ask him. He never had the key to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

157

1    any --
2        MR. STEWART: Wait, wait. Let him
3    ask a question and then answer that
4    question, please. You weren't finished,
5    Michael.
6        Q So this would have been the only
7    time that you would have requested him to
8    go over there and open up the property?
9        A I think I already answered that.
10   It's possible that he opened the property
11   for Doodle Hoppers. It's possible. But
12   he never had the key to any other property
13   that I know of.
14       Q Okay. And as far as his
15   possibility to negotiate a lease for any
16   of those properties, you don't know
17   whether he had that authority or not?
18       A In this situation, he had no
19   authority to negotiate anything other than
20   what had to do with the collections
21   through the bankruptcy court.
22       Q Okay. How do you know that?
23       A How do I know that? Well, I do not

158

1    know that, but Ms. Forney would have -- if
2    that had been the case, she knew that I
3    was working -- I mean, she had already
4    approved that -- to move forward with the
5    Doodle Hoppers lease, so -- it would be
6    unusual if she went and told him to
7    negotiate a lease.
8        Q Okay.
9        A It would have been out of sinc or
10   character.
11       Q After you learned -- well, did you
12   talk to Mr. Little after he met Mr.
13   Cranage at the property?
14       A Yes.
15       Q And did he tell you what
16   transpired?
17       A I don't know what specifically what
18   transpired.
19       Q Just tell me what y'all talked
20   about after he had met Mr. Cranage. Did
21   he say anything?
22       A I'm trying to sort out what he said
23   afterwards and what I know now. I'm

159

1    trying to sort it through.
2        Q Yeah, because all I want to know is
3    what he told you, if anything, about the
4    meeting after the meeting was over with
5    Mark Cranage.
6        A I think he said that Mark was going
7    to call me.
8        Q Okay. Did he?
9        A And -- I believe he did.
10       Q I'm sorry. I interrupted you.
11   Were you going to add something? And?
12   Did he say anything else other than that
13   Mark was going to call you?
14       A I can't remember.
15       Q Let me see if I can jog your
16   memory. Did he say -- did he indicate to
17   you that he had had a conversation with
18   Mark and that Mark was very interested in
19   leasing the space, that he was going to
20   try to free up the property by Monday so
21   that if he came -- if he called you with a
22   lease or offer that, in fact, the
23   property would be cleared up, did he tell

160

1    you anything to that effect?
2        A No, nothing.
3        Q Did he say that Mark was interested
4    in leasing the property period?
5        A He said that he was -- Mark was
6    going to call me. That's what I remember,
7    none of that other that you said, nothing
8    of that other.
9        Q Okay. Did you -- have you've seen
10   the transcript of the video that was done?
11       A I did read the transcript.
12       Q Have you had any conversation with
13   Mr. Little since you saw that transcript?
14       A Yes.
15       Q What did y'all talk about?
16       A I asked him about it. I said where
17   did this come from? It was a shock.
18       Q And what did he say?
19       A He said I was just puffing, and I
20   said all you were supposed to do was just
21   unlock the door.
22       Q Puffing for who?
23       A I don't know.

40   (Pages 157 to 160)

# FREEDOM COURT REPORTING

161

1    Q  Well, he didn't own the property,
2  did he?
3        MR. STEWART:  Object to form.
4    Q  So he had to be puffing for
5  somebody.
6        MR. STEWART:  Object to the form.
7    A  Well, you'll have to ask him that.
8  Of course, I said did you know that you
9  were being videotaped?  Did the man have a
10  video camera with him?  Mr. Cranage never
11  asked me for permission to bring a video
12  camera.  He never asked me nothing.  I
13  mean, it was a complete shock.
14    Q  Now, let's back up and let's --
15  when did you first learn that Mark Cranage
16  had brought a video camera?
17    A  Scott Harris called me into his
18  office and said that an attorney had
19  called him and another attorney had called
20  him.
21    Q  Okay.  And did he say and they have
22  a video?  What did he say?
23    A  I'm trying to think how he -- he

162

1  said did you know.
2        MR. STEWART:  This sounds like it's
3  revealing what an attorney told Scott
4  Harris.  Is what you're about to testify
5  to something that an attorney told Scott
6  Harris?
7        THE WITNESS:  Yes.
8        MR. STEWART:  And is that attorney
9  Bobby Segall?
10        THE WITNESS:  Yes.
11        MR. STEWART:  I instruct you not to
12  discuss the contents of any conversation
13  that Bobby Segall had with either you or
14  Scott Harris.
15        THE WITNESS:  Okay.
16    Q  Did you ever, after you learned
17  that there was a video, call anybody other
18  than Mr. Little and talk about the video?
19    A  I believe --
20    Q  Other than lawyers?
21    A  I believe that Mr. Cranage called.
22    Q  He called you?
23    A  I believe I called him, and then he

163

1  returned my call.
2    Q  Okay.  And tell me about that
3  conversation.
4    A  I asked him if he had taken a video
5  and he said his father was a stroke victim
6  and that he wanted to take a video to show
7  his father and that he was very angry at
8  me and Mr. Little because he asked for any
9  -- for the viewing of the dance floor to
10  be confidential and that Barry Barr had
11  come to him and had started yelling at him
12  and telling him that he wanted to lease
13  that space and that -- and he said he told
14  Barry you can have it, in fact I've got a
15  video tape and you can look at it to Barry
16  and that Barry had taken it to an
17  attorney.  And I said, well, can I see it?
18  And he said I'm probably going to lose my
19  job and I'm very upset and I wish I had
20  just gotten rid of it.
21    Q  Did you ever ask him to get rid of
22  it?
23    A  No.  I had never seen it.  I didn't

164

1  know what it said.  I didn't know what was
2  on it.
3        MR. STEWART:  Hey.  The question
4  was did you ever ask him to get rid of it.
5        THE WITNESS:  Okay.
6    Q  Did this conversation with Mark
7  take place after you talked to Mr. Harris
8  and learned that there was, in fact, a
9  tape?
10    A  Yes.
11    Q  What eventually -- well, I think
12  I've already asked you that.  Doodle
13  Hoppers eventually got the property; is
14  that right?  They expanded into this
15  property?
16    A  Doodle Hoppers negotiated a lease.
17    Q  When you learned about the criminal
18  record of one of the owners or proprietors
19  or somebody of Doodle Hoppers, did you
20  check to see whether the leases that were
21  involved were, in fact, signed by somebody
22  other than him because he had a felony
23  record?

41  (Pages 161 to 164)

# FREEDOM COURT REPORTING

165

1    A You've got like three or four
2  little parts in there, so --
3    Q You were told that he had a
4  criminal record --
5    A Yes.
6    Q -- and you were even sent to the
7  website and you confirmed that he had a
8  criminal record.
9    A Yes.
10    Q That was the truth?
11    A Yes.
12    Q Did you know that for a bar that is
13  going to sell alcohol through the ABC
14  board that a convicted felon could not
15  sign a lease for such property?
16    MR. STEWART: Object to form.
17    A I can't say that I knew that at
18  that point in time. I did -- for some
19  reason, I did know or I thought that a
20  felon could not get a liquor license.
21  That was my concern, also, with Mr. Barr.
22    Q When you renegotiated with Doodle
23  Hoppers and they worked out the

166

1  arrangements, do you know who signed the
2  new lease?
3    A Yes.
4    Q Who?
5    A Jeff Strong.
6    Q Okay. And did the owner pay for
7  any improvements to the property for
8  Doodle Hoppers?
9    A No.
10    Q Did anyone -- did the owner give
11  him any incentives such as rent reduction,
12  anything like that as -- to help him
13  expand into that location?
14    A There was some beneficial rent.
15    Q How much beneficial rent was there?
16    A Do you have the lease so I can
17  review?
18    Q No, we do not have the lease.
19    MR. QUINN: Do we?
20    MR. STEWART: Not to Doodle
21  Hoppers.
22    Q We have not been given the Doodle
23  Hoppers lease.

167

1    MR. STEWART: It's not due yet.
2    Q It's not due yet.
3    A Okay.
4    Q So you don't know the specifics?
5    A The -- Doodle Hoppers asked for
6  some beneficial rent because they were
7  going to have to put in a vent hood that
8  was going to be in excess of ten thousand
9  dollars, and so they paid partial rent but
10  not the full rent, and it was for a period
11  of time.
12    Q Okay. Do you know whether Doodle
13  Hoppers got any assistance, any financial
14  assistance from anyone else in order to
15  work out this deal for the expanded space?
16    A I don't.
17    Q How did you know that Mr. Barr was
18  a felon?
19    A It was just general knowledge.
20    Q Really?
21    A Uh-huh.
22    Q Okay. When did you first learn
23  that he had a criminal record?

168

1    A I don't know. It just -- general
2  knowledge and -- I go to chamber of
3  commerce events. I mean, it's part of --
4  I don't -- I believe my brother-in-law or
5  my son-in-law had a case where
6  Celebrations was sued. I don't know if it
7  came up in that conversation. I don't
8  know.
9    Q Okay. How much does -- how much
10  does Little know about the renovations to
11  Doodle Hoppers? Was he involved in those
12  negotiations?
13    A I believe that he did have some
14  independent meetings, not in his capacity
15  as an attorney, but he is a home builder
16  and has done some -- built homes and I
17  think that Jeff Strong and Mr. Stewart may
18  have in -- you know, at times when he
19  unlocked the door or whatever, they may
20  have asked him a question or two about --
21  but I don't know specifics, no.
22    Q Okay. Have you been on any
23  medications today while we've been taking

42  (Pages 165 to 168)

# FREEDOM COURT REPORTING

169

1  this deposition?
2      A  I took a tiny bit of Adderall.
3      Q  Are you prescribed Adderall for
4  anything in particular?
5      A  ADD.
6          MR. QUINN:  Aren't we all.  I think
7  that's all, gentleman.
8          MR. GUY:  I have just a few
9  questions.
10         MR. QUINN:  Thank you.
11         THE WITNESS:  You're welcome.
12
13  EXAMINATION BY MR. GUY:
14     Q  Ms. Knudsen, I want to just ask you
15  a few follow-up questions.  I know it has
16  been a long day, so I will try to be brief,
17  okay?
18     A  Okay.
19     Q  And I may jump around just a little
20  bit because, obviously, we don't need to
21  go over some things that have already been
22  talked about or discussed.  What
23  nationality is Meiying Forney, for the

170

1  record?
2      A  She is Chinese.
3      Q  And during the time that you have
4  worked with her on her properties, has she
5  ever instructed you or directed you to
6  lease or not lease, to sell or not sell
7  any properties based upon a person's race,
8  religion, national origin, age, et cetera,
9  any criteria such as that?
10     A  Never.  And in addition, she never,
11  ever has asked what the race, creed,
12  anything.
13     Q  Have you ever known her during the
14  time that you have worked with her to make
15  any kind of discriminatory remarks about
16  anyone concerning their race, religion,
17  national origin, et cetera?
18     A  No.
19     Q  Have you ever known her to make
20  during the time that you've known her
21  socially and, you know -- well, let me ask
22  you this:  Do you even know her socially
23  other than the times that she's come into

171

1  town for business?
2      A  It's difficult to be social long
3  distance, but she does share about -- she
4  does share about her daughter, Sophia.
5  She loves her family and her daughter
6  and --
7      Q  In any social setting, have you
8  ever known her to make any discriminatory
9  remarks about anybody?
10     A  Never.
11     Q  Okay.  And again for the record,
12  let me ask you this:  I think Mr. Quinn
13  did ask you, but Ms. Forney lives in
14  California; is that correct?
15     A  That's correct.
16     Q  And how often would you say she
17  probably even comes to Montgomery on an
18  annual basis as an average?
19     A  Maybe once or twice a year.
20     Q  So most of -- other than when she
21  comes to town, most of your dealings with
22  her are either by phone or by E-mail,
23  probably?

172

1      A  Yes.
2      Q  In this particular instance, I know
3  that Mr. Quinn asked you a series of
4  questions about those initial
5  conversations that you had with Grant
6  Sullivan as it related to him having a
7  client who was a, I believe -- and I don't
8  want to misquote -- was a baseball player
9  that was interested in opening a sports
10  bar, right?
11     A  Correct.
12     Q  And that line of questioning there,
13  I don't think Mr. Quinn asked you, but if
14  he did, I apologize, was it ever made
15  known to you at any time during those
16  conversations that Mr. Long was black?
17     A  No.
18     Q  When was the first time that you
19  were made known that Terrence Long was
20  black?
21     A  At this table, at the deposition of
22  Barry Barr.
23     Q  Okay.

43  (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

173

1    A  For all I know, Mark Cranage could
2  be black or African-American.
3    Q  But as it related to your dealings
4  with Mr. Barr and as it related to your
5  dealings with Grant Sullivan, all you knew
6  is that there was a person interested in
7  opening a sports bar who was a baseball
8  player?
9    A  Correct.
10    Q  But his race, nationality,
11  religion, none of those things were ever
12  mentioned in those conversations?
13    A  No.
14    Q  And you mentioned in your direct
15  testimony, I believe, that in all of the
16  locations which Ms. Forney owns -- and I
17  believe there were three different
18  locations, properties she owns here in
19  Montgomery, right?
20    A  Yes, sir.
21    Q  In all of those locations, there
22  are tenants who are minorities, correct?
23    A  Absolutely.

174

1    Q  And in any of those locations that
2  she owns here in Montgomery, has she ever
3  denied anybody the request to lease it
4  based upon their race, religion, national
5  origin, or that kind of thing?
6    A  Never.
7    Q  Exhibit number 4 that's in front of
8  you, Ms. Knudsen, is the offer, as I
9  understand it, by Barry Barr and witnessed
10  by Grant Sullivan to purchase the
11  property, the property LeCroy shopping
12  center, owned by Ms. Forney for a purchase
13  price of a million dollars; is that right?
14    A  Yes.
15    Q  Is that the only written offer --
16  listen to my question.  Is that the only
17  written offer concerning Ms. Forney's
18  property that was ever made by Mr. Barr or
19  anyone acting on his behalf in this case?
20    A  Yes.
21    Q  And is there any mention of Mr.
22  Long's name in this Exhibit 4?
23    A  No.

175

1    Q  And that offer to purchase was
2  communicated to Ms. Forney, correct?
3    A  Yes.
4    Q  And I believe you said earlier that
5  was rejected because it wasn't even close
6  to being what she was wanting for the
7  property, right?
8    A  Correct.
9    Q  And no counteroffer was even made,
10  correct?
11    A  She chose not to make a
12  counteroffer.
13    Q  And I believe you said you
14  communicated that to Grant Sullivan,
15  correct?
16    A  Yes.
17    Q  And in response to that
18  communication to Grant Sullivan, was there
19  ever any counteroffer made by Grant
20  Sullivan or anyone that he was acting for
21  for another price on Ms. Forney's
22  property?
23    A  No, sir.

176

1    Q  Okay.  And I should say written or
2  oral, was there ever another counteroffer
3  from Grant Sullivan or anybody he was
4  acting for?
5    A  No, sir.
6    Q  Was there ever another offer by Mr.
7  Barr individually in any conversations you
8  had with him to again purchase the
9  property?
10    A  No, sir.
11    Q  For a higher amount, I'm saying,
12  than one million dollars?
13    A  No, sir.
14    Q  Have you ever had an offer from
15  Terrence Long to either lease or purchase
16  the property that's the subject of this
17  lawsuit either in writing or orally?
18    A  No.  I've never spoken with
19  Terrence Long other than in this --
20    Q  Other than here in his deposition?
21    A  Yes.
22    Q  Now, earlier, and I hope I get the
23  context right, I believe when you said

44  (Pages 173 to 176)

# FREEDOM COURT REPORTING

177

1 that Mr. Barr initially met with you there
2 at the Pure Country Saloon the first time
3 that a discussion was had about what Ms.
4 Forney wanted in the lease, I believe you
5 said forty-five hundred dollars a month,
6 right?
7    A That's what she was asking.
8    Q Okay. And that's what you
9 communicated to him?
10    A Yes.
11    Q And then there was a question, I
12 believe, by Mr. Quinn as to -- I shouldn't
13 state it that way. Let me just say it
14 this way: That forty-five hundred dollars
15 a month, as I understood your earlier
16 testimony, was derived by a dollar per
17 square foot, right?
18    A Yes.
19    Q And that dollar per square foot,
20 that forty-five hundred dollars was just
21 the number of square feet in the Pure
22 Country Saloon times what Ms. Forney
23 wanted dollar per square foot, correct?

178

1    A Yes.
2    Q And what she wanted dollar per
3 square foot, that had been discussed with
4 you, I guess, and Ms. Forney as to what
5 was a current market rate for that type of
6 business property?
7    A Yes.
8    Q Okay. And was that discussion with
9 Ms. Forney about the appropriate dollar
10 per square foot, was that prior to you
11 ever meeting with Mr. Barr?
12    A Yes.
13    Q Okay. And I don't think that was
14 ever established. If it was, I apologize.
15 You know, how long before your meeting
16 with Mr. Barr was that dollar per square
17 foot established, if you recall?
18    A It was established as soon as it
19 became apparent that Mr. Fannin would not
20 be able to continue with his lease and
21 that the property would be coming
22 available immediately.
23    Q And I don't know the first thing

179

1 about leasing, so was that dollar per
2 square foot the same kind of dollar per
3 square foot you would have got for some of
4 the other property in the same shopping
5 center?
6    A Some. It varies. It can vary.
7    Q And then what I understood you to
8 say is that that was an asking price, it
9 could be negotiable?
10    A Yes.
11    Q So, I mean, in your business, an
12 asking price -- I mean, an amount you ask
13 per square foot is negotiable?
14    A Yes.
15    Q It's not uncommon to negotiate that
16 is what I'm asking.
17    A It is not uncommon.
18    Q Somebody makes an offer, and then
19 if somebody doesn't want that, they can
20 make a counteroffer and it can be
21 negotiated, correct?
22    A It can.
23    Q And then you also testified, as I

180

1 understood it, and correct me if I'm
2 wrong, and I'm going have to paraphrase,
3 so if I misstate my paraphrase -- that at
4 some point, you informed Ms. Forney about
5 your meeting with Barry Barr on that first
6 occasion and that the discussions -- that
7 there were discussions with her about some
8 of the things that he discussed with you
9 about -- about the Pure Country location,
10 and I'm going to say i.e., I believe there
11 was some mention of three hundred thousand
12 dollars in improvements he was saying he
13 wanted and those types of things. Do you
14 remember that testimony?
15    A Yes.
16    Q Okay. What I wanted to understand,
17 and I don't know if it was made clear when
18 the questions were asked, was that
19 discussion with Ms. Forney by you in the
20 form of you communicating an offer from
21 Mr. Barr to her, or was it something else?
22    A No. It was just a follow-up
23 report. There was no formal offer made at

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

181

1  all.
2     Q  Okay.  So you --
3     A  To lease the space by Mr. Barr.
4  There was never a formal or informal
5  offer, for that matter.
6     Q  I believe you testified and you
7  told Mr. Quinn that later, but I just
8  wanted to make sure I understood when you
9  stated that you informed Ms. Forney about
10  -- and I think you also said that you told
11  her he was the former owner of
12  Celebrations, as well?
13     A  Yes.
14     Q  So you just had some general
15  discussion with Ms. Forney about a meeting
16  you had with Barry Barr, but there was
17  never a communication to Ms. Forney about
18  him requesting to lease the property.  Is
19  that a fair characterization?
20     A  Correct.
21     Q  Because there never was, as you
22  testified earlier, and you correct me if
23  I'm wrong, there never was a request by

182

1  Mr. Barr to lease the property?
2     A  No, there never was a request.
3     Q  You talked in terms --
4     A  There was an expression of desire.
5     Q  Well, obviously, he came there
6  because he was interested in the property.
7  I'm not trying -- I don't want to mix
8  words here.  But he never gave you a
9  written offer to lease the property?
10     A  No.
11     Q  He or Grant Sullivan?
12     A  No.
13     Q  And then orally, Grant Sullivan, he
14  never said we want to lease this property,
15  here's what we'll -- here's what we'll
16  give you or he never said I'll accept
17  whatever terms you put on the table?  He
18  never said anything like that?
19     A  Correct.
20     Q  He expressed an interest in the
21  property or he wouldn't have been there to
22  look at it, correct?
23     A  Correct.

183

1     Q  And, obviously, that was what you
2  were there for is to show him the
3  property, correct?
4     A  Yes, sir.
5     Q  Okay.  But there never was a formal
6  or what you would consider an offer in
7  your business to say I want to lease the
8  property?
9     A  There never was.
10     Q  The only thing you ever got was the
11  request to purchase the property?
12     A  Correct.
13     Q  When Ms. Forney leases property --
14  I don't know if you've ever sold any
15  property for her.  When she leases
16  property, does she have attorneys draft
17  the leases and take care of that for her?
18  Does she have somebody that does that
19  or --
20     A  Most leases --
21     Q  I would say reviewed, maybe, by an
22  attorney?
23     A  -- are very simple, standard leases

184

1  for each property; however, in a situation
2  where there is adult beverages and
3  security, health and safety issues, I
4  requested that an attorney review the
5  lease, Mr. Knox Argo.
6     Q  Is that in the Doodle Hoppers case
7  you mean?
8     A  Yes, sir.
9     Q  When they wanted to lease the
10  space?
11     A  Yes, sir.
12     Q  That has to do with just a review
13  of the terms to make sure that she's
14  protected?
15     A  The greatest concern is the health
16  and safety of the parking lot, the
17  invitees, the other tenants, and it's
18  connected with adult beverages.
19     MR. GUY:  I think that's all.  Give
20  me one second to make sure I've covered
21  all my little check marks here.  Thank
22  you, ma'am.
23     MR. STEWART:  I don't have

46  (Pages 181 to 184)

# FREEDOM COURT REPORTING



185

1  anything.
2
3      AND FURTHER DEPONENT SAITH NOT.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

186

1          C E R T I F I C A T E
2
3  State of Alabama
4  St. Clair County
5
6    I hereby certify that the above and
7  foregoing deposition was taken down by me
8  in stenotype and the questions and answers
9  thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14    I further certify that I am neither of
15  counsel, nor of kin to the parties to the
16  action, nor am I in any way interested in
17  the result of said cause named in said
18  caption.
19
20
21          Kim Duckett
22          Alabama CCR#142
23

47 (Pages 185 to 186)

D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRENCE LONG and<br>BARRY BARR, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:07-CV-881-WKW |
| | ) | |
| ARONOV REALTY MANAGEMENT, | ) | |
| INC., AMY CLARK KNUDSEN, and | ) | |
| MEIYING FORNEY, | ) | |
| | ) | |
| Defendants. | ) | |

MEIYING FORNEY'S RESPONSE TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW, the defendant, Meiying Forney, by and through her undersigned

counsel of record, and in response to plaintiff's first set of Interrogatories and Request for

Production of Documents, avers the following separately and severally:

GENERAL OBJECTIONS

1.    This defendant objects to providing any information or producing any

document that is protected from disclosure by the attorney/client privilege, work product

doctrine, or any other applicable privilege or protection, including, but not limited to, any

information or document that was or is prepared in anticipation of litigation and/or during

the course of preparation for litigation.

2.    This defendant objects to providing any confidential or proprietary

business information and documents, except pursuant to an appropriate protective order

as agreed upon by the parties and to be entered by this Court.

3.    This defendant objects to plaintiffs' definitions and instructions, to the extent they attempt to expand its obligations beyond the requirements of the <u>Federal Rules of Procedure</u>.

4.    This defendant objects to each and every one of the plaintiffs' interrogatories to the extent that any such discovery calls for information that can be more appropriately and efficiently elicited through depositions upon oral examination.

5.    This defendant objects to each and every one of the plaintiffs' interrogatories in so far as such discovery requires this defendant to engage in a lengthy, time consuming and expensive search for information and documentation.

6.    Defendant objects to plaintiffs' discovery requests to the extent they seek documents or things not within defendant's possession, custody or control or that are easily available to plaintiffs.

7.    Inadvertent production of privileged information and documents by defendant shall not constitute a waiver of any applicable privilege nor shall the response to an interrogatory or the production of any document be construed as a waiver of any objection to the admissibility of such documents.  Further, defendant's response to any particular item of discovery shall not be construed as an admission by defendant that any documents or things responsive to that request exist.

8.    In searching for information, documents and other materials, defendant will conduct a thorough and reasonable search of its records kept in the ordinary course of business, where information, documents, or other things responsive to this discovery are most likely to be found.  To the extent plaintiffs' requests for production ask for

more, defendant objects because the discovery is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

9.    This defendant reserves the right to assert additional objection to discovery, as appropriate, and to supplement its objections and responses, as needed.

## SPECIFIC INTERROGATORY OBJECTIONS AND RESPONSES

1.    Please provide a list by address and name (if applicable) of all real property owned by you.

**RESPONSE: (1) LeCroy Shopping Village – Debbie Drive; (2) Office Park Circle – Vaughn Road; and, East Park Plaza – Atlanta Highway.  These are all of the properties in Montgomery, Alabama.**

2.    Please provide a list of all individuals, entities or organizations who lease space at the LeCroy Shopping Village.

**RESPONSE: Sam McGharr or Amy Knudsen would have this information.**

3.    Please state whether you entered into an agreement with Aronov Realty to act as your agent in the selling or leasing of real property and if yes please state all properties at which Aronov is authorized to act on your behalf in selling or leasing.

**RESPONSE: Yes.  I had an agreement at one time.  I can no longer locate this agreement.  Amy Knudsen handles the selling and/or leasing of all my property.**

4.    Have you ever had any communications, whether oral, written or electronic, with Amy Knudsen concerning the selling or leasing of real property at the LeCroy Shopping Village?  Please provide the dates and the subject matter of these communications.

3

**RESPONSE: Yes, I don't remember the date, received an offer of $1 million to purchase which I rejected. I have also had conversations with Amy about the leasing of Pure Country by Doodlehopper. I don't remember dates or specifics of conversations. I'm sure there have been other conversations as well about other lease space.**

5.     Have you ever had any communications, whether oral, written or electronic, with anyone associated, employed, or otherwise connected with Aronov Realty concerning the selling or leasing of real property at the LeCroy Shopping Village? Please provide the names of the individuals and the dates and the subject matter of these communications.

**RESPONSE: See response to #4.**

6.     Did you hire or retain Don Little to represent you as an attorney in any matters concerning the LeCroy Shopping Village or any other real property you own. Please list all matters on which Don Little has represented or is representing you concerning LeCroy Shopping Village.

**RESPONSE: I hired Don Little on recommendation of Amy Knudsen to handle collection of some delinquent accounts and bankruptcy involving Pure Country.**

7.     Did Don Little and Amy Knudsen have your permission to communicate with each other concerning the property at the LeCroy Shopping Village?

**RESPONSE: As relating to the bankruptcy matter of Pure Country, yes.**

8.     Did you allow Don Little to act on your behalf in communicating with third parties regarding the leasing of property at the LeCroy Shopping Village and in particular the Pure Country location?

4

**RESPONSE: No.**

9. Did Don Little have a key to the Pure Country space at the LeCroy Shopping Village?

**RESPONSE: I am not aware personally.**

10. Please list every individual, entity or organization over the last 10 years who has been authorized to act on your behalf in regard to the leasing or selling of property at the LeCroy Shopping Village. For each person listed, please provide the dates during which each person was authorized to act on your behalf as described in this interrogatory.

**RESPONSE: Only know of Josh Hall and Amy Knudsen.**


## RESPONSES TO REQUEST FOR PRODUCTION

1. Please produce any documents in your possession relating to the Pure Country Nightclub location at the LeCroy Shopping Village.

**RESPONSE: I am sure I had a lease but cannot presently locate.**

2. Please produce any documents in your possession which relate to, reflect or in anyway mention Aronov Realty.

**RESPONSE: Object. Question is vague and ambiguous and not reasonably calculated to lead to discovery of admissible evidence. Without waiving said objection, almost any correspondence ever sent from Amy Knudsen would mention Aronov Realty.**

3.     Please produce any documents in your possession which refer to, reflect or in any way mention communications between you and anyone associated, affiliated or employed with Aronov Realty, including Amy Knudsen.

**RESPONSE: Object.   Question is vague and ambiguous and not reasonably calculated to lead to discovery of admissible evidence.   Without waiving said objection, almost any correspondence ever sent from Amy Knudsen would mention Aronov Realty.**

4.     Please produce any documents in your possession which refer to, reflect or in anyway mention the Doodlehoppers location at LeCroy Shopping Village.

**RESPONSE: Object.   Question is vague and ambiguous.   Without waiving said objection, locating any such document is very time consuming and I presently cannot locate any such document.   Amy Knudsen or Sam McGharr would probably have a copy of any such document.**

5.     Please produce any documents in your possession which refer to, reflect ot in anyway mention the plaintiffs in this case.

**RESPONSE: None other than offer to purchase by Barr and copy of lawsuit.**

6.     Please produce any documents in your possession which refer to, reflect or in anyway show efforts by you or by anyone acting on your behalf to lease any property at the LeCroy Shopping Village, particularly the location of the former Pure Country Nightclub.

**RESPONSE: None.**

_MEIYING FORNEY_

STATE OF _Alabama_
COUNTY OF _Montgomery_

    Before me, the undersigned Notary Public, did personally appear MEIYING FORNEY who states to me that she is aware of the contents of the foregoing document, and that she did execute it voluntarily.

    SWORN TO and SUBSCRIBED before me on this the 21st day of _July_, 2008

_____
NOTARY PUBLIC
My commission expires: _5-6-2012_

Respectfully submitted this 22nd day of July, 2008.

_/s/_    N. Gunter Guy, Jr.

N. Gunter Guy, Jr.
Attorney for Defendant, Meiying Forney

OF COUNSEL:

Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, AL  36102-2148
Telephone:    (334) 387-7680
Facsimile:    (334) 387-3222
gguy@ball-ball.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system and have also served a copy of the following by e-filing or mailing the same by United States mail properly addressed and first class postage prepaid:

C. Michael Quinn
Kevin W. Jent
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL  35203

Charles A. Stewart
Quindal C. Evans
Bradley, Arant, Rose & White
401 Adams Ave., Ste. 780
Montgomery, AL  36104

_/s/_    N. Gunter Guy, Jr.

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TERRENCE LONG and<br>BARRY BARR,<br><br>    Plaintiffs,<br><br>v.<br><br>ARONOV REALTY MANAGEMENT,<br>INC.,  AMY CLARK KNUDSEN, and<br>MEIYING FORNEY,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)    Case No.: 2:07-CV-881-WKW<br>)<br>)<br>)<br>)<br>)<br>) |

## MEIYING FORNEY'S RESPONSE TO
## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

**COMES NOW**, the defendant, Meiying Forney, by and through her undersigned

counsel of record, and in response to plaintiff's first Request for Admissions, avers the

following separately and severally:

1.    Please admit that you were the owner of the LeCroy Shopping Village

located in Montgomery, Alabama, in April, May, June, July and August 2007.

**RESPONSE: Admitted.**

2.    Please admit that attorney Don Little was retained by you to represent you

on matters related the lease and bankruptcy of Tony Fannin d/b/a F&H LLC, otherwise

known as the "Pure Country Lounge."

**RESPONSE: Admit that Don Little was retained by me for the bankruptcy**
**proceeding involving the Pure Country Lounge.  However, deny that Don Little was**
**retained by me relating to the lease of the Pure Country Lounge.**

3.    Please admit that Don Little was authorized to act on your behalf when he showed the Pure Country Lounge location at the LeCroy Shopping Village to Mark Cranage on June 13, 2007.

**RESPONSE: Denied.**

4.    Please admit that Amy Clark Knudsen was authorized to act on your behalf regarding any matter related to the sale or rental of the property owned by you and the location known as the LeCroy Shopping Village in Montgomery, Alabama, including offers, solicitations, or contracts and the administration of matters regarding such offers, solicitations, or contracts or any commercial real estate-related transaction for a time period including April, May, June, July and August 2007.

**RESPONSE: Object. This defendant does not understand the use of the term "was authorized to act on your behalf regarding any matter". Such term is vague and ambiguous and any response by this defendant could be interpreted incorrectly. Without waiving said objection, I admit that Amy Clark Knudsen was my real estate agent for purposes of leasing and/or sales of commercial properties owned by me in Montgomery, Alabama for the period of April 2007 through August 2007.**

5.    Please admit that Amy Clark Knudsen was authorized to act on your behalf at all times when she showed or discussed the leasing of the Pure Country Lounge location at LeCroy Shopping Village with Barry Barr for a timer period including April, May, June, July and August 2007.

**RESPONSE: Object. This defendant does not understand the use of the term "was authorized to act on you[r] behalf at all times". Such term is vague and ambiguous and any response by this defendant could be interpreted incorrectly. Without**

2

waiving said objection, I admit that Amy Clark Knudsen was my real estate agent for the leasing and/or sales of commercial properties owned by me in Montgomery, Alabama for the period of April 2007 through August 2007.

6.   Please admit that you entered into an agreement with defendant Aronov Realty (hereinafter "Aronov"), that Aronov would act as your agent in the leasing or selling of the real property known as the LeCroy Shopping Village in Montgomery, Alabama for a period of time including April, May, June, July and August 2007.

**RESPONSE: Denied as to any "written" agreement.**

Respectfully submitted this 22nd day of July, 2008.

/s/   N. Gunter Guy, Jr.
N. Gunter Guy, Jr.
Attorney for Defendant, Meiying Forney

OF COUNSEL:

Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, AL 36102-2148
Telephone:   (334) 387-7680
Facsimile:   (334) 387-3222
gguy@ball-ball.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system and have also served a copy of the following by e-filing or mailing the same by United States mail properly addressed and first class postage prepaid:

C. Michael Quinn
Kevin W. Jent
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL  35203

3

Charles A. Stewart
Quindal C. Evans
Bradley, Arant, Rose & White
401 Adams Ave., Ste. 780
Montgomery, AL  36104

                /s/     N. Gunter Guy, Jr.
OF COUNSEL





SULLIVAN WILLS
REAL ESTATE, L.L.C
6708 Taylor Cr.
Montgomery, AL 36117
Phone: 334-396-3333
Fax: 334-396-9390
email amy@sullivanwills.com

272·2279 E

**R E A L   E S T A T E**

## STATE OF ALABAMA
## COUNTY OF MONTGOMERY
### PURCHASE AND SALES AGREEMENT

This Purchase and Sale Agreement ("Agreement") is made and entered into by and between __MEIYING FORNEY__ (hereinafter referred to as "Seller"), and __BARRY BARR__ (hereinafter referred to as Buyer");

### W I T N E S S E T H:

1. <u>Property</u>. Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and take from Seller, under and subject to the terms, conditions and provisions hereof, that certain real property located at __LECROY__ __SHOPPING CENTER MONTG. AL.__

Lying and being situated in __MONTG.__ County, Alabama, as more particularly described or shown on Exhibit "A" attached hereto and made a part hereof by reference as if set out in full (hereinafter the "Property"), together with all appurtenances, rights of way, privileges, easements, appurtenances and other rights benefiting or pertaining to the Property and all right, title and interest of the Seller in and to any land lying in the right-of-way in front or adjoining the Property to the centerline thereof. An exact legal description of the Property shall be based on the survey to be obtained or furnished pursuant to Paragraph 5 hereof.

2. <u>Purchase Price</u>. The purchase price for the property shall be __1,000,000__ OR ($ _____) The purchase price shall be payable as follows: (a) The sum __5,000__ and 00/100 Dollars ($ _____) as earnest money (the "Earnest Money"), to be deposited with __ANONOU__ within Ten (10) days after Buyer's receipt of a fully executed copy of this Agreement; and (b) The balance of the purchase price, after deductions or credits and prorations as herein provided, shall be paid in full at the Closing herein provided by check or cash on the day of Closing. The Earnest Money shall be paid to Seller at Closing and credited against the purchase price.

3. <u>Earnest Money</u>. The Seller and Purchaser hereby authorize the listing agent __ANONOU__ to hold the earnest money in trust pending to fulfillment of this contract with the understanding that (a) it is not a party to this contract and does not assume any liability for performance or non-performance of any parties, (b) it has the right to request from all parties a written release of liability of the listing agency which authorizes the release of the earnest money, (c) it is not liable for interest or other charges on the funds held, and (d) in the event a dispute arises between the parties to this agreement as to which shall be entitled to said earnest money, the listing agency shall be authorized to interplead said earnest money into the proper court, and in doing so, the listing agency shall be entitled to deduct a reasonable attorney's fee from the sums so interpleaded.

