**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERRENCE LONG and** | ) | |
| **BARRY BARR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:07-CV-881-WKW** |
| | ) | |
| **ARONOV REALTY MANAGEMENT,** | ) | |
| **INC., AMY CLARK KNUDSEN, and** | ) | |
| **MEIYING FORNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**REPLY BRIEF IN SUPPORT OF MEIYING FORNEY'S**
**MOTION FOR SUMMARY JUDGMENT**

**COMES NOW**, the defendant, Meiying Forney, by and through her undersigned

counsel of record, and submits this Reply Brief in support of her Motion for Summary

Judgment previously filed with the Court (Doc.35) and in response to the Brief of the

Plaintiffs in Opposition (Doc. 56). For the reasons stated herein below, Forney's Motion

for Summary Judgment is due to be granted as to all claims asserted by the plaintiffs.

**ADDITIONAL FACTUAL ALLEGATIONS**

BARRY BARR

Barry Barr has no evidence to confirm that the LeCroy Shopping Village owned

by Meiying Forney was offered for sale. Barr can only testify that someone told him it

was for sale. Barr never saw a document of any kind indicating that LeCroy was for sale.

Barr's assumption that LeCroy was for sale was based on his discussions with Grant

Sullivan. (Barr depo. p.234, l.9-23; p.235, l.1-22). Barry Barr had never seen the Loop

Net listing (Exhibit F to Plaintiff's Brief in Opposition) until it was showed to him at his deposition.[1]  (Barr depo. p.291, l.19-23; p.292, l.1-11).

GRANT SULLIVAN

Grant Sullivan was contracted by Barry Barr.  According to Sullivan, Barr and a fellow by the name of Terrence Long was interested in leasing the building at LeCroy Shopping Center and Amy Knudsen had the building listed for lease.  Sullivan contacted Knudsen and Knudsen agreed she would meet Barr and show the property to him. (Sullivan depo. p.9, l.14-21).  According to Sullivan, it was only Barry Barr's name on the contract.  He does not recall any discussion with Barr about any negotiation if the offer was rejected.  Sullivan could not recall any conversation with Amy Knudsen about the contract.  Sullivan never got a counteroffer on the deal.  Sullivan admits that that sometimes happens in the real estate business.  (Sullivan depo. p.13, l.17-23; p.14, l.1-23; p.15, l.1-4).  Sullivan has no recollection that the LeCroy Shopping Center was even up for sale at the time the offer was made.  (Sullivan depo. p.18, l.17-23; p.19, l.1-2). Furthermore, Sullivan did not find this property listed anywhere for sale with an amount and no amount was ever communicated to him.  (Sullivan depo. p.19, l.15-21).  Barry Barr just came to him and said he wanted to make an offer to purchase the property. (Sullivan depo. p.19, l.22-23; p.20, l.1-2).

DON LITTLE

Don Little is an attorney licensed to practice law in the State of Alabama.  (Little depo. p.6, l.5-14).  Little has a business relationship with Meiying Forney whereby he tries to collect monies for her as a result of lease defaults.  (Little depo. p.7, l.3-11). Little has only handled one bankruptcy proceeding for Forney relevant to the Pure

---

[1] The Loop Net listing is referenced as Exhibit #13 to Barry Barr's deposition.

Country Saloon located at the LeCroy Shopping Center. (Little depo. p.9, l.4-14). Because Little was the bankruptcy attorney for the owner of the Pure Country Saloon location, the bankruptcy trustee gave the keys to the facility to Don Little for his safekeeping and for protection of the assets until it could be determined whether any of the assets in the Pure Country Saloon location were the property of the debtor. (Little depo. pp. 9-14). Because Little was entrusted with the keys to the facilities, he was asked by Amy Knudsen to meet with Mark Cranage on June 13, 2007 and open the door so he could see the facility. (Little depo. pp. 17-19, p. 20, l.1). At the time that Little was in the building with Cranage, none of the statements made by Little to Cranage were with the authorization of Meiying Forney. (Little depo. p.21, l.7-19). None of the statements made by Little to Cranage were with the authorization of Aronov Realty or Amy Knudsen. (Little depo. p.21, l.20-23; p.22, l.1-9). Little was not acting within his authority as Ms. Forney's attorney in any capacity at anytime he had any discussions with Mark Cranage. (Little depo. p.22; p.23, l.1-14). Amy Knudsen never told Don Little anything about Cranage as a possible client. Little was just there to unlock the door and let Cranage in to see the place and nothing else. (Little depo. p.39, l.11-23; p.40, l.1-6). In Little's opinion, he had the keys to the Pure Country Saloon location solely because he represented Forney in regards to the bankruptcy action and for no other reason. (Little depo. p.59, l.17-23; p.60, l.1-3). Little has never been involved in the leasing of any property for Meiying Forney. He has never had the authority to lease or even show a piece of Meiying Forney's property. (Little depo. p.65, l.17-23; p.66, l.1-2). When Little told Cranage that he could actually go ahead and go into lease negotiation and get a draft for a lease, he did so without authority and totally misspoke. Little was sales-puffing and

acting wholly for motives personal in nature as opposed to professional in nature. It was not in contemplation of his representation of Meiying Forney in the bankruptcy proceeding that he could make statements about trying to lease her property. (Little depo. p.84, 85, 86, l.1-4).

## REPLY ARGUMENT

In the plaintiffs' Brief in response to Meiying Forney's Motion for Summary Judgment, the plaintiffs have made several representations to the Court which are in fact not true. The plaintiffs have stated in their brief that Little is an attorney who represents Meiying Forney on collection matters and "was representing her in her efforts to lease the Pure Country location in regards to the issue presented by the Pure Country's bankruptcy filing". The plaintiffs cite to Exhibit D, Forney's Responses to Interrogatories, page 4, no.6. Exhibit D, page 4, paragraph 6 says nothing about Meiying Forney hiring Don Little to represent her in "her efforts to lease the Pure Country location." Such a claim made by plaintiffs is untrue and not supported by the referenced evidence. However, on Exhibit D, page 4, paragraph 8, the plaintiffs asked "did you allow Don Little to act on your behalf in communicating with third-parties regarding the leasing of property at the LeCroy Shopping Village, and in particular, the Pure Country location?" Meiying Forney's response was "**no**". (Plaintiffs' Ex. D, Forney's Response to Interrogatories, p.4, par.8; p.5). Furthermore, Meiying Forney provided responses to the plaintiffs' First Request for Admissions. These Requests for Admissions are also listed under Exhibit D to the plaintiffs' Brief. In those responses, Meiying Forney denies that Don Little was retained by her relating to the lease of the Pure Country Saloon and denies that Don Little was authorized to act on her behalf to show the Pure Country Saloon location.

(Plaintiffs' Ex. D, Forney's Responses to Plaintiffs' First Request for Admissions, par.2; par.3).  Consequently, the plaintiffs' representation to the Court that Little represented Forney in her efforts to lease the Pure Country location is false and not supported by the evidence in this case.

In addition, the plaintiffs have made a statement to the Court that both Little and Knudsen made representations at the time they made certain statements that they were acting on behalf of Forney in leasing the property that she owned.  (Plaintiffs' Brief, p.21, last par.).  There is no evidence in the record before this Court that Little made any statements to any person that he was acting on the authority of the defendant Forney.  There are no citations by the plaintiffs in their Brief to such statements, and there is no evidence of such statements.

