IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TERRENCE LONG & BARRY BARR,    )<br><br>　　　Plaintiffs,　　　　　　　)<br><br>V.　　　　　　　　　　　　　)<br><br>ARONOV REALTY MANAGEMENT,　)<br>INC., AMY CLARK KNUDSEN, &　)<br>MEIYING FORNEY,　　　　　)<br><br>　　　Defendants.　　　　　)<br><br>) ) ) ) | Civil Action No.:<br>2:07-CV-00881-WKW-WC |

REPLY TO PLAINTIFFS' RESPONSE TO MOTIONS FOR SUMMARY
JUDGMENT FILED BY DEFENDANTS ARONOV REALTY MANAGEMENT,
INC., ARONOV REALTY BROKERAGE, INC., AND AMY CLARK KNUDSEN

Defendants **Aronov Realty Management, Inc.** ("Aronov Management"), **Aronov Realty Brokerage, Inc.** ("Aronov Brokerage"), and **Amy Clark Knudsen** ("Knudsen") (collectively, "these Defendants") reply to Plaintiff's response to summary judgment as follows:

## ADDITIONAL UNDISPUTED FACTS

In addition to the undisputed facts set forth in their initial brief in support of summary judgment, Defendants assert that the following facts are undisputed in this matter:

According to Sam McGhar, a tenant at LeCroy for 23 years who also acts as assistant manager for Forney, the property currently has nineteen tenants. (McGhar Dep. at 9:1-4, 10:1-14, 44:2-5.) Ten of these tenants are African-American. *Id.* at 11:9-13. Two other tenants cater to Hispanic communities. *Id.* at 11:16-20. McGhar testified that he believes Knudsen leased to "50 percent or better" of the current tenants, and she has never mentioned race to McGhar as a factor in leasing to a tenant. *Id.* at 12:1-12.

Of the ten African-American tenants, four were tenants before May 2007 when Barry Barr first expressed an interest in the property. (Knudsen Decl. at ¶ 5.) In May 2007, eight of the tenants at LeCroy were African-American, and Knudsen had assisted in placing six of those tenants at LeCroy. *Id.* Since Forney purchased the property in 2004, Knudsen has assisted in placing fourteen African-American tenants in LeCroy. *Id.* at ¶ 6. Five of those tenants are no longer at LeCroy, and nine are still leasing at LeCroy. *Id.*

McGhar also testified that Doodle Hoppers, the existing tenant to which Forney leased the Pure Country space, had so much business that customers were literally standing on the sidewalk waiting to get in and that the owners of Doodle Hoppers were familiar with LeCroy's rules and regulations, such as the requirement to have security in the parking lot and the rules against loitering, allowing people to sit in their cars, and drinking in the parking lot. (McGhar Dep. at 16:12-18, 17:5-18.) Doodle Hoppers currently leases the space for $4103 per month. *Id.* at 19:10-23. McGhar also believes that Doodle Hoppers received about six months of free rent in order to make the improvements to the space. *Id.* at 20:1-10.

Plaintiff Barr operated a business at the Celebrations location for fourteen years, until he closed Celebrations on April 1, 2007. (Barr Dep. at 44:1-3, 50:5-6.) For the last seven of those fourteen years, Barr operated Celebrations. *Id.* at 50:21-23. The format of Celebrations was '70s/'80s music, then Top 40 music, and then hip hop music, with each format lasting two or two-and-a-half years each. *Id.* at 60:4-13. Therefore, Barr began using the hip hop format sometime in 2005 or later. The police reports for criminal activity reported at Celebrations for 2002 through April 1, 2007, when Celebrations closed, show 583 calls to the police. *See* Montg. Police Dept. Records. However, 297 calls (over half of the 583 calls) occurred during 2002 to 2004, before Celebrations converted to a hip hop format. *Id.*

Don Little, Forney's bankruptcy attorney, has never been an agent for Knudsen or Aronov, and he was not acting as an agent for Knudsen or Aronov or speaking on their behalf when he met with Mark Cranage. Little testified as follows:

> A:    No, sir. And I don't see it in the transcript, but I even explicitly explained to [Cranage] that I do not represent Aronov Realty in any way and I do not represent the landlord in regard to any new lease.
>
> Q:    Okay. So my next question I think you've answered. So were any of the statements that you made that day to Mr. Cranage, were they in any way authorized by Aronov Realty Management, Aronov Realty Brokerage, Inc., or Amy Knudsen?
>
> A:    They were not authorized by any Aronov entity that I know of nor Amy Knudsen. Amy Knudsen specifically instructed me to just open the building for the man, that she was handling, you know, a lease for a potential client, if I would just unlock it.

(Little Dep. At 21:14—22:9.)

> Q:    Okay. But the statements that you made, which are indicated in that transcript, assuming that any of those are true, those statements about who was wanted in that location or what they were trying to do to lease that property, that was not anything where Aronov or Amy Knudsen or Meiying Forney had authorized you to make those statements on their behalf.
>
> A:    No, sir. To be honest with you, I didn't actually know the names of a single person who was trying to lease that facility except that one man, Mr. Cranage, who said he wanted it the next day.

*Id.* at 26:8-21.

Little also testified that he has never worked with Aronov as a leasing or sales agent and has never been hired by Knudsen or asked by Knudsen to act as a leasing or sales agent of any type. *Id.* at 37:12-23. Before Little met with Cranage, Knudsen told him nothing about the type of business Cranage operated or his clientele. *Id.* at 39:2-14. Other than asking Little to unlock the door for Cranage, Knudsen gave Little no instructions or directions about what to say to Cranage when he viewed the property. *Id.* at 39:20—40:6. Further, Little does not recall

Knudsen ever mentioning the race of anyone who was interesting in renting the property from Forney. *Id.* at 40:18-22.

Regarding the rent amount for the Pure Country space, Mark Cranage, the person who posed as an interested tenant for Barr, testified that it should rent for an amount between four and five thousand dollars per month. (Cranage Dep. at 61:22—-63:3.) In Barr's deposition, he said he tried to lease another building "because they were going to lease it for $3,500 a month," which he thought was "pretty cheap." (Barr Dep. at 131:15-20.) Barr was paying $6,700 per month, "[r]ight at $7,000.00," for the Celebrations space. (Barr Dep. at 307:1-3.)

### ARGUMENT

In their initial summary judgment brief, these Defendants argued that Knudsen and Aronov are entitled to summary judgment on Plaintiffs' leasing claims for the following reasons:

1. Plaintiffs do not have direct evidence of discrimination by Knudsen because.

   A. Knudsen was not a decision-maker.

   B. Knudsen's alleged statement is subject to more than one interpretation.

2. Under the circumstantial evidence burden-shifting analysis, Plaintiffs' claims still fail.

   A. Whether analyzed as part of the Plaintiffs' prima facie case or part of Plaintiffs' attempt to prove pretext, they cannot identify a similarly situated person who was treated differently by Knudsen or Aronov.

   B. There is no "challenged action" by Knudsen or Aronov for which any articulated reason is arguably pretextual; however, even in the context of Knudsen's comments to Barr and her articulated reason for making such

comments (a concern for crime and negative publicity), Plaintiffs have no evidence that the articulated reason is pretext.

3.    By the time Plaintiff Barr actually requested to lease the property, Forney had already decided to rent the property to an existing tenant, and no conduct by Knudsen or Aronov prevented the Plaintiffs from leasing the property.

Defendants also argued that, with respect to Plaintiffs' purchase claims, neither Plaintiff can establish a claim for discriminatory refusal to sell against Knudsen and Aronov because:

1.    Knudsen and Aronov played no role in the decision to reject Barr's purchase offer.

2.    Plaintiff Long never offered to purchase the property.

In response, Plaintiffs extensively discuss the principal/agency relationship as a basis of liability, but the majority of the Plaintiffs' response is devoted to facts and arguments concerning the meeting between Don Little, an attorney who represented Meiying Forney in the Pure Country bankruptcy proceedings, and Mark Cranage, the person who posed as a tenant interested in the Pure Country space for Barr. Plaintiffs do not address how any alleged conduct by Knudsen or Aronov—separate and distinct from Little's conduct—allows them to survive summary judgment. Plaintiffs correctly assert that the law can hold a principal liable for the actions of an agent, but Plaintiffs do not apply their theories of liability to each of the agency relationships alleged to exist in this lawsuit. Instead, they lump all of the alleged conduct together and, relying predominantly on the statements by Don Little, argue that they have created fact questions as to the liability of all Defendants.

Beginning on Page 20 of their brief, Plaintiffs do attempt to explain the separate agency relationships alleged in this lawsuit. They claim that Forney is liable for Little's conduct because

he was her agent, Forney is liable for Knudsen's conduct because Knudsen was Forney's agent, and Aronov Brokerage is liable for Knudsen's conduct because she was at least an employee of Aronov Brokerage at the time. However, Plaintiffs fail to rebut Defendants' specific arguments about whether Knudsen's alleged conduct was even discriminatory. Further, they fail to show that the Defendants' facts are disputed, and they fail to assert any additional facts showing that Knudsen's conduct was discriminatory.

Continuing with their agency discussion, Plaintiffs' brief next claims that **all Defendants** (including Knudsen and Aronov) are liable for the conduct of Knudsen **and Little**. Plaintiffs support this claim with three alleged facts: (1) the alleged discriminatory statements were made to lease property owned by Forney, (2) both Little and Knudsen had formal business relationships with Forney, and (3) both Little and Knudsen stated they were acting on behalf of Forney in leasing the property. However, these facts, even if true, demonstrate a relationship between Forney and Knudsen or a relationship between Forney and Little, not a relationship between Little and Knudsen or between Little and Aronov. Thus, Plaintiffs essentially assert:

> Little was an agent of Forney.
> Knudsen was an agent of Forney.
> Knudsen was an agent of Aronov.
> Therefore, Knudsen and Aronov are liable for Little's discriminatory statements, regardless of whether they also had a discriminatory intent.

Assuming, for the sake of argument, that all of the various agency relationships alleged by the Plaintiff do exist, it is clear that Plaintiffs believe either (1) an agent is liable for the actions of another agent simply because they share a principal or (2) Little was an agent of Knudsen or Aronov. However, there is no basis for imposing liability on Knudsen or Aronov for Little's actions. The undisputed facts show that Knudsen and Aronov engaged in no conduct that

discriminated against the Plaintiffs, and Little's conduct cannot be attributed to Knudsen and Aronov.

A summary of Knudsen's involvement in the events giving rise to this lawsuit, as described by the Plaintiffs, is set forth below:

- Knudsen met Barr at the Pure Country space and allegedly told him "they 'didn't want a black club there and they didn't want that Celebrations thing.'"[1] In this same section of their brief, Plaintiffs describe the conversation between Knudsen and Barr about the negative publicity Celebrations had received. They claim Knudsen quoted a rent amount that was almost double the previous tenant's rent and included no leasehold improvements. In response, Barr told Knudsen he would try to secure a different space. (Pls.' Brf. at 4.)

- When Barr offered to purchase the property, Knudsen presented the offer to Forney and communicated Forney's response to Barr's agent. *Id.* at 5.

- Knudsen spoke to Barr on the phone right before he met Cranage at the Woodmere Tavern. (Barr Dep. at 184:1-18.) Barr asked if he and Mr. Long could get in the building. *Id.* at 184:17-19. According to the Plaintiffs, Knudsen asked if Long was still his client and, when Barr said yes, Knudsen said the property was still tied up in bankruptcy and that they could not get in. *Id.* at 184:17—185:3. *See also* Pls.' Brf. at 5.

- Knudsen spoke to Cranage when he called to see the property. Because the building was tied up in bankruptcy and Knudsen did not have keys, she asked Don Little to open the building for Cranage. It was a day or two after Barr's meeting with Cranage at the Woodmere Tavern before Cranage was able to see the property. (Barr Dep. at 186:22—187:9.) Cranage says Knudsen told him she "didn't want [Barr] coming into [LeCroy] with a place like Celebrations," but he also testified that he does not recall Knudsen using the term "black club." *Id.* at 63:13-22, 64:15-21, 87:5-15. Cranage testified, "And I really honestly can't say that she said black club. I knew she mentioned Celebrations." *Id.* at 67:5-7. *See also* Pls.' Brf. at 5-6.

- Barr spoke to Knudsen "the day after [Cranage] had gone in." (Barr Dep. at 176:8-14.) He asked her about the possibility of getting a backup lease on the property and asked if they were working on a lease because they had just offered Cranage a lease. *Id.* at 178:5—179:4. Barr said Knudsen "didn't seem real anxious," **but he could not recall what Knudsen said about whether he could be put on a backup lease.** *Id.* at 179:11-14. Knudsen told him that she may be able to get in touch with the person who had the keys. *Id.* at 179:15-23. Barr

---

[1] Plaintiffs do not explain who "they" is meant to represent in either reference to it in this sentence.

admits that he then began asking her about another property near a flea market and the restrictions for that property. *Id.* at 180:5-10. *See also* Pls.' Brf. at 8.

Barr recalls having no further conversations with Knudsen after this last conversation.[2] Therefore, the above is the extent of Knudsen's alleged discriminatory conduct.[3] For the reasons set forth in their original summary judgment brief and below, Plaintiffs cannot establish that Knudsen engaged in intentional discrimination against the Plaintiffs, and these Defendants are entitled to summary judgment on all of Plaintiffs' claims.

## I.    Plaintiffs do not have direct evidence of discrimination.

### A.    Knudsen's statement is not direct evidence because she was not a decision-maker.

Plaintiffs fail to present any facts showing that Knudsen or anyone else at Aronov was a decision-maker with respect to the lease or purchase of the Pure Country space. Plaintiffs argue that "comments *from decision makers* that were less directly connected to the challenged ... decisions have been found to constitute direct evidence." (Pls.' Brf. at 24 (emphasis added)). However, this argument necessarily assumes that the Court is analyzing a remark by a decision-maker. This quote from the Plaintiffs' brief merely affirms that a remark must be made by a decision-maker to be considered direct evidence, even if it is "less directly connected" to a challenged decision.

---

[2] Plaintiffs' brief appears to imply that Barr asked to be put on a back-up lease twice. However, Barr's own deposition testimony contradicts this. Barr did say in his deposition that the request to be put on a back-up lease may have occurred when he was trying to get Mr. Long in to see the building and that he "offered to put a lease – a backup lease on it when I knew she wasn't going to let me in – I mean, they weren't going to let me in the building." *Id.* at 283:2-15. However, Barr was questioned extensively about the telephone conversation that occurred between him and Knudsen when he tried to get Mr. Long in the building. When asked if anything else was discussed during this conversation, he replied: "Just trying to get in the building." *Id.* at 185:13-15. A few minutes later in the deposition, Barr was asked when the conversation took place. He replied: "It's the same day that I went to Woodmere. I'm sure." *Id.* at 186:12-15. He was again asked if he recalled anything else about the conversation, to which he replied. "No." *Id.* at 186:16-18. He later testified that he made the request to be put on a back-up lease after Cranage's meeting with Little. *Id.* 283:23-284:11. So, although Barr may not be certain about the timing of his request to be put on a back-up lease, his deposition testimony is clear that he made only one request.
[3] Plaintiffs do not claim that anyone else at Aronov played a role in the events giving rise to this lawsuit; their claims against Aronov are based solely on Knudsen's alleged conduct.

Knudsen was not a decision-maker in this case. In *Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999), the Eleventh Circuit held that a co-employee could not be considered a decision-maker because the co-employee did not have the authority to terminate plaintiff and because there was no evidence that the co-employee recommended termination. *Id.* Furthermore, the court held that *simply supplying the decision-maker with information* "which [ ] may or may not have [been] considered in making [the] decision to terminate . . . does not show that [the co-employee] made the decision." *Id.* (emphasis added).  *See also Hodges v. Stone Savannah River Pulp and Paper*, 892 F. Supp. 1571 (S.D. Ga. 1995) (holding that, even if the supervisor made the remark, "the opinions of employees or rumors about supervisors' attitudes are irrelevant unless clearly connected to the attitudes of supervisors" and, further, the plaintiff "failed to establish a causal nexus between the [supervisor's] remarks and the transfer decision") (citing *Williams v. Mead Coated Bd., Inc.*, 836 F. Supp. 1552, 1572 (M.D. Ala. 1993).  Plaintiffs have presented no evidence that Knudsen did anything more than supply the decision-maker with information or showing a causal nexus between her alleged comment and any decision concerning the lease of the property.

Plaintiffs argue that Knudsen's remark was "definitely related to the decision making process" because Knudsen was acting on Forney's behalf and because Forney relies on Knudsen to sell and lease her property. (Pls.' Brf. at 25.)  However, these facts, if true, do not create a fact question as to whether Knudsen played a role in Forney's decision to lease or sell her property. In their initial brief, Defendants submitted specific evidence establishing that Doodle Hoppers had been a tenant since Forney purchased LeCroy, that Doodle Hoppers wanted to expand into the Pure Country space, and Forney decided to rent the space to Doodle Hoppers because it was a good tenant. Defendants also submitted evidence that Knudsen had never mentioned the race of

a tenant or a tenant's clientele in all her dealings with Forney and that Knudsen never mentioned the race of Barr, Long, or their clientele to Forney. Defendants' evidence showed that Knudsen emailed Barr's purchase offer to Forney, that Forney felt is was too far below what she needed to make a counter-offer, that Knudsen relayed this information to Barr's agent, and that Knudsen and Aronov played no role in Forney's decision not to make a counteroffer.

Plaintiffs do not dispute the above facts, and they have presented no additional facts on the issue of whether Knudsen or Aronov was a decision-maker in the leasing or purchasing decisions at issue in this lawsuit. They have presented no evidence whatsoever about the decision-making process and no evidence contradicting Forney's statements that she needed more money if she were going to sell the property. Plaintiffs' conclusory statement that Knudsen's comment was "definitely related to the decision making process" is insufficient to create a fact question on this issue. Therefore, assuming for purposes of summary judgment that Knudsen made the statement alleged by the Plaintiffs, it is not direct evidence of intentional discrimination because the undisputed facts show that Knudsen was not a decision-maker with respect to the lease or purchase of the property.

