IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRENCE LONG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:07-CV-881-WKW [WO] |
| | ) | |
| ARONOV REALTY MANAGEMENT, | ) | |
| INC.*, et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Several motions for summary judgment in this case are ripe for resolution.  Prior to

Plaintiffs' Amended Complaint (Doc. # 43), Defendant Meiying Forney ("Forney") filed a

motion for summary judgment (Doc. # 35), with a supporting brief (Doc. # 36), as did

Defendants Aronov Realty Management ("Aronov Management") and Amy Clark Knudsen

("Knudsen") (Docs. # 37 & 38).  Plaintiffs subsequently amended their complaint to add

Aronov Realty Brokerage, Inc. ("Aronov Brokerage") as a defendant.  (Doc. # 43.)  Aronov

Brokerage filed a motion for summary judgment (Doc. # 50), with a supporting brief (Doc.

# 51), and Aronov Management filed a second motion for summary judgment (Doc. # 52),

with a supporting brief (Doc. # 53).  Plaintiffs responded to Forney's motion (Doc. # 56), and

responded to all other Defendants in one response (Doc. # 57), and filed an evidentiary

submission for all claims (Doc. # 58).  Forney replied (Doc. # 63), and Aronov Management,

Aronov Brokerage, and Knudsen filed a combined reply (Doc. # 64), with evidentiary

submission (Doc. # 65).  Based upon careful consideration of the arguments of counsel, the

relevant law and the record as a whole, the motions are due to be denied in part and granted in part.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1331, 1343(a)(4), 2201, and 2202.  The parties do not contest personal jurisdiction or venue, and there are allegations sufficient to support both.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Terrence Long ("Long") and Barry Barr ("Barr") are suing Defendants for discriminating against them on the basis of race when they attempted to lease and purchase real estate in Montgomery, Alabama. (Am. Compl.)  Plaintiffs allege violations of 42 U.S.C. § 1981 and 42 U.S.C. § 1982, and request declaratory and injunctive relief, compensatory and punitive damages, retention of jurisdiction for enforcement, costs, reasonable attorney's fees, prejudgment interest, and any additional relief deemed just and equitable. (Am. Compl. ¶¶ 31-40 & p.7.)  Long and Barr filed suit October 2, 2007 (Doc. # 1), and Defendants answered (Docs. # 7, 8, 10).  In June 2008, Plaintiffs filed a motion to amend their complaint to add Aronov Brokerage. (Doc. # 33.)  The first summary judgment motions were filed after that, but before the Amended Complaint.  The second set of summary judgment motions, in addition to Aronov Brokerage's answer (Doc. # 48), followed the Amended Complaint. Pending are three additional motions that will be resolved by separate order, the Motion for Leave to File Defendants' Amended Witness List (Doc. # 68), the Motion for Leave to Use

Ben Kushner's Video Deposition as Trial Testimony (Doc. # 74), and the Motion for Leave to Use Sam McGhar's Video Deposition as Trial Testimony (Doc. # 75), all filed by both Aronov entities and Knudsen.

The following facts are undisputed.[1]  Long is a former major league baseball player who is African-American, and Barr is a Caucasian male.  At the time of the alleged conduct, Knudsen was a commercial real estate broker for Aronov Brokerage, which is a wholly-owned subsidiary of Aronov Management.[2]  In the spring of 2007, Long and Barr discussed opening a sports bar that would cater to African-Americans.[3]  That May, Knudsen showed Barr a commercial space for lease in the LeCroy Village Shopping Center ("LeCroy").  LeCroy is owned by Forney.  Knudsen assisted Forney in leasing the space even though Knudsen and Forney no longer had a written agency agreement for that space.[4]  Not long after meeting with Knudsen, Barr offered to buy the entire LeCroy shopping center for one

---

[1] Aronov Management and Knudsen include a section in their brief for describing "material undisputed facts."  (Mot. Summ. J. Br. Aronov Management & Knudsen 3.)  Those facts that are verified as undisputed are included in this section, as are any additional undisputed facts.  Material disputed facts will be discussed as they arise, and the facts will be viewed in the light most favorable to Plaintiffs.  Occasionally, record citations are given for important or controversial facts.

[2] Knudsen worked for Aronov Management prior to working for Aronov Brokerage.

[3] The nature of this discussion and the business relationship between Barr and Long, however, is not undisputed.

[4] Knudsen had a written agreement with Forney to lease the space at one point, and Knudsen actively rented spaces in LeCroy for Forney until the agreement expired, at which time Knudsen continued to rent LeCroy spaces for Forney without a written agreement.  (Knudsen Dep. 50-51, June 23, 2008 (Pls.' Evidentiary Submission Ex. C).)

million dollars, with a ten-percent sales commission, to be paid by Forney. Forney rejected the offer without presenting a counteroffer.

Also shortly after Barr's meeting with Knudsen, Mark Cranage ("Cranage") contacted Knudsen, who arranged for him to view the space. Don Little ("Little"), an attorney working for Forney, opened the space up, showed Cranage around, and discussed leasing options with him. Unbeknownst to Little, Barr had arranged for Cranage to visit the space because Barr was suspicious that he was being discriminated against; Cranage videotaped the meeting.[5] Eventually, a preexisting tenant with Forney negotiated a lease for the space.

At issue in this case is whether Knudsen and Little[6] impermissibly discriminated against Long and Barr when they tried to lease a space in LeCroy or purchase LeCroy. Of the Defendants, only Knudsen and Forney face personal liability, and Forney, for the offer to purchase only. The other Defendants face vicarious liability – for Forney because Knudsen and Little were allegedly her agents,[7] for Aronov Brokerage, on the basis of employer liability, and for Aronov Management, on the basis of employer liability or because Knudsen was allegedly an agent. Liability for all Defendants depends principally upon two separate but interrelated events – the attempt to lease the LeCroy space and the attempt to

---

[5] (Barr Dep. 166-67, Apr. 15, 2008 (Pls.' Evidentiary Submission Ex. A).)

[6] Little is not a defendant, but Plaintiffs have premised Forney's liability, in part, on Little's actions. (*See, e.g.*, Pls.' Resp. Br. to Def. Forney's Mot. for Summ. J. 19-20.)

[7] Plaintiffs admit in their response that, at least with respect to the leasing arrangement, "[Forney's] liability is premised upon the actions of her agents," and that the claim against Forney "does not rise and fall on her knowledge of [anyone's] race." (Pls.' Resp. Br. to Forney 20.) This admission appears to be limited, however, to Forney's role in the lease negotiations.

4

purchase LeCroy.  The most salient disputed facts relate to Knudsen's meeting with Barr, and Little's meeting with Cranage.

### III.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its

claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Celotex*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). If the evidence on which the nonmoving party relies, however, "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). "A mere 'scintilla' of evidence supporting the

[nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (Plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV.  DISCUSSION

**A.      The Alleged Underlying Discriminatory Conduct**

Plaintiffs claim Defendants impermissibly discriminated against them on the basis of race, violating their contractual and property rights under the civil rights statutes.[8]  Section 1981 states, in relevant part, that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  § 1981(a).  The elements for a cause of action are: "'(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.'"  *Kinnon v. Arcoub, Gopman & Assocs.*, 490 F.3d 886, 891 (11th Cir. 2007) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)).

Section 1982 is similar to § 1981, "except that it focuse[s], not upon rights to make and enforce contracts, but rights related to the ownership in property."  *CBOCS W., Inc. v. Humphries*, 128 S. Ct. 1951, 1955 (2008).  Section 1982 states, in relevant part, "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to . . . purchase, lease, [and] sell . . . real . . . property."  § 1982.  The elements of a § 1982 claim "parallel" those of a § 1981 one: A plaintiff must show the same first two elements, and "interference with the rights or benefits connected with the ownership of property."  *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004); *CBOCS W., Inc.*,

---

[8] Whether Long has standing to raise these claims is addressed later in the opinion.  For purposes of this section, both Plaintiffs are treated identically.

128 S. Ct. at 1956 (noting that Supreme Court precedents "have long construed §§ 1981 and 1982 similarly" and that the only difference in the statutes' language is the set of rights protected); *see, e.g.*, *Lawrence v. Courtyards at Deerwood Ass'n*, 318 F. Supp. 2d 1133, 1150 (S.D. Fla. 2004). Defendants argue that Plaintiffs have failed to meet the second and third elements of each claim, discriminatory intent and abridged rights.[9] (Mot. Summ. J. Br. Aronov Management & Knudsen 13.)

### 1.   *The Lease*

#### a.   **Direct Evidence of Discriminatory Intent**

Direct evidence of discriminatory intent satisfies the second element of a *prima facie* case – discriminatory motive. *See Kinnon*, 490 F.3d at 891. "Direct evidence of discrimination is evidence, that, 'if believed, proves [the] existence of [a] fact in issue without inference or presumption.'"[10] *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (per curiam) (alteration in original) (quoting *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999)). "'[O]nly the most blatant remarks, whose intent could be

---

[9] Section 1981 "prohibits discrimination based upon an . . . an interracial association" as well. *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986). Thus, discrimination in this case, at least theoretically, could be predicated not only on discrimination against Long for his race (or against Barr for his alleged business partnership with Long), but also for Barr's association with Long, or either or both Defendants' association with clientele of a specific race. *See also Kelser v. Alcazar Shriners*, No. 2:06-cv-818, 2007 WL 484551, at *2 (M.D. Ala. Feb. 9, 2007) (Watkins, J.).