4. <u>Entry Upon Property</u>. Upon execution of the Agreement, Buyer, its agents, employees and all other persons authorized by it, or any of them, are permitted to enter upon the Property and to obtain and perform such test, studies and maps as Buyer may deem necessary or advisable including, but not limited to, percolation, soils, hazardous waste, environmental, and geological tests and studies.

5. <u>Survey</u>. Seller shall at Seller's expense procure and furnish to Buyer within __90__ days after the Effective Date of the Agreement a current on-site survey of the Property prepared by __SELLER__ engineer or another surveyor acceptable to Buyer (the "Surveyor") and Buyer, the Surveyor and their respective agents, employees and contractors, shall have the right to enter upon the Property for the purposes thereof and also may perform thereon such topographical and soil studies and related engineering tests as Buyer deems necessary to evaluate its proposed use of the Property. The Surveyor shall also determine the extent and scope of any easements that now affect or benefit the Property.

6. <u>Abstract of Title</u>. Seller agrees at its cost to furnish to Buyer within Thirty (30) days after the Effective Date of the Agreement, an up-to-date abstract of title of the Property extending back at least Sixty (60) years and disclosing good and merchantable fee simple title thereon vested in Seller. Buyer shall have its attorney examine the abstract of title; provided, however, it is Buyer's requirement that the abstract of title disclose Seller as present owner of fee simple title to the Property without exception except for ad valorem taxes not yet due and payable, any existing mortgage (from which the Property shall be released at closing) and such other easements and exceptions as Buyer may, in its sole and absolute discretion, waive in writing (the "Permitted Exceptions"). If the abstract of title discloses a defect or defects in title to either the Property or discloses easements or other exceptions that Buyer is unwilling to waive, then Buyer agrees to notify Seller of such matters and Seller shall proceed to cure such matters at Seller's expense. If said matters are not cured within Twenty (20) days after notice, then Buyer may grant Seller additional time to cure the defects and, further Buyer may, at any time thereafter, at is option in writing waive such defect or unacceptable easements or other exceptions or cancel this Agreement, in which case of the latter event, Seller shall immediately refund to Buyer the Earnest Money paid hereunder. Seller represents that it presently owns fee simple title to the Property, except for any existing mortgage which Seller covenants to have released with respect to the Property at the time of closing, and will not permit any change in the status of the title to the Property until the Agreement has been consummated or otherwise terminated in accordance with the terms hereof. Risk of loss prior to closing shall be borne by Seller.

7. <u>Closing</u>. Subject to the satisfaction of all the conditions hereof or the waiver in writing thereof by Buyer, the date of Closing shall be on or before __SEPT 1ST__, 2007. OCCUPANCY SHALL BEGIN __@ CLOSING__ The sale shall be closed in __MONTG.__ County, Alabama at the office of Buyer's attorney. At Closing Seller shall deliver to Buyer a Warranty Deed containing the usual and customary full covenants utilized in general warranty deeds in __MONTG.__ County, Alabama, conveying a good and merchantable, indefeasible fee simple title in and to the Property, subject only to Permitted Exceptions, and Buyer shall be subrogated to all rights and actions of Seller against all former owners and vendors. The description used in the Deed shall be one and the same and shall coincide with the survey. Seller shall pay at Closing, by deduction from the purchase price, any and all expenses herein provided to be paid by Seller and the cost of preparing the Deed. Buyer shall pay to record its deed. Ad valorem taxes and utilities, if any, shall be prorated as of Closing. Any assessments, whether due or not, levied against the Property shall be paid in full by Seller at Closing. At Closing, Buyer shall pay the balance of the purchase price, subject to adjustments and credits as herein provided, and the Earnest Money shall be applied and credited to the purchase price. Each party shall bear its own attorney's fees. Seller shall also execute and deliver at Closing such affidavits of title, lien and possession as may be required by Buyer, a FIRPTA Affidavit, and appropriate 1099 forms. Except for the right of entry granted herein, possession shall be given to Buyer on the Closing Date, free and clear of all tenancies and parties in possession.

8. <u>Default; Remedies</u>. If Seller has complied with all of its obligations herein contained and all of Seller's representations and warranties are true and correct, and all of the conditions herein have been met to Buyer's satisfaction or waived in writing by Buyer, but Buyer fails to proceed with the purchase of said Property, the Seller shall have the right of specific performance or any other right or remedy on account of a default by Buyer and shall have the right to declare the Earnest Money forfeited to Seller as liquidated damages. If Seller defaults, violates, or breaches any of its warranties, covenants, obligations and representation and warranties herein provide, then in such event Buyer may declare this Agreement canceled and of no further force and effect and promptly receive a return of the Earnest Money, or Buyer shall have the right of specific performance or any other right or remedy on account of a default by Seller.

9. <u>Assignment</u>. This Agreement may be assigned by Buyer and all powers, rights and privileges herein reserved and given to Buyer or the Seller shall inure to the benefit of and be held by the respective successors and assigns of the parties, and all liabilities or obligations imposed on each shall be binding upon the respective heirs, successors and assigns of the parties.

10. <u>Condemnation</u>. Seller covenants and agrees there is no pending or threatened condemnation or similar proceeding affecting the Property or any portion thereof, nor has Seller acknowledged that any such action is presently contemplated. Should this happen, Buyer, at Buyer's sole option, may elect to (a) terminate Buyer's obligation to purchase the Property by giving written notice to Seller at any time prior to the time of Closing and receive back all sums paid hereunder, or (b) complete the purchase of the Property.

1

11.    Notices.  Any notice permitted or required to be given hereunder shall be made in writing and sent to receiving party at the address set forth below by Certified, return receipt requested with postage prepaid sufficient to deliver to its addresses destination whether or not the receiving party receives the same.  The addresses of the parties are as follows.

Seller:_____

Buyer_BARRY BARR  500 BRISTOL CT. MTG. AL. 36117_____

12.    Miscellaneous.  Seller warrants and represents to Buyer as follows, which representations and warranties shall expressly survive the Closing hereunder: (1)  The Property is now assessed on a "fair market value" classification rather a "current use" classification and is not subject to any so-called "rollback taxes".  In the event this warranty and representation shall prove to be untrue, the Seller shall be solely responsible for, and agree to reimburse Buyer, for any additional ad valorem taxes in the nature of rollback or recapture taxes due under Code of Alabama 1975 Section 40-7-25-3, if such taxes are levied.  (2)  That Seller owns fee simple title to the Property and has the power and authority to enter into the Agreement, and the entering into of this Agreement and the performance of Seller's obligations hereunder shall not violate the terms or conditions of any applicable law, rule or regulation pertaining to Seller or the Property.  (b)  In the event it becomes necessary for either Seller or buyer to employ the services of an attorney to enforce any term, covenant or provisions of the Agreement, then each party agrees that the non-prevailing party shall pay the reasonable attorney's fee incurred by the prevailing party in enforcing this Agreement.  (c)  This agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property.  It is expressly agreed that there are no verbal understanding or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Agreement and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.  (d)  Each party hereto has been represented, or had the opportunity to be represented, by separate counsel in connection with the negotiation and drafting of this Agreement.  Accordingly, no ambiguity herein shall be resolved against either party based upon principals of draftsmanship.  (e)  All personal pronouns used in this Agreement whether used in masculine, feminine, or neuter gender, shall include all other genders, the singular shall include the plural, and vice versa.  (f)  Any provision of the Agreement or any paragraph, sentence, clause, phrase or wording appearing herein which shall prove to be invalid, void or illegal for any reason shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions, paragraphs, sentences, clauses, phrases and words hereof shall nevertheless remain in full force and effect.  (g)  This Agreement shall be constructed and enforced in accordance with the laws of the Sate of Alabama.  (h)  The submission of the Agreement, executed by Buyer, shall not be deemed a continuing offer to enter into this Agreement and this Agreement shall be effective only upon the execution and delivery thereof by both Seller and buyer on or before_____N/A_____.As used herein, the "Effective Date of this Agreement" shall be the last date of execution of this Agreement by the parties comprising Seller and the Buyer.

13    Agency Disclosure and Brokers

The listing company  SULLIVAN & WILLS  AARON OU  is an agent of (check one):  (a) Seller_____ or Purchaser_____ (b)  or both Parties as a limited consensual dual agent_____ (c) Neither party is acting as a contract broker__.

The selling company  SULLIVAN & WILLS  is an agent of (check one):  (a) Seller_____ or Purchaser_____ (b)  or both Parties as a limited consensual dual agent_____ (c) Neither party is acting as a contract broker__.

Seller(s) initials_____  Purchaser(s) initials_____

In the event this sale is consummated, seller shall pay at closing a commission of  10  % of the purchase price to the brokers, who shall equally divide the same.

14.    Feasibility Period.  Within Ten (10) days after the Effective Date of this Agreement, Seller shall furnish to Buyer a copy of a all the following pertaining to the Property which are in Seller's possession or which Seller has reasonably available to Seller:  survey, soils report, environmental report, title report or policy, drainage and utility studies pertaining to the physical condition of the property and all documents or instruments pertaining to the physical condition of the Property or that might affect Buyer's intended use or development of the Property.  Buyer shall have a period of  NINTY  ( 90 ) days after the Effective Date of the Agreement (the "Feasibility Period") to satisfy itself as to any or all matters or conditions pertaining to the Property and the intended use and development thereof.  During the Feasibility Period Buyer shall have the right to inspect the Property, to conduct land use, engineering and environmental studies and reviews with respect to the Property, to conduct and market analysis of the Property and the intend use thereof, to confirm and seek, as necessary, zoning and other governmental land use approvals, permits and licenses with respect to the Property and the intended use thereof, and to otherwise conduct a feasibility review and analysis with respect to the Property and the intended use and development thereof.  Notwithstanding any thing contained herein to the contrary, in the event that Buyer determines, in its sole and absolute discretion, that the Property is not satisfactory for any reason, Buyer shall have the sole right to terminate this Agreement at any time on or before the expiration of the Feasibility Period and, in such event, the Earnest Money shall be  REFUNDED  to  BUYER  and all rights and obligations hereunder shall cease and terminate.

15.    Governmental Approvals.  Buyer is hereby authorized to seek and obtain any and all permits, licenses, site and development plan approvals, permits and authorizations, zoning approvals, curb-cut approvals, and any and all other approvals or consents as Buyer may deem necessary in connection with its proposed acquisition, development and use of the Property and Seller agrees to cooperate with Buyer in such endeavor.  If any such applications, approvals or permits are required to be sought in Seller's name, Seller shall upon Buyer's request seek same without cost to Seller.  As part of the consideration for Buyer's payment of the purchase price, Seller shall assign, transfer and convey to Buyer at Closing all permits, approvals, licenses, site and development plans affecting the property which Buyer requests Seller to assign to Buyer and shall deliver such originals to Buyer at closing.

16.    Environmental Concerns.  Not withstanding anything contained in the Agreement to the contrary, in the event that, as a result of Buyer's investigation, "hazardous substance(s)", "hazardous waste(s)" or "hazardous material(s)", as defined under applicable federal or state law, or both , are found on the Property, then Buyer shall have the right, at its option and election at any time, to terminate this Agreement and to receive a return of the Earnest Money; it being a condition precedent to Buyer's obligation to purchase the Property that the results of Buyer's environmental studies, reveal that the Property is free from any and all "hazardous substance(s)", Hazardous waste(s)" or "hazardous material(s)", as defined under applicable federal or state law, or both, provided such environmental studies are performed during the Feasibility Period.  Buyer, its agents and representatives, are hereby authorized to perform any and all studies, tests and inquires as it may deem appropriate or necessary in furtherance of the foregoing, including entering upon Property and performing tests and studies thereon.  Seller agrees that Buyer may make inquiry of pertinent governmental and administrative bodies and agencies concerning environmental violations or citations regarding the Property.

17.    Additional Provisions.  RENTS + LEASES SHALL BE PRORATED AT CLOSING.

Except as set forth above, each of the parties agree to indemnify and hold the other harmless from and against any and all claims or demands with respect to any brokerage fees or agents' commissions or other compensation asserted by any person, firm or corporation in connection with this Agreement or the transactions contemplated hereby, insofar as any such claim is based upon any conversation, contact or contract with Seller or Buyer, respectively, relating to the proposed purchase of the property by Buyer.  Each party acknowledges to the other that it has not dealt with any broker except as set for above.  The provisions hereof shall expressly survive the Closing

this  23  day of  MAY , 2007.

WITNESS:_____  SELLER:_____  DATE:_____

                                          SELLER:_____  DATE:_____

WITNESS:___Gury Sullivan___  BUYER:___Barry Barr___  DATE: 5/23/07

                                          BUYER:_____  DATE:_____

2





## #1 in Commercial Real Estate Online
www.LoopNet.com

## Welcome to One of Many Properties on LoopNet

Search 515,000 other commercial properties For Sale and For Lease including Land, Office, Retail, Industrial, Apartments, Hotels and other types of property on LoopNet — the #1 Commercial Real Estate Marketplace

LeCroy Shopping Village
3600 Debby Drive
Montgomery, Alabama 36111
County: Montgomery

To contact the broker for more details about this listing:



| Photos | | For Lease | Active |
|--------|--|-----------|--------|
| Image 1 of 1 | | **Primary Type:** | Retail<br>Retail (Other) |
| | | **Total Space Available:** | 7,000 SF |
|  | | **Divisible To:** | 800 SF |
| | | **Maximum Contiguous:** | 7,000 SF |
| | | **Occupancy:** | 100%* |
| | | **Building Size:** | 39,000 SF |
| | | **Year Built:** | 1988 |
| | | **Date Last Verified:** | 8/22/2007 |
| | | **Property ID:** | 14921317 |
| Click to Enlarge (74 KB) | | * Does not include space available for sublease | |

### Available Spaces

| More Info | Suite/ Floor | Space Available | Minimum Divisible | Maximum Contiguous | Rental Rate As Entered | Date Available | Space Type | S |
|-----------|--------------|-----------------|-------------------|--------------------|------------------------|----------------|------------|---|
| + | 3617 - 3677 | 7000 SF | 800 | 3600 | $8.00/SF/Year | Immediate | Strip Center | Y |

### Additional Information

**Property Description:**
Very stable long term tenants, Good use for retail office; flower shop; wedding or event related business. Rentable SF: 1 3600 contiguous

**Location Description:**
Located on Debby Drive off of McGhee Road and the Eastern Boulevard near the Super Walmart and 231 (Troy Highway

**Zoning Description:**
Retail/Office

| No. Stories: | 1 | Lot Size: | 3.80 Acres |
|--------------|---|-----------|------------|
| Cross Streets: | Eastern Blvd & McGhee Road | | |

### Highlights

- Great opportunity for Accountant, Insurance, Retail
- Visibility from pass through with high traffic counts

- Safe friendly environment with abundant parking
- Reasonable rental rates

**Interested in this property?** Contact the listing broker to find out more details.    

---

The information above has been obtained from sources believed reliable. While we do not doubt its accuracy we have not verified it and make no gu
or representation about it. It is your responsibility to independently confirm its accuracy and completeness. Any projections, opinions, assumptions,
are for example only and do not represent the current or future performance of the property. The value of this transaction to you depends on tax ar
which should be evaluated by your tax, financial, and legal advisors. You and your advisors should conduct a careful, independent investigation of tl
determine to your satisfaction the suitability of the property for your needs.

# G

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

| Page 1 | Page 3 |
|---|---|

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5

6    CIVIL ACTION NO.: 2:07-CV-00881-WKW-WC

7

8    TERRENCE LONG & BARRY BARR,

9         Plaintiff(s),

10   vs.

11   ARONOV REALTY MANAGEMENT,

12   INC., AMY CLARK KNUDSEN, &

13   MEIYING FORNEY,

14        Defendant(s).

15

16        DEPOSITION OF

17        MARK CRANAGE

18        JOB NO. 1101-58771

19

20   BEFORE:   Victoria M. Castillo

21        Certified Court Reporter and

22        Notary Public

23        ACCR# 17, Expires 9/30/2008

**Page 3**

1    full compliance had been had with all laws and

2    rules of Court relating to the taking of

3    depositions.

4         IT IS FURTHER STIPULATED AND

5    AGREED that it shall not be necessary for any

6    objections to be made by counsel to any questions,

7    except as to form or leading questions, and that

8    counsel for the parties may make objections and

9    assign grounds at the time of trial, or at the time

10   said deposition is offered in evidence, or prior

11   thereto.

12        IT IS FURTHER STIPULATED AND

13   AGREED that notice of filing of the deposition by

14   the Commissioner is waived.

15

16

17

18

19

20

21

22

23

**Page 2**

1         In accordance with Rule 5(d) of

2    The Alabama Rules of Civil Procedure, as Amended,

3    effective May 15, 1988, I, Victoria M. Castillo, am

4    hereby delivering to CHARLES A. STEWART, III, ESQ.

5    the original transcript of the oral testimony taken

6    on the 24th day of June, 2008, along with exhibits.

7         Please be advised that this is

8    the same and not retained by the Court Reporter,

9    nor filed with the Court.

10

11        S T I P U L A T I O N

12

13        IT IS STIPULATED AND AGREED, by

14   and between the parties through their respective

15   counsel, that the deposition of MARK CRANAGE may be

16   taken before Victoria M. Castillo, Commissioner, at

17   BRADLEY, ARANT, ROSE & WHITE, Alabama Center for

18   Commerce, 401 Adams Avenue, Suite 780, Montgomery,

19   Alabama 36104 on the 24th day of June, 2008.

20        IT IS FURTHER STIPULATED AND

21   AGREED that the signature to and the reading of the

22   deposition by the witness is waived, the deposition

23   is said to have the same force and effect as if

**Page 4**

1         I N D E X

2

3    EXAMINATION BY:              PAGE NUMBER:

4    Mr. Stewart                      7

5    Mr. Guy                         87

6    Mr. Quinn                      111

7    Mr. Stewart                    113

8

9    EXHIBITS:                    PAGE NUMBER:

10   Defendant's Exhibit 1           79

11   Defendant's Exhibit 2           79

12   Defendant's Exhibit 3           80

13   Defendant's Exhibit 4           82

14

15

16

17

18

19

20

21

22

23

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

## Page 5

1  A P P E A R A N C E S

2

3  FOR THE PLAINTIFF(S):

4     C. Michael Quinn, Esq.

5     WIGGINS, CHILDS, QUINN, & PANTAZIS

6     The Kress Building

7     301 19th Street North

8     Birmingham, Alabama 35203

9

10  FOR MEIYING FORNEY:

11     N. Gunter Guy, Jr., Esq.

12     BALL, BALL, MATTHEWS & NOVAK

13     2000 Interstate Park Drive

14     Suite 204

15     Montgomery, Alabama 36019

16

17  FOR ARONOV REALTY MANAGEMENT AND AMY CLARK KNUDSEN:

18     Charles A. Stewart, III, Esq.

19     BRADLEY, ARANT, ROSE & WHITE

20     Alabama Center for Commerce

21     401 Adams Avenue

22     Suite 780

23     Montgomery, Alabama 36104

## Page 6

1     A P P E A R A N C E S(CONTINUED)

2

3  ALSO PRESENT:   Katherine Green, Summer Clerk at
                   BALL, BALL, MATTHEWS & NOVAK

4

5     Rudy Hill, Summer Clerk at
      BRADLEY, ARANT, ROSE & WHITE

6

7     Barry Barr, Plaintiff

8     Scott Harris, Representative from
      Aronov Realty

9     Amy Clark Knudsen, Defendant

10

11  *********************

12

13     I, Victoria M. Castillo, a Court

      Reporter of Montgomery, Alabama, acting as

14  Commissioner, certify that on this date, as

15  provided by the Alabama Rules of Civil Procedure

16  and the foregoing stipulation of counsel, there

17  came before me at BRADLEY, ARANT, ROSE & WHITE,

18  Alabama Center for Commerce, 401 Adams Avenue,

19  Suite 780, Montgomery, Alabama 36104, commencing at

9:28  20     a.m., MARK CRANAGE, in the above cause, for

21  oral examination, whereupon the following

22  proceedings were had:

23

## Page 7

1          MARK CRANAGE,

2     being first duly sworn, was examined and

3          testified as follows:

4

5          COURT REPORTER:  Usual

6  stipulations?

7          MR. STEWART:  Yes.

8

9  EXAMINATION BY MR. STEWART:

10     Q.   Mr. Cranage, we met before your

11  deposition began today.  But just for the record, I

12  want you to know that I represent Aronov Realty

13  Company in this case and Amy Knudsen.

14     A.   Okay.

15     Q.   Gunter Guy is here representing

16  Ms. Forney.  You know Mr. Quinn is representing

17  Barry Barr.  And then we have some other

18  individuals who are in law school who are sitting

19  in, and we have some clients.  But you are the only

20  one who is going to be answering questions today,

21  so let me just tell you -- I understand from

22  talking with you before that you have never given

23  your deposition before?

## Page 8

1     A.   Right.

2     Q.   As you know, you just raised your

3  right hand and gave an oath to tell the whole truth

4  in this case?

5     A.   Right.

6     Q.   And your testimony is being given in

7  a case which is called Terrence Long and Barry Barr

8  versus Aronov and others.  Are you aware of that?

9     A.   Yes, sir.

10     Q.   Has it been explained to you that

11  your testimony today, because it's being given

12  under oath, subjects you to the laws of perjury?

13     A.   Yes, sir.

14     Q.   And do you understand what perjury

15  is?

16     A.   Yes.

17     Q.   One of the things I probably should

18  have told you before we started too is that you

19  need to speak out answers when you go uh-huh or

20  huh-uh, the court reporter just takes an M-M-M-M-M,

21  we don't know if you said yes or no.

22     A.   Got you.

23     Q.   I don't mean to sound like a school

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 9

1  teacher telling you to speak out your answers, but
2  that is what I'm doing if I do that, just reminding
3  you, because she's got this microphone here that
4  she's taking down too. So getting back to what we
5  were talking about -- you do know that if you
6  testify falsely here today that you are subjected
7  to the laws of perjury?
8  A.    Yes.
9  Q.    And that perjury is punishable by
10 fines or even a criminal sentence in some
11 situations?
12 A.    Uh-huh.
13 Q.    Because of that, if I ask you a
14 question that you don't understand, tell me -- I
15 don't understand your question -- so that I make
16 sure you and I are communicating correctly. Okay?
17 A.    Yes.
18 Q.    If you don't tell me I don't
19 understand your question, I have no way of knowing
20 it. All right?
21 A.    Yes.
22 Q.    Where are you from, Mr. Cranage?
23 A.    Pennsylvania.

## Page 10

1  Q.    And where do you currently live?
2  A.    Marbury.
3  Q.    And is that in Elmore County?
4  A.    Yes, sir.
5  Q.    And how long have you lived there?
6  A.    One year.
7  Q.    Do you have any family down here?
8  A.    Yes.
9  Q.    And who are your family down here?
10 A.    I have a sister that lives in Titus;
11 my wife resides with me; my father resided in
12 Wetumpka -- and we just buried him yesterday.
13 Q.    I am sorry to hear that. What's your
14 wife's name?
15 A.    Laura.
16 Q.    And does she have the same last name
17 you do?
18 A.    Yes, sir.
19 Q.    And is it pronounced Cranage?
20 A.    Cranage.
21 Q.    And your sister who lives in Titus,
22 what's her name?
23 A.    Jackie Reagan.

## Page 11

1  Q.    Is she a court reporter?
2  A.    No, she's a schoolteacher.
3  Q.    Any other relatives that you have in
4  Alabama?
5  A.    Not that I recall.
6  Q.    And what does Laura do?
7  A.    She works for the deputy -- I mean,
8  she works for ADEM, Alabama Department of
9  Environmental Management.
10 Q.    And what does she do with ADEM?
11 A.    She works in the office of the
12 director.
13 Q.    Did you move here from Pennsylvania?
14 A.    Yes.
15 Q.    Had you lived in Pennsylvania all
16 your life before then?
17 A.    Until I was 18. I was in the
18 military for 15 years.
19 Q.    And what service?
20 A.    Air Force.
21 Q.    And after you got out of the Air
22 Force, where did you live?
23 A.    In Wetumpka.

## Page 12

1  Q.    So how old are you?
2  A.    Forty-six.
3  Q.    Why did you move to Alabama?
4  A.    I was stationed in Gunter Air Force
5  Base and relocated from overseas.
6  Q.    Just decided you liked it?
7  A.    Alabama.
8  Q.    Yes.
9  A.    Yes, sir.
10 Q.    What did you do in the Air Force?
11 A.    I was a computer software tester.
12 Q.    What did you do after you got out of
13 the Air Force?
14 A.    I have an entertainment company and
15 had a dance club and got into the bar business.
16 Q.    When you say you had an entertainment
17 company, can you be more specific?
18 A.    Disk jockeys, karaoke.
19 Q.    And what is the name of that?
20 A.    MC Entertainment.
21 Q.    Where is it located?
22 A.    Well, my home is in --
23 Q.    Are you a disk jockey or do you just

3 (Pages 9 to 12)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 13

1  provide disk jockeys?
2      A.    I provide DJs.
3      Q.    And you said you had a dance club?
4      A.    Yes, sir.
5      Q.    Is it still --
6      A.    Heartland Dance Center -- it was a
7  family dance center in Wetumpka, country dance
8  center. That was during the time that I got out of
9  the service. It is not in existence anymore.
10     Q.    Did you say Heartline or Heart --
11     A.    Heartland.
12     Q.    And then you said you got out of the
13  bar business?
14     A.    Uh-huh.
15     Q.    Is that a yes?
16     A.    Yes, sorry about that.
17     Q.    That's no problem. Everybody does
18  it. What experience did you have in the bar
19  business before you got into it?
20     A.    Just mainly through my
21  entertainment. We were successful in building a
22  lot of business, and I decided I might as well
23  start building my own business.

## Page 14

1      Q.    And when you say you're in the bar
2  business, do you own a bar?
3      A.    Yes.
4      Q.    What's the name of it?
5      A.    Right now, Woodmere Tavern.
6      Q.    Are you the sole owner of Woodmere
7  Tavern?
8      A.    No, Mike Morin is the senior partner.
9      Q.    What type of business is Woodmere
10  Tavern -- is it a corporation, a partnership?
11     A.    Corporation.
12     Q.    Are you a shareholder in the
13  corporation?
14     A.    Our agreement is on paper. It's not
15  really in the business itself — an agreement
16  between him and I.
17     Q.    What is that agreement?
18     A.    Just as far as sale of it — and
19  mainly that's what it is. I get 50 percent of the
20  sale once we sell it.
21     Q.    So you're in the process right now of
22  selling Woodmere Tavern?
23     A.    We're looking at it. He just

## Page 15

1  recently got married. He's 64 years old and not
2  wanting to be in it any longer.
3      Q.    Do you work for any type of salary
4  there as well?
5      A.    Yes.
6      Q.    And what do you do on a day-to-day
7  business at Woodmere Tavern?
8      A.    I do the ordering and inventory. I
9  also do the nightly operation when we're open --
10  manage at night.
11     Q.    Anything else you do for --
12     A.    My disk jockeys -- I provide DJs to
13  both Air Force bases under contract.
14     Q.    How did you know Mike -- is it Morin?
15     A.    Morin.
16     Q.    How did you know him?
17     A.    I provided entertainment for him in
18  the -- I guess between the early '90s. I think
19  around '93, '94. And at that time when we were
20  building his business up, I brought to him other
21  business proposals and opening other places, and he
22  went ahead and done that with me.
23           MR. GUY:  Can I ask him to spell

## Page 16

1  his last name, Morin?
2           THE DEPONENT:  M-O-R-I-N.
3           MR. GUY:  Thank you, sir.
4      Q.    (Mr. Stewart)  So you have been in
5  this area of the country for some time then?
6      A.    Since 1990.
7      Q.    And other than living in Marbury,
8  where else have you lived?
9      A.    In Wallsboro.
10     Q.    Where is that?
11     A.    That's right above Wetumpka.
12     Q.    Where else did you live?
13     A.    Titus. And for about six months when
14  I initially got stationed here, I lived in
15  Montgomery.
16     Q.    And how long have you been married to
17  Laura?
18     A.    For three-and-a-half years.
19     Q.    Had you ever been married before?
20     A.    Yes.
21     Q.    What was your former spouse's name?
22     A.    Nancy.
23     Q.    And where does she live?

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

## Page 17

1    A.    In Pennsylvania.
2    Q.    I don't mean to pry. We are just
3    trying to find out if there is a juror you are
4    related to, we need to recognize that name.
5    A.    That is fine.
6    Q.    And how is it that you got into this
7    deal with Mr. Morin?
8    A.    Providing him entertainment and more
9    or less built his business for him, and I brought
10   other business proposals to him, and he went ahead
11   and invested in them.
12   Q.    How long have you been actually in
13   business with him?
14   A.    Doing business with him or in
15   business?
16   Q.    In business with him.
17   A.    Well, initially my father and my step
18   mom -- who is also deceased -- we were opening a
19   club in Wetumpka, and she come up with ovarian
20   cancer. And we had already started the process of
21   buying the equipment and stuff, and then they had
22   to pull out because of her illness and death. So I
23   approached Mike to go in on that tavern in

## Page 18

1    Wetumpka, and that's when we started -- and that
2    was in '97.
3    Q.    So you've been with Woodmere Tavern
4    since the very beginning?
5    A.    No.
6    Q.    Woodmere Tavern has been around since
7    before then?
8    A.    I think since '93 -- I believe so.
9    Q.    Have you ever been in business with
10   Barry Barr?
11   A.    No, sir.
12   Q.    How long have you known Barry Barr?
13   A.    Known of him or known him
14   personally?
15   Q.    Known him personally.
16   A.    I got to really know him personally
17   probably in the last -- it's been less than a year
18   as far as personally. I've known of him because of
19   the bar business for several years.
20   Q.    Do you know any of the other people
21   that are in this room -- Amy Knudsen?
22   A.    I've only talked to Amy on the phone.
23   I wouldn't have been able to tell you it was Amy if

## Page 19

1    she walked in the door.
2    Q.    Do you know Scott Harris sitting to
3    her right?
4    A.    No, sir.
5    Q.    Do you know anybody out at Aronov
6    Realty -- management or brokerage company?
7    A.    No, sir.
8    Q.    How many times have you spoken with
9    Amy Knudsen?
10   A.    Approximately a dozen times.
11   Q.    You said you have known of Barry Barr
12   for several years because of the bar business?
13   A.    Yes, sir.
14   Q.    Can you explain that to me?
15   A.    He was the owner of the Texas
16   Steakhouse, and then I know it turned to Sports
17   Rock, and they were more or less our competition at
18   that time, and then it turned from Sports Rock to
19   Celebrations.
20   Q.    Did you ever have any interest in
21   either of those companies?
22   A.    No, sir.
23   Q.    Or either of those bars -- are you

## Page 20

1    and Barry Barr in business together now?
2    A.    No, sir.
3    Q.    Do you consider yourself a friend of
4    Barry Barr's?
5    A.    We don't go out, we don't eat
6    together or anything like that, but I mean I don't
7    dislike him.
8    Q.    Is that to say you're not friends?
9    A.    No, I mean I'd say we're friends.
10   He's more friends with my partner than with me.
11   Q.    How often do you see Barry Barr --
12   weekly?
13   A.    I'd say probably once a week.
14   Q.    Does he come out to you-all's place,
15   Woodmere Tavern?
16   A.    Yes.
17   Q.    And does he come out there as a
18   customer?
19   A.    As Mike's friend.
20   Q.    Have you ever been to Mr. Barr's
21   house?
22   A.    Yes.
23   Q.    How many times?

## Page 21

1    A.    Two, maybe three.

2    Q.    Has he ever been to your house?

3    A.    He come out and -- he hasn't been
4    inside my house. He's been up to -- driving by. I
5    think him and Mike come up and seen I've got horses
6    and stuff.

7    Q.    How many times?

8    A.    Once I believe.

9    Q.    You-all ever go on vacations or
10   holidays together?

11   A.    No, sir.

12   Q.    Are your spouse's friends?

13   A.    They know each other, but they are
14   not friends. They don't know each other well at
15   all -- I mean, that well.

16   Q.    How is it that you got involved in
17   this case?

18   A.    We were at -- we were down in the
19   office, and I was looking -- I was looking at
20   possibly getting out of Woodmere Tavern, but doing
21   without Mike knowing until I had somewhere to go.
22   My dad agreed -- he initially, before my step mom
23   passed away, was backing me in Madison's, and he

## Page 22

1    agreed to back me to go ahead and leave Woodmere,
2    and I was looking for another location. During
3    approximately the same time, my dad had a stroke,
4    and Barry was in the office, and he was talking
5    about trying to find another location, and he
6    mentioned that he was trying to get Pure Country
7    Saloon and that it wasn't available. I had several
8    folks that used to come up to Heartland Dance
9    Center that were -- Pure Country was a country
10   bar -- that asked me if I'd look into that -- and I
11   was going to look into it. I mentioned to Barry
12   that I thought it was still available, and he told
13   me it wasn't -- that he was told that it was not
14   available. So he asked me if I would call Aronov
15   and find out if I would be able to get to it -- he
16   felt he was being discriminated against because of
17   the type of club he had.

18   Q.    Do you remember when that took place?

19   A.    Had to have been probably the
20   beginning of June. That's about the time my father
21   got sick the first time.

22   Q.    When you say you were in the office,
23   where was that?

## Page 23

1    A.    At Woodmere Tavern.

2    Q.    And who all was there?

3    A.    Mike Morin -- he was there visiting
4    Mike. I was just in the back of the office doing
5    my computer stuff, and I just overheard what they
6    said.

7    Q.    Are you saying that before that
8    moment you had been thinking about getting out of
9    Woodmere Tavern and opening your own place?

10   A.    Yes, sir.

11   Q.    That people who had come to
12   Heartland --

13   A.    That used to go to Pure Country.

14   Q.    -- that used to go to Pure Country,
15   they are the ones that got you interested in Pure
16   Country?

17   A.    Well, they had made mention because
18   some would go there and then also come in Woodmere,
19   and they asked me why don't you just get that place
20   and do the same thing that you did up in Heartland,
21   and I just thought about looking into it.

22   Q.    Did you know Fannin, the owner of
23   Pure Country?

## Page 24

1    A.    He's another one I know of. And
2    after he shut down Pure Country, he came into
3    Woodmere. And he's just like Amy -- I wouldn't
4    know him by face, but he introduced himself to me.
5    I met him once.

6    Q.    What did he tell you about Pure
7    Country in terms of why he was out of business?

8    A.    I couldn't specifically say, but it's
9    a lot of things that -- I guess a lot of people
10   that lose their business are going to blame
11   everything else -- and I don't know -- could have
12   been anything from the area to the location.

13   Q.    Did he tell you he was bankrupt?

14   A.    Pardon?

15   Q.    Did he tell you that the business was
16   bankrupt?

17   A.    No, sir.

18   Q.    Or in bankruptcy?

19   A.    No, sir.

20   Q.    Or that he was going to have to get
21   out of it?

22   A.    No, sir.

23   Q.    Did he tell you that his place was

## Page 25

1    available?
2    A.    No, sir.
3    Q.    Did he tell you that he'd closed
4    down?
5    A.    Yes, sir.
6    Q.    And did you talk with Fannin about
7    maybe going into that space or taking it off his
8    hands or taking over the lease?
9    A.    No, we didn't get into that in-depth
10   of a conversation.  As a matter of fact, I think
11   the lady that was with him was actually coming in
12   to see us to apply for a job.
13   Q.    And did you ever talk with Fannin
14   again after that day?
15   A.    No, sir.
16   Q.    You said that your father had backed
17   you on Heartland?
18   A.    No, Madison's.  That was another pub
19   in Wetumpka that we had opened in '97.
20   Q.    Is that still in business?
21   A.    It is, but not under that same name.
22   It's called Dakota's now.  We sold it.
23   Q.    So you were actively looking for

## Page 26

1    another location to get out of Woodmere at the
2    time?
3    A.    Yes, sir.
4    Q.    And you said your father had had a
5    stroke?
6    A.    Yes, sir, he had several.
7    Q.    You said Barry was in the office, and
8    he was looking at another location to set up a
9    club?
10   A.    He had mentioned that he had looked
11   at Pure Country Saloon in that plaza, I believe.  I
12   think he made mention of Mike that, you know, the
13   only way he'll probably get in there would be to
14   buy the whole plaza, or something to that aspect.
15   At that time, I told him, I said that I thought it
16   was still available.  Because if he knew something
17   I didn't, I wasn't even going to waste my time
18   making a phone call for myself.
19   Q.    Why did he need a new place to do
20   business, Barry Barr?
21   A.    Because he shut his other one down.
22   Because what I feel is lack of cooperation from the
23   police in his parking lot.