### BARR'S OFFER TO PURCHASE THE LeCROY SHOPPING CENTER FROM DEFENDANT FORNEY

The plaintiffs argue that Forney's failure to accept the offer presented by Barr without a counteroffer is evidence of discrimination.  Nothing could be further from the truth or supported by the law.  The evidence in this case is clear that this property was never listed for sale at or during the time when the events took place which is the subject of this litigation.  That evidence is substantiated by the testimony of Barry Barr and his agent Grant Sullivan.  The evidence in this case supports a finding by the Court that Barry Barr, through his agent, Grant Sullivan, made an offer to purchase property (The LeCroy Shopping Center) which was not listed by the owner as being for sale.  The offer for the property was less than the plaintiff Barr or his agent believed it to be worth.  In actuality, the contract offered by the plaintiff Barr would have only netted the defendant Forney $900,000 instead of a $1 million because of the 10% sales commission that would

have been earned by Grant Sullivan. Therefore, this unsolicited offer by the plaintiff Barr was simply rejected by the defendant Forney as insufficient without a counteroffer. The plaintiffs' statement in brief that Forney rejected Barr's offer and within a short time thereafter the property was on the market for sale is completely untrue and unsubstantiated by the evidence. (Plaintiffs' Brief, p.30, l.1). There is no evidence that after Barr's offer was rejected that this property was placed on the market for sale. Furthermore, there is no evidence in the record before the Court that any information was communicated to Forney about who Barry Barr was, what businesses he had previously owned, or what kind of clientele patronized his business. In fact, there is no evidence in the record before the Court that any information was provided to Meiying Forney about Barry Barr when the sales contract was presented to her by Amy Knudsen. Furthermore, the plaintiff Terrence Long was not a party to the contract, and there is no evidence that Meiying Forney was aware of Long's identity. There is also no evidence before the Court that when Barr submitted the sales contract to Forney that she was aware that he would allegedly lease the space back to the plaintiff Long for a bar which he intended to open. The plaintiffs' assertions of those facts in the Brief are false and unsupported. The evidence before the Court has not established a prima facie case for discriminatory refusal to sale real property pursuant to §1981 and §1982 because the property was never listed for sale. Furthermore, since the property was not listed for sale and the offer was for an amount less than the property was worth, Forney's rejection of Barr's offer was legitimate and non-discriminatory.

6

## DON LITTLE

Don Little was Meiying Forney's bankruptcy attorney. Little had no authority to act on behalf of Forney in any other capacity. For Little's actions to bind Forney, Little must have been acting "within his authority" as her attorney. The evidence before the Court clearly indicates that Little was <u>not</u> acting within his authority when he made certain statements to Mark Cranage.[2]

The cases cited by plaintiff in Brief all deal with the actions of an attorney who is acting within the line and scope of his employment at the time certain statements are made. Most of the cases cited by the plaintiffs deal with the authority of an attorney to bind his client in negotiating a settlement. Clearly, those cases are distinguishable from the case before this Court herein. Little had been retained by Forney to represent her in a bankruptcy proceeding. Little admits, and Forney has stated in response to discovery, that he had no authority outside of his representation of her interest in the bankruptcy proceeding. That authority within the attorney/client relationship did not extend to any statements made by Little to Cranage regarding the lease of the Pure Country property. Such statements were made wholly for personal motives and not in any professional capacity. The act of an agent, to be performed within the scope of his authority, must be performed in the promotion of business of his employment and it must not be the result of, or be impelled by, wholly personal motives if the master is to be liable for the act of the servant. (See <u>Railway Exp. Agency v. Burns</u>, 255 Ala. 557, 52 So.2d 177 (Ala.1951); <u>Smith v. Brown-Service Ins. Co.</u>, 250 Ala. 613, 35 So.2d 490 (Ala.1948); <u>Palos Coal & Coke Co. v. Benson</u>, 145 Ala. 664, 39 So. 727 (Ala.1905)).

---

[2] The defendant Forney does not concede that Little's remarks were discriminatory or made with any racial bias.

The only reason Don Little had the keys to the Pure Country Saloon location was because the bankruptcy trustee had placed those keys in Little's trust until it could be determined whether the debtor owned any of the property inside of the premises. Meiying Forney had not provided the keys to Mr. Little. In fact, Meiying Forney did not even know that Little had the keys to the Pure Country Saloon location. (See Plaintiffs' Ex. D, Meiying Forney's Response to Plaintiffs' First Set of Interrogatories and Request for Production of Documents, p.5, par.9).

### NO DIRECT EVIDENCE OF INTENTIONAL DISCRIMINATION

For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision and related to that particular decision. Bass v. Bd. of County Com'rs, Orange County, Fla., 256 F.3d 1095 (11th Cir.2001). Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998). See also Trotter v. Bd. of Trustees, 91 F.3d 1449, 1453 (11th Cir. 1996). Meiying Forney made no statements nor took any action that would constitute direct evidence of discrimination. Therefore the plaintiffs claims fail in that regard.

### FORNEY DID NOT ABRIDGED A RIGHT ENUMERATED UNDER §1981 OR §1982

The only substantial evidence before the Court regarding Barr's offer to purchase the subject property clearly establishes the communication of an offer (admittedly below what the property was worth) and the rejection of the offer by the defendant Forney. There is no evidence, direct or circumstantial, to create an issue of fact that Forney rejected that offer because of any of the claims made in this case. Additionally, the

uncontradicted evidence in this case clearly establishes that no offer to lease the property was ever communicated to Forney. Therefore, Forney did not abridge any right enumerated in the statute.

## **TERRENCE LONG**

The plaintiff Terrence Long never submitted any document to the defendant Forney or to Amy Knudsen which contains his name or any information about him. There is no evidence before the Court that Long was ever identified to Forney or Knudsen. Knudsen never met Terrence Long and consequently could not have provided any information to Forney about his race. Terrence Long never submitted to Forney or to Amy Knudsen any document desiring to lease the premises known as the Pure Country Saloon. Terrence Long never personally made any offer to lease the property known as the Pure Country Saloon. While the plaintiff Barr may have testified that he and Long had decided to enter into a business venture to operate a sports bar in Montgomery, that intention was never reduced to writing and that intention was never communicated to the defendant Forney or to the defendant Knudsen. Therefore, any claim by Long in this case for discrimination is without merit.

## **BARRY BARR**

Barry Barr is a Caucasian male who offered to purchase the LeCroy Shopping Center from Meiying Forney, even though it was not on the market for sale. The defendant has previously herein addressed the issue regarding the sale of the property and why that claim should fail. However, Barr also claims that he offered to lease the property and the plaintiffs' Brief states categorically that he made "numerous attempts" to negotiate a lease. The Court will find from a review of the record and exhibits in this

case that there is no written lease which was ever submitted to Knudsen, and thus, no offer to lease the premises was ever communicated to the defendant Forney. The only evidence before the Court as presented solely by Barry Barr's testimony is that he offered to write a back-up lease. The evidence is uncontradicted that a back-up lease was never submitted to Knudsen by Barr or Grant Sullivan, his agent, nor were any oral terms ever submitted to Knudsen regarding a back-up lease. In that regard, Barr has failed to state a prima facie case of discrimination against Forney under §1981 or §1982 for failure to lease.

## CONCLUSION

Both plaintiffs, Barr and Long, have failed to present substantial evidence necessary to overcome the defendant Forney's Motion for Summary Judgment.

WHEREFORE, the defendant Forney moves this Honorable Court to grant to her a summary judgment on all of the plaintiffs' claims.

Respectfully submitted this 22nd day of August, 2008.

s/N. Gunter Guy, Jr.
N. Gunter Guy, Jr.
Attorney for Defendant, Meiying Forney

OF COUNSEL:

Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, AL  36102-2148
Telephone:     (334) 387-7680
Facsimile:      (334) 387-3222
gguy@ball-ball.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of August, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system and have also served a copy of the following by e-filing or mailing the same by United States mail properly addressed and first class postage prepaid:

C. Michael Quinn
Kevin W. Jent
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL 35203

Charles A. Stewart
Quindal C. Evans
Bradley, Arant, Rose & White
401 Adams Ave., Ste. 780
Montgomery, AL 36104

s/ N. Gunter Guy, Jr.
OF COUNSEL



**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 1

1         IN THE UNITED STATES DISTRICT COURT FOR

2            THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    TERRENCE LONG & BARRY BARR,

6              Plaintiffs,

7    vs.                    CIVIL ACTION NO.