**B.    Knudsen's statement is not direct evidence because it is subject to more than one interpretation.**

Knudsen's statement also cannot be considered direct evidence because it is subject to more than one interpretation. Knudsen has a demonstrated history of renting Forney's properties to African-Americans.[4]  Any alleged statement by Knudsen concerning a "black club like

---

[4] As set forth above, LeCroy currently has nineteen tenants, ten of which are African-American and two of which cater to the Hispanic community. Forney's assistant manager for the property, who has been a tenant at LeCroy for twenty-three years, testified that Knudsen leased to "50 percent or better" of the current tenants and that she has never mentioned race to him as a factor in leasing. Of the ten African-American tenants, four were tenants before May 2007 when Barry Barr first expressed an interest in the property, and, in May 2007, eight of the tenants at LeCroy were African-American. Knudsen had assisted in placing six of those tenants at LeCroy. Since Forney purchased the property in 2004, Knudsen has assisted in placing fourteen African-American tenants in LeCroy, five of which are no longer there and nine of which are still tenants at LeCroy.

Celebrations" is subject to the interpretation that Knudsen was concerned about the bad publicity Celebrations had received for criminal activity. In their brief, Plaintiffs do not argue that Knudsen's comment is subject to only one interpretation. Plaintiffs even describe how Barr discussed Celebrations' negative publicity in the very same conversation in which Knudsen made the alleged statement. (Pls.' Brf. at 4.) In his deposition, Barr described the conversation as follows:

> So about the third time she mentioned Celebrations and all the crap going on out there and everything, I asked her if she knew who I was…. We actually talked a little bit, and I tried to explain to her, I said, that was a parking lot issue up there and it had nothing to do with the club, and I hope you don't think that has anything to do with this. And at that point I told her who I was doing this for and told her who Terrance Long was and what he was looking at doing. And she said that she probably had formed her opinions through the media, and she was, you know, very nice about it. And I left.

(Barr Dep. at 153:15—154:12.)    So, not only did Barr testify that Knudsen mentioned everything that was going on at Celebrations, but his response addressed the publicity and crime issues, explaining that it was a parking lot issue and had nothing to do with the club.[5]

In *Boyd v. Walgreen Co.*, No. 2:05-cv-328-MEF, 2006 WL 2239192 (M.D. Ala., Aug. 4, 2006) (copy attached), Judge Fuller considered a case where a white pharmacist allegedly told an African-American customer that another pharmacy began closing early because of "you peoples." *Id.* at *2. According to the pharmacist, the plaintiff had been loud and boisterous when he came in the store. *Id.* In Judge Fuller's opinion, he stated that the "Eleventh Circuit has characterized a very similar comment as 'the kind of stray remark' that does not concretely

---

[5] The police reports for Celebrations are further evidence of the high number of crime reports the bar received. As set forth above, Barr operated a business at the Celebrations location for fourteen years until he closed Celebrations on April 1, 2007. Celebrations was open for the last seven of those fourteen years. The format of Celebrations was '70s/'80s music, then Top 40 music, and then hip hop music in 2005 or later. The police reports show 583 calls to the police from 2002 to until Celebrations closed in 2007. However, over half of the 583 calls occurred during 2002 to 2004. Thus, regardless of which music format Celebrations used, it was the subject to a high number of crime reports and had been so for several years before it finally closed.

establish a discriminatory motive.  Indeed, while [the pharmacist's] statement may **suggest** a discriminatory motive, the Court cannot say that the comment by itself is not amenable to multiple interpretations.    Thus, [the plaintiff] has not provided direct evidence of a discriminatory motive on [the pharmacist's] part and must proceed under the circumstantial evidence framework if he is to prevail on his claims..." *Id.* at 3 (emphasis added) (citing *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990)).

In this case, Barr interpreted Knudsen's statements as a reference to Celebrations' bad publicity for criminal activity and actually conversed with her about that very topic, so Plaintiffs cannot deny that her statement is subject to more than one interpretation.  Other evidence in this case supports this proposition:  Barr said he would not blame an owner for wanting to avoid the type of publicity Celebrations received; Plaintiff Long testified that Celebrations had black and white patrons; Cranage could not say that Knudsen ever used the word "black" or referred to race; and Knudsen did not know Long was African-American at the time she made the alleged statement.  Given these facts, it is clear that Knudsen could have been referring to the adverse publicity that Celebrations received and not to any perception about the race of its patrons.  Therefore, her statement is not direct evidence, and Plaintiffs must proceed under the circumstantial evidence framework in order to prevail on their claims.

## II.    Under the circumstantial evidence burden-shifting analysis, Plaintiffs' claims still fail.

### A.    Little's conduct is not attributable to Knudsen or Aronov.

Before addressing the Plaintiffs' specific arguments regarding circumstantial evidence, it is important to note that Plaintiffs devote a large portion of their brief to statements made by Little to Cranage.  They rely heavily on Little's conduct in trying to establish that Cranage is a similarly situated individual who was treated differently, specifically pointing to Little's

statements about being able to enter into a lease and the landlord's willingness to make leasehold improvements. They also rely heavily on Little's statements in arguing that Forney's articulated reasons for entering into a lease with Doodle Hoppers and for rejecting Barr's purchase offer are pretextual. However, there is no basis for attributing Little's statements to Knudsen or Aronov. In fact, Little testified that he told Cranage when they met that he was not representing Aronov in any way. Little's statements to Cranage were not authorized by Knudsen or any Aronov entity. Knudsen asked him to open the door for Cranage and for nothing more. Little has never worked with Aronov as a leasing or sales agent and has never been hired by Knudsen or asked by Knudsen to act as a leasing or sales agent of any type. In asking that Little open the door for Cranage, Knudsen never told Little anything about the type of business Cranage operated or his clientele, and she gave him no instructions or directions about what to say to Cranage when he viewed the property. Further, Little does not recall Knudsen ever mentioning the race of anyone who was interested in renting the property from Forney.

Plaintiffs do not expressly claim that Knudsen and Aronov are liable for Little's statements, but they rely on those statements to imply that Knudsen and Aronov acted in a discriminatory manner. Plaintiffs never address whether Knudsen's alleged conduct, taken alone, results in liability for Forney, Knudsen, or Aronov. Instead, Plaintiffs combine Little's and Knudsen's alleged conduct and argue that it results in liability for all Defendants. It is clear that Plaintiffs are attempting to establish some connection between Little and Knudsen because they say Little's comments "reiterated Knudsen's sentiment," that Little told Cranage Knudsen was trying to "dodge the Celebrations crowed," and that Knudsen had offered Barr a "high ass rent." (Pls.' Brf. At 18, 25.) However, Little never mentions Knudsen's name during his meeting with Cranage. The proposition that Little was acting for Knudsen or that they had a common

13

objective is an assumption made by the Plaintiffs, but that assumption is unsupported by any evidence in this case. The only connection between Knudsen and Little in this lawsuit is that Little had the key to the property and Knudsen asked him to open it for a potential tenant when she was unavailable, and there is no basis for attributing Little's conduct to Knudsen or Aronov.

**B.    Plaintiffs cannot identify a similarly situated person who was treated differently by Knudsen or Aronov.**

Courts have consistently required Section 1981 plaintiffs to identify similarly situated persons outside of the plaintiffs' protected class who were treated more favorably by the defendants. *Munnings v. Fedex Ground Package Sys., Inc.*, No. 6:07-cv-282-Orl-19KRS, 2008 WL 1849003, at *17 (M.D. Fla. Apr. 22, 2008) (copy attached) (citing *Benton v. Cousins Props., Inc.*, 230 F. Supp. 2d 1351, 1370 (N.D. Ga. 2002); *Kinnon*, 490 F.3d at 893; and *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1273 (11th Cir. 2004) and copy attached).    Whether this aspect of Plaintiffs' case is analyzed as part of their prima facie case or as part of their effort to show pretext, the undisputed facts show that no similarly situated person was treated differently by Knudsen or Aronov.

With respect to Barr's purchase offer, Forney still owns the property, so there is no similarly situated person who was allowed to purchase the property at Barr's price or at any other price. With respect to leasing the property, the undisputed facts show that Barr requested at least $100,000 in leasehold improvements to be made by the landlord. Forney decided to lease the property to an established existing tenant who wanted to expand and who had expressed an interest before Barr ever viewed the property. McGhar believes that Forney allowed six months of free rent in order to make improvements, which would total $24,618.00. Thus, leasing to Barr instead of Doodle Hoppers would have cost Forney approximately $75,000 in leasehold improvements alone. Forney did not lease the property to an unknown white tenant and allow

14

$100,000 in leasehold improvements; instead, she leased to an existing tenant with a good rental history who required much less in leasehold improvements. Therefore, Plaintiffs cannot identify a similarly situated white tenant who was treated differently than Plaintiffs.

Plaintiffs argue that allowing Cranage to see the property is evidence of a similarly situated individual who was treated differently. However, Barr had already seen the property once, thought the rent was too high,[6] and had asked for a substantial amount of leasehold improvements. When Barr asked to see the property a second time, Knudsen told him it was tied up in bankruptcy and that she could not get in (two facts that are undisputed in this lawsuit). The undisputed testimony of Knudsen, set forth below, shows that Cranage insisted on seeing the property, said he was about to enter into a lease for another property, said he had to see the space right away, and even went so far as to say the owner of Doodle Hoppers was a convicted felon in order to convince Knudsen to let him see the space:

> A:    I cannot remember. My memory was that I gave him the attorney's number because he wanted to see it on a Thursday night and I had another appointment. I could not be there. And he said -- I said I can't -- he said I just want to see the floor, I want to see the dance floor.
>
> Q:    Okay.
>
> A:    And I said, well, you can look at the dance floor, but I don't have the key.

---

[6] On the issue of rent, Plaintiffs claim the $4500 per month rental rate quoted to Barr was too high because it was almost double the previous tenant's rent. However, the previous tenant had been in the space for thirteen years and their rental rate was not set by Forney. It is perfectly logical that rent for a tenant moving in thirteen years later would be substantially higher than it was for the previous tenant. Also, the undisputed facts show that Cranage thought the space should rent for four or five thousand dollars per month; Barr had tried leasing another space before leasing the Pure Country space because they were offering it for $3,500 a month, which he thought was "pretty cheap"; Barr was paying almost $7,000 per month for the Celebrations space; and Doodle Hoppers currently leases the space for $4103 per month. Obviously, Plaintiffs' characterization of the quoted rental rate as high is not supported by the evidence in this case. Plaintiffs' attempt to support their assertion that the rent was too high by attaching a "Loopnet Internet listing" showing that the property was advertised for $8.00 per square foot instead of the $9.00 quoted to Plaintiffs. Even if this evidence is admissible, it is unclear from the exhibit which space is actually referenced in the advertisement, it is irrelevant to what Forney hoped to get for rent at the time Barr looked at the property, and the difference of $1.00 per square foot would not make up for the "double" rent that Plaintiff believed he was being quoted.

...

Q:   Explain to me your understanding of why he wanted to see the property
     and whether it included possibly leasing it.

A:   Okay. He identified himself on the telephone as a manager of Woodmere
     Tavern. He asked -- told me that Tony Fannin had come there, said that he
     was in bankruptcy and he was -- that it was available, that he knew that
     Doodle Hoppers was in the process of their due diligence in deciding
     whether they wanted to lease the space. He then told me that Phillip
     Stewart, one of the principals at Doodle Hoppers, was a convicted
     pedophile, and he then directed me to the website and showed me the web
     site where Mr. Stewart came up as having a felony, being incarcerated for
     a felony. He then said that he had always wanted to own his own place.
     He said that he was either part owner or owner of a country and western
     bar – establishment up in Prattville where there was line dancing. He said
     that some of the ladies that worked at Woodmere were interested in line
     dancing, and he said I understand it has one of the best dance floors in
     Montgomery and he said I would really like to see it. He said I don't want
     my boss to know that I'm looking, but I have looked at some other spaces
     for lease and I'm almost at the point of leasing another space and I would
     just like to look at this one. I understand that you're already in due
     diligence -- well, negotiations with Doodle Hoppers, but I thought you
     might want to know about the criminal history of who you are working
     with. And he said if it's possible, I would like to at least see the dance
     floor before I lease this other space in case this other one falls through and
     in case you decide not to lease to them since now you know that he is a
     felon.

Q:   Okay.

A:   And I said well, I -- he said I need to see it right away...

(Knudsen Dep. at 144:3—147:8.) When Barr contacted Knudsen about seeing the property a
second time, Knudsen knew that he had already seen the property, that he required a substantial
amount of leasehold improvements, that the property was tied up in bankruptcy, and that she did
not have a key. Cranage, on the other hand, said he had to see the property right away, told
Knudsen he wanted her to know the type of person she was dealing with at Doodle Hoppers, and
asked just to be able to look at the dance floor in case his other lease fell through and the Doodle
Hoppers lease fell through. He was very insistent and expressed a sense of urgency, so Knudsen

1/1740167.3                                    16

put him in touch with Little, the attorney who had the key to the building. When Barr called Knudsen again a day or two after Cranage viewed the property, as with Cranage, Knudsen offered to get in touch with Little to open the building, but Barr declined this time, saying he did not need to see it again. (Barr Dep. at 179:15—180:4.)

Plaintiffs say that Barr was "given a flat no from Knudsen when he asked to put a lease and back up lease on the property" and that he "was not even allowed to attempt to negotiate with Forney or Knudsen after he viewed the property." These assertions are contradicted by Barr's testimony. Barr testified that he decided to pursue another location when he learned the amount of rent and that the landlord would not make an allowance for his required leasehold improvements. Nothing prevented Barr from making a counter offer with different terms after his first meeting with Knudsen, but he decided to pursue another location instead. He later asked to be put on a back-up lease but offered no specific rent or leasehold improvement numbers. He even stated at one point that he could not recall Knudsen's response about whether he could be put on a backup lease. In short, he never accepted the quoted rental rate, never said that his leasehold improvements would no longer be required, and never made any type of counteroffer. Thus, to say that Barr was "given a flat no" and "not even allowed to negotiate" is an inaccurate description of what the evidence demonstrates.

As mentioned above, much of the Plaintiffs' argument on this issue is based on comments to Cranage by Little—not Knudsen—about the landlord's willingness to enter into a lease right away and to make certain leasehold improvements.[7] Plaintiffs claim that Defendants

---

[7] Although Plaintiffs take issue with Little's statement that the landlord would allow half of the first six months' rent for leasehold improvements, calculating that amount on the $4,500.00 rent quoted to Barr (which Barr claims was too high), the allowance for improvements would total only $13,500.00. In reality, Forney leased to Doodle Hoppers and allowed six months of free rent (approximately $25,000) for leasehold improvements. These amounts are nowhere near the $100,000 in leasehold improvements that Barr told Knudsen would be required. In order to give Barr credit for the $100,000 in leasehold improvements he requested, Forney would have to give him 22

have ignored the fact that the Doodle Hoppers lease would not have prevented Cranage from leasing the property, but this is also based on statements made by Little to Cranage. Knudsen never told Cranage that he could definitely get ahead of Doodle Hoppers; she simply told him that she did not know if they had the money to work out a deal. Knudsen never quoted a rental rate to Cranage, never told him he could enter into a lease right away, and never discussed leasehold improvements with him. These are statements Little made to Cranage, and there is no basis for attributing them to Knudsen or Aronov.

The evidence submitted by the Plaintiffs does not demonstrate that Knudsen or anyone else at Aronov treated Cranage more favorably than they treated Barr or Long. Knudsen showed the property to Barr once, and then, after much insistence by Cranage, put him in touch with the person who had the keys so he could see it. A day or two later, Knudsen offered to do the same thing for Barr so he could see it a second time, but Barr declined. This is the extent of Knudsen's interactions with Barr and Cranage, and it does not demonstrate favorable treatment toward Cranage.

C.    **Plaintiffs cannot establish that the Defendants' articulated reason is pretext.**

With respect to the leasing issue, Plaintiffs argue that they can prove pretext by relying on comments or racial slurs, but, as Plaintiffs' brief plainly admits, the cases they cite discuss comments and racial slurs made *by decision-makers*. (Pls.' Brf. at 26-27.) As shown above and in Defendants' original brief, Knudsen and Aronov simply assisted Forney with leasing the property, do not own the property, and were not decision-makers. There is no "challenged action" that can be attributed to Knudsen or Aronov, so there is no decision by Knudsen or Aronov that can be analyzed to determine whether it was discriminatory or if it was made for

---

months of free rent or a one-half discount for 44 months. Therefore, even if Little had been speaking with authority when he met with Cranage, his statement about leasehold improvements does not establish that Cranage was treated more favorably than Barr.

legitimate, non-discriminatory reasons. As to Forney's lease decision, Plaintiffs did not decide they definitely wanted the property and ask for a lease until Forney had already decided to lease to an existing tenant. The existing tenant, Doodle Hoppers, had so much business that customers were literally standing on the sidewalk waiting to get in, and the owners of Doodle Hoppers were familiar with LeCroy's rules and regulations, such as the requirement to have security in the parking lot and the rules against loitering, allowing people to sit in their cars, and drinking in the parking lot. As to Forney's purchase decision, it was rejected because it was too low. To the extent, then, that Plaintiffs want to use Knudsen's alleged statement as evidence of pretext as to those two decisions, they cannot do so because it was not a statement by the decision-maker.

Furthermore, as to whether Knudsen's stated reason for making the alleged comment (a concern about crime and negative publicity)[8] is pretext for unlawful discrimination, Barr has already admitted that Celebrations received a lot of bad publicity for criminal activity and that a concern over such publicity would be reasonable. A building owner who wants to keep his building fully occupied is justified in considering whether a new tenant will bring criminal activity and public news reports about that criminal activity. It is disingenuous to admit that Celebrations received adverse publicity, admit that a concern over similar publicity is reasonable, and then claim that Knudsen's concern is pretext for racial discrimination.

Plaintiffs next argue that the treatment of Cranage shows pretext with respect to leasing the property. (Pls.' Brf. at 27-29.)   However, as described in detail above, neither Knudsen nor Aronov treated Cranage more favorably than they treated the Plaintiffs.  Knudsen met Barr to see the property once; asked Little to open the space for Cranage so he could see the property once (after he insisted on doing so and accused the Doodle Hoppers' tenant of being a convicted

---

[8] Again, Knudsen's comment is not a challenged action or a decision.  However, because Plaintiffs argue that Knudsen intended to discriminate when making the alleged comment, Defendants address her articulated reason for doing so.

felon); and then offered to contact Little for Barr to see it again (an offer Barr declined two days after supposedly needing to get Long in the space to view it). Nothing about Knudsen's treatment of Cranage and Barr demonstrates pretext. She did nothing more to help Cranage with leasing the property than she did for Barr, so her "treatment" of Cranage is not evidence of pretext for unlawful discrimination by Knudsen or Aronov.