[10] The distinction between direct and circumstantial evidence of discriminatory intent is not always readily discernible. Indeed, in instances where courts, including the Eleventh Circuit, have found direct evidence, there still is an *inference* that must be drawn between the evidence of discriminatory intent and the adverse action. Only when a person states, for example, "You cannot lease this property because you are black," is there *no* inference to be made (aside from the necessary inference between the comment and state of mind). Clearly, courts have recognized "direct" evidence presented in circumstances less direct than that.

nothing other than to discriminate' on the basis of some impermissible factor" is direct evidence. *Schoenfeld*, 168 F.3d at 1266 (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).

The direct evidence of discriminatory intent in *Kinnon* was a voice mail during which the defendant called the plaintiff a "'nig--r trying to sound important.'" *Kinnon*, 490 F.3d at 889 (quoting the record) (alteration added). In a more analogous case addressing direct evidence, *EEOC v. Alton Packaging, Corp.*, 901 F.2d 920 (11th Cir. 1990), a witness testified that the general manager at the plant with authority for making employment decisions said that "'if it was his plant, he wouldn't hire any black people.'" *Id.* at 922 (quoting the record). The court found this statement constituted direct evidence of discrimination. *Id.* at 924.[11] Similarly, in *Caban-Wheeler v. Elsea*, 71 F.3d 837 (11th Cir. 1996), a statement by a decision-maker that "he wanted a black person to have a white employee's job" was direct evidence that the white employee was terminated for racially discriminatory reasons. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citing *Caban-Wheeler*, 71 F.3d at 842-43).[12]

In this case, Barr testified that when he met with Knudsen to see the rental space, she told him that "they didn't want a black club there and they didn't want that Celebrations

---

[11] *Alton Packaging Corp.*, however, was not a § 1981 case.

[12] *See also Lamothe v. Bal Harbour 101 Condo. Ass'n*, No. 07-11321, 2008 WL 800041, at *1-2 (11th Cir. Mar. 27, 2008) (per curiam) (The supervisor's comment about plaintiff that "'only a Haitian with brain cancer would write a note like that,'" stated contemporaneously with firing plaintiff, was direct evidence.)

thing." (Barr Dep. 153.) Celebrations was a business Barr ran but it had closed just prior to meeting with Knudsen. (Barr Dep. 47, 50, 112.) The last iteration of Celebrations' format was as a "hip hop" bar, where the clientele visited to "dance and drink." (Barr Dep. 263.) Prior to its closing, Celebrations received negative media attention, especially during the ultimately unsuccessful process of the government's attempt to shut it down. (Barr Dep. 257-62.) Knudsen expressed her concerns about having a bar like Celebrations before Barr told her that he ran it. (Barr Dep. 153.)

Defendants argue that Knudsen's comments are subject to more than one interpretation and that evidence subject to more than one interpretation cannot be direct evidence of discriminatory intent.[13] (Mot. Summ. J. Br. Aronov Management & Knudsen 14-16.) "The undisputed evidence shows," Defendants argue, "that Knudsen's concern was not one of race; it was merely about the bad publicity Celebrations had received for criminal activity." (Mot. Summ. J. Br. Aronov Management & Knudsen 15.) This argument is unpersuasive, however, when considering the evidence in favor of the nonmovant. Knudsen's comment about "black club[s]" was made *separately from* her comment about Celebrations and "all that crap going on out there." (Barr Dep. 153.) Knudsen stated "they didn't want a black club there *and* they didn't want that Celebrations thing." (Barr Dep. 153

---

[13] The arguments are asserted by different Defendants, depending on which Defendant's liability is at stake. "Defendants" will be used to discuss arguments raised by any one of the defendants, or several, if the identity of the defendant is not relevant to the outcome of the arguments. Arguments Aronov Brokerage makes in its motion for summary judgment duplicate the applicable arguments in Aronov Management and Knudsen's first motion for summary judgment.

(emphasis added).)  Also, in his deposition, Barr was asked whether Knudsen stated that "they didn't want a black club there," to which he replied "[w]ord for word."  (Barr Dep. 156-57.)  Knudsen's comment about "black club[s]" was made separately from what was arguably just a comment about preferring no rowdy or notorious clubs.

Defendants' argument – that Knudsen's statements were solely focused on the negative publicity Celebrations brought (Mot. Summ. J. Br. Aronov Management & Knudsen 15-16) – arguably would be more persuasive had Knudsen stated they did not want a black club *like* Celebrations in the rental space.  When a factfinder reasonably could infer that a statement was "nothing more than an observation of a fact," in this case, that Celebrations was predominately frequented by African-Americans, the statement is not direct evidence of discriminatory intent.  *Wilson*, 376 F.3d at 1087.  Knudsen explained, however, that they did not want a "black club" *and* that they did not want a club like Celebrations.  Stated in that way, Knudsen's comment on race was not an *observation* about Celebrations' clientele.[14]

Defendants also argue that Knudsen's comments are not direct evidence because Knudsen was not a decision-maker with respect to accepting or rejecting an offer to lease the property.[15]  (Mot. Summ. J. Br. Aronov Management & Knudsen 14-15.)  Defendants' argument assumes, however, that the basis for liability is Forney's decision to reject the lease,

---

[14] Besides, Knudsen claims that she was not aware that Celebrations catered to African-Americans.  *See infra* note 17.

[15] The question of whether Knudsen was a decision-maker for purposes of finding direct evidence of discriminatory intent is separate from whether the Aronov entities are vicariously liable for her actions.

but conduct prior to accepting or rejecting a lease can violate a plaintiff's rights under the relevant statutes.[16]  Because Knudsen's conduct alone can be the basis of liability,[17] a determination of Knudsen's role in *Forney's* decision-making process is therefore not necessary at this point.

Finally, to be direct evidence of discriminatory intent, evidence must also "indicate that the complained-of [action] was *motivated* by [the person's state of mind]."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999).  Barr testified that he had told Knudsen what he and Long were envisioning for the space – a sports bar for African-Americans.  (Barr Dep. 154.)  From that point on, Knudsen was therefore aware that Barr was planning on opening a sports bar catering to African-Americans, and that he was

---

[16] *See* discussion on abridged rights *infra*.  Besides, "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person *involved* in the challenged decision."  *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095 (11th Cir. 2001) (emphasis added) (quoting *Trotter v. Bd. of Trustees*, 91 F.3d 1449, 1453-54 (11th Cir. 1996)), *abrogation on other grounds recognized by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).  In *Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999), a Title VII retaliation case Defendants cite at length (*e.g.*, Reply Br. Aronov Entities & Knudsen 9), the court rejected a theory of liability because the culpable employee was not a decision-maker.  *Clover*, 176 F.3d at 1349, 1356.  First, the court rejected employer liability because even though the employee was a part of department that reviewed and evaluated termination decisions as a general practice, the employee had not testified to authority to overrule the termination.  *Id* Second, there was no testimony that the employee recommended the termination to the decision-maker. *Id.*  There is circumstantial evidence in this case that Knudsen could have recommended to Forney that she not pursue negotiating a lease, but resolving the issue is not necessary now.  Knudsen's conduct alone can be the basis of liability.

[17] *See* discussion on abridged rights *infra*.

the former owner of a bar with a "black format"[18] (Barr Dep. 67).  Additionally, though a

temporal gap between comments evidencing intent and the adverse action can be a reason

for not finding direct evidence, *see, e.g.*, *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d

1223, 1227 (11th Cir. 2002), the relevant conduct in this case occurred contemporaneously

or shortly after Knudsen's comments allegedly evidencing discriminatory intent.

> **b.    Circumstantial Evidence of Discriminatory Intent**

Even if there is no direct evidence of intent, Plaintiffs have presented circumstantial

evidence sufficient to survive summary judgment.  The Eleventh Circuit has not yet clarified

whether the test for proving discriminatory intent with circumstantial evidence is the same

for § 1981 claims outside the employment context as it is for Title VII and § 1981 claims in

the employment context.  For proving an employment discrimination § 1981 claim by

circumstantial evidence, the *McDonnell Douglas* framework applies.[19]  Under the *McDonnell*

*Douglas* framework, once the plaintiff establishes a *prima facie* case of discrimination, the

burden shifts to the opposing party "to articulate some legitimate, nondiscriminatory reason"

for the action, and if met, the plaintiff must show that the stated reason is pretextual.