## Page 27

1    Q.    Really?
2    A.    Yes.
3    Q.    Had you ever discussed that with
4    Barry?
5    A.    I have discussed it with a lot of
6    people.  I don't think the problem with Barry's
7    business was inside his place, it was outside his
8    place.  When he -- everybody knows that a lot of
9    the problems even occurred across from his parking
10   lot, and that's something that he couldn't control.
11   And it's something that even being in the bar
12   business myself, it's tough to have enough people
13   in the parking lot the whole time of your
14   operation.  We don't have that problem at Woodmere,
15   but it could happen to anybody at any time in this
16   town, I believe.
17   Q.    What do you attribute your success in
18   keeping a safe parking lot at Woodmere to?
19   A.    Well, I don't do anything to the
20   degree he's done.  He's put plenty of security in
21   it, and I'd like to say it's Irish luck, but I
22   guess that's not it.  But I couldn't tell you.  I
23   mean, I have -- we don't have the same clientele.

## Page 28

1    I play a different style of music than he plays.
2    Q.    What style of clientele do you have?
3    A.    I have a lot of military; I have
4    police officers; I have firemen; I have white and
5    black.
6    Q.    What style of people did he have?
7    A.    His majority of his clientele were
8    black.
9    Q.    Do you attribute that to anything?
10   A.    Pardon?
11   Q.    Do you attribute that to anything as
12   far as the parking lot is concerned?
13   A.    Not in the inside, but in the outside
14   I feel like that in that kind of a club that his
15   competition might have played a part in that.
16   Q.    Can you tell me what you mean by
17   that?
18   A.    I believe that they have done it in
19   the past to other places.  They can send trouble
20   into the parking lot just for the mere reason that
21   it's going to hit the papers -- and it's going to
22   be associated with the club, it's not going to be
23   associated with -- you know, like I said some of

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 29

1  his problems happened across the street. There
2  were shootings from across the street. That wasn't
3  his parking lot, but it was related to his club.
4      Q.   So you think it's possible that
5  another club that played hip hop-style music sent
6  people over to his place to create bad publicity
7  and put him out of business to shut down the
8  competition?
9      A.   I think that's possible.
10     Q.   Did you ever talk to Barry about
11 that?
12     A.   No.
13     Q.   Did you ever talk to Barry about why
14 he had the problems that he had?
15     A.   When he was in there. I mean, I told
16 him I said -- Barry -- any time I tell people --
17 because you hear a lot of people talk about
18 Celebrations and the problems they had over there.
19 I'd correct them because -- you know, I do know
20 people that have gone in there, and they said it
21 was run good on the inside -- couldn't help what
22 happened on the outside.
23     Q.   You said that Woodmere is a different

Page 30

1  style of clientele. What do you attribute that to?
2      A.   Different style -- probably because
3  of my entertainment, the type of music I play.
4      Q.   Can you tell us what type of
5  entertainment you --
6      A.   I play a variety of music. I play
7  the newer dance stuff; I play country; I play rock.
8      Q.   Do you consider yourself to run or
9  operate a country western band place?
10     A.   Woodmere?
11     Q.   Yes.
12     A.   No. Heartland was a country western
13 place. Woodmere is a variety.
14     Q.   And you said that you have both white
15 and African-American clientele?
16     A.   Yes.
17     Q.   Is there a majority white, majority
18 African-American?
19     A.   It's majority white. And it has been
20 increasingly turning, you know, blacker -- or
21 African-American -- however you do that -- and it's
22 mainly because we got a strong presence of the
23 military, and there's just a lot of people that

Page 31

1  want a safe place to go, and they come in there --
2  and I have had African-Americans -- if that's the
3  way you want to put it -- come to me and say, you
4  know, we don't the like your rock or country, but
5  you run a very safe place -- and so they wait on
6  their dance music.
7      Q.   You said that you told Barry that it
8  was your understanding that the Pure Country space
9  was available?
10     A.   From what other people told me. I
11 guess they would know that owner. They come to
12 know -- I mean, my clientele has come to know me
13 over the years. And some of them were certain that
14 the space was still available. And that's when I
15 told him, I said, I was under the understanding
16 that it was still available.
17     Q.   What did he tell you when you said
18 that?
19     A.   He said he was told that it was
20 already being -- it was already going to be rented,
21 and that he wasn't going to be available to get
22 that location.
23     Q.   And did he tell you who was going to

Page 32

1  be renting the space?
2      A.   I think he might have -- no, I don't
3  think he said who it was, and I don't even think he
4  even mentioned who it was he talked at -- who was
5  handling the property.
6      Q.   Did you at any time learn that Doodle
7  Hoppers was looking at the space?
8      A.   In talking with Amy, she said that it
9  was a possibility.
10     Q.   And do you know who has the space
11 now?
12     A.   The people that had Doodle Hoppers.
13 I don't know if they are using both spaces, but I
14 know they moved into the Pure Country side.
15     Q.   And you said that Barry felt
16 discriminated against because of the type of club
17 that he had?
18     A.   Yes.
19     Q.   Did he use any other detail other
20 than that when he said that?
21     A.   No.
22     Q.   Did you understand that he was
23 looking to open another place like Celebrations?

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 33

1    A.    I didn't know if he was looking to
2  open another place like Celebrations. I would
3  imagine if T. Long was going to do it with him, I
4  don't know if T. Long was on the investment side or
5  what -- but I know that he wanted to open another
6  place because that's -- if I left Woodmere, that's
7  what I'd do. I don't know what kind -- Barry's
8  operated -- Sports Rock, by Montgomery standards,
9  would be considered a white club. That's how they
10  break them down in this town. He's operated
11  several places and restaurants. What he wanted to
12  open up, I do not know.
13    Q.    Did Barry ever tell you that the
14  reason he was having problems in the parking lot
15  was because a rival club was trying to run him out
16  of business?
17    A.    No.
18    Q.    Did you ever discuss that theory with
19  Barry?
20    A.    No.
21    Q.    Did Barry ever tell you that he was
22  having problems in the parking lot and didn't know
23  how to handle them, or words to that effect?

Page 34

1    A.    Didn't know how to handle it -- no,
2  with the money that he spent -- that I know he
3  spent there -- because I hired security too, just
4  for the sake of having security at one time -- and
5  the money he spent, I knew he was making an
6  effort. But I just don't think that -- I think he
7  told me the police told him at one time they were
8  not going to police his parking lot.
9    Q.    Did you ever go to Celebrations when
10  it was a hip hop club?
11    A.    Yes, sir.
12    Q.    And how would you describe the
13  breakdown of the clientele in there, in terms of
14  race?
15    A.    At the time I went in there, it was
16  probably 50/50. I don't drink that much, and it
17  was more or less a thing after work -- you know, my
18  employees -- let's go have a drink.
19    Q.    Had you ever been there at nighttime?
20    A.    As a customer?
21    Q.    Yes.
22    A.    No, I don't really go to clubs. I'm
23  in them enough.

Page 35

1    Q.    Had you ever been in that parking lot
2  at night?
3    A.    Yes, sir.
4    Q.    Had you ever seen the problems that
5  were going on in that parking lot?
6    A.    I've never seen any altercations, if
7  that's what you're asking. But there were people
8  in the parking lot.
9    Q.    Was there an excessive amount of
10  people in the parking lot?
11    A.    I don't know what you mean by
12  excessive. I mean, people could be coming or going
13  to their cars. You could say I have an excessive
14  amount of people. But as long as they are moving,
15  I won't approach them, or my security won't
16  approach them.
17    Q.    Did you see any non-moving people in
18  his parking lot?
19    A.    No, sir.
20    Q.    People loitering around or standing
21  around?
22    A.    I really didn't go there -- during
23  the hours I have been through his parking lot -- he

Page 36

1  was a later night club than I was. So when we
2  would pull in, there would be people there. But
3  not to the point where I was worried about my car
4  contents.
5    Q.    Did Barry ever discuss with you the
6  fact that he had a roving bunch of gang members
7  that would come to his parking lot?
8    A.    No, sir.
9    Q.    You never heard that before?
10    A.    No, I don't believe I have. We've
11  had conversations before. And if he said it, then
12  I don't recall it.
13    Q.    Do you ever remember him saying
14  anything about a roving group of black thugs or
15  roving group of black gang members?
16    A.    I don't recall it.
17    Q.    You know your tape has been provided
18  to all the parties in this case?
19    A.    Yes, sir.
20    Q.    Have you had a chance to look at it?
21    A.    They -- Barry said they wrote down --
22  with the stuff I've had to deal with with my dad, I
23  haven't had a chance to study it.

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 37

1    Q.    Who is Bob? Is there an individual
2   named Bob?
3    A.    Bob?
4    Q.    Bob, yes. I was trying to think -- I
5   thought the tape started out. It sounded like it
6   started out?
7    A.    No. I call my dad Pop.
8    Q.    Maybe it was Pop and the court
9   reporter wrote down Bob. Actually, it doesn't even
10  make the transcript. It's on the tape version, but
11  it didn't make the transcript. I guess we're going
12  back to the beginning of June. Barry is in your
13  office. He's said he's felt discriminated against
14  because of the type of club he had. Are those the
15  words that he used?
16   A.    Pretty much.
17   Q.    Did he say anything else?
18   A.    Well, I mean the conversation came up
19  where I said I thought the property was available,
20  and I kind of looked at it as an opportunity to
21  where I could find out if it was available. And if
22  I seen down there or word got out that I was
23  looking at it and got back to Woodmere, well I'd be

Page 38

1   doing it. Because he asked me, he said -- why
2   don't you call and find out if it is available.
3    Q.    Okay. Did you call them right then?
4    A.    Yes, sir.
5    Q.    Was he in the room?
6    A.    Yes, sir.
7    Q.    Who did you call?
8    A.    Amy Knudsen.
9    Q.    How did you know to call her?
10   A.    Barry provided the phone number for
11  me, and it was for Aronov.
12   Q.    Did you get her when you placed the
13  call?
14   A.    I think initially I got Aronov, and
15  they gave me the number for her.
16   Q.    Did you speak with anyone at Aronov,
17  or just like the operator?
18   A.    Whoever answered the phone.
19   Q.    Did you discuss what you were doing
20  in that phone call?
21   A.    No.
22   Q.    How did you reach her then, on a cell
23  phone?

Page 39

1    A.    I believe so.
2    Q.    And what phone were you calling from?
3    A.    From Woodmere Tavern.
4    Q.    Is that a hard-line phone that you
5   have in the place?
6    A.    Yes.
7    Q.    What is the phone number there?
8    A.    Well, there is two phone numbers --
9   279-0802 and 274-0437.
10        MR. GUY: I'm sorry, you fade off
11  for me here -- it's 0437?
12        THE DEPONENT: Yes, sir.
13        MR. GUY: Thank you, sir.
14   Q.    (Mr. Stewart) Do you know which of
15  those numbers you called her on?
16   A.    No. It is a phone that if one is
17  being used, it will go to the other number.
18   Q.    And where did you place the call
19  from, the office?
20   A.    From the office.
21   Q.    And were both Mike and Barry in there
22  when the call was made?
23   A.    Yes, sir.

Page 40

1    Q.    Was the conversation recorded?
2    A.    No.
3    Q.    Did anyone take notes of the
4   conversation?
5    A.    I couldn't tell you if Barry did or
6   not.
7    Q.    Did you yourself take any notes of
8   conversations with Amy at any time that you talked
9   with her?
10   A.    Just at the time where I made that
11  call and she said she would talk to me about the
12  club. And I told her who I was, what places I've
13  had.
14   Q.    Let's talk about the first
15  conversation that you had with her. Tell me what
16  you said and what she said.
17   A.    Just more or less that I was
18  interested in that location in finding a place, and
19  that some of my customers in Heartland had told me
20  that they were interested in me possibly opening
21  another --
22   Q.    Anything else?
23   A.    I don't really recall a lot from

10 (Pages 37 to 40)

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 41

1    that.
2        Q.    What did she say?
3        A.    She said that she would be available
4    to talk to me about it, and I believe either in
5    that conversation -- the ones to follow that -- she
6    would get with an attorney for that shopping center
7    and that he would be able to show it to me.
8        Q.    Did you discuss in that conversation
9    the dance floor?
10        A.    I said I'd like to see the dance
11    floor. Because if I did country music -- which
12    Pure Country was a country bar -- I said, I just
13    want to ensure that it would be large enough.
14        Q.    Did you tell her that you had had a
15    line dancing place at one point in time?
16        A.    Yes.
17        Q.    And so she told you that she would
18    let you see the place, or do you know what words
19    she used?
20        A.    No. She said she would be interested
21    in me looking at the place and that she could
22    arrange for the -- I don't know if he was managing
23    also, but I know he's an attorney.

Page 42

1        Q.    Anything else that she said during
2    that conversation?
3        A.    No, that was pretty much just setting
4    up a time to go look at it.
5        Q.    Did you set up a time in that actual
6    conversation?
7        A.    No, because she said she'd have to
8    see what the availability was to look at it.
9        Q.    Did you understand that she was going
10    to see what the availability to look at it was?
11        A.    Pardon?
12        Q.    How did you understand she would find
13    out about the availability of it, through talking
14    with this lawyer?
15        A.    I'm assuming she was going to check
16    with him, and then -- and I can't even really tell
17    you if in that conversation she let me know that he
18    would be the one showing it to me. She said she
19    would be interested in showing the place to me.
20        Q.    And is there anything else that took
21    place in that first conversation?
22        A.    I believe it was somewhat of a brief
23    conversation.

Page 43

1        Q.    Did you tell her anything in that
2    first conversation about what type operation you
3    were going to run?
4        A.    Well, I told her what places I run
5    now and what places I ran in the past, and I was
6    interested doing another country place. And at
7    that time, I don't think I revealed to her that I
8    was trying to get out of Woodmere. I thought I'd
9    mentioned that I wanted to do a country place that
10    wouldn't compete with Woodmere.
11        Q.    Did she say anything about the type
12    of place that you were intending on putting in that
13    location?
14        A.    She said she knew of Woodmere and
15    Heartland and that that's the kind of place that
16    they would like to have.
17        Q.    Did she explain why that was the type
18    of place they would like to have?
19        A.    No.
20        Q.    Did she say anything about the race
21    of the people that would be there?
22        A.    We are still on the first
23    conversation, right?

Page 44

1        Q.    Right.
2        A.    Okay -- no. I'm having a hard time
3    remembering which conversation that she brought up
4    what kind of club and whatnot.
5        Q.    If we can -- I understand you are
6    having a little difficulty putting them in there --
7    but as far as you recall, is that all you discussed
8    in the first conversation?
9        A.    I believe so.
10        Q.    And how long was it before you had a
11    second conversation?
12        A.    Possibly either that evening or the
13    next day.
14        Q.    And how was it that you had this
15    conversation? Did she call you, or did you call
16    her?
17        A.    I don't recall.
18        Q.    Where were you at the time of the
19    second conversation?
20        A.    On my cell phone. I couldn't tell
21    you where.
22        Q.    And what is your cell phone number?
23        A.    657-6765.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 45

1  Q.  Is that 334?
2  A.  Correct.
3  Q.  Is that still your cell phone number?
4  A.  Yes, sir.
5  Q.  Was she on her cell phone, or was she
6  at the office?
7  A.  I believe she was on her cell phone.
8  I really couldn't tell you.
9  Q.  How long a conversation was the
10  second one?
11  A.  I have no idea.
12  Q.  Tell me what you-all discussed in the
13  second conversation.
14  A.  She had discussed that there was
15  other people looking at it, and she was kind of in
16  a hurry for me to look at it and see if it's
17  something I would be interested in.  She had
18  mentioned that Doodle Hoppers was interested in it
19  and that she wasn't sure if they had the money to
20  go into the new location.  And she mentioned that
21  there was a guy with a black club that wanted --
22  that was interested in it.
23  Q.  Were those the words she used?

## Page 46

1  A.  Yes, sir.
2  Q.  Was she any more specific?
3  A.  Pardon?
4  Q.  Was she any more specific?
5  A.  I don't believe in that point in time
6  that she come out and said the guy from
7  Celebrations.  But in during one of our
8  conversations, both her and the attorney mentioned
9  Celebrations.
10  Q.  But you don't know if it was
11  mentioned in this conversation?
12  A.  I really -- we've had several -- I
13  mean, quite a few phone conversations.
14  Q.  And we are going to get to them.  I
15  am just trying to -- best I can --
16  A.  I really couldn't tell you exactly
17  which conversation a lot of this stuff happened in.
18  Q.  Did you record the second
19  conversation?
20  A.  On the phone?
21  Q.  Yes, sir.
22  A.  I recorded none of our conversations
23  on the telephone.

## Page 47

1  Q.  Did she ever leave a message on an
2  answering machine of yours?
3  A.  Yes, sir, several times.
4  Q.  And did you save those messages?
5  A.  Yes, sir.
6  Q.  And where are those messages saved?
7  A.  On my cell phone.
8  Q.  So if we wanted to today, we could
9  listen to those conversations while we are sitting
10  here?
11  A.  Yes, sir.
12  Q.  In this second conversation -- and I
13  understand you've told me sometimes these
14  conversations move together, but at this point all
15  I'm asking for is your best recollection -- did you
16  actually set up an appointment time to go look at
17  the place?
18  A.  She set up an appointment time
19  with -- I got the name on here -- Don Little.
20  Q.  And do you know Don Little?
21  A.  Just in the time I have met him.
22  Q.  And do you know when it was that it
23  was set up that you go look at it?

## Page 48

1  A.  On the 13th of June.  I just have it
2  on this tape right here.
3  Q.  And did you actually call Don Little?
4  A.  I really can't recollect if he called
5  me or I called him.
6  Q.  Before the meeting?
7  A.  Yes, sir.
8  Q.  Was there anything else you-all
9  discussed in the second conversation?
10  A.  With Amy?
11  Q.  Right.
12  A.  I couldn't tell you.
13  Q.  Tell me about your conversation with
14  Don Little, the phone conversation.
15  A.  Just that I was interested in going
16  and looking at the location, and then we just
17  mainly set up a time to go look at it.
18  Q.  And that was June 13 then that you
19  were going to meet, the time?
20  A.  Yes, that was the date that they set
21  -- that he set up for me to go look at it.
22  Q.  And what time on June 13th were you
23  supposed to meet?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 49

1    A.    I don't recall.
2    Q.    Did you keep Barry Barr in the loop
3    on these conversations that you were having?
4    A.    I really didn't at the time when we
5    were meeting because I said it was kind of a
6    twofold thing. I was really interested in the
7    location myself. And occasionally I would
8    tell Mike -- and I think Mike told him, and then
9    he'd be in the office -- and I did tell him when I
10    went and looked at it.
11    Q.    So at the time that you were talking
12    to Don Little, you were still interested in leaving
13    Mike Morin and starting your own place?
14    A.    Right.
15    Q.    Okay. So you got to LeCroy Shopping
16    Center to look at the place on June 13th?
17    A.    Yes, sir.
18    Q.    You took with you at that time a
19    video camera?
20    A.    Yes, sir.
21    Q.    What kind of video camera was it?
22    A.    JVC minicam. I'm not sure exactly
23    what the model is.

Page 50

1    Q.    Does it record to DVD?
2    A.    Yes.
3    Q.    And is the original DVD what you have
4    brought with you today?
5    A.    Yes.
6    Q.    And why did you bring a recorder?
7    A.    For one, Barry asked me to record the
8    conversation, and I was going to record it for my
9    father. But really at that time when I went in
10    there, I think it was pretty much -- when I knew I
11    was going to go in there and look at the location,
12    I pretty much decided not to go with that location.
13    Q.    Is the picture that you have on your
14    DVD -- since we haven't had a chance to look at
15    your version -- does it actually have people and
16    objects in it?
17    A.    Yes. We went inside, and I videoed
18    the interior of it. I went into the kitchen -- I
19    think he couldn't find the lights in the kitchen,
20    but we were outside. I was filming the dance
21    floor, filming the DJ booth, and more or less the
22    dimensions, and really the condition too --
23    condition of the place.

Page 51

1    Q.    So I think my version has like a
2    black screen on it when you look at it. Was there
3    a period of time that the lens cap was on the
4    camera?
5    A.    Yes.
6    Q.    And then at some point in time, you
7    took the lens cap off and actually filmed the area?
8    A.    Yes.
9    Q.    At the time you were filming the
10    area, you had already decided you weren't
11    interested in the place?
12    A.    Pretty much, because I don't want to
13    be involved in this -- I really don't, and I guess
14    it turned out to be a little more involvement than
15    what I thought I would have. And at that time of
16    doing it, and you know, I knew I didn't want to
17    have that location.
18    Q.    Did you know you didn't want to have
19    that location the second you saw it?
20    A.    Pretty much as we were going into
21    this. And once I did do the filming and the audio
22    and all that stuff, I just didn't have a good feel
23    about it for me.

Page 52

1    Q.    Why is that?
2    A.    Because I really didn't -- I really
3    didn't want to be involved in it.
4    Q.    You are talking about you didn't want
5    to be involved in the lawsuit?
6    A.    Right.
7    Q.    I thought you were saying you didn't
8    want the space for --
9    A.    No. And because of that, I didn't
10    want the location anymore.
11    Q.    So your decision not to pursue the
12    location was just to stay out of the lawsuit, not
13    that it wouldn't be a good location for the type of
14    place you were trying to run?
15    A.    Basically. And I don't feel good
16    about that location anyway anymore.
17    Q.    And you have since decided not to
18    start your own place; is that right?
19    A.    Right. And a lot of that has to do
20    with because of the health of my father.
21    Q.    When you told Mr. Little that you
22    were recording it so that you could go back and
23    show your partner it --

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

## Page 53

1   A.   My father.

2   Q.   That was your father?

3   A.   Yes, sir.

4   Q.   At that time, he was unable to

5   travel?

6   A.   Right.

7   Q.   So is there a conversation that you

8   had with Don Little that doesn't appear on the

9   version of the DVD that I have?

10  A.   That DVD should be an exact copy of

11  what I did.

12  Q.   And how did you have the copies made?

13  A.   I have a copy machine.

14  Q.   Are you the one then that when I

15  asked for a copy of it, they contacted you and said

16  the lawyer on the other side wants a copy of it,

17  and one of them was provided to me?

18  A.   Pardon, I don't understand?

19  Q.   Did you provide a copy of this DVD to

20  Barry Barr --

21  A.   Yes, sir.

22  Q.   -- so that he could provide it to us?

23  A.   Yes, sir.

## Page 54

1   Q.   And you attempted to make an exact

2   copy of that DVD when you turned it over?

3   A.   Yes, sir. I don't have any editing

4   skills to where I can cut and block. It's just a

5   straightforward copy. And I believe even because

6   of the way the disks are, if you have a Dash R, you

7   can't edit -- Dash RWs you can edit.

8   Q.   Did you turn off the camera toward

9   the end there of your meeting while Don Little was

10  there, or did you keep it running at all times

11  while you were with Don Little?

12  A.   I kept it running a good bit of the

13  time, I believe. I'm going to be honest, I have

14  not listened to this since probably June of last

15  year.

16  Q.   In saying that, are you saying that

17  there were times when you would cut it on and cut

18  it off?

19  A.   I believe there was times when I cut

20  it on and cut it off.

21  Q.   And why did you do that?

22  A.   Saving battery -- or there might have

23  been a time when I was looking around the place on

## Page 55

1   my own.

2   Q.   At times when it was off, did you

3   talk with Mr. Little?

4   A.   I'm sure I did.

5   Q.   Do you remember anything that you-all

6   discussed after you turned it off?

7   A.   No, sir.

8   Q.   After you took the video, did you

9   play it for anyone?

10  A.   I gave -- I believe I played it on my

11  video, on my camera for Barry -- Mr. Barr.

12  Q.   Were you sitting there while it was

13  being played?

14  A.   Yes, sir.

15  Q.   And where is it that it was played?

16  A.   I believe at his house. That's one

17  of the few times I have been to his house.

18  Q.   Who was there?

19  A.   Barry and his wife Kristen.

20  Q.   Is that it?

21  A.   And myself, of course.

22  Q.   Did you listen to it while you were

23  playing it?

## Page 56

1   A.   Yes, sir.

2   Q.   And at the time you were listening to

3   it, were any of the crucial conversations with Don

4   Little not recorded?

5   A.   I don't believe so, no.

6   Q.   So anything that you and Don Little

7   discussed while the recorder was not on was just

8   trivial conversation?

9   A.   I believe so, yes.

10  Q.   Did he say, at any of the times that

11  the recorder was not on, anything about race of

12  people?

13  A.   No. I believe that the recorder was

14  on a good bit of the time that him and I talked.

15  The only time I believe that I might have turned it

16  off is if I was inspecting any piece of that

17  property myself. But we did have some conversation

18  -- I'm not going to sit here and say -- well, I do

19  remember him saying something, and it wasn't on

20  video -- I'm not going to do that. I'm not going

21  to lie about it.

22  Q.   So what we get on this video, these

23  are the statements that --

14 (Pages 53 to 56)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 57

1    A.   I believe so.

2    Q.   -- that Barry Barr was interested in

3 getting recorded?

4    A.   Yes, sir.

5    Q.   Do you know when it was that you

6 played the tape for Barry Barr?

7    A.   It would have probably been shortly

8 after the meeting with Don Little.

9    Q.   Like same-day, next-day kind of

10 thing?

11    A.   Possibly, yes, sir.

12    Q.   And did you talk to Amy Knudsen after

13 that day?

14    A.   Yes.

15    Q.   When was the next time you spoke with

16 Ms. Knudsen?

17    A.   It might have been shortly after that

18 meeting, telling her that I did go and look at the

19 location.

20    Q.   And tell me what you-all discussed.

21    A.   I told her that even though I was not

22 interested, I believe I told her I was interested

23 in the property.

## Page 58

1    Q.   And what did she say?

2    A.   And during the tape, I believe they

3 mentioned some build-out stuff, and whatnot, and I

4 can't even really recall what the whole

5 conversation was. I don't remember what's even on

6 the tape. But it was conversations as to that.

7 And even in -- you will see with the phone call

8 messages that her messages were up to even a week

9 afterwards where we were still talking about my

10 renting the location.

11    Q.   Did you discuss with Amy Knudsen that

12 you would want to do some build-out?

13    A.   I told her there would have to be

14 build-out done, and Don Little I believe afforded

15 me some avenues or some choices I could make and

16 that they would -- like I said, I haven't listened

17 to the video in a year, but I was under the

18 understanding that they were going to make some

19 concessions for me to get into that location.

20    Q.   And so you talked with Don Little

21 about the concessions that they would make, or the

22 concept?

23    A.   Yes, sir. Don Little and Amy, yes.

## Page 59

1    Q.   At any time did you discuss a dollar

2 figure on the concessions?

3    A.   I believe so. I'm not sure what it

4 was. I can't recollect. I know there was some

5 dollar figures mentioned. I believe in the

6 video -- and I can't say -- I don't have it in

7 front of me. I know they wrote it out. I never

8 read the transcript. But like I said, it's been

9 years since I have listened to that. I believe I

10 told him what I thought it would cost to go in

11 there and that they would make some concessions as

12 far as build-out time. And I think he said

13 something about repairing some things -- I can't

14 remember what it was.

15    Q.   At the time you were looking at it,

16 what were you talking about in terms of build-out

17 concessions?

18    A.   Possibly -- about two or three

19 months. That's what I usually try to do.

20    Q.   And how much money were you talking

21 about?

22    A.   As far as rent or --

23    Q.   No, as any type of rent concession?

## Page 60

1    A.   I don't recall.

2    Q.   Would it have been some huge amount

3 of money?

4    A.   I don't believe it would have been

5 huge, no.

6    Q.   Like ten, fifteen thousand, something

7 --

8    A.   If they were going to rent -- and I

9 can't even remember what the rent was going to

10 be -- it would have been two months, or whatever

11 that would have been. I imagine it would have come

12 close to ten thousand. But there was some other

13 times too that I had concerns with. And like I

14 said, I just can't recollect what they were.

15    Q.   Anything else that you talked with

16 Amy about or Little about in terms of rent -- the

17 amount of the rent, the concessions, build-out

18 dollars, and so forth?

19    A.   Not that I can recall right now.

20    Q.   Anything else that you and Amy

21 discussed in this first conversation after the

22 videotaping?

23    A.   Pardon?

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 61

1    Q.    Is there anything else that you and
2  Amy discussed in this first conversation after the
3  videotaping?
4    A.    I don't recall.
5    Q.    Did you actually quote her a figure
6  to lease the space?
7    A.    I believe that we had talked about a
8  figure, but that's just another one of the
9  non-recollection things. I can't -- I really put
10  this to bed a year ago.
11    Q.    So you don't have any recollection as
12  you sit here today what the lease was going to be,
13  how many dollars per square foot, or --
14    A.    I know it was something that I'm
15  pretty sure I would have -- if I wanted to pursue
16  the location, I was going to do. They made it
17  attractive enough to where I was going to probably
18  do it. I would have done it.
19    Q.    Did you understand at the time that
20  they still had Doodle Hoppers looking at it?
21    A.    Yes, sir.
22    Q.    How much would space like that rent
23  for, in your opinion, at that time?

## Page 62

1    A.    In the condition of that building --
2  I would say between four and five thousand dollars
3  a month approximately.
4    Q.    Do you recall anything else from this
5  first conversation at the videotaping?
6    A.    No, sir.
7    Q.    How did you leave it with Ms. Knudsen
8  at that time?
9    A.    That I was still interested in the
10  property.
11    Q.    And did you tell her you would get
12  back with her, or how --
13    A.    I don't recollect.
14    Q.    I guess what I'm getting at is: It
15  sounds like you're having this conversation after
16  looking at it, you tell her you're still interested
17  in it in -- but in terms of making a formal offer,
18  either oral or in writing to lease the space, you
19  hadn't gotten to that point?
20    A.    Right.
21    Q.    You told her that you would have to
22  talk to your partner or get back with her, or words
23  to that effect?

## Page 63

1    A.    Something like that. But I do
2  remember that she had made mention in one of our
3  conversations that we need -- you know, if we're
4  going to do something, we need to do it soon.
5    Q.    Did she offer on explanation why?
6    A.    During our conversations, I mean it
7  had absolutely had to do with the fact that she
8  didn't want to look like -- which I was kind of
9  confused on how I would be able to come in and get
10  that place if she told him the people from Doodle
11  Hoppers were getting it, and then all of a sudden I
12  would show up as a tenant. That kind of confused
13  me at first, how she would explain that. But it
14  was totally that she just didn't want Barry coming
15  into it with a place like Celebrations.
16    Q.    She said that?
17    A.    Yes, sir.
18    Q.    Was that in this conversation?
19    A.    It was in one of our conversations.
20    Q.    She didn't want Barry to come in with
21  a place like Celebrations?
22    A.    Right.
23    Q.    Did she say anything further about

## Page 64

1  that?
2    A.    No, I believe she was pretty
3  straightforward. I mean, she didn't elaborate on
4  what his problems were. I don't think she knows
5  what his problems were, except for what she might
6  have read in the papers.
7    Q.    You said earlier that Amy said that
8  there was a guy with a black club that was
9  interested in it. In here you said that she didn't
10  want Barry to come up with a place like
11  Celebrations. Is that what she said?
12    A.    Pretty sure. I think at one in point
13  she understood -- I made her understand I know who
14  she was talking about.
15    Q.    But I mean, did she use "a place like
16  Celebrations" or "a black club"?
17    A.    Might have been Mr. Little that used
18  black club. She might have used Celebrations.
19    Q.    And I take your answer that you just
20  don't remember, since it's been a year ago?
21    A.    Yes, sir.
22    Q.    Was anybody listening in on this
23  conversation with Ms. Knudsen?

16 (Pages 61 to 64)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 65

1      A.    No, sir.
2      Q.    And again this conversation was not
3  recorded?
4      A.    No, sir.
5      Q.    That's true?
6      A.    Yes, sir.
7      Q.    Make sure we are talking about the
8  same thing.
9      A.    The only thing I'm going to say I
10  have is just her phone messages to call her back.
11      Q.    And I want to hear those. But I'm
12  one of those people if I'm asking a certain line of
13  questions, I got to keep on going, or I'll forget
14  something.
15      A.    Yes, sir.
16      Q.    So that's all you recall about this
17  conversation?
18      A.    Yes, sir.
19      Q.    Can you tell me about the next
20  conversation you had with her?
21      A.    We've had conversations on it.
22      Q.    And I know you had conversations
23  like, you know, where you would call and leave a

## Page 66

1  message on her phone and she would do the other.
2  I'm really just more interested in substantive
3  conversations. Conversations where you actually
4  spoke about the place. Were there any others that
5  you had like that?
6      A.    They were all pretty much the same --
7  if you are interested, you need to do something,
8  and I will need to know.
9      Q.    And did you ever get to the point
10  where you actually specifically made an offer to
11  lease the place?
12      A.    I believe we did come to terms. What
13  the terms were, I don't recall.
14      Q.    And how it is that you didn't end up
15  leasing the space if you actually came to terms?
16      A.    Because I wasn't going to lease it to
17  begin with. I was just getting to the point where
18  I knew I had the location if I wanted it.
19      Q.    And in any of these conversations,
20  did the subject of Celebrations come up?
21      A.    With Amy?
22      Q.    Yes.
23      A.    It might have once or twice. Again,

## Page 67

1  they were very apprehensive of Barry, I think,
2  pursuing this. I don't think she knew that I knew
3  Barry, and I really didn't know Barry, except for
4  my partner. When she mentioned black club, you
5  know, I pretty much knew Celebrations. And I
6  really honestly can't say that she said black
7  club. I knew she mentioned Celebrations. Don
8  Little did mention black club.
9      Q.    Any other discussions that you-all
10  had about this property?
11      A.    Keep asking me questions, you might
12  spur my memory. I really -- other than trying to
13  set up to go in there and operate -- and I think I
14  discussed with her some of the stuff that I asked
15  Don about. But other than that, like I said I
16  really can't remember a lot of it.
17      Q.    At any time did you tell her that the
18  landlord would have to invest $300,000 in the
19  property before you'd lease the space?
20      A.    No, sir.
21      Q.    Does that sound like a lot of money
22  to you?
23      A.    It sounds like a no-deal situation to

## Page 68

1  me.
2      Q.    At any time did you have a face-to-
3  face meeting with Amy Knudsen?
4      A.    No. I wouldn't be able to tell you
5  if that was Amy when she walked in the door.
6      Q.    How is it that you actually came to
7  terms on the lease, but then got out of it? That's
8  the part that I'm confused about. Does that make
9  sense the you?
10      A.    At the time -- and I don't know how
11  Amy found out about the recording. She called me.
12  I was down at my barn at time. I remember when it
13  was. And she asked me about a recording, and she
14  was a little bit excited about it, and told me --
15  and I told her, I said -- Amy, I'm in the same
16  situation -- if Mike actually knew I was down there
17  looking at that place -- then I said -- I was
18  deceptive. I told her I did recorded it for my
19  father and Barry listened to it. She told me --
20  well, you need to destroy that recording.
21      Q.    She used those words?
22      A.    Yes, sir.
23      Q.    Are you sure about that?