8                          2:07-CV-00881-WKW-WC

9    ARONOV REALTY MANAGEMENT,

10   INC., AMY CLARK KNUDSEN,

11   & MEIYING FORNEY,

12             Defendants.

13            *      *      *      *      *

14            DEPOSITION OF BARRY BARR,

15   taken pursuant to notice and stipulation

16   on behalf of the Defendants, in the

17   offices of Bradley, Arant, Rose & White,

18   401 Adams Avenue, Suite 780, Montgomery,

19   Alabama, before Nicole Paulk, Certified

20   Court Reporter and Notary Public in and

21   for the State of Alabama at Large, on

22   April 15, 2008, commencing at 9:42 a.m.

23

Page 234

1    A.    I don't even know her.

2    Q.    Okay.  But --

3    A.    No.

4    Q.    It's just a question, though.

5              MR. QUINN:  Remember, yes or no.

6    A.    No.

7              MR. QUINN:  It just makes things

8                   easier.

9    Q.    Would you turn to your lawsuit in

10         Paragraph 20, please?  It says in

11         Paragraph 20 that Barr discovered that the

12         LeCroy shopping center was for sale and

13         approached Knudsen with a one million

14         dollar offer to purchase the shopping

15         center.  Correct?

16   A.    Correct.

17   Q.    It goes on to say that this offer was

18         turned down with no counteroffer.  My

19         question to you is, from what information

20         did you discover that the LeCroy Shopping

21         Village was for sale?

22   A.    I don't know if I had Grant call Amy up

23         and ask her if it was for sale or -- I

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 235

1    don't know how --

2    Q.    Well, let me ask you this:  Is that a true

3          statement, that you discovered it was for

4          sale?

5    A.    Well, somebody told me it was for sale.

6    Q.    You just don't remember who?

7    A.    I don't remember who, no.

8    Q.    Have you ever seen a document of any kind

9          that indicated it was for sale?

10   A.    No.

11   Q.    Okay.  And when I say that, I'm

12         specifically referring to the time upon

13         which you made the offer.  Are you aware

14         that it was actually for sale personally?

15   A.    Well, I was told -- I mean, they gave us

16         the rent rolls so we could set the cap

17         rates and come up with a value of the

18         property, so I'm assuming they were saying

19         it was for sale.

20   Q.    So you're making that assumption based on

21         your discussions with Grant Sullivan?

22   A.    Right.  True.

23   Q.    All right.  Just so I'm clear, the

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 291

1          you as well?

2    A.    Yes, he did.

3    Q.    With your consent and approval?

4    A.    Yes, he did.

5    Q.    Is there a date on there?

6    A.    May 23.

7    Q.    So the offer on the Friday's building and

8          the offer on the shopping center, LeCroy

9          shopping center, were made on the same

10         day, correct?  If you need to refresh your

11         recollection, look at -- actually, your

12         attorney's got the full exhibit --

13              MR. QUINN:  It's got the date on

14                    it.  So the answer is yes.

15   A.    Yes.

16              MR. QUINN:  Why is that so hard?

17                    Yes/no.

18              (Off-the-record discussion.)

19   Q.    Let me show you Defendants' Exhibit 13.

20         And again, this was given to us in initial

21         disclosures.  And again I'll ask, have you

22         ever seen that document?

23              (The referred-to document was

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 292

1          marked for identification as

2          Defendants' Exhibit No. 13.)

3    A.    I don't remember ever having seen it.

4    Q.    Okay.  Very good.  It appears that it was

5          probably just given to us by your

6          attorneys who looked it up online.  All

7          right.  You had said earlier that you were

8          prepared to pay the million dollars in

9          cash out of your own pocket for the LeCroy

10         shopping center, right?

11   A.    Right.

12   Q.    Okay.  Is that personal assets of yours

13         that you have in a bank or institution

14         somewhere here?

15   A.    At the time, that was in the Sterling Bank

16         sitting in a checking account.

17   Q.    Okay.  That's my question.  So it's your

18         sworn testimony that on 5/23, when you

19         made the offer on the LeCroy shopping

20         center, you had a million dollars in a

21         Sterling Bank account?

22   A.    It was right at a million, then I have a

23         line of credit there also.  So yes, I

Don Little - 8/19/2008

1          IN THE UNITED STATES DISTRICT COURT FOR

2              THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     TERRENCE LONG & BARRY BARR,

6              Plaintiffs,

7     vs.                        CIVIL ACTION NO.

8                                2:07-CV-00881-WKW-WC

9     ARONOV REALTY MANAGEMENT,

10    INC., ARONOV REALTY BROKERAGE,

11    INC., AMY CLARK KNUDSEN,

12    & MEIYING FORNEY,                COPY

13              Defendants.

14          *       *       *       *       *

15          DEPOSITION OF DON LITTLE,

16    taken pursuant to notice and stipulation

17    on behalf of the Defendants, in the

18    offices of Bradley, Arant, Rose & White,

19    401 Adams Avenue, Suite 780, Montgomery,

20    Alabama, before Nicole Paulk, Certified

21    Court Reporter and Notary Public in and

22    for the State of Alabama at Large, on

23    August 19, 2008, commencing at 1:15 p.m.

Page 6

1  Q.    And what is your business address, please,

2        sir?

3  A.    P.O. Box 1881, Montgomery, 36102.

4  Q.    What is your occupation?

5  A.    Primarily, attorney.

6  Q.    Are you licensed to practice in the state

7        of Alabama?

8  A.    I am licensed in Alabama and admitted in

9        the middle district and southern district

10       of Alabama and the middle district of

11       Florida. And I've done some -- I may be

12       admitted still in Dougherty County in

13       Georgia; done a little pro hac vice in

14       Georgia and Florida.

15 Q.    Okay. And could you just tell us

16       approximately how long have you been

17       licensed or how long have you practiced

18       law?

19 A.    Approximately 15 years.

20 Q.    Okay. And do you primarily practice here

21       in Montgomery, Alabama?

22 A.    Yes, sir.

23 Q.    All right. And are you familiar or do you

Don Little - 8/19/2008

1          know Ms. Meiying Forney?

2    A.    Yes, sir.

3    Q.    In what way do you know Ms. Forney?

4    A.    We have a business relationship whereby I,

5          on some occasions, try to collect monies

6          as a result of a lease default.

7    Q.    So you do some -- in the vernacular that

8          we lawyers sometimes use, you do some

9          collection work for Ms. Forney from time

10         to time?

11   A.    Yes, sir.

12   Q.    Okay.  And how long have you known Ms.

13         Forney?

14   A.    I'm not sure, but I'm just going to guess

15         three years.  But I'm not sure.

16   Q.    And during that term or time, can you tell

17         me approximately how many collection

18         matters have you worked on for her?

19   A.    I really can't tell you.  At least five,

20         but I can't tell you for sure.

21   Q.    That's fine.  Approximately in the

22         neighborhood of five or so?

23   A.    Five to ten.

Don Little - 8/19/2008

Page 9

1    A.    I can't think of a single thing I've done

2          other than taking care of trying to

3          collect monies on a lease in default.

4    Q.    What about the bankruptcy proceeding?

5    A.    Well, I'm sorry.  You're exactly right.

6          I've handled one bankruptcy proceeding at

7          the -- relevant to a bar located at Le

8          Croy shopping center.

9    Q.    And that would be the Pure Country Saloon

10         location?

11   A.    Yes, sir.

12   Q.    Is that the only bankruptcy matter that

13         you have worked on for her?