**III.    Neither Knudsen nor Aronov engaged in any conduct that abridged Plaintiffs' right to lease the property.**

Although Plaintiffs state that Defendants' initial brief reads as though Plaintiffs never expressed an interest in leasing the property, Defendants never made such an assertion. Defendants stated instead that their conduct had not abridged the Plaintiffs' right to lease the property because the Plaintiffs' only request to lease the property occurred after Forney decided to rent to Doodle Hoppers. Plaintiffs admit they made no written offer to lease the space. They admit Barr told Knudsen he wanted to pursue another location after his first meeting with her. Barr could have offered to lease the space for the quoted terms, but he never accepted the terms and never made a counteroffer with different terms. After Barr's purchase offer was rejected and Cranage had viewed the property, Barr asked to be put on a back-up lease. This was Barr's first request to enter into a lease, this request contained no specific financial terms, and Barr did not offer a lease document or any other written offer. At this time, he did not accept the previously quoted rent or say that he would forego his required leasehold improvements. It was simply a request to be put on a backup lease if the Doodle Hoppers lease fell through. As it turns out, the Doodle Hoppers lease did not fall through, and they are currently leasing the space for $4103 per month. By arguing that no conduct by Aronov or Knudsen abridged Plaintiffs' right to lease the property, Defendants were simply pointing out that Forney had already agreed to rent to Doodle

Hoppers by the time Plaintiffs decided they wanted the property, and, consequently, Plaintiffs cannot now claim that Knudsen and Aronov prevented them from entering into a lease.

## IV.    Plaintiffs cannot establish a claim for discriminatory refusal to sell against Knudsen and Aronov.

### A.    Knudsen and Aronov played no role in the decision to reject his offer.

The Plaintiffs' argument concerning Barr's rejected purchase offer ignores the fact that Aronov and Knudsen played no role in Forney's decision. Plaintiffs do not even address this issue. Knudsen provided the property's rent figures to Barr's agent when he asked for them, conveyed Barr's offer to Forney, and then conveyed Forney's rejected to Barr's agent. However, there is no evidence whatsoever that Knudsen or Aronov played a role in the Forney's decision. Defendants submitted evidence showing that Forney made the decision to reject Barr's offer because it was so far below the amount she needed in order to sell the property, and Plaintiffs have presented no evidence creating an fact question on this issue.

### B.    Plaintiffs cannot establish that Forney's articulated reason for rejecting Barr's offer is pretext.

Plaintiffs claim that Forney's articulated reason for rejecting Barr's offer is pretext because there is no explanation as to why Forney did not make a counter offer, but a seller is not required to make a counteroffer to a potential purchaser. Further, the Defendants' undisputed evidence demonstrates why Forney did not make a counter-offer. The property was not for sale when Barr made an offer. It had been listed for $1.9 million a couple of years before Barr's offer. Barr offered $1 million for the property, minus a ten percent sales commission to be paid by the seller, which would have resulted in $900,000 to Forney, $1 million less than her previous asking price. When asked whether it would be fair to say that Barr did not even offer an amount that the rent rolls would show as an appropriate value, Barr replied, "Well, I was looking for a

deal." (Barr Dep. at 285:11-15.) Barr thinks his offer would have been a "deal" for him, but that does not mean it would have been a good deal for Forney. Moreover, in his deposition, Barr admitted that he has no facts or evidence or reason to believe that Forney's decision not to make a counter-offer was racially motivated, and he said he does not begrudge Forney if she did not feel his offer was appropriate. (Barr Dep. at 182:14-17, 286:8-12.)

Despite Barr's admission that he has no evidence of racial motivation with respect to the purchase offer, Plaintiffs claim in their brief that they can show pretext through the statements of Knudsen and Little. This argument is without merit. First, the alleged statements related only to leasing the property and were completely unrelated to Barr's purchase offer. Second, Knudsen complied with every request that Barr's agent made in connection with the purchase offer, such as providing rent rolls and conveying the offer and Forney's response to the offer. Third, Little's statements cannot be attributed to Knudsen and Aronov and, even if they could, they were made **after** Barr offered to purchase the property. Fourth, the alleged comments do not change the fact that Barr's offer was about half of the property's previously listed sales price, and Plaintiffs have presented no evidence showing that the low-ball offer was rejected for any other reasons. Certainly, as owner of the property, Forney is entitled to determine for herself the value negotiating with a party whose initial offer is so far below what she needed in order to sell the property. As a practical matter, if Barr had purchased Forney's property, Forney would no longer be concerned with getting or keeping tenants. She lives in California and presumably would have no further dealings with the property or its new owners, so there is no reason for her to be concerned about the race of the purchaser. For these reasons, the statements made by Knudsen and Little do not prove that Forney's reason for rejecting Barr's purchase offer is pretext for unlawful discrimination.

### C.    Long never made an offer to purchase Forney's property.

In addition to the above arguments concerning Barr's purchase offer, Defendants also set forth in their initial brief undisputed facts showing that Long was in no way involved in the offer to purchase the property. His name was not on the written purchase offer; he never discussed purchasing the property with Barr; and he said the purchase offer was something Barr did all on his own. Plaintiffs argue that this claim is based on (1) Long's having given Barr authority to find a location for their bar and not caring whether Barr leased it or bought it and (2) Barr's testimony that he planned to buy the property and lease it back to Long. Plaintiffs fail to cite to any authority supporting the existence of Long's claim under these facts. By Plaintiffs' logic, any tenant who would have rented from Barr would have a discrimination claim for Forney's rejection of Barr's purchase offer. Although Plaintiffs cite no authority for this position, their brief does set forth the basic elements of a discriminatory refusal to sell claim, which include that the plaintiff apply for and be qualified to purchase the property and that the owner reject the plaintiff's offer. Despite recognizing the elements of this claim, Plaintiffs have presented no facts showing that Long tried to purchase the property, was qualified to purchase the property, or that Forney rejected an offer he made. Defendants, on the other hand, submitted specific testimony demonstrating that Long never tried to purchase the property and that Forney never rejected an offer by Long. Therefore, even if the above arguments did not warrant summary judgment on Long's purchase claim, his claim still fails because he cannot establish a prima facie case of discriminatory refusal to sell.

## V.    Aronov Management cannot be held liable for Knudsen's alleged conduct.

Plaintiffs' only allegation against Aronov Management is that it should be liable for Knudsen's alleged actions even though Knudsen worked for Aronov Brokerage. However,

Plaintiffs have failed to establish that Aronov Management is liable under either an agency or a joint employer theory of liability.

Plaintiffs cannot establish that Knudsen was Aronov Management's agent. The undisputed facts show that Knudsen was an employee of Aronov Brokerage at the time she met with Barr. Plaintiffs argue that Aronov Management's ownership of Aronov Brokerage creates an agency relationship, but this confuses the "joint employee test," which is a separate test for liability with basic agency principals. *See generally, McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir. 1987) (discussing single employer doctrine). In light of the insufficient evidence demonstrating any agency relationship between Knudsen and Aronov Management, Aronov Management cannot be held liable as Knudsen's principle.

Aronov Management also cannot be considered a joint employer with Aronov Brokerage. Plaintiffs do not dispute Defendants' evidence on this issue, and they outright ignore several key aspects of this evidence. Plaintiffs argue that the two companies are really a single employer because Harris manages both Aronov Management and Aronov Brokerage, and Harris did testify that he has a management role in the commercial and industrial aspects of each company. (Harris Dep. 6:23-7:4, 22:9-18.) However, this is not enough. Plaintiffs note that the same company is responsible for each company's payroll, but this company is not in-house; instead, it is an independent, third-party payroll processor, and Aronov Brokerage is separately responsible for funding its payroll expenses. (Terry Decl. ¶ 7.) Additionally, Plaintiffs are correct that a joint human resources department can be relevant when determining whether parties are a single employer, but Plaintiffs ignore the fact that Aronov Brokerage actually *purchases* this service. Finally, the two companies share a 401K plan, but this joint plan is required by federal law in many parent-subsidiary situations. *See 6 Mertens Law of Federal Income Taxation* §25B:164.

In short, Plaintiffs simply list the few combined aspects of Aronov Management and Aronov Brokerage, but they fail to establish how these aspects compel the conclusion that Aronov Management, a separate company from Aronov Brokerage, can be held liable under the facts of this case. The two companies share some business operations, but these operations do not constitute "combined control over the action that is alleged to have caused the discrimination." *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998). Plaintiffs do not even argue as much. Knudsen was never simultaneously employed by Aronov Brokerage and Aronov Management. *See McKenzie*, 834 F.2d at 933-34; Knudsen Dep. 29:23—30:10. Aronov Management did not control Knudsen's status, schedule, or benefits as an Aronov Brokerage employee or real estate agent. *See Hagre v. Alberto-Culver USA, Inc.*, 485 F. Supp. 2d 1367, 1374-75 (S.D. Ga. 2007); Knudsen Decl. ¶ 3-6; Knudsen Dep. 26:4-7, 28:12-23 & Ex. 1, 30:20-21, 32:1-19, 37:2-10; Harris Dep. 45:5-8, 9:22-10:4. Additionally, to the extent that Aronov Brokerage uses any services provided by Aronov Management, it pays for those services. See Terry Decl. ¶ 3-9. Simply put, the undisputed evidence shows that Aronov Management and Aronov Brokerage are not interrelated or joint employers.

Because Knudsen was not an agent of Aronov Management and because Aronov Brokerage and Aronov Management were not joint employers of Knudsen, Aronov Management is entitled to summary judgment.

## CONCLUSION

For the above reasons, these Defendants are entitled to summary judgment.

Respectfully submitted this the 25th day of August, 2008.

s/ Charles A. Stewart III
_____

Charles A. Stewart, III (STE067)
Quindal C. Evans (EVA040)
Bradley Arant Rose & White LLP
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: cstewart@bradleyarant.com
Email: qevans@bradleyarant.com
**Attorneys for Defendants Aronov Realty**
**Management, Inc., Aronov Realty Brokerage,**
**Inc., and Amy Knudsen**

## CERTIFICATE OF SERVICE

I certify that on August 25, 2008, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to the following:

| | |
|---|---|
| Kevin W. Jent | N. Gunter Guy |
| Wiggins, Childs, Quinn & Pantazis, LLC | Ball, Ball, Matthews & Novak, P.A. |
| The Kress Building | P.O. Box 2148 |
| 301 19th Street North | Montgomery, AL 36102-2148 |
| Birmingham, AL 35203 | |

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: Not applicable.

/s/ Charles A. Stewart III
_____

Charles A. Stewart III
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: cstewart@bradleyarant.com

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2239192 (M.D.Ala.)

Page 1

**H**
Boyd v. Walgreen Co.
M.D.Ala.,2006.
Only the Westlaw citation is currently avail-
able.[DO NOT PUBLISH]
United States District Court,M.D.
Alabama,Northern Division.
John BOYD, Plaintiff,
v.
WALGREEN COMPANY, et al., Defendants.
No. 2:05-cv-328-MEF.

Aug. 4, 2006.

Carol Robin Gerard, Jay Lewis, The Law Office of
Jay Lewis, LLC, Montgomery, AL, for Plaintiff.
John Wesley Clark, Jr., Clark Dolan Morse Oncale
& Hair PC, Birmingham, AL, for Defendant.

### CORRECTED MEMORANDUM OPINION AND ORDER

MARK E. FULLER, Chief District Judge.
*1 Because of a typographical error relating to foot-
note numbers in the Memorandum Opinion and Or-
der (Doc. # 37) entered on July 14, 2006, the court
will on this date enter a corrected version of the
Memorandum Opinion and Order. This Corrected
Memorandum Opinion and Order makes no sub-
stantive changes and is not intended to alter the of-
ficial date of the Court's action. It is merely being
entered to correct the typographical error and make
the footnote numbers visible in the text.

Plaintiff John Boyd ("Boyd") brings this civil rights
action against Defendants Walgreen Company
("Walgreen") and one of its pharmacists, David
Dudley ("Dudley"), alleging that the Defendants'
racial discrimination impaired his ability to enter
into a contract to obtain his prescription medica-
tion. The events underlying this litigation occurred
when Boyd and Dudley had a verbal confrontation
while Boyd was attempting to have his prescription
filled at a Walgreen pharmacy. Boyd has asserted

that Dudley's refusal to serve him was motivated by
racial animus, while Dudley contends that Boyd
was barred from the store because of his disruptive
conduct, not his race. This cause is before the Court
on the Defendants' Motion for Summary Judgment
(Doc. # 13) filed on December 12, 2005. The Court
has reviewed the submissions of the parties and
finds that, for the reasons set forth below, the mo-
tion is due to be GRANTED IN PART and
DENIED IN PART.

### JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over
this action pursuant to 28 U.S.C. §§ 1331 and 1343.
The parties do not contest personal jurisdiction or
venue, and the Court finds adequate allegations in
support of both.

### STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Pro-
cedure, summary judgment is appropriate "if the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits,
if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
a judgment as a matter of law."*Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986). The party asking
for summary judgment "always bears the initial re-
sponsibility of informing the district court of the
basis for its motion, and identifying those portions
of 'the pleadings, depositions, answers to interrog-
atories, and admissions on file, together with the af-
fidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact."*Id.* at
323.The movant can meet this burden by presenting
evidence showing there is no dispute of material
fact, or by showing the nonmoving party has failed
to present evidence in support of some element of
its case on which it bears the ultimate burden of
proof. *Id.* at 322-23.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2239192 (M.D.Ala.)

Once the moving party has met its burden, Rule 56(e)"requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor.*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See*Fed.R.Civ.P. 56(c). The evidence "adduced at the summary judgment phase must be based on personal knowledge, must set forth specific facts as would be admissible in evidence, and must demonstrate the competence of the party to offer the evidence." *Davis v. Qualico Misc., Inc.,* 161 F.Supp.2d 1314, 1321 (M.D.Ala.2001).

## FACTS AND PROCEDURAL HISTORY

**\*2** The Court has carefully considered all documents and deposition excerpts submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the following facts.

On April 2, 2005, Boyd, a black male, entered the Walgreen store located on Atlanta Highway in Montgomery, Alabama just before midnight. Earlier that night, Boyd had visited the Walgreen on South Boulevard, which was closer to his home, but was unable to obtain his medication there because that store's pharmacy had closed at 6 p.m. Upon his entrance at the Atlanta Highway establishment,

Boyd proceeded to the pharmacy and asked Dudley, a white male and the Walgreen pharmacist on duty, to fill his prescription. Boyd also inquired of Dudley as to the reasons behind the early closure of the pharmacy at the South Boulevard Walgreen store. According to Boyd, Dudley snapped back in a hostile tone that "you peoples" were the cause. The fact that most of the South Boulevard Walgreen's customers are black in combination with Dudley's language and intonation led Boyd and at least one other bystander to interpret the statement as referencing race. Boyd took great exception to Dudley's comment and animatedly responded that his money was green and should be accepted irrespective of his race. Dudley was not pleased with Boyd's reaction and informed Boyd that he considered Boyd's behavior to be harassment and would be calling the police.

At this point, Boyd went to speak with the Walgreen assistant manager, Sandy Strassburger ("Strassburger"). Boyd recounted the details of his interaction with Dudley to Strassburger, whose response was "he said that?" Strassburger informed Boyd that he had no authority over the pharmacy or the pharmacist on duty and that Boyd would have to take up his complaints with the district manager. Boyd then went to the front of the store to await the arrival of the police.

Montgomery policeman Antonio Loria ("Loria") arrived shortly thereafter, and Boyd explained his description of the verbal altercation to him. Loria observed that Boyd appeared agitated, and he detected the aroma of alcohol on Boyd but did not consider his demeanor to be disorderly. After discussing the night's events with Boyd outside of the store, Loria entered Walgreen to hear Dudley's side of the story. Inside, Dudley told Loria that Boyd had been loud and boisterous in the store and that he wanted to bar Boyd from both the Atlanta Highway and South Boulevard Walgreen pharmacies. In order to effectuate this desire, Dudley went outside the store and declared to Boyd in front of Loria that Boyd would no longer be welcome inside either establishment.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2239192 (M.D.Ala.)

On April 13, 2005, Boyd filed a complaint in this Court seeking relief under 42 U.S.C. §§ 1981, 1982, and 2000a against Walgreen and Dudley. In response, the Defendants have contested Boyd's factual account of the April 2 incident. Specifically, Dudley contends that he stated that "people like you" were responsible for the South Boulevard store's early closure rather than "you peoples." Dudley also asserts that he articulated to Boyd that his comments were not meant to refer to race but instead to the negative attitudes of customers at the South Boulevard Walgreen.

## DISCUSSION

**\*3** Through 42 U.S.C. §§ 1981 and 1982, "Congress intended to prohibit 'all racial discrimination, private and public, in the sale of property' " and in the making and enforcement of contracts. *Runyon v. McCrary,* 427 U.S. 160, 170 (1976) (quoting *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437 (1968)). It is the aim of these "statutes ... to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace." *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 949 (11th Cir.1991). To prevail under either of these provisions, a plaintiff must demonstrate that the defendant engaged in intentional discrimination. *Id.; see also Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1235 (11th Cir.2000) (recognizing intentional discrimination as the "critical element" in an action brought under § 1981). In contrast to claims brought under Title VII, §§ 1981 and 1982 allow for suits against an employer's agents. *Moss v. W & A Cleaners,* 111 F.Supp.2d 1181, 1187 (M.D.Ala.2000).

The parameters of a claim under §§ 1981 and 1982 depend largely upon the type of evidence the plaintiff offers to establish his or her allegations. To create a genuine issue of material fact, a plaintiff can produce either direct evidence of a discriminatory motive or circumstantial evidence sufficient to demonstrate an inference of discrimination. *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir.1998)."Where the [plaintiff] presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even when the [defendant] presents conflicting evidence." *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996). Direct evidence is "evidence, which if believed proves [the] existence of [a] fact in issue without inference or presumption." *Merritt v. Dillard Paper Co.,* 120 F .3d 1181, 1189 (11th Cir.1997) (quoting *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987))."Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence."*Id.* (citations omitted).