---

[18] Knudsen claims she was not aware that Celebrations was frequented by mostly African-Americans.  (Knudsen Dep. 115, 117.)  An issue of material fact exists to this question, however, as there is sufficient testimonial evidence that Celebrations catered to an African-American clientele and that media reports directly or indirectly disseminated this information.  Additionally, Knudsen was a real estate agent for commercial spaces in Montgomery.  A reasonable factfinder could find her claimed ignorance not credible.

[19] *E.g.*, *Sledge v. Goodyear Dunlop Tires N.Am., Ltd.*, 275 F.3d 1014, 1015 n.1 (11th Cir. 2001) (per curiam) ("The *McDonnell Douglas* standard for a prima facie case is applicable in employment discrimination suits brought under [§ 1981].").  The framework is based on the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  The *McDonnell Douglas*

*prima facie* test requires proof that the plaintiff was treated less favorably than a similarly-

situated person outside of his protected class.  *See, e.g.*, *Knight v. Baptist Hosp. of Miami,*

*Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam).  In *Kinnon*, however, the Eleventh

Circuit noted the district court "acknowledged that our circuit has not articulated a *prima*

*facie* test to apply in § 1981 cases involving commercial establishments, as opposed to

employment cases."[20]  490 F.3d at 889.[21]

    The Sixth Circuit applies the *McDonnell Douglas* framework to § 1981 claims outside

the employment context, but the court has adopted a tailored *prima facie* test for commercial

establishment cases.  *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872, 879 (6th Cir.

2001).  The plaintiff must prove he is a member of a protected class, that he "sought to make

or enforce a contract for services ordinarily provided by the defendant," and that the plaintiff

---

[20] *But cf. Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990) (noting that the *McDonnell Douglas* scheme "is routinely used in housing and employment discrimination cases alike").

    In *Munnings v. Fedex Ground Package Sys., Inc.*, No. 6:07-cv-282, 2008 WL 1849003, at *17 (M.D. Fla. Apr. 22, 2008), the district court noted the lack of clarity of the law in this circuit:

> As observed by Judge Story in the Northern District of Georgia, 'While courts have had little difficulty determining that the *McDonnell Douglas* burden-shifting test is the appropriate one, [c]ourts have struggled with the appropriate elements of a *prima facie* case to apply in the context of § 1981 claims.' *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1353 (N.D. Ga. 2005).  The Eleventh Circuit has applied the standard Title VII *prima facie* elements to Section 1981 claims of discrimination in employment. *E.g.*, *Howard [v. B.P. Oil, Inc.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994)].  However, the Eleventh Circuit has not yet articulated the appropriate *prima facie* elements to apply in cases outside of the traditional employment context. *Kinnon*, 490 F.3d at 889, 891, 893.

[21] Because the plaintiff could not show pretext in *Kinnon*, the court did not need to define the *prima facie* elements for a circumstantial non-employment § 1981 claim.  490 F.3d at 893.

"was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship." *Id.* at 872. To establish the third element, the plaintiff can show either that he was "deprived of services while similarly situated persons outside the protected class were not" *or* that he "received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." *Id.* at 874. This test "allows a plaintiff to state a claim when similarly-situated persons are not available," which, the *Christian* court noted, is often the case in commercial establishment claims. *Id.* at 873. The test is specifically designed to account for the unique challenges of showing similarly-situated individuals in the commercial establishment context. Arguably, that same justification resonates here, but a specifically-tailored *prima facie McDonnell Douglas* standard has not been articulated by the Eleventh Circuit. It also is not clear what test would apply for proving § 1982 claims circumstantially.

In *Kinnon*, the Eleventh Circuit declined to rule on the appropriate test for the *prima facie* elements of a § 1981 non-employment claim proven by circumstantial evidence, but the court did apply the *burden-shifting* part of *McDonnell Douglas*, and found the plaintiff had failed to rebut the legitimate, non-discriminatory reason the defendant had offered for the conduct. *Kinnon*, 490 F.3d at 893 (Kinnon failed to show evidence that the defendant's reasons for the late delivery and surcharge on her order were pretextual. *Id.* at 893-94.). Under the *McDonnell Douglas* framework, once a defendant has rebutted a plaintiff's *prima facie* case by "'articulat[ing] some legitimate discriminatory reason' for the alleged

discriminatory action," the plaintiff carries the ultimate burden of proving discriminatory intent, and can do that indirectly, by showing that the proffered reason for the alleged discriminatory conduct is pretextual. *Perryman v. Johnson Prods. Co.*, 698 F.2d 1139, 1142 (11th Cir. 1983) (quoting *McDonnell Douglas*, 411 U.S. at 802).[22]

The evidence on pretext "must reveal 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (applying *McDonnell Douglas* in a § 1981 employment case)).  Comparator evidence can be raised as a part of a showing of pretext. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276 (11th Cir.) (citing for one, *McDonnell Douglas*, 411 U.S. at 804), *reh'g denied*, 785 F. App'x 741 (11th Cir. 2008). Knudsen argues that the legitimate basis for her actions was "the adverse publicity regarding criminal activities at Celebrations."  (Mot. Summ. J. Br. Aronov Management & Knudsen 19.)  Knudsen's testimony bears that out.

Plaintiffs have offered evidence, however, that would allow a reasonable factfinder to conclude Knudsen's reasons were pretextual.  Even if her statements about a "black club" are insufficient as direct evidence, they nevertheless can be circumstantial evidence that Knudsen's otherwise benign excuse – that a place like Celebrations would damage the

---

[22] *Kinnon* cites *Perryman* for these points. *Kinnon*, 490 F.3d at 893-94.

property – was pretextual.  *See Vessels*, 408 F.3d at 770 ("Even where such evidence of race bias proves insufficient to prove [a] [plaintiff's] case through direct evidence, it can be relevant in the circumstantial framework to show that the [defendant's] proffered reasons were pretextual.").

There also is additional evidence relevant to pretext.  After Barr's disclosure that he was associated with Celebrations and after he told Knudsen of his plans for the space, Knudsen quoted Barr a rental rate of $4500 per month.[23]  (Barr Dep. 154.)  Barr told Knudsen that the space would need $100,000 to $150,000 in improvements.[24]  (Barr Dep. 156.)  Knudsen told Barr that there would be no leasehold improvements at all.  (Barr Dep. 159.)  When Little showed Cranage the rental space, however, Little told Cranage that Forney would be willing to charge half rent for the first six months for the amount of the expenses, as long as they were reasonable.[25]  (Video Tr. 18-19, June 13, 2007 (Pls.' Evidentiary Submission Ex. A to Ex. I).)  Little also stated that "they" were trying to "avoid" and "dodge" the "Celebrations guy" from securing the place, and when Cranage asked if the

---

[23] Knudsen testified that $4500 was what Forney wanted for the space and that it was a dollar amount per square foot based on the current market rate for that type of property.  (Knudsen Dep. 177-78.)

[24] Knudsen argues that Barr discussed improvements costing $300,000, and that he mentioned that they would need to move a nearby tenant out of his space.  (Knudsen Dep. 103-04.)  Barr testified that though he asked about moving another tenant out, "it wasn't part of the criteria."  (Barr Dep. 188.)

[25] Even when Little's comments are not attributable to other parties as a matter of vicarious liability, an issue addressed later in the opinion, they can still be circumstantial evidence of Knudsen's or Forney's lease communications.  Knudsen testified to discussing the lease and Barr's interest in the space, with Little (Knudsen Dep. 152), and he was at least in contact with Forney as her attorney on other matters.

"Celebrations guy" had made an offer, Little responded: "Oh, yeah. Yeah.  I mean, she even gave him a high-a-- rent and s---, he didn't blink.  Now, naturally, he's going to do it through someone else."  (Tr. 21.)  Little also noted that "these are big white tenants.  And sometimes drug s---, black ghetto fight situation kicks off there, they're all leaving.  And the landlord ain't going to put up with that."[26]  (Tr. 26.)

It is not only Little's meeting with Cranage that bolsters a claim of pretext, but also Knudsen's treatment of Cranage as it compares to her treatment of Barr.  Cranage worked for an establishment that featured a variety of bands, and mainly catered to white clientele.[27] (Cranage Dep. 30, June 24, 2008 (Pls.' Evidentiary Submission Ex. G).)  When Cranage called Knudsen, she expressed an interest in showing him the space.  (Cranage Dep. 42.) Cranage also discussed rent concessions with Knudsen for improvements to the space amounting to $10,000 or $15,000.[28]  (Cranage Dep. 58-60.)  Prior to Cranage's contact with Knudsen, however, Barr had asked Knudsen if he could see the space again.  (Barr Dep. 184.)  Barr testified that when he called Knudsen, she asked him if his client was still Long,

---

[26] Little also stated the following, but without reference to Knudsen or Forney: "And, by the way, what would you do – what would you be willing to include in the lease about something to keep the parking lot quiet? Because let me tell you, you've got a group of old white tenants, white people."  (Tr. 26.)  At one point, Little did qualify that "what [he] mean[s] by 'they' don't like the music I like, I'm talking about it don't matter if it's black or white or whatever.  I mean, there's as many white kids out there wearing the chains around their neck and all of that other crap that I don't want them in my place, you know."  (Tr. 28.)