17 (Pages 65 to 68)

## Page 69

1    A.    I'm positive. Absolutely one hundred
2    percent positive.
3    Q.    Tell me what she said.
4    A.    She said -- Mark, if there is a
5    recording, you need to destroy it, said, that could
6    be my job -- and I said -- Amy, that could be my
7    job, too. And then Don Little called me, and I've
8    got this thing. He knew -- and I talked to him --
9    that I'm doing this kind of twofold, and I was
10   looking for a location, and I felt his second
11   message he left on my answering machine was
12   somewhat of a threat without being in that tone,
13   that he really needs to talk to me about the
14   recording -- if you don't hear from me, he guesses
15   he'll have to call Woodmere Tavern and find out
16   when I'm working next there. And I have that on my
17   cell phone also.
18   Q.    The conversation with you and Amy,
19   was there anyone listening in on that phone
20   conversation?
21   A.    No one has ever listened to a phone
22   call. I've never had it recorded. I've never sat
23   there and had a phone call with her, by chance when

## Page 70

1    she called me, Barry would be sitting there, or
2    anybody else. No one was there.
3    Q.    In the recording that you were
4    discussing when you were talking with Amy about it,
5    was the recording of Don Little?
6    A.    No, it was a voice recording on my
7    answering machine, leaving a message.
8    Q.    There is a voice recording on your
9    answering machine from Amy where she left the
10   message "if there is a recording, then destroy it"?
11   A.    No, that was a conversation her and I
12   had.
13   Q.    Help me out. I got confused.
14   A.    She called me on my cell phone, and
15   she told me -- and how she found out that I had
16   recorded it, I believe Barry might have called her
17   and said -- this guy is looking at the place -- or
18   whatever. I don't know how that came about. She
19   called me on my cell phone, told me -- she says,
20   Mark, what is this about a recording? I don't know
21   what the exact conversation was. And I said -- I
22   recorded it on video for my father -- and I said --
23   Barry had listened to it -- and I said -- there

## Page 71

1    were, you know, I mean they had listened to it and
2    heard the reference to they don't want a black club
3    there and whatnot. And at that point in time, she
4    told me, and she says -- you need to destroy that.
5    Q.    Why did she say it needed to be
6    destroyed?
7    A.    Probably because it was
8    incriminating, what was on there, as far as who
9    they were going to lease the club to.
10   Q.    Did she say why she asked you to
11   destroy it?
12   A.    She just said I need to. I'm
13   assuming she realized that I knew why it had to be
14   destroyed with what the contents was.
15   Q.    Be she didn't go on and say -- you
16   need to destroy that because -- and then give an
17   explanation?
18   A.    She said she could lose her job.
19   Q.    Anything else?
20   A.    No, sir. And I told her at that
21   time, I said -- well, I could lose my job, too.
22   Q.    And by that you meant if Morin found
23   out about it, that he might --

## Page 72

1    A.    Right. Because at that time, I was
2    still being deceptive towards her. I was really in
3    there at that point in time for Barry, and I just
4    had a hard time talking with her, because I realize
5    I'm messing with somebody's livelihood at that
6    point in time.
7    Q.    Is that all you-all discussed in that
8    conversation?
9    A.    Pretty much.
10   Q.    Did she offer you any money to
11   destroy it?
12   A.    No, sir.
13   Q.    Just asked you to destroy it because
14   she could lose her job?
15   A.    Yes, sir.
16   Q.    And I think it's clear -- but the
17   recording we're talking about is the recording of
18   Don Little that you have on video?
19   A.    Inside Pure Country, yes, sir.
20   Q.    Any other conversations that you had
21   with Amy ever?
22   A.    I believe at that point in time, I
23   quit taking her calls.

18 (Pages 69 to 72)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

| Page 73 |
|---|
| 1     Q.    And did anybody ever call you on her |
| 2   behalf, such as a lawyer? |
| 3     A.    The only one that called me |
| 4   concerning this, I got two phone messages from Don |
| 5   Little. |
| 6     Q.    And are they on your cell phone? |
| 7     A.    Yes, sir. |
| 8     Q.    And did you ever actually speak with |
| 9   Don Little? |
| 10     A.    No, sir, I would not take any of his |
| 11   calls. |
| 12     Q.    And did you have anything else to do |
| 13   with Aronov or Amy Knudsen after that time? |
| 14     A.    No, sir. |
| 15     Q.    Have we discussed here this morning |
| 16   the conversations that you've had with Amy Knudsen |
| 17   to the best of your recollection? |
| 18     A.    Yes, sir. |
| 19     Q.    Are there any other conversations |
| 20   that you have had with Ms. Knudsen that we have not |
| 21   discussed? |
| 22     A.    No, sir. |
| 23     Q.    Is there any other information that |

| Page 74 |
|---|
| 1   we haven't discussed, that she and you discussed? |
| 2     A.    No, sir. |
| 3     Q.    Does that make sense? |
| 4     A.    No. |
| 5     Q.    You were supposed to stop me, |
| 6   remember? |
| 7     A.    I was getting ready to. You beat me |
| 8   to it. |
| 9     Q.    Other than the topics that we talked |
| 10   about today, are there any other topics that you |
| 11   and Amy Knudsen talked about? |
| 12     A.    No, sir. |
| 13     Q.    We've talked about them all? |
| 14     A.    Yes, sir. To my recollection, yes, |
| 15   sir. |
| 16     Q.    Other than the topics that we have |
| 17   discussed this morning that you and Don Little |
| 18   discussed, have we discussed them all? |
| 19     A.    I believe so, yes. |
| 20     Q.    Have you ever spoken with the |
| 21   landlord for LeCroy Shopping Center? |
| 22     A.    I never have, no, sir. |
| 23     Q.    You said you've got these |

| Page 75 |
|---|
| 1   conversations recorded on your cell phone |
| 2   voicemail? |
| 3     A.    Yes, sir. |
| 4         MR. STEWART: We would it make |
| 5   sense if we went ahead and played them and got them |
| 6   actually transcribed by the court reporter while |
| 7   we're here. |
| 8         MR. QUINN: Let's all hear them |
| 9   for the first time together. |
| 10   (Deponent plays voicemail messages on his cell |
| 11         phone speaker.) |
| 12     Q.    (Mr. Stewart) Those are the only |
| 13   recordings that you have of either Amy or Don |
| 14   Little, other than the video that you've talked |
| 15   about? |
| 16     A.    Yes, sir. |
| 17     Q.    And the two messages that I heard |
| 18   from Amy were dated 6/12 and 6/19 of '06? |
| 19     A.    Yes, sir. |
| 20     Q.    And those messages were |
| 21   essentially -- give me a call, here is my phone |
| 22   number, please call me? |
| 23     A.    Right. Most of the time in between |

| Page 76 |
|---|
| 1   then, we contacted -- |
| 2     Q.    And were the other messages that you |
| 3   had on your cell phone that were from Amy, were |
| 4   they of the same nature? |
| 5     A.    I think it was more or less a "cat |
| 6   and mouse", you know -- I wouldn't get her, she |
| 7   wouldn't get me. |
| 8     Q.    Do you know which of these |
| 9   conversations you and I have discussed that you had |
| 10   with Amy on the telephone took place after 6/12 or |
| 11   6/19? |
| 12     A.    At the time of the recording, I mean, |
| 13   definitely that was after the -- after the 13th |
| 14   when she asked me to destroy the tape. And then we |
| 15   were talking pretty much on a daily basis up until |
| 16   the time -- from the time that I told her I was |
| 17   interested in the place. |
| 18     Q.    Did you tell Amy that you would |
| 19   destroy the tape? |
| 20     A.    Pardon? |
| 21     Q.    Did you tell Amy that you would |
| 22   destroy the tape? |
| 23     A.    I don't believe that I said anything |

19 (Pages 73 to 76)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 77

1  about it.
2      Q.   Did you tell Amy that you were going
3  to give it to Barry Barr?
4      A.   No, I did not.
5      Q.   Who else did you play the tape for?
6      A.   Barry and Kristen. I believe that's
7  the only ones I've --
8      Q.   Did you ever play it for an attorney?
9      A.   No, sir.
10      Q.   Have you ever a met with an attorney?
11      A.   No, sir.
12      Q.   Is the first time that you have met
13  Mr. Quinn here today?
14      A.   Yes, sir.
15      Q.   How about Kevin Jent, have you ever
16  met with him?
17      A.   Talked with him on the phone three or
18  four times. Every time I have gotten a letter from
19  your office, I have called Barry, and he asked me
20  to call Kevin Jent.
21      Q.   So you talked to Kevin Jent three or
22  four times?
23      A.   Three or four times, yes, sir.

## Page 78

1      Q.   And what did you-all discuss?
2      A.   Just -- at first when I couldn't
3  make -- you know, I've never come down and done
4  this. I asked him if I had to. I already had a
5  vacation planned. So he wanted to be informed so
6  that he could be present for the deposition. So he
7  said any time I got any correspondence from you to
8  go ahead and call him.
9      Q.   And did you-all ever discuss anything
10  about what you had done -- the recordings that you
11  made, things like that?
12      A.   I just told him the same thing I told
13  Barry. I said -- I'm not going to lie for either
14  side. I would hate that Amy would lose her job. I
15  would hate if Barry was done any kind of injustice
16  because of the race of his club. I just told him
17  I'm not going to meet and have them coach me or
18  anything like that. I'm just going to come in and
19  tell what I know.
20      Q.   Did anybody from my office attempt to
21  meet with you and coach you?
22      A.   No, sir.
23      Q.   And did anyone from any law firm

## Page 79

1  offer to meet with you and coach you?
2      A.   No, sir.
3      Q.   Has Barry told you what he testified
4  to in his deposition?
5      A.   I mean, I asked him what it was
6  about, and he said -- just go in -- they are going
7  to ask you questions -- he said they are going to
8  try to beat you up and bully you, and that type
9  stuff.
10      Q.   Did you ever get a copy of the Notice
11  of your deposition?
12      MR. STEWART: Which I have marked
13  Defendant's Exhibit 1.
14      (WHEREUPON, a document was marked
15      as Defendant's Exhibit 1 and is
16      attached to the original
17      transcript.)
18      A.   That what was with the letter.
19      Q.   (Mr. Stewart) And then Defendant's
20  Exhibit 2, is that the letter you were talking
21  about?
22      (WHEREUPON, a document was marked
23      as Defendant's Exhibit 2 and is

## Page 80

1      attached to the original
2      transcript.)
3      A.   Yes, sir.
4      Q.   (Mr. Stewart) And then we had
5  earlier sent a subpoena to you I think for whatever
6  you had in terms of recordings and tapes?
7      A.   I was on my vacation. I had a
8  daughter come in from California. We had already
9  had that planned and paid for.
10      Q.   I am not fussing with you. But we
11  had sent you a subpoena?
12      A.   Yes, sir.
13      Q.   And then you had sent a letter back,
14  I think to me at some point. Let me just mark it.
15      MR. STEWART: And I will mark it
16  Defendant's Exhibit 3.
17      (WHEREUPON, a document was marked
18      as Defendant's Exhibit 3 and is
19      attached to the original
20      transcript.)
21      Q.   (Mr. Stewart) And that's letter you
22  sent to me that said -- just got back from
23  vacation, come view the DVD at my office any time?

20 (Pages 77 to 80)

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 81

1    A.   Yes.

2    Q.   Is that right?

3    A.   Yes, sir, that's my signature.

4    Q.   And in all fairness, I called you and

5    tried to meet with you to look at the DVD but we

6    never got together?

7    A.   I believe your -- I talked with you,

8    and then your -- what's the young lady in your

9    office?

10   Q.   Quinn Evans?

11   A.   Sent a message through Woodmere, and

12   then I called and talked to her, and then she set

13   it for this time, I believe.

14   Q.   But at no time did we ever come out

15   to your place of business and actually look at the

16   DVD?

17   A.   No, sir.

18        MR. STEWART:  And I haven't

19   discussed this with you-all, but is there some way

20   we can mark the original DVD as an exhibit?  Are

21   you ready to get rid of that thing?  Are you ready

22   to get rid of the original of that DVD, and we just

23   mark it as the original to his deposition?

## Page 82

1         MR. QUINN:  Yes.  And that way

2    you don't have to worry about preserving it any

3    longer.

4         THE DEPONENT:  I will give you

5    this one right here, and I don't know if you can

6    play that.  That's off my computer.  This is a copy

7    right here.

8         MR. QUINN:  So that is the

9    original.

10        MR. STEWART:  We will mark the

11   original Defendant's Exhibit 4 and make it

12   available for all parties for viewing and that kind

13   of stuff.

14        (WHEREUPON, a document was marked

15        as Defendant's Exhibit 4 and is

16        attached to the original

17        transcript.)

18        MR. QUINN:  Where are you going

19   to keep it?

20        MR. STEWART:  It doesn't matter

21   to me.  My suggestion would be it stay as the

22   original.

23        MR. QUINN:  You are not going to

## Page 83

1    keep it.  He is not going to keep it.

2         MR. STEWART:  It will be an

3    original exhibit that stays with the original

4    deposition that both of us have equal access to at

5    any time.

6         MR. QUINN:  That will be fine.

7         MR. STEWART:  Okay.

8    Q.   (Mr. Stewart)  Mr. Cranage, did you

9    tell Don Little that Doodle Hoppers' business was

10   falling off?

11   A.   Yes, I believe I said it was

12   tapering.  That's just from what I hear from other

13   customers.  A lot of our people that leave our

14   place, that's kind of a late-night place, and they

15   said it was kind of tapering off.

16   Q.   Did you tell Mr. Little that one of

17   the things that you've done to be successful in

18   having a safe parking lot is not allowing people to

19   get drunk at your place?

20   A.   I told him that we don't allow what I

21   am seeing in a lot of places -- people stumbling

22   off their bar stool, and then pointing in the

23   direction of the club.  We try to prevent it to the

## Page 84

1    best of our ability.

2    Q.   Did you tell him that you-all had a

3    practice of driving people home if they have been

4    too drunk to drive?

5    A.   We've done it numerous occasions.

6    Q.   Did you tell him that you-all tried

7    to keep the place safe so that women would feel

8    comfortable at your bar?

9    A.   Yes, sir.  I think that is the key to

10   having a good bar.

11   Q.   Because if the women feel safe coming

12   there, then the men will follow?

13   A.   Absolutely.

14   Q.   Did you tell Mr. Little that security

15   is a big thing for you?

16   A.   Yes, sir.

17   Q.   Did you tell him that you had armed

18   security if necessary?

19   A.   No, sir.

20   Q.   But that you could hire armed

21   security if necessary to keep the peace?

22   A.   There was a time when we hired the

23   same company I believe Barry had, and they were

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

## Page 85

1   armed, and we had them for a short period. I seen
2   it wasn't necessary, and plus I had a little bit of
3   a conflict with the guy that ran the security.
4       Q.   Who is that, Ted Shiek(sic)?
5       A.   They call him Chief, I believe.
6       Q.   Did you also tell him that you kept
7   your place safe and secure by charging a cover
8   charge?
9       A.   We started charging cover charge
10  because my partner wanted to charge a cover
11  charge. I never wanted to charge. But I believe
12  that keeps a lot of people that are walking in my
13  club that don't have money in their pocket that are
14  just strolling around.
15      Q.   Which, in turn, leaves for a safer or
16  more secure environment?
17      A.   I believe so.
18      Q.   Did you also tell him that you have a
19  dress code at your place?
20      A.   Yes, sir. I believe I told him that.
21  I do have a dress code at my place.
22      Q.   Did you ever talk with an attorney by
23  the name of Wayne Sabel?

## Page 86

1       A.   No, sir.
2       Q.   Bobby Segall?
3       A.   No, sir.
4       Q.   And when you and I spoke, was it just
5   to set up a time to meet and view the DVD?
6       A.   Yes, sir.
7       Q.   Did we discuss anything else?
8       A.   I don't believe so.
9       Q.   Did I ever call you and threaten you,
10  or anything like that?
11      A.   No.
12      Q.   Have we seen or listened to all
13  recordings, voicemails, messages, or anything else
14  that you might have?
15      A.   I know you have listened to these. I
16  don't know if you have listened to that. I am sure
17  you have.
18      Q.   You mean watched the actual DVD?
19      A.   You've got everything I've got that
20  would pertain to this, yes, sir.
21      Q.   You don't have any written notes or
22  anything at home?
23      A.   I don't believe so.

## Page 87

1            MR. STEWART: Let me look back in
2   my notes. I think that's all I have for you. I
3   know these other guys might have something for
4   you.
5       Q.   (Mr. Stewart) Just to be clear -- as
6   I understand your testimony, you cannot testify
7   under oath that Amy Knudsen ever used the word
8   "black" in speaking with you; is that right?
9       A.   Yes.
10      Q.   You know that she used the term
11  "Celebrations"?
12      A.   Yes, sir.
13      Q.   But she never, as far as you know,
14  referred to the race of the people that were there?
15      A.   Right, yes, sir.
16           MR. STEWART: That's all I have.
17  Mr. Guy.
18           MR. GUY: Do you want to go
19  first?
20           MR. QUINN: I am not going.
21
22  EXAMINATION BY MR. GUY:
23      Q.   Mr. Cranage, I'm Gunter Guy, and I

## Page 88

1   represent Meiying Forney who has been sued in this
2   case. Do you know who Meiying Forney is?
3       A.   No, sir.
4       Q.   If I told you she was the owner of
5   LeCroy Shopping Center, does that mean anything to
6   you?
7       A.   No, sir.
8       Q.   So her name has never been mentioned
9   to you in any conversations you had with either
10  Ms. Knudsen or Mr. Little?
11      A.   The only thing that I have ever heard
12  that referred to her was the owner of the shopping
13  centers. I've never heard her name.
14      Q.   In what reference was that made?
15      A.   Just Don Little saying, you know,
16  when he'd refer that he's representing them when he
17  was showing the place. And then Barry had
18  mentioned that he had asked about buying the
19  shopping center from the owners.
20      Q.   Anything other than in that
21  connotation?
22      A.   No, sir.
23      Q.   When you say Mr. Little mentioned

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 89

1  something about representing the owner, you mean in
2  that tape?
3      A.    Yes, sir, everything that's in that
4  tape.
5      Q.    So if it was a representation -- or
6  reference, I should say -- to the owner of the
7  shopping center, it would be -- what you're
8  referring to would be contained in that DVD?
9      A.    And also in my conversation with Amy
10  Knudsen, she said that Don Little represented the
11  owners of the shopping center. I don't know if she
12  mentioned the name of the people that owned it, or
13  just said "the owners of the shopping center".
14      Q.    That was when she was setting up the
15  meeting for you to meet with Mr. Little. Is that
16  what you were referring to?
17      A.    Yes, sir.
18      Q.    So there was a reference by Amy to
19  Mr. Little having represented the owner of the
20  shopping center?
21      A.    Yes, sir.
22      Q.    Did she say or do you have a
23  recollection of whether -- again, I think it was

Page 90

1  mentioned to you earlier -- I don't want to repeat
2  it too much -- that there was a reference that he
3  represented the owner of the shopping center in the
4  bankruptcy proceeding that was going on with the
5  Pure Country Saloon?
6      A.    I knew nothing of the bankruptcy. I
7  know there was probably nothing said about that.
8      Q.    So you don't recollect that being
9  mentioned in those references?
10      A.    Yes, sir.
11      Q.    So other than Amy mentioning when she
12  set up the meeting -- as you have alleged -- with
13  Mr. Little referencing the owner, that's the only
14  time she's mentioned the owner to you, right?
15      A.    Yes, sir, I believe so.
16      Q.    And then Mr. Little discussed the
17  owner with you when he met with you, and whatever
18  he said would be contained on that DVD that we have
19  marked as Defendant's Exhibit 4, right?
20      A.    Yes, sir.
21      Q.    If it's not on Defendant's Exhibit 4,
22  then there is nothing else he made reference to
23  about the owner then; is that correct?

Page 91

1      A.    When we were setting up the meeting,
2  we've had phone conversations. I'm sure that he
3  identified himself in some way to let me know why
4  he was the one showing me instead of Aronov.
5      Q.    When you are saying you are sure, are
6  you just speculating or assuming something, or did
7  he actually say something?
8      A.    When I say I am sure, it is because I
9  knew he was an attorney when I got there and I knew
10  he was there on the behalf of the shopping center.
11      Q.    Do you know now that Pure Country
12  Saloon was in fact in bankruptcy?
13      A.    No, sir, I don't. I thought they
14  just went out of business.
15      Q.    So you weren't made aware and do not
16  know in fact that he was the bankruptcy attorney
17  for the owner of the shopping center in that
18  proceeding?
19      A.    I don't believe, no. I don't believe
20  that ever came up in conversation.
21      Q.    So other than setting up the meeting,
22  any other mentions of the owner by Mr. Little?
23      A.    Not by name, no.

Page 92

1      Q.    Or in reference as the owner?
2      A.    Other than just initially identifying
3  himself, and he might have casually said that. In
4  the tape I think he references some of the other
5  tenants in there, and I believe in the tape it says
6  we have white tenants here that would not
7  appreciate the type of club -- if I can remember --
8  like I said, it's been a year since I have even
9  listened to the tape. I have not read the --
10      Q.    That's what Don Little says?
11      A.    Yes, sir.
12      Q.    Well, I'm asking you about reference
13  he made to the owner. If he made it in your
14  presence, other than setting up the meeting, it
15  would be on that DVD?
16      A.    Or in our phone conversations.
17      Q.    Or in your phone conversations?
18      A.    Right.
19      Q.    What phone conversations did you have
20  with Don Little, other than setting up the meeting
21  that references the owner?
22      A.    Obviously we had phone conversations
23  if he had my phone number and asked me to call him

23 (Pages 89 to 92)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 93

1  back. So that's the phone conversations I'm
2  referencing.
3      Q.    I am sorry, you're just -- I'm not
4  making myself clear. You said to me that you had
5  phone conversations with Mr. Little to set up the
6  meeting?
7      A.    Yes.
8      Q.    In which he referenced the owner as
9  representing the owner. Isn't that what you told
10  me?
11     A.    Yes.
12     Q.    I'm trying to say what are those
13  conversations? What did he say?
14     A.    Conversations where I am Don Little
15  -- Amy told me to call you -- or however that
16  transpired. He said -- I am the attorney for the
17  shopping center.
18     Q.    Anything other than that kind of
19  reference, is what I'm asking?
20     A.    No, pretty much that's it.
21     Q.    That's what I am asking. I want to
22  make sure I understand all the different references
23  he made about the owner in conversations with you.

## Page 94

1      A.    That's fine. I'm just very leery of
2  people like you, lawyers. Make sure you don't try
3  to get me in a Catch-22 or something.
4      Q.    Well, I'm not trying to deceive you,
5  sir?
6      A.    I appreciate that, and I'm not going
7  to deceive you back.
8      Q.    Good. But you did deceive
9  Ms. Knudsen, didn't you?
10     A.    Yes, I did.
11     Q.    And you did deceive your own partner
12  in this case, did you not?
13     A.    Somewhat, yes -- with good reason,
14  let me add. That is personal.
15     Q.    I am not here to deceive you. I am
16  here to ask questions because you are involved in
17  the case.
18     A.    Well, you seem to get a little
19  excited, and I just wanted to make sure you're all
20  right --
21     Q.    No, sir, I'm not excited at all. I
22  am just trying to ask you questions. So I want to
23  know just about any of the conversations you had

## Page 95

1  with Don Little, in which the owner was referenced
2  and --
3      A.    The main part of it was on that tape.
4      Q.    And any other telephone conversations
5  you had with him, in which the owner was
6  referenced, it was just him saying -- I'm here
7  representing the owner --
8      A.    Representing the shopping center.
9      Q.    No other statements attributed to the
10  owner other than that; is that fair?
11     A.    That is fair, yes.
12     Q.    Just like Mr. Stewart, I just want to
13  know if there is something that you are going to
14  testify to about the owner, and so that's what
15  we're here for today. Other than Amy, what you
16  told me about what Amy said about the owner, and
17  other than what Don Little says on that DVD, and
18  other than what Don Little said in setting up the
19  meeting for you, any other references to the
20  owner -- and then you said Barry, I believe, said
21  he had made an offer to the owner to purchase the
22  place, right?
23     A.    Yes, sir.

## Page 96

1      Q.    Any other references to the owner as
2  far as your involvement in this case?
3      A.    Not that I can recollect, no.
4      Q.    I was a little confused about your
5  employment with Woodmere. Have you ever worked for
6  Woodmere as an employee before becoming a part
7  owner?
8      A.    The way the ownership is is mainly
9  done on a handshake, and I receive my pay for
10  managing it. I receive also money for providing
11  DJs to Woodmere Tavern. We got an agreement in
12  writing that once the place is sold -- which is his
13  intentions now that he is somewhat retired -- is
14  that I would get 50 percent of the sales.
15     Q.    When was the agreement put in
16  writing?
17     A.    I believe last year.
18     Q.    So that would be 2007?
19     A.    Yes, sir.
20     Q.    Would that be before or after this
21  incident?
22     A.    I'd have to look at the date on the
23  agreement.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 97

1    Q.    Where is that agreement kept?
2    A.    Woodmere Tavern.
3    Q.    So you actually worked for Woodmere
4    as an employee before anything was ever reduced to
5    writing about you having a partnership interest?
6    A.    Right.
7    Q.    And you've worked for Woodmere since
8    -- you are going to have to refresh my
9    recollection -- did you say '93?
10    A.    Well, we started entertainment I
11    think in '95. I think Woodmere opened in '93, and
12    I'm not positive on all the years. But we have
13    been doing entertainment there for over ten years.
14    I personally have been down there approximately
15    five years operating.
16    Q.    That's what I'm trying to figure
17    out -- as a manager operating the thing somehow?
18    A.    Probably five years.
19    Q.    About five years?
20    A.    Yes, sir.
21    Q.    So back around 2003 or so you have
22    been actually operating the place in some form or
23    fashion?

Page 98

1    A.    Yes, sir.
2    Q.    And then it was reduced to writing in
3    2007 between you and Mr. Morin that you would
4    actually get 50 percent of it if it was sold,
5    correct?
6    A.    Yes.
7    Q.    So if you look at the corporate
8    records for Woodmere Tavern, I guess Mr. Morin
9    would be the only one that would show up as the
10    owner of the property?
11    A.    Yes, sir.
12    Q.    Has Woodmere ever been sued for any
13    discriminatory conduct?
14    A.    No, sir, not that I'm aware of.
15    Q.    The date that Mr. Barr came to
16    Woodmere and talked to you and Mr. Morin about his
17    meeting with Ms. Knudsen, do you know what date
18    that was?
19    A.    That would have been early part of
20    June. I don't know the exact date.
21    Q.    You don's have that memorialized
22    anywhere, written down, anything?
23    A.    Didn't seem important to me.

Page 99

1    Q.    Just making sure. After Barry
2    discussed this, was there a plan by Barry for you
3    to actually do this recording of Ms. Knudsen?
4    A.    He mentioned he'd like me to try to
5    set up an appointment, and stuff like that, and
6    could you try to tape it. And actually I wasn't
7    even going to turn that tape over him. I wasn't
8    even going to tell him I taped it, but I did. I
9    don't remember what the circumstances were around
10    it. He asked me if I would go in and try to get
11    the appointment and tape it. I hadn't decided
12    whether I was going to give him the tape or not,
13    and I did give it to him.
14    Q.    So the answer to my question is:
15    There was a plan then?
16    A.    Yes, sir.
17    Q.    And the plan was to go in and tape
18    Ms. Knudsen to see if she would say something
19    different than what she told Barry? Is that what
20    the plan was?
21    A.    To see if he was being discriminated
22    against, right. The way he put it to me -- because
23    I was apprehensive about doing it anyway -- he said

Page 100

1    this is just unfair and criminal that they would
2    not rent it to me and kind of played on that and
3    made me feel like this would be the right thing to
4    do -- and so that's basically why I did it.
5    Q.    And this was like the first time you
6    ever met him?
7    A.    No, this not the first time I have
8    met him. I've known of Barry for years being in
9    this business.
10    Q.    You said that earlier, but I thought
11    you said you didn't really know him until this last
12    year. That was your --
13    A.    Right, I knew of him. I'd never
14    really known him personally.
15    Q.    That is what I'm asking you, sir. I
16    don't want to confuse you either. I'm just like
17    Mr. Stewart. I'm not trying to deceive you or
18    trick you. I just want to understand your
19    testimony. So had you in fact ever personally met
20    Mr. Barr?
21    A.    Yes. In his place of business, yes,
22    I have.
23    Q.    So how many times had you met him

25 (Pages 97 to 100)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 101

1    before this time that he comes over to Woodmere and
2    asks you to do this?
3        A.    I'd say several dozen times. He's
4    been in Woodmere where my DJs were. I've been in
5    his place. Him and Mike were friends, so it kind
6    of -- I couldn't avoid him.
7        Q.    So when he came over, was it just the
8    three of you meeting there at Woodmere Tavern?
9        A.    We weren't meeting. He was in there
10   talking with Mike. I overheard his conversation.
11       Q.    Was it during business hours?
12       A.    It was during the hours during the
13   day when we weren't open when I normally do my
14   purchasing and ordering.
15       Q.    So if I understand your testimony,
16   you agreed to do that to help him out? Is that
17   what I understand?
18       A.    Not so much to help him out, as when
19   he started saying that it wasn't right that they
20   wouldn't rent to me and that the place is still
21   offered. But that was after I told him that I
22   understood that the place was still available.
23       Q.    But you also said earlier that you

Page 102

1    were interested in the place, too?
2        A.    Yes, I was at one time.
3        Q.    So did you use the deception of doing
4    it for Barry so that your boss wouldn't know? Is
5    that kind of --
6        A.    It was going to go under that -- kind
7    of that hat. Everything that I was checking out
8    kind of for myself until I seen how far this thing
9    possibly would go that I was doing it for Barry.
10   If I was seen down there looking at the place and
11   it got back to my partner --
12       Q.    Prior to this meeting with Barry,
13   what other action had you taken to try to find your
14   own place?
15       A.    Just putting my feelers out, going
16   around, looking at different places.
17       Q.    Had you ever called up any agents or
18   employees of any?
19       A.    No, because this is probably
20   initially either the first or second place I
21   thought of. I thought of the Circuit City
22   building, and I understood that was a ten $10,000
23   lease. So that's totally beyond my scope of what I

Page 103

1    can make here in this town.
2        Q.    So your meeting with Barry just
3    coincidentally went hand-in-hand with your thought
4    about going out on your own?
5        A.    Absolutely. When he was talking with
6    Mike about it, my back was to him at my computer.
7    When I overheard him say that, I said -- I
8    understand that's still available.
9        Q.    So then was it your idea to use the
10   DVD recorder?
11       A.    Yes, sir.
12       Q.    Did Barry just ask you to use a tape
13   recorder?
14       A.    He said if you could record the
15   conversations, he said that --
16       Q.    And have you ever told Mr. Morin that
17   you were actually looking for property yourself?
18       A.    He knows now.
19       Q.    He now knows?
20       A.    Yes, sir.
21       Q.    Would you agree with me that there
22   was a time before Celebrations closed that it was
23   getting some pretty bad publicity in the

Page 104

1    newspapers, on the radio, TV, and all that?
2        A.    Yes, sir. What I feel is unfair
3    publicity.
4        Q.    But it was getting the publicity,
5    whether unfair or not, right?
6        A.    Right.
7        Q.    You were in that business, so you
8    know more about what's going on than the average
9    person?
10       A.    I know incidents could happen that
11   could turn your business around at the drop of a
12   hat and not be your fault, or anything that you
13   could prevent.
14       Q.    But the average John-Q citizen
15   wouldn't probably know that?
16       A.    Absolutely.
17       Q.    So his place of business,
18   Celebrations, was had some very negative publicity
19   for a while there, did it not?
20       A.    Even taking into consideration that
21   there are three other clubs in that parking lot and
22   a drive-through late-night eating place. Krystal's
23   down there on Atlanta Highway, they have people

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

## Page 105

1  hanging out there -- and McDonald's, and all that.
2    Q.    And that kind of negative publicity,
3  I am assuming it was stuff you heard about through
4  patrons at your place, right?
5    A.    Absolutely.
6    Q.    And you said something about the
7  possibility that Barry's competition or competitors
8  may have been causing him problems.  Who would have
9  been Mr. Barr's competition or competitors at that
10  time that would have caused him problems as you
11  said might have happened?
12    A.    Any of the clubs around town.  I
13  don't consider Barry a competitor of mine because
14  of the style of music he plays.  He's a hip hop
15  club.
16    Q.    You said it.  I don't know about the
17  clubs.  Do you have names of any clubs that you
18  could point me to?
19    A.    I don't patronize even clubs that
20  would play country and rock.  I know of the ones
21  that are in my immediate area.
22    Q.    Well, for the record though do you
23  have the name of any club that you would consider

## Page 106

1  to have been a competitor of his Celebrations club?
2    A.    No, I don't.
3    Q.    Have you ever hired off-duty police
4  officers for security?
5    A.    No, sir.
6    Q.    Did Mr. Barr tell you what to ask
7  Ms. Knudsen when you met with her?  Was there a
8  plan as to what questions you were to ask or what
9  things you were to say?
10    A.    I think originally when I told him I
11  thought the place was still available, he goes --
12  call her up and see if you can get an appointment
13  and see if she would be willing to show you,
14  because she wasn't willing to show him.
15    Q.    He didn't say that he met with her
16  down there?
17    A.    I didn't know nothing of that, no.
18    Q.    So you did not know that he actually
19  met and looked at the place?
20    A.    When I made the phone call?
21    Q.    Yes.
22    A.    I don't -- I can't remember if he
23  said he did or not.  Him and Mike were in

## Page 107

1  conversation the whole time I was doing stuff on my
2  computer, and he might have assumed that I heard
3  him say he went in there and talked with her and
4  looked at it.  Since then I believe that I know he
5  did go in there and look at it.
6    Q.    But it was your understanding at the
7  time that he didn't even get to see the place, that
8  it wasn't available for him to go in there an look
9  at?  Is that what I understood you to say?
10    A.    I just felt he was asking me to call
11  and see if I could get in there to look at it
12  because maybe he was denied, or I really -- you
13  know, totally even the conversation I had with her,
14  I can't tell you one hundred percent if she may
15  have mentioned a Celebrations on her first call or
16  if it was her second call.
17    Q.    So you don't recall him actually
18  telling you that he actually saw the place the day
19  that he actually came to Woodmere?
20    A.    I don't recollect.
21    Q.    You also mentioned that, as I
22  understand it -- and tell me if I'm incorrect --
23  that you did come to terms on leasing the

## Page 108

1  property?  Is that what I understood you to say?
2    A.    I believe we were close enough,
3  because at the time our conversations with Amy were
4  let's hurry up and get this done.  Some of our
5  later phone calls prior to her wanting to know
6  about the tape were we need to get moving and get
7  this thing done.
8    Q.    When you say you were close enough --
9  I'm not in this business -- are you saying that you
10  had actually had an offer and acceptance of terms,
11  or that you-all had just been discussing terms
12  which you felt like you could have said I'll take
13  it?
14    A.    I believe that anything I would have
15  offered them in the ballpark and hurried up and got
16  in there, they were going to settle on.
17    Q.    But you did not do that, you did not
18  make an offer?
19    A.    No written, no nothing.
20    Q.    Let's get clear.  I'm just trying to
21  make sure I'm clear.  You never made a written
22  offer to her saying I would like the Pure Country
23  area that we have been discussing -- I would like

## Page 109

1  it for these terms?  You never said that in
2  writing, correct?
3      A.    Not in writing.
4      Q.    And you never said it orally to her
5  either?
6      A.    No.  And orally I told her I was very
7  interested in it.  And when I had talked to him
8  about some concessions, I wanted to get back with
9  her.  At that point in time our conversation
10 was more or less let's hurry up and get this deal
11 done.
12     Q.    But it never was a statement to
13 Ms. Knudsen --
14     A.    No, there was never any set dollar
15 amount.  It was around the park -- hey, there are
16 some concerns I have.
17     Q.    And I want it, and I want it today
18 for this amount.  You never said that?
19     A.    No, not "today" -- no.
20     Q.    Do you have any recordings on your
21 phone or anywhere else of any conversations you had
22 with Mr. Barr?
23     A.    No, sir.