14   A.    The only one I can remember today.

15   Q.    Okay.  And were you retained by her or

16         asked to do legal work in reference to

17         this bankruptcy for Ms. Forney?

18   A.    Yes, sir.  The bar Pure Country originally

19         filed a Chapter 13, and Ms. Forney

20         instructed me on what she would do under a

21         13, then they converted to a 7.  Then at

22         that time, Ms. Forney was just trying to

23         preserve her assets, and so the main

Don Little - 8/19/2008

Page 10

1          thrust in the Chapter 7 was a lift of stay

2          that I handled for Ms. Forney.

3     Q.   So you would have submitted a notice of

4          appearance for her in that bankruptcy

5          stay; is that correct?

6     A.   Yes, sir, and I filed of course a lift of

7          stay, and there's a substantial filing fee

8          that has to be paid on a lift of stay.

9     Q.   And then I guess you were paid for your

10         services in connection with this

11         bankruptcy matter by Ms. Forney?

12    A.   Yes, sir.

13    Q.   Okay.  I just happen to have the docket

14         report from that bankruptcy matter.

15    A.   Just happen?

16    Q.   Just happen.  And I just thought it might

17         be helpful to refresh your recollection.

18         It looks like to me as far as your

19         involvement was concerned -- and you can

20         tell me if it's different.  It looks like

21         you filed a notice of appearance,

22         obviously, for her in that matter, and

23         then you filed the motion for relief from

Page 11

| | | |
|---|---|---|
| 1 | | stay.  And then it appears there was an |
| 2 | | order granting that motion for relief from |
| 3 | | stay, and then pretty much after that, it |
| 4 | | looks like maybe that whole bankruptcy |
| 5 | | proceeding was over.  Take a second just |
| 6 | | to look at that, if you would, Mr. Little, |
| 7 | | and just refresh your recollection from |
| 8 | | looking at that case action summary. |
| 9 | A. | Who was the trustee?  I'm trying to see. |
| 10 | Q. | Let's see. |
| 11 | A. | Daniel Hamm?  I'm trying to catch it.  It |
| 12 | | ought to be right in here.  Hold on. |
| 13 | | Yeah, trustee is Daniel Hamm.  That's |
| 14 | | right.  Okay.  I remember it now. |
| 15 | Q. | Okay.  The reason I ask that is that -- |
| 16 | | would it be fair to say that from looking |
| 17 | | at the case action summary that your |
| 18 | | actual involvement in this bankruptcy |
| 19 | | proceeding for Ms. Forney was fairly |
| 20 | | limited as far as the work was concerned? |
| 21 | A. | Yes, sir.  Really, the whole goal was |
| 22 | | preservation of assets.  The debtor -- |
| 23 | | after converting to 7, using Lewis |

1    Hickman, the debtor thought that he had

2    some $10,000 of assets located inside the

3    bar, and he was going to try and sell

4    those assets to pay off some whiskey

5    creditors that he liked and wanted to try

6    and make good with.  So by chance, I

7    caught the debtor and Lewis Hickman at the

8    location right after they filed a 7 and --

9    after they converted to a 7.  And I

10   demanded the keys, and they informed me

11   they weren't giving the keys.  So then we

12   had a little squabble with -- and Daniel

13   Hamm ended up with all keys to the

14   facility.  Well, the reason I wax eloquent

15   here is that after just a little while, it

16   became obvious that my client had to get

17   in to look after maintenance issues or a

18   possible leak.  The power company was

19   about to cut the power off, so I had to

20   get the utilities put in Meiying Forney's

21   name.  So after Daniel Hamm at first held

22   on to the keys, he finally decided this

23   was such an inconvenience that he handed

Page 13

1      me all keys to the facility, with the

2      understanding that I was liable and

3      responsible if the debtor did, in fact,

4      end up being awarded any of the assets

5      inside the building.  So at that time, I

6      then became quite concerned about who

7      would go in that building, and I actually

8      felt a little more at peace if I were in

9      the building whenever anyone entered.

10   Q.   So more or less, the trustee provided you

11         with possession of the keys subject to you

12         being responsible for those particular

13         assets within the Pure Country Saloon that

14         were still subject to a decision by the

15         trustee as to what was going to happen to

16         them; is that right?

17   A.   That is correct.  And there were some

18         expensive disk jockey electronics and some

19         other items that if they had been taken

20         and I was found liable, I could be out --

21         I could be looking at being out many

22         thousands of dollars.

23   Q.   And just for the ladies and gentlemen of

Page 14

1    the jury, when you say a Chapter 7, it was

2    converted to a 7, meaning that the debtor,

3    in this case, I think his name was --

4  A.  Tony Fannin.

5  Q.  -- Tony Fannin, who was the person who

6    leased or ran the Pure Country Saloon

7    location, he was actually now seeking,

8    with a Chapter 7, a full dissolution, I

9    guess, of debts from his creditors; is

10    that right?

11  A.  Correct.

12  Q.  So he wasn't going to pay any of his

13    debtors any money from the bankruptcy

14    proceeding unless there were some assets

15    there that were part of that -- part of

16    what he owned that he could pay out?

17  A.  Correct.

18  Q.  And that's what the trustee was trying to

19    protect, right?

20  A.  Yes, sir.

21  Q.  And you did get that relief from stay so

22    that you could be in charge of those

23    assets pending that decision by the

Page 17

```
1          against Aronov Realty Management, Inc.,

2          and I believe Aronov Realty Brokerage,

3          Inc., and Amy Knudsen and Ms. Forney.

4          You're aware of that, correct?

5    A.    Yes, sir.

6    Q.    And you're aware that there are some

7          issues in this case that relate to you

8          showing this Pure Country location -- and

9          I'm going to use that term, okay?  I hope

10         that's --

11   A.    I disagree with that term.  I've never

12         shown any property for Meiying Forney.

13   Q.    Okay.  Well, let me say it this way:  Did

14         you at some point on or about June 13,

15         2007, meet an individual by the name of

16         Mark Cranage at that location?

17   A.    I met a man who said he was Mark Cranage.

18         I don't know if he was actually Mark

19         Cranage or not.

20   Q.    Okay.  What were the circumstances about

21         which you came to meet that person on or

22         about June 13, 2007?

23   A.    At this time, at that date, I was still on
```

Don Little - 8/19/2008

Page 18

1    the hook for being financially liable for

2    any assets of the facility, so I still --

3    and I only took -- legally was the only

4    person who had keys and access to the

5    building. And Ms. Knudsen had shown it to

6    a couple of people -- and I can't tell you

7    who. I don't even know today who actually

8    leased it. I've never -- I'm not privy to

9    any executed lease at Le Croy shopping

10   center unless it's in default. So anyway,

11   there was quite a bit of trouble in the

12   fact that Ms. Knudsen would have to set

13   appointment times and then make sure I was

14   available to get a key from me, our round

15   trip in traffic, and on and on. And so

16   for some reason there was some pressing

17   engagement Ms. Knudsen had, and I just

18   happened that day not to have anything

19   very pressing. And she called me -- I

20   cannot tell you when. I don't -- it

21   wasn't that important to me at the time.

22   And she just kind of said, look, I'm

23   negotiating with somebody about a possible

Page 19

```
 1        lease; I just need you to open the

 2        facility.  And I said, well, I'll need to

 3        stay there and make sure he doesn't haul

 4        anything off.  And that is how I ended up

 5        meeting this man who claims he's

 6        Mr. Cranage on that date.  I cannot swear

 7        under oath it was that date.

 8    Q.  So you don't actually know Mark Cranage or

 9        --

10    A.  No.  Only met him -- if that was him, only

11        met him that one time and then found out

12        -- the reason I'm not even sure what his

13        name is, I found out after looking at a

14        copy of a transcript that he supposedly

15        recorded -- there's quite a few things

16        later on I discovered where he just flat

17        out lied about, so I don't know that it

18        was Mark Cranage.

19    Q.  Let me ask you this way:  He identified

20        himself as Mark Cranage; is that right?

21    A.  Identified himself and also said he was

22        part owner of Woodmere Tavern, which I

23        later discovered was a complete
```

Don Little - 8/19/2008

Page 20

1      fabrication.