Dudley's alleged statement to Boyd that "you peoples" caused the early closing of the South Boulevard Walgreen pharmacy is the primary evidence that Boyd has offered to demonstrate discriminatory intent. The Eleventh Circuit has characterized a very similar comment as "the kind of stray remark" that does not concretely establish a discriminatory motive. *E.E. O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990). Indeed, while Dudley's statement may suggest a discriminatory motive, the Court cannot say that the comment by itself is not amenable to multiple interpretations. Thus, Boyd has not provided direct evidence of a discriminatory motive on Dudley's part and must proceed under the circumstantial evidence framework if he is to prevail on his claims under §§ 1981 and 1982. *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

**\*4** "To establish a claim under [§§ ] 1981 [and 1982] where, as here, there is no direct evidence of racial discrimination, [p]laintiffs must first establish an inference of discrimination under the burden shifting provisions established in *McDonnell Douglas."Wells v. Burger King Corp.,* 40 F.Supp.2d 1366, 1368 (N.D.Fla.1998). Under this paradigm, a plaintiff must demonstrate that (1) he or she is a member of a racial minority, (2) the de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2239192 (M.D.Ala.)

fendant intended to discriminate against the plaintiff on the basis of race, and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Lawrence v. Courtyards at Deerwood Ass'n, Inc.,* 318 F.Supp.2d 1133, 1150 (S.D.Fla.2004); *Puglisi v. Underhill Park Taxpayer Ass'n,* 947 F.Supp. 673, 700 (S.D.N.Y.1996). A plaintiff may establish discriminatory intent at this stage by demonstrating that the defendant treated similarly situated individuals outside of the plaintiff's racial group differently. *Lawrence,* 318 F.Supp.2d at 1150; *Wells,* 40 F.Supp.2d at 1368. If the plaintiff successfully makes this showing, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged action. *Brown,* 939 F.2d at 949. The defendant's production of a legitimate reason for the conduct at issue returns the burden to the plaintiff to show that the proffered explanation is merely a pretext for discrimination. *Id.*

The Court finds that Boyd has satisfied his burden to make a prima facie demonstration of discrimination under both provisions. He is a member of a racial minority group, he attempted to contract for the purchase of prescription drugs from Walgreen through Dudley, and he was denied this opportunity while similarly situated individuals not part of his minority group presumably retained it. As a result, the Court must examine the proffered justification of Walgreen.

According to Dudley, he took the questioned actions against Boyd because Boyd was disruptive and bothersome in his inquiries concerning the South Boulevard Walgreen. Dudley asserts that Boyd persisted in an extended course of agitating conduct while the pharmacy was very busy and that Boyd leaned over the pharmacy counter and looked through the window against Dudley's prior requests. The Defendants also argue that Dudley attempted to allay any notion Boyd might have had that racial animus motivated Dudley's actions by articulating to Boyd that his statement was not meant to imply any racial hostility but referred to the negative cus-

tomer attitude he felt that Boyd had displayed and that was prevalent at the South Boulevard location.

The difficulty with this explanation is that Boyd disputes Dudley's description of the events. Boyd contends that Dudley's harsh reaction occurred after Boyd requested his medication from Dudley and briefly questioned the early closing of the South Boulevard store. Boyd also denies that he was bothering Dudley while placing his order and denies that Dudley offered any explanation of his comments. At the summary judgment stage, the Court cannot resolve this factual contrast and must accept Boyd's account of these events. And, when the Court considers the fact that most of the patrons of the South Boulevard Walgreen are black and that Dudley referenced "you peoples" in a hostile manner as the reason for that pharmacy's early closure, it appears a question of fact exists on the issue of Dudley's motive. Thus, Boyd's claims against the Defendants must be allowed to go forward because of the conflict between the parties' recitations of the facts and the inferences drawn therefrom.[FN1]

> FN1. While the Court has sustained Boyd's claims under §§ 1981 and 1982, the parties appear to agree that his claim under 42 U.S.C. § 2000a is due to be dismissed because Walgreen is not a place of public accommodation within the meaning of that statute. As a result, the Defendants' motion is granted as to this particular count.

### CONCLUSION

**\*5** For the reasons stated above, it is hereby ORDERED that the Defendants' Motion for Summary Judgment (Doc. # 13) is GRANTED IN PART and DENIED IN PART. In addition, the Defendants' Motion to Strike (Doc. # 26) is DENIED, and the Plaintiff's Motion for Extension (Doc. # 36) is DENIED AS MOOT.

M.D.Ala.,2006.
Boyd v. Walgreen Co.
Not Reported in F.Supp.2d, 2006 WL 2239192

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2239192 (M.D.Ala.)

(M.D.Ala.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## Westlaw.

Slip Copy                                                              Page 1
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

**H**
Munnings v. Fedex Ground Package Systems, Inc.
M.D.Fla.,2008.
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.
Javano MUNNINGS, Plaintiff,
v.
FEDEX GROUND PACKAGE SYSTEMS, INC.,
Defendant.
**No. 6:07-cv-282-Orl-19KRS.**

April 22, 2008.

Mark E. Tietig, Tietig & Tietig, PA, Merritt Island,
FL, for Plaintiff.
Anne Marie Estevez, Beth S. Joseph, Sharon Ann
Lisitzky, Morgan, Lewis & Bockius, LLP, Miami,
FL, for Defendant.

### ORDER

PATRICIA C. FAWSETT, Chief Judge.
**\*1** This case comes before the Court on the follow-
ing:

1. Motion for Case-Dispositive Summary Judg-
ment, Statement of Undisputed Material Facts,
and Supporting Memorandum of Law by Defend-
ant FedEx Ground Package System, Inc. (Doc.
No. 46, filed Dec. 21, 2007);

2. Appendix to Motion for Case-Dispositive
Summary Judgment, Statement of Undisputed
Material Facts, and Supporting Memorandum of
Law by Defendant (Doc. No. 47, filed Dec. 21,
2007);

3. Motion to Strike and for Sanctions and Incor-
porated Memorandum of Law by Plaintiff Javano
Munnings (Doc. No. 50, filed Jan. 15, 2008);

4. Notice of Withdrawal of Two Claims by
Plaintiff (Doc. No. 52, filed Jan. 21, 2008);

5. Notice of Filing Evidence in Support of
Plaintiff's Response to Defendant's Motion for
Summary Judgment by Plaintiff (Doc. No. 54,
filed Jan. 21, 2008);

6. Verified Response in Opposition to Plaintiff's
Motion to Strike and for Sanctions by Defendant
(Doc. No. 59, filed Jan. 29, 2008);

7. Motion to Strike Affidavits and Other Evid-
ence Filed in Opposition to Defendant's Motion
for Case-Dispositive Summary Judgment and
Supporting Memorandum of Law by Defendant
(Doc. No. 60, filed Feb. 7, 2008);

8. Amended Response to Motion for Summary
Judgment by Plaintiff (Doc. No. 68, filed Mar.
27, 2008); and

9. Amended Response to Defendant's Motion to
Strike by Plaintiff (Doc. No. 69, filed Mar. 27,
2008).

### Background

Plaintiff Javano Munnings, a black male, was an in-
dependent contractor for Defendant FedEx Ground
Package System, Inc. from July 2005 to February
2007. (Doc. No. 46 at p. 6,*id.* at p. 7, 18, ¶¶ 3, 32;
Doc. No. 68 at pp. 1, 11, ¶¶ 1, 17.)[FN1]He has
brought this action against Defendant for unlawful
discrimination and retaliation in violation of 42
U.S.C. § 1981 (2006) and breach of the implied
covenant of good faith and fair dealing. (Doc. No. 2.)

> FN1. Where, as in Defendant's Motion for
> Summary Judgment, the numbers printed
> at the bottom of the page differ from the
> CM-ECF numbers stamped in the docu-
> ment header, the Court will cite the CM-
> ECF page numbers.

**I. Material Facts About Which There Is No Dis-**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

pute

On July 22, 2005, Plaintiff purchased two FedEx Ground delivery routes and two delivery trucks from Troy Hinds. (Doc. No. 46 at p. 7, ¶ 1; Doc. No. 68 at p. 1, ¶ 1.) One delivery route was a "primary service area" that serviced the Kennedy Space Center, and the other was a "supplemental route" that serviced Cocoa Beach and Cape Canaveral. (Doc. No. 46 at p. 7, ¶ 1; Doc. No. 68 at p. 1, ¶ 1.) Plaintiff and Defendant entered into a Pick-Up and Delivery Contractor Operator Agreement ("the Contract") on July 27, 2005, in which Plaintiff agreed to provide delivery services for Defendant as an independent contractor. (Doc. No. 78-2 at pp. 2-34; Doc. No. 79-2.)

At all times while Plaintiff was contracted with Defendant, Russell Dezelan, a white male, was the Senior Terminal Manager at the loading facility from which Plaintiff serviced his route. (Doc. No. 46 at p. 8, ¶ 4; Doc. No. 68 at p. 2, ¶ 3.) Mr. Dezelan was widely regarded as an ineffective terminal manager with poor communication skills. (Doc. No. 46 at pp. 8-9, ¶¶ 5-6; Doc. No. 68 at p. 2, ¶ 3.) His employment with Defendant was terminated in May 2007. (Doc. No. 46 at p. 9, ¶ 6; Doc. No. 68 at p. 12, ¶ 18 .)

*2 Second in command at Mr. Dezelan's terminal was the Pick-Up and Delivery ("P & D") Manager, who from June 2006 was Luke Anderson, an Asian male. (Doc. No. 47-4 at p. 1, ¶ 1.)[FN2] Also working at the terminal was Troy Hinds, a white male, who worked for Defendant as a Quality Assurance Clerk from January 2006 to May 2006 and from October 2006 to the present. (Doc. No. 47-3 at p. 5, ¶¶ 9-10.)Outside of the terminal, Doug Ferguson held the position of Assistant Managing Director for FedEx Ground for the State of Florida until January 2007. (Doc. No. 47-5 at pp. 2-3, ¶¶ 1-2.)Mr. Dezelan reported to Mr. Ferguson. (Id.) Also, Vernon Jones was the Senior Manager in the Office of Contractor Relations for the State of Florida. (Doc. No. 47-9 at p. 2, ¶ 1.)

> FN2. The CM-ECF stamp, which normally appears in the header of documents, appears in the middle of Defendant's evidentiary documents. Defendant's counsel are directed to correct this technical error in future filings with this Court.

At the terminal, Defendant would provide "package handlers" or "loaders" in the early morning to load packages onto the contractors' trucks for delivery. (Doc. No. 46 at p. 10, ¶ 10; Doc. No. 68 at pp. 3-4, ¶¶ 6-7.)There were serious problems with the preload sorting and loading process while Plaintiff was contracted with Defendant, affecting virtually every contractor at the terminal. (Doc. No. 46 at p. 10, ¶¶ 10-11; Doc. No. 68 at p. 4, ¶ 7.) When a package was left behind at the terminal that should have gone out on one of Plaintiff's trucks for delivery, Plaintiff's drivers would often be called back to the terminal to pick up the package. (Doc. No. 46 at pp. 11-12, ¶¶ 14-16; Doc. No. 68 at pp. 6-8, ¶¶ 11-13.)

During his time working with FedEx, Plaintiff tried to get his supplemental route converted into a primary service area. (Doc. No. 46 at p. 12, ¶ 17; Doc. No. 68 at pp. 8-10, ¶ 14.)[FN3]His supplemental route was finally contracted as a primary service area in September of 2006. (Doc. No. 46 at p. 12, ¶ 17; Doc. No. 68 at p. 10, ¶ 14.)Several months later, in February 2007, Plaintiff sold both routes to Stan Brotherton, ending his contractual relationship with Defendant. (Doc. No. 46 at p. 18, ¶ 32; Doc. No. 68 at p. 11, ¶ 17.)

> FN3. A supplemental route is created "to assist the main route with covering the work area."(Doc. No. 54-12 at p. 101.)Such a route could be converted into a fully contracted "primary service area" which was more profitable and valuable to the contractor. (See id . at pp. 191-96; Doc. No. 54-13 at p. 245.)

**II. Procedural History**

In his Verified Complaint, Plaintiff alleges that two

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 1849003 (M.D.Fla.)

of Defendant's employees, Troy Hinds and Russell Dezelan, racially discriminated against Plaintiff by "deliberately sabotag[ing] the scheduling, routing, loading, and other aspects of delivery of packages to Mr. Munnings and his drivers to make the deliveries by Mr. Munnings and his drivers more difficult and stressful, and to induce Mr. Munnings to breach his contract by misdelivering packages ."(Doc. No. 2 at p. 2, ¶ 13.)Further, Plaintiff claims that these actions escalated when Plaintiff complained of the unlawful racial discrimination to Vernon Jones in Defendant's Office of Contractor Relations in 2006. (*Id.* at p. 4, ¶ 31.)

Plaintiff brings this action against Defendant alleging: (1) discriminatory impairment of Plaintiff's rights to make and enforce contracts in violation of 42 U.S.C. § 1981; (2) retaliation for complaining about discrimination in violation of 42 U.S.C. § 1981; (3) tortious interference with a prospective contractual relationship; (4) breach of the implied covenant of good faith and fair dealing; and (5) defamation *per se.*(Doc. No. 2.) Defendant denies all five counts. (Doc. No. 13.)

*3 Defendant has filed a Motion for Summary Judgment on all of Plaintiff's claims. (Doc. No. 46.) Plaintiff has filed a Response in opposition to Defendant's Motion with respect to Counts I, II, and IV and a Notice of Withdrawal of Counts III and V. (Doc. Nos.52, 68.)Additionally, both parties have filed Motions to Strike portions of the evidence submitted with the Summary Judgment Motion and Response. (Doc. Nos.50, 60.)

### Analysis

### I. Motions to Strike and for Sanctions

Both Plaintiff and Defendant filed Motions to Strike various entries in the record. (Doc. Nos.50, 60.)A motion to strike should be granted only if "the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party."*Reyher v.*

*Trans World Airlines, Inc. .,* 881 F.Supp. 574, 576 (M.D.Fla.1995) (citing cases). Because this standard is rarely met, "[m]otions to strike are generally disfavored by the Court and are often considered time wasters."*Somerset Pharm., Inc. v. Kimball,* 168 F.R.D. 69, 71 (M.D.Fla.1996).

### A. Plaintiff's Motion

Plaintiff moves the Court to strike: (1) the Declaration of Carl Howard for improper backdating and lack of relevance; (2) the Declaration of Mike Golda for lack of relevance; (3) paragraph 8 of the Declaration of Doug Ferguson as contradicting his deposition testimony; and (4) paragraphs 12 and 13 of the Declaration of Vernon Jones as contradicting his deposition testimony. (Doc. No. 50.) Defendant opposes Plaintiff's Motion, explaining that Plaintiff's counsel failed to fully comply with Local Rule 3.01(g) and also failed to provide a substantive basis for his Motion to Strike. (Doc. No. 59.)

Plaintiff argues that the Court should strike the Declarations of Carl Howard and Mike Golda as irrelevant. (Doc. No. 50 pp. 1-2, ¶ 3.) Specifically, Plaintiff states:

Paragraph 1 of Mr. Howard's Declaration and Paragraph 1 of the Declaration of Mike Golda should be stricken because the Declarations parrot each other in stating that those men work at FXG's terminal in Cocoa Beach, Florida. If true, any FXG terminal in Cocoa Beach is irrelevant to this case because all of the incidents in this case that occurred at FXG terminals were at the FXG terminals in Rockledge and Cocoa, and their employment at a Cocoa Beach terminal would negate all other averments in their Declarations.... The very fundamental averment of the FXG terminal being located in Cocoa Beach, even if in error, strongly indicates the underlying unreliability of these Declarations, with the logical inference being that these Declarations were presented by out-of-area FXG attorneys for signatures by the FXG employees without an opportunity for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

review and correction by the Declarants.

(*Id.*) Defendant responds by conceding the mistake but explaining that such error was inadvertent. (Doc. No. 59 at pp. 9-10.)Defendant states, "FXG does not dispute that its terminal is not located in Cocoa Beach, FL, but rather in Cocoa, FL, and that there is only one terminal located in Brevard County, FL. This inconsequential error, however, does not justify invalidating Howard's and Golda's entire declarations."(*Id.* at p. 9.) The Court agrees and denies Plaintiff's Motion to strike the Declarations on this ground.

**\*4** Plaintiff also asks the Court to strike Mr. Howard's Declaration and impose sanctions on Defendant and/or its attorneys for backdating the Declaration. (Doc. No. 50 at pp. 1, 5.) Plaintiff explains, "The backdating is apparent because until FXG filed Mr. Howard's Declaration with the Court, copies of the Declaration had not been dated."(*Id.* at p. 1, ¶ 2.) Plaintiff specifically seeks sanctions "under the Court's inherent power ...." (*Id.*)

Federal courts have the inherent power to impose sanctions on parties, their lawyers, or both. *Bank of New York v. Sunshine Jr. Stores, Inc. (In re Sunshine Jr. Stores, Inc.),* 456 F.3d 1291, 1304 (11th Cir.2006). Before a court may impose sanctions under its inherent powers, however, the court must make a finding of bad faith. *Amlong & Amlong, P.A. v. Denny's, Inc.,* 500 F.3d 1230, 1251 (11th Cir.2007); *Thomas v. Tenneco Packaging Co.,* 293 F.3d 1306, 1320 (11th Cir.2002). Even when there is a finding of bad faith, "inherent powers must be exercised with restraint and discretion."*Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The appellate court reviews a district court's exercise of its inherent powers for abuse of discretion. *In re Sunshine Jr. Stores, Inc.,* 456 F.3d at 1304.

Defendant has offered the following explanation for its filing of Mr. Howard's undated Declaration in its Verified Response:

In late November, defense counsel contacted Golda and Howard, and interviewed them for the second time in this case. Defense counsel then typed up declarations summarizing the information that Golda and Howard provided, and forwarded the declarations to Golda and Howard with a request that they read them very carefully, ensure complete accuracy, and contact counsel if they had any changes or concerns, or if they felt that anything in the declarations was incorrect in any way. After having sufficient time to review their declarations and ensure that the information was accurate, Golda forwarded his signed and dated declaration to FXG's counsel on November 29, 2007, and Howard forwarded his signed (but undated) declaration on November 30, 2007.