[27] Cranage testified, though, that the bar was starting to attract more African-Americans because of the strong military presence.  (Cranage Dep. 30.)

[28] The space is currently rented for $4103 per month, some of which covers utilities, and the current tenant received about six months of free rent to "build out."  (McGhar Dep. 19-20, Aug. 19, 2008 (Defs.' Additional Evidentiary Submission Ex. A).)

and after he replied in the affirmative, she stated the property was tied up in bankruptcy and that he could not get into the space.[29]  (Barr Dep. 184-85.)  Only after Little showed Cranage the rental space, when Barr called Knudsen again, this time asking about a back-up lease, did Knudsen relent and offer that she might be able to get in touch with the attorney to see the space.  (Barr Dep. 178-79.)

Defendants argue that Plaintiffs cannot identify a similarly-situated person not associated with African-Americans, or not African-American, who was treated more favorably than Barr.  (Mot. Summ. J. Br. Aronov Management & Knusden 20.)  Defendants argue first, that the current tenant for the property had to make improvements only in the range of $10,000.  (Mot. Summ. J. Br. Aronov Management & Knusden 18.)  Barr testified, however, that Knudsen offered *no* rent concessions for improvements to Barr.  Cranage too is a similarly-situated person with respect to determining whether Plaintiffs were discouraged and deterred from renting the LeCroy space.  Cranage was white and involved in an establishment catering mainly to whites.  Cranage was treated more favorably than Barr.  Though Cranage's establishment's reputation was less controversial than Celebrations', Knudsen's treatment of Cranage did not occur in a vacuum.  She treated Cranage more favorably than Barr *in the context of* her comments to Barr about "black club[s]," in addition

---

[29] Knudsen offered the following as an explanation: "[Barr] wanted to go back and see it right then and there, and I can't just drop – I couldn't just drop everything at that moment," especially considering that at the last meeting, she had waited "an hour and a half" for Long, who never showed up. (Knudsen Dep. 126.)  Knudsen also explained that showing the space to Barr did not seem "urgent" because he had already seen the property, and he had made no indication that his terms from the first meeting had changed and Forney had been made aware of the "problems" with leasing according to those terms (*e.g.*, the improvements).  (Knudsen Dep. 137-38.)

to the circumstantial evidence from Little's meeting with Cranage. That evidence combined is enough that a reasonable factfinder could find Knudsen's reason for her conduct was pretextual – that the excuse that Celebrations was rowdy was pretext for excluding "black club[s]."[30]

### c.   Conduct Abridging Plaintiffs' Rights

Defendants argue that Plaintiffs cannot establish that the alleged conduct abridged their rights under § 1981 and § 1982. (Mot. Summ. J. Br. Aronov Management & Knudsen 20.) The cases Defendants cite do not directly address the conduct a plaintiff must engage in to fall within the ambit of either statute. Defendants rather assume that because neither Plaintiff offered to lease the LeCroy space, Plaintiffs cannot establish their rights were violated under the statutes. (Mot. Summ. J. Br. Aronov Management & Knudsen 22.) Plaintiffs counter that Barr "attempted to engage in lease negotiations" and "attempted to put a back up lease on the property," and that the actions are not outside the statute just because Defendants "refused to deal with [Plaintiffs] in the leasing of the property and a written lease was never presented." (Pls.' Resp. Br. to Aronov Entities & Knudsen 17, 18 (citing relevant though non-precedential case law).)

---

[30] Defendants have offered additional counter-evidence. For example, Knudsen submitted an affidavit that describes the number of African-American tenants in LeCroy that she helped to place. (Knudsen Aff. (Defs.' Additional Evidentiary Submission Ex. D).) The rulings in this opinion, however, are wed to the summary judgment standard; Defendants' evidence can be a matter for trial. It is just this sort of dispute, frequently implicating motives and intent, that juries are best suited to resolve.

The rights protected by § 1981 include the ability to make a contract, *Kinnon*, 490 F.3d at 891, and the Supreme Court "has broadly construed [§ 1982] to protect not merely the enforceability of property interests acquired by black citizens but also their right to *acquire* and use property on an equal basis with white citizens," *City of Memphis v. Greene*, 451 U.S. 100, 120 (1981) (emphasis added). Section 1982 covers "'every racially motivated refusal to sell or rent.'"[31] *Greene*, 451 U.S. at 121 (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 421-22 (1968)). Thus, the "unequal application of defendants' rental criteria" between a black plaintiff and white applicants has been held to violate § 1981 and § 1982.[32] *Marable v. H. Walker & Assocs.*, 644 F.2d 390, 397 (5th Cir. Unit B May 1981)[33] (finding that the unequal application of the rental criteria of marital status and employment and credit histories discriminatory).[34] The Eighth Circuit has gone so far as to find the civil rights statutes prohibit "all forms of discrimination, sophisticated as well as simpleminded, and thus disparity of treatment between whites and blacks, burdensome application procedures, and

---

[31] In *Greene*, the Court specifically noted as an example of cases broadly defining property rights a lower court case on "discrimination in modes of *negotiation* for sale of property." 451 U.S. at 122 n.35 (emphasis added) (discussing *Newbern v. Lake Lorelei, Inc.*, 308 F. Supp. 407 (S.D. Ohio 1968)).

[32] The plaintiff in *Marable*, however, did apply for tenancy, unlike the plaintiffs here. *Marable v. H. Walker & Assocs.*, 644 F.2d 390, 393 (5th Cir. Unit B May 1981).

[33] Decisions of Unit B of the former Fifth Circuit are binding precedent in this circuit. *Stein v. Reynolds Sec. Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

[34] The court in *Marable* found that the district court erred in not considering comparative evidence that demonstrated pretext. *See* discussion on circumstantial evidence *supra*.

tactics of delay, hindrance, and special treatment."[35]  *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974).

---

[35] Also potentially relevant is the futile gesture doctrine.  In the employment context, the futile gesture doctrine allows a plaintiff who never applied for an employment position to "nonetheless establish a prima facie case [of employment discrimination] by showing that she refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1274.  "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting and application." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977); *Darby v. Heather Ridge*, 806 F. Supp. 170, 174 (E.D. Mich. 1992) ("The doctrine recognizes that the class of victims of racial discrimination are not limited to those who first apply for employment and are rebuffed by overt discrimination, but also includes those who are discouraged from applying by a well-known, discriminatory policy.").

This reasoning seems as applicable in housing discrimination – that a plaintiff could still sue even if she never made a formal lease or purchase offer.  In fact, the Fourth Circuit explicitly adopted the doctrine as a basis for § 1981 and § 1982 liability outside of the employment context. *Pinchback*, 907 F.2d at 1450-51.  Because "fair employment and fair housing statutes . . . have traditionally facilitated the development of common or parallel methods of proof when appropriate," the court extended the doctrine to fair housing claims. *Id.* at 1451 (noting, however, that the *prima facie* test from *McDonnell Douglas* was a "fundamental part" of fair housing law, which is not the case in this circuit).  Establishing a fair housing violation under the futile gesture doctrine requires proof that: (1) the plaintiff was a member of a racial minority, a bona fide potential buyer (renter), and financially capable of purchasing (leasing) property when it was offered for sale (rent); (2) the owner discriminated against people of the plaintiff's race; (3) the plaintiff was reliably informed of this policy of discrimination and did not take steps to procure (lease) the property because of it; and (4) the owner would have discriminated against the plaintiff had he disclosed an interest in the property. *See id* at 1452.

The parties in this case have not argued for the doctrine, nor is it clear that it is applicable.  At the very least, however, the Eleventh Circuit recognizes it, and its application in this circumstance is sensible.  A version of this doctrine seems to even have surfaced in a housing discrimination case in the former Fifth Circuit, *Lee v. S. Home Sites Corp.*, 429 F.2d 290 (5th Cir. 1970).  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981).  In *Lee*, the court stated that for any person who could present a letter received from Southern Home Sites offering to sell lots but explicitly requiring buyers to be white, and "who [could] show by competent evidence that, in good faith, he was either deterred or prevented from acquiring a lot by reason of the racial restriction" was "[o]bviously" entitled to relief. 429 F.2d at 297.  Indeed, it would undermine the purposes of anti-discrimination laws to hold that they do not prohibit discrimination that *deters* rental and sales offers, and "[a] narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866, from which § 1982 was derived" *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969).

It is arguable, however, that not all negotiations fall under the civil rights statutory provisions.  In *Grant v. Smith*, 574 F.2d 252 (5th Cir. 1978), the former Fifth Circuit distinguished between discrimination under the civil rights statutes and discrimination under 42 U.S.C. § 3604, the Fair Housing Act.  The court stated that § 3604(b) – which prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling," among other things – was in a "similar vein" as the civil right statutes.  *Grant*, 574 F.2d at 255.  In those circumstances, it stated, a plaintiff's "good faith or lack of it would be pertinent to the claims."  *Id.*  "The same is not true," the court continued, for claims asserted under sections (a) and (d) of § 3604, which prohibit (a) the refusal to sell or rent after making a bona fide offer, as well as the refusal to negotiate or otherwise make unavailable or deny, and (d) the representation that any dwelling is not available for inspection, sale, or rental.  *Grant*, 574 F.2d at 255.  The court explained that "[b]oth negotiation and inspection involve aspects of real estate dealing which often *precede the formation of any intent to buy or rent* on the part of a prospective customer."  *Id.* (emphasis added).