## Page 110

1      Q.    Do you have any recordings on your
2  phone or anywhere else that you had with Grant
3  Sullivan?
4      A.    No.
5      Q.    Do you know Grant Sullivan?
6      A.    I have met him one time.
7      Q.    Under what circumstances did you meet
8  Mr. Sullivan?
9      A.    I was introduced to him at LaJolla,
10 don't like him.
11     Q.    Do you have any recordings of any
12 kind of -- and this may have been asked already,
13 and I apologize if it has -- of any attorney, of
14 any conversations you had with any attorney?
15     A.    No, sir.
16     Q.    And just so I'm clear -- you are
17 still managing Woodmere?
18     A.    Yes, sir.
19     Q.    The recorder that you used for that
20 is a mini DVD recorder?
21     A.    Yes, sir.
22     Q.    Do you still have it?
23     A.    Yes, sir.

## Page 111

1      Q.    How long had you had it when you made
2  that recording?
3      A.    Bought it in 2005.
4      Q.    So you had it for a year?
5      A.    Yes, sir.
6          MR. GUY:  That's all I have.
7          MR. QUINN:  I said I didn't have
8  any, but I've got a couple.
9
10 EXAMINATION BY MR. QUINN:
11     Q.    How long have you been in the lounge
12 business?
13     A.    Approximately 20 years.
14     Q.    As such, a hip hop club, as you know
15 the term, who are the main clientele?
16          MR. STEWART:  Object to form.
17          MR. QUINN:  He's objecting.  You
18 can answer the question.
19     A.    Hip hop club can be -- it's white and
20 black.
21     Q.    (Mr. Quinn)  The club that he had,
22 that was the predominantly black club?
23     A.    Black club, yes.

## Page 112

1      Q.    And the publicity that you say was
2  unfair, do you believe that that publicity in part
3  or in whole was the result of the fact that that
4  was a black club?
5          MR. STEWART:  Object to form.
6      A.    I really can't say.
7      Q.    (Mr. Quinn)  In your conversations
8  with Ms. Knudsen, did she ever tell you that
9  Mr. Little did not have the authority to show the
10 building?
11     A.    Did she say she did not have the
12 authority?
13     Q.    Yes.
14     A.    I am assuming if he showed it to me,
15 he had the authority to show it.
16     Q.    Did you know that Mr. Little didn't
17 own the building?
18     A.    No, I knew he was an attorney for the
19 owner.
20     Q.    Did you know that Ms. Knudsen didn't
21 own the building?
22     A.    No.
23     Q.    And during the conversation --

## Page 113

1  A.  I mean, yes, I knew she didn't own
2  the building.
3  Q.  And during the conversation that was
4  videotaped, when Mr. Little used the term "we" --
5  and I think you even made reference to "we have
6  white tenants", who did you understand he was
7  referring to?
8  A.  To the people that owned the plaza.
9  MR. QUINN:  That is all.
10  MR. STEWART:  Mr. Cranage, I
11  promise I am not going to be as long as I was the
12  first time.
13
14  EXAMINATION BY MR. STEWART:
15  Q.  Do you remember discussing with
16  Ms. Knudsen, Phillip Stewart, the owner of Doodle
17  Hoppers?
18  A.  I would know as the owner of Doodle
19  Hoppers.
20  Q.  Do you remember discussing with her
21  that he had a criminal record?
22  A.  Yes.
23  Q.  And did that come up in the context

## Page 114

1  of Ms. Knudsen telling you that Doodle Hoppers was
2  in the process of trying to lease this Pure Country
3  space?
4  A.  No, I believe she knew they probably
5  weren't going to be able to because they did not
6  have the funds to do it.
7  Q.  So you were talking about the Pure
8  Country space?
9  A.  Right.
10  Q.  And you-all were talking about it
11  that it's possible that Doodle Hoppers wouldn't be
12  able to lease it because they wouldn't have the
13  funds to do so?
14  A.  Right.
15  Q.  And that's the context that this
16  criminal record came in?
17  A.  Right.
18  Q.  The phone conversation with Amy
19  Knudsen about the tape --
20  A.  Yes, sir.
21  Q.  -- do you remember that?
22  A.  Yes, sir.
23  Q.  Did she know what was on the tape?

## Page 115

1  A.  I don't believe so.
2  Q.  Do you know why she would be
3  concerned about having the tape destroyed if she
4  didn't know what was on the tape?
5  A.  I'm not sure if she knew about it or
6  if she actually did hear it. I'm assuming she
7  wouldn't. I don't know how it came about because
8  the only ones I let listen to it were Barry and
9  Kristen, and I'm assuming maybe he was mad and
10  called her up and said there's a lot of stuff on
11  this that you're not going to want heard or
12  whatever, and then I got the phone call from her.
13  Q.  You were on a cell phone?
14  A.  Yes, sir.
15  Q.  She was on a cell phone?
16  A.  Couldn't tell you.
17  Q.  Is it possible that you misunderstood
18  her?
19  A.  No.
20  Q.  You don't think it's possible that
21  you had a bad signal and didn't understand what she
22  said?
23  A.  No, sir.

## Page 116

1  Q.  When Barry Barr was sitting at the
2  bar talking with Mr. Morin --
3  A.  Sitting in our office.
4  Q.  -- I'm sorry, sitting in our
5  office -- and talking with Mr. Morin and you were
6  working on the computer --
7  A.  Yes, sir.
8  Q.  Did Barry say that Ms. Knudsen used
9  any type of racial word?
10  A.  No.
11  Q.  Were you paid for your time in going
12  to the club and recording it?
13  A.  No, sir.
14  Q.  Were you paid anything for the tape?
15  A.  No, sir. The only check I've
16  received was from you-all, and I haven't cashed
17  it.
18  Q.  Let's be clear about that since you
19  brought it up. We sent you a check -- which we are
20  required to do under Federal law -- it's called an
21  appearance fee. I haven't paid you for your
22  testimony here, but we sent you a check for $47.07
23  to cover the witness fee and mileage; is that

29 (Pages 113 to 116)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 117

1  right?
2      A.    I believe so.  I was going to ask him
3  if I could cash it.
4          MR. QUINN:  Yes, you can cash it.
5      Q.    (Mr. Stewart)  That is the check
6  we're talking about right?
7      A.    Okay.
8      Q.    Just want to make sure.  In fact, we
9  are required to — I'm sorry it can't be more.  It
10  probably isn't enough to pay you for you time.
11          MR. STEWART:  But I appreciate
12  it.
13          MR. GUY:  Hold on just a second.
14  Let me see you for a second.
15              11:28 a.m.
16          (Short break.)
17              11:28 a.m.
18          ***********************
19          FURTHER DEPONENT SAITH NOT
20
21
22
23

## Page 118

1          CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6          I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13          I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
_____
22  Victoria M. Castillo, Certified Court Reporter
    ACCR# 17, Expires 9/30/2008
23  Commissioner and Notary Public

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

IN RE:                                    )
                                          )
TONY FANNIN                               )
d/b/a                                     )        CASE NO. 07-30450-
F & H LLC.                                )
         Debtor.                          )

## LANDLORD CREDITOR MOTION FOR RULE 4001 RELIEF FROM AUTOMATIC STAY

COMES NOW Meiying Forney ("Landlord Creditor"), the owner of the commercial property

used by Tony Fannin ("Debtor") d/b/a F & H LLC, Country Saloon, and a creditor in the above-

styled bankruptcy cause, and moves this Court, pursuant to Bankruptcy Rules 4001(a)(3), 9013,

9014, to enter an order immediately terminating the automatic stay imposed by §362 of the

Bankruptcy Code as said stay applies to the Landlord Creditor's property and all assets and

inventory located on the premises, and further order that the Landlord Creditor be allowed to

proceed under all rights and remedies per the expired lease and Alabama Commercial Lease law. In

support of said motion the Landlord Creditor shows as follows:

(1)    On December 13, 1993 the Debtor executed a commercial lease in which Debtor was

to pay the amount of TWO THOUSAND EIGHT HUNDRED AND 00/XX DOLLARS ($2,800.00)

at the beginning of each month, for the purpose of operating a bar located at 3627 Debby Drive,

Montgomery, Alabama ("Property"). Sub-Parts of said lease are attached hereto as Exhibit "A"

("Lease").

(2)    Under the terms of said Lease the Debtor is considered in Default whenever the

following occurs:

(a) Whenever debtor fails to make the monthly payment in a timely manner. In this action

the Debtor has not made a timely payment since November 2006

(b) Whenever the Debtor enters in to any type of bankruptcy action;

(c) Whenever the Debtor fails to keep adequate liability insurance, fails to pay utility bills or fails to keep said Property insured, per the terms of the Lease

(3)    Including all executed extensions, the Lease expired in December 2006. While attempts at collection by Landlord Creditor have resulted in collection of $ 1500.00 in past-due rents, the Debtor never paid a full months' rent in 2007. After the Lease expired, Debtor and Landlord Creditor never executed a new lease. Debtors' Chapter 13 and Chapter 7 Filings claim to possess an "UNEXPIRED LEASE" relating to the property. The Landlord Creditor 's attorney has notified the Trustee and Debtor that said claim is wholly false and fraudulent. At present, the amount of Lease payments not paid is in excess of TWENTY THOUSAND DOLLARS ($20,000.00).

(4)    The Debtor has defaulted according to the terms of the Lease. In cases of default, the Lease specifically allows the Landlord Creditor to take possession and/or sell all equipment and inventory up to an amount equal to the lease arrearage, plus storage costs and reasonable attorney fees. (See Lease, Section 21)

(5)    The Debtor did leave some thirty opened bottles of alcohol, and some six cases of different beers. Strangely, the opened bottles each seemed to hold about two inches of fluid, and no tops for said bottles can be located. Upon examination of the manufacturer "Born date," it was found that the beer is not worth any value and should be disposed immediately to discourage rodents.

(6)    On or about April 26, 2007, Landlord Creditor discovered that the Debtor had ceased conducting business, removed equipment that was used in the location, and stolen neon signs owned by the Budweiser Distributor. The facility contains some twenty neon signs, each which are owned by a beer distributor.

(7)    When the debtor took possession of the premises, the location included beer coolers, a large ice maker, electronic music equipment and large speakers, a refrigerator and freezer. In the

cross-examination of the debtor at the Creditors' meeting, the Debtor admitted that he had sold most

of the kitchen equipment, the ice machine and keg cooler. The Debtor further admitted to taking the

$400.00 dollar neon sign and placing it "In my attic." This admission of selling goods was

contradictory to his testimony, under oath, when the trustee inquired about all events whereby the

Debtor sold any goods in recent months. While answering the questions from the Trustee, the debtor

stated that he had sold nothing, and received no monies for any sales in the last six months.

(8)     The premises included expensive music & kitchen equipment when the Debtor took

possession, and said items are still the property of the Landlord Creditor. Debtor also testified, at the

Meeting of Creditors, that he had some equipment/inventory at the location in excess of $ 20,000.00.

In fact the total new equipment, not actually a replacement for items provided by Landlord Creditor,

which are unattached to the building structure and were provided by the Debtor, consists of:

(a) – One $ 50.00 white microwave

(b) – One $ 100.00 walkie-talkie set

(c) – Assorted country music tapes/CD - $ 100.00

(d) – Two $ 50.00 used portable phones

(9)     Landlord Creditor presently lacks adequate protection of its interest in the Property.

The Debtor left the premises without even emptying the garbage, and said action has resulted in a

break-out of roaches and foul smell. In addition, Landlord Creditor had to place the utilities in the

Landlord Creditor's name, to prevent the damage to walk-in coolers from loss of power.

(10)     In conclusion, good cause pursuant to 11 U.S.C. §4001(a)(3) & 362(d)(1) exists for

terminating the automatic stay as said stay applies to the Landlord Creditor. To protect the value of

the facility, a massive clean-up needs to occur immediately. All the expensive equipment is the

property of the Landlord Creditor, either through ownership prior to possession by Debtor, or

through default under the terms of the EXPIRED LEASE.

WHEREFORE THE ABOVE PREMISES CONSIDERED, the Landlord Creditor respectfully requests this Court GRANT this Motion to Lift Stay and enter an order which:

(a)     Immediately terminates, annuls, or modifies the automatic stay to permit the Landlord Creditor to take possession of its collateral, and all equipment and inventory being stored in the premises to avoid irreparable injury, loss, or damage pursuant to 11 U.S.C. §4001(a)(3);

(b)     Award Landlord Creditor the right to proceed under all rights of the related Lease and state law regarding commercial leases.

Respectfully submitted this May 25, 2007.

> **s/Don B. Little**
> **Donald B. Little, Attorney**
> **Mid. Dist Ident. #- LITTD6371**
> **400 So. Union St, Ste 220**
> **P.O. Box 1881**
> **Montgomery, Alabama 36102-1881**
> **(334) 263-1411 Fax (334) 263-1411**
> **Email donlittle@bellsouth.net**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail or electronically, to the Honorable: Daniel Hamm, Trustee, & Lewis Hickman, counsel for debtor in this action on this May 25, 2007.

> **s/Don B. Little**
> Donald B. Little

THIS LEASE, made this 9th day of November, 1993 by and between LeCroy, an Alabama General Partnership, hereinafter called Landlord, and Tony Nelson Fannin and William Joseph Hastings, hereinafter called Tenant.

W I T N E S S E T H:

PREMISES. Landlord, in consideration of the rents herein reserved and the covenants of Tenant, does hereby let and lease unto Tenant, for the use as exclusively a country and western dance club and lounge with live dance band. No pool table or gambling will be allowed on premises. Video and arcade games will be allowed for entertainment purposes only, and not otherwise for the term hereinafter specified the following described premises:

Unit P of LeCroy Shopping Village, situated in the City of Montgomery, County of Montgomery, State of Alabama, said unit also known as 3627 Debby Drive, Montgomery, Alabama 36111: said unit shall contain approximately 6000 square feet (as shown on the plot plan attached hereto and made a part hereof) and shall hereinafter be referred to the "Premises".

TERM. FOR TENANT TO HAVE AND TO HOLD for an initial term of one(1) year commencing on the earlier of the following dates: (i) December 1, 1993 or (ii) the date Tenant commences doing business from the Premises. If the commencement date of the Lease term is on a date other than the first day of a month, then the Lease term shall be for a period of one(1) year plus the number of days in the partial month prior to the commencement of the first full month of the term of this Lease. *

This Lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

1. RENTAL: Tenant agrees to pay Landlord the sum of Two Thousand Eight Hundred and No/100 ($2,800.00) Dollars in advance on the first day of each month, being at a rate of Thirty-three Thousand Six Hundred and No/100 ($33,600.00) Dollars

* This is with the stipulation that Lessee is able to obtain an ABC license.

per annum.    If the    commencement date of the
Lease term is on a date other than the first day of a month the
rental for the partial month shall be prorated and payable
in advance on the commencement date.

2.    ADDRESS OF LANDLORD:    Said rental installments, and any
other charges payable hereunder, shall be delivered to the office
of Landlord at 3613 Eastern Boulevard, Suite 2-O, Montgomery,
Alabama 36116, or to such other address as Landlord may direct by
written notice forwarded to Tenant by Registered or Certified
Mail.

3.    USE OF PREMISES.    The Premises during the term of this
Lease shall be used and occupied solely for the purpose stated in
the preamble and Tenant shall not use or permit the same to be
used for any other purposes without the prior written consent of
Landlord; the decision of Landlord to withhold such consent shall
be final regardless of the reasons or if for no reason.    Tenant at

-2-

21.  DEFAULT:  The happening of any one or more of the following listed events (hereinafter referred to as "Event of Default"), shall constitute a breach of this Lease on the part of Tenant:

a.  The filing by or on behalf of Tenant of any petition or pleading to declare Tenant a bankrupt, which is not removed within sixty (60) days of the filing thereof, or the adjudication in bankruptcy of Tenant under any bankruptcy law or act.

b.  The failure of Tenant to pay any rent payable under this Lease and the continued failure to pay the same for five (5) days or more after Landlord has given Tenant written notice of its failure to pay the same.

c.  The failure of Tenant to perform fully and promptly any non-monetary act required of it in the performance of this Lease or otherwise to comply with any terms or provisions hereof after Landlord has given Tenant thirty (30) days written notice of such failure to act or perform.

d.  The appointment by any court or under any law of a receiver, trustee, or other custodian of the property, assets or business of Tenant.

e.  The assignment by Tenant of all or any part of its property or assets for the benefit of creditors.

f.  The levy of execution, attachment or other taking of property or assets located at the Premises or the leasehold interest of Tenant by process of law or otherwise in satisfaction of any judgment, debt or claim.

Upon the happening of any Event of Default, Landlord, if Landlord shall elect may (1) collect each installment of rental hereunder as and when the same matures, (2) accelerate rents for the remainder of the term of this Lease, or (3) Landlord, or any other person by Landlord's order, may re-enter the Premises, without being liable to any prosecution therefor, and may either elect to terminate this Lease or if Landlord desires, not terminate the Lease but terminate the right to possession and occupancy and relet the Premises to any person, firm or corporation, as the

agent of the Tenant or otherwise, for whatever rent Landlord shall obtain, applying the avails of such letting first to the payment of such expenses as Landlord may incur in the re-entering and reletting of same, and then to the payment of the rent due hereunder and the fulfillment of the Tenant's covenants, and paying over to Tenant the balance, if any; and in case of its deficiency, Tenant shall remain liable therefor. Tenant waives notice of any demand for payment of rent or notice to terminate or demand for possession of the Premises, including any and all other forms of demand and notice prescribed by law. Tenant agrees to pay a reasonable attorney's fee and all costs if it becomes necessary for Landlord to employ an attorney to collect any of the rent or enforce any of the provisions of this Lease. Tenant expressly waives all exemptions secured to Tenant under the laws of the State of Alabama, or of any other state of the United States, as against the collection of any debt herein or hereby incurred or secured. The remedies, rights, and privileges of Landlord in case of default of Tenant as enumerated above shall not be exclusive. In addition thereto, Landlord may also exercise and enforce all rights in law and in equity which Landlord may otherwise have as a result of said default.

22.  IDENTITY OF INTEREST:  The execution of this Lease or the performance of any act pursuant to the provisions thereof shall not be deemed or construed to have the effect of creating between Landlord and Tenant the relationship of principal or agent or of partnership or of joint venture and the relationship between them shall be that only of landlord and tenant.

23.  WAIVER:  The failure of Landlord to insist upon strict performance of any of the covenants or conditions of this Lease or to exercise any option herein conferred in any one or more instances shall not be construed as a waiver or relinquishment of any such covenants, conditions or options, but the same shall be and remain in full force and effect.

respective parties hereto, their successors, heirs, personal representatives or assigns (provided that any assignment by Tenant shall be effective only if made in strict accordance with the terms of this Lease).

30.  PROHIBITED ACTIVITIES:  Tenant covenants and agrees that it will at no time conduct any "going-out-of-business" sale or conduct any "discount", "cut-rate", "second-hand", "cancellation" or other business other than a "first-class" retail business of the type and limited to that described in the Preamble of this Lease.  The term "discount", as used herein, shall be construed to include, but not be limited to, any business operated or advertised, directly or indirectly, as being based on a discounted price structure.

31.  LANDLORD'S RELEASE:  If Landlord transfers or assigns this Lease, except as security for a loan, then Landlord shall thereupon and thereby be released from any liability under this Lease.

32.  EXCULPATION:  Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the rights, title or interest of Landlord in the land and/or buildings comprising the Shopping Center of which the demised Premises are a part, and subject to prior rights of any present or future mortgages of the Premises for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no other property or assets of Landlord, and no other property or assets of Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

33.  SEVERABILITY:  If any part of any provision of this Lease, or any other agreement or writing executed pursuant hereto or in connection herewith shall be invalid or unenforceable under applicable law, said part shall be ineffective to the extent of

ing the remaining part of said provision or the remaining provisions of this Lease or said document.

34.  NOTICES:  All notices required to be given to Tenant under the terms of this Lease shall be sent by Registered or Certified Mail to Tenant at   3627 Debby Drive, Montgomery, Alabama  36111, or such other address as Tenant may direct from time to time by written notice forwarded to Landlord by Registered or Certified Mail.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this instrument in duplicate on the date and year first above mentioned.

WITNESS:

LECROY

By: _Frances E. Cason_
    Frances E. Cason,
    General Partner

                    LANDLORD

By: _____
    Tony Nelson Fannin

By: _____
    William Joseph Hastings

                    TENANT

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

IN RE:                                     ]
                                           ]
**TONY FANNIN**                            ]
**d/b/a**                                  ]        CASE NO. 07-30450-
**F & H LLC.**                             ]
      **Debtor.**    ]

## LANDLORD CREDITOR AMENDED MOTION FOR RULE 4001 RELIEF FROM AUTOMATIC STAY

COMES NOW Meiying Forney ("Landlord Creditor"), the owner of the commercial property used by Tony Fannin ("Debtor") d/b/a F & H LLC, Country Saloon, and a creditor in the above-styled bankruptcy cause, and moves this Court, pursuant to Bankruptcy Rules 4001(a)(3), 9013, 9014, to enter an order immediately terminating the automatic stay imposed by §362 of the Bankruptcy Code as said stay applies to the Landlord Creditor's property and all assets and inventory located on the premises, and further order that the Landlord Creditor be allowed to proceed under all rights and remedies per the expired lease and Alabama Commercial Lease law. (b) Motions for Relief From the Automatic Stay in cases under Chapter 7 shall contain the following legend featured prominently on the first page of the motion:

> **PURSUANT TO LBR 4001-1, THE MOVING PARTY SEEKS RELIEF FROM THE AUTOMATIC STAY. UNLESS A RESPONSE IS FILED WITH THE COURT, AND SERVED UPON THE MOVING PARTY WITHIN 20 DAYS FROM THE DATE OF SERVICE OF THIS MOTION, THE MOTION MAY BE GRANTED BY THE COURT WITHOUT FURTHER NOTICE OR HEARING.**

In support of said motion the Landlord Creditor shows as follows:

(1)      On December 13, 1993 the Debtor executed a commercial lease in which Debtor was

to pay the amount of TWO THOUSAND EIGHT HUNDRED AND 00/XX DOLLARS ($2,800.00) at the beginning of each month, for the purpose of operating a bar located at 3627 Debby Drive, Montgomery, Alabama ("Property"). Sub-Parts of said lease are attached hereto as Exhibit "A" ("Lease").

(2)      Under the terms of said Lease the Debtor is considered in Default whenever the following occurs:

(a) Whenever debtor fails to make the monthly payment in a timely manner. In this action the Debtor has not made a timely payment since November 2006

(b) Whenever the Debtor enters in to any type of bankruptcy action;

(c) Whenever the Debtor fails to keep adequate liability insurance, fails to pay utility bills or fails to keep said Property insured, per the terms of the Lease

(3)      Including all executed extensions, the Lease expired in December 2006. While attempts at collection by Landlord Creditor have resulted in collection of $ 1500.00 in past-due rents, the Debtor never paid a full months' rent in 2007. After the Lease expired, Debtor and Landlord Creditor never executed a new lease. Debtors' Chapter 13 and Chapter 7 Filings claim to possess an "UNEXPIRED LEASE" relating to the property. The Landlord Creditor 's attorney has notified the Trustee and Debtor that said claim is wholly false and fraudulent. At present, the amount of Lease payments not paid is in excess of TWENTY THOUSAND DOLLARS ($20,000.00).

(4)      The Debtor has defaulted according to the terms of the Lease. In cases of default, the Lease specifically allows the Landlord Creditor to take possession and/or sell all equipment and inventory up to an amount equal to the lease arrearage, plus storage costs and reasonable attorney fees. (See Lease, Section 21)

(5)      The Debtor did leave some thirty opened bottles of alcohol, and some six cases of

different beers. Strangely, the opened bottles each seemed to hold about two inches of fluid, and no tops for said bottles can be located. Upon examination of the manufacturer "Born date," it was found that the beer is not worth any value and should be disposed immediately to discourage rodents.

(6)    On or about April 26, 2007, Landlord Creditor discovered that the Debtor had ceased conducting business, removed equipment that was used in the location, and stolen neon signs owned by the Budweiser Distributor. The facility contains some twenty neon signs, each which are owned by a beer distributor.

(7)    When the debtor took possession of the premises, the location included beer coolers, a large ice maker, electronic music equipment and large speakers, a refrigerator and freezer. In the cross-examination of the debtor at the Creditors' meeting, the Debtor admitted that he had sold most of the kitchen equipment, the ice machine and keg cooler. The Debtor further admitted to taking the $400.00 dollar neon sign and placing it "In my attic." This admission of selling goods was contradictory to his testimony, under oath, when the trustee inquired about all events whereby the Debtor sold any goods in recent months. While answering the questions from the Trustee, the debtor stated that he had sold nothing, and received no monies for any sales in the last six months.

(8)    The premises included expensive music & kitchen equipment when the Debtor took possession, and said items are still the property of the Landlord Creditor. Debtor also testified, at the Meeting of Creditors, that he had some equipment/inventory at the location in excess of $ 20,000.00. In fact the total new equipment, not actually a replacement for items provided by Landlord Creditor, which are unattached to the building structure and were provided by the Debtor, consists of:

(a) – One $ 50.00 white microwave

(b) – One $ 100.00 walkie-talkie set

(c) – Assorted country music tapes/CD - $ 100.00

(d) – Two $ 50.00 used portable phones

(9)     Landlord Creditor presently lacks adequate protection of its interest in the Property. The Debtor left the premises without even emptying the garbage, and said action has resulted in a break-out of roaches and foul smell. In addition, Landlord Creditor had to place the utilities in the Landlord Creditor's name, to prevent the damage to walk-in coolers from loss of power.

(10)    In conclusion, good cause pursuant to 11 U.S.C. §4001(a)(3) & 362(d)(1) exists for terminating the automatic stay as said stay applies to the Landlord Creditor. To protect the value of the facility, a massive clean-up needs to occur immediately. All the expensive equipment is the property of the Landlord Creditor, either through ownership prior to possession by Debtor, or through default under the terms of the EXPIRED LEASE.

WHEREFORE THE ABOVE PREMISES CONSIDERED, the Landlord Creditor respectfully requests this Court GRANT this Motion to Lift Stay and  enter an order which:

(a)     Immediately terminates, annuls, or modifies the automatic stay to permit  the Landlord Creditor to take possession of its collateral, and all equipment and inventory being stored in the premises to avoid irreparable injury, loss, or damage pursuant to 11 U.S.C. §4001(a)(3);

(b)     Award Landlord Creditor the right to proceed under all rights of the related Lease and state law regarding commercial leases.

Respectfully submitted this May 25, 2007.

  s/Don B. Little
**Donald B. Little, Attorney**
**Mid. Dist Ident. #- LITTD6371**
**400 So. Union St, Ste 220**
**P.O. Box 1881**
**Montgomery, Alabama 36102-1881**
**(334) 263-1411 Fax (334) 263-1411**
**Email donlittle@bellsouth.net**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail or electronically, to the Honorable: Daniel Hamm, Trustee, & Lewis Hickman, counsel for debtor in this action on this May 25, 2007.

**s/Don B. Little**
Donald B. Little

MOT LFT STAY BAR.DOC                5

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF ALABAMA**

In re                                                                      Case No. 07−30450
                                                                          Chapter 7
Tony N. Fannin

      Debtor

**ORDER TERMINATING STAY**

Upon consideration of the motion of the creditor, *Meiying Forney* , for relief from the stay imposed by 11 U.S.C. § 362(a) the court concludes that no response to the motion has been filed within the time allowed by M.D. AL L.B.R. 4001−1 or a response was filed consenting to the motion and therefore the motion should be **GRANTED** . Accordingly, it is

**ORDERED** that the stay in this case with respect to this creditor, to permit enforcement of a lien against the property of the estate or of the debtor described in the motion, is TERMINATED.

Dated:  June 25, 2007

                                         William R. Sawyer
                                         United States Bankruptcy Judge



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRENCE LONG and<br>BARRY BARR, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO.:<br>2:07-cv-00881-WKW-WC |
| ARONOV REALTY MANAGEMENT,<br>INC., AMY CLARK KNUDSEN, and<br>MEIYING FORNEY, | ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF MARK CRANAGE

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the below information is true and correct to the best of my knowledge.

1. My name is Mark Cranage. I have personal knowledge of all matters contained within this statement.

2. On June 13, 2007, I met with Don Little at the Pure Country Saloon, located at the LeCroy Shopping Center in Montgomery, Alabama. When I met with Mr. Little I knew that he was an attorney who represented the owner of the shopping center.

4. During my meeting with Mr. Little, I had a video recorder which was recording the conversation between Mr. Little and myself, along with videoing the Pure Country location.

1

5.  It is my understanding that a transcript of the videotape has been made by a court reporter.

A copy of the transcript is attached to my declaration as Exhibit A.  On the transcript Speaker 1 is Mr.

Little.  I am Speaker 2.

I declare under penalty of perjury that the above is true and correct based upon my own personal

knowledge.

_____
Mark Cranage

8/11/08
_____
Date

2

A

# FREEDOM COURT REPORTING

Page 1

```
1        CASE #18290-1
2    Attorney Don Little showing Mark
3    Pure Country Saloon
4        JUNE 13, 2007
5
6    SPEAKER 1: All right. This is the
7  property. I'm looking at it. It's -- I'm not
8  sure of the name of the shopping center. This
9  used to be Pure Country and Shooter's. It has
10  been closed down for, I don't know how long.
11  It's the middle of June now and I guess it has
12  been a couple of months it has been closed
13  down. It's right next to another place that
14  does a late-night business called
15  Doodlehopper's.
16    I'll just film around the building so
17  you see the condition of the building and,
18  then, I guess we're going to go inside.
19  That's the back of the building. I don't
20  think there's much room for deliveries back
21  there, but probably delivers in front kind of
22  like our other places. That's the side of it.
23  Of course, this wouldn't be the side we're
```

Page 2

```
1  renting but just to show you that's kind of a
2  Butler building.
3    I'm going to guess, but I'm not the
4  agent by any means, but somewhere around eight
5  hundred to a thousand for that. And I
6  think -- to be honest with you, I think --
7  see, this deal has to work this time or this
8  place is finished as a bar.
9    SPEAKER2: Right.
10    SPEAKER1: It has got to
11  succeed. The landlord knows that.
12    SPEAKER2: Yeah. Like I said,
13  I'm batting about a hundred percent on these
14  things.
15    SPEAKER1: She's going to get
16  right on some rent money to get the -- a
17  successful person to make a running.
18    SPEAKER2: Right.
19    SPEAKER1: Because, you know,
20  seven hundred dollars a month less rent in
21  exchange for success is a --
22    SPEAKER 2: What was Tony and
23  them paying a month, if they don't mind me
```

Page 3

```
1  asking her? Or is that something that has got
2  to be hashed out?
3    SPEAKER1: Well, it was such an
4  old lease he was only paying, I forgot. I
5  don't know exactly. Around (inaudible). I
6  don't know how long it was Shooter's.
7    SPEAKER2: Yeah. Because I
8  talked to -- talked to Amy and she said that
9  the guy next door was interested in it. And,
10  then, when I talked to you, you said there
11  were several others. I said, Man, I'm, you
12  know -- I had an obligation last night so I
13  was kind of worried about I might be a day
14  late and a dollar short getting down here, but
15  --
16    SPEAKER1: If you're serious
17  about it, you're going to have to really get
18  -- start humping and start figuring and get up
19  with us quick, because there are two that are,
20  you know, really looking hard and trying to
21  check on things. But they're not doing the
22  same thing you're doing, apparently.
23    SPEAKER2: I'm not -- the guy
```