2    Q.    Okay.  In regard to that time where you

3          met Mr. Cranage there or the person we

4          believe to be Mr. Cranage, did you let him

5          in?

6    A.    Yes, sir.  Met him outside the front door;

7          we shook hands; and he went into great

8          detail about how this had to be the most

9          secretive of meetings and no one could

10         find out.  So I unlocked the door, and we

11         went inside and probably spent -- probably

12         spent 40 minutes in there.

13   Q.    Okay.  And do you now know, after the

14         fact, that he recorded at least part or

15         some of that conversation between the two

16         of you?

17   A.    I reviewed a transcript, although it's

18         incomplete and inconclusive and full of

19         lies.  But I have read a transcript which

20         I contend is only part of the

21         conversation.

22   Q.    That was going to be my question:  Do you

23         believe there's other parts of that

Don Little - 8/19/2008

Page 21

1           conversation that are not part of the

2           transcript or -- and we have a DVD of the

3           --

4    A.    The transcript I reviewed has -- is

5           confusing at best, incomplete at best, and

6           almost fraudulent.

7    Q.    Okay.  At any time that you were in the

8           building there, the Pure Country Saloon

9           location, at any time that you were in the

10          building with Mr. Cranage, were any of

11          those statements that you made, were they

12          with authority or -- excuse me, the

13          authorization of Meiying Forney?

14   A.    No, sir.  And I don't see it in the

15          transcript, but I even explicitly

16          explained to him that I do not represent

17          Aronov Realty in any way and I do not

18          represent the landlord in regards to any

19          new lease.

20   Q.    Okay.  So my next question I think you've

21          answered.  So were any of the statements

22          that you made that day to Mr. Cranage,

23          were they in any way authorized by Aronov

Page 22

1          Realty Management, Inc., Aronov Realty

2          Brokerage, Inc., or Amy Knudsen?

3    A.    They were not authorized by any Aronov

4          entity that I know of nor Amy Knudsen.

5          Amy Knudsen specifically instructed me to

6          just open the building for the man, that

7          she was handling, you know, a lease for a

8          potential client, if I would just unlock

9          it.

10   Q.    Okay.  Let me follow up just a little bit

11         more on that issue about your authority.

12         At any time during your discussion with

13         Mr. Cranage were you acting within your

14         authority as Ms. Forney's attorney in any

15         capacity?

16   A.    No, sir.  I really wasn't even acting as a

17         bankruptcy attorney that day.  I just

18         happened to be the person who had

19         possession of the building.

20   Q.    Well -- and maybe I should be a little

21         clearer.  Other than opening the door,

22         which may have been within your capacity

23         as her bankruptcy attorney --

Don Little - 8/19/2008

Page 23

1    A.    Yes, sir.

2    Q.    Other than that action, which you've

3          already stated you had the keys and that

4          was because you were representing her as

5          her bankruptcy attorney, correct?

6    A.    Correct.

7    Q.    Okay.  Other than opening the door -- let

8          me be a little more specific -- any of the

9          statements that you made at that time to

10         Mr. Cranage, were any of those within your

11         authority as her bankruptcy attorney in

12         any capacity?

13   A.    None whatsoever.  I was just what I call

14         sales puffing.

15   Q.    That was what I was going to ask you.

16         You're kind of ahead of me each time;

17         that's okay.  And I want to make clear for

18         the record, I have talked to you on two

19         occasions about this before, right?

20   A.    Yes, sir.  I've talked to any attorney

21         who's called me about this case.  I have

22         not refused to -- I think one time Ms.

23         Quin called me about a potential

Page 39

1           that.

2     Q.     Okay.  Before you went to meet the man who

3            identified himself as Mr. Cranage to meet

4            at the Pure Country space, did Ms. Knudsen

5            tell you anything about the type of

6            business that he operated?

7     A.     I don't remember.  I remember Mr. Cranage

8            coming up and telling me that he was half

9            owner of Woodmere, which I later

10           discovered to be wholly false.

11    Q.     Do you remember, did Ms. Knudsen tell you

12           anything about Mr. Cranage's clientele?

13           Did she mention that at all?

14    A.     No, ma'am.  I just unlocked the door.  And

15           we all had busy -- other things to do, so

16           we really didn't have a long conversation

17           about something which at the time was --

18           it was just an inconvenience, and I was

19           trying to get it over with quickly.

20    Q.     Did Ms. Knudsen or anybody at Aronov give

21           you any instructions or directions at all

22           about what to say to Mr. Cranage at your

23           meeting with him?

Page 40

1    A.    Yes, ma'am.  She asked me to just unlock

2          the door and let the man in and see the

3          place.

4    Q.    And that's it, nothing else?

5    A.    That's it.  I was just to unlock the door

6          because I had possession of the building.

7    Q.    Do you recall Ms. Knudsen saying anything

8          at all to you about the race of any other

9          tenant who was interested in the Pure

10         Country space?

11   A.    The race of any other tenant in that strip

12         center?

13   Q.    Or potential tenant.

14   A.    For that whole strip center?

15   Q.    No, for the Pure Country space.

16   A.    For the Pure Country?  The race of any

17         potential tenant?

18   Q.    Do you recall Ms. Knudsen mentioning to

19         you the race of anybody who was interested

20         in renting the Pure Country space from Ms.

21         Forney?

22   A.    I do not recall, no, ma'am.

23               MS. ROGERS:  Thank you.  That's

Page 59

```
 1    Q.    Do you know if Mr. McGhar had any keys to

 2          any of the particular properties, I guess

 3          the tenants' spaces, for lack of a better

 4          --

 5    A.    I don't know.

 6    Q.    And then you say you were given the keys

 7          by Mr. Hamm.  Was that at your request?

 8    A.    Nick Parnell, the debtor's attorney,

 9          surrendered the keys to the trustee.  Then

10          I, on a couple of occasions, got the keys

11          from the trustee and returned them to the

12          trustee.  And then finally, the trustee

13          realized what a terrible inconvenience and

14          time waste this was, and so he entrusted

15          me with all keys that had been turned over

16          to him for the facility.

17    Q.    Do you know why you were chosen to give

18          the keys to?

19    A.    The landlord's attorney, you know, the

20          bankruptcy attorney, in my opinion.  I

21          don't know.

22    Q.    So it was your opinion that you had those

23          keys because you represented Ms. Forney?
```

Don Little - 8/19/2008

Page 60

1  A.    I represented her in regards to a

2        bankruptcy action and solely a bankruptcy

3        action.

4  Q.    And that bankruptcy action concerned the

5        property known as what we're going to call

6        Pure Country?

7  A.    Yes, sir.

8  Q.    And so when you went -- you had the keys,

9        and when you went to open up the property,

10       you were doing that because you were Ms.

11       Forney's attorney, correct?

12 A.    I was opening up the property because I

13       was Ms. Forney's attorney? I'm sorry.  I

14       don't understand what you mean.  What do

15       you mean, I'm her attorney?

16 Q.    You were Ms. Forney's attorney in the

17       bankruptcy proceeding?

18 A.    I was her bankruptcy attorney.  If that's

19       what you're asking, the answer is yes.

20 Q.    And you had the keys to the Pure Country

21       property because you were her bankruptcy

22       attorney?

23 A.    Because I was given them by the trustee.

Don Little - 8/19/2008

1        after Mr. Hamm, the trustee, had given you

2        the keys, that time period was also the

3        same time period --- or was it also the

4        same time period that you were acting as

5        Ms. Forney's bankruptcy attorney in

6        regards to the Pure Country Saloon?