After defense counsel noticed that Howard's declaration was not dated, FXG's counsel immediately sent the declaration back to Howard for him to review it again, re-confirm its accuracy, and date it. FXG, however, was unable to obtain a copy of Howard's dated declaration by the end of business on November 30th. Because November 30th was the discovery deadline in this case, FXG forwarded Mike Golda's signed and dated declaration and Howard's signed (but undated) declaration to Munnings as part of a supplemental disclosure. The following Monday, December 3, 2007, FXG's counsel received Howard's dated and signed declaration, which it submitted to the Court in support of its Summary Judgment Motion. Dkt. No. 47 at Tab I. FXG's counsel has reviewed the contents of the undated and dated versions of Howard's declaration and certifies that they are identical, with the sole exception being that the date was filled in by Howard at some point between November 30 and December 3, 2007.

**\*5** (Doc. No. 59 at pp. 2-3.)Defendant concludes, "Thus, Munnings has not shown any conduct by FXG or its counsel that would warrant any sanctions, let alone the ultimate sanction of striking pleadings and assessing costs and attorney's fees

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

against FXG and/or its counsel."(*Id.* at p. 11.)Plaintiff has offered nothing to rebut these assertions and has not presented any evidence of bad faith on the part of Defendant or its attorneys. Therefore, the Court will deny Plaintiff's Motion to Strike this testimony and for Sanctions.

Lastly, Plaintiff invokes the "sham affidavit rule" in his Motion to Strike the Declarations of Doug Ferguson and Vernon Jones. (Doc. No. 50 at pp. 4-5.)The Eleventh Circuit has explained this rule as follows: "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."*Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir.1984). As this quotation demonstrates, the rule was intended to prevent the party *opposing summary judgment* from fabricating genuine issues of material fact to avoid summary judgment. *See id* .Secondly, a court applying this rule merely disregards the sham affidavit when considering the motion for summary judgment because the contradiction goes to the weight of the evidence rather than its admissibility. *See, e.g., Porterfield v. Flowers Baking Co. of Opelika, L.L.C.,* No. 2:05-cv-937-MEF, 2007 WL 4373006, at *7 (M.D.Ala. Dec.12, 2007). Therefore, the Court will disregard, rather than strike, any statements in the Declarations of Doug Ferguson and Vernon Jones that are inherently inconsistent with the deposition testimony of these witnesses.[FN4]

> FN4. In its Response, Defendant claims that Plaintiff's Motion was frivolous and seeks an award of reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1927. (Doc. No. 59 at pp. 11-12.)The Court does not find Plaintiff's Motion to be frivolous and accordingly denies Defendant's request.

**B. Defendant's Motion**

Defendant moves the Court to strike: (1) Plaintiff's Affidavit as contradicting his deposition testimony and including inadmissible evidence; (2) Gary Wolford's Affidavit since Mr. Wolford was not disclosed prior to the discovery deadline; (3) documents referenced in and attached to the Affidavits of Plaintiff and Mrs. Munnings since these materials were not disclosed prior to the discovery deadline; (4) the Affidavit of Selena McNeely as contradicting her deposition testimony; (5) the Affidavit of Alex Rosario as contradicting his deposition testimony; (6) the Affidavit of Ramon Suarez as contradicting his deposition testimony; and (7) the Affidavit of Chris Wilson as contradicting his deposition testimony. (Doc. No. 60.) Plaintiff has filed a Response opposing Defendant's Motion. (Doc. No. 69.)

Defendant's arguments that the contradictory statements in the Affidavits of Plaintiff, Ms. McNeely, Mr. Rosario, Mr. Suarez, and Mr. Wilson should be striken invoke the "sham affidavit rule" discussed previously. (*See* Doc. No. 60 at pp. 6-9.)The Court will disregard, rather than strike, the statements of these witnesses in their Affidavits that are inherently inconsistent with their deposition testimony. Furthermore, the Court will apply the Federal Rules of Evidence to these Affidavits and will exclude from its consideration those statements that violate such Rules.

*6 Defendant also moves to strike the Affidavit of Mr. Wolford and the attachments to the Affidavits of Plaintiff and Mrs. Munnings on the ground that such evidence was not disclosed during discovery. (Doc. No. 60 at pp. 3-6.)Federal Rule of Civil Procedure 26 imposes on a party the duty to disclose, among other things, the names of all individuals "likely to have discoverable information" as well as all documents "that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses" to the opposing party. Fed.R.Civ.P. 26(a)(1)(A). A party also has a duty to supplement or correct its disclosures "in a timely manner if the party learns that in some material re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                           Page 6
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

spect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made know to the other parties during the discovery process or in writing ....."*Id.* at R. 26(e)(1)(A). A party does not have to disclose such evidence only if the evidence is intended for use "solely for impeachment." *Id.* If a party fails to provide evidence or identify a witness as required by Rule 26(a) or (e), Rule 37 provides that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."*Id.* at R. 37(c)(1).

The Eleventh Circuit considers three factors when reviewing a district court's decision to exclude previously undisclosed evidence under Rule 37:(1) the importance of the evidence; (2) the reason for the party's failure to disclose the evidence earlier; and (3) the prejudice to the opposing party if the evidence is considered. *Bearint ex rel. Bearint v. Dorel Juvenile Group, Inc.,* 389 F.3d 1339, 1353 (11th Cir.2004); *Cooley v. Great S. Wood Preserving,* 138 F. App'x 149, 160-61 (11th Cir.2005). The Court considers each factor in turn for the three contested documents.

**1. Affidavit of Gary Wolford**

The Affidavit of Gary Wolford, a customer of Defendant on Plaintiff's route, contains four paragraphs detailing an incident in which Mr. Wolford called FedEx to find out why a package he was expecting to receive had been delayed. (Doc. No. 54-5 at p. 1, ¶ 3.) He allegedly spoke to Troy Hinds, who transferred him to a "manager ... named Russ." (*Id.*) According to Mr. Wolford, Russ told him that "the problem was caused by the route contractor, Javano Munnings" and encouraged him to "make a complaint against Mr. Munnings."(*Id.*) Further, Mr. Wolford stated, "Russ' statements to me seemed to be a rather personal attack against Mr. Munnings."(*Id.* at p. 2, ¶ 4.) This Affidavit offers evidence that Mr. Dezelan manipulated the customer complaint process to ensure Mr. Munnings re-

ceived formal complaints against him and could be "important" evidence of racial discrimination. Thus, the first factor weighs in favor of considering Mr. Wolford's Affidavit.

\*7 Plaintiff offers two reasons for failing to disclose Mr. Wolford as a person with discoverable information under Rule 26. First, Plaintiff states that "neither Mr. Munnings nor undersigned Counsel knew that Mr. Wolford had information relevant to the case until after FXG had filed its motion for summary judgment on December 21, 2007, essentially denying that Dezelan fabricated complaints."(Doc. No. 69 at p. 2.) Plaintiff continues:

> Here, the information known by Mr. Wolford presumably has been known by FXG all along because he is an FXG customer whose business is (and has been) located on what used to be Mr. Munnings' route; and, as Mr. Wolford testified, FXG's manager attempted to incite him to complain about Mr. Munnings when Mr. Wolford contacted FXG's terminal merely to track a package-something FXG presumably always knew and something Mr. Munnings did not know until Mr. Wolford was contacted in Mr. Munnings['] researching of his previous customers in an attempt to gather evidence to rebut the false assertions made in FXG's summary judgment motion. Thus, FXG-not Mr. Munnings-is delinquent in disclosing Mr. Wolford; and, for this reason alone, the supposed non-disclosure of Mr. Wolford is harmless to FXG, while Mr. Munnings is substantially justified in using Mr. Wolford's testimony that is newly discovered by Mr. Munnings.

(*Id.* at pp. 3-4.)Second, Plaintiff asserts that Mr. Wolford's testimony is intended for impeachment only and therefore is not subject to disclosure.(*Id.* at p. 4.)

Plaintiff's justifications for failing to disclose this witness in a timely manner are not availing. Regarding Plaintiff's first argument, Plaintiff does not allege that he did not know Mr. Wolford's identity

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

prior to Defendant's Motion for Summary Judgment; he instead states that he simply did not know what Mr. Wolford would say until he asked him. Such a belated investigation after the close of discovery to find new evidence to oppose a summary judgment motion does not provide good cause for admitting such evidence. Plaintiff's second argument that this evidence was intended only for purposes of impeachment is not well taken, as Plaintiff appears to equate rebuttal evidence with impeachment evidence. Rebuttal evidence tends to disprove a fact asserted by the other side while impeachment evidence goes to the credibility of a witness. Black's Law Dictionary 597, 599 (8th ed.2004). Mr. Wolford's testimony would constitute rebuttal, rather than impeachment, evidence. Furthermore, impeachment evidence is entirely irrelevant at the Summary Judgment stage because it goes to the credibility of a witness. The second factor therefore weighs against its consideration.

Finally, Defendant would likely suffer unfair prejudice if this evidence is considered. Defendant was not able to depose this witness since Mr. Wolford was identified after the close of discovery. Despite Plaintiff's arguments to the contrary, the Court will not impute knowledge to Defendant of Mr. Wolford's testimony. (See Doc. No. 69 at pp. 4-5.)Further, since Plaintiff has opposed Defendant's Motion to stay or for a continuance, Plaintiff is apparently unwilling to give Defendant an opportunity to depose Mr. Wolford. (See Doc. Nos. 75-76.)

*8 Two of the three factors weigh against considering this evidence; therefore, the Court strikes the Affidavit of Gary Wolford from the record pursuant to Federal Rule of Civil Procedure 37.

**2. Settlement Statements**

Plaintiff included with his Affidavit copies of his settlement statements from April to September of 2006. (Doc. No. 54-3 at pp. 14-35.)These settlement statements show the volume of packages

picked up and delivered on Plaintiff's then-supplemental route for these months. (Id.) Plaintiff uses these statements to contest the validity of Defendant's evidence of a legitimate, non-discriminatory reason for the delay in converting Plaintiff's supplemental route to a primary service area: that Plaintiff's package volume did not warrant the conversion. (Id. at pp. 7-8, ¶ 27.)These settlement statements, when viewed in the light most favorable to Plaintiff, could constitute important circumstantial evidence of race discrimination. Therefore, the first factor weighs in favor of considering these statements.

To explain his failure to previously disclose this evidence, Plaintiff contends that "only when FXG filed and served the false and misleading [package volume] figures [of Plaintiff's white co-workers whose routes were converted] did the FXG settlement statements regarding Mr. Munnings' package volume for the specified time period become relevant."(Doc. No. 69 at p. 6.)[FN5] This contention is unavailing, however, because the standard for relevance is extremely low. SeeFed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Certainly Plaintiff could have foreseen that the package volume for the route he claims Defendant failed to convert for discriminatory reasons would be relevant to his claim, as it goes directly to the similarly situated comparator inquiry. See Section II.B.1, infra.Thus, the second factor weighs against consideration of the settlement statements.

> FN5. Plaintiff further argues that such evidence is not subject to disclosure as it is intended for impeachment purposes only. (Doc. No. 69 at pp. 6-7.)For the reasons stated in the previous note, this argument is without merit.

Lastly, Defendant concedes that these statements are from its own records. (Doc. No. 60 at pp. 5-6 n.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

3.) Nevertheless, Defendant denies the failure to disclose such statements is harmless because Defendant "has thousands of documents that may pertain to Munnings and to his routes," and Defendant "should not be left to guess at which documents in Munnings' possession, which were specifically requested but not disclosed during discovery, may be used in opposition to summary judgment or at trial."(*Id.*) However, in support of its Motion for Summary Judgment, Defendant attached the Declaration of Luke Anderson, the P & D Manager at Defendant's Cocoa, FL terminal. (Doc. No. 47-4.) Mr. Anderson indicated he had reviewed "the records regarding other contractors who had routes approved around the same time as Munnings" and further detailed Plaintiff's package volume figures for the relevant time. (*Id.* at pp. 11-12, ¶ 33.)This belies Defendant's claim that it is prejudiced by Plaintiff's introduction of the settlement statements. Since Defendant apparently had access to this information and even submitted comparative evidence against Plaintiff, Defendant will not be prejudiced by consideration of the settlement statements attached to Plaintiff's Affidavit.

*9 Two of the three factors weigh in favor of consideration; therefore, Defendant's Motion to Strike the settlement statements is denied.

### 3. Bill of Sale

Plaintiff has included the Bill of Sale for the route "known and commonly referred to as Merritt Island Mall" with the Affidavit of Mrs. Natasha Munnings, Plaintiff's wife. (Doc. No. 54-4 at p. 6.) This shows that "Javano Munnings and Gary Lanz executed the purchase agreement on August 8th, 2005."(*Id.* at p. 2, ¶ 5.) The fact of the purchase has not been contested by Defendant, and Plaintiff uses Mr. Dezelan's recommendation to make this purchase as evidence of discrimination rather than the purchase agreement itself. (*See* Doc. No. 68 at p. 9, ¶ 14.)Thus, this does not constitute "important" evidence of discrimination and weighs against consideration.

Second, Plaintiff explains that "the failure for the late disclosure (sic) was substantially justifiable because Mr. Munnings mistakenly thought he had lost the bill of sale, thereby rendering the failure inadvertent."(Doc. No. 69 at p. 8.) Giving Plaintiff the benefit of the doubt, the Court finds this failure to disclose justifiable and concludes that the second factor weighs in favor of consideration of this evidence.

Finally, Defendant has not offered any explanation as to what prejudice it would suffer if the Court were to consider this evidence. (*See* Doc. No. 60 at pp. 5-6.)Since the document in question provides direct evidence of the purchase of a particular route, which is an uncontested fact, the Court finds that Defendant will not suffer any prejudice if the bill of sale is considered.

Therefore, with two factors weighing in favor of consideration, the Court denies Defendant's Motion to Strike the bill of sale.[FN6]

> FN6. Defendant seeks an award of attorneys' fees and costs for having to bring its Motion to Strike, "particularly in light of the distressing fact that the Affidavits, consisting almost entirely of inadmissible statements, were drafted and/or submitted by Munnings' counsel, and not a lay person."(Doc. No. 60 at p. 17.)Even assuming this is true, Defendant has not demonstrated bad faith warranting such sanctions; therefore, Defendant's Motion for attorneys' fees and costs is denied.

### II. Defendant's Motion for Summary Judgment

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law."Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hickson Corp. v. N.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Crossarm Co.,* 357 F.3d 1256, 1259 (11th Cir.2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.,* 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260.A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*Id.;Anderson,* 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."*Celotex Corp.,* 477 U.S. at 322.

## A. Withdrawn Claims

*10 Defendant moves for summary judgment on all of Plaintiff's claims. (Doc. No. 46 at pp. 6-7.)Plaintiff does not offer any opposition to Defendant's arguments for summary judgment on Count III, tortious interference with a prospective contractual relationship, and Count V, defamation

*per se. (See* Doc. No. 68.) Instead, Plaintiff has filed a Notice of Withdrawal of these two claims because "key witnesses have recanted their statements regarding [these] claims."(Doc. No. 52 at p. 1.) In its Motion to Stay, Defendant notes in response:

> Plaintiff's Complaint also asserts claims of tortious interference with a prospective contractual relationship, and defamation. Dkt. No. 2. On January 21, 2008, Plaintiff filed his Notice of Withdrawal of those two claims. Dkt. No. 52.While FXG does not oppose the dismissal of those claims with prejudice, no order of dismissal has been entered by the Court to date. Although the undersigned counsel notified Plaintiff's counsel that the purported withdrawal failed to comply with the requirements of Fed.R.Civ.P. 41(a), Plaintiff has yet to correct the procedural error and file the appropriate documents.

(Doc. No. 67 at p. 2, n. 1.) Plaintiff has not presented to the Court any response to this argument.

Under Federal Rule of Civil Procedure 41, a plaintiff may file a notice of dismissal of a claim "before the opposing party serves either an answer or a motion for summary judgment."Fed.R.Civ.P. 41(a)(1)(A)(i). If a plaintiff does not file a notice of dismissal as provided in this subsection, then a claim may be voluntarily dismissed either by a "stipulation of dismissal signed by all parties" or by "court order, on terms that the court considers proper."*Id.* at R. 41(a)(1)(A)(ii), 41(a)(2).

The Court construes Plaintiff's Notice of Withdrawal as a Motion for Voluntary Dismissal of Counts III and V of the Complaint. (Doc. No. 52.) Since the dispositive motions deadline has passed, Defendant has moved for summary judgment on all counts, and Plaintiff has not come forward with any evidence to support these two claims, the Court finds that it is proper to dismiss Counts III and V with prejudice.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**B. Count I: Discrimination**

In his first Count, Plaintiff alleges that Defendant racially discriminated against him and violated his rights under Section 1981 to make and enforce contracts. (Doc. No. 2 at pp. 1-4, ¶¶ 1-29.)Section 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

*11 (c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (2006). The elements of a claim of race discrimination under Section 1981 are: (1) that the plaintiff is a member of a protected class; (2) that the defendant intended to discriminate against the plaintiff on that basis; and (3) that the defendant's racially discriminatory conduct abridged a right enumerated in the statute. *E.g., Kinnon v. Arcoub, Gopman & Assocs., Inc.,* 490 F.3d 886, 891 (11th Cir.2007).

For purposes of its Summary Judgment Motion, Defendant does not dispute that Plaintiff has estab-

lished the first element of his Section 1981 claim. (Doc. No. 46 at p. 20.)Defendant does, however, argue that Plaintiff has failed to demonstrate the second and third elements of his claim. (*Id.* at pp. 20-24.)Plaintiff responds that he has produced evidence that raises genuine issues of material fact as to both of these elements. (Doc. No. 68 at pp. 12-16.)The Court first considers whether Plaintiff has raised a genuine issue of material fact that Defendant abridged one of his contractual rights and then whether Plaintiff has raised a genuine issue of material fact that Defendant intended to discriminate against him.[FN7]

> FN7. This analysis takes the two elements out of order. However, as explained by Judge Carnes in the Northern District of Georgia: "[T]he plaintiff must show that the defendants actually did something wrong before she can call on a court to gauge whether there was an racial motivation behind their actions."*Benton v. Cousins Props., Inc.,* 230 F.Supp.2d 1351, 1371 (N.D.Ga.2002).