There is at least, however, a question of material fact as to whether Plaintiffs intended to lease the space (assuming "good faith" is indeed required for a § 1981 or § 1982 violation and "good faith" does not require a presentation of an official written lease).  Barr expressed an interest in renting the space during the meeting with Knudsen.  Any comments he may have made about the *possibility* of renting other spaces did not foreclose expressing an interest in the LeCroy space.  He followed up with Knudsen.  He offered to purchase the

same shopping area.  He even asked about a back-up lease.  At some point, his interest in pursuing the space may have blended with or crossed over into his interest in confirming his suspicions that Knudsen was discriminating against him, but there is no clear evidence that Barr did not act with a good faith interest in leasing the property.

In summary, therefore, even with the current lack of clarity on the law, there is a question of material fact as to whether Barr's attempt to rent Lecroy's space was an abridged right, and whether Knudsen's role in thwarting that attempt was motivated by discriminatory intent.[36]

### 2.    The Sale

#### a.    Knudsen's Role

After Barr met with Knudsen, Barr, through Grant Sullivan ("Sullivan"),[37] made an offer to purchase LeCroy for one million dollars, with a ten-percent commission to be paid by Forney.[38]  Sullivan handled the transaction.  Knudsen received the purchase and sales agreement from Sullivan by fax.  (Knudsen Dep. 121.)  According to Knudsen, Forney was e-mailed, and Knudsen scanned and faxed the agreement to her.  (Knudsen Dep. 122.)

---

[36] With respect to the discussion on direct evidence, Knudsen was clearly directly involved in "decision-making" in this sense – she was involved in aspects of the rental process that deterred Barr from renting: showing the space, negotiating the lease, or facilitating progress in the transaction.

[37] Sullivan was also the one who initially contacted Knudsen on behalf of Barr to lease the LeCroy space.  (Sullivan Dep. 9, June 24, 2008 (Second Mot. Summ. J. Aronov Management Ex. H).)

[38] Sullivan testified that he never found the property listed for sale, nor was he aware that it was for sale.  (Sullivan Dep. 19.)  Barr just approached Sullivan and expressed wanting to make an offer to purchase the property.  (Sullivan Dep. 19-20.)

Knudsen testified that Forney rejected the offer and declined to even propose a counteroffer because the offer was "so far below what she needed to get out of the center." (Knudsen Dep. 122.)   Knudsen claims that she called Sullivan and just told him there was no counteroffer and that Forney had declined the offer, to which he did not respond favorably. (Knudsen Dep. 123.)  She claims Barr called later to apologize for Sullivan's reaction, and to inquire further about leasing the space in LeCroy, though it does not appear that Barr pushed purchasing LeCroy. (Knudsen Dep. 123-24.)

There is no evidence to dispute what role Knudsen played in Barr's offer to purchase LeCroy, and in Forney's rejection.  Sullivan testified to not recalling any conversation with Knudsen about the contract, and having no reason to believe Knudsen did not present the contract to Forney. (Sullivan Dep. 14 (Reply Br. Forney Ex. 3).)[39]  Even though Sullivan stated that it was "unusual" for an owner to reject a contract outright without making a counteroffer (Sullivan Dep. 18 (Reply Br. Forney Ex. 3)), that fact is only relevant to Forney's, not Knudsen's behavior.  In fact, according to Sullivan's testimony, Knudsen supplied him with information (*e.g.*, rental income, expenses) for calculating the value of the property based on the net operating income. (Sullivan Dep. 20 (Reply Br. Forney Ex. 3).) Additionally, after the offer was rejected, Barr did not propose offering a higher price. (Sullivan Dep. 20-21.)

---

[39] Aronov Management and Forney submitted different pages of Sullivan's deposition.  The citations from Forney's submission are specially designated.

Forney testified that when an offer for purchasing LeCroy was submitted, "[n]either Knudsen [n]or anyone else at Aronov played a role in [Forney's] decision not to make a counteroffer to Barr." (Forney Decl. ¶ 9 (Second Mot. Summ. J. Aronov Management Ex. C).) Forney's testimony that "[Barr's] offer was so much lower than the previous asking price of $1.9 million that [she] decided not to make a counteroffer to him" (Forney Decl. ¶ 9) confirms Knudsen's testimony on how the transaction was handled. There is no evidence sufficient for surviving summary judgment to show that Knudsen's role in the purchase transaction, at any point of the process, was other than as a reliable conduit. Liability premised on Knudsen's discriminatory actions *at the time of the purchasing proposal* has not been adequately shown.

### b.    Forney's Role

Knudsen's conduct prior to the purchasing proposal only matters insomuch as it may have affected why Forney later rejected the offer. Plaintiffs appear to premise Forney's liability for the sales discrimination on Forney's personal conduct as well.[40] (Pls.' Resp. Br. to Forney 31 (describing evidence allegedly showing pretext on the part of why *Forney* rejected the offer).) Plaintiffs argue that based upon circumstantial evidence, Forney discriminated against them with respect to the sales purchase. (Pls.' Resp. Br. to Forney 30.)

---

[40] Plaintiffs do not clearly parse personal from vicarious liability at critical stages in their arguments. As Defendants note, "Plaintiffs do not apply their theories of liability to each of the agency relationships alleged to exist in this lawsuit." (Reply Br. Aronov Entities & Knudsen 5.)

Plaintiffs contend that they have "easily" met the standard for establishing a *prima facie* case for housing discrimination and have also demonstrated pretext. (Pls.' Resp. Br. to Forney 30.) The case Plaintiffs rely upon to set out the *prima facie* elements (Pls.' Resp. Br. to Forney 29), however, addresses the legal framework for discrimination cases brought under the Fair Housing Act of 1968 and Title VII only. In that case, *Secretary, U.S. Dep't Hous. & Urban Dev. ex rel. Herron v. Blackwell*, 908 F.2d 864 (11th Cir. 1990), the court agreed with the Administrative Law Judge that the *McDonnell Douglas* test governed the *Fair Housing Act* case.[41] *Id.* at 870. The case did not concern § 1981 nor § 1982 claims.

Regardless, Plaintiffs fall short of proving pretext.[42] Forney's reason for rejecting Barr's offer is that it was significantly lower than the former asking price. Even Barr acknowledges that this reason is at least legitimate. (*See* Barr. Dep. 286 (stating that it was "[c]orrect" that "if [Forney] didn't feel it was worth it – that it was worth more than a million dollars, that would be good business on her part, to not accept a million," regardless of the

---

[41] *Blackwell*, 908 F.2d at 870 ("In this case, the ALJ applied the legal framework developed by the federal courts in discrimination cases brought under the Fair Housing Act of 1968 and Title VII of the Civil Rights Act. We agree with the ALJ that the three-part burden of proof test developed in *McDonnell Douglas* governs *in this case*." (citations omitted) (emphasis added)). The court cited a Sixth Circuit case, *Seldon Apartments v. U.S. Dep't Hous. & Urban Dev.*, 785 F.2d 152 (1986), that applies the test to a Fair Housing Act claim *and* to § 1981 and § 1982 claims. *Id.* at 159. In light of the prior discussion on the role of *McDonnell Douglas* in non-employment § 1981 and § 1982 claims in the Eleventh Circuit, a citation to a Sixth Circuit opinion applying *McDonnell Douglas* to housing discrimination under § 1981 and § 1982 does not determine definitively, the applicable test for this case, especially when the Eleventh Circuit was citing the case with respect to Fair Housing Act claims only.

[42] As noted above, the Eleventh Circuit in *Kinnon* avoided determining the appropriate *prima facie* test to apply in a non-employment § 1981 claim because Kinnon could not prove pretext.

28

offeror's race).)[43]  Plaintiffs argue, however, that there is no explanation for why Forney did

not extend a counteroffer.  (Pls.' Resp. Br. to Forney 30.)  Forney did offer a legitimate

explanation for that too – that the offer was so low.  (Forney Decl. ¶ 9.)

Plaintiffs' reasons for why that reason is pretextual are weak.  Though they point to

Knudsen's and Little's comments, they fail to draw out the inference between those

comments and *Forney*'s actions.  Knudsen testified that by the time Barr was persistently

pushing a back-up lease, Forney had been informed that he wanted $300,000 in

improvements and to move the other tenant out, and that he was the former owner of

Celebrations.  (Knudsen Dep. 137.)  Forney argues, however, that "[t]here is no evidence in

the record before the [c]ourt that any information was provided to [Forney] about [Barr]

*when the sales contract was presented to her* by [Knudsen]."  (Reply Br. Forney 6 (emphasis

added).)  Knudsen testified in addition that Forney never made discriminatory remarks to her

(Knudsen Dep. 170), and in her declaration, Forney stated that Knudsen never mentioned the

race of a prospective tenant or prospective purchaser, or the race of their clientele (Forney

Decl. ¶ 7).