Page 4

```
1  next door, I don't see how he can do it. I
2  mean, I don't see how he could branch off into
3  this. I don't think he has got the money.
4  So, I -- and the guy at Doodlehopper's, he has
5  a -- he has had some problems where I think
6  his business has fallen off over there.
7    SPEAKER1: Well, if it has
8  fallen off, why in the hell does he want to
9  take this?
10    SPEAKER2: I don't know. That's
11  what I'm saying. He's the type that I guess
12  -- and this -- I don't know the guy. I mean,
13  I absolutely don't know him, but I've heard he
14  is claiming he is going to buy the Plaza
15  across the street and buy this and buy that.
16  And, like I said, I don't know him, but I know
17  people that do know him and just say he does a
18  lot of this.
19    SPEAKER1: Oh, boy.
20    SPEAKER2: So, if he was the
21  only one in contention, I wasn't going to
22  worry about it. But if there's somebody else,
23  I am going to get working on it.
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1  SPEAKER1: Well, there's some
2 other people who have called and talked with
3 us. All they've done is talk.
4  SPEAKER2: Yeah.
5  SPEAKER1: So, are you going --
6 would you actually be selling a part of
7 Woodmere to come over here?
8  SPEAKER2: I'm going to sell my
9 part of Woodmere to come here.
10  SPEAKER1: So, that would give
11 you your operating capital to --
12  SPEAKER2: No. I've already got
13 the operating capital. I mean, I've got that
14 much.
15  SPEAKER1: You figure it's going
16 to be how long before you think this place
17 would be break even, turn a profit, what would
18 you think?
19  SPEAKER2: For me?
20  SPEAKER1: Yeah.
21  SPEAKER2: I'm going to sound
22 pretty arrogant, but I would say probably two
23 months.

Page 6

1  SPEAKER1: Damn. That would be
2 the quickest one I've heard. I've always
3 heard it took six months to a year.
4  SPEAKER2: No. That's for most
5 people. I've got entertainers that are in the
6 Air Force bases, both of them. I've got
7 entertainers that are in about four or five
8 clubs under contract. And I've got an
9 advertising avenue that newspapers and radio
10 and TV can't -- can't offer.
11  I've had -- you know, there's one disk
12 jockey company in this town that does better
13 than me and that's Darryl E. And that's just
14 because he does all of Bazz Hughes things.
15 But as far as money spent at Beverly Brothers
16 or anywhere else, I've got everybody knocked
17 dead.
18  But we do -- we've been in that
19 business, too, for twenty years. And like I
20 say, we do weddings, Christmas parties,
21 everything, plus I contract other places. I
22 contract all of the military clubs. Most
23 clubs don't get a military class. Like, when

Page 7

1 the SOS class comes in or any of those
2 classes, it's three weeks before they find
3 some of these watering holes. I mean, it's at
4 night. It's at night when they're coming up
5 to my disk jockey saying, "Hey, man, where can
6 we go?"
7  SPEAKER1: But do you have -- if
8 you had this place, could you -- during your
9 slow nights during the week, could you do
10 private parties?
11  SPEAKER1: During the weeks,
12 you're not supposed to. Because if you're a
13 public bar, by ABC Regs, any time your doors
14 are open, you're supposed to be open to the
15 public. But that's just like, you know, over
16 there at Woodmere, you know, I've sectioned
17 sides off and stuff like that. You actually
18 could rent it out, but there's a fine line
19 there with the ABC rules. Because if you're
20 an ABC establishment -- because what that
21 would fall under is, you know, I could -- I
22 could be there at the front door on Friday
23 night and there could be an undesirable

Page 8

1 customer coming up and I could tell him, "This
2 is a private party," you know.
3  SPEAKER1: Oh.
4  SPEAKER2: That's where that
5 falls into play.
6  There's a lot of -- and there's not --
7 and that's another problem, too, with this
8 business. There's not a lot of people that
9 have studied this ABC book.
10  SPEAKER1: No.
11  SPEAKER2: The ABC agents leave
12 me alone, because I run it right by the book.
13  SPEAKER1: Well, if you didn't
14 get in trouble from the Celebration's crowd,
15 you must have done something right. I just
16 knew they were going to head over to y'all's,
17 because I couldn't think where else the hell
18 for them to go.
19  SPEAKER2: Well, you know, we --
20 you know, we play that music and stuff like
21 that. It's just that, you know, I guess they
22 found some place else to go. I don't know.
23  SPEAKER1: How many pool tables

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1  do y'all run over at Woodmere now?
2       SPEAKER2:  We've got two.
3       SPEAKER1:  Only two?
4       SPEAKER2:  Yeah.
5       SPEAKER1:  Huh.
6       SPEAKER2:  And, you know, the
7  problem over there at Celebration's wasn't his
8  -- his clientele.  It was the ones he wouldn't
9  let in the door.
10      SPEAKER1:  Out in the parking
11 lot.
12      SPEAKER2:  The ones in the
13 parking lot.  I don't know.  I sit there and
14 say, you know, I would be in trouble over
15 there at Woodmere if they all started hanging
16 out over there at Sam's because I would be
17 blamed for it.  That's crazy.
18      SPEAKER1:  Well, hell, they had
19 already hired a damn Black Belt guy who was a
20 bone crusher for Freddie D's.  They weren't
21 going -- they had decided they were going to
22 be tough out in the parking lot.
23      SPEAKER2:  Yeah.

Page 10

1       SPEAKER1:  And that, apparently,
2  may not be a problem if he can't get his
3  financing.
4       SPEAKER2:  He might have -- he
5  might have shot himself in the foot.
6       SPEAKER1:  Yeah.
7       SPEAKER2:  And it's a shame,
8  too, because I don't know how much money he's
9  making now.  He's not playing for San
10 Francisco anymore.
11      SPEAKER1:  Oh, he got cut by
12 Miami last fall, last preseason cut.  He had a
13 little contract that paid some up until then,
14 but he got -- his contract got terminated and
15 he hasn't been picked up since.  He kept it
16 quiet from the people he was leasing from for
17 a while.  But I'm recruiting in football,
18 checking the internet, and I saw him on the
19 waiver wire.  And no one else knew about it.
20      SPEAKER2:  Yeah.
21      SPEAKER1:  But, anyway, neon
22 signs go all the way down.  I don't know if
23 you're interested or not.  And, then, there is

Page 11

1  a --
2       SPEAKER2:  Well, they're pretty
3  much owned by the beer company, right?
4       SPEAKER1:  Yeah, I would -- it's
5  just the beer company has told me, whoever
6  takes the place, whichever ones you want to
7  use, fine.  And, then, I'm going to give the
8  rest of them back to them.
9       SPEAKER2:  Right.
10      SPEAKER1:  We've got some other
11 ones in the back.
12      These cash registers, are they usable
13 now or will they have some kind --
14      SPEAKER2:  Yeah, those -- they
15 are still good registers.  I mean, they're not
16 like the automated systems or anything, but, I
17 mean, they're still good.  They can be used.
18 I -- like I say, he gutted this place pretty
19 much with equipment, didn't he?
20      SPEAKER2:  Yeah, probably did.
21      SPEAKER2:  He left his well
22 jacks and --
23      SPEAKER1:  So, did a -- the

Page 12

1  thing next door, Doodlehopper's, I had an ice
2  maker that the landlord owned and he sold it.
3       SPEAKER2:  Doodlehopper's?
4       SPEAKER1:  Yeah.
5       SPEAKER2:  That the landlord
6  owned?
7       SPEAKER1:  Yeah.  It was there
8  when he got here, but he got in trouble.  And
9  I started pressing him for rent one time.  He
10 did make a fifteen hundred dollar rent payment
11 one time, though.  I found out he made it,
12 because he sold some of the landlord's
13 equipment.
14      SPEAKER2:  Man.  Oh, man.
15      SPEAKER1:  Six thousand square
16 feet, I think I told you.
17      SPEAKER2:  Right.
18      SPEAKER1:  And these black
19 things, they've got a little open space on a
20 lot of them if you needed to run some kind of
21 (unintelligible) or something, it might be a
22 (unintelligible).
23      SPEAKER2:  Right.  Most of my

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  wiring would probably be right up here in the
2  ceiling.
3          SPEAKER1:  Okay.
4          SPEAKER2:  She wouldn't have any
5  problem with me painting your ceiling, would
6  she?
7          SPEAKER1:  No.  But don't you
8  think the curved one has got to be replaced?
9          SPEAKER2:  Yeah.  Those have got
10 to be replaced and --
11         SPEAKER1:  She just wanted some
12 simple little nothing looking arcade, just
13 simple little drawings showing what you're
14 going to do with the place.
15         SPEAKER2:  Any kind of
16 improvement to jazz it up.
17         SPEAKER1:  And you can sign it
18 today if you're interested.  Anything
19 reasonable at all, she'll go with it.  If not,
20 I'm supposed to let you know.
21         SPEAKER2:  How soon would I be
22 able to get a lease on this place?
23         SPEAKER1:  I am finished with

Page 14

1  the Bankruptcy Court in this place.  If I
2  remember right, I think I'm finished Monday.
3  Today is the 13th?
4          SPEAKER2:  Yeah.
5          SPEAKER1:  Yeah, I think I'm
6  finished Monday with bankruptcy.  That's
7  completely free from it Monday.  I could
8  actually go ahead and go into lease
9  negotiations now and get drafts and everyone
10 look.  And there's no way we could get a lease
11 finished by Monday.  I'm sure you want to look
12 it over and do some specs and stuff.
13         SPEAKER2:  Well, you know, I'm
14 going to go home and, like I said, tell my
15 dad.  And he helped back me in a few other
16 things and --
17         SPEAKER1:  Let me show you -- I
18 don't know why they raised that.  Do you have
19 any idea?  Is this because this is where the
20 riding bull used to be?
21         SPEAKER2:  I have no idea.  Like
22 I said, it has been ten years since I've been
23 in here.

Page 15

1          SPEAKER1:  The only bad thing
2  about it is, right here (indicating), it was
3  just -- you know, it's just flat out -- well,
4  he just had it flat out dangerous right there
5  (indicating).
6          SPEAKER2:  Right.
7          SPEAKER1:  Someone could get
8  hurt.  I can't understand that.  Got round
9  tables up here and square tables everywhere
10 else.
11         SPEAKER2:  I can't understand
12 how he didn't make it down here.
13         SPEAKER1:  Well, it got really
14 bad after a few years.  And then, he changed
15 from Shooter's to -- he changed to
16 (unintelligible).  And he was always chasing
17 tail so heavy.  He and his wife split up and
18 got a divorce and that might have began -- you
19 know, the beginning of the end right there.
20 Because he used to be working over here and
21 he was cutting around pretty heavy.
22         SPEAKER2:  That'll do it.
23         SPEAKER1:  Yeah.

Page 16

1          SPEAKER2:  You can't shit where
2  you eat.
3          SPEAKER1:  That's right.  So,
4  then, he got the employees mad, so, you know,
5  they would come in on kind of a holding
6  situation of we'll let you know if we need you
7  tonight.  Well, you're sitting there with a
8  guy unpaid till 10:30 and, then, they say, "Go
9  home", he has got to be pissed off, too.
10         SPEAKER2:  Right.
11         SPEAKER1:  I have a draft that's
12 just the -- it's one of those iron deals
13 forever pages I could give you to play with as
14 far as the lease --
15         SPEAKER2:  Yeah.  I'll have to
16 let my attorney look at it.  I mean, what kind
17 of insurance besides the one I'm going to
18 carry?  I've got to carry general liability.
19 I carry liquor liability.  What besides that
20 does she require, nothing?
21         SPEAKER1:  It's the basics.
22 You've got your -- how much -- what's your
23 limit on your -- the drunk goes out and gets

4  (Pages 13 to 16)

## FREEDOM COURT REPORTING

Page 17

1  killed? I call it dram shopping.
2          SPEAKER2: Well, see -- well,
3  see another thing, too, is all of our people
4  are responsible vendor trained. I mean, I've
5  probably pissed off more people than I've --
6  than I -- probably anybody else in this town.
7  I mean, they're not going to not let somebody
8  have a good time, but I don't let people
9  stumble around. I don't let people stumble
10 out the door. I don't let them fall off their
11 stool and pour them in their car. As a matter
12 of fact, we drive quite a few people home or
13 find them -- find them rides.
14         SPEAKER1: Yeah. You save one
15 lawsuit and it pays for all of it.
16         SPEAKER2: Well, I've been in a
17 couple and, fortunately, we won every one of
18 them.
19         SPEAKER1: Well, that's good.
20         SPEAKER2: But it's because of
21 that. Because a responsible vendor will go to
22 bat for you in court if all of your people are
23 trained. And that's put on by the ABC Board.

Page 18

1          SPEAKER1: Right.
2          SPEAKER2: But I'm one of the
3  few in this town that does it. In the
4  classrooms up there in Prattville, it cost
5  thirty-five dollars per employee to do it, and
6  people just choose to save the money and not
7  go with it.
8          SPEAKER1: Anyway, you think on
9  it tonight and talk real heavy with whoever
10 you want to talk with. And it sounds like you
11 may not have to have a -- if you've already
12 owned the equipment, that's the big expense.
13 You already got it in storage and own it,
14 then, your only biggy is to spruce it up and
15 you can, I'm sure, paint yourself and --
16         SPEAKER2: Yeah. It'll -- well,
17 it'll cost me about twenty-five hundred
18 dollars to have somebody come in and paint
19 this ceiling. And we've definitely got to do
20 something with this floor. I can probably do
21 that.
22         Will she give me any consideration on a
23 month or two lease for any kind of

Page 19

1  improvements like that because --
2          SPEAKER1: Yeah. She'll give
3  you an allowance for like, you know, half rent
4  for the first six months to total up whatever
5  your expenses, if you come up with a
6  reasonable list of what your expenses are
7  going to be.
8          SPEAKER2: Right.
9          SPEAKER: And let's just say --
10         SPEAKER2: It's work that will
11 be done, too.
12         SPEAKER1: -- you're going to
13 spend, you know, eight thousand bucks, she
14 would cut, you know, eight thousand dollars
15 out of the rent the first six months.
16         SPEAKER2: Right. I would also
17 like to, if she would entertain the thought of
18 making this a little bigger. I've actually,
19 in my mind, thought this place was bigger than
20 what it was.
21         SPEAKER1: How many square feet
22 is Woodmere now? Well, you've got that back
23 area, too.

Page 20

1          SPEAKER2: Yeah, I've got that
2  huge back patio area that I put in there about
3  two years ago. Let's see, we're at about
4  three, six -- I would say about between eight
5  and nine thousand.
6          SPEAKER1: All right. Do you
7  want to take pictures back there of anything?
8          SPEAKER2: Well, no, just mainly
9  the main area and, then, I don't want show my
10 contractor.
11         The main thing I'm concerned with, I'm
12 going to tell the people that I was looking at
13 at some other locations and everything, that
14 I've pretty much found another one.
15         What's my chance of -- who am I in
16 competition -- am I in competition with
17 anybody besides Doodlehopper's or is it pretty
18 much me?
19         SPEAKER1: Well, we're trying --
20 you're going to get me in trouble. We're
21 trying to avoid it, but the Celebration's guy
22 wants this real bad and we really are trying
23 to dodge that.

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1    SPEAKER2: Has he made an offer
2  or anything?
3    SPEAKER1: Oh, yeah. Yeah. I
4  mean, she even gave him a high-ass rent and,
5  shit, he didn't blink. Now, naturally, he's
6  going to do it through somebody else.
7    SPEAKER2: Right. Yeah.
8  Because I don't think he ran Celebration's.
9    SPEAKER1: All right. Take your
10  pictures. Tell me one more thing before you
11  go.
12    SPEAKER2: All right.
13    SPEAKER1: Why did they keep all
14  of the paper things? What's the advantage of
15  that?
16    SPEAKER2: I'm going to tell you
17  why, because a lot of your case beer comes in
18  just your twenty-four cases -- I mean, your
19  cases. It has just got these little fans in
20  there and the bottle just goes in there. If
21  you're stacking them in there, you can't stack
22  a whole case in there. So, he saved those to
23  fill them up to where they can move them

Page 22

1  around in the cooler.
2    SPEAKER1: Oh, so they might
3  (unintelligible).
4    SPEAKER2: Yeah. If you had a
5  case box here, I could show you want I mean.
6    SPEAKER1: Well, that's the
7  other thing. This beer that's been in here
8  like, you know, six weeks. It's no good, is
9  it?
10    SPEAKER2: Well, you've got to
11  look at the date.
12    SPEAKER1: I mean, that's
13  probably a case of Bud Lite.
14    SPEAKER2: Budweiser is a great
15  product to check.
16    SPEAKER1: How old are you?
17    SPEAKER2: I can't see it.
18  Forty-five.
19    SPEAKER1: I couldn't read that
20  (unintelligible).
21    SPEAKER2: Yeah. It's down
22  there in the bottom and I can't read that. My
23  middle-aged boy (unintelligible) thirty and my

Page 23

1  eyesight was going to go at forty and he was
2  right on both of them.
3    SPEAKER1: So, it'll have a date
4  on there. And if the date hasn't passed,
5  you're saying it's still good?
6    SPEAKER2: Well, right here --
7  that's old. You can look right here on the
8  bottle.
9    SPEAKER1: The 13th of February.
10    SPEAKER2: That's the brew date.
11  You're looking at two months after that. So,
12  March, April. You're about a month out on
13  that. That don't mean it's bad.
14    SPEAKER1: Give it to some
15  college kids and they wouldn't know the
16  difference.
17    SPEAKER2: I mean, I wouldn't
18  doubt that that beer still tastes all right.
19  And that would be a good keg cooler. I would
20  have to put another bigger one in here for a
21  case cooler.
22    SPEAKER1: Well, if you're not
23  going to use the kitchen for that much

Page 24

1  cooking, does that give you room to add
2  another --
3    SPEAKER2: That's just exactly
4  where I would put my cooling system. Well, I
5  would start off with some double door like --
6  you ever see those double door Coke coolers in
7  a convenience store?
8    SPEAKER1: Yeah. Yeah.
9    SPEAKER2: I would start off
10  with some of them. I've got a bunch of those
11  piled in. I would wait and see how the
12  business does. And then, I would probably
13  come in and put a -- as a matter of fact, the
14  walk-in I would put in, would be an
15  eight-by-eight. So, this would be almost a
16  perfect size right here (indicating).
17    SPEAKER1: Well, wouldn't you
18  allow the Woodmere people to come over here
19  after you did this?
20    SPEAKER2: They're my employees
21  and my customers and they're going to follow
22  me wherever I go, between you and me.
23    SPEAKER1: Well, that's going to

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  slow their ass down if that happens.
2        Here, I might can show you a little
3  patio area. Well, I'll show you when we go
4  out. I'll just show you that when we go out.
5        SPEAKER2: My concern is, if I
6  don't -- if I go ahead and tell these people
7  I'm not interested in the other places, I
8  don't have to worry about Barry's and
9  Celebration's or anything.
10        SPEAKER1: I'll tell you what,
11  why don't you do this? Why don't you go chat
12  tonight with whoever you've got to chat with,
13  wife, father, whoever --
14        SPEAKER2: Right.
15        SPEAKER1: -- and see if y'all
16  really are serious about it.
17        SPEAKER2: Right.
18        SPEAKER1: And if you're really
19  serious about it, call -- well, one way or the
20  other, just call me whenever and say, "Look,
21  I'm dead serious about checking on seeing if
22  we can work anything out to both of our
23  benefit."

Page 26

1        And at that point, I'll call Amy and see
2  where they are or where she is and call you
3  back and let you know.
4        But, like I said, she's ducking the
5  Celebration's crowd. She's trying to avoid
6  that. She doesn't want -- she's not putting
7  up with a whole bunch of crap going on.
8        And, by the way, what would you do --
9  what would you be willing to include in the
10  lease about something to keep the parking lot
11  quiet? Because let me tell you, you've got a
12  group of old white tenants, white people. The
13  Cake Design place here --
14        SPEAKER2: Right.
15        SPEAKER1: -- does cakes for
16  big-time weddings.
17        SPEAKER2: Right.
18        SPEAKER1: And these are big
19  white tenants. And sometimes drug shit, black
20  ghetto fight situation kicks off out there,
21  they're all leaving. And the landlord ain't
22  going to put up with that.
23        SPEAKER2: Right. Yeah. But I

Page 27

1  mean, you know, you can do that through your
2  own security and stuff like that. I really
3  feel like a lot of people have lost their
4  businesses through reasons like that was their
5  own fault.
6        SPEAKER1: Right. So, what
7  would you do to make sure it didn't happen in
8  front of the parking lot?
9        SPEAKER2: Keep security. I
10  mean, I would probably have my own security at
11  first. And, if not, I mean, I would go to an
12  armed security.
13        SPEAKER1: Really.
14        SPEAKER2: Yeah. I don't
15  believe -- I have a hard time believing that
16  Mayor Bright won't support -- like I said, the
17  problem with Celebration's, I feel, because I
18  know, you know, being over there at Gators and
19  stuff like that he campaigned against him,
20  there were a lot of people that he wouldn't
21  let in his club.
22        And so, how you deal with that out
23  there, well, I mean, you can deal with it with

Page 28

1  armed security, which he tried to, but I don't
2  know. Like over there at Woodmere, I don't
3  play the kind of music they like, you know. I
4  mean, I don't --
5        SPEAKER2: Well, the drug crowd
6  usually -- if there's a drug crowd, usually
7  someone in management is also in the drug
8  crowd.
9        SPEAKER1: Well, exactly. And,
10  see, I would test them. And what I mean by
11  "they" don't like the music I like, I'm
12  talking about it don't matter if it's black or
13  white or whatever. I mean, there's as many
14  white kids out there wearing the chains around
15  their neck and all of that other crap that I
16  don't want them in my place, you know. I do a
17  -- I monitor a lot of that stuff, not only by
18  a door charge, but by a dress code. And the
19  biggest thing is I've got security that is
20  trained. Not just security.
21        SPEAKER1: I was about to say,
22  Doodlehopper's big customers after midnight or
23  late, late is police. They're in over there

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  drinking all of the time.
2        SPEAKER2:  Right.
3        SPEAKER1:  And that kind of
4  helps as far as security.
5        SPEAKER2:  Yeah.
6        SPEAKER1:  Now, Doodlehopper's
7  lease expires, I don't know when, but sometime
8  this year.  And he has been talking about
9  going to all kinds of places like you told me
10  just a while ago.  I don't know if he is or
11  not.
12        SPEAKER2:  Like I said -- like I
13  said, I don't know the guy.  But from what
14  I've heard, you know, people that do know him
15  that have hung around with him is just
16  talking.  I can't say nothing bad about him. I
17  don't know him.
18        SPEAKER1:  Yeah.  All right.
19  Take your pictures and let's go.
20        SPEAKER2:  All right.  I'll take
21  some still shots now.
22        SPEAKER1:  I'll find out if we
23  can get a key to that space right next door.

Page 30

1        SPEAKER2:  Oh, shit, this thing
2  has been on.  Damn, Don, this thing has been
3  on.  I've about run out of damn battery now.
4     Next door, this place is a mess.  I'm
5  definitely interested in that thing.
6        (End of CD)
7
8
9  Transcribed by:  Louise Summers
10             Freedom Court Reporting
11  Date:  October 15, 2007
12
13
14
15
16
17
18
19
20
21
22
23

8  (Pages 29 to 30)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

J

# FREEDOM COURT REPORTING

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  TERRENCE LONG & BARRY BARR,
6  Plaintiffs,
7  CIVIL ACTION NO:
8  v.  2:07-CV-00881-WKW-WC
9
10  ARONOV REALTY MANAGEMENT, INC.,
11  AMY CLARK KNUDSEN, & MEIYING
12  FORNEY,
13  Defendants.)
14  S T I P U L A T I O N S
15
16  IT IS STIPULATED AND AGREED
17  by and between the parties through their
18  respective counsel, that the deposition of
19  *****************************************
20  SCOTT HARRIS
21  *****************************************
22  may be taken before Kim Duckett,
23  Commissioner, at 401 Adams Avenue,

**2**

1  Montgomery, Alabama, on June 23rd, 2008,
2  beginning at 10:00 A.M.
3  IT IS FURTHER STIPULATED AND
4  AGREED that the signature to and the
5  reading of the deposition by the witness is
6  waived, the deposition to have the same
7  force and effect as if full compliance had
8  been had with all laws and rules relating
9  to the taking of depositions.
10  IT IS FURTHER STIPULATED AND
11  AGREED that it shall not be necessary for
12  any objections to be made by counsel to any
13  questions, except as to the form or leading
14  questions, and that counsel for the parties
15  may make objections and assign grounds at
16  the time of trial, or at the time said
17  deposition is offered in evidence, or prior
18  thereto.
19  IT IS FURTHER STIPULATED AND
20  AGREED that notice of filing of the
21  deposition by the Commissioner is waived.
22
23

**3**

1  I N D E X
2
3  WITNESS:
4  SCOTT HARRIS
5
6  EXAMINATION BY  PAGE
7  Mr. Quinn ................... 5
8
9  DEFENDANT'S EXHIBITS
10  There were no Defendant's Exhibits marked
11  to this deposition.
12  PLAINTIFF'S EXHIBITS
13  NO.  PAGE
14  1.............................12
15
16
17
18
19
20
21
22
23

**4**

1  A P P E A R A N C E S
2  APPEARING ON BEHALF OF THE PLAINTIFF(S):
3
4  WIGGINS, CHILDS, QUINN & PANTAZIS
5  BY: Mike Quinn & Kevin Jent
6  301 19th Street North
7  Birmingham, Alabama 35203
8
9
10  APPEARING ON BEHALF OF THE DEFENDANT(S):
11
12  BRADLEY, ARANT, ROSE & WHITE
13  BY: CHARLES STEWART III
14  401 Adams Avenue, Suite 780
15  Montgomery, Alabama 36104
16
17  BALL, BALL, MATTHEWS & NOVAK
18  BY: N. Gunter Guy
19  2000 Interstate Park Drive, Suite 204
20  Montgomery, Alabama 36109
21
22  ALSO PRESENT: AMY KNUDSEN, BARRY BARR
23

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

**5**

1    SCOTT HARRIS,
2  being first duly sworn, was examined and
3  testified as follows:
4
5  EXAMINATION BY MR. QUINN:
6    Q State your name for the record?
7    A Joseph Scott Harris.
8    Q And where are you employed?
9    A At Aronov Realty Brokerage, Inc.
10    Q And what is your position with
11  them?
12    A Senior vice president.
13    Q And how long have you held the
14  position of senior vice president?
15    A Eleven years.
16    Q Prior to that, what were you doing?
17    A I was with Aronov as well in
18  another position.
19    Q How long have you been with Aronov?
20    A Since 1987.
21    Q Okay. And tell me what other
22  positions you've held with Aronov prior to
23  the one you hold now.

**6**

1    A I was a property manager and
2  leasing agent. I was hired as a property
3  manager and leasing agent in '87. And
4  then in '97 I was promoted to vice
5  president and then a couple of years ago
6  to senior vice president.
7    Q Okay. In the first position that
8  you held, property manager leasing?
9    A Right.
10    Q What were your duties and
11  responsibilities?
12    A I was responsible for the bottom
13  line operations of a portfolio of office
14  and industrial properties. I was
15  responsible for leasing the properties and
16  managing the properties.
17    Q Okay. And I'm sorry, I may have
18  asked you this, but how long have you been
19  in your present position?
20    A For a couple of years.
21    Q And what are your duties and
22  responsibilities in that job?
23    A I'm responsible for overseeing our

**7**

1  -- the profitability and the employees in
2  our commercial division which includes our
3  brokerage division and our office and
4  industrial division.
5    Q Okay.
6    A And I'm also the qualifying broker
7  for the company for the Aronov Realty
8  Brokerage, Inc. and Aronov Realty
9  Management, Inc. And I also -- I am
10  actively involved in leasing and
11  investment sales and commercial sales.
12    Q So you still do sales even though
13  you also manage?
14    A Correct.
15    Q And in your position, do you
16  actually have the responsibility over
17  employees of Aronov?
18    A Yes.
19    Q Okay. What employees do you have
20  responsibility over?
21    A Employees I have responsibility
22  over -- direct responsibility?
23    Q Uh-huh.

**8**

1    A The individual names?
2    Q No, no, no, the positions. The
3  people that you supervise. I don't need
4  their names, I need to know what their
5  positions and what they do?
6    A There is a property manager and
7  leasing agent that handles our office and
8  industrial portfolio.
9    Q Just one person?
10    A Yes.
11    Q Who is that?
12    A Neil Bernie.
13    Q Okay.
14    A And then Sherry Cavanaugh is the
15  manager of our -- of a mini warehouse
16  complex and she actually oversees the
17  managers of two other mini warehouse
18  complexes.
19    Q Okay.
20    A And then Dawn Casey is -- she
21  really is my assistant, but she also
22  handles the Baptist Hospital account that
23  we handle the leasing on. And Gloria

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

9

1 Batten is an administrative assistant for
2 Aronov Realty Brokerage, Inc. And then
3 Mickey Griffin is director of our
4 corporate services division. And then Amy
5 Knudsen is in the commercial brokerage
6 division. Those are the employees.
7    Q Okay. And --
8    A One more. Mark Davis is the -- is
9 a -- he oversees part of our maintenance
10 operation and also gets involved in
11 construction management, primarily
12 construction management.
13    Q Okay. Now, what is Amy Knudsen's
14 position?
15    A Amy is a commercial sales and
16 leasing specialist in our brokerage
17 division.
18    Q And she is -- is she actually an
19 employee of Aronov?
20    A Yes. Yeah, Aronov Realty
21 Brokerage.
22    Q And receives a salary from Aronov
23 Brokerage?

11

1    Q What does Aronov Realty Management,
2 Inc. do?
3    A They manage and lease a portfolio
4 of properties; office, industrial, retail,
5 multi-family.
6    Q As far as you know, did Ms. Knudsen
7 ever work for Aronov Realty Management,
8 Inc.?
9    A Yes.
10    Q When did she work for Aronov Realty
11 Management, Inc.?
12    A She was hired -- I don't know the
13 exact dates, but I think about five years
14 ago to lease a portfolio of office
15 properties for Aronov Realty Management,
16 Inc.
17    Q As far as you know, is she still
18 employed with Aronov Realty Management,
19 Inc.?
20    A No, she's not.
21    Q When did that cease?
22    A I believe in '96. I don't know the
23 exact date.

10

1    A Yes.
2    Q Does she also get commissions as
3 well as a salary in her position?
4    A She does.
5    Q Okay. And tell me what her job is,
6 what her duties and responsibilities are.
7    A She is involved in the selling and
8 leasing of commercial property.
9    Q I see. Okay. Do you know what her
10 direct relationship with Aronov is? Is
11 she an employee?
12    A Yes.
13    Q Okay.
14    MR. STEWART: You're using Aronov,
15 but just so you know -- make sure y'all
16 are speaking about the same company.
17    A She's an employee of Aronov Realty
18 Brokerage, Inc., the brokerage company.
19    Q Not Aronov Realty Management, Inc.?
20    A No, sir.
21    Q Who is that?
22    A Aronov Realty Management, Inc. is a
23 separate company that --

12

1    MR. STEWART: Did you say 1996?
2    Q You said '96.
3    A I'm sorry. I meant 2006. I'm
4 sorry. I apologize. 2006.
5    Q So as of May 2007, is it your
6 testimony that she was not an employee of
7 Aronov Realty Management, Inc.?
8    A Yes.
9    Q She was rather an employee of
10 Aronov Realty Brokerage --
11    A Yes, sir.
12    Q -- Inc.; is that right?
13    A Yes, sir.
14    Q And is still an employee of Aronov
15 Realty Brokerage, Inc.; is that right?
16    A Yes.
17    Q Let me show you what I've marked as
18 Plaintiff's Exhibit 1.
19 (Whereupon, Plaintiff's Exhibit 1 was
20 marked for identification and the same is
21 attached hereto.)
22    Q I'm showing you Ms. Knudsen's card.
23 Can you tell me why if she's not an

3 (Pages 9 to 12)

## FREEDOM COURT REPORTING

13

1  employee of Aronov Realty Management,
2  Inc., her card says she is?
3      MR. STEWART: Object to form.
4      A I don't know.
5      Q Could that be an old card?
6      A Yes, sir, it could be.
7      Q All right. And tell me again so I
8  understand it, the difference between what
9  Aronov Realty Brokerage, Inc. does and
10  what Aronov Realty Management, Inc. does.
11      A Aronov Realty Brokerage, Inc. is a
12  company that leases and sells commercial
13  real estate in the commercial division.
14  Aronov Realty Brokerage, Inc. also has a
15  division that sells residential real
16  estate -- is responsible for brokering,
17  selling residential real estate primarily
18  for third parties but Aronov Realty
19  Brokerage, Inc. also sells and leases for
20  the -- can sell and lease for the
21  portfolio that Aronov Realty Management,
22  Inc. leases. Aronov Realty Management,
23  Inc. is really a management company and

14

1  leasing company for a portfolio of
2  properties.
3      Q So rather --
4      A So the brokerage company is
5  responsible -- really primarily focuses on
6  selling and leasing and the management
7  company primarily focuses on managing and
8  leasing and some development work.
9      Q Managing and leasing, not just
10  managing?
11      A Correct. Managing and leasing and
12  development. They also have a financial
13  services division.
14      Q Okay. Do you know a Meiying
15  Forney?
16      A I've not met Ms. Forney that I'm
17  aware of, but I know the name.
18      Q Who was representing her as of May
19  of 2007 --
20      MR. STEWART: Object to the form.
21      Q -- in leasing the property that --
22  the shopping center property that's in
23  dispute here?

15

1      MR. STEWART: Object to form.
2      A I don't know.
3      Q You don't know?
4      A I don't know.
5      Q Okay. Do you know who was
6  responsible for leasing the property at
7  LeCroy Shopping Village?
8      MR. STEWART: Object to form.
9      A I don't know who was -- no, sir.
10      Q Did Aronov Realty Brokerage, Inc.
11  -- well I think I've already asked you.
12  Let me make sure I've got this straight so
13  I can back this all up. Amy worked for
14  the brokerage company as of May of 2007;
15  is that right?
16      A Yes. She -- I believe in '06 is
17  when she first started working for the
18  brokerage.
19      Q Are you aware that Amy showed the
20  property LeCroy Shopping Village to my
21  client in May of 2007?
22      A Yes, sir.
23      Q Okay. When she was showing that

16

1  property in May of 2007, who was she
2  representing?
3      A I don't believe she was
4  representing anybody. I think she was
5  acting as a transaction broker.
6      Q As a transaction broker for who?
7      A As a transaction broker for Ms.
8  Forney.
9      Q Okay. How would she have been
10  acting as a transaction broker for Ms.
11  Forney if there was no relationship
12  between Ms. Forney and the brokerage
13  company?
14      MR. STEWART: Object to form.
15      A Because that's the type of
16  relationship that a real estate company
17  defaults to if there is no written
18  agreement.
19      Q Okay. I'm going get educated
20  today. So there was no written agreement
21  with Ms. Forney?
22      A That's my understanding. There was
23  no written listing agreement is my

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

17

1  understanding.
2     Q  And your understanding of that
3  comes from what?  How do you know that?
4  Did somebody tell you or how do you know
5  that?
6     A  Because I asked Amy Knudsen if
7  there was a written listing agreement and
8  I was informed there was not.
9     Q  Okay.  Now let's back up even more.
10  At any point in time were you involved in
11  any way in Amy's showing this property to
12  Mr. Barr?
13     A  No, sir.
14     Q  At what point in time did you learn
15  that she had shown the property to Mr.
16  Barr?
17     A  I really can't remember the exact
18  time I learned.
19     Q  Was it before the lawsuit got
20  filed?
21     A  I really can't remember.
22     Q  Okay.  In the complaint or in the
23  answer that was filed by Aronov Realty

18

1  Management, Inc., the second paragraph
2  states that this defendant, and this
3  defendant would be Aronov Realty
4  Management, Inc., at the times material to
5  the complaint had no employment,
6  contractual or agency relationship with
7  any of the other defendants, that would be
8  Ms. Forney or Ms. Knudsen, or with the
9  attorney referred to in the complaint.  Is
10  that true?
11     MR. STEWART:  Object to form.
12     A  Who is the attorney referred to?
13     Q  Don Little.
14     A  That's correct.
15     Q  Can you tell me why Don Little
16  would show that property to somebody?
17     A  I don't know.
18     Q  You don't know?
19     A  No, sir.
20     Q  Can you tell me why Ms. Knudsen
21  would show that property to somebody?
22     A  Because she was working with Ms.
23  Forney as a transaction broker

19

1  assisting --
2     Q  She had a relationship with Ms.
3  Forney?
4     A  Yes, sir, as a --
5     Q  She had a relationship with Ms.
6  Forney by herself or through Aronov or
7  with Aronov?
8     MR. STEWART:  Object to form.
9     A  She had a relationship -- it's my
10  understanding that she had a relationship
11  with Ms. Forney as an employee of Aronov
12  Realty Brokerage, Inc., working with Ms.
13  Forney to help market that property.
14     Q  Okay.  But what you're telling me
15  is as far as you know, there was no
16  written agreement?
17     A  Yes, sir, that's what -- yes, sir.
18     Q  Is there any relationship between
19  Aronov Realty Management, Inc. and Aronov
20  Realty Brokerage, Inc.?
21     MR. STEWART:  Object to form.
22     A  They are both owned -- they are
23  both owned by the Aronov Corporation.

20

1     Q  How many different corporations
2  does the Aronov Corporation own?
3     A  I don't know.
4     Q  Do you know how many they own that
5  are involved in real estate?  Let me ask
6  it another way.  Does Aronov do anything
7  else other than buy and sell real estate?
8     A  Yes, sir.
9     Q  What else do they do?
10     A  We have an insurance company.
11     Q  Okay.
12     A  And a new homes construction
13  company.
14     Q  Okay.
15     A  And that's all I'm aware of.
16     Q  Okay.  Does Aronov Realty Brokerage
17  company have officers?
18     A  Yes, sir.
19     Q  Are any of those officers the same
20  officers that are officers for Aronov
21  Realty Management, Inc.?
22     A  Yes, sir.
23     Q  Who are they that are the same

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

21

1 officers?
2     A I don't know all but Owen Aronov,
3 Jake Aronov, and I'm an officer of both,
4 Jenny Autrey. And those are the ones that
5 I'm aware of.
6     Q As far as you know, does Ms.
7 Knudsen have any relationship with both
8 management and brokerage?
9     A No, sir.
10    Q So she was with management. She
11 left management, and she came to
12 brokerage?
13    A Correct.
14    Q And she came to brokerage when? In
15 2006?
16    A Yes, sir.
17    Q And was working with brokerage at
18 the time that this property was shown?
19    A Correct.
20    Q And you don't know why Ms. Knudsen
21 would be showing Mr. Barr a card that said
22 that she worked for the realty management
23 group?

22

1     A I don't know.
2     Q We'll have to ask her that then.
3 Now you don't do -- the brokerage company
4 doesn't do any home selling, does it?
5     A It does.
6     Q It does? So you do both commercial
7 and residential?
8     A I personally only do commercial.
9     Q Okay. Do you manage people who do
10 residential?
11    A No, sir.
12    Q You don't?
13    A No.
14    Q But is there a residential division
15 under the brokerage company?
16    A Yes.
17    Q Who heads that up?
18    A Carol Andrews.
19    Q Now, in doing -- in managing the
20 commercial end -- which is all you do,
21 right?
22    A Yes.
23    Q Do y'all have any policies or

23

1 procedures concerning discrimination in
2 leasing and how to avoid discrimination in
3 leasing?
4     A Yes, sir.
5     Q Are those in writing?
6     A Yes, sir.
7     Q And what are those called?
8     A It's the National Association of
9 Realtors Code of Ethics.
10    Q Okay. And what does the Code of
11 Ethics say about nondiscrimination in
12 leasing?
13    A It says that you shall provide
14 professional services to all individuals
15 regardless of race, religion, color,
16 national origin, handicap, status.
17    Q And how are the employees made
18 aware of that policy?
19    A We have courses that instructs the
20 employees as well as our independent
21 contractors in the policies.
22    Q Now, you're also an officer of the
23 realty management, right?

24

1     A Yes, sir.
2     Q Do they have those same policies
3 and procedures concerning discrimination
4 with the management group?
5     A Yes, sir.
6     Q And are the employees of the
7 management group also given instruction on
8 those rules?
9     A Yes, sir.
10    Q And so it's a well-known fact that
11 to discriminate based on race in leasing
12 is unlawful, correct?
13    A Yes, sir.
14    Q And specifically that -- are you
15 aware that it is a violation of 42 USC
16 section 1982, have you ever heard that?
17    A No, sir.
18    Q Now, have you had any communication
19 with anyone who owns or is involved with
20 LeCroy Shopping Village?
21    A No, sir.
22    Q When did you --
23    A I'm sorry. Ask that question

6 (Pages 21 to 24)

## FREEDOM COURT REPORTING

25

1  again.
2      Q  That owns or is in any way involved
3  in managing or leasing LeCroy Shopping
4  Village?
5      A  Other than Ms. Knudsen, no, sir.
6      Q  Was there anybody else that could
7  show that property other than Ms. Knudsen?
8      A  I don't know if there was anybody
9  else -- other people could show it.  I
10  don't know if anybody else was showing,
11  any other real estate agents.
12      Q  Okay.
13      A  As long as that person was
14  receiving their instruction from Ms.
15  Forney.
16      Q  Okay.  Have you ever had a
17  conversation with Ms. Forney?
18      A  Not that I can remember.
19      Q  If in fact she were to have a
20  relationship with the brokerage company,
21  how would that happen?
22      MR. STEWART:  Object.
23      A  I'm not sure I'm following you.

26

1      Q  If she wanted Aronov to help her
2  lease or sell that space at LeCroy
3  shopping center, how would she go about
4  doing that?
5      A  She would talk to one of our
6  independent contractors or employees.
7      Q  Okay.  And why would she talk to
8  them?
9      A  To describe what services she was
10  interested in having Aronov perform.
11      Q  And is that the way that the
12  relationship is always done for the
13  leasing or the selling of a piece of
14  commercial property such as a shopping
15  center, that the relationship is between
16  the independent agent?
17      MR. STEWART:  Object to form.
18      A  I wouldn't say it's always the
19  case.
20      Q  Okay.  Was there -- to your
21  knowledge, was there anybody else who had
22  a relationship with Ms. Forney who could
23  show the property?

27

1      MR. STEWART:  Object to form.
2      A  Within Aronov?
3      Q  Yes.
4      A  Not that I'm aware of.
5      Q  So is it your testimony that the
6  only one in -- the only person with Aronov
7  that could show that property was Ms.
8  Knudsen?
9      A  No.  Anybody could have shown it
10  within the company.  But our typical --
11  our typical procedure would be since Amy
12  Knudsen knew the property the best and was
13  working with Ms. Forney on the property
14  that they would work through Amy if there
15  was a prospect for that property within
16  Aronov.
17      Q  Well, then that creates confusion
18  in my mind.  Earlier you said that Ms.
19  Knudsen had an independent transactional
20  agreement with Ms. Forney to try and lease
21  the property, right?
22      MR. STEWART:  Object to form.
23      A  She was acting as a transaction

28

1  broker, right?
2      Q  A transaction broker?
3      A  Right.
4      Q  Okay.  But the relationship, if
5  other people from Aronov could show the
6  property, was with Aronov not Ms. Knudsen,
7  right?
8      MR. STEWART:  Object to form.
9      A  It was with Aronov Realty
10  Brokerage, Inc. through Ms. Knudsen.
11      Q  And tell me, somebody who doesn't
12  know a thing in the world about real
13  estate, what that agreement between her
14  and the brokerage company was.
15      MR. STEWART:  Object to form.
16      Q  What was it called first?
17      MR. STEWART:  Same objection.
18      A  It would be called a transaction
19  brokerage agreement.
20      Q  And are transaction brokerage
21  agreements usually but in writing?
22      A  Sometimes they are and sometimes
23  they are not.

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

29

1    Q Okay. And this one I understand
2 was not?
3    A Correct.
4    Q Is there any difference in the
5 relationship whether it's in writing or
6 not in writing?
7    A No, sir, not that I'm aware of, a
8 transaction brokerage relationship.
9    Q And as I understand it, the
10 relationship is that Aronov brokerage has
11 an agreement with her to assist her in
12 leasing or selling that piece of property;
13 is that right?
14    A I'm not sure whether it was leasing
15 and selling or whether it was just
16 leasing.
17    Q Okay. All right.
18    A Could have been selling.
19    Q Okay. To your knowledge, do you
20 know whether Ms. Knudsen -- well, do you
21 know whether the brokerage company had
22 represented Ms. Forney in any other
23 properties?

30

1    A Yes, I believe they had.
2    Q Can you tell me any of the other
3 properties that Ms. Forney had that the
4 brokerage company had a relationship with
5 her on?
6    A East Park Plaza and Office Park I
7 believe is the name of the property.
8    Q And to your knowledge, how long had
9 the brokerage company had this
10 relationship with Ms. Forney?
11    A I really don't know how long.
12    Q Okay. So LeCroy was not the first
13 property of Ms. Forney's that the
14 brokerage company was assisting in leasing
15 the property?
16    A I can't remember whether it was,
17 you know, which order that property fell.
18    Q Okay. How long is has this
19 particular brokerage company been in
20 existence?
21    A I don't know the exact year it was
22 incorporated, but it's been in existence
23 since I have been employed with the

31

1 company.
2    Q Okay. Have you ever been involved
3 in any other lawsuits against either the
4 -- one of the Aronov companies and one of
5 it's agents in which both the company and
6 the agent were sued?
7    A Define involvement.
8    Q Aware of lawsuits that have been
9 filed?
10    A Yes.
11    Q And is it your understanding that
12 when those lawsuits are filed, that
13 generally the company for which the agent
14 works is named and then the agent is also
15 named?
16    A I don't know.
17    Q You don't know? Have you ever
18 personally been sued as an agent?
19    A No, sir.
20    Q Has the brokerage company been sued
21 as a result of the actions of one of it's
22 agents other than Ms. Knudsen since you've
23 been there?

32

1    A Yes.
2    Q And let's just use that as an
3 example. Was the agent sued as well as
4 the brokerage company?
5    A Yes.
6    Q Okay. What was that one about?
7    A It was a lawsuit involving dual
8 agency where a -- where Aronov Realty
9 Brokerage, Inc. had a property listed and
10 -- listed for lease and the perspective
11 lessee ended up leasing a property that
12 was managed by the management company.
13 And the owner of the property where we had
14 the listing in place sued.
15    Q What happened with that case?
16    A I believe ultimately it was settled
17 before it went to court.
18    Q Are you familiar with the results
19 of the settlement?
20    A No, sir, I'm not.
21    Q Are you familiar with who paid it?
22 Did Aronov pay it or did the agent pay it?
23    A I don't know.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

33

1    Q  Are you familiar with any type of
2  an arrangement between agents such as Ms.
3  Knudsen and the brokerage company or even
4  the management company, that if they get
5  sued they are responsible for paying their
6  own judgments or does Aronov stand behind
7  them?
8        MR. STEWART:  Object to form.
9    A  I guess it depends on the
10  situation.
11    Q  All right.  Well, let's talk about
12  this particular situation that we're here
13  about.  Mr. Barr's allegation is that Ms.
14  Knudsen would not rent to him because the
15  nightclub that he was going to open was
16  going to be a hip hop African American
17  nightclub.  If in fact that is true and if
18  in fact we prevail in this case, is Ms.
19  Knudsen going to have to pay her own
20  judgment or is Aronov brokerage or Aronov
21  management or Aronov period going to pay
22  the judgment?
23        MR. STEWART:  Object to form.

34

1    A  I don't know.
2    Q  You don't know?  Ever faced a
3  situation like that before?
4        MR. STEWART:  Object to form.
5    A  I just don't know.
6    Q  As far as you know has the
7  brokerage company been sued for
8  discrimination before?
9        MR. STEWART:  Object to form.
10    A  It has not been sued for
11  discrimination as it relates to leasing or
12  selling commercial property.
13    Q  How about under Fair Housing Act,
14  been sued under the Fair Housing Act?
15        MR. STEWART:  Object to form.
16    A  I'm generally aware of several
17  discrimination lawsuits, but I don't know
18  the details of them.
19    Q  Okay.  Those that you are aware of,
20  are they against the brokerage company,
21  the management company, both, neither,
22  Aronov as a whole, or what's your
23  understanding?

35

1        MR. STEWART:  Object.
2    A  I don't know.  But I don't believe
3  they are against the brokerage company.
4    Q  As far as you know, do they involve
5  housing?
6    A  I don't know.
7    Q  You don't know?
8    A  I don't.
9    Q  Are you aware of any other
10  complaints that have been alleged against
11  Ms. Knudsen since she went to work for the
12  brokerage company other than this one?
13    A  No, sir.
14    Q  Are you aware of any other
15  complaints that were made against her
16  while she was with the management group?
17    A  No, sir, not that I can remember.
18    Q  And let me make sure I'm correct --
19  well, let me ask you, when Ms. Knudsen is
20  involved in leasing and representing the
21  company and showing property, do you
22  generally know all of the property that
23  she's showing?

36

1    A  No, sir.
2    Q  Okay.  Are you aware -- do you know
3  whether she showed any other property for
4  Ms. Forney other than this one piece
5  that's involved in this litigation?
6    A  Yes, East Park Plaza and the Office
7  Park.  I don't know the exact name.
8    Q  Okay.
9    A  Off of Vaughn Road.
10    Q  Was she kind of the exclusive agent
11  for Ms. Forney?
12        MR. STEWART:  Object to form.
13    A  Not that -- no, sir, not that I'm
14  aware of, no.
15    Q  So any one of the agents could show
16  Ms. Forney's property?
17    A  That's my understanding.
18    Q  Do you know whether Ms. Knudsen had
19  been showing it more than others?
20    A  I don't know.
21    Q  And I've asked you this, but the
22  attorney who showed Mr. Barr the property
23  the second time, what's his name?  Don

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

37

1    Little.  Do you know him?
2        A  I know him, yes.
3        Q  Had you had any relationships with
4    him as far as him representing Aronov in
5    any matters?
6        A  No, sir.
7        Q  Had you had any dealings with him
8    representing Ms. Forney on any matter?
9        A  I have not, no, sir.
10       Q  Do you know whether anybody at
11   Aronov or at Aronov brokerage has?
12       A  I don't know.
13       Q  To your knowledge present -- I
14   think you've told me, as far as you know,
15   there are some other discrimination cases
16   against Aronov pending presently; is that
17   right?
18       A  I don't know if they are pending.
19   I don't know if they are pending
20   presently.
21       Q  Okay.  But you know that there have
22   been other discrimination suits against
23   Aronov companies?

39

1    have alleged discrimination in leasing,
2    commercial leasing?
3        A  No, sir, none that I'm aware of.
4        Q  Any lawsuits alleging
5    discrimination in housing?
6        MR. STEWART:  Object to form.
7        Q  With either one of those companies
8    that you're on the board of?
9        MR. STEWART:  Same objection.
10       A  I don't know.
11       Q  You don't know?  Any lawsuits
12   involving discrimination in the employment
13   of any of the employees of either one of
14   those companies?
15       A  I don't know.
16       Q  Who would know?
17       MR. STEWART:  Can you ask that
18   question again?
19       MR. QUINN:  Yes.
20       Q  Any complaints against either the
21   management company or the brokerage
22   company or anyone acting on it's behalf
23   alleging race discrimination in either the

38

1        A  Yes, sir.
2        Q  To your knowledge since you've been
3    on the board of the management company or
4    the brokerage company -- are you on the
5    board of any other companies of Aronov?
6        A  No, sir.
7        Q  Just those two?
8        A  Yes, sir.
9        Q  How many other are there?  How many
10   other companies of Aronov that deal in
11   property are there other than these two?
12       A  I don't know.
13       Q  A bunch?
14       A  I don't know how many there are.
15       Q  Do y'all have annual meetings where
16   y'all get together?
17       A  I'm not included in any annual
18   meetings if they are held.
19       Q  Are you aware either -- on either
20   of the companies that you are on the board
21   of -- and those are the only two, right?
22       A  Yes, sir.
23       Q  Okay.  Of any other lawsuits that

40

1    leasing or selling of real property?
2        A  No, sir, not that I'm aware of.
3        Q  Because you're listed as the person
4    most knowledgeable of that or you're
5    sitting here as the person most
6    knowledgeable.
7        A  Right.
8        Q  So sitting here today, you don't
9    know of any other lawsuits?
10       A  Any other discrimination lawsuits
11   involving the leasing or selling of
12   commercial property?
13       Q  Correct -- no, of real property.
14       A  I don't know of any involving real
15   property but -- or commercial property
16   that I'm aware of.
17       Q  How about complaints that have not
18   resulted in lawsuits?
19       A  Regarding leasing or selling --
20       Q  Discrimination, yes, discrimination
21   in leasing or selling real property?
22       A  I don't know of any involving
23   leasing or selling on commercial property,

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

41

1  and real property, I don't know.
2      Q  Okay.  Do you know whether there
3  has ever been any kind of a written
4  agreement between Ms. Forney and the
5  brokerage or management company regarding
6  her properties?
7      A  I don't know.  It is my
8  understanding there has not been, but I
9  don't know.
10      Q  The other two properties that we
11  talked about, the Office Park and the
12  other, as far as you know there is no
13  written agreement with her?
14      A  Right, not that I'm aware of.
15      Q  Am I correct that the -- are there
16  any other relationships between Ms.
17  Knudsen and the brokerage company -- other
18  than the brokerage company that you
19  are aware of as far as Aronov is
20  concerned?
21      A  No, sir.
22      MR. QUINN:  Let's take a break.
23  (Whereupon, a break was taken.)

42

1      MR. STEWART:  You had asked a
2  question and I wanted to make sure I
3  understood it correctly.  Before you
4  rephrased a question, it sounded like you
5  were asking about employment race cases.
6  And then when you rephrased it, I think
7  you rephrased it to again go back to
8  commercial leasing and real property.  I
9  just wanted to make sure that you knew
10  that there have been race employment cases
11  filed against Aronov entities.  And I just
12  wanted to make sure the record was clear
13  on that.  I'm not sure y'all were talking
14  about the same thing.
15      MR. QUINN:  All right.
16      Q  Ms. Knudsen was not the exclusive
17  agent for the LeCroy property; is that
18  right?
19      A  That's my understanding.
20      Q  Why would the signs have her name
21  and nobody else's on it then?
22      A  Because Ms. Forney would have had
23  to give her permission to put those signs

43

1  up.
2      Q  But even though the signs have Ms.
3  Knudsen, others can show the property?
4      A  Yes, sir.
5      Q  Okay.  To your knowledge was
6  anybody else other than Ms. Knudsen
7  showing that property other than the
8  incident with the lawyer?  I'm talking
9  about were other Aronov agents showing
10  that property that you know of?
11      A  Not to my knowledge, no.
12      Q  To the best of your knowledge had
13  Ms. Knudsen been the one that had been
14  filling that space up for Ms. Forney?
15      A  I believe she had completed several
16  leases in the property.
17      Q  Now, you told me that the
18  management company, in addition to
19  managing, also is responsible for leasing?
20      A  Yes, sir.
21      Q  And selling or just leasing, mostly
22  leasing?
23      A  Mostly leasing although they do

44

1  some brokerage.
2      Q  When Ms. -- do you know how Ms.
3  Knudsen came from management over to
4  brokerage?
5      A  Yes, sir.
6      Q  How did that happen?
7      A  She had a lot of business contacts
8  and a lot of contacts in the community
9  that were not necessarily office related.
10  Her previous responsibilities when she was
11  with Aronov Realty Management, Inc. was to
12  lease office space in a given portfolio,
13  meaning she was responsible for leasing
14  office space in Executive Park for
15  example.
16      Q  Okay.
17      A  So she was in the Executive Park
18  box, that was her only focus was leasing
19  office space in Executive Park.  But she
20  had more potential to lease and sell to
21  contacts that she knew in the community
22  and outside the community in other areas
23  other than just leasing office space.  So

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

45

1  we wanted to provide her the opportunity
2  to really lease and sell other properties
3  other than office properties.
4      Q  Okay.
5      A  So that in a brokerage capacity,
6  she could really focus on anything in
7  commercial real estate involving leasing
8  and selling.
9      Q  So I take it you knew her?
10     A  Yes.
11     Q  And you had known her?
12     A  Yes.
13     Q  How long had she been with Aronov?
14     A  I think around five years
15  approximately.
16     Q  Had she worked anywhere else before
17  Aronov that you're aware of?
18     A  Not with Aronov, but I believe she
19  was with AT&T. I think it was AT&T.
20     Q  So she had been with Aronov about
21  five years. Had all of those years been
22  with the management company?
23     A  Yes, sir, up until '06.

46

1      Q  Did you have to have a conversation
2  with her boss at management about this
3  switch?
4      A  I was her boss at management.
5      Q  Okay. All right. So while she was
6  at management -- how were you her boss at
7  both management and then became her boss
8  at the brokerage company?
9      A  Because I'm a senior vice president
10  for the management company and the
11  brokerage company.
12     Q  I got you. So you actually were
13  her boss while she was with the management
14  company?
15     A  Correct.
16     Q  Did she develop the relationship
17  with Ms. Forney while she was at
18  management?
19     A  I can't remember.
20     Q  Can you remember whether or not --
21     A  I think she -- I can't remember.
22     Q  Can you remember whether or not she
23  was involved in leasing tenants for that

47

1  LeCroy space before she came over to
2  brokerage and then just continued it after
3  she got over to brokerage?
4      A  I believe she had.
5      Q  Okay. Did her salary change when
6  she moved?
7      A  No, sir.
8      Q  What was her salary?
9         MR. STEWART:  Object to that.
10     Q  What was her salary at management?
11        MR. STEWART:  I'm going to object.
12  Unless I can understand how it's relevant
13  what she earned, I'm going instruct the
14  witness not to answer that question.
15        MR. QUINN:  She's sued
16  individually. And if they don't pay for
17  it, she going to have to pay for it. So I
18  need to know how much money she's got.
19        MR. STEWART:  You can do that after
20  you get a judgment.
21        MR. QUINN:  I can do it now.
22        MR. STEWART:  Not as long as I'm
23  sitting here.

48

1         MR. QUINN:  I can too.
2         MR. STEWART:  Not as long as I'm
3  sitting here.
4         MR. QUINN:  You're instructing him
5  not to tell me how much she makes.
6         MR. STEWART:  That's what I did
7  already.
8         MR. QUINN:  That's a new one on me,
9  Charlie.
10     Q  Does she make most of her money off
11  commission or salary?
12     A  I don't know where she makes most
13  of her money, but she's salaried plus
14  commissions.
15     Q  So basically you've been her
16  manager then for seven years?
17     A  I think she's been with the company
18  -- with Aronov Realty Management, Inc. and
19  Brokerage, Inc. I think a total of about
20  five years.
21     Q  Let me make it simpler. Have you
22  been her manager since she's been there?
23     A  Yes.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

49

1    Q Okay. And as her manager, have you
2 ever had any problems with her in leasing
3 space of the nature like this before?
4    A No, sir.
5    Q Do you, sitting here today, have
6 any personal knowledge of what transpired
7 between her and Mr. Barr other than what
8 you may have been told by somebody else?
9    A No, sir.
10    Q Did you know Mr. Barr?
11    A No, sir.
12    Q You've never met him before?
13    A Not that I can remember.
14    Q Brokerage company, as far as you
15 know, had never done anything for him?
16    A Not to my knowledge, but again, I
17 don't know of all the relationships in the
18 brokerage company.
19    Q Okay. Now when Ms. Knudsen made
20 the switch from management to brokerage,
21 did the person -- did the entity writing
22 her check change?
23    A I think it did.

50

1    Q And did her check then start coming
2 from Aronov brokerage rather than Aronov
3 management?
4    A It should have, but I haven't seen
5 her check, but it should have.
6    Q That's what's supposed to happen?
7    A Yes, sir.
8    Q Okay. And those companies, since
9 you're on the board of both, do those
10 companies in any way commingle their
11 profits, losses, revenues, any of that or
12 are they stand alone --
13    A I don't know.
14    Q -- on their own? You're on the
15 board. You don't know?
16    A I don't know. No, I don't.
17    Q Do either one of those companies
18 get revenue infused from somewhere else
19 other than what they actually go out and
20 lease or sell?
21    A Not to my knowledge.
22    Q Okay. But basically, am I correct
23 that Ms. Knudsen --

51

1    A They would receive management fees.
2 When you say lease or sell, management
3 fees, development fees, in addition to
4 income -- in addition to commissions
5 generated from leasing and selling.
6    Q Okay. And those would come from
7 the properties that they are managing?
8    A Correct.
9    Q At the time of her transition to
10 the brokerage company, was she performing
11 basically the same duties and
12 responsibilities and that was leasing
13 commercial property?
14    MR. STEWART: Object to form.
15    A Repeat the question.
16    Q I'm curious as to how her job
17 changed when she came to the brokerage
18 company.
19    A Okay. She would have been more
20 focussed on leasing or selling a larger --
21 she would have been exposed to a larger
22 universe of properties.
23    Q Would she continue to lease those

52

1 that she already was while she's over in
2 management or did she give those up?
3    A She gave those up, but she could --
4 you know, she could lease those
5 properties. But it wasn't her sole
6 responsibility to lease those properties.
7    Q And if I understand it correctly
8 then what we're doing is we're talking
9 about a broker who while with the
10 management group is mostly responsible for
11 portfolios that deal with office space?
12    A Exactly. And a limited portfolio
13 within that office space.
14    Q But brokerage has much more
15 commercial such as shopping centers and
16 that kind of thing --
17    A Exactly.
18    Q -- than management does?
19    A Yes. Well, than our division of
20 management, what she was employed to do.
21    Q Could she have stayed in management
22 and done the same thing, made the same
23 transition to selling more commercial

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

53

1 shopping center, that type of stuff other
2 than office space?
3     MR. STEWART: Object to form.
4     A  Well, when she focussed more on
5 brokerage work, selling and leasing more
6 third party properties, then it's more of
7 a -- you know, the Aronov Realty
8 Brokerage, Inc.
9     Q  Aronov owned most of the management
10 property and she was responsible for
11 leasing it; is that right?
12     A  They owned some of the property.
13 Yeah, they owned a percentage of the
14 property that the company -- that the
15 management company manages, and then there
16 is a certain part that's, you know, not
17 owned by the ARONOVs.
18     Q  And again, I'm showing my
19 ignorance, but when you talk about
20 brokerage, you're talking about selling a
21 third party's property?
22     A  It doesn't have to be third party.
23     Q  It can be ARONOV's property or it

54

1 can be somebody else's property?
2     A  Yes, sir.
3     Q  When she transitioned over, it
4 sounds like that she could still lease
5 property that she had in the management
6 group as well as lease property that's in
7 the brokerage group; is that right?
8     A  When she transferred over to the
9 brokerage company, she could really lease
10 any type of commercial property in any
11 portfolio as long as she was licensed in
12 that state to do so.
13     Q  So it didn't matter -- and I guess
14 it leads me to ask this: Is the -- tell
15 me what the big distinction between the
16 management group and the brokerage group
17 is so that I can understand.
18     A  As relates to Amy's employment?
19     Q  Yeah, as it relates to her
20 employment.
21     A  When she was working for the
22 management company -- when she was
23 employed by the management company, her

55

1 primary responsibility was to lease office
2 space in Executive Park in Montgomery
3 which is an office park of about three
4 hundred thousand plus or minus square feet
5 of office space.
6     Q  Okay. I've got that. And so then
7 when she moved over, she expanded and she
8 was able to lease much more than just
9 office space?
10     A  And sell much more, right.
11     Q  The properties that she is out
12 there trying to lease and trying to sell,
13 are they distinguished by whether they are
14 properties of the management group or
15 properties of the brokerage group or are
16 they just Aronov properties?
17     MR. STEWART: Object to form.
18     A  They don't have to be just Aronov
19 properties.
20     Q  I understand that. I'm sorry. But
21 I guess what I'm saying, are the customers
22 the same -- can a broker or agent that's
23 in the brokerage company show a piece of

56

1 property that management also shows?
2     A  Sure, yes.
3     Q  Okay. So other than the name and
4 other than the fact that management is
5 mostly involved with office space, the
6 customer -- that was only a division?
7     A  Right.
8     Q  Okay. Management is just as
9 involved in commercial space as brokerage
10 is or are they?
11     A  I'm confused.
12     Q  You're confused because I'm
13 confused. Because I don't understand why
14 you got to have both companies under
15 separate roofs because it sounds like they
16 do the same thing?
17     A  The brokerage company does not make
18 it a practice to manage properties.
19     Q  Okay. And so that is the
20 distinction. But even though the
21 management company manages, that ain't all
22 it does. It also leases, sells, both
23 commercial and office properties, right?

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

1    A Right.
2    Q Okay. Which is what Ms. Knudsen
3 was doing but mostly office before she
4 came over to brokerage?
5    A Right.
6    Q And brokerage, as I understand it,
7 not only has the same officers but also
8 has the same employees as brokerage.
9 You're an employee of both management and
10 brokerage; is that right?
11    MR. STEWART: Object to form.
12    A Yes.
13    Q Other than you, are there other
14 people that are employees of both
15 management and brokerage?
16    A I don't know.
17    Q As a vice president of both, do you
18 get separate checks from each of them or
19 do you just get one big check?
20    A I used to get separate checks.
21    Q You used to get separate checks.
22 When did that stop?
23    A I can't remember.

58

1    Q Has it been a while?
2    A Yeah, it's been a little while.
3    Q And so now where does your check
4 come from? Do you look at it to see what
5 name's on it?
6    A It's an automatic deposit.
7    Q Right. Have you ever looked to see
8 whether it's coming from management or
9 whether it's coming from brokerage or
10 whether it's coming from both or whether
11 it's coming from Aronov himself, whoever
12 that may be?
13    A I can't remember.
14    Q Okay. That's it.
15    MR. STEWART: Just so I make sure I
16 understand --
17    MR. GUY: Before you do that, can
18 we take a quick break before you ask the
19 questions? Can I speak to you?
20    MR. STEWART: Yeah.
21 (Whereupon, a break was taken.)
22    MR. QUINN: I got a couple of more
23 before you do.

59

1    Q Have you filed your income taxes
2 this year?
3    A Yes.
4    Q When you did, do you remember how
5 much money you made from the brokerage
6 company and how much money you made from
7 the management company? I don't want you
8 to tell me how much it is, but were they
9 separate?
10    A Yes.
11    Q They were listed separately on your
12 income tax return?
13    A Yes, sir.
14    Q Okay. And when Ms. Knudsen changed
15 over to the brokerage company, other than
16 her pay, did her benefits remain the same
17 or change in any way? By that, I mean
18 pension, 401K, insurance, that kind of
19 stuff.
20    A No, sir.
21    Q Do you know whether the same entity
22 runs the benefits for both the brokerage
23 employees and the management employees?

60

1    MR. STEWART: Object to form.
2    A I don't know.
3    Q Does it come out of the same human
4 resources department or payroll
5 department?
6    A Yes, it comes out of the same human
7 resource department.
8    Q Okay. Thanks. That's it. She
9 didn't lose vacation or anything like that
10 when she switched over?
11    A I don't know that.
12    MR. QUINN: That's all.
13    MR. STEWART: Nothing.
14    MR. GUY: Nothing.
15
16
17    AND FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

61