7  A.    The time I had the keys?  Yes, sir.

8  Q.    I know that was probably a pretty bad

9        question, but it's a much better form than

10       what's in my head, so -- it's all jumbled

11       in there:  Did you ever have any

12       conversations with Mr. McGhar about the

13       leasing of the Pure Country location?

14  A.   I'm sorry.  You'll have to be a little

15      more specific.  What do you mean, "about

16      the leasing"?

17  Q.    About prospective tenants at the Pure

18      Country location after the Pure Country

19      bankruptcy?

20  A.   No, sir.  I never was involved in any

21      leasing of any property for Meiying

22      Forney.  I never was an authority.  I

23      never in any way, shape, or form ever

Page 66

1    leased or even showed a piece of Meiying

2    Forney's property.

3    Q.   Did you ever have any conversations with

4         Sam McGhar regarding, first off, the

5         leasing of the property at the Pure

6         Country Saloon after Pure Country filed

7         bankruptcy?

8    A.   I cannot swear to it.  I feel sure that I

9         somehow or another told Mr. McGhar about

10        the Chapter 7, but as far as a new tenant,

11        no.  And see, actually, I don't think I

12        ever had any dealings with Mr. McGhar

13        about a prospective tenant, because to my

14        knowledge, he doesn't lease either.  He

15        just looks after -- for the work I've done

16        with him, he looks after -- keeps a little

17        bit of an accounting of who has paid when,

18        and he tries to take care of, you know, if

19        a toilet stops up or something like that.

20   Q.   Are you familiar with the tenants at the

21        Le Croy --

22   A.   I cannot tell you the name of one single

23        signatory to a lease at Le Croy shopping

Page 84

1    Yeah, I think I'm finished Monday with

2    bankruptcy.  That's completely free from

3    it Monday.  I could actually go ahead and

4    go into lease negotiations now and get

5    drafts and everyone look, and there's no

6    way we could get a lease finished by

7    Monday.  I'm sure you want to look it over

8    and do some specs and stuff.

9              My question to you is, taking

10   into account what you've already said,

11   that is a statement that is attributed to

12   you, made to Mr. Cranage on this June 13th

13   date.  And my question is, did you have

14   authority to make that statement?

15  A.   No, sir.  I totally misspoke when I used

16   the word "I."  I did not have the

17   authority to do a lease.  I never drafted

18   a lease for this property.  I was, in my

19   opinion -- I don't remember actually

20   saying this, but I don't doubt that I did

21   say it.  But I was just simply trying to

22   facilitate getting a new tenant.  And

23   naturally, my intention would have been if

Page 85

```
 1              he came back like he was going to, I was

 2              just -- naturally, it was all going to go

 3              to the actual leasing agent, Ms. Knudsen.

 4    Q.        And is this part of the sales puffing you

 5              were talking about earlier?

 6    A.        Yes, sir.  That's exactly what I was

 7              talking about.

 8    Q.        And in regard to the sales puffing that

 9              you spoke about earlier, is it fair to say

10              that your motives for the salesperson

11              puffing were personal in nature as opposed

12              to professional in nature?

13    A.        Yes, sir.  If you're asking if I had any

14              authority to do a lease with this person,

15              the answer is no, I had no professional

16              authority.

17    Q.        And it was not in contemplation of your

18              representation of Ms. Forney in the

19              bankruptcy proceeding that you could make

20              such statements?

21    A.        I'm sorry.  How about --

22    Q.        Yeah.  All I'm trying to say is, as her

23              bankruptcy attorney, it was not in her
```

Page 86

1       contemplation that you'd be making

2       statements about trying to lease the

3       property?

4    A.    No, sir, it was not.

5    Q.    And the same would hold true for Amy

6       Knudsen.  I mean, when she said, how about

7       opening up the place for me because I'm

8       busy, I'm going to be somewhere else, she

9       certainly didn't give you authority and it

10      wasn't in her contemplation that you would

11      be making statements about trying to lease

12      the property, was it?

13   A.    I have absolutely no authority to enter

14      into any lease on behalf of Aronov or Amy

15      Knudsen or Meiying Forney.

16            MR. GUY:  All right.  That's all

17      I have.

18            EXAMINATION

19   BY MS. ROGERS:

20   Q.    Just one quick follow-up, just to clear up

21      something I think you said earlier.  The

22      plaintiffs' attorney was asking you about

23      collecting -- or attempts to collect by

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5

6     CIVIL ACTION NO.:  2:07-CV-00881-WKW-WC

7

8     TERRENCE LONG & BARRY BARR,

9              Plaintiff(s),

10    vs.

11    ARONOV REALTY MANAGEMENT,

12    INC., AMY CLARK KNUDSEN, &

13    MEIYING FORNEY,

14              Defendant(s).

15

16                    DEPOSITION OF

17                    GRANT SULLIVAN

18                         JOB NO. 1101-58771

19

20    BEFORE:    Victoria M. Castillo

21               Certified Court Reporter and

22               Notary Public

23               ACCR# 17, Expires 9/30/2008

Page 9

1        Q.        And to your knowledge, has anyone in

2    your dealings with Aronov done that -- mentioned

3    the race of tenants or prospects?

4        A.        I'm not sure I understand the

5    question.

6        Q.        Any of the agents at Aronov ever

7    referred to the race of a potential tenant?

8        A.        You mean in last 62 years?

9        Q.        In your dealings with Aronov?

10       A.        Not that I remember.

11       Q.        How did you get involved in this deal

12   with the LeCroy Shopping Center?  Could you just

13   tell us briefly?

14       A.        Barry contracted me.  He and a fellow

15   by the name of Terrence Long were interested in

16   leasing the building at LeCroy Shopping Center, and

17   I believe Amy had the building listed for lease.

18   I'm not sure, but for some reason I contacted Amy

19   and asked her if she would show the property to

20   Barry and to Mr. Long, and she agreed that she

21   would met him and show the property to him.

22       Q.        And did you-all discuss anything else

23   in that first conversation with her?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 13

1    Q.    In my hurry to get you out of here, I

2    guess I'm not thinking as thoroughly as I normally

3    do.  Do you remember discussing this purchase and

4    sales agreement with Amy Knudsen?

5    A.    Yes.

6    Q.    What do you recall about that?

7    A.    There was some discussion about

8    income and expenses of the shopping center,

9    vacancies, so that I could go through the numbers

10   and evaluate what kind of value I felt like the

11   property had.

12   Q.    And those numbers were provided to

13   you by Aronov?

14   A.    Yes.

15   Q.    And after you looked at it, did you

16   come up with a million dollars?

17   A.    I think that was -- I'm not sure --

18   but I think that's what Barry and his partner, or

19   Barry -- I can't remember if they were doing it

20   together.  Obviously, it's in Barry's name, so it

21   must have been just Barry.  That may have been the

22   number that he went to offer.

23   Q.    Did you have any negotiation room?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 14

1       A.    Explain that.  What do you mean?

2       Q.    Did he say offer a million and if

3 they take it great -- if not, I could go up a

4 couple hundred thousand?

5       A.    No.

6       Q.    You don't recall any discussion about

7 that?

8       A.    No.

9       Q.    Do you recall what Amy said when she

10 got it?

11       A.    No.  I know the contract was

12 rejected.

13       Q.    Do you recall any conversation with

14 Amy about the contract?

15       A.    No.

16       Q.    Do you have any reason to believe

17 that she did not present the contract to her

18 client?