**1. Third Element: Abridgement of a Contractual Right**

To establish the third element of a Section 1981 claim, a plaintiff must prove that the defendant failed to perform a contractual obligation. *E.g., Benton,* 230 F.Supp.2d at 1369. In other words, the plaintiff must produce evidence demonstrating that the defendant acted to deprive him of benefits to which he was entitled under the contract. *Id.* at 1371.The Court therefore will first look to the contract to determine which provisions Plaintiff claims have been violated by Defendant's actions. Next, the Court will decide which of Defendant's employees may create liability for Defendant. Lastly, the Court will consider which particular actions may properly be considered impairments of Plaintiff's contractual rights.

**a. Relevant Contractual Provisions**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The Contract includes several provisions which indicate that the parties expected Defendant to provide adequate loading service and package volume for its contractors:

> FedEx Ground wants to provide for package pick-up and delivery services through a network of independent contractors, and, subject to the number of packages tendered to FedEx Ground for shipment, will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment.... [T]his Agreement will set forth the mutual business objectives of the two parties intended to be served by this Agreement ....

(Doc. No. 78-2 at p. 6; Doc. No. 79-2 at p. 5.) This provision suggests the parties would both work to run an efficient and productive package delivery operation. This goal was stated more explicitly in another provision:

> *12 This Agreement is based on the concept that Contractor and FedEx Ground are each engaged in an undertaking to operate an efficient package delivery service which is fully competitive with the standards of other national participants in the industry. FedEx Ground and Contractor recognize that, because of the reciprocal benefits which flow from participation in an interrelated, national service, they have a mutual interest in increasing package volume and the number of customers both in Contractor's Primary Service Area and in the service areas of other contractors who have entered into substantially identical agreements with FedEx Ground.... [T]his Agreement contemplates the recognition both by the parties hereto and by other contractors in the FedEx Ground system of a proprietary interest by Contractor in the customer accounts in his/her Primary Service Area ....

(Doc. No. 78-2 at p. 22; Doc. No. 79-2 at p. 21.)

The Contract also includes several provisions concerning expected payments. For instance, the Contract provides: "FedEx Ground agrees to settle on a weekly basis with Contractor for services provided in accordance with the settlement schedule ...." (Doc. No. 78-2 at p. 18; Doc. No. 79-2 at p. 17.)This weekly "settlement" was "payment for stops made and packages handled."(Doc. No. 78-2 at p. 19; Doc. No. 79-2 at p. 18.)A weekly service bonus would also be paid to every contractor who had no missed pickups. (Doc. No. 78-2 at p. 51; Doc. No. 79-12 at p. 2.) Additionally, the Contract contemplated additional performance-based payments for which a contractor was eligible after his first year. (Doc. No. 78-2 at pp. 20, 24; Doc. No. 79-2 at pp. 19, 23.)To qualify for a contractor customer service program bonus, the contractor must have, among other things, no verified customer complaints during the applicable accounting period. (Doc. No. 78-2 at p. 50; Doc. No. 79-12 at p. 1.)

### b. Relevant Actors

Plaintiff claims that he was discriminated against by two of Defendant's employees: Russell Dezelan and Troy Hinds. (Doc. No. 54-12 at pp. 336-39.)FN8A corporate defendant may be liable for the discriminatory actions of its employees under two theories. *E .g., Vance v. S. Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1512 (11th Cir.1981), *overruled on other grounds by Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Martinez v. Pavex Corp.,* 422 F.Supp.2d 1284, 1294-95 (M.D.Fla.2006). Under the first theory, a corporate defendant is vicariously liable for the conduct of its agents FN9 acting within the scope of their authority. *Vance,* 863 F.2d at 1514-15;*Martinez,* 422 F.Supp.2d at 1294-95;*see also Alexander v. Fulton County,* 207 F.3d 1303, 1334 (11th Cir.2000). Under the second theory, a corporate defendant is liable under the principle of *respondeat superior* for an employee's discriminatory actions if the corporate management knew or should have known of the discriminatory action and failed to prevent further discrimination or take prompt remedial action. *Vance,* 863 F.2d at 1512-14;*Martinez,* 422 F.Supp.2d at 1295.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN8. As with all citations to the electronic record, the page numbers cited here are the CM-ECF stamped page numbers in the header of the document rather than the transcript numbers appearing within the document.

FN9. The Restatement (Third) of Agency defines "agency" as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."Restatement (Third) Agency § 1.01. The comments to this section explain that the common law definition of agency encompasses the employment relationship. *Id.* cmt. c.

### i. Russell Dezelan

*13 The majority of Plaintiff's factual allegations involve the actions of Russell Dezelan, the Senior Terminal Manager in Brevard County. (Doc. No. 46 at p. 8, ¶ 4; Doc. No. 68 at p. 2, ¶ 3.) Though the specifics of Mr. Dezelan's job responsibilities are unclear, the record shows that Mr. Dezelan was generally responsible for working with the FedEx contractors to ensure that their trucks were loaded and packages properly delivered. (Doc. No. 46 at pp. 8-12, ¶¶ 4-6, 8-10, 12-14; Doc. No. 54-12 at p. 121; Doc. No. 68 at pp. 2, 4-11, ¶¶ 3-4, 7-8, 10-16.)Mr. Dezelan also was responsible for investigating customer complaints against contractors. (Doc. No. 47-4 at pp. 2-3, ¶ 6.) Therefore, Mr. Dezelan was acting as an agent of Defendant when performing his job as Senior Terminal Manager.FN10Accordingly, the Court will consider whether Mr. Dezelan's actions impaired Plaintiff's contractual rights.

FN10. Defendant does not dispute this in its Motion. (*See* Doc. No. 46 at p. 8, ¶ 5.)

### ii. Troy Hinds

Plaintiff also claims that he was discriminated against by Troy Hinds who worked as a Quality Assurance Clerk for Defendant from approximately January 2006 to May 2006, and again from October 2006 to the present. (Doc. No. 47-3 at p. 4, ¶¶ 9-10.)In his Declaration, Mr. Hinds described his employment duties as follows: "I am responsible for making address corrections and performing package damage inspections with addresses."(*Id.* at p. 4, ¶ 10.)He continued, "If a package is left behind at the terminal, I look to determine whether it has the correct address and whether it needs to be repacked."(*Id.* at p. 6, ¶ 15.)Plaintiff has testified that Mr. Hinds was in a position to affect his business. (Doc. No. 54-12 at pp. 319-20.)Since Plaintiff alleged that Mr. Hinds was discriminatory in carrying out the tasks assigned to him by Defendant, Defendant is liable to Plaintiff under an agency theory of vicarious liability for discriminatory actions Mr. Hinds took within the scope of his employment that impaired Plaintiff's contractual rights. FN11

FN11. The evidence suggests that Mr. Hinds did not have a supervisory role at the terminal over FedEx employees or independent contractors. (*E.g.,* Doc. No. 47-3 at p. 5, ¶ 10.)Thus, Mr. Hinds is an agent of Defendant only when performing those duties assigned to him by Defendant, and Defendant is liable for any discriminatory actions Mr. Hinds took in the performance of his assigned duties. *See, e.g.,*Restatement (Third) Agency § § 7.04, 7.07.

### c. Alleged Impairments

### i. Actions of Russell Dezelan

Plaintiff has produced evidence that Mr. Dezelan's actions impaired his contractual right to operate an efficient package delivery service and maximize his benefits under the contract. For instance, according to Plaintiff, Mr. Dezelan either did not assign

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiff a loader or assigned the worst loader to Plaintiff.[FN12]As Plaintiff stated in his deposition: "Amongst other complaints pertaining to loading, the main ones I had were either that I did not have a loader, I didn't have a loader available to load my truck or a loader that was knowledgeable of my trucks to load them."(Doc. No. 54-13 at p. 131.)Though Plaintiff recognized that white contractors had loading problems, he explained, "None had the same issues that I had."(*Id.* at p. 133.)Further, when Plaintiff asked Mr. Dezelan for assistance with loading, Mr. Dezelan would ignore him and instead assist white contractors. (*Id.* at pp. 180-81; Doc. No. 54-12 at pp. 307-311.)Once a loader was assigned to Plaintiff's truck and learned how to properly load the truck, "he was removed and placed on someone else's truck and a less experienced loader was then placed on my truck, which did not allow smooth delivery dates for me."(Doc. No. 54-13 at p. 367.)The loader most frequently assigned to Plaintiff's trucks was "Sloppy Joe," who was "one of the most inadequate loaders."(Doc. No. 54-12 at p. 359.)Such loading inadequacies would delay Plaintiff's drivers and affect their ability to make all their deliveries on time. (Doc. No. 54-13 at pp. 151-55.)

> FN12. The parties have presented conflicting evidence as to Mr. Dezelan's involvement with the assignment of loaders to contractors. (*Compare, e .g.,* Doc. No. 47-4 at p. 8, ¶ 26*with* Doc. No. 54-10 at p. 2, ¶ 10.)The Court may not resolve this factual issue on summary judgment but must view the evidence in the light most favorable to Plaintiff. *See Anderson,* 477 U.S. at 255.

**\*14** Additionally, Plaintiff testified that his packages were frequently mishandled by the loaders. (*Id.* at pp. 193-201.)Plaintiff's drivers were called back for left-behind packages far more frequently than other drivers.(*Id.*) When this happened, the appropriate procedure was to scan the package as a terminal failure. (Doc. No. 54-16 at p. 81.)The left-behind package then "sits there until it gets de-

livered either the next day by the driver that it belongs to or management will-is supposed to deliver them themselves, not take them to the drivers."(*Id.* at p. 84.)However, when one of Plaintiff's packages was left behind, Mr. Dezelan would depart from normal procedure and would call Plaintiff's driver and have him return to the terminal to pick the package up, further delaying deliveries. (Doc. No. 54-13 at pp. 193-201; Doc. No. 54-19 at p. 121.)

Plaintiff has also produced evidence that Mr. Dezelan interfered with his ability to earn customer service bonuses. It was Plaintiff's perception that Mr. Dezelan handled most of the customer complaints against Plaintiff's drivers and that Mr. Dezelan inflated the complaints to ensure that they became formal customer complaints. (Doc. No. 54-3 at pp. 3-4, 12, ¶¶ 11, 41; Doc. No. 54-12 at pp. 374-75.)Mr. Dezelan himself admitted that he was the one who decided whether a customer complaint was valid or invalid. (Doc. No. 54-23 at p. 7.)

Furthermore, during a peak season, Mr. Dezelan prevented Plaintiff from delivering packages on Saturdays. (Doc. No. 54-16 at pp. 112-13.)Plaintiff's drivers normally delivered on Saturdays, but on one particular day, Mr. Dezelan told the contractors that only three drivers would be permitted to deliver on Saturdays. (*Id.* at p. 113.)Mr. Dezelan then selected three white contractors to do the Saturday deliveries and not Plaintiff. (*Id.;* Doc. No. 54-20 at pp. 185-87, 195-97.)

Finally, Plaintiff has testified that Mr. Dezelan repeatedly threatened to have Plaintiff's contract terminated and delayed recommending the conversion of Plaintiff's supplemental route to a primary service area. (Doc. No. 54-12 at pp. 181, 191, 231-32, 313-14.)He encouraged Plaintiff to make a bad business decision and purchase stops at Merritt Square Mall, purporting to help Plaintiff get his supplemental route converted. (Doc. No. 54-13 at pp. 81-82, 91-94.)Plaintiff also claims that Mr. Dezelan failed to pass on his route conversion request and relevant materials to the corporate office

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

even though Mr. Dezelan said he had submitted such materials. (Doc. No. 54-3 at p. 2, 10, ¶¶ 6-7, 37.)

This evidence, if believed by a jury, shows instances of Mr. Dezelan impairing Plaintiff's right to enjoy the contractual benefits of running an efficient delivery service, maximizing his profits, and receiving customer service bonuses. Thus, Plaintiff has raised a genuine issue of material fact that the actions of Russ Dezelan impaired his rights under the Contract and his right to enter into a new primary service area contract.

### ii. Actions of Troy Hinds

*15 Plaintiff has offered evidence that Troy Hinds also interfered with his contractual right to compensation for properly delivered packages and customer service bonuses. For example, Plaintiff testified that Mr. Hinds, who managed left-behind packages, would improperly scan his packages to reflect a driver error rather than a loader error with much greater frequency than he would the packages of white contractors. (Doc. No. 54-12 at pp. 319-23; Doc. No. 54-13 at pp. 287-90; Doc. No. 54-16 at pp. 43, 63-73; Doc. No. 54-18 at pp. 73-74; Doc. No. 54-20 at p. 121.)A jury could infer from the disparity in such errors that Mr. Hinds' actions were intentional.

Such improper scanning penalizes Plaintiff because, according to Plaintiff, "If I intentionally leave packages behind, I receive a code which is issued by the terminal, which means that I intentionally left the packages behind. It goes against my service, it goes against my bonuses that I would get from Fedex and lowers my reputation as a contractor."(Doc. No. 54-12 at pp. 322-23;*see also* Doc. No. 54-13 at pp. 289-90.)Thus, if Mr. Hinds intentionally scanned Plaintiff's packages improperly, such conduct would constitute impairment of Plaintiff's contractual rights because it adversely affects Plaintiff's weekly settlement and bonus. Accordingly, Plaintiff has raised a genuine issue of

material fact that the actions of Troy Hinds impaired his rights under the Contract.

The Court must now consider whether the actions of either Mr. Dezelan or Mr. Hinds constitute intentional racial discrimination.

### 2. Second Element: Intentional Discrimination

### a. Classification of the Evidence Submitted By Plaintiff

A plaintiff may prove the second element of his 1981 claim through either direct or circumstantial evidence. *E.g., Kinnon,* 490 F.3d at 891-93; *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1105 (11th Cir.2001). Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption. *Bass,* 256 F.3d at 1105; *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990). Only the most blatant remarks, the intent of which could be nothing other than to discriminate on the basis of race, constitute direct evidence of discrimination. *Bass,* 256 F.3d at 1105; *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir.1999). For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision and related to that particular decision. *Bass,* 256 F.3d at 1105; *Trotter v. Bd. of Trustees,* 91 F.3d 1449, 1453-54 (11th Cir.1996), *abrogated on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). Remarks by non-decisionmakers or remarks unrelated to the decision-making process itself are not direct evidence of discrimination.*Bass,* 256 F.3d at 1105; *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998). If the plaintiff's evidence is subject to more than one interpretation or suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir.2004); *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 15
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

Cir.1997).

*16 In its Motion for Summary Judgment, Defendant asserts that Plaintiff has offered no direct evidence of discrimination. (Doc. No. 46 at pp. 18-19 & n. 5.) Specifically, Defendant states:

> Munnings may attempt to argue that certain comments by Dezelan and Hinds constitute direct evidence in this case. Specifically, Munnings testified that he heard Hinds use the word "nigger" in his presence, but could not recall ever reporting it to Contractor Relations or to any FXG managers, .... While Munnings never heard Dezelan use that word, he did testify that at some unspecified time, Dezelan referred to him as "you blacks, you people" during a heated argument with Munnings by telephone, and made other comments that did not reference his race, but that Munnings felt "implied" his race.... Even if taken as true, neither of these statements constitutes direct evidence of discrimination .... First, as to Hinds, it is undisputed that he was not, and never has been, a manager with decisionmaking authority over Munnings and/or his contract.... Further, Munnings was unable to provide a temporal context for the alleged statement by Dezelan. At best, this comment, which was not linked to any tangible decisions with respect to Munnings' contract, constitutes a "stray remark" that cannot be used as direct evidence.

(*Id.* at p. 19, n. 5 (internal citations omitted).) Plaintiff does not directly address this argument in his Response but does include an analysis of pretext, in which he states, "[Plaintiff's] prima facie evidence ... refutes [Defendant's] proffered excuses as pretexts."(Doc. No. 68 at pp. 17-19.)This indicates that Plaintiff is proceeding under a circumstantial evidence theory, and Plaintiff has not offered any evidence that suggests otherwise. Therefore, the Court will analyze Plaintiff's claims using the rules applicable to circumstantial evidence cases.

**b. Analysis of the Circumstantial Evidence**

Section 1981 race discrimination claims premised on circumstantial evidence are analyzed under the burden shifting rules articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for cases brought under Title VII. *E.g., Howard v. BP Oil, Inc.,* 32 F.3d 520, 524 n. 2 (11th Cir.1994). Under the *McDonnell Douglas* burden shifting framework, a plaintiff alleging discriminatory treatment must first establish a *prima facie* case of unlawful discrimination. *E.g., E.E.O. C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1286 (11th Cir.2000). Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production but not of persuasion shifts to the defendant to produce "legitimate, non-discriminatory reasons for its [challenged] action[s]."*Joe's Stone Crab, Inc.,* 220 F.3d at 1286 (internal quotation marks and citations omitted)."If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination."*Id.* The United States Supreme Court has offered some further guidance about proof of pretext: "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."*Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); *see also Walker v. Mortham,* 158 F.3d 1177, 1183-85 & n. 10 (11th Cir.1998).

**c. Prima Facie Case**[FN13]

> FN13. Plaintiff has neither pled nor substantively argued a hostile work environment theory of discrimination under Section 1981; therefore, such theory will not be considered here.

**i. Appropriate Test**

*17 As observed by Judge Story in the Northern District of Georgia, "While courts have had little

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

difficulty determining that the *McDonnell Douglas* burden-shifting test is the appropriate one, [c]ourts have struggled with the appropriate elements of a *prima facie* case to apply in the context of § 1981 claims."*Brooks v. Collis Foods, Inc.,* 365 F.Supp.2d 1342, 1353 (N.D.Ga.2005). The Eleventh Circuit has applied the standard Title VII *prima facie* elements to Section 1981 claims of discrimination in employment. *E.g., Howard,* 32 F.3d at 524 n. 2. However, the Eleventh Circuit has not yet articulated the appropriate *prima facie* elements to apply in cases outside of the traditional employment context. *Kinnon,* 490 F.3d at 889, 891, 893.