Plaintiffs point to no proof that Knudsen or Little told Forney that Celebrations was

a predominantly "black club," or that Barr was planning a sports bar for African-American

clientele with an African-American business partner.  It is understandable that the evidence

could be sparse, given the nature of what Plaintiffs are trying to prove, but pointing to

---

[43] In fact, Forney would only have netted $900,000.

Knudsen's and Little's comments alone is not sufficient to show that Forney's legitimate reason for declining the offer to purchase was pretextual. Also, Little's comments about the landlord's attitude toward black tenants interfering with her white tenants shed less light on what Forney would have preferred had the ownership *of the entire shopping complex* changed hands. Plaintiffs have failed to raise a genuine issue of material fact that Forney's reasons for rejecting the offer and not offering a counteroffer in response were pretextual.

**B.  Vicarious Liability**

**1.  *Aronov Brokerage***

Aronov Brokerage has not challenged its vicarious liability as Knudsen's employer. Knudsen was acting as a "transaction broker" with respect to leasing Forney's space in LeCroy. (Harris Dep. 28, June 23, 2008 (Pls.' Evidentiary Submission Ex. J).) A transaction broker is "the type of relationship that a real estate company defaults to when there is no written agreement with one of the parties." (Mot. Summ. J. Br. Aronov Brokerage 4.) It was *as an employee* of Aronov Brokerage that Knudsen was a transaction broker. (Harris Dep. 19.)[44]

**2.  *Aronov Management***

Aronov Management's second motion for summary judgment challenges its liability as Knudsen's alleged employer; Aronov Management filed it after Aronov Brokerage was added to the complaint. (Second Mot. Summ. J. Br. Aronov Management 1-2.) Plaintiffs

---

[44] (See Harris Dep. 27-28 for more explanation.)

argue Aronov Management is liable for Knudsen's alleged discriminatory conduct on two theories: (1) because Aronov Management was a joint employer with Aronov Brokerage; and (2) because Knudsen was acting as an agent on behalf of Aronov Management.  (Pls.' Resp. Br. to Aronov Entities & Knudsen 32-33.)

### a.    "Single Employer" Liability

Aronov Brokerage is a wholly-owned subsidiary of Aronov Management, an entity that buys, sells, develops, and leases real property.  Aronov Brokerage leases and sells Aronov Management properties, but unlike Aronov Management, does not manage property. The two companies: (1) share some office space; (2) use the same 401(k) plan; (3) use the services of the human resources division of Aronov Management, though Aronov Brokerage must pay for using those services; (4) outsource their payroll to a third-party payroll processor, funded by Aronov Management, which then receives reimbursement from Aronov Brokerage; and (5) share five officers in common (five of Aronov Management's eight, and five of Aronov Brokerage's seven).  The companies do not share tax identification numbers, and employees receive W-2 forms from their respective employing companies.   The companies have separate employee policies, meetings, and stationary, and the companies reimburse employees separately.

An officer of both companies, Scott Harris ("Harris"), Aronov Brokerage's Senior Vice President and a qualifying broker for both companies, oversees profitability and personnel for both companies' brokerage, commercial, and industrial divisions, and leases

and sells property. He received separate checks from both entities until he received his salary by direct deposit. Harris was Knudsen's supervisor at Aronov Management and after she changed employers to Aronov Brokerage.

Aronov Management hired Knudsen in 2003 as a commercial leasing agent. At Aronov Management, she needed special permission to rent spaces outside of the Aronov Management portfolio. Knudsen's paycheck came from Aronov Management until August 2006, and she used its business cards. When she became an employee of Aronov Brokerage, she was allowed to focus on leasing and selling other commercial property as well.[45] Since August 2006, Knudsen's salary and commission have come from Aronov Brokerage. Aronov Brokerage is the qualifying company on her real estate license. She is not eligible for certain reimbursements or a mobile phone from Aronov Management.[46]

Plaintiffs claim that Aronov Brokerage and Aronov Management are joint employers, but apply the test for determining whether two companies are a single employer. (*See* Pls.' Resp. Br. to Aronov Entities & Knudsen 32.) Whether two entities are joint employers or a single employer are two distinct inquiries.[47] "A 'joint employer' relationship is different

---

[45] In Knudsen's brokerage capacity, she could focus on leasing or selling any real estate. (Harris Dep. 44-45.)

[46] (Second Mot. Summ. J. Br. Aronov Management 3-5.) Plaintiffs do not appear to dispute the preceding facts. (*See* Pls.' Resp. Br. to Aronov Entities & Knudsen 8-9.)

[47] *See, e.g.*, *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997) ("Although the State also uses the term 'joint employer' in its brief to this Court, plaintiffs have never argued that [the parties] acted as their 'joint employer.' . . . As other courts have explained, these concepts are analytically distinct." (citations omitted) (citing *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1360 n.6 (11th Cir. 1994), for one)).

from, though sometimes confused with, a 'single employer' situation." *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1360 n.6 (11th Cir. 1994).

> A "single employer" situation exists "where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" The single employer standard is relevant when "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise.'"

> In contrast, in a "joint employer" relationship, there is no single integrated enterprise. A conclusion that employers are "joint" assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly.

*Clinton's Ditch Coop. Co. v. NRLB*, 778 F.2d 132, 137 (2d Cir. 1985) (citations omitted) (cited by the Eleventh Circuit in *Virgo*, 30 F.3d at 1359 n.6). "The single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise . . . ." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997). The parties' arguments are focused on this test.

"The showing required to warrant a finding of single employer status has been described as 'highly integrated with respect to ownership and operations.'" *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987) (quoting *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 726 (N.D. Ala. 1981)). The relevant factors, borrowed from standards promulgated by the National Labor Relations Board are "(1) the interrelation of

operations;[48] (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Id.* (internal footnote added). Not every factor must be present; nor is any single factor controlling. *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 n.5 (11th Cir. 1999) (en banc); *Harriel v. Dialtone, Inc.*, 179 F. Supp. 2d 1309, 1311-12 (M.D. Ala. 2001) (DeMent, J.). The single employer analysis ultimately "concentrate[s] on the degree of control an entity has over the [allegedly liable conduct]" on which the suit is based. *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998).

   *McKenzie* applied the single employer test in a Title VII context. 834 F.2d at 933; *see also Thornton v. Mercantile Stores Co.*, 13 F. Supp. 2d 1282, 1291 (M.D. Ala. 1998) (noting that a parent and subsidiary can be viewed as a single employer for Title VII liability). The Eleventh Circuit, however, has not applied the "single employer" test to § 1981 and § 1982 non-employment claims.[49] The basis for the "single employer" test is tied

---

   [48] Indicia of interrelated operations include combined accounting records, bank accounts, lines of credit, payroll preparation, switchboards, phone numbers, and offices. *E.g.*, *Walker v. Boys & Girls Club of Am.*, 38 F. Supp. 2d 1326, 1332 (M.D. Ala. 1999) (Albritton, C.J.).

   [49] Nevertheless, one federal court in this state claims the single employer test has been "employed widely in civil rights acts." *Kennan v. Matchmaker Int'l, Inc. of Mobile*, No. 98-0515, 1999 WL 33590522, at *4 (S.D. Ala. Jan. 20, 1999) (citing *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 763 (5th Cir. 1997)). Because of that, the court states, the same analysis "has been employed in a wide variety of *labor and employment* cases . . . to Title VII cases, to ADEA cases." *Id.* (emphasis added) (citations omitted). *Kennan* continued by noting that the test is employed more often to the parent-subsidiary relationship and that its analysis "draws on the reasoning developed in corporate veil-piercing and alter-ego doctrine cases." *Id.* (citing circuit court cases).
   In *Schweitzer*, the Fifth Circuit introduced the single employer test by stating that "[i]n *civil rights actions*, 'superficially distinct entities may be exposed to liability upon a finding they represent a single, integrated enterprise: a single employer.'" 104 F.3d at 764 (emphasis added) (quoting *Trevino v. Celanese Corp.*, 701 F.3d 397, 391 (5th Cir. 1983)). The Fifth Circuit has gone through the single

to the language in Title VII.  "A liberal construction must be accorded to the term: employer," *McKenzie*, 834 F.2d at 933, but as the case *McKenzie* cited clarifies, it is the term employer "*as used in Title VII*" that was "meant to be liberally construed," *Trevino v. Celanese Corp.*, 701 F.3d 397, 403 (5th Cir. 1983) (emphasis added).  *Accord Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977) (cited by *McKenzie*, 834 F.2d at 933).[50]

Even assuming that the single employer theory applies to liability for non-employment claims under § 1981 and § 1982, however, Plaintiffs have failed to create an issue of material fact as to Aronov Management's liability as an employer under a single employer theory of liability.  In *McKenzie*, the court found a single employer based on a number of factors: both companies were founded and owned by the same family; one company owned the majority of the other company's stock; the company shared the same president, who also controlled personnel management for both companies and issued payroll checks from the same company, signed by the same people; the companies advertised as "twins in service;" and the plaintiff worked as an insurance agent for one company while she worked at the other.  834 F.2d at 933-34.  In *Llampallas*, however, the court found no single employer when one company was not involved in the adverse employment action (termination), had no interaction with the other company's employees, made no decisions that affected the terms

_____

employer analysis for a § 1981 claim, but expressly assumed that the test applied in that context without deciding whether it did.  *See Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 343 (5th Cir. 2005).