```
1        C E R T I F I C A T E
2
3    State of Alabama
4    St. Clair County
5
6      I hereby certify that the above and
7    foregoing deposition was taken down by me
8    in stenotype and the questions and answers
9    thereto were transcribed by means of
10   computer-aided transcription, and that the
11   foregoing represents a true and correct
12   transcript of the testimony given by said
13   witness upon said hearing.
14     I further certify that I am neither of
15   counsel, nor of kin to the parties to the
16   action, nor am I in any way interested in
17   the result of said cause named in said
18   caption.
19
20
21          Kim Duckett
22          Alabama CCR#142
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

J

# FREEDOM COURT REPORTING

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3      NORTHERN DIVISION
4
5  TERRENCE LONG & BARRY BARR,
6      Plaintiffs,
7                  CIVIL ACTION NO:
8  v.          2:07-CV-00881-WKW-WC
9
10  ARONOV REALTY MANAGEMENT, INC.,
11  AMY CLARK KNUDSEN, & MEIYING
12  FORNEY,
13      Defendants.)
14  S T I P U L A T I O N S
15
16      IT IS STIPULATED AND AGREED
17  by and between the parties through their
18  respective counsel, that the deposition of
19  *****************************************
20      SCOTT HARRIS
21  *****************************************
22  may be taken before Kim Duckett,
23  Commissioner, at 401 Adams Avenue,

**2**

1  Montgomery, Alabama, on June 23rd, 2008,
2  beginning at 10:00 A.M.
3      IT IS FURTHER STIPULATED AND
4  AGREED that the signature to and the
5  reading of the deposition by the witness is
6  waived, the deposition to have the same
7  force and effect as if full compliance had
8  been had with all laws and rules relating
9  to the taking of depositions.
10      IT IS FURTHER STIPULATED AND
11  AGREED that it shall not be necessary for
12  any objections to be made by counsel to any
13  questions, except as to the form or leading
14  questions, and that counsel for the parties
15  may make objections and assign grounds at
16  the time of trial, or at the time said
17  deposition is offered in evidence, or prior
18  thereto.
19      IT IS FURTHER STIPULATED AND
20  AGREED that notice of filing of the
21  deposition by the Commissioner is waived.
22
23

**3**

1          I N D E X
2
3  WITNESS:
4  SCOTT HARRIS
5
6  EXAMINATION BY                    PAGE
7  Mr. Quinn ....................  5
8
9      DEFENDANT'S EXHIBITS
10  There were no Defendant's Exhibits marked
11  to this deposition.
12      PLAINTIFF'S EXHIBITS
13  NO.                      PAGE
14  1..............................12
15
16
17
18
19
20
21
22
23

**4**

1        A P P E A R A N C E S
2  APPEARING ON BEHALF OF THE PLAINTIFF(S):
3
4  WIGGINS, CHILDS, QUINN & PANTAZIS
5    BY: Mike Quinn & Kevin Jent
6    301 19th Street North
7    Birmingham, Alabama 35203
8
9
10  APPEARING ON BEHALF OF THE DEFENDANT(S):
11
12  BRADLEY, ARANT, ROSE & WHITE
13    BY: CHARLES STEWART III
14    401 Adams Avenue, Suite 780
15    Montgomery, Alabama 36104
16
17  BALL, BALL, MATTHEWS & NOVAK
18    BY: N. Gunter Guy
19  2000 Interstate Park Drive, Suite 204
20    Montgomery, Alabama 36109
21
22  ALSO PRESENT: AMY KNUDSEN, BARRY BARR
23

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

5

1         SCOTT HARRIS,
2   being first duly sworn, was examined and
3   testified as follows:
4
5   EXAMINATION BY MR. QUINN:
6       Q State your name for the record?
7       A Joseph Scott Harris.
8       Q And where are you employed?
9       A At Aronov Realty Brokerage, Inc.
10      Q And what is your position with
11  them?
12      A Senior vice president.
13      Q And how long have you held the
14  position of senior vice president?
15      A Eleven years.
16      Q Prior to that, what were you doing?
17      A I was with Aronov as well in
18  another position.
19      Q How long have you been with Aronov?
20      A Since 1987.
21      Q Okay. And tell me what other
22  positions you've held with Aronov prior to
23  the one you hold now.

6

1       A I was a property manager and
2   leasing agent. I was hired as a property
3   manager and leasing agent in '87. And
4   then in '97 I was promoted to vice
5   president and then a couple of years ago
6   to senior vice president.
7       Q Okay. In the first position that
8   you held, property manager leasing?
9       A Right.
10      Q What were your duties and
11  responsibilities?
12      A I was responsible for the bottom
13  line operations of a portfolio of office
14  and industrial properties. I was
15  responsible for leasing the properties and
16  managing the properties.
17      Q Okay. And I'm sorry, I may have
18  asked you this, but how long have you been
19  in your present position?
20      A For a couple of years.
21      Q And what are your duties and
22  responsibilities in that job?
23      A I'm responsible for overseeing our

7

1   -- the profitability and the employees in
2   our commercial division which includes our
3   brokerage division and our office and
4   industrial division.
5       Q Okay.
6       A And I'm also the qualifying broker
7   for the company for the Aronov Realty
8   Brokerage, Inc. and Aronov Realty
9   Management, Inc. And I also -- I am
10  actively involved in leasing and
11  investment sales and commercial sales.
12      Q So you still do sales even though
13  you also manage?
14      A Correct.
15      Q And in your position, do you
16  actually have the responsibility over
17  employees of Aronov?
18      A Yes.
19      Q Okay. What employees do you have
20  responsibility over?
21      A Employees I have responsibility
22  over -- direct responsibility?
23      Q Uh-huh.

8

1       A The individual names?
2       Q No, no, no, the positions. The
3   people that you supervise. I don't need
4   their names, I need to know what their
5   positions and what they do?
6       A There is a property manager and
7   leasing agent that handles our office and
8   industrial portfolio.
9       Q Just one person?
10      A Yes.
11      Q Who is that?
12      A Neil Bernie.
13      Q Okay.
14      A And then Sherry Cavanaugh is the
15  manager of our -- of a mini warehouse
16  complex and she actually oversees the
17  managers of two other mini warehouse
18  complexes.
19      Q Okay.
20      A And then Dawn Casey is -- she
21  really is my assistant, but she also
22  handles the Baptist Hospital account that
23  we handle the leasing on. And Gloria

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

9

1  Batten is an administrative assistant for
2  Aronov Realty Brokerage, Inc. And then
3  Mickey Griffin is director of our
4  corporate services division. And then Amy
5  Knudsen is in the commercial brokerage
6  division. Those are the employees.
7      Q  Okay. And --
8      A  One more. Mark Davis is the -- is
9  a -- he oversees part of our maintenance
10 operation and also gets involved in
11 construction management, primarily
12 construction management.
13     Q  Okay. Now, what is Amy Knudsen's
14 position?
15     A  Amy is a commercial sales and
16 leasing specialist in our brokerage
17 division.
18     Q  And she is -- is she actually an
19 employee of Aronov?
20     A  Yes. Yeah, Aronov Realty
21 Brokerage.
22     Q  And receives a salary from Aronov
23 Brokerage?

10

1      A  Yes.
2      Q  Does she also get commissions as
3  well as a salary in her position?
4      A  She does.
5      Q  Okay. And tell me what her job is,
6  what her duties and responsibilities are.
7      A  She is involved in the selling and
8  leasing of commercial property.
9      Q  I see. Okay. Do you know what her
10 direct relationship with Aronov is? Is
11 she an employee?
12     A  Yes.
13     Q  Okay.
14     MR. STEWART:  You're using Aronov,
15 but just so you know -- make sure y'all
16 are speaking about the same company.
17     A  She's an employee of Aronov Realty
18 Brokerage, Inc., the brokerage company.
19     Q  Not Aronov Realty Management, Inc.?
20     A  No, sir.
21     Q  Who is that?
22     A  Aronov Realty Management, Inc. is a
23 separate company that --

11

1      Q  What does Aronov Realty Management,
2  Inc. do?
3      A  They manage and lease a portfolio
4  of properties; office, industrial, retail,
5  multi-family.
6      Q  As far as you know, did Ms. Knudsen
7  ever work for Aronov Realty Management,
8  Inc.?
9      A  Yes.
10     Q  When did she work for Aronov Realty
11 Management, Inc.?
12     A  She was hired -- I don't know the
13 exact dates, but I think about five years
14 ago to lease a portfolio of office
15 properties for Aronov Realty Management,
16 Inc.
17     Q  As far as you know, is she still
18 employed with Aronov Realty Management,
19 Inc.?
20     A  No, she's not.
21     Q  When did that cease?
22     A  I believe in '96. I don't know the
23 exact date.