19       A.    No, that's what she's supposed to do.

20       Q.    You never got a counter on the deal?

21       A.    No.

22       Q.    Does that sometimes happen in the

23 real estate business?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 15

```
1           A.      That a seller would not counter an

2      offer?

3           Q.      Right.

4           A.      Yes.

5           Q.      Are you and Mr. Barr friends?

6           A.      Yes.

7           Q.      How long have you-all been friends?

8           A.      Probably 10 or 15 years.

9           Q.      And did you-all ever discuss his bar,

10     Celebrations?

11          A.      Did we discuss it?

12          Q.      Yes.

13          A.      What do you mean?

14          Q.      I was just asking generally if

15     you-all discussed it -- and if you said no, I was

16     finished.

17          A.      Discuss it from a standpoint of

18     business?  I mean --

19          Q.      The experience that he was having in

20     Celebrations in the last year of it being open.

21          A.      Other than that there were some

22     problems that he had on-site that the City of

23     Montgomery was talking to him about.  Other than
```

Page 18

1    untypical, that that sometimes happens, right?

2         A.    I'd  say norally what happens is:  He

3    makes an offer; it's presented -- if it's not

4    acceptable, normally the owner will counter the

5    offer and initial the changes, and the contract

6    would be given back to me, and I would go to my

7    client and see if my client was willing to initial

8    the changes and move forward with the deal.  That's

9    normal.  It's not that it never happens, but it's

10   very -- in my opinion, it's very unusual to have

11   somebody just reject a contract altogether and

12   never make a counter-offer.

13        Q.    And that's particularly in the case

14   where something is for sale that there would be a

15   counter-offer between the parties?

16        A.    Usually, yes.

17        Q.    Were you aware that this property was

18   not even up for sale at the time that the offer was

19   made?

20        A.    I don't remember.

21        Q.    Do you have a recollection or are you

22   testifying or would you testify that it was your

23   understanding it was for sale, or you just don't

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 19

1    remember?

2         A.     Don't remember.

3         Q.     So if the property wasn't even up for

4    sale -- if the evidence in this case is that it

5    wasn't being offered for sale at the time, then

6    under those circumstances, it might not be that

7    unusual for the owner just to reject the offer

8    without a counter-offer, correct?

9         A.     If the owner did not want to sell it

10   at any price, yes.

11        Q.     Any price -- there is always maybe a

12   price, right?

13        A.     If there is, there is usually a

14   counter-offer.

15        Q.     But what I'm saying is:  You didn't

16   find this property listed anywhere for sale with an

17   amount, correct?

18        A.     No.

19        Q.     And that was never communicated to

20   you?

21        A.     No.

22        Q.     Mr. Barr just came to you and said I

23   want to make an offer to purchase this property,

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 20

1    right?

2         A.    Yes.

3         Q.    And you did this due diligence before

4    I guess you made the offer?

5         A.    I believe I asked Amy to give me the

6    rental income, the expenses, and so on and so

7    forth, so that I could look at the net operating

8    income to see if the value of the property was --

9    and I don't remember exactly, but I think that was

10   the sequence of events that she gives me the

11   information, and I evaluate the property -- or

12   maybe Barry made the offer, and then I asked for

13   the information.  I don't know.  I don't remember.

14        Q.    And it wouldn't be unusual for to

15   want that information so you could try to -- but

16   all I saying is in this particular case Barry --

17   not Mr. Long -- but Barry wanted to make an offer

18   to purchase, and you communicated that?

19        A.    Yes.

20        Q.    To her?

21        A.    Yes.

22        Q.    And Barry on the other hand did not,

23   when it was rejected, he didn't say -- well, let's



## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **TERRENCE LONG and** | ) | |
| **BARRY BARR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:07-CV-881-WKW** |
| | ) | |
| **ARONOV REALTY MANAGEMENT,** | ) | |
| **INC., AMY CLARK KNUDSEN, and** | ) | |
| **MEIYING FORNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEIYING FORNEY'S RESPONSE TO
### PLAINTIFF'S FIRST SET OF INTERROGATORIES
### AND REQUEST FOR PRODUCTION OF DOCUMENTS

**COMES NOW,** the defendant, Meiying Forney, by and through her undersigned

counsel of record, and in response to plaintiff's first set of Interrogatories and Request for

Production of Documents, avers the following separately and severally:

### GENERAL OBJECTIONS

1.      This defendant objects to providing any information or producing any

document that is protected from disclosure by the attorney/client privilege, work product

doctrine, or any other applicable privilege or protection, including, but not limited to, any

information or document that was or is prepared in anticipation of litigation and/or during

the course of preparation for litigation.

2.      This defendant objects to providing any confidential or proprietary

business information and documents, except pursuant to an appropriate protective order

as agreed upon by the parties and to be entered by this Court.

3.      This defendant objects to plaintiffs' definitions and instructions, to the extent they attempt to expand its obligations beyond the requirements of the <u>Federal Rules of Procedure</u>.

4.      This defendant objects to each and every one of the plaintiffs' interrogatories to the extent that any such discovery calls for information that can be more appropriately and efficiently elicited through depositions upon oral examination.

5.      This defendant objects to each and every one of the plaintiffs' interrogatories in so far as such discovery requires this defendant to engage in a lengthy, time consuming and expensive search for information and documentation.

6.      Defendant objects to plaintiffs' discovery requests to the extent they seek documents or things not within defendant's possession, custody or control or that are easily available to plaintiffs.

7.      Inadvertent production of privileged information and documents by defendant shall not constitute a waiver of any applicable privilege nor shall the response to an interrogatory or the production of any document be construed as a waiver of any objection to the admissibility of such documents.  Further, defendant's response to any particular item of discovery shall not be construed as an admission by defendant that any documents or things responsive to that request exist.

8.      In searching for information, documents and other materials, defendant will conduct a thorough and reasonable search of its records kept in the ordinary course of business, where information, documents, or other things responsive to this discovery are most likely to be found.  To the extent plaintiffs' requests for production ask for

more, defendant objects because the discovery is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

       9.     This defendant reserves the right to assert additional objection to discovery, as appropriate, and to supplement its objections and responses, as needed.

## SPECIFIC INTERROGATORY OBJECTIONS AND RESPONSES

       1.     Please provide a list by address and name (if applicable) of all real property owned by you.

**RESPONSE: (1) LeCroy Shopping Village – Debbie Drive; (2) Office Park Circle – Vaughn Road; and, East Park Plaza – Atlanta Highway. These are all of the properties in Montgomery, Alabama.**

       2.     Please provide a list of all individuals, entities or organizations who lease space at the LeCroy Shopping Village.

**RESPONSE: Sam McGharr or Amy Knudsen would have this information.**

       3.     Please state whether you entered into an agreement with Aronov Realty to act as your agent in the selling or leasing of real property and if yes please state all properties at which Aronov is authorized to act on your behalf in selling or leasing.

**RESPONSE: Yes. I had an agreement at one time. I can no longer locate this agreement. Amy Knudsen handles the selling and/or leasing of all my property.**

       4.     Have you ever had any communications, whether oral, written or electronic, with Amy Knudsen concerning the selling or leasing of real property at the LeCroy Shopping Village? Please provide the dates and the subject matter of these communications.

3

**RESPONSE: Yes, I don't remember the date, received an offer of $1 million to purchase which I rejected. I have also had conversations with Amy about the leasing of Pure Country by Doodlehopper. I don't remember dates or specifics of conversations. I'm sure there have been other conversations as well about other lease space.**

5.    Have you ever had any communications, whether oral, written or electronic, with anyone associated, employed, or otherwise connected with Aronov Realty concerning the selling or leasing of real property at the LeCroy Shopping Village? Please provide the names of the individuals and the dates and the subject matter of these communications.

**RESPONSE: See response to #4.**

6.    Did you hire or retain Don Little to represent you as an attorney in any matters concerning the LeCroy Shopping Village or any other real property you own. Please list all matters on which Don Little has represented or is representing you concerning LeCroy Shopping Village.

**RESPONSE: I hired Don Little on recommendation of Amy Knudsen to handle collection of some delinquent accounts and bankruptcy involving Pure Country.**

7.    Did Don Little and Amy Knudsen have your permission to communicate with each other concerning the property at the LeCroy Shopping Village?