Those courts that have articulated such a *prima facie* test have had trouble distinguishing it from the elements of a Section 1981 cause of action. *E.g., Brooks,* 365 F.Supp.2d at 1353 (citing cases). Courts agree that the goal is to articulate a test that describes what evidence a plaintiff must produce to create a presumption of discrimination. *See id.*To this end, courts have consistently required Section 1981 plaintiffs to identify similarly situated persons outside of the plaintiffs' protected class(es) who were treated more favorably by the defendants. *Id.;Benton,* 230 F.Supp.2d at 1370;*see also Kinnon,* 490 F.3d at 893;*Jackson v. BellSouth Telecomms.,* 372 F.3d 1250, 1273 (11th Cir.2004).[FN14] This Court will look to the same factor in determining whether Plaintiff has presented evidence that raises a rebuttable presumption of discrimination.

> FN14. In the employment discrimination context, the Eleventh Circuit has explained the degree to which a comparator must be similarly situated: "The plaintiff and the [person] she identifies as a comparator must be similarly situated 'in all relevant respects.' The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the [defendant] ."*Wilson,* 376 F.3d at1091 (internal citation omitted).

**ii. Application**

Plaintiff has argued that his contractual rights were impaired in at least four contexts: (1) package loading; (2) left-behind packages; (3) customer complaints; and (4) conversion of his route from a supplemental route to a primary service area. (*See* Doc. Nos. 2, 68.)The Court will consider whether Plaintiff has produced evidence of more favorably treated white comparators in each context.

In the context of package loading, Plaintiff testified that Mr. Dezelan "would not provide the assistance that I saw him providing other white contractors."(Doc. No. 54-12 at p. 285.)While all of the contractors had "issues with the loaders," Mr. Dezelan "made sure to do what he could with the white contractors."(*Id* . at p. 307.)Plaintiff specifically referred to Gerry Quick and Chris Wilson as white contractors whom Mr. Dezelan would help instead of Plaintiff. (*Id.* at pp. 308-09.)While Plaintiff was not present for the loading every single day, he stated: "I can account for the days that I witnessed myself and I saw a disparity in the way that my trucks were being loaded and I was being treated versus the other contractors."(*Id.* at p. 311;*see also* Doc. No. 54-13 at pp. 135-43, 180-85, 189-93.)Chris Wilson and Alex Rosario also testified that Plaintiff tended to have more loading problems than anyone else. (Doc. No. 54-17 at pp. 35-38, 66-69, 93-97; Doc. No. 54-20 at pp. 65-73, 92-93, 95, 125-29, 145-49 .)This evidence raises a genuine issue of material fact that Plaintiff was subject to less favorable treatment by Mr. Dezelan in the loading process than white contractors.

*\*18 Plaintiff also testified about a number of instances in which one of his drivers, Alex Rosario, was called back for a left-behind package by either Mr. Dezelan or Mr. Hinds. (Doc. No. 54-13 at pp. 193-201.)He indicated that other contractors' drivers would not be called back for packages. (*Id.* at p. 201.)This was confirmed by another witness, Selena McNeely, an Administrative Assistant at the terminal, who testified during her deposition, "I witnessed [Plaintiff's] trucks not being loaded, I witnessed many packages not scanned to Mr. Mun-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

nings' truck being taken to him or his drivers being forced back to the terminal to pick them up."(Doc. No. 54-16 at p. 53.)Ms. McNeely further stated that this did not happen to other contractors and that there were too many mistakes being made to Plaintiff's loads for this to be accidental.(*Id.* at pp. 63-65, 71-73.)Mr. Rosario confirmed that he was called back for missed packages more than any other drivers. (Doc. No. 54-20 at pp. 97, 121, 209-13.)Such evidence raises a genuine issue of material fact as to whether Plaintiff was treated less favorably than white contractors by Mr. Dezelan and Mr. Hinds with respect to left-behind packages.

When asked if he knew of any specific white contractors who were more favorably treated regarding the classification of customer complaints by Mr. Dezelan, Plaintiff responded, "The majority of the contractors in the terminal."(Doc. No. 54-12 at pp. 344-45.)Specifically, Plaintiff named, "Tom George, King, I can't remember his first name, the Palm Bay drivers, I can't remember their last names, Gerry Quick, Jason, I can't remember his last name, Stindel, McCarry, Brotherton and I'm sure there are more that I can't recall at this time, that's what I can remember."(*Id.* at p. 345.)Since Plaintiff was able to identify particular white contractors who received customer complaints of a similar nature that were not converted into formal complaints by Mr. Dezelan, Plaintiff has raised a genuine issue of material fact on this matter.

Regarding route conversion, Plaintiff stated in his Affidavit that Mr. Dezelan was responsible for providing FedEx management with information and recommendations for route conversions. (Doc. No. 54-3 at pp. 2-3, ¶¶ 6-8;*see also* Doc. No. 54-12 at p. 191.)Plaintiff testified in his deposition that several white contractors had their supplemental routes contracted while Plaintiff was waiting for his route to be contracted. (Doc. No. 54-12 at pp. 236-37.)Specifically, Plaintiff named Chris Wilson, Gerry Quick, Rich McCardy, Leonard Winn, and Gary Stindle. (Doc. No. 54-13 at pp. 165-74.)Plaintiff's perception was confirmed by the

sworn statement of another witness, Thomas George, who stated:

> I heard Russ Dezelan ... tell Mr. Munnings several times that Mr. Munnings' KSC/Cocoa Beach route would be the next route from our terminal to be split and contracted as two separate routes. However, every time I heard Dezelan say that to Mr. Munnings, the route of a white contractor would be the next route from our terminal to be split and contracted as separate routes.

*19 (Doc. No. 54-6 at p. 1, ¶ 3.)[FN15] This evidence raises a genuine issue of material fact that Mr. Dezelan treated white contractors more favorably than Plaintiff in his recommendations of route conversions to FedEx management.

> FN15. Defendant objects to this paragraph as unreliable, speculative, conclusory, and containing hearsay. (Doc. No. 60 at pp. 13-15.)Defendant's arguments that Mr. George's statement is unreliable and conclusory goes to the weight, rather than the admissibility, of this evidence. Defendant's claim that Mr. George's statement is speculative is overruled at this time, for Mr. George has sworn in his Affidavit that he has personal knowledge of the facts therein. (Doc. No. 54-6 at p. 1, ¶ 1.) The truth of this statement is an issue for trial. Finally, the statements to which Mr. George refers are those of Mr. Dezelan in his capacity as terminal manager. Therefore, these statements are not hearsay but are instead admissions by a party-opponent under Federal Rule of Evidence 801(d)(2)(D). Even if this were not the case, these statements are not offered for the truth of the matter asserted but instead for the fact of whether or not they were stated and thus do not constitute hearsay.

As previously explained, the Court may not weigh evidence or judge credibility when considering a Motion for Summary Judgment. *Hairston,* 9 F.3d at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

919. Further, the Court must draw all reasonable inferences in favor of the non-moving party, Plaintiff. *Anderson,* 477 U.S. at 255. The majority of Defendant's arguments regarding Plaintiff's *prima facie* case involve the weight of the evidence, the credibility of witnesses, or the proper inferences to be drawn from the record. (*See* Doc. No. 46 at pp. 20-24.)These are not proper considerations at the summary judgment stage. Plaintiff has produced evidence that raises a genuine issue of material fact as to whether he was treated less favorably than similarly situated white contractors. This evidence, if believed by the jury at trial, would be sufficient to sustain a *prima facie* case of racial discrimination.

#### d. Legitimate, Nondiscriminatory Reason

Having determined that Plaintiff has presented triable issues of fact as to his *prima facie* case of discrimination, the Court next considers whether Defendant has met its burden of production to "articulate a legitimate, nondiscriminatory reason for the challenged ... action."*E.g., Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000) (en banc). This intermediate burden is "exceedingly light." *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir.1997).

In its Motion for Summary Judgment, Defendant argues that it has asserted legitimate, nondiscriminatory reasons for every action challenged by Plaintiff:

Specifically, the preload issues were the result of difficulties in retaining qualified loaders, a problem that was experienced by all contractors across the board, and about which FXG took action to correct. Further, providing excellent customer service is among a FXG manager's most important responsibilities, and the company has an obligation to investigate and take action on valid customer complaints where appropriate. Finally, all decisions regarding supplemental routes are based on route productivity, area growth and

terminal package volume. FXG and Dezelan followed the company's established approval process for having supplemental routes converted to primary service areas, and any statements by Dezelan regarding there being no guarantee that a route would be contracted by a particular date were accurate and do not reflect discriminatory or retaliatory animus.

(Doc. No. 46 at p. 25 (internal citations omitted).) To support these claims, Defendant has included the sworn statements of Troy Hinds, Luke Anderson, and Doug Ferguson and excerpts from the depositions of Selena McNeely, Brian Shafranek, and Christopher Wilson. (Doc. Nos. 47-3 to 47-8.) Regarding the loading issues, Mr. Hinds, Mr. Anderson, Mr. Shafranek, and Mr. Wilson stated that problems with loading at the terminal were shared by all the contractors because there was frequent turnover in the loading staff. (Doc. No. 47-3 at p. 5, ¶ 14; Doc. No. 47-4 at pp. 8-9, ¶ 26; Doc. No. 47-7 at pp. 10-11; Doc. No. 47-8 at pp. 5-8.)Mr. Hinds also explained that packages could be left behind at the terminal for any number of reasons, including driver or loader error. (Doc. No. 47-3 at p. 6, ¶ 15.)As an example, Mr. Hinds stated that the addresses for the Kennedy Space Center were unusual and would confuse inexperienced loaders. (*Id.* ¶ 16.)Mr. Hinds also asserted that he never intentionally mishandled Plaintiff's packages. (*Id.* at pp. 6-7, ¶ 17.)Mr. Bennington, a white male contractor, testified in his deposition that he too would occasionally get called back for left behind packages. (Doc No 47-13 at pp. 5-7.)

**\*20** Defendant also offered evidence that explains the customer complaint policy. Mr. Anderson stated that all independent contractors are required to provide the highest level of customer service so that Defendant can remain competitive in the market. (Doc. No. 47-4 at p. 2, ¶ 4.) Defendant maintains a customer service department, which handles customer complaints, to ensure this expectation is met. (*Id.* at pp. 2-3, ¶ 6.) As Mr. Anderson explained:

The terminal and its managers have no control

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

over whether a customer call is converted to a formal customer complaint. That is completely up to our customer service department in Pittsburgh, PA. At the terminal, we receive electronic printouts of complaints that have already been received and processed by the customer service department, and marked as official complaints. At that point, either the P & D manager, the senior manager, or the P & D service managers investigate the complaint by following up with the customer and meeting with the contractor and/or driver to obtain the necessary facts, and we then send the response to Corporate with our findings and recommendations with supporting documentation.

(*Id.*) Thus, Mr. Anderson contends, Mr. Dezelan was not in a position to manufacture customer complaints against Plaintiff. (*See id.*)

Additionally, Mr. Anderson explained that Mr. Dezelan was in charge of the investigation of very few of the complaints against Plaintiff. Mr. Anderson detailed the complaints against Plaintiff and his drivers and stated, "According to our records, which always identify the specific manager who investigated the complaint, Dezelan only personally handled three of the many complaints and signature compliance violations brought to Munnings' attention."(*Id.* at pp. 3-7, ¶¶ 8-23.)Furthermore, "The independent contractor who purchased Munnings' proprietary interests in his routes, Stan Brotherton of The Stan Group LLC, has had similar problems with customer complaints against his drivers, who are Munnings' old drivers. Brotherton is a white male."(*Id.* at p. 7, ¶ 24.)

Also, Defendant has produced evidence that Plaintiff's route conversion was not delayed anymore than the normal time period. For instance, Mr. Hinds stated that it could take years to get a supplemental route converted into a contracted primary service area. (Doc. No. 47-3 at p. 2, ¶ 4.) Mr. Hinds in fact attempted to get the supplemental route that Plaintiff purchased from him contracted before selling it but was unsuccessful. (*Id.*) Mr. Anderson

explained that the route conversion process depends on a number of factors and was subject to multiple layers of management approval. (Doc. No. 47-4 at pp. 10-11, ¶¶ 30, 32.)Mr. Ferguson further explained that during the time Plaintiff was seeking route conversion, the engineering department wanted to develop other areas. (Doc. No. 47-5 at p. 3, ¶ 5.) Additionally, according to Mr. Anderson, the package volume for Plaintiff's supplemental route was "significantly lower" than those on the routes that were selected for conversion earlier than his. (Doc. no. 47-4 at pp. 11-12, ¶ 33.)Plaintiff's supplemental route was eventually contracted as a primary service area in September of 2006. (Doc. No. 47-4 at p. 11, ¶ 32; Doc. No. 47-5 at p. 2, ¶ 4.)

*21 Finally, Defendant has produced evidence indicating that Mr. Dezelan was simply an unpleasant person who mismanaged the terminal and treated everyone equally poorly. (Doc. No. 47-5 at pp. 3-4, ¶¶ 6-7; Doc. No. 47-6 at pp. 5-6; Doc. No. 47-7 at pp. 5-8; Doc. No. 47-8 at pp. 11-14.)Thus, Defendant has met the burden of articulating legitimate, nondiscriminatory reason(s) for its challenged actions.

**e. Pretext**

Since Defendant has met its intermediate burden, the burden of production shifts back to Plaintiff to demonstrate that Defendant's articulated reasons for the adverse actions are merely pretexts for unlawful discrimination.*Holifield*, 115 F.3d at 1565. This demonstration merges with Plaintiff's ultimate burden of proving by a preponderance of the evidence that Defendant intentionally discriminated against Plaintiff. *Id.* As the Eleventh Circuit has explained:

If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

the [defendant] were not the real reasons for the adverse employment decision."...If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the [defendant's] articulated reasons is pretextual, the [defendant] is entitled to summary judgment on the plaintiff's claim.

*Chapman,* 229 F.3d at 1024-25 (internal citations omitted). In other words, a plaintiff must "come forward with sufficient evidence to permit a reasonable factfinder to find that [the defendant's] reasons were pretextual."*Id.* at 1028.

In its Motion for Summary Judgment, Defendant argues:

> The only possible evidence that Munnings could offer to show pretext would be his allegations that Hinds made racial comments in his presence, and that Dezelan once allegedly referred to him as "you people, you blacks" during a heated argument.... The isolated statements by Hinds, a non-managerial employee who was not involved in any decisions with respect to Munnings' contract, do not show the requisite discriminatory motivation.... Nor can the admittedly isolated, stray remark by Dezelan support a pretext argument by Munnings, as it was unrelated to any adverse decision with regard to Munnings' contractual rights.

(Doc. No. 46 at pp. 25-26.)Defendant here appears to invoke the stray remarks doctrine to support its claim that Plaintiff has not raised a genuine issue of material fact of pretext. (*See id.*)This doctrine holds that ambiguous, isolated stray remarks alone will not establish pretext. *E.g., Ash v. Tyson Foods, Inc.,* 190 F. App'x 924, 926 (11th Cir.2006). However, stray racial remarks, in combination with other evidence, may constitute circumstantial evidence of discrimination. *E.g., Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291-92 (11th Cir.1998).

*22 Plaintiff has introduced evidence that supports his claims that Mr. Dezelan and Mr. Hinds were

motivated by racial animus and not Defendant's proffered legitimate, non-discriminatory reasons. As explained in detail in Section II.B. 1.b, Plaintiff has produced evidence that he was treated less favorably than similarly situated white contractors. While all contractors had loading problems, Plaintiff's loading problems were more severe. (*E.g.,* Doc. No. 54-17 at pp. 35-38.)Plaintiff's drivers were called back to the terminal for left-behind packages more often than the other drivers. (*E.g.,* Doc. No. 54-13 at pp. 193-201.)Additionally, more of the customer complaints against Plaintiff were deemed formal customer complaints. (*E.g.,* Doc. No. 54-12 at pp. 344-45.)Finally, Plaintiff's supplemental route conversion was delayed while white contractors' routes were converted, and Plaintiff has produced evidence that the package volume for his supplemental route was comparable to those of the routes selected for conversion. (*E .g.,* Doc. No. 54-3 at pp. 14-35; Doc. No. 54-13 at pp. 166-74.)This evidence shows that while Defendant's legitimate, nondiscriminatory reasons explain some of the problems faced by all contractors at the terminal, these reasons do not explain why Plaintiff's problems were more severe than those of white contractors as Plaintiff's evidence reflects.

Also, Plaintiff has offered evidence that both Mr. Dezelan and Mr. Hinds demonstrated racially discriminatory behavior in the workplace while acting as employees of Defendant. According to Plaintiff's deposition testimony, Mr. Dezelan ignored Plaintiff in favor of white contractors and refused to shake Plaintiff's hand while never refusing to shake the hand of a white person. (Doc. No. 54-12 at pp. 254-263; Doc. No. 54-13 at pp. 95-97.)Plaintiff also asserts that Mr. Dezelan sympathized with white people suffering family tragedies but did not do so with Plaintiff. (Doc. No. 54-13 at pp. 113-18.)Further, Mr. Dezelan talked down to Plaintiff, referring to Plaintiff and other black people derogatorily as "you blacks" and "you people." (Doc. No. 54-12 at pp. 240-41, 267-68; Doc. No. 54-13 at pp. 99-101, 121-25, 298-99, 303-305.)Plaintiff also detailed an incident in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

which Mr. Dezelan "suggested that if I was frustrated, that I pour diesel fuel over myself and light it" like a Middle Eastern man did at another terminal who was similarly frustrated with Mr. Dezelan. (Doc. No. 54-13 at p. 299.)

In his deposition, Mr. Wilson, a white contractor, also testified that Mr. Dezelan treated Plaintiff differently than other contractors and spoke to Plaintiff in a particularly condescending tone. (Doc. No. 54-17 at pp. 101-03.)Plaintiff's driver, Alex Rosario, explained that while he was on a three-way telephone call with Mr. Dezelan and Plaintiff, Mr. Dezelan asked Plaintiff "why is it you people are always getting out of hand?"(Doc. No. 54-20 at pp. 221-25.)Furthermore, Mr. Shafranek, a white contractor, heard Mr. Dezelan use the word "nigger" while at work. (Doc. No. 54-18 at p. 37.)This evidence raises a genuine issue of material fact that racial animus motivated Mr. Dezelan's actions against Plaintiff.