[50] Though § 1982 should also be broadly construed, neither § 1981 & § 1982 uses the term "employer."

35

and conditions of the other company's employees, and was "completely uninvolved" in the operation of the other company.  163 F.3d at 1245.

In *Thornton*, the district court expounded at length on the facts relevant to the four single employer factors, denying summary judgment on single employer liability.  On the interrelation of operations, the court discussed that the moving party: handled the wholly-owned subsidiary's banking operations; paid vendors supplying products; retained control over the yearly operating budget; made all hiring, firing, transfer and promotion decisions for the subsidiary's senior employees; maintained significant contact with the subsidiary's human resources managers; distributed a handbook setting policies and procedures to subsidiaries; operated centralized management information services for subsidiaries; provided centralized "risk management" for its subsidiaries; allowed subsidiary employees to transfer among subsidiaries without requiring new paperwork; managed all the subsidiaries' benefit programs; and provided extensive training for subsidiary employees. 13 F. Supp. 2d at 1291-92.  Furthermore, there was no evidence that the subsidiary reimbursed the parent company for the services it provided or that the interrelated activities were "'mutually convenient arrangements' that could be characterized as 'armslength transactions between separately organized legal entities.'"  *Id.* at 1292.  Evidence of control of labor relations included control over aspects of the subsidiaries' other policies and practices, and overriding control over hiring and firing decisions.  *Id.* at 1292-93.  Most of the senior officials of the parent company also held senior management positions with the

subsidiary. *Id.* at 1294; *see also Landon v. Agatha Harden, Inc.*, 6 F. Supp. 2d 1333, 1338-42 (M.D. Ala. 1998) (DeMent, J.) (similarly denying summary judgment and providing an extensive analysis).

This case lies somewhere between the interrelation of the companies in *McKenzie* and *Thornton* and that in *Llampallas*.  Aronov Management and Aronov Brokerage have overlapping officers, share office space, and use the same human resources division and third-party payroll company (though importantly, Aronov Brokerage pays for using both), but Knudsen's compensation comes from Aronov Brokerage, it was the qualifying company on her real estate license, she was walled off from the employment benefits her former employer offered, and her job description changed when she transferred employers, thereby freeing her to work with properties outside Aronov Management's portfolio.  Her supervisor, however, did not change.  Aronov Management argues though that Harris wears two hats, and that when he supervised Knudsen, he did so "in his capacity as the qualifying broker for Aronov Brokerage."  (Second Mot. Summ. J. Br. Aronov Management 9.)  But Harris controlled personnel management for claims in both companies.

The role of Harris is particularly important because the "single employer" analysis is aimed at determining liability based upon the degree of control a company had over the alleged employee's discriminatory conduct.  Harris, who was managing personnel for and an officer of both companies, supervised Knudsen both at the old and new company.  That fact undermines Aronov Management's argument that it had no control over Knudsen's

conduct.  At the same time, as Aronov Management argues, Harris had dual capacities, and

Plaintiffs present no additional facts challenging this characterization.[51]  If Harris in his role

as an Aronov Brokerage employee supervised Knudsen, and there are no additional indicia

of the companies' overlap besides sharing officers at the top level and sharing office space,

Plaintiffs have failed to create an issue of material fact on the "single employer" question.

Indeed, a critical fact for determining whether Aronov Management controlled

Knudsen, was not addressed with sufficient evidence by either party[52]: which company had

control over hiring, disciplining, training, and firing Knudsen.  Aronov Management cites

*Hegre v. Alberto-Culver USA, Inc.*, 485 F. Supp. 2d 1367 (S.D. Ga. 2007), where the district

court did not find a single employer because though some management functions and

services were shared, "the issue remain[ed] 'who had control of the day-to-day operations

of the business and who had authority to hire and fire employees,'" *id.* at 1375 (quoting *Cruz-*

*Lovo v. Ryder Sys., Inc.*, 298 F. Supp. 2d 1248, 1253 (S.D. Fla. 2003)).  (Reply Br. Aronov

Entities & Knudsen 25.)  Aronov Management never mentions who at either company had

the capacity to hire, discipline, train, or fire Knudsen.  Missing the cue, Plaintiffs failed to

present evidence on any of those critical determinations.  Therefore, Aronov Management

---

[51] Plaintiffs only add that "[e]ven though [Harris] was on the Board of both companies and was Senior Vice President of both companies, Harris did not know if the companies in any way commingled their profits, losses or revenues, or whether they stood alone."  (Pls.' Resp. Br. to Aronov Entities & Knudsen 8-9.)

[52] Defendants did argue in their reply brief that "Aronov Management did not control Knudsen's status, schedule, or benefits as an Aronov Brokerage employee or real estate agent."  (Reply Br. Anonov Entities & Knudsen 25.)  The evidence Defendants cite, however, is not very clear or specific on the practices of hiring, firing, and other related supervisory actions.

prevails on whether it was a single employer with Aronov Brokerage and thus, liable. This assumes, of course, that the single employer test even applies.

### b.     Agency Liability

Aronov Management also had no principal-agent relationship with Knudsen to trigger liability. Plaintiffs' only argument is that Knudsen handed Barr a card that said "Aronov Realty Management" during their meeting.[53] (Pls.' Resp. to Aronov Entities & Knudsen 33.) In Plaintiffs' words, "[a]t that moment Barr believed he was dealing with a representative of Aronov Realty Management." (Pls.' Resp. to Aronov Entities & Knudsen 33.)

Knudsen was an employee of Aronov Brokerage at the time. As Plaintiffs neither challenge this fact nor respond to Aronov Management's arguments for why she lacked express or implied authority as its agent, Aronov Management's authority with respect to Knusden would have to have been apparent authority. Assuming common-law principles of agency apply,[54] Aronov Management is not liable for Knudsen's actions.

---

[53] Knudsen has disputed that she even gave Barr an Aronov Management card. She claims that she had thrown away all of her old Aronov Management cards, and that Barr may have received the card from someone else. (Knudsen Dep. 91.) If she did give him an Aronov Management card, it was, she says, because the card was in her car, which she had not cleaned out, and it was mixed up with her brokerage cards. (Knudsen Dep. 91.)

[54] Aronov Management is unclear if state or federal law should apply, so it argues under both. Courts look to common-law principles of agency to determine if a corporate defendant should be liable under Title VII for the acts of specific employees, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986), but this case does not involve employment discrimination, let alone Title VII. And yet the Eleventh Circuit recognizes direct liability for employers under § 1981, at least in the employment context, and determines agency based on common-law agency principles. *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1512, 1514 (11th Cir. 1989), *abrogated on other grounds*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Flanagan v. Aaron H. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989) ("Other circuits have held that, based on . . . general principles of agency law, liability may be imposed under § 1981 against a private employer for the acts of an employee." (citing *Vance*)).

"As a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have, as distinct from where the agent threatens to misuse actual power." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998).  Apparent authority only exists, however, "'to the extent it is *reasonable* for the third person dealing with the agent to believe that the agent is authorized.'" *Id.* (emphasis added) (quoting Restatement (Second) of Agency § 8 cmt. c (1957)[55]).  It is the *principal* that creates apparent authority, not because of its representation to the agent, but because of its representation to the third party.  *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1245 (11th Cir. 2002).  Apparent authority requires "'some manifestations, written or spoken words or conduct, by the principal, communicated . . . to the third party.'"  *Id.* (quoting *Prod. Promotions, Inc. v. Cousteau*, 495 F.2d 483, 493 (5th Cir. 1974)).[56]

However, not everything a principal gives an agent is an indicium of authority. Restatement (Third) of Agency § 3.11 cmt. d (2006) [hereinafter Restatement].  The governing principle is "whether a reasonable person would understand the item in the agent's

---

[55] "When applying agency principles to federal statutes, 'the Restatement (Second) of Agency . . . is a useful beginning point for discussion of general agency principles." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1245 (11th Cir. 2002) (omission in original) (quoting *Burlington Indus., Inc.*, 524 U.S. at 755).  Presumably, this applies to using the Restatement (Third) of Agency, cited *infra*, as well.