12

1      MR. STEWART:  Did you say 1996?
2      Q  You said '96.
3      A  I'm sorry. I meant 2006. I'm
4  sorry. I apologize. 2006.
5      Q  So as of May 2007, is it your
6  testimony that she was not an employee of
7  Aronov Realty Management, Inc.?
8      A  Yes.
9      Q  She was rather an employee of
10 Aronov Realty Brokerage --
11     A  Yes, sir.
12     Q  -- Inc.; is that right?
13     A  Yes, sir.
14     Q  And is still an employee of Aronov
15 Realty Brokerage, Inc.; is that right?
16     A  Yes.
17     Q  Let me show you what I've marked as
18 Plaintiff's Exhibit I.
19 (Whereupon, Plaintiff's Exhibit 1 was
20 marked for identification and the same is
21 attached hereto.)
22     Q  I'm showing you Ms. Knudsen's card.
23 Can you tell me why if she's not an

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

13

1 employee of Aronov Realty Management,
2 Inc., her card says she is?
3     MR. STEWART: Object to form.
4     A I don't know.
5     Q Could that be an old card?
6     A Yes, sir, it could be.
7     Q All right. And tell me again so I
8 understand it, the difference between what
9 Aronov Realty Brokerage, Inc. does and
10 what Aronov Realty Management, Inc. does.
11     A Aronov Realty Brokerage, Inc. is a
12 company that leases and sells commercial
13 real estate in the commercial division.
14 Aronov Realty Brokerage, Inc. also has a
15 division that sells residential real
16 estate -- is responsible for brokering,
17 selling residential real estate primarily
18 for third parties but Aronov Realty
19 Brokerage, Inc. also sells and leases for
20 the -- can sell and lease for the
21 portfolio that Aronov Realty Management,
22 Inc. leases. Aronov Realty Management,
23 Inc. is really a management company and

14

1 leasing company for a portfolio of
2 properties.
3     Q So rather --
4     A So the brokerage company is
5 responsible -- really primarily focuses on
6 selling and leasing and the management
7 company primarily focuses on managing and
8 leasing and some development work.
9     Q Managing and leasing, not just
10 managing?
11     A Correct. Managing and leasing and
12 development. They also have a financial
13 services division.
14     Q Okay. Do you know a Meiying
15 Forney?
16     A I've not met Ms. Forney that I'm
17 aware of, but I know the name.
18     Q Who was representing her as of May
19 of 2007 --
20     MR. STEWART: Object to the form.
21     Q -- in leasing the property that --
22 the shopping center property that's in
23 dispute here?

15

1     MR. STEWART: Object to form.
2     A I don't know.
3     Q You don't know?
4     A I don't know.
5     Q Okay. Do you know who was
6 responsible for leasing the property at
7 LeCroy Shopping Village?
8     MR. STEWART: Object to form.
9     A I don't know who was -- no, sir.
10     Q Did Aronov Realty Brokerage, Inc.
11 -- well I think I've already asked you.
12 Let me make sure I've got this straight so
13 I can back this all up. Amy worked for
14 the brokerage company as of May of 2007;
15 is that right?
16     A Yes. She -- I believe in '06 is
17 when she first started working for the
18 brokerage.
19     Q Are you aware that Amy showed the
20 property LeCroy Shopping Village to my
21 client in May of 2007?
22     A Yes, sir.
23     Q Okay. When she was showing that

16

1 property in May of 2007, who was she
2 representing?
3     A I don't believe she was
4 representing anybody. I think she was
5 acting as a transaction broker.
6     Q As a transaction broker for who?
7     A As a transaction broker for Ms.
8 Forney.
9     Q Okay. How would she have been
10 acting as a transaction broker for Ms.
11 Forney if there was no relationship
12 between Ms. Forney and the brokerage
13 company?
14     MR. STEWART: Object to form.
15     A Because that's the type of
16 relationship that a real estate company
17 defaults to if there is no written
18 agreement.
19     Q Okay. I'm going get educated
20 today. So there was no written agreement
21 with Ms. Forney?
22     A That's my understanding. There was
23 no written listing agreement is my

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

17

1 understanding.
2   Q And your understanding of that
3 comes from what? How do you know that?
4 Did somebody tell you or how do you know
5 that?
6   A Because I asked Amy Knudsen if
7 there was a written listing agreement and
8 I was informed there was not.
9   Q Okay. Now let's back up even more.
10 At any point in time were you involved in
11 any way in Amy's showing this property to
12 Mr. Barr?
13   A No, sir.
14   Q At what point in time did you learn
15 that she had shown the property to Mr.
16 Barr?
17   A I really can't remember the exact
18 time I learned.
19   Q Was it before the lawsuit got
20 filed?
21   A I really can't remember.
22   Q Okay. In the complaint or in the
23 answer that was filed by Aronov Realty

18

1 Management, Inc., the second paragraph
2 states that this defendant, and this
3 defendant would be Aronov Realty
4 Management, Inc., at the times material to
5 the complaint had no employment,
6 contractual or agency relationship with
7 any of the other defendants, that would be
8 Ms. Forney or Ms. Knudsen, or with the
9 attorney referred to in the complaint. Is
10 that true?
11   MR. STEWART: Object to form.
12   A Who is the attorney referred to?
13   Q Don Little.
14   A That's correct.
15   Q Can you tell me why Don Little
16 would show that property to somebody?
17   A I don't know.
18   Q You don't know?
19   A No, sir.
20   Q Can you tell me why Ms. Knudsen
21 would show that property to somebody?
22   A Because she was working with Ms.
23 Forney as a transaction broker

19

1 assisting --
2   Q She had a relationship with Ms.
3 Forney?
4   A Yes, sir, as a --
5   Q She had a relationship with Ms.
6 Forney by herself or through Aronov or
7 with Aronov?
8   MR. STEWART: Object to form.
9   A She had a relationship -- it's my
10 understanding that she had a relationship
11 with Ms. Forney as an employee of Aronov
12 Realty Brokerage, Inc., working with Ms.
13 Forney to help market that property.
14   Q Okay. But what you're telling me
15 is as far as you know, there was no
16 written agreement?
17   A Yes, sir, that's what -- yes, sir.
18   Q Is there any relationship between
19 Aronov Realty Management, Inc. and Aronov
20 Realty Brokerage, Inc.?
21   MR. STEWART: Object to form.
22   A They are both owned -- they are
23 both owned by the Aronov Corporation.

20

1   Q How many different corporations
2 does the Aronov Corporation own?
3   A I don't know.
4   Q Do you know how many they own that
5 are involved in real estate? Let me ask
6 it another way. Does Aronov do anything
7 else other than buy and sell real estate?
8   A Yes, sir.
9   Q What else do they do?
10   A We have an insurance company.
11   Q Okay.
12   A And a new homes construction
13 company.
14   Q Okay.
15   A And that's all I'm aware of.
16   Q Okay. Does Aronov Realty Brokerage
17 company have officers?
18   A Yes, sir.
19   Q Are any of those officers the same
20 officers that are officers for Aronov
21 Realty Management, Inc.?
22   A Yes, sir.
23   Q Who are they that are the same

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

21

1 officers?
2    A I don't know all but Owen Aronov,
3 Jake Aronov, and I'm an officer of both,
4 Jenny Autrey. And those are the ones that
5 I'm aware of.
6    Q As far as you know, does Ms.
7 Knudsen have any relationship with both
8 management and brokerage?
9    A No, sir.
10    Q So she was with management. She
11 left management, and she came to
12 brokerage?
13    A Correct.
14    Q And she came to brokerage when? In
15 2006?
16    A Yes, sir.
17    Q And was working with brokerage at
18 the time that this property was shown?
19    A Correct.
20    Q And you don't know why Ms. Knudsen
21 would be showing Mr. Barr a card that said
22 that she worked for the realty management
23 group?

22

1    A I don't know.
2    Q We'll have to ask her that then.
3 Now you don't do -- the brokerage company
4 doesn't do any home selling, does it?
5    A It does.
6    Q It does? So you do both commercial
7 and residential?
8    A I personally only do commercial.
9    Q Okay. Do you manage people who do
10 residential?
11    A No, sir.
12    Q You don't?
13    A No.
14    Q But is there a residential division
15 under the brokerage company?
16    A Yes.
17    Q Who heads that up?
18    A Carol Andrews.
19    Q Now, in doing -- in managing the
20 commercial end -- which is all you do,
21 right?
22    A Yes.
23    Q Do y'all have any policies or

23

1 procedures concerning discrimination in
2 leasing and how to avoid discrimination in
3 leasing?
4    A Yes, sir.
5    Q Are those in writing?
6    A Yes, sir.
7    Q And what are those called?
8    A It's the National Association of
9 Realtors Code of Ethics.
10    Q Okay. And what does the Code of
11 Ethics say about nondiscrimination in
12 leasing?
13    A It says that you shall provide
14 professional services to all individuals
15 regardless of race, religion, color,
16 national origin, handicap, status.
17    Q And how are the employees made
18 aware of that policy?
19    A We have courses that instructs the
20 employees as well as our independent
21 contractors in the policies.
22    Q Now, you're also an officer of the
23 realty management, right?

24

1    A Yes, sir.
2    Q Do they have those same policies
3 and procedures concerning discrimination
4 with the management group?
5    A Yes, sir.
6    Q And are the employees of the
7 management group also given instruction on
8 those rules?
9    A Yes, sir.
10    Q And so it's a well-known fact that
11 to discriminate based on race in leasing
12 is unlawful, correct?
13    A Yes, sir.
14    Q And specifically that -- are you
15 aware that it is a violation of 42 USC
16 section 1982, have you ever heard that?
17    A No, sir.
18    Q Now, have you had any communication
19 with anyone who owns or is involved with
20 LeCroy Shopping Village?
21    A No, sir.
22    Q When did you --
23    A I'm sorry. Ask that question

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

25

1 again.
2    Q  That owns or is in any way involved
3 in managing or leasing LeCroy Shopping
4 Village?
5    A  Other than Ms. Knudsen, no, sir.
6    Q  Was there anybody else that could
7 show that property other than Ms. Knudsen?
8    A  I don't know if there was anybody
9 else -- other people could show it.  I
10 don't know if anybody else was showing,
11 any other real estate agents.
12    Q  Okay.
13    A  As long as that person was
14 receiving their instruction from Ms.
15 Forney.
16    Q  Okay.  Have you ever had a
17 conversation with Ms. Forney?
18    A  Not that I can remember.
19    Q  If in fact she were to have a
20 relationship with the brokerage company,
21 how would that happen?
22    MR. STEWART:  Object.
23    A  I'm not sure I'm following you.

26

1    Q  If she wanted Aronov to help her
2 lease or sell that space at LeCroy
3 shopping center, how would she go about
4 doing that?
5    A  She would talk to one of our
6 independent contractors or employees.
7    Q  Okay.  And why would she talk to
8 them?
9    A  To describe what services she was
10 interested in having Aronov perform.
11    Q  And is that the way that the
12 relationship is always done for the
13 leasing or the selling of a piece of
14 commercial property such as a shopping
15 center, that the relationship is between
16 the independent agent?
17    MR. STEWART:  Object to form.
18    A  I wouldn't say it's always the
19 case.
20    Q  Okay.  Was there -- to your
21 knowledge, was there anybody else who had
22 a relationship with Ms. Forney who could
23 show the property?

27

1    MR. STEWART:  Object to form.
2    A  Within Aronov?
3    Q  Yes.
4    A  Not that I'm aware of.
5    Q  So is it your testimony that the
6 only one in -- the only person with Aronov
7 that could show that property was Ms.
8 Knudsen?
9    A  No.  Anybody could have shown it
10 within the company.  But our typical --
11 our typical procedure would be since Amy
12 Knudsen knew the property the best and was
13 working with Ms. Forney on the property
14 that they would work through Amy if there
15 was a prospect for that property within
16 Aronov.
17    Q  Well, then that creates confusion
18 in my mind.  Earlier you said that Ms.
19 Knudsen had an independent transactional
20 agreement with Ms. Forney to try and lease
21 the property, right?
22    MR. STEWART:  Object to form.
23    A  She was acting as a transaction

28

1 broker, right.
2    Q  A transaction broker?
3    A  Right.
4    Q  Okay.  But the relationship, if
5 other people from Aronov could show the
6 property, was with Aronov not Ms. Knudsen,
7 right?
8    MR. STEWART:  Object to form.
9    A  It was with Aronov Realty
10 Brokerage, Inc. through Ms. Knudsen.
11    Q  And tell me, somebody who doesn't
12 know a thing in the world about real
13 estate, what that agreement between her
14 and the brokerage company was.
15    MR. STEWART:  Object to form.
16    Q  What was it called first?
17    MR. STEWART:  Same objection.
18    A  It would be called a transaction
19 brokerage agreement.
20    Q  And are transaction brokerage
21 agreements usually but in writing?
22    A  Sometimes they are and sometimes
23 they are not.

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

29

1    Q Okay. And this one I understand
2  was not?
3    A Correct.
4    Q Is there any difference in the
5  relationship whether it's in writing or
6  not in writing?
7    A No, sir, not that I'm aware of, a
8  transaction brokerage relationship.
9    Q And as I understand it, the
10 relationship is that Aronov brokerage has
11 an agreement with her to assist her in
12 leasing or selling that piece of property;
13 is that right?
14   A I'm not sure whether it was leasing
15 and selling or whether it was just
16 leasing.
17   Q Okay. All right.
18   A Could have been selling.
19   Q Okay. To your knowledge, do you
20 know whether Ms. Knudsen -- well, do you
21 know whether the brokerage company had
22 represented Ms. Forney in any other
23 properties?

30

1    A Yes, I believe they had.
2    Q Can you tell me any of the other
3  properties that Ms. Forney had that the
4  brokerage company had a relationship with
5  her on?
6    A East Park Plaza and Office Park I
7  believe is the name of the property.
8    Q And to your knowledge, how long had
9  the brokerage company had this
10 relationship with Ms. Forney?
11   A I really don't know how long.
12   Q Okay. So LeCroy was not the first
13 property of Ms. Forney's that the
14 brokerage company was assisting in leasing
15 the property?
16   A I can't remember whether it was,
17 you know, which order that property fell.
18   Q Okay. How long is has this
19 particular brokerage company been in
20 existence?
21   A I don't know the exact year it was
22 incorporated, but it's been in existence
23 since I have been employed with the

31

1  company.
2    Q Okay. Have you ever been involved
3  in any other lawsuits against either the
4  -- one of the Aronov companies and one of
5  it's agents in which both the company and
6  the agent were sued?
7    A Define involvement.
8    Q Aware of lawsuits that have been
9  filed?
10   A Yes.
11   Q And is it your understanding that
12 when those lawsuits are filed, that
13 generally the company for which the agent
14 works is named and then the agent is also
15 named?
16   A I don't know.
17   Q You don't know? Have you ever
18 personally been sued as an agent?
19   A No, sir.
20   Q Has the brokerage company been sued
21 as a result of the actions of one of it's
22 agents other than Ms. Knudsen since you've
23 been there?

32

1    A Yes.
2    Q And let's just use that as an
3  example. Was the agent sued as well as
4  the brokerage company?
5    A Yes.
6    Q Okay. What was that one about?
7    A It was a lawsuit involving dual
8  agency where a -- where Aronov Realty
9  Brokerage, Inc. had a property listed and
10 -- listed for lease and the perspective
11 lessee ended up leasing a property that
12 was managed by the management company.
13 And the owner of the property where we had
14 the listing in place sued.
15   Q What happened with that case?
16   A I believe ultimately it was settled
17 before it went to court.
18   Q Are you familiar with the results
19 of the settlement?
20   A No, sir, I'm not.
21   Q Are you familiar with who paid it?
22 Did Aronov pay it or did the agent pay it?
23   A I don't know.

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

33

1    Q Are you familiar with any type of
2  an arrangement between agents such as Ms.
3  Knudsen and the brokerage company or even
4  the management company, that if they get
5  sued they are responsible for paying their
6  own judgments or does Aronov stand behind
7  them?
8    MR. STEWART: Object to form.
9    A I guess it depends on the
10 situation.
11   Q All right. Well, let's talk about
12 this particular situation that we're here
13 about. Mr. Barr's allegation is that Ms.
14 Knudsen would not rent to him because the
15 nightclub that he was going to open was
16 going to be a hip hop African American
17 nightclub. If in fact that is true and if
18 in fact we prevail in this case, is Ms.
19 Knudsen going to have to pay her own
20 judgment or is Aronov brokerage or Aronov
21 management or Aronov period going to pay
22 the judgment?
23   MR. STEWART: Object to form.

34

1    A I don't know.
2    Q You don't know? Ever faced a
3  situation like that before?
4    MR. STEWART: Object to form.
5    A I just don't know.
6    Q As far as you know has the
7  brokerage company been sued for
8  discrimination before?
9    MR. STEWART: Object to form.
10   A It has not been sued for
11 discrimination as it relates to leasing or
12 selling commercial property.
13   Q How about under Fair Housing Act,
14 been sued under the Fair Housing Act?
15   MR. STEWART: Object to form.
16   A I'm generally aware of several
17 discrimination lawsuits, but I don't know
18 the details of them.
19   Q Okay. Those that you are aware of,
20 are they against the brokerage company,
21 the management company, both, neither,
22 Aronov as a whole, or what's your
23 understanding?

35

1    MR. STEWART: Object.
2    A I don't know. But I don't believe
3  they are against the brokerage company.
4    Q As far as you know, do they involve
5  housing?
6    A I don't know.
7    Q You don't know?
8    A I don't.
9    Q Are you aware of any other
10 complaints that have been alleged against
11 Ms. Knudsen since she went to work for the
12 brokerage company other than this one?
13   A No, sir.
14   Q Are you aware of any other
15 complaints that were made against her
16 while she was with the management group?
17   A No, sir, not that I can remember.
18   Q And let me make sure I'm correct --
19 well, let me ask you, when Ms. Knudsen is
20 involved in leasing and representing the
21 company and showing property, do you
22 generally know all of the property that
23 she's showing?

36

1    A No, sir.
2    Q Okay. Are you aware -- do you know
3  whether she showed any other property for
4  Ms. Forney other than this one piece
5  that's involved in this litigation?
6    A Yes, East Park Plaza and the Office
7  Park. I don't know the exact name.
8    Q Okay.
9    A Off of Vaughn Road.
10   Q Was she kind of the exclusive agent
11 for Ms. Forney?
12   MR. STEWART: Object to form.
13   A Not that -- no, sir, not that I'm
14 aware of, no.
15   Q So any one of the agents could show
16 Ms. Forney's property?
17   A That's my understanding.
18   Q Do you know whether Ms. Knudsen had
19 been showing it more than others?
20   A I don't know.
21   Q And I've asked you this, but the
22 attorney who showed Mr. Barr the property
23 the second time, what's his name? Don

9 (Pages 33 to 36)

## FREEDOM COURT REPORTING

37

1   Little.  Do you know him?
2      A I know him, yes.
3      Q Had you had any relationships with
4   him as far as him representing Aronov in
5   any matters?
6      A No, sir.
7      Q Had you had any dealings with him
8   representing Ms. Forney on any matter?
9      A I have not, no, sir.
10     Q Do you know whether anybody at
11  Aronov or at Aronov brokerage has?
12     A I don't know.
13     Q To your knowledge present -- I
14  think you've told me, as far as you know,
15  there are some other discrimination cases
16  against Aronov pending presently; is that
17  right?
18     A I don't know if they are pending.
19  I don't know if they are pending
20  presently.
21     Q Okay.  But you know that there have
22  been other discrimination suits against
23  Aronov companies?

38

1      A Yes, sir.
2      Q To your knowledge since you've been
3   on the board of the management company or
4   the brokerage company -- are you on the
5   board of any other companies of Aronov?
6      A No, sir.
7      Q Just those two?
8      A Yes, sir.
9      Q How many other are there?  How many
10  other companies of Aronov that deal in
11  property are there other than these two?
12     A I don't know.
13     Q A bunch?
14     A I don't know how many there are.
15     Q Do y'all have annual meetings where
16  y'all get together?
17     A I'm not included in any annual
18  meetings if they are held.
19     Q Are you aware either -- on either
20  of the companies that you are on the board
21  of -- and those are the only two, right?
22     A Yes, sir.
23     Q Okay.  Of any other lawsuits that

39

1   have alleged discrimination in leasing,
2   commercial leasing?
3      A No, sir, none that I'm aware of.
4      Q Any lawsuits alleging
5   discrimination in housing?
6      MR. STEWART:  Object to form.
7      Q With either one of those companies
8   that you're on the board of?
9      MR. STEWART:  Same objection.
10     A I don't know.
11     Q You don't know?  Any lawsuits
12  involving discrimination in the employment
13  of any of the employees of either one of
14  those companies?
15     A I don't know.
16     Q Who would know?
17     MR. STEWART:  Can you ask that
18  question again?
19     MR. QUINN:  Yes.
20     Q Any complaints against either the
21  management company or the brokerage
22  company or anyone acting on it's behalf
23  alleging race discrimination in either the

40

1   leasing or selling of real property?
2      A No, sir, not that I'm aware of.
3      Q Because you're listed as the person
4   most knowledgeable of that or you're
5   sitting here as the person most
6   knowledgeable.
7      A Right.
8      Q So sitting here today, you don't
9   know of any other lawsuits?
10     A Any other discrimination lawsuits
11  involving the leasing or selling of
12  commercial property?
13     Q Correct -- no, of real property.
14     A I don't know of any involving real
15  property but -- or commercial property
16  that I'm aware of.
17     Q How about complaints that have not
18  resulted in lawsuits?
19     A Regarding leasing or selling --
20     Q Discrimination, yes, discrimination
21  in leasing or selling real property?
22     A I don't know of any involving
23  leasing or selling on commercial property,

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

41

1  and real property, I don't know.
2      Q  Okay.  Do you know whether there
3  has ever been any kind of a written
4  agreement between Ms. Forney and the
5  brokerage or management company regarding
6  her properties?
7      A  I don't know.  It is my
8  understanding there has not been, but I
9  don't know.
10     Q  The other two properties that we
11 talked about, the Office Park and the
12 other, as far as you know there is no
13 written agreement with her?
14     A  Right, not that I'm aware of.
15     Q  Am I correct that the -- are there
16 any other relationships between Ms.
17 Knudsen and the brokerage company -- other
18 than the brokerage company that you
19 are aware of as far as Aronov is
20 concerned?
21     A  No, sir.
22        MR. QUINN:  Let's take a break.
23 (Whereupon, a break was taken.)

42

1         MR. STEWART:  You had asked a
2  question and I wanted to make sure I
3  understood it correctly.  Before you
4  rephrased a question, it sounded like you
5  were asking about employment race cases.
6  And then when you rephrased it, I think
7  you rephrased it to again go back to
8  commercial leasing and real property.  I
9  just wanted to make sure that you knew
10 that there have been race employment cases
11 filed against Aronov entities.  And I just
12 wanted to make sure the record was clear
13 on that.  I'm not sure y'all were talking
14 about the same thing.
15        MR. QUINN:  All right.
16     Q  Ms. Knudsen was not the exclusive
17 agent for the LeCroy property; is that
18 right?
19     A  That's my understanding.
20     Q  Why would the signs have her name
21 and nobody else's on it then?
22     A  Because Ms. Forney would have had
23 to give her permission to put those signs

43

1  up.
2      Q  But even though the signs have Ms.
3  Knudsen, others can show the property?
4      A  Yes, sir.
5      Q  Okay.  To your knowledge was
6  anybody else other than Ms. Knudsen
7  showing that property other than the
8  incident with the lawyer?  I'm talking
9  about were other Aronov agents showing
10 that property that you know of?
11     A  Not to my knowledge, no.
12     Q  To the best of your knowledge had
13 Ms. Knudsen been the one that had been
14 filling that space up for Ms. Forney?
15     A  I believe she had completed several
16 leases in the property.
17     Q  Now, you told me that the
18 management company, in addition to
19 managing, also is responsible for leasing?
20     A  Yes, sir.
21     Q  And selling or just leasing, mostly
22 leasing?
23     A  Mostly leasing although they do

44

1  some brokerage.
2      Q  When Ms. -- do you know how Ms.
3  Knudsen came from management over to
4  brokerage?
5      A  Yes, sir.
6      Q  How did that happen?
7      A  She had a lot of business contacts
8  and a lot of contacts in the community
9  that were not necessarily office related.
10 Her previous responsibilities when she was
11 with Aronov Realty Management, Inc. was to
12 lease office space in a given portfolio,
13 meaning she was responsible for leasing
14 office space in Executive Park for
15 example.
16     Q  Okay.
17     A  So she was in the Executive Park
18 box, that was her only focus was leasing
19 office space in Executive Park.  But she
20 had more potential to lease and sell to
21 contacts that she knew in the community
22 and outside the community in other areas
23 other than just leasing office space.  So

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

45

1  we wanted to provide her the opportunity
2  to really lease and sell other properties
3  other than office properties.
4      Q  Okay.
5      A  So that in a brokerage capacity,
6  she could really focus on anything in
7  commercial real estate involving leasing
8  and selling.
9      Q  So I take it you knew her?
10     A  Yes.
11     Q  And you had known her?
12     A  Yes.
13     Q  How long had she been with Aronov?
14     A  I think around five years
15  approximately.
16     Q  Had she worked anywhere else before
17  Aronov that you're aware of?
18     A  Not with Aronov, but I believe she
19  was with AT&T. I think it was AT&T.
20     Q  So she had been with Aronov about
21  five years. Had all of those years been
22  with the management company?
23     A  Yes, sir, up until '06.

46

1      Q  Did you have to have a conversation
2  with her boss at management about this
3  switch?
4      A  I was her boss at management.
5      Q  Okay. All right. So while she was
6  at management -- how were you her boss at
7  both management and then became her boss
8  at the brokerage company?
9      A  Because I'm a senior vice president
10  for the management company and the
11  brokerage company.
12     Q  I got you. So you actually were
13  her boss while she was with the management
14  company?
15     A  Correct.
16     Q  Did she develop the relationship
17  with Ms. Forney while she was at
18  management?
19     A  I can't remember.
20     Q  Can you remember whether or not --
21     A  I think she -- I can't remember.
22     Q  Can you remember whether or not she
23  was involved in leasing tenants for that

47

1  LeCroy space before she came over to
2  brokerage and then just continued it after
3  she got over to brokerage?
4      A  I believe she had.
5      Q  Okay. Did her salary change when
6  she moved?
7      A  No, sir.
8      Q  What was her salary?
9          MR. STEWART:  Object to that.
10     Q  What was her salary at management?
11         MR. STEWART:  I'm going to object.
12  Unless I can understand how it's relevant
13  what she earned, I'm going instruct the
14  witness not to answer that question.
15         MR. QUINN:  She's sued
16  individually. And if they don't pay for
17  it, she going to have to pay for it. So I
18  need to know how much money she's got.
19         MR. STEWART:  You can do that after
20  you get a judgment.
21         MR. QUINN:  I can do it now.
22         MR. STEWART:  Not as long as I'm
23  sitting here.

48

1          MR. QUINN:  I can too.
2          MR. STEWART:  Not as long as I'm
3  sitting here.
4          MR. QUINN:  You're instructing him
5  not to tell me how much she makes.
6          MR. STEWART:  That's what I did
7  already.
8          MR. QUINN:  That's a new one on me,
9  Charlie.
10     Q  Does she make most of her money off
11  commission or salary?
12     A  I don't know where she makes most
13  of her money, but she's salaried plus
14  commissions.
15     Q  So basically you've been her
16  manager then for seven years?
17     A  I think she's been with the company
18  -- with Aronov Realty Management, Inc. and
19  Brokerage, Inc. I think a total of about
20  five years.
21     Q  Let me make it simpler. Have you
22  been her manager since she's been there?
23     A  Yes.

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

49

1    Q Okay. And as her manager, have you
2    ever had any problems with her in leasing
3    space of the nature like this before?
4    A No, sir.
5    Q Do you, sitting here today, have
6    any personal knowledge of what transpired
7    between her and Mr. Barr other than what
8    you may have been told by somebody else?
9    A No, sir.
10    Q Did you know Mr. Barr?
11    A No, sir.
12    Q You've never met him before?
13    A Not that I can remember.
14    Q Brokerage company, as far as you
15    know, had never done anything for him?
16    A Not to my knowledge, but again, I
17    don't know of all the relationships in the
18    brokerage company.
19    Q Okay. Now when Ms. Knudsen made
20    the switch from management to brokerage,
21    did the person -- did the entity writing
22    her check change?
23    A I think it did.

50

1    Q And did her check then start coming
2    from Aronov brokerage rather than Aronov
3    management?
4    A It should have, but I haven't seen
5    her check, but it should have.
6    Q That's what's supposed to happen?
7    A Yes, sir.
8    Q Okay. And those companies, since
9    you're on the board of both, do those
10    companies in any way commingle their
11    profits, losses, revenues, any of that or
12    are they stand alone --
13    A I don't know.
14    Q -- on their own? You're on the
15    board. You don't know?
16    A I don't know. No, I don't.
17    Q Do either one of those companies
18    get revenue infused from somewhere else
19    other than what they actually go out and
20    lease or sell?
21    A Not to my knowledge.
22    Q Okay. But basically, am I correct
23    that Ms. Knudsen --

51

1    A They would receive management fees.
2    When you say lease or sell, management
3    fees, development fees, in addition to
4    income -- in addition to commissions
5    generated from leasing and selling.
6    Q Okay. And those would come from
7    the properties that they are managing?
8    A Correct.
9    Q At the time of her transition to
10    the brokerage company, was she performing
11    basically the same duties and
12    responsibilities and that was leasing
13    commercial property?
14    MR. STEWART: Object to form.
15    A Repeat the question.
16    Q I'm curious as to how her job
17    changed when she came to the brokerage
18    company.
19    A Okay. She would have been more
20    focussed on leasing or selling a larger --
21    she would have been exposed to a larger
22    universe of properties.
23    Q Would she continue to lease those

52

1    that she already was while she's over in
2    management or did she give those up?
3    A She gave those up, but she could --
4    you know, she could lease those
5    properties. But it wasn't her sole
6    responsibility to lease those properties.
7    Q And if I understand it correctly
8    then what we're doing is we're talking
9    about a broker who while with the
10    management group is mostly responsible for
11    portfolios that deal with office space?
12    A Exactly. And a limited portfolio
13    within that office space.
14    Q But brokerage has much more
15    commercial such as shopping centers and
16    that kind of thing --
17    A Exactly.
18    Q -- than management does?
19    A Yes. Well, than our division of
20    management, what she was employed to do.
21    Q Could she have stayed in management
22    and done the same thing, made the same
23    transition to selling more commercial

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

53

1  shopping center, that type of stuff other
2  than office space?
3      MR. STEWART: Object to form.
4      A  Well, when she focussed more on
5  brokerage work, selling and leasing more
6  third party properties, then it's more of
7  a -- you know, the Aronov Realty
8  Brokerage, Inc.
9      Q  Aronov owned most of the management
10  property and she was responsible for
11  leasing it; is that right?
12      A  They owned some of the property.
13  Yeah, they owned a percentage of the
14  property that the company -- that the
15  management company manages, and then there
16  is a certain part that's, you know, not
17  owned by the ARONOVs.
18      Q  And again, I'm showing my
19  ignorance, but when you talk about
20  brokerage, you're talking about selling a
21  third party's property?
22      A  It doesn't have to be third party.
23      Q  It can be ARONOV's property or it

54

1  can be somebody else's property?
2      A  Yes, sir.
3      Q  When she transitioned over, it
4  sounds like that she could still lease
5  property that she had in the management
6  group as well as lease property that's in
7  the brokerage group; is that right?
8      A  When she transferred over to the
9  brokerage company, she could really lease
10  any type of commercial property in any
11  portfolio as long as she was licensed in
12  that state to do so.
13      Q  So it didn't matter -- and I guess
14  it leads me to ask this: Is the -- tell
15  me what the big distinction between the
16  management group and the brokerage group
17  is so that I can understand.
18      A  As relates to Amy's employment?
19      Q  Yeah, as it relates to her
20  employment.
21      A  When she was working for the
22  management company -- when she was
23  employed by the management company, her

55

1  primary responsibility was to lease office
2  space in Executive Park in Montgomery
3  which is an office park of about three
4  hundred thousand plus or minus square feet
5  of office space.
6      Q  Okay.  I've got that.  And so then
7  when she moved over, she expanded and she
8  was able to lease much more than just
9  office space?
10      A  And sell much more, right.
11      Q  The properties that she is out
12  there trying to lease and trying to sell,
13  are they distinguished by whether they are
14  properties of the management group or
15  properties of the brokerage group or are
16  they just Aronov properties?
17      MR. STEWART:  Object to form.
18      A  They don't have to be just Aronov
19  properties.
20      Q  I understand that.  I'm sorry.  But
21  I guess what I'm saying, are the customers
22  the same -- can a broker or agent that's
23  in the brokerage company show a piece of

56

1  property that management also shows?
2      A  Sure, yes.
3      Q  Okay.  So other than the name and
4  other than the fact that management is
5  mostly involved with office space, the
6  customer -- that was only a division?
7      A  Right.
8      Q  Okay.  Management is just as
9  involved in commercial space as brokerage
10  is or are they?
11      A  I'm confused.
12      Q  You're confused because I'm
13  confused.  Because I don't understand why
14  you got to have both companies under
15  separate roofs because it sounds like they
16  do the same thing?
17      A  The brokerage company does not make
18  it a practice to manage properties.
19      Q  Okay.  And so that is the
20  distinction.  But even though the
21  management company manages, that ain't all
22  it does.  It also leases, sells, both
23  commercial and office properties, right?

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

1   A Right.
2   Q Okay. Which is what Ms. Knudsen
3 was doing but mostly office before she
4 came over to brokerage?
5   A Right.
6   Q And brokerage, as I understand it,
7 not only has the same officers but also
8 has the same employees as brokerage.
9 You're an employee of both management and
10 brokerage; is that right?
11   MR. STEWART: Object to form.
12   A Yes.
13   Q Other than you, are there other
14 people that are employees of both
15 management and brokerage?
16   A I don't know.
17   Q As a vice president of both, do you
18 get separate checks from each of them or
19 do you just get one big check?
20   A I used to get separate checks.
21   Q You used to get separate checks.
22 When did that stop?
23   A I can't remember.

58

1   Q Has it been a while?
2   A Yeah, it's been a little while.
3   Q And so now where does your check
4 come from? Do you look at it to see what
5 name's on it?
6   A It's an automatic deposit.
7   Q Right. Have you ever looked to see
8 whether it's coming from management or
9 whether it's coming from brokerage or
10 whether it's coming from both or whether
11 it's coming from Aronov himself, whoever
12 that may be?
13   A I can't remember.
14   Q Okay. That's it.
15   MR. STEWART: Just so I make sure I
16 understand --
17   MR. GUY: Before you do that, can
18 we take a quick break before you ask the
19 questions? Can I speak to you?
20   MR. STEWART: Yeah.
21 (Whereupon, a break was taken.)
22   MR. QUINN: I got a couple of more
23 before you do.

59

1   Q Have you filed your income taxes
2 this year?
3   A Yes.
4   Q When you did, do you remember how
5 much money you made from the brokerage
6 company and how much money you made from
7 the management company? I don't want you
8 to tell me how much it is, but were they
9 separate?
10   A Yes.
11   Q They were listed separately on your
12 income tax return?
13   A Yes, sir.
14   Q Okay. And when Ms. Knudsen changed
15 over to the brokerage company, other than
16 her pay, did her benefits remain the same
17 or change in any way? By that, I mean
18 pension, 401K, insurance, that kind of
19 stuff.
20   A No, sir.
21   Q Do you know whether the same entity
22 runs the benefits for both the brokerage
23 employees and the management employees?

60

1   MR. STEWART: Object to form.
2   A I don't know.
3   Q Does it come out of the same human
4 resources department or payroll
5 department?
6   A Yes, it comes out of the same human
7 resource department.
8   Q Okay. Thanks. That's it. She
9 didn't lose vacation or anything like that
10 when she switched over?
11   A I don't know that.
12   MR. QUINN: That's all.
13   MR. STEWART: Nothing.
14   MR. GUY: Nothing.
15
16
17   AND FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

61

```
 1        C E R T I F I C A T E
 2
 3   State of Alabama
 4   St. Clair County
 5
 6     I hereby certify that the above and
 7   foregoing deposition was taken down by me
 8   in stenotype and the questions and answers
 9   thereto were transcribed by means of
10   computer-aided transcription, and that the
11   foregoing represents a true and correct
12   transcript of the testimony given by said
13   witness upon said hearing.
14     I further certify that I am neither of
15   counsel, nor of kin to the parties to the
16   action, nor am I in any way interested in
17   the result of said cause named in said
18   caption.
19
20
21            Kim Duckett
22            Alabama CCR#142
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**





**Amy Clark Knudsen**
Leasing & Sales Specialist
Commercial Division

# ARONOV

**Aronov Realty Management, Inc.**
3500 Eastern Boulevard  Montgomery, Alabama 36116-1781
Tel 334-277-1000  Fax 334-272-2279  Mobile 334-549-5005
amy.knudsen@aronov.com