**RESPONSE: As relating to the bankruptcy matter of Pure Country, yes.**

8.    Did you allow Don Little to act on your behalf in communicating with third parties regarding the leasing of property at the LeCroy Shopping Village and in particular the Pure Country location?

**RESPONSE: No.**

9.   Did Don Little have a key to the Pure Country space at the LeCroy Shopping Village?

**RESPONSE: I am not aware personally.**

10.   Please list every individual, entity or organization over the last 10 years who has been authorized to act on your behalf in regard to the leasing or selling of property at the LeCroy Shopping Village.  For each person listed, please provide the dates during which each person was authorized to act on your behalf as described in this interrogatory.

**RESPONSE: Only know of Josh Hall and Amy Knudsen.**

## RESPONSES TO REQUEST FOR PRODUCTION

1.   Please produce any documents in your possession relating to the Pure Country Nightclub location at the LeCroy Shopping Village.

**RESPONSE: I am sure I had a lease but cannot presently locate.**

2.   Please produce any documents in your possession which relate to, reflect or in anyway mention Aronov Realty.

**RESPONSE: Object.   Question is vague and ambiguous and not reasonably calculated to lead to discovery of admissible evidence.   Without waiving said objection, almost any correspondence ever sent from Amy Knudsen would mention Aronov Realty.**

5

3.      Please produce any documents in your possession which refer to, reflect or in any way mention communications between you and anyone associated, affiliated or employed with Aronov Realty, including Amy Knudsen.

**RESPONSE: Object. Question is vague and ambiguous and not reasonably calculated to lead to discovery of admissible evidence. Without waiving said objection, almost any correspondence ever sent from Amy Knudsen would mention Aronov Realty.**

4.      Please produce any documents in your possession which refer to, reflect or in anyway mention the Doodlehoppers location at LeCroy Shopping Village.

**RESPONSE: Object. Question is vague and ambiguous. Without waiving said objection, locating any such document is very time consuming and I presently cannot locate any such document. Amy Knudsen or Sam McGharr would probably have a copy of any such document.**

5.      Please produce any documents in your possession which refer to, reflect ot in anyway mention the plaintiffs in this case.

**RESPONSE: None other than offer to purchase by Barr and copy of lawsuit.**

6.      Please produce any documents in your possession which refer to, reflect or in anyway show efforts by you or by anyone acting on your behalf to lease any property at the LeCroy Shopping Village, particularly the location of the former Pure Country Nightclub.

**RESPONSE: None.**

Case 2:07-cv-00881-WKW-WC    Document 63-5    Filed 08/25/2008    Page 8 of 13
FROM : Case 2:07-cv-00881-WKW-WC    Document 58-5    Filed 08/11/2008    Page 8 of 13
FAX NO. : 406-525-8649    Jul. 21 2008 01:44PM P1

_____

MEIYING FORNEY

STATE OF Alabama
COUNTY OF Montgomery

    Before me, the undersigned Notary Public, did personally appear MEIYING
FORNEY who states to me that she is aware of the contents of the foregoing document,
and that she did execute it voluntarily.

    SWORN TO and SUBSCRIBED before me on this the 21st day of July , 2008

_____

NOTARY PUBLIC
My commission expires: 5-6-2012

Respectfully submitted this 22nd day of July, 2008.

_____/s/_____ N. Gunter Guy, Jr._____

N. Gunter Guy, Jr.
Attorney for Defendant, Meiying Forney

OF COUNSEL:

Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, AL 36102-2148
Telephone:    (334) 387-7680
Facsimile:    (334) 387-3222
gguy@ball-ball.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system and have also served a copy of the following by e-filing or mailing the same by United States mail properly addressed and first class postage prepaid:

C. Michael Quinn
Kevin W. Jent
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL 35203

Charles A. Stewart
Quindal C. Evans
Bradley, Arant, Rose & White
401 Adams Ave., Ste. 780
Montgomery, AL 36104

_____/s/_____ N. Gunter Guy, Jr._____
OF COUNSEL

8

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRENCE LONG and<br>BARRY BARR, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:  2:07-CV-881-WKW |
| | ) | |
| ARONOV REALTY MANAGEMENT, | ) | |
| INC.,  AMY CLARK KNUDSEN, and | ) | |
| MEIYING FORNEY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEIYING FORNEY'S RESPONSE TO
## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

COMES NOW, the defendant, Meiying Forney, by and through her undersigned counsel of record, and in response to plaintiff's first Request for Admissions, avers the following separately and severally:

1.      Please admit that you were the owner of the LeCroy Shopping Village located in Montgomery, Alabama, in April, May, June, July and August 2007.

**RESPONSE: Admitted.**

2.      Please admit that attorney Don Little was retained by you to represent you on matters related the lease and bankruptcy of Tony Fannin d/b/a F&H LLC, otherwise known as the "Pure Country Lounge."

**RESPONSE: Admit that Don Little was retained by me for the bankruptcy proceeding involving the Pure Country Lounge.  However, deny that Don Little was retained by me relating to the lease of the Pure Country Lounge.**

3.    Please admit that Don Little was authorized to act on your behalf when he showed the Pure Country Lounge location at the LeCroy Shopping Village to Mark Cranage on June 13, 2007.

**RESPONSE: Denied.**

4.    Please admit that Amy Clark Knudsen was authorized to act on your behalf regarding any matter related to the sale or rental of the property owned by you and the location known as the LeCroy Shopping Village in Montgomery, Alabama, including offers, solicitations, or contracts and the administration of matters regarding such offers, solicitations, or contracts or any commercial real estate-related transaction for a time period including April, May, June, July and August 2007.

**RESPONSE: Object. This defendant does not understand the use of the term "was authorized to act on your behalf regarding any matter". Such term is vague and ambiguous and any response by this defendant could be interpreted incorrectly. Without waiving said objection, I admit that Amy Clark Knudsen was my real estate agent for purposes of leasing and/or sales of commercial properties owned by me in Montgomery, Alabama for the period of April 2007 through August 2007.**

5.    Please admit that Amy Clark Knudsen was authorized to act on your behalf at all times when she showed or discussed the leasing of the Pure Country Lounge location at LeCroy Shopping Village with Barry Barr for a timer period including April, May, June, July and August 2007.

**RESPONSE: Object. This defendant does not understand the use of the term "was authorized to act on you[r] behalf at all times". Such term is vague and ambiguous and any response by this defendant could be interpreted incorrectly. Without**

2

waiving said objection, I admit that Amy Clark Knudsen was my real estate agent for the leasing and/or sales of commercial properties owned by me in Montgomery, Alabama for the period of April 2007 through August 2007.

6.     Please admit that you entered into an agreement with defendant Aronov Realty (hereinafter "Aronov"), that Aronov would act as your agent in the leasing or selling of the real property known as the LeCroy Shopping Village in Montgomery, Alabama for a period of time including April, May, June, July and August 2007.

**RESPONSE: Denied as to any "written" agreement.**

Respectfully submitted this 22nd day of July, 2008.


_____/s/_____N. Gunter Guy, Jr._____
N. Gunter Guy, Jr.
Attorney for Defendant, Meiying Forney


OF COUNSEL:

Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, AL 36102-2148
Telephone:     (334) 387-7680
Facsimile:     (334) 387-3222
gguy@ball-ball.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system and have also served a copy of the following by e-filing or mailing the same by United States mail properly addressed and first class postage prepaid:

C. Michael Quinn
Kevin W. Jent
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL 35203

3

Charles A. Stewart
Quindal C. Evans
Bradley, Arant, Rose & White
401 Adams Ave., Ste. 780
Montgomery, AL  36104

          /s/     N. Gunter Guy, Jr.
OF COUNSEL

4