*23 Similarly, Plaintiff testified in his deposition that Mr. Hinds admitted to using the word "nigger" to Plaintiff when Plaintiff confronted Mr. Hinds in front of Mr. Dezelan. (Doc. No. 54-13 at pp. 233-35.)Mr. Shafranek testified that he heard Mr. Hinds say "nigger" quite frequently while Mr. Hinds was at the terminal working as Defendant's employee. (Doc. No. 54-18 at pp. 61-63, 66, 74-75.)This, along with Plaintiff's evidence suggesting that Mr. Hinds intentionally mishandled Plaintiff's packages, raises a genuine issue of material fact that racial animus motivated Mr. Hind's actions against Plaintiff.

In modern society, race discrimination is often more subtle than overt, blatantly racist acts. As the United States Supreme Court stated in the context of school segregation: "[I]t must be acknowledged that the potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms ...."*Freeman v. Pitts*, 503 U.S. 467, 490, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Similarly, Justice Marshall wrote, "Today, although flagrant ex-

amples of intentional discrimination still exist, discrimination more often occurs 'on a more sophisticated and subtle level,' the effects of which are often as cruel and 'devastating as the most crude form of discrimination.'"*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 412, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (Marshall, J., dissenting) (citing *Pennsylvania v. Local 542, Int'l Union of Operating Eng'rs*, 469 F.Supp. 329, 337 (E.D.Pa.1978)); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir.2003) ( "Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it.").

Plaintiff has presented evidence suggesting, in part, a subtler and more sophisticated form of racial discrimination. Resolution of this case will require credibility determinations, decisions on disputed facts, and the weighing of conflicting evidence. Such considerations are the province of a jury and not a court considering a motion for summary judgment. *See Anderson*, 477 U.S. at 255. Since the evidence produced by Plaintiff raises a genuine issue of material fact that Defendant's legitimate, nondiscriminatory reasons for the challenged actions were pretext for racial discrimination, the Court must deny Defendant's Motion for Summary Judgment on Count I.

**C. Count II: Retaliation**

The Eleventh Circuit recognizes as cognizable retaliation claims under Section 1981. *E.g., Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir.1998). The analysis for Section 1981 retaliation claims follows the same *McDonnell Douglas* burden-shifting framework used in Title VII claims. *E.g., Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 (11th Cir.2008); *Vennett v. Gen. Elec. Co.*, No. 07-14364, 2008 WL 834456, at *5 (11th Cir. Mar.31, 2008). First, a plaintiff must establish a *prima facie* case of retaliation by producing evidence that: (1) the plaintiff

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

was engaged in statutorily protected conduct; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision. *Drago v. Jenne,* 453 F.3d 1301, 1307 (11th Cir.2006); *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1336 (11th Cir.1999). Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.*Farley,* 197 F.3d at 1336. If the employer meets its burden of production, then the burden shifts back to plaintiff to prove that the employer's proffered reason is merely pretext for unlawful retaliation. *Id.*

**1. Prima Facie Case**

\*24 For purposes of its Motion for Summary Judgment only, Defendant does not challenge Plaintiff's ability to meet the first prong of the *prima facie* case, that Plaintiff engaged in protected activity. (Doc. No. 46 at p. 24.)However, Defendant denies that Plaintiff can prove the second and third prongs, that there was any adverse action suffered on account of the alleged retaliation and that there was a causal connection between the protected conduct and the adverse action. (*Id.*)

**a. Protected Activity**

Plaintiff claims that Defendant, through the actions of Mr. Dezelan,[FN16] retaliated against him when he began complaining about racial discrimination in approximately mid-2006.[FN17]In his deposition, Plaintiff stated that he complained specifically to Doug Ferguson, an Assistant Managing Director, and Vernon Jones, a Senior Manager in the Office of Contractor Relations. (Doc. No. 54-12 at pp. 251-52.)Plaintiff spoke with Mr. Ferguson "several times on the phone" and met with him in person in the "latter part of 2006." (*Id.* at p. 253.)He estimates that he spoke with Mr. Ferguson about discrimination "in excess of ten times." (*Id.* at p.

315-17.)Similarly, Plaintiff had "in excess of 30 conversations with Mr. Jones" about discrimination. (*Id.* at pp. 281, 314-15.)He could not recall the exact dates of these conversations.(*Id.* at p. 315.)Plaintiff testified more generally that whenever he complained to Mr. Ferguson or Mr. Jones about discrimination, Mr. Dezelan would soon thereafter escalate his disparate treatment of Plaintiff. (Doc. No. 54-13 at pp. 307-315.)Such testimony suggests that Plaintiff began making continuous complaints of discrimination around mid-2006, and Defendant has offered no evidence or argument to the contrary.

> FN16. In his Response, Plaintiff does not offer any argument that Mr. Hinds retaliated against him; therefore, the Court will only consider the actions of Mr. Dezelan in this Section. (*See* Doc. No. 68 at pp. 16-17.)

> FN17. The record is not clear as to when Plaintiff allegedly engaged in statutorily protected activity, that is, complained of racial discrimination. In his Affidavit, Plaintiff suggests he first complained about such discrimination around the middle of 2006. (Doc. No. 54-3 at p. 2, ¶ 5.) The record evidence does not, however, reveal the exact number of times Plaintiff complained or the precise dates of these complaints.

**b. Adverse Action**

In making out a claim of retaliation, to establish that challenged conduct constitutes an adverse action, a plaintiff must demonstrate that the action was materially adverse from the standpoint of a reasonable person in the plaintiff's position. *Davis,* 516 F.3d at 978 n. 52 (citing *Burlington N. & Sante Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415-16, 165 L.Ed.2d 345 (2006)). The United States Supreme Court has explained that an action is "materially adverse" if it "well might have dissuaded a reasonable worker from making or sup-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

porting a charge of discrimination."*Burlington N. & Sante Fe Ry. Co.,* 126 S.Ct. at 2415 (citation and quotation marks omitted.) This legal standard is intentionally general "because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."*Id.*

Plaintiff has produced evidence that Mr. Dezelan's actions against Plaintiff were materially adverse. For instance, in his deposition, Plaintiff testified:

Q: How do you feel you were retaliated against?

A: In the interference of my day-to-day operation, ... in the attacking of my person, in the attacking of my drivers and the escalation of customer service calls that every other contractor receives on a daily basis to conversion of making them formal complaints.

*25 (Doc. No. 54-12 at p. 339.)Plaintiff further testified:

Q: How do you claim you were retaliated against by FedEx?

A: Russ Dezelan is FedEx. Any action taken by Russ Dezelan, as far as I'm concerned, is an action taken against me by FedEx.

Q: What actions do you feel were retaliation?

A: The increase in problems with packages, the hesitance by FedEx to contract my routes, even though I was promised repeatedly that it would be the next to be contracted. There are other things, at this time I just can't recall.

(Doc. No. 54-13 at pp. 305-07.)Also, Plaintiff has offered evidence that during the 2006 peak season in December, Mr. Dezelan pulled Plaintiff off Saturday deliveries and assigned those deliveries to white contractors. (Doc. No. 54-20 at pp. 185-87, 195-97.)This evidence, if believed by a jury, would constitute materially adverse actions against Plaintiff.

**c. Causal Connection**

To prove a causal connection, a plaintiff need only demonstrate "that the protected activity and the adverse action were not *wholly unrelated.*"*Farley,* 197 F.3d at 1337 (citations omitted). According to the Eleventh Circuit, "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action."*Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1354 (11th Cir.1999). This awareness may be established either by direct or circumstantial evidence. *Brown v. Metro. Atlanta Rapid Transit Auth.,* No. 06-16434, 2008 WL 60279, at *6 (11th Cir. Jan.7, 2008); *see also Bass,* 256 F.3d at 1119 (stating that to establish a causal connection, the decision maker's awareness of the protected activity might be established by circumstantial evidence, such as "close temporal proximity between the protected activity and the adverse action"); *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004) ("[I]n the absence of other evidence tending to show causation" a party might establish causation by showing a very close temporal proximity between the protected activity and the adverse action).

Plaintiff testified in his deposition that he complained about Mr. Dezelan's racial discrimination to Vernon Jones in the Department of Contractor Relations. (Doc. No. 54-12 at pp. 251-53, 271-84, 307, 313-17; Doc. No. 54-13 at pp. 313-315.)He also testified that he complained to the regional manager, Doug Ferguson:

Q: Is there a particular date or a particular time frame during which you feel that the issues with your packages increased?

A: It's not just issue[s] with packages, it's overall complaints or the threats that complaints were becoming excessive, the threats that I wasn't servicing my routes the way that I should, in addition to the problems with being called back for packages. Each time that I would make calls to Contractor Relations to complain about Dezelan,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

Contractor Relations would say that they would speak to him and that the instances should decrease, whereas they increased. When speaking to the regional manager at the time, Doug Ferguson, about the issues with Dezelan and my concerns, he told me to go directly to Dezelan and let him know that I had spoken to [Ferguson] about these issues and even though I had done that, there was still escalation. So each time that I made protest to someone other than Dezelan and it got back to him, he would increase his retaliation, his discrimination, all of his antics.

*26 (Doc. No. 54-13 at pp. 307-09.)A jury could infer from this testimony that there was a close temporal proximity between Plaintiff's complaints of discrimination and Mr. Dezelan's adverse actions against him.(*Id.*)

Additionally, Plaintiff has stated under oath that the number of formal customer complaints charged against his drivers escalated dramatically after he began complaining of discrimination in mid-2006. (Doc. No. 54-3 at p. 12, ¶ 41.)Other employees also observed that towards the end of Plaintiff's time as a contractor with FedEx, Mr. Dezelan treated Plaintiff worse after Plaintiff made his complaints. (Doc. No. 54-16 at p. 69; Doc. No. 54-17 at p. 66.)Thus, Plaintiff has produced evidence that raises a genuine issue of material fact that Mr. Dezelan's adverse actions were causally connected to Plaintiff's complaints of discriminatory treat- ment.

**2. Legitimate Nondiscriminatory Reason and Pretext**

Since Plaintiff has established genuine issues of material fact as to his *prima facie* case of retaliation, the Court next considers whether Defendant has met its burden of production to articulate a legitimate, non-retaliatory reason for its actions. *See Farley,* 197 F.3d at 1336. As explained in detail above, Defendant has produced evidence that the issues that Plaintiff faced were commonly shared

among all contractors due to staffing shortages and general mismanagement. *See* Section II.B.2, *supra.*Therefore, the burden of production shifts back to Plaintiff to produce evidence raising a genuine issue of material fact that Defendant's articulated reasons were pretextual or unworthy of belief. *See Farley,* 197 F.3d at 1336.

As also discussed above, Plaintiff has produced evidence of pretext. *See* Section II.B.3, *supra.*Plaintiff testified that Mr. Dezelan's treatment of him worsened after he complained about Mr. Dezelan's discrimination. (*E.g.,* Doc. No. 54-13 at pp. 307-09.)Other employees noticed that Mr. Dezelan appeared to single Plaintiff out more frequently towards the end of Plaintiff's time as a contractor. (*E.g.,* Doc. No. 54-16 at p. 69; Doc. No. 54-17 at p. 66.)Defendant's legitimate, nondiscriminatory reasons do not explain this escalating disparate treatment. Therefore, Plaintiff has raised a genuine issue of material fact that Defendant's reasons are pretextual. Accordingly, the Court must deny Defendant's Motion for Summary Judgment on Count II.

**D. Count IV: Breach of Implied Covenant of Good Faith and Fair Dealing**

Under Florida law,[FN18] the implied covenant of good faith and fair dealing is a part of every contract. *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1291 (11th Cir.2001). Rather than serving as an independent term within a contract, however, the covenant attaches to the performance of a specific contractual obligation. *Id.* Therefore, an action for breach of this covenant cannot be maintained in the absence of breach of an express contractual provision. *E.g., Burger King Corp. v. Weaver,* 169 F.3d 1310, 1316-18 (11th Cir.1999); *Ament v. One Las Olas, Ltd.,* 898 So.2d 147, 149 (Fla. 4th DCA 2005) (quoting *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.,* 710 So.2d 573, 575 (Fla. 4th DCA 1998)) ("a duty of good faith must relate to the performance of an express term of the contract").[FN19]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

FN18. As the Court explained in its Order at Docket Number 91, both parties rely exclusively on Florida law to support their contractual arguments. (*See, e.g.,* Doc. No. 46 at pp. 26-28; Doc. No. 68 at p. 19.)Neither party mentions the choice of law provision in the Pick-Up and Delivery Contractor Operating Agreement calling for the application of Pennsylvania law. (Doc. No. 78-2 at p. 33; Doc. No. 79-2 at p. 32.)Since the Court has not been asked to enforce this provision, and both parties cite Florida law in their arguments, the Court will also apply Florida law.

FN19. This standard is narrower than the one afforded by Section 1981(b) which applies more generally to impairment with "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

*27 Defendant moves for Summary Judgment on Count IV of the Complaint, arguing that Plaintiff has not alleged that Defendant breached an express provision of the Contract. (Doc. No. 46 at pp. 27-28.)Defendant argues:

In this case, Munnings has not alleged-nor could he, given the undisputed record evidence-that FXG breached an express provision of the Agreement. In fact, Munnings fails to identify any specific provision of the Contractor Operating Agreement in support of his claim. Instead, Munnings identifies some abstract and independent obligation by FXG, claiming that it somehow failed to cooperate with Munnings in providing a standard of service that is fully competitive with that offered by other national participants in the industry, and failed to provide sufficient volume of packages to Munnings.... Such abstract allegations do not support his claim. *See Burger King Corp.,* 169 F.3d at 1316 (finding that "[w]ith respect to [a] breach of an implied duty of good faith, a duty of good faith must relate to the performance of an express term of the contract and

is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.").

(*Id.* at p. 28.)Defendant's reliance on *Burger King Corp.* is misplaced, however, because Plaintiff has alleged a breach of express contractual terms:
Moreover, since the inception of this action, Munnings's claim is based on the following express terms: first, that FXG failed to cooperate with Munnings in providing a standard of service that is fully competitive with that offered by other national participants in the industry; and, second, that FXG failed to provide sufficient volume of packages to Munnings to make full use of his equipment.

(Doc. No. 68 at p. 19.)The relevant provisions of the contract are cited above in Section II.B. 1.a. Therefore, Defendant's arguments that Plaintiff has not *alleged* a breach of an express contractual term fail.

Next, Defendant argues that "Munnings has no evidence to support [his claim] that [Defendant] denied him a standard of service provided by others in the industry, and denied him [a] sufficient volume of packages."(Doc. No. 46 at p. 28.)Plaintiff responds that he has produced evidence of the loading problems which prevented Plaintiff from "meeting [Defendant's] loading requirements" and "grow[ing] his business." (Doc. No. 68 at p. 20.)While this evidence shows that Defendant may have interfered with Plaintiff's ability to meet his obligations under the contract and maximize his benefits, it does not show a breach of the term indicating the parties will provide "a standard of service that is fully competitive with that offered by other national participants in the industry."Furthermore, Plaintiff has not offered any evidence as to the *national* industry standard with which the Court could compare Defendant's conduct.[FN20]Finally, this contractual provision relates to *customer* service and does not guarantee that Defendant will provide *Plaintiff* with a given level of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

service. (*See* Doc. No. 78-2 at p. 22; Doc. No. 79-2 at p. 21.)Therefore, Plaintiff has failed to establish breach of this contractual provision.

> FN20. While Plaintiff describes his perception of the local Orlando business practices of DHL and UPS, Plaintiff has offered no evidence of the national industry standard. (*See* Doc. No. 54-3 at p. 12, ¶ 42.)

*28 Plaintiff also states that "[a]mple evidence also shows that FXG failed to provide [a] sufficient volume of packages to Munnings to make full use of his equipment."(Doc. No. 68 at p. 20.)While Plaintiff has offered evidence that his drivers were unable to *deliver* packages due to loading issues or equipment failures, Plaintiff has not offered any evidence that he was provided an inadequate *volume* of packages. (*See id.* at p. 12, ¶ 19.)Therefore, Plaintiff has also failed to establish breach of the second contractual provision.

Thus, Plaintiff, who bears the burden of proof, has not provided evidence raising a genuine issue of material fact to support a claim that Defendant breached the implied covenant of good faith and fair dealing.^FN21^ Therefore, Defendant is entitled to judgment as a matter of law, and the Court must grant Summary Judgment for Defendant on Count IV.

> FN21. Plaintiff offers the deposition testimony of Vernon Jones in which Mr. Jones opined that if Mr. Dezelan acted in a racial discriminatory manner, such conduct would violate the terms of the operating agreement. (Doc. No. 54-15 at p. 12; Doc. No. 68 at p. 20 .)However, Plaintiff has not identified any express contractual provision that prohibits racial discrimination. (*See* Doc. No. 68 at pp. 19-20.)Thus, Plaintiff's argument that Mr. Jones' opinion establishes breach of an express contractual term fails.

### Conclusion

Based on the foregoing, the it is **ORDERED** and **ADJUDGED** that:

1. The Court **GRANTS IN PART AND DENIES IN PART** the Motion for CaseDispositive Summary Judgment, Statement of Undisputed Material Facts, and Supporting Memorandum of Law by Defendant FedEx Ground Package System, Inc. (Doc. No. 46, filed Dec. 21, 2007). Summary Judgment is **GRANTED** on Count IV and **DENIED** on Counts I and II.

2. The Court **DENIES** the Motion to Strike and for Sanctions and Incorporated Memorandum of Law by Plaintiff Javano Munnings (Doc. No. 50, filed Jan. 15, 2008).

3. Construing Plaintiff's Notice of Withdrawal of Two Claims as a Motion for Voluntary Dismissal of Two Claims, the Court **DISMISSES WITH PREJUDICE** Counts III and V of the Complaint (Doc. No. 52, filed Jan. 21, 2008).

4. The Court **GRANTS IN PART AND DENIES IN PART** the Motion to Strike Affidavits and Other Evidence Filed in Opposition to Defendant's Motion for Case-Dispositive Summary Judgment and Supporting Memorandum of Law By Defendant (Doc. No. 60, filed Feb. 7, 2008). The Court **GRANTS** the Motion as to the Affidavit of Gary Wolford and **DENIES** the rest of the Motion.

**DONE and ORDERED.**

M.D.Fla.,2008.
Munnings v. Fedex Ground Package Systems, Inc.
Slip Copy, 2008 WL 1849003 (M.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.