[56] Issues of apparent authority can arise when the actual authority of an agent to act on behalf of a principal is terminated.  Restatement § 3.11 cmt. c.  Under this "lingering authority" doctrine, until a third party has notice of circumstances that make it unreasonable to assume an agent's actual authority is ongoing or continuing, it is reasonable for the third party to assume actual authority even when that authority no longer exists.  *Id.*  The policy behind this doctrine is to protect third parties who interact with an agent on the basis of the principal's prior actions but who lack notice that the agent's actual authority has terminated.  *Id.*  As Barr testified that no prior dealings with Knudsen occurred while she was at Aronov Management, apparent authority in this case is not "lingering authority."

possession to express the principal's assent to be bound by actions taken by the agent." *Id.*
In other words, the item must "reflect authority *to bind the principal*." *Id.* (emphasis added).
For that reason, an agent's possession of the principal's letterhead stationary *does not by itself* constitute a "manifestation" that triggers apparent authority, although it may be relevant to its existence. *Id.* An agent's possession of stationary letterhead is different from its possession of the principal's power of attorney because the latter is "a written manifestation of the principal's assent." *Id.* Like the stationary letterhead, the Aronov Management business cards do not reflect the authority to bind Aronov Management. It was not reasonable for Barr to understand the card to express the principal's assent to be bound by Knudsen's actions. Nor is it credible that Barr thought about it one way or the other when he got the card. Accordingly, summary judgment is due to be granted in favor of Aronov Management on the issue of its liability on an agency theory.[57]

---

[57] Plaintiffs' arguments would also fail under state law. "The test for determining whether an agency existed by . . . 'apparent authority' is based upon the potential principal's holding the potential agent out to their parties as having the authority to act . . . ." *Malmberg v. Am. Honda Motor Co.*, 644 So. 2d 888, 891 (Ala. 1994). What determines apparent authority is the actions of the *principal*, not the agent. *Id.* Aronov Management relies on *Malmberg* for the proposition that "signs, logos, literature, brochures and similar writings" alone cannot establish apparent authority. (Second Mot. Summ. J. Br. Aronov Management 12.)

The basis for *Malmberg*'s holding, however, appears to be distinguishable. In *Wood v. Shell Oil Co.*, 495 So. 2d 1034 (Ala. 1986), the case upon which *Malmberg* relied, 644 So. 2d 891, the court found that those types of writings do not create an inference of agency because "it is common knowledge among the general public that such a logo is often displayed by independent dealers and that the only representation made by such displays is that [the logo company's] gasoline is sold at the service station." *Wood*, 495 So. 2d at 1039. *See also Malmberg*, 644 So. 2d at 891 (discussing Honda logos at an independently owned and operated Honda car dealership). The reliance was unreasonable because of the relationship of *independent car dealers* to the company on the logo.

Nevertheless, it is also common knowledge that business cards are easy to acquire or improperly used, and that a third party's reliance on the agent's authority to act should be based on something other than just a business card. Barr talked to Knudsen several times. He has also offered no evidence other

### 3.    *Forney's Liability*

Forney has not challenged her liability as a principal of Knudsen.  Her only challenge is to the underlying conduct.  The claim for the underlying conduct having survived summary judgment, the claim against Forney for Knudsen's actions in the leasing process must go forward to trial.  There is no basis for questioning whether Knudsen was Forney's agent.

Plaintiffs predicate Forney's liability, however, on Little's actions as well.  Plaintiffs argue that Little's comments were direct evidence of a discriminatory motive attributable to Forney because he was an agent acting on her behalf.  (Pls.' Resp. Br. to Forney 19-20.) Plaintiffs argue Little was an agent for Forney when he made the discriminatory remarks to Cranage because Little represented Forney in bankruptcy proceedings related to the property, he had a key to the property, he represented her in other matters related to collecting rent, and he drafted and negotiated a lease with Cranage.[58]  (Pls.' Resp. Br. to Forney 20.)

The evidence related to this determination is as follows.  According to Little, the trustee of the property provided him with keys to the space so that Little would be responsible for the assets still there during the bankruptcy proceedings, but when the

_____

than the business card. (Pls.' Resp. Br. to Aronov Entities & Knudsen 33.) *Cf. Chamlee v. Johnson-Rast & Hays*, 579 So. 2d 580 (Ala. 1990) (Hornsby, J., dissenting) (finding apparent authority based on the principal's manifestations, which included, *in addition to* the agent's showing a business card with the principal's name: the agent's showing potential buyers numerous properties by the principal and telling them that she could arrange a house to be built on those properties, advertisements that the principal was the listing *broker* for the property, using a contract that was a form contract with the principal's logo (this in emphasis), and the principal's accepting earnest money).

[58] Forney admits that she had a business relationship with Little – that he tried to collect monies for her when there were lease defaults, and that he handled a bankruptcy proceeding tied to the tenant in the LeCroy rental space. (Reply Br. Forney 2.)

bankruptcy court granted a relief from the stay, Little handed the keys to Knudsen.[59]  (Little

Dep. 10-16, Aug. 19, 2008 (Defs.' Additional Evidentiary Submission Ex. B).)   Little

testified that neither the Aronov entities nor Knudsen authorized him to make any statements

to Cranage, and that he was not acting in his capacity as a bankruptcy attorney for Forney.

(Little Dep. 22, 85-86.)  He claims he had no authority to lease space for Forney, and he

argues he never "leased or even showed a piece of [Forney's] property."  (Little Dep. 65.)

He also testified that he never drafted a lease for the property.  (Little Dep. 84.)  Little was,

in his words, "simply trying to facilitate getting a new tenant," and was "sales puffing."

(Little Dep. 84-85.)  Forney answered in response to interrogatories that only a Josh Hall and

Knudsen were authorized to act on Forney's behalf to lease or sell property at LeCroy.

(Forney's Resp. to Pls.' First Set Interrogs. & Reqs. Prod. Docs. ¶ 10.)

Neither party, however, has provided sufficient briefing on the applicable legal

standard to apply to the facts.  Forney is therefore provided the opportunity to supplement

her briefs to specifically address, in more detail (1) what type of agency law applies to the

question of Forney's liability for Little's underlying discriminatory conduct and (2) whether

Forney should face liability under that law *based on Little's actions with respect to the lease*.

Plaintiffs are given the opportunity to respond; there is no need for a reply brief.

Incidentally, the question of agency assumes that the underlying conduct of Little violates

---

[59] In response to Plaintiffs' interrogatories, Forney stated that she was not aware that Little had a
key to the LeCroy rental space.  (Forney's Resp. to Pls.' First Set Interrogs. & Reqs. Prod. Docs. ¶ 9
(Pls.' Evidentiary Submission Ex. D).)

the statutes, an issue not reached in this opinion.  The evidence as laid out in this opinion will provide the basis for any finding of the *underlying* conduct, but the parties may discuss whether his actions violate the relevant statutes.[60]

## C.    Long's Role

Defendants argue that Long was not involved in the purchase offer, and that therefore, his rights under § 1981 or § 1982 were not abridged.  (Mot. Summ. J. Br. Aronov Management & Knudsen 20.)  Because the purchasing (offer) claims have not survived summary judgment, this argument does not need to be resolved.  Defendants' arguments that Long never offered to lease the space were based on their arguments that Barr never made an offer (Mot. Summ. J. Br. Aronov Management & Knudsen 22), an issue discussed and resolved against Defendants *supra*.

Forney argues that because Long was never identified to her, she could not have discriminated against him.  (Reply Br. Forney 9.)  Forney's remaining liability, however, is predicated on the underlying conduct of Little and Knudsen with respect to the lease, so what Forney knew about Long is now irrelevant.  Barr testified that he told Knudsen that he was renting the space for Long and explained who he was.  (Barr Dep. 154.)  That testimony, absent sufficient challenging facts, creates a genuine issue of material fact as to what Knudsen knew about Long's business relationship with Barr, and whether she therefore discriminated against Long.  Defendants have not raised the issue of what Little knew about

---

[60] New evidence will not be considered by the court.

Long with respect to his underlying conduct, and there is testimonial evidence that Little and Knudsen discussed Barr's meeting with Knudsen during which Barr discussed Long.  The claims raised by Long, therefore, will go forward to trial.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that:

(1)    Knudsen's motion for summary judgment (Doc. # 37) is DENIED with respect to the allegations surrounding the lease but GRANTED with respect to the allegations surrounding the purchase offer.

(2)    Aronov Brokerage's motion for summary judgment (Doc. # 50) is DENIED in part and GRANTED in part on the same grounds as Knudsen's.

(3)    Aronov Management's second motion for summary judgment (Doc. # 52) is GRANTED and the claims against Aronov Management are dismissed with prejudice.

(4)    Forney's motion for summary judgment (Doc. # 35) is DENIED with respect to the allegations surrounding Knudsen's conduct with the lease, and GRANTED with respect to the allegations surrounding the purchase offer.  Forney is DIRECTED to file supplemental briefing on her liability with respect to the allegations surrounding Little's conduct with the lease, *in conformity with this opinion*.  Forney's brief is due **February 18, 2009**.  A response brief is due **February 25, 2009.**

DONE this 4th day of February, 2009